1    BERNSTEIN LITOWITZ BERGER
        & GROSSMANN LLP
2    BLAIR A. NICHOLAS  (Bar No. 178428)
     (blairn@blbglaw.com)
3    TAKEO A. KELLAR  (Bar No. 234470)
     (takeok@blbglaw.com)
4    12481 High Bluff Drive, Suite 300
     San Diego, CA 92130
5    Tel:   (858) 793-0070
     Fax:  (858) 793-0323
6           -and-
     SALVATORE J. GRAZIANO
7    (sgraziano@blbglaw.com)
     HANNAH E. GREENWALD
8    (hannah@blbglaw.com)
     1285 Avenue of the Americas
9    New York, NY 10019
     Tel:   (212) 554-1400
10   Fax:  (212) 554-1444

11   Lead Counsel for Lead Plaintiff New
     York State Teachers' Retirement System

12

13                UNITED STATES DISTRICT COURT

14              CENTRAL DISTRICT OF CALIFORNIA

15

16   **IN RE NEW CENTURY**          Case No.  2:07-cv-00931-DDP
                                     **(JTLx)**
17                                   **(Lead Case)**

18
                                     **SECOND AMENDED**
19                                   **CONSOLIDATED CLASS**
                                     **ACTION COMPLAINT**
20

21                                   **JURY TRIAL DEMANDED**

22

23                                   **Judge:  Hon. Dean D. Pregerson**

24                                         By Fax

25

26

27

28

─────────────────────────────────────────────
SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 2:07-cv-00931-DDP (JTLx)

# TABLE OF CONTENTS

I.      NATURE OF THE ACTION ...................................................................1

II.     NON-FRAUD AND FRAUD CLAIMS ....................................................6

III.    JURISDICTION AND VENUE ...............................................................6

IV.     PARTIES ...............................................................................................7

        A.      Plaintiffs ....................................................................................7

        B.      Defendants ..................................................................................8

        1.      The New Century Officer Defendants ........................................8

        2.      The New Century Director Defendants.......................................11

        3.      Defendant KPMG .......................................................................16

        4.      The Underwriter Defendants .......................................................16

V.      CLASS ACTION ALLEGATIONS.........................................................18

VI.     FACTUAL ALLEGATIONS PERTINENT TO
        CLAIMS FOR RELIEF .........................................................................21

        A.      The Company's Formation And Rapid
                Growth........................................................................................21

        B.      Throughout The Class Period, New  Century
                Recognized Substantial Revenue  From
                Whole Loan Sales And Securitizations.........................................23

        C.      New Century's Financial Statements  Were
                Materially Misstated Throughout The Class
                Period And At The Time Of The Offerings ....................................25

        1.      Whole Loan Sales - GAAP Violations.........................................26

        2.      Securitizations Structured As Sales - GAAP
                Violations ...................................................................................53

        3.      Securitizations Structured As Financings -
                GAAP Violations ........................................................................62

        4.      Other GAAP Violations ..............................................................68

        D.      New Century's Underwriting And Loan
                Quality Declined, Rather Than Improved As
                Defendants Repeatedly Stated During The
                Class Period And At The Time Of The
                Offerings.....................................................................................72

        E.      New Century's Misstatements  Regarding
                Its Internal Controls....................................................................119

F.   New Century's Misstatements And
     Omissions During The Class Period And  At
     The Time Of the Offerings Were Material ....................................130

G.   Defendant KPMG's Numerous Violations
     Of Auditing Standards...................................................................134

VII.   THE OFFERING REGISTRATION
       STATEMENT AND PROSPECTUSES
       CONTAINED UNTRUE  STATEMENTS OF
       MATERIAL FACT ...........................................................................176

A.   The Series A Preferred Stock Offering .........................................176

B.   The Series B Preferred Stock Offering .........................................190

VIII.   CLAIMS FOR RELIEF UNDER THE
        SECURITIES ACT............................................................................213

        COUNT ONE ....................................................................................213

        COUNT TWO ....................................................................................217

        COUNT THREE..................................................................................219

        COUNT FOUR ...................................................................................223

IX.   FACTUAL ALLEGATIONS PERTINENT TO
      CLAIMS FOR RELIEF UNDER THE
      EXCHANGE ACT ...........................................................................225

X.   THE NEW CENTURY OFFICER
     DEFENDANTS AND DEFENDANT KPMG
     MADE MATERIALLY FALSE AND
     MISLEADING STATEMENTS DURING THE
     CLASS PERIOD ...............................................................................226

A.   2005 First Quarter Statements.......................................................226

B.   2005 Second Quarter Statements ...................................................239

C.   2005 Third Quarter Statements ......................................................250

D.   2005 Fourth Quarter Statements ...................................................261

E.   2006 First Quarter Statements.......................................................277

F.   2006 Second Quarter Statements ...................................................287

G.   2006 Third Quarter Statements .....................................................297

H.   New Century's February 7, 2007 And
     Subsequent Disclosures...................................................................311

I.   Post-Class Period Disclosures........................................................329

XI.    THE NEW CENTURY OFFICER
       DEFENDANTS ACTED WITH SCIENTER ...........................................334

XII.   DEFENDANT KPMG ACTED WITH
       SCIENTER ..............................................................................................351

XIII.  LOSS CAUSATION ...............................................................................358

XIV.   THE INAPPLICABILITY OF THE
       STATUTORY SAFE  HARBOR AND
       BESPEAKS CAUTION DOCTRINE .......................................................363

XV.    THE PRESUMPTION OF RELIANCE....................................................364

XVI.   CLAIMS FOR RELIEF UNDER THE
       EXCHANGE ACT ...................................................................................365

       COUNT FIVE...........................................................................................365

       COUNT SIX .............................................................................................367

       COUNT SEVEN .......................................................................................369

XVII.  JURY DEMAND.....................................................................................370

XVIII. PRAYER FOR RELIEF..........................................................................371

Lead Plaintiff, the New York State Teachers' Retirement System, and Plaintiffs Carl Larson and Charles Hooten (collectively "Plaintiffs") make the following allegations upon information and belief based upon all of the facts set forth herein which were obtained through an investigation made by and through Plaintiffs' Lead Counsel. Lead Counsel's investigation has included, among other things, a review of filings by Defendants with the United States Securities and Exchange Commission ("SEC"), press releases and other public statements issued by Defendants, the Final Report of Michael J. Missal, Bankruptcy Court Examiner (the "Examiner"), dated February 29, 2008 (the "Examiner's Report"),[1] and the other sources set forth below. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.     NATURE OF THE ACTION

1.     Plaintiffs bring this federal securities class action on behalf of themselves and all other persons and entities other than Defendants and their affiliates as specified below, who purchased or acquired New Century Financial Corporation ("New Century" or the "Company") common stock; New Century 9.125% Series A Cumulative Redeemable Preferred Stock ("Series A Preferred Stock"); New Century 9.75% Series B Cumulative Redeemable Preferred Stock ("Series B Preferred Stock"); and/or New Century call options and/or who sold New Century put options (collectively "New Century securities") during the time

---

[1]  "The Examiner sought to assess each of the relevant issues in a thorough, objective, fair, efficient and responsible manner, without the use of hindsight." Examiner's Report at 13. The Examiner's 551 page report is based on a review of a large volume of documents, including documents from the Company and KPMG LLP, and 110 interviews of 85 fact witnesses. Id. at 14, 16. "In addition, while the Examiner did not review and analyze all of New Century's statements in public filings and press releases, he identified several problematic statements in connection with his analysis of other accounting and financial reporting issues. . . . Given these errors, there may very well be other misstatements, omissions or inaccuracies in New Century's public filings and press releases." Id. at 417.

period between May 5, 2005 and March 13, 2007 (the "Class Period") and who, upon disclosure of certain facts alleged herein, were injured thereby.

2.    New Century, until it filed for bankruptcy on or about April 2, 2007, operated as one of the nation's largest mortgage finance companies. Since its formation in 1996, the Company grew rapidly to become one of the country's largest sub-prime lenders, reporting $56.1 billion of total mortgage originations and purchases for the year-ended December 31, 2005, nearly ten times as much as the Company had originated and purchased in 2001, and an increase of over $10 billion of originations and purchases from the prior year-ended December 31, 2004.

3.    As the real estate market softened and interest rates increased prior to and during the Class Period, New Century kept pushing ever-increasing sub-prime mortgage loan volume through its system by loosening the Company's underwriting practices and introducing a growing percentage of higher risk mortgage products, including adjustable-rate, interest-only loans and "stated income" loans, where even W-2 wage earners did not have to bother verifying their stated income.

4.    In addition, as these circumstances led to increased first payment default loans being pushed back to New Century from its mortgage loan purchasers and delinquencies and defaults grew in number, New Century failed to account for these adverse facts and substantially increased risk in its publicly-reported financial statements, in violation of Generally Accepted Accounting Principles ("GAAP"). The Company's outside auditor, KPMG LLP ("KPMG"), certified the Company's December 31, 2005 financial statements and internal control assessments notwithstanding the Company's numerous GAAP violations and significant deficiencies and material weaknesses in the Company's internal controls.

5.    It was only at the end of the Class Period, and less than three months after hiring a new Chief Financial Officer, that New Century announced the need to restate its reported financial results for the first three quarters of 2006, just one day before it was scheduled to report its fourth quarter and year-end 2006 financial results.  A few weeks later, the Company announced that New Century would have to report a net loss for the quarter and year-ended December 31, 2006, wiping out over $270 million of the net income previously reported by the Company for the first three quarters of 2006, and that its Audit Committee was reviewing the Company's accounting in 2006 "and prior periods."   Thereafter, the Company reported that its independent investigation revealed that it was "more likely than not" that there was also a "material overstatement" of earnings in 2005 and that the Company's financial statements for the year-ended December 31, 2005 should no longer be relied upon.   Ultimately, the Company never revealed the actual magnitude of the required adjustments, citing to the constraints it faced as a bankrupt company.

6.    Before any of these adverse disclosures were made, as set forth below, the Company's senior executive officers named as Defendants herein repeatedly signed sworn certifications attesting to the fair presentation of New Century's financial statements in accordance with GAAP and the adequacy of the Company's internal controls.   These certifications were materially misstated when made as they failed to reveal New Century's (now admitted) violations of GAAP as well as (now admitted) material weaknesses in the Company's internal controls.   KPMG also issued two separate audit opinions, on or about March 16, 2006, stating that it had conducted its 2005 year-end audits in accordance with the standards of the Public Company Accounting Oversight Board (the "PCAOB") which were materially misstated when made given KPMG's numerous auditing violations detailed below.   As set forth below, KPMG's 2005 audit engagement team was poorly staffed, unduly willing to acquiesce to New Century's numerous violations

of GAAP and often resisted and ignored suggestions from KPMG's own internal experts. Critical tasks -- such as KPMG's 2005 New Century internal controls assessment -- also were delegated to junior auditors with no relevant experience. As set forth below, the 2005 engagement team's audits were so deficient in so many ways, they amounted to no audit at all and an egregious refusal to see the obvious and to investigate the doubtful.

7. Throughout the Class Period, New Century's senior executive officers also repeatedly stated that the credit quality of the Company's mortgages was "strong," "very high" and "higher" or "better" than it had been in the Company's past as the result of purportedly "strict," "improved" and "strong" underwriting controls and guidelines and risk management discipline, when the true facts were to the contrary. As revealed by the Company's increasingly adverse loan performance, first-hand accounts obtained by Lead Counsel's investigation from dozens of former New Century employees from across the Company, the Examiner's Report and additional data (set forth in detail below), New Century's underwriting standards were not strengthened, but actually loosened beginning in 2003 and further loosened year-after-year from 2004 through 2006, in order to continue to drive record-breaking loan volume through the Company's origination system in the face of adverse industry trends and severe competition, with quantity at the expense of quality.

8. The New Century officer Defendants' repeated statements regarding the purported improvement of New Century's underwriting during the Class Period, the failure to present New Century's reported financial results and balance sheets in accordance with GAAP and KPMG's failure to audit New Century in accordance with the standards of the PCAOB, resulted in a material deception of the investing public. Unfortunately for unsuspecting investors, it was only a matter of time before the Company's extremely loose lending practices -- driven by aggressive volume targets and financial incentives -- and accounting violations and

KPMG's auditing violations would be revealed by substantially increased mortgage delinquencies and defaults and the need for financial restatements, causing material losses for New Century investors.

9.     Indeed, when the true facts were revealed, including the need for a financial restatement, the price of New Century securities declined precipitously, causing substantial losses and damages to Plaintiffs and members of the Class. The price of New Century common stock declined from over $30 per share to less than $1 per share, between February 7 and March 13, 2007, as the true facts were revealed, a decline of approximately 97%.  The price of New Century Series A and B Preferred stock declined by over 75% during that same time period.

10.    The disclosures also triggered an immediate (and entirely foreseeable) liquidity crisis for the Company, because of the Company's dependence upon numerous short-term credit agreements to fund its mortgage business and operations, agreements that required the Company to present its financial statements in accordance with GAAP, causing New Century to file for bankruptcy on or about April 2, 2007.

11.    Before any of the adverse disclosures were made, however, individual New Century officer Defendants Robert K. Cole, Brad A. Morrice, Edward F. Gotschall and Patti M. Dodge -- who controlled New Century's financial reporting and were the public spokespersons of the Company -- each took personal advantage of the artificially inflated price for New Century securities by selling, in the aggregate, over $50 million of their personally-held New Century common stock during the Class Period and by receiving incentive bonuses and other substantial compensation and income based on New Century's (mis)reported financial performance.

12.    Not surprisingly, these individuals now face a grand jury and criminal investigation by the United States Attorney for the Central District of California as well as an elevated, formal investigation by the SEC and the Federal Bureau of

Investigation.   Recent reports indicate that members of the 2005 KPMG engagement team for the New Century audits also are under investigation by the SEC and the Department of Justice.

## II.   NON-FRAUD AND FRAUD CLAIMS

13.   In this Second Amended Complaint, Plaintiffs assert two different sets of claims.   In the first set of claims (Counts One through Four), Plaintiffs assert strict liability and negligence claims based on the Securities Act of 1933 (the "Securities Act").   These claims are asserted against those Defendants who are statutorily responsible for material misstatements of facts and omissions in the prospectuses and registration statements pursuant to which New Century Series A and B Preferred Stock were offered to the public in June 2005 and August 2006, respectively (the "Offerings").   Plaintiffs specifically disclaim any allegations of fraud in connection with these non-fraud claims.

14.   In the second set of claims (Counts Five through Seven), Plaintiffs assert fraud-based claims under the Securities Exchange Act of 1934 (the "Exchange Act") against those individual Defendants who are alleged to have directly participated in a fraudulent scheme and made materially misleading statements and omissions throughout the Class Period and who acted with knowledge or deliberate reckless disregard of the true facts, and against New Century's outside auditor, KPMG, for its own intentional or deliberately reckless material misstatements regarding its 2005 audits.

## III.   JURISDICTION AND VENUE

15.   Certain non-fraud related claims asserted herein arise under Sections 11 and 15 of the Securities Act, 15 U.S.C. §§ 77k and 77o.   Certain other claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b-5").

16.     This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v, Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331, because this is a civil action arising under the laws of the United States.

17.     Venue is proper in this district pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77, Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b), (c) and (d).  Many of the acts and transactions that constitute violations of law complained of herein, including the dissemination to the public of untrue statements of material facts, occurred in this district.  During the Class Period, New Century's headquarters were located at 18400 Von Karman, Irvine, California and, in 2007, were relocated to 3161 Michelson Drive, Irvine, California.

18.     In connection with the acts alleged in this Second Amended Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications and the facilities of national securities exchanges.

IV.   **PARTIES**

   A.   **Plaintiffs**

19.     On June 26, 2007, the Honorable Dean D. Pregerson appointed the New York State Teachers' Retirement System ("NYSTRS") to serve as Lead Plaintiff in this consolidated class action.  NYSTRS provides retirement, disability and death benefits to eligible New York State public school teachers and administrators.  NYSTRS is one of the ten largest public retirement systems in the nation, serving nearly 400,000 active members, retirees and beneficiaries.  As set forth in the previously-filed certification attached hereto as Exhibit A, NYSTRS purchased New Century common stock during the Class Period and suffered damages as the result of the conduct complained of herein.

20.    Plaintiff Carl Larson, as set forth in the previously-filed certification attached hereto as Exhibit B, purchased New Century Series A and B Preferred Stock during the Class Period issued pursuant and/or traceable to the Series A and Series B Preferred Stock Registration Statement (as defined below) and suffered damages as the result of the conduct complained of herein.

21.    Plaintiff Charles Hooten, as set forth in the previously-filed certification attached hereto as Exhibit C, sold New Century put options during the Class Period and suffered damages as the result of the conduct complained of herein.

**B.    Defendants**

22.    New Century is not named as a Defendant in this Second Amended Complaint due to its filing for bankruptcy protection under Chapter 11 of the Bankruptcy Code.

**1.    The New Century Officer Defendants**

23.    Defendant Robert K. Cole ("Cole"), one of the Company's co-founders, served as Chairman of the Board of Directors of New Century from December 1995 until December 31, 2006; as Chief Executive Officer of New Century from December 1995 until June 30, 2006; and as a director of the Company from November 1995 through the end of the Class Period.  In addition, Cole has substantial prior financial and industry experience.  From February 1994 to March 1995, Cole was the President and Chief Operating Officer, Finance, of Plaza Home Mortgage, a publicly-traded savings and loan holding company specializing in the origination and servicing of residential mortgage loans.  Cole also served as a director of Option One Mortgage Corporation, a subsidiary of Plaza Home Mortgage specializing in the origination, sale and servicing of non-prime mortgage loans.  Previously, Cole served as the President of operating subsidiaries of NBD Bancorp and Public Storage, Inc.  Cole received a Masters of Business Administration degree from Wayne State University.

24.     Defendant Brad A. Morrice ("Morrice"), one of the Company's co-founders, served as Vice Chairman of the Board of Directors of New Century from December 1996 until his termination, after the end of the Class Period, on June 8, 2007; as President and a director of the Company from 1995 until June 8, 2007; as Chief Executive Officer from July 1, 2006 until June 8, 2007; as Chief Operating Officer from January 2001 until July 2006; as General Counsel from December 1995 until December 1997; and as Secretary of the Company from December 1997 until May 1999.   In addition, Morrice has substantial prior legal, financial and industry experience.   From February 1994 to March 1995, Morrice was the President and Chief Operating Officer, Administration, of Plaza Home Mortgage, after serving as its Executive Vice President, Chief Administrative Officer since February 1993.   Morrice also served as General Counsel of Option One Mortgage Corporation and, from August 1990 to January 1993, was a partner in a law firm specializing in the legal representation of mortgage banking companies.   Morrice has a law degree from the University of California, Berkeley (Boalt Hall) and a Masters of Business Administration degree from Stanford University.

25.     Defendant Edward F. Gotschall ("Gotschall"), one of the Company's co-founders, served as Vice Chairman, Finance, of the Board of Directors of New Century from July 2004 until June 2006; as a director of the Company from November 1995 through the end of the Class Period; as Chief Financial Officer of the Company from August 1998 until July 2004; and as Chief Operating Officer, Finance/Administration, from December 1995 until August 1998.   Gotschall served as a member of the Finance Committee of the Board of Directors from its inception on January 9, 2006.   The Finance Committee was responsible for reviewing, inter alia, the Company's loan performance, including the adequacy of its loan loss reserves.   In addition, Gotschall has substantial prior financial and industry experience.   From April 1994 to July 1995, Gotschall was the Executive Vice President/Chief Financial Officer of Plaza Home Mortgage and a director of

Option One Mortgage Corporation.  Gotschall co-founded Option One Mortgage Corporation and, from December 1992 to April 1994, served as its Executive Vice President/Chief Financial Officer.  From January 1991 to July 1992, Gotschall was the Executive Vice President/Chief Financial Officer of The Mortgage Network, Inc., a retail mortgage banking company.

26.  Defendant Patti M. Dodge ("Dodge") served as Executive Vice President, Chief Financial Officer of New Century from July 20, 2004 until November 14, 2006; and as Executive Vice President, Investor Relations from November 15, 2006 through the end of the Class Period.  Prior to these positions, Dodge served as Senior Vice President and Chief Financial Officer of the Company (February 2002 until July 2004); Senior Vice President and Controller (February 1999 until February 2002); and Vice President and Controller (September 1996 until February 1999).  Dodge also has substantial prior financial and industry experience.  From December 1990 to June 1995, Dodge was Senior Vice President at Plaza Home Mortgage Corporation.  From February 1989 to December 1990, Dodge served as Vice President and Chief Financial Officer of University Savings Bank and from October 1984 to February 1989, Dodge served as Controller of Butterfield Savings.  Dodge earned her Bachelor's degree in Business Administration with an emphasis in accounting from the University of Southern California.

27.  Defendants Cole, Morrice, Gotschall and Dodge are referred to herein collectively as the "New Century Officer Defendants."  As set forth below, the materially misstated information conveyed in the Company's press releases and SEC filings were the collective actions of these individuals.  These individuals were each involved in drafting, producing, reviewing and/or disseminating the press releases and SEC filings at issue in this case during his or her tenure with the Company.

28.     As officers and directors of a publicly-held company whose shares are registered with the SEC pursuant to the Exchange Act, traded on the New York Stock Exchange, and governed by the Federal securities laws, these individual Defendants each had a duty to disseminate promptly accurate information with respect to the Company's business, operations, financial statements and internal controls, and to correct any previously-issued statements that had become materially misstated or untrue, so that the market price of the Company's publicly-traded securities would be based upon accurate information.  Defendants Cole, Morrice, Gotschall and Dodge each violated these requirements and obligations during the Class Period.

29.     These four individuals, because of their positions of control and authority as senior executive officers and directors of New Century, were able to and did control the content of the press releases, SEC filings and other public statements issued by New Century during the Class Period.  Each of these individuals, during his or her tenure with the Company, was provided with copies of the written statements at issue in this action before they were issued to the public and had the ability to prevent their issuance or cause them to be corrected. Moreover, each of these four individuals personally made public statements at analyst and investor conference calls and meetings on behalf of the Company. Accordingly, each of these individuals is responsible for the accuracy of the public statements detailed herein.

## 2.     The New Century Director Defendants

30.     Defendant Fredric J. Forster ("Forster") served as a director of the Company from July 1997 through the end of the Class Period.  During the Class Period, Forster served as the Company's Lead Independent Director, and was appointed to serve as Non-Executive Chairman of the Board of Directors effective January 1, 2007.  Forster served as a member of the Audit Committee of the New Century Board from 2000 through 2005.  Forster also served as a member of the

Compensation Committee from 1998 through 2007, serving as its Chairman from 2001 through 2005.  Forster has extensive industry experience, spending nine years at ITT Financial Corporation, including as President and Chief Executive Officer of ITT Federal Bank.  Forster was a principal of Financial Institutional Partners from November 1996 until December 1998.  Prior to that, he served as President and Chief Operating Officer of H.F. Ahmanson & Co. and its subsidiary, Home Savings of America.  In addition, Forster spent nearly ten years as a director of the Federal Home Loan Bank of San Francisco and as a director of and consultant to LoanTrader, a private company that developed a website serving mortgage brokers and lenders.  Forster received his Masters Degree in Business Administration from Harvard Business School and his Bachelor's degree in Physics from Princeton University.  As set forth below, Forster signed the registration statement pursuant to which New Century Series A and B Preferred Stock were offered and sold to the public during the Class Period.

31.    Defendant Michael M. Sachs ("Sachs") served as a director of the Company from November 1995 through the end of the Class Period and was one of the Company's founding shareholders.  Sachs served as a member of the Board's Audit Committee from 1998 through 2007, serving as its Chairman from 2000 through 2006.  Sachs also served as a member of the Compensation Committee (1998 to 2007) and as a member of the Finance Committee (from its inception on January 9, 2006 through the end of the Class Period).  Sachs has substantial legal, financial, accounting and business experience.  Sachs is a Certified Public Accountant and an attorney.  Since 1990, Sachs has served as Chairman of the board of directors and Chief Executive Officer of Westrec Financial, an operator of marinas and related businesses.  As set forth below, Sachs signed the registration statement pursuant to which New Century Series A and B Preferred Stock were offered and sold to the public during the Class Period.  Sachs

sold 140,000 shares of New Century common stock on or about February 8, 2007, at an average price of $19.62 per share.

32.    Defendant Harold A. Black ("Black") served as a director of the Company from June 2004 through the end of the Class Period.  For the past twenty years, Black has served as the James F. Smith, Jr. Professor of Financial Institutions at the University of Tennessee, Knoxville.  From 1987 to 1995, he was Head of the Department of Finance, College of Business Administration of the University of Tennessee.  Black's industry experience includes, among other things, serving as:  (i) Deputy Director, Department of Economic Research and Analysis, Office of the Comptroller of the Currency from 1976 to 1978; (ii) board member of the National Credit Union Administration from 1979 to 1981; (iii) director from 1990 to 1994, and Chairman in 1992, of the Nashville Branch of the Federal Reserve Bank of Atlanta; (iv) public interest member of the Federal Deposit Insurance Corporation's Savings Association Insurance Fund Advisory Committee from 1994 to 1998; and (v) director of H.F. Ahmanson & Co., the parent company of Home Savings of America prior to its merger with Washington Mutual Savings Bank, from 1995 to 1998.  As set forth below, Black signed the registration statement pursuant to which New Century Series A and B Preferred Stock were offered and sold to the public during the Class Period.

33.    Defendant Donald E. Lange ("Lange") served as a director of the Company from November 2002 through the end of the Class Period.  Lange served as a member of the Audit Committee of the Board of Directors from November 2002 to June 22, 2007.  Lange also served on the Compensation Committee, serving as its Chairman from October 26, 2005 to 2007.  Lange has extensive industry and financial experience.  Since 1999, Lange has served as the President and Chief Executive Officer of Pacific Financial Services, a mortgage banking and specialty finance company.  From March 2001 to February 2002, Lange served as President and Chief Executive Officer of OptiFI, a private company specializing in

prepayment analytics. He also served as the President and Chief Executive Officer of several specialty finance subsidiaries of Weyerhaeuser Company, including Weyerhaeuser Financial Services and Weyerhaeuser Mortgage Company. In addition, Lange served as a director of Mortgage Electronic Registration System (1995 until 2002) and as a director of Pacific Gulf Properties (1998 until 2001). Lange was the President of the Mortgage Bankers Association of America in 1999. As set forth below, Defendant Lange signed the registration statement pursuant to which New Century Series A and B Preferred Stock were offered and sold to the public during the Class Period.

34.    Defendant Terrence P. Sandvik ("Sandvik") served as a director of the Company from November 1995 until May 17, 2005. From 1999 through the end of his tenure on the Board, Sandvik served as a member of the Compensation Committee. Sandvik has substantial prior business experience, including serving as President of U.S. Bancorp Business Technology Center at U.S. Bancorp from 1990 to 1999. As set forth below, Defendant Sandvik signed the registration statement pursuant to which New Century Series A Preferred Stock was offered and sold to the public during the Class Period.

35.    Defendant Richard A. Zona ("Zona") served as a director of the Company from June 2000 through the end of the Class Period. Zona served as a member of the Audit Committee of the Board of Directors from 2000 to 2007 and as a member of the Finance Committee of the Board of Directors from its inception on January 9, 2006 to 2007. Zona has substantial industry and accounting experience. Zona was a partner with the accounting firm of Ernst & Young LLP from 1979 to 1989. Zona served as the Chief Financial Officer of U.S. Bancorp from 1989 to 1996 and as Vice Chairman of U.S. Bancorp from 1996 to 2000. Zona served as a director of sub-prime lender Olympic Financial Ltd. from 1995 to 1996 and of ING Bank Direct. Zona currently serves as a director of Piper Jaffray Companies. As set forth below, Defendant Zona signed the registration statement

1   pursuant to which New Century Series A and B Preferred Stock were offered and

2   sold to the public during the Class Period.

3        36.    Defendant Marilyn A. Alexander ("Alexander") served as a director of

4   the Company from May 18, 2005 until April 10, 2007.  Alexander served as a

5   member of the Audit Committee of the Board of Directors from May 18, 2005 until

6   April 10, 2007 and as Chair of the Finance Committee of the Board of Directors

7   from its inception on January 9, 2006 to 2007.  Alexander has more than twenty

8   three years of finance, marketing and strategic planning experience.  She served as

9   Senior Vice President and Chief Financial Officer of the Disneyland resort in

10   California and, prior to that, served as Vice President of Financial Planning and

11   Analysis for the Marriott Corporation.  Alexander holds a Masters of Business

12   Administration degree from the Wharton Graduate School of the University of

13   Pennsylvania.  As set forth below, Defendant Alexander served as a director of the

14   Company at the time New Century Series A and B Preferred Stock were offered

15   and sold to the public.

16        37.    Defendant William J. Popejoy ("Popejoy") served as a director of the

17   Company from 2002 until June 5, 2006.  Popejoy served on the Board's

18   Compensation Committee from 2002 through 2005.  Popejoy also has extensive

19   industry and financial experience.  Popejoy was the Managing Member of Pacific

20   Capital Investors (1999 to 2005) and the Chief Executive Officer and a director of

21   the California State Lottery (April 1997 to November 1998).  He served as the

22   Chief Executive Officer of the County of Orange, Chairman and Chief Executive

23   Officer of Financial Corporation of America and its subsidiary, American Savings,

24   President and Chief Executive Officer of Financial Federation, Inc., the President

25   of Far West Savings, the President of First Charter Financial and its subsidiary,

26   American Savings & Loan Association, and the President and Chief Executive

27   Officer of The Federal Home Loan Mortgage Corporation (Freddie Mac).  In

28   addition, since 1996, Popejoy has served as a member of the board of trustees of

PIMCO Funds and PIMCO Commercial Mortgage Securities, Inc. As set forth below, Defendant Popejoy signed the registration statement pursuant to which New Century Series A Preferred Stock was offered and sold to the public during the Class Period.

38.     Defendant David Einhorn ("Einhorn") served as a director of the Company and a member of the Finance Committee of the Board of Directors from March 31, 2006 until March 7, 2007. Einhorn is the President of Greenlight Capital, Inc., a New York investment management firm managing over $4 billion of assets founded in 1996. As set forth below, Defendant Einhorn was a director at the time New Century Series B Preferred Stock was offered and sold to the public during the Class Period.

### 3.     Defendant KPMG

39.     Defendant KPMG LLP ("KPMG") served as the Company's outside auditor from 1995 until its resignation on April 27, 2007. KPMG provided audit, audit-related, tax and other services to the Company prior to and throughout the Class Period. KPMG issued unqualified opinions on the Company's financial statements and management's assessment of internal controls for the year ended December 31, 2005. KPMG consented to the incorporation by reference in the registration statement for the Series B Preferred Stock offering of its unqualified opinions on the Company's financial statements and management's assessment of internal controls for the year ended December 31, 2005. KPMG maintains its national headquarters at 757 Third Avenue, New York, New York 10017.

### 4.     The Underwriter Defendants

40.     Defendant Bear, Stearns & Co. Inc. ("Bear Stearns") is an investment bank and acted as one of the underwriters with respect to the public offerings of New Century securities in June 2005 and August 2006. Bear Stearns' corporate headquarters are located at 383 Madison Avenue, New York, New York 10179.

41.     Defendant Deutsche Bank Securities Inc. ("Deutsche Bank") is an investment bank and acted as one of the underwriters with respect to the public offering of New Century securities in June 2005.  Deutsche Bank's U.S. headquarters are located at 60 Wall Street, New York, New York 10005.

42.     Defendant Piper Jaffray & Co. ("Piper Jaffray") is an investment bank and acted as one of the underwriters with respect to the public offering of New Century securities in June 2005.  Piper Jaffray's headquarters are located at 800 Nicollet Mall, Minneapolis, Minnesota 55402.

43.     Defendant Stifel, Nicolaus & Company, Incorporated ("Stifel Nicolaus") is an investment bank and acted as one of the underwriters with respect to the public offerings of New Century securities in June 2005 and August 2006. Stifel Nicolaus' headquarters are located at 501 N Broadway, St. Louis, Missouri 63102.

44.     Defendant JMP Securities LLC ("JMP Securities") is an investment bank and acted as one of the underwriters with respect to the public offering of New Century securities in June 2005.  JMP Securities' headquarters are located at 600 Montgomery Street, San Francisco, California 94111.

45.     Defendant Roth Capital Partners, LLC ("Roth Capital") is an investment bank and acted as one of the underwriters with respect to the public offering of New Century securities in June 2005.  Roth Capital's headquarters are located at 24 Corporate Plaza Drive, Newport Beach, California 92660.

46.     Defendant Morgan Stanley & Co. Incorporated ("Morgan Stanley") is an investment bank and acted as one of the underwriters with respect to the public offering of New Century securities in August 2006.  Morgan Stanley's headquarters are located at 1585 Broadway, New York, New York 10036.

47.     Defendant Jefferies & Company, Inc. (Jefferies & Co.) is an investment bank and acted as one of the underwriters with respect to the public

offering of New Century securities in August 2006. Jefferies & Co.'s headquarters are located at 520 Madison Avenue, New York, New York 10022.

## V.    CLASS ACTION ALLEGATIONS

48.    Plaintiffs bring this action on behalf of themselves and as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of a class (the "Class") consisting of all persons and entities who purchased or otherwise acquired New Century common stock, New Century Series A Preferred Stock, New Century Series B Preferred Stock and/or New Century call options and/or who sold New Century put options during the Class Period, May 5, 2005 through March 13, 2007, either in the Offerings, pursuant to a registration statement, or in the market, and, who, upon disclosure of certain facts alleged herein, were injured thereby. Excluded from the Class are: (a) Defendants; (b) members of the immediate families of the individual Defendants; (c) the subsidiaries and affiliates of Defendants; (d) any person or entity who is a partner, executive officer, director, or controlling person of New Century (including any of its subsidiaries or affiliates) or of any other Defendant; (e) any entity in which any Defendant has a controlling interest; (f) Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof; and (g) the legal representatives, heirs, successors and assigns of any such excluded party.

49.    The members of the Class are so numerous that joinder of all members is impracticable. As of March 1, 2006, New Century had 55,984,299 shares of common stock issued and outstanding; 4,500,000 shares of Series A Preferred Stock issued and outstanding; 2,300,000 shares of Series B Preferred Stock issued and outstanding; and substantial options trading. Throughout the Class Period, New Century common stock and Series A and B Preferred Stock were actively traded on the New York Stock Exchange and New Century options were actively traded on the Chicago Board of Options Exchange. While the exact

number of Class members is unknown to Plaintiffs at this time, Plaintiffs believe that Class members number in the thousands.

50.    Plaintiffs' claims are typical of the claims of the members of the Class.    Plaintiffs and the other members of the Class acquired New Century securities in the Offerings, pursuant to a registration statement, purchased or sold New Century securities in the market, and sustained damages as a result of Defendants' conduct complained of herein.

51.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.    Plaintiffs have no interests that are adverse or antagonistic to the Class.

52.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.    Because the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impracticable for Class members individually to seek redress for the wrongful conduct alleged herein.

53.    Common questions of law and fact exist as to all members of the Class, and predominate over any questions affecting solely individual members of the Class.    Among the questions of law and fact common to the Class are:

a.    whether the Federal securities laws were violated by Defendants' conduct as alleged herein;

b.    whether the registration statements and prospectuses for the Company's Offerings contained material misstatements or omitted to state material information;

c.    whether the SEC filings, press releases and other public statements disseminated to the investing public during the Class Period contained material misstatements or omitted to state material information;

d.      whether and to what extent the Company's financial statements failed to comply with GAAP during the Class Period;

e.      whether and to what extent Defendant KPMG's audits of the Company's financial statements and management's assessments of internal controls during the Class Period failed to be conducted in accordance with the standards of the PCAOB;

f.      whether and to what extent the market prices of New Century common stock, Series A and B Preferred Shares and/or call options were artificially inflated (and whether and to what extent the market prices of New Century put options were artificially reduced) during the Class Period due to the non-disclosures and/or misstatements complained of herein;

g.      whether, with respect to Plaintiffs' claims under the Securities Act, Defendants named in those claims can sustain their burden of establishing an affirmative defense pursuant to the applicable statute;

h.      whether, with respect to Plaintiffs' claims under the Exchange Act, Defendants named in those claims acted with scienter;

i.      whether, with respect to Plaintiffs' claims pursuant to Section 15 of the Securities Act and Section 20(a) of the Exchange Act, Defendants Cole, Morrice, Gotschall and Dodge were controlling persons of New Century;

j.      whether reliance may be presumed pursuant to the fraud-on-the-market doctrine; and

k.      whether the members of the Class have sustained damages as a result of the conduct complained of herein, and if so, the proper measure of damages.

54.     The names and addresses of those persons and entities who purchased or sold New Century securities during the Class Period are available from the Company's transfer agent(s) and/or from the Underwriter Defendants.  Notice may be provided to such class members via first-class mail using techniques and a form of notice similar to those customarily used in securities class actions.

## VI.  FACTUAL ALLEGATIONS PERTINENT TO CLAIMS FOR RELIEF[2]

### A.  The Company's Formation And Rapid Growth

55.    During the Class Period, New Century operated as a publicly-traded Real Estate Investment Trust, or REIT, and, through its subsidiaries, operated as one of the nation's largest mortgage finance companies.  According to the Company's Form 10-K filed with the SEC on or about March 16, 2006 for the year-ended December 31, 2005 (the "2005 Form 10-K"), New Century began originating and purchasing mortgage loans in 1996, and began operating its business as a REIT in the fourth quarter of 2004.[3]

56.    During the Class Period, New Century originated and purchased primarily first mortgage loans nationwide, focusing on the sub-prime market, lending to individuals who did not satisfy the credit, documentation or other underwriting standards prescribed by conventional mortgage lenders and loan buyers.

57.    According to the Company's 2005 Form 10-K, New Century originated and purchased mortgage loans through two divisions – its "Wholesale Division" and its "Retail Division."  In 2005, New Century's Wholesale Division reportedly originated and purchased $49.2 billion in mortgage loans, or 87.7% of the total mortgage loans originated and purchased by the Company, and its Retail Division reportedly originated $6.9 billion in mortgage loans, or 12.3% of the total.

---

[2] In this section of the Second Amended Complaint, Plaintiffs have provided additional facts and data demonstrating that Defendants' Class Period statements were materially misstated when made, including at the time of the Offerings.  In the sections below, Plaintiffs identify each statement made during the Class Period and/or incorporated into the Offerings and re-demonstrate why each statement was materially misstated when made during the Class Period and at the time of the Offerings.

[3]  As a REIT, New Century was generally not subject to federal corporate income tax on that portion of its REIT taxable income that it distributed to its stockholders.  To qualify as a REIT, New Century was required to distribute to its stockholders at least 90% of its REIT taxable income.  Because of its low level of retained cash, New Century required ready access to the secondary market to obtain the liquidity necessary to originate a high volume of mortgage loans.

58.    During the Class Period, New Century's Wholesale Division originated and purchased loans through a network of independent mortgage brokers and correspondent lenders.  According to the Company's 2005 Form 10-K: "The Wholesale Division operates under the name New Century Mortgage Corporation and originates mortgage loans through its FastQual Web site at www.newcentury.com, where a broker can upload a loan request and receive a response generally within 12 seconds."  According to the 2005 Form 10-K, as of December 31, 2005, New Century's Wholesale Division operated through 35 regional operating centers located in 18 states and had more than 47,000 approved mortgage brokers to submit loan applications to the Company.

59.    According to the 2005 Form 10-K, the Company's total 2005 loan production volume was $56.1 billion, its "tenth consecutive record year of loan production."  Indeed, New Century's annual loan production grew rapidly from $357 million in 1996, to $56.1 billion in 2005.  The Company's reported earnings per share also grew rapidly from $0.13 in 1996, to $7.17 in 2005.  In May 2006, Defendant Morrice publicly reported that the Company's wholesale business "ranked as the #1 non-prime wholesale lender and #4 wholesale lender in the overall mortgage market in 2005."

60.    On or about February 2, 2006, New Century presented the following slide showing its dramatic growth over the previous 10 years:



## B. Throughout The Class Period, New Century Recognized Substantial Revenue From Whole Loan Sales And Securitizations

61. During the Class Period, one of the primary components of New Century's reported revenue was the recognition of "gain on sale" of its mortgage loans through whole loan sales and securitizations structured as sales. Starting in 2003, New Century also structured securitizations as "financings" under GAAP. These sales and securitizations were an essential component of New Century's operations since they provided cash to repay substantial sums of money the Company borrowed each quarter on a short-term basis to originate and purchase mortgage loans and support its operating activities.

62. In a whole loan sale, New Century recognized and received a cash gain upon the sale of a pool of mortgage loans to third parties.

63. In a securitization structured as a sale for financial reporting purposes, New Century also recognized a gain on sale at the time it sold a pool of loans to a trust that raised cash by selling certificates representing interests in a pool of loans. In addition to the cash received at the time of the securitization, New Century could receive cash flows over the life of the loans from the residual interests it retained in the securitized pool of loans, if the specified over-collateralization requirements were met. Alternatively, the Company could sell a substantial portion

of its residual interests through net interest margin securities, or NIMS, at the time of or shortly after a securitization. A NIMS transaction allowed the Company to receive a substantial portion of its residual interest as an additional cash gain at the time of the securitization rather than over the actual life of the mortgage loans.

64.    In securitizations structured as financings for financial reporting purposes, New Century did not record a gain on sale at the time of the transaction, but recognized interest income as the payments on the underlying mortgages were received. According to New Century's 2005 Form 10-K, because the Company's credit facilities were short-term in nature and generally did not allow for its mortgage loans to be financed for longer than 180 days, securitizations structured as financings allowed the Company the most attractive means of financing its mortgages over a longer term and retaining them on its balance sheet.

65.    According to the Company's 2005 Form 10-K, in 2005, the Company sold or financed a total of approximately $52.7 billion of loans through secondary market transactions. According to the Company's Form 10-K, in 2005, New Century sold approximately $32.8 billion of sub-prime loans through whole loan sales, or 62.2% of total loans sold or financed; New Century sold approximately $6.4 billion of loans through securitizations structured as sales, or 12.2% of total loans sold or financed; and New Century financed approximately $11 billion of loans through securitizations structured as financings, or 20.8% of total loans sold or financed. According to the Company's third quarter 2006 Form 10-Q, in the first nine months of 2006, the Company sold or financed a total of approximately $44.1 billion of loans through secondary market transactions. According to the Company's Form 10-Q, in the first nine months of 2006, New Century sold approximately $40.2 billion of loans through whole loan sales, or 91.3% of total loans sold or financed; and New Century financed approximately $3.4 billion of loans through securitizations structured as financings, or 7.7% of total loans sold or financed.

1

2

**C.    New Century's Financial Statements
Were Materially Misstated Throughout The
Class Period And At The Time Of The Offerings**

3

4

5

6

7

8

66.    Unfortunately for unsuspecting investors, the Company, in reporting its financial results throughout the Class Period and at the time of the Offerings, made numerous untrue statements of material fact and omitted to state material facts necessary to make its reported financial results and other public statements not misleading, including violations of GAAP in connection with its whole loan sales and securitizations.

9

10

11

12

13

14

15

16

67.    GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practices at a particular time.   The SEC has the statutory authority for the promulgation of GAAP for public companies and has delegated that authority to the Financial Accounting Standards Board (the "FASB").   SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) provides that financial statements filed with the SEC which are not presented in accordance with GAAP will be presumed to be misleading, despite footnotes or other disclosures.

17

18

19

20

21

22

23

24

25

26

68.    Statement of Financial Accounting Standards No. 5, "Accounting for Contingencies" ("SFAS 5") was issued in March 1975 by the FASB.   The principles described in SFAS 5 set forth the standards of financial accounting and reporting for loss contingencies.   Statement of Financial Accounting Standards No. 140, "Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities" ("SFAS 140") was issued in September 2000 by the FASB.   The principles described in SFAS 140 set forth "the standards for accounting for securitizations and other transfers of financial assets and collateral." As set forth below, New Century violated GAAP, SFAS 5 and SFAS 140, in a number of ways during the Class Period and at the time of the Offerings.

27

28

### 1.     Whole Loan Sales - GAAP Violations

69.     According to the Company's 2005 Form 10-K, New Century sold whole loans on a non-recourse basis pursuant to purchase agreements in which it gave "customary representations and warranties" regarding its loan characteristics and origination process, including, for example, that the home borrower would make the first mortgage payment.  New Century was required to repurchase or substitute loans in the event of a breach of these representations and warranties.[4]

70.     As reported by the Company in the 2005 Form 10-K and required by GAAP, the Company established, at the time the sale was consummated, an allowance for repurchase losses on whole loan sales, which is a reserve for expenses that may be incurred by the Company due to the potential repurchase of loans resulting from early payment defaults by the underlying home borrowers or from alleged violations of representations and warranties in connection with the sale of the loans (the "Allowance for Repurchase Losses").  As set forth by GAAP, Emerging Issues Task Force 92-2, "Measuring Loss Accruals by Transferors for Transfers of Receivables With Recourse," issued in September 1992 ("EITF 92"), this reserve should include "all probable credit losses over the life" of the transaction.  When New Century repurchased loans, it was required by GAAP, SFAS 140, to add the repurchased loans to its balance sheet as Mortgage Loans Held for Sale at their estimated fair values (net of any expected discount upon disposition) and reduce its Allowance for Repurchase Losses reserve by the amount that the repurchase prices exceeded the fair value.  As the Company acknowledged in its 2005 Form 10-K, "repurchased mortgage loans typically can only be financed at a steep discount to their repurchase price, if at all.  They are

---

[4] According to the Examiner's Report (at 71), notice of loan repurchase claims was received by New Century's Secondary Marketing Department, usually by the last New Century employee with whom the investor making the repurchase claim dealt with at New Century.

also typically sold at <u>a significant discount</u> to the unpaid principal balance." (Emphasis added.)

71.    According to the 2005 Form 10-K, the Company's Allowance for Repurchase Losses purportedly covered all expenses due to the potential repurchase of loans or indemnification of losses based on alleged violations of representations and warranties that are customary to the business.  The Company represented in the 2005 Form 10-K that its Allowance for Repurchase Losses reserve represented "the Company's estimate of the <u>total losses</u> expected to occur" and was "<u>considered to be adequate by management based upon the Company's evaluation of the potential exposure related to the loan sale agreements over the period of repurchase risk</u>."  (Emphasis added.)  In fact, and contrary to the New Century Officer Defendants' public statements and representations throughout the Class Period and at the time of the Offerings, New Century has now admitted that its Allowance for Repurchase Losses reserve was materially understated.

72.    On February 7, 2007, the Company admitted the need to restate New Century's previously reported financial statements for the first three quarters of 2006 based on material violations of GAAP in setting New Century's Allowance for Repurchase Losses reserve and related material weaknesses in internal controls. The February 7, 2007 press release stated:

> The Company establishes an allowance for repurchase losses on loans sold, which is a reserve for expenses and losses that may be incurred by the Company due to the potential repurchase of loans resulting from early-payment defaults by the underlying borrowers or based on alleged violations of representations and warranties in connection with the sale of these loans.  When the Company repurchases loans, it adds the repurchased loans to its balance sheet as mortgage loans held for sale at their estimated fair values, and reduces the repurchase reserve by the amount the repurchase prices exceed the fair values.  During

the second and third quarters of 2006, the Company's accounting policies incorrectly applied Statement of Financial Accounting Standards No. 140 – Accounting for Transfers and Servicing of Financial Assets and Extinguishment of Liabilities.  <u>Specifically, the Company did not include the expected discount upon disposition of loans when estimating its allowance for loan repurchase losses</u>.

<u>In addition, the Company's methodology for estimating the volume of repurchase claims to be included in the repurchase reserve calculation did not properly consider, in each of the first three quarters of 2006, the growing volume of repurchase claims outstanding that resulted from the increased pace of repurchase requests that occurred in 2006, compounded by the increasing length of time between the whole loan sales and the receipt and processing of the repurchase request</u>.

\* \* \*

<u>In light of the pending restatements, the Company's previously filed condensed consolidated financial statements for the quarters ended March 31, June 30 and September 30, 2006 and all earnings-related press releases for those periods should no longer be relied upon</u>.

\* \* \*

<u>The Company also expects that the errors leading to these restatements constitute material weaknesses in its internal control over financial reporting for the year ended December 31, 2006</u>.

\* \* \*

While the Company is still determining the magnitude of these adjustments to its fourth quarter 2006 results, <u>the Company expects the combined impact of the foregoing to result in a net loss for that period</u>.   [Emphasis added.]

73.    On May 24, 2007, New Century filed a Form 8-K which admitted to further "errors" and a "more likely than not" material overstatement in the Company's previously-issued 2005 financial statements with respect to, inter alia, "both the accounting and reporting of loan repurchase losses:"

On February 7, 2007, New Century Financial Corporation (the "Company") filed a Form 8−K with the Securities and Exchange Commission (the "SEC") reporting that the Company's Board of Directors had concluded that the Company's previously filed interim financial statements for the quarters ended March 31, 2006, June 30, 2006, and September 30, 2006 (collectively, the "Interim Financial Statements"), should be restated to correct errors the Company discovered in its accounting and financial reporting of loan repurchase losses.    In connection with the restatement process, the Audit Committee of the Company's Board of Directors, on the advice of its independent counsel, initiated an independent investigation into the issues giving rise to the Company's need to restate the Interim Financial Statements, and as previously reported, subsequently expanded the investigation to include issues pertaining to the Company's valuation of certain residual interests in securitizations in 2006 and prior periods (the "Internal Investigation"). In addition to its independent counsel, the Audit Committee also retained forensic accountants and other professionals (collectively, the "Investigative Team") to assist it in connection with the Internal Investigation.

Based on recent communications with members of the Investigative Team, the Audit Committee has determined that there were errors in the Company's previously filed annual financial statements for its fiscal year ended December 31, 2005 (the "2005 Financial

Statements") with respect to both the accounting and reporting of loan repurchase losses and the Company's valuation of certain residual interests in securitizations.    The Company's ability to further investigate these matters is constrained as the Company is currently in liquidation proceedings under chapter 11 of the Bankruptcy Code. However, based upon the work performed by the Investigative Team, the Audit Committee and management believe that it is more likely than not that these errors in the aggregate resulted in a material overstatement of pretax earnings in the 2005 Financial Statements. Accordingly, on May 23, 2007, the Company's Board of Directors concluded, based upon the recommendation of the Audit Committee, that the 2005 Financial Statements should no longer be relied upon. [Emphasis added.]

74.    In addition to these admissions, Lead Counsel's investigation reveals that New Century's Allowance for Loan Repurchase Losses reserve was materially misstated in violation of GAAP at all times during the Class Period (commencing on May 5, 2005), including at the time of the Offerings.

75.    According to a former New Century senior financial manager employed by the Company from September 2004 until February 2007 ("CW 1"), prior to the restatement, New Century had intentionally delayed payment of valid repurchase claims in an effort to cause its previously reported 2005 and 2006 financial results to appear better than they actually were.  According to the former senior financial manager, he was specifically tasked to review the Company's repurchase claims backlog during July and August of 2006, including analyzing the repurchase claims process at New Century.  From his review, CW 1 concluded that the Company had intentionally delayed payment of valid repurchase claims, causing a massive backlog of repurchase claims, 80% of which, or hundreds of millions of dollars worth, were 18-24 months old as of September 2006.

According to CW1, these repurchase claims already were determined to be valid and should have been paid 18-24 months earlier. According to CW 1, by the end of the 2004 fourth quarter, New Century already had a large backlog of valid, unfunded repurchase claims. Accordingly, hundreds of millions of dollars worth of these valid repurchase claims should have been funded prior to the start of the Class Period in May 2005 (and the Offerings), but were not. CW 1 further reported that he had "no doubt" that there was a conscious decision made about how the Company wanted earnings to look and the Company delayed funding valid repurchase claims in order to make those numbers. According to the former employee, New Century's transaction managers, who were primarily responsible for investigating the validity of repurchase requests, analyzed and recommended repurchasing valid claims in a timely fashion, but the Company simply never funded the majority of these valid claims. According to the former employee, New Century Senior Vice President of Capital Markets Karl S. Weiss (responsible for managing secondary market operations and reporting to Kevin M. Cloyd) had commented during a meeting in the summer of 2006 that New Century had delayed payment of repurchase claims to make its 2005 reported financial results look better than they actually were and the Company was waiting to fund its repurchase claims when it had better cash flow. According to CW 1, Karl Weiss stated in substance at the meeting: "We all know that we made a decision to delay payment of repurchases to make our 2005 numbers look good and we were waiting to pay when we had more cash flow." According to CW 1, the result of this delay caused a "snowball" effect to a point where the Company could not catch up. According to the former employee, repurchase claims which were not funded did not appear on the Company's financial statements and the Company's data was "so unkempt" that it took him a while to compile it from several different sources and combine it in order to obtain a true picture of what was going on.

76.    According to a former New Century Vice President, Assistant Controller, who was employed by the Company from September 2004 to July 2007 ("CW 2"), the repurchase claims backlog information was shared between Kevin M. Cloyd, Executive Vice President of New Century and President of New Century's secondary marketing division, NC Capital Corporation (a wholly-owned subsidiary responsible for the Company's capital market activities), and Defendant Dodge and the Company's other senior executive officers.  According to the former Vice President, Assistant Controller, Cloyd kept Dodge up to date with repurchase claim information.

77.    According to a former New Century Vice President, Corporate Finance, employed by the Company from 2002 until April 2007, who reported directly to Defendant Dodge or, at times, Dodge's direct reports, and who specifically worked on a special internal New Century project examining how investor "kickbacks" and repurchase claims were handled ("CW 3"), prior to the restatement New Century was "sitting on repurchase requests" hoping to ride out the market.  According to CW 3, New Century was "trying to game the system." According to the former employee, the Company failed to have good internal reporting of repurchase information prior to 2006, and New Century was not "an easy place" to examine repurchase information.

78.    An internal, non-public New Century document entitled "Inventory Management September 2006" obtained through Lead Counsel's investigation with handwritten notes from Defendant Dodge to Kevin Cloyd demonstrates the following pattern of growing outstanding loan repurchase claims as compared to funded repurchases during the first eight months of 2006 and a portion of September 2006 (in dollars):

| 2006 | Beginning Balances | Claims Received | Repurchases | Refuted/Removed | Ending Outstanding |
|---|---|---|---|---|---|
| Jan | 120,800,483 | 99,970,165 | 14,784,592 | 19,048,681 | **186,937,375** |
| Feb | 186,937,375 | 89,884,364 | 20,696,974 | 80,000 | **256,044,765** |
| Mar | 256,044,765 | 78,598,606 | 29,189,176 | 46,036,822 | **259,417,373** |
| Apr | 259,417,373 | 33,528,709 | 55,993,512 | 16,078,072 | **220,874,498** |
| May | 220,874,498 | 149,184,807 | 133,229,453 | 33,257,620 | **203,572,231** |
| Jun | 203,572,231 | 47,998,054 | 60,825,108 | 13,832,593 | **176,912,584** |
| Jul | 176,912,584 | 64,187,707 | 47,496,937 | 3,044,646 | **190,558,708** |
| Aug | 190,558,708 | 173,473,845 | 46,921,772 | 4,154,300 | **312,956,481** |
| Sep | 312,956,481 | 69,847,846 | 174,400 | 148,292 | **382,481,635** |
| **Total** | **382,481,635** | **806,674,103** | **409,311,925** | **135,681,026** | |

79.    The prior page of the document reports that 61% of the Company's outstanding repurchase claims received from January 1, 2005 and September 8, 2006, or $167 million out of $273 million of outstanding repurchase claims, had been received by the Company by July 31, 2005.  The prior page states:  "Between 01/01/05 and 09/08/06 there have been $640M loans repurchased with an additional outstanding of $273M, $913M in total . . . 61% or $167M of the Outstanding Claims have been received 07/31/05."

80.    Another internal, non-public New Century document, obtained through Lead Counsel's investigation, covers thirteen months of repurchase claims data from January 2006 through January 2007 and demonstrates the following pattern of growing outstanding 2006 loan repurchase claims as compared to funded repurchases during 2006 (in dollars):

| Rolling 13 Months | Beginning Balances | Claims Received | Repurchases | Re-Priced | Refuted/ Remove | Ending Outstanding |
|---|---|---|---|---|---|---|
| Jan | | 75,270,123 | 345,499 | | 10,351,000 | 64,573,624 |
| Feb | 64,573,624 | 92,820,763 | 16,406,884 | | 17,000,350 | 123,987,153 |
| Mar | 123,987,153 | 82,617,193 | 28,420,664 | | 46,034,119 | 132,149,563 |
| Apr | 132,149,563 | 42,295,804 | 48,424,178 | | 11,544,350 | 114,476,840 |
| May | 114,476,840 | 151,237,862 | 121,737,906 | | 24,056,966 | 119,919,740 |
| Jun | 119,919,740 | 60,210,366 | 53,002,238 | | 12,231,761 | 114,896,108 |
| Jul | 114,896,108 | 81,037,574 | 46,427,065 | | 2,467,800 | 147,038,818 |
| Aug | 147,038,818 | 194,795,931 | 46,748,567 | | 6,702,500 | 288,383,682 |
| Sep | 288,383,682 | 168,384,651 | 58,163,032 | | 2,917,839 | 395,687,461 |
| Oct | 395,687,461 | 190,042,233 | 61,082,036 | | 13,694,009 | 510,953,649 |
| Nov | 510,953,649 | 60,254,283 | 51,100,059 | 50,739,034 | 42,916,988 | 426,451,851 |
| Dec | 426,451,851 | 109,812,818 | 62,183,446 | 87,139,340 | 36,648,227 | 350,293,656 |
| Jan | 350,293,656 | 214,829,368 | 83,312,716 | 18,706,001 | 59,846,941 | 403,257,366 |
| Total | | 1,523,608,969 | 677,354,379 | 156,584,375 | 286,412,849 | |

81.    The above, internal New Century repurchase claims and backlog data which was not publicly reported during the Class Period demonstrates a growing backlog of outstanding repurchase claims.  While the failure of the Company to repurchase approved claims on a timely basis had the short-term effect of improving its publicly reported cash flow and earnings, under GAAP, the Company was required (but admittedly failed) to account for this growing volume of repurchase claims outstanding in setting its Allowance for Repurchase Losses reserve throughout the Class Period and at the time of the Offerings.  In fact, as set forth below, the Examiner has confirmed that New Century's methodology for calculating its Allowance for Repurchase Losses was never adjusted to account for the backlog, resulting in the major reason why the reserve was materially understated in 2005 and 2006.

82.    In addition, in accordance with GAAP, SFAS 140, the Company was required to consider the impact of its growing repurchase claims backlog in estimating the expected discounted resale value of the repurchased loans.  The Company failed to include the expected discount upon disposition of loans when estimating its Allowance for Repurchase Losses reserve in the second and third quarters of 2006, despite its growing repurchase claims backlog as well as the fact

that its discounted loan sales both in total volume and discount severity were increasing dramatically.   For example, the Company reported in its 2006 third quarter 10-Q:

> During the three and nine months ended September 30, 2006, we sold $409.9 million and $916.3 million, respectively, in mortgage loans at a discount to their outstanding principal balance.   Included in discounted loan sales for the three and nine months ended September 30, 2006 is approximately $152.1 million and $447.4 million, respectively, of second lien mortgage loans that were sold at a slight discount.   There were no discounted second lien sales for the same period in 2005.   The remaining $257.7 million and $468.9 million of discounted loan sales loans for the three and nine months ended September 30, 2006, respectively, consisted of repurchased loans, loans with documentation defects or loans that whole loan buyers rejected because of certain characteristics.   For the three and nine months ended September 20, 2005, discounted loan sales totaled $32.1 million and $178.5 million, respectively.   <u>As a percentage of secondary market transactions, when adjusting for the second lien transaction, discounted sales increased from 0.2% for the three months ended September 30, 2005 to 1.6% for the three months ended September 30, 2006.   The severity of the discount increased from 3.5% for the three months ended September 30, 2005 to 12.9% for the three months ended September 30, 2006.   As a percentage of secondary market transactions, when adjusting for the second lien transaction, discounted sales increased from 0.5% for the nine months ended September 30, 2005 to 1.1% for the nine months ended September 30, 2006.   The severity of the discount increased from 3.9% for the nine months ended September 30, 2005 to 8.7% for the</u>

1  <u>nine months ended September 30, 2006 due to a less favorable</u>

2  <u>secondary market for these types of loans as well as the mix of loans</u>

3  <u>sold as discounted sales</u>.  [Emphasis added.]

4  83.    According to a former New Century Vice President, Assistant

5  Controller, who was employed by the Company from September 2004 to July 2007

6  (CW 2)**,** contrary to GAAP, the Company did not include in its Allowance for

7  Repurchase Losses reserve <u>any</u> estimated discount upon disposition necessary to

8  report loans repurchased in the second and third quarters of 2006 at fair market

9  value.

10  84.    As admitted by the Company in its February 7, 2007 press release and

11  May 24, 2007 Form 8-K, New Century, in violation of GAAP, SFAS 140, failed to

12  account for both its growing backlog of outstanding repurchase claims, as well as

13  the expected discount upon disposition of the repurchased loans, in setting its

14  Allowance for Repurchase Losses reserve in 2005 and 2006.    These were

15  violations of GAAP that had a material effect on the Company's financial

16  statements.

17  85.    Throughout the Class Period, New Century also never publicly

18  disclosed the magnitude of its repurchase claims or its growing repurchase claims

19  backlog.  In fact, New Century did not report any quarterly data in its Forms 10-Q

20  regarding repurchases until after the end of the second quarter of 2006, when it

21  apparently reported only the portion of actual funded loan repurchases that were

22  resold at a discount during the 2006 second quarter, as opposed to total repurchase

23  claims received, validated or funded.  In the Form 10-Q filed for the quarter ended

24  June 30, 2006, New Century reported as follows:

25  The table below illustrates the composition of discounted loan sales

26  for each of the periods indicated (dollars in thousands):

27

28

| Three Months Ended June 30 | | | | |
| | 2006 | | 2005 | |
| | Principal | Discount | Principal | Discount |
| Repurchases From Whole Loan Investors | $45,911 | (27.6)% | $48,038 | (9.4)% |

86.     This disclosure came after Defendant Dodge publicly stated that the Company was experiencing only a "modest" rise in repurchase requests in the 2006 second quarter as a result of early payment defaults.  However, internal New Century repurchase claims and backlog data which was not publicly reported during the Class Period demonstrates that New Century actually received a total of $253,744,032 repurchase claims during the quarter ended June 30, 2006, and New Century actually paid $223,164,322 of repurchases during the quarter, as compared to the $45,911,000 of repurchases reported in the 2006 second quarter Form 10-Q. The repurchase claims received by the Company during the quarter ended June 30, 2006 were more than five times larger than the subset of repurchase data reported by the Company.

87.     Similarly, the above, non-public New Century repurchase claims data obtained through Lead Counsel's investigation demonstrates that the Company received a total of $444,218,156 of repurchase claims during the quarter ended September 30, 2006, whereas the Company's Form 10-Q for that quarter reported only that the Company paid $150,974,000 of repurchase claims from whole loan investors during the quarter.  This presentation was misleading as funded repurchases in the 2006 third quarter were less than half of the total repurchase claims received during the quarter and less than half the total repurchase claims backlog as of the end of the quarter.  The Company's publicly reported repurchases for the nine months ended September 30, 2006, were also less than half of the total repurchase claims received but not disclosed by New Century during that same time period.

88.    A review of the Company's actually funded repurchases on a year-to-year "vintage" loan basis (which were not publicly reported on a quarterly basis in the Company's Forms 10-Q and K during the Class Period other than in connection with discounted loan sales data in the 2006 second quarter and in the 2006 third quarter), also demonstrates a significant pattern of increasing repurchases. According to internal, non-public New Century data obtained through Lead Counsel's investigation, the Company funded a total of $255,420,289 repurchases of 2004 vintage loans, representing 0.61% of total originations; and $419,667,368 of repurchases of 2005 vintage loans, representing 0.77% of total originations. According to the internal data, the Company funded a total of $414,948,357 of repurchases of 2006 vintage loans as of early 2007, representing 0.76% of total originations, only a few months into the 2007 year.  The Company was required by GAAP to consider its increasing repurchases and growing backlog of repurchase claims in setting its Allowance for Repurchase Losses reserve, but failed to do so.

89.    Only at and after the end of the Class Period did the Company disclose the need to restate its previously issued financial statements based on material violations of GAAP in setting New Century's Allowance for Repurchase Losses reserve.  In that regard, the Company finally admitted that:  (1) it failed to account for (a) the expected discount upon disposition of its repurchased loans; and (b) its growing backlog of repurchase claims outstanding when stating its Allowance for Repurchase Losses reserve in 2005 and 2006; and (2) that its previously reported 2005 and 2006 financial statements should no longer be relied upon.

90.    The Company's February 7, 2007 restatement announcement came less than three months after newly hired Tajvinder S. Bindra replaced Defendant Dodge as Chief Financial Officer of the Company, effective November 15, 2006. According to a former New Century Senior Vice President of Financial Planning who reported directly to Bindra and was employed by the Company from February

2007 until July 2007 ("CW 4"), Bindra told the former employee that he was the one who revealed the Company's accounting errors and that he observed that New Century's reserves were way too low as soon as he came on board. This is consistent with a July 11, 2007 filing in the bankruptcy court by Heller Ehrman LLP which states at page 11 that it acted as special counsel to the independent subcommittee of New Century's Audit Committee and that, "The initial focus for the Investigators was an analysis of [New Century's] accounting for its repurchase reserve, <u>an issue that had first been flagged by [New Century's] new Chief Financial Officer</u> and that had become the basis for [New Century's] February 7, 2007 announcement that it would be restating certain financial results." (Emphasis added.) This is also consistent with the Examiner's Report as set forth below.

91. Consistent with the results of Lead Counsel's investigation, the Examiner reports the following additional facts:

New Century's repurchase reserve calculation failed to include potential losses associated with Backlog Claims.[5] <u>During 2005 and through September 30, 2006, Backlog Claims never were considered in New Century's calculation of its repurchase reserve.</u> Estimated expenses and losses on an assumed percentage of Backlog Claims expected to be valid should have been taken into account along with estimated expenses and losses on projected future repurchase claims.

* * *

<u>New Century knew of a large number of reported but unresolved claims at year-end 2005 ($188 million) and a further mounting volume of repurchase claims by no later than June 2006.</u> Similarly, KPMG's workpapers for the 2005 audit reflect knowledge

---

[5] The Examiner defines "Backlog Claims" to include repurchase claims received by or pending at New Century relating to loans sold by New Century prior to 90 days of the close of any given quarterly accounting period. Examiner's Report at 178.

of the $188 million in outstanding repurchase claims, but KPMG took no steps to test whether the New Century repurchase reserve calculation took any or all of these claims into account.

\* \* \*

In reality, beginning no later than 2004, New Century was receiving repurchase requests related to loans outside of the previous 90-day period and it was taking much longer than 90 days to evaluate and process repurchase requests and repurchase loans.  New Century was not reserving, however, for these loans that it might be required to repurchase and on which it might incur losses and expenses, but for which no reserve was provided.

\* \* \*

The data set forth later in this section of this Final Report establish that New Century did not include in the repurchase reserve calculation any estimate of expenses and losses associated with Backlog Claims. . . .  This was a significant error, leading to a material underestimation of the quantity of repurchases for which the repurchase reserve needed to account.  Examiner's Report at 213, 183 (emphasis added).

92.    The Examiner also reported facts, consistent with those uncovered by Lead Counsel's investigation, both that New Century had poor internal reporting of repurchase claims and that New Century's growing repurchase claims backlog was "no secret" and "general knowledge" within the Accounting, Finance and Secondary Marketing groups:

New Century experienced an increase in repurchase claims beginning in the fourth quarter of 2004 and continuing at a much greater rate in 2006.  As such claims continued to grow, the Accounting Department continued to compute the quantity of loans

·

that might need to be repurchased as of the close of a reporting period based on the assumption that only the loans that were sold in the prior 90 days before the financial statement reporting date would be susceptible to repurchase. This was a significant error, resulting in a material underestimate of the required repurchase reserve.

New Century failed to keep careful records of its unresolved repurchase claims. Had it kept careful records, it would have learned at an early date of the growing amount of Backlog Claims relating to loans sold before the 90-day look-back period. This is an internal controls deficiency, which is discussed in Section VIII. of this Final Report.[6]

Even though New Century did not maintain accurate data regarding the growing Backlog Claims, their existence was no secret.

* * *

The data are clear that New Century personnel knew that many repurchase claims pending as of the time of a quarterly financial statement pertained to loans that had been sold in earlier quarters. KPMG likely knew of this information in early 2005, and data specifically communicated to KPMG in early 2006 that pending repurchase claims were $188 million at December 31, 2005 should have made KPMG investigate the issue. Both New Century and KPMG, however, proceeded quarter after quarter to assume with no in-depth investigation that the only loans needing to be considered in the repurchase reserve calculation were loans sold during that quarter.

---

[6] As noted above, the New Century Officer Defendants repeatedly certified the adequacy of the Company's internal controls throughout the Class Period and at the time of the Offerings notwithstanding then-existing internal control deficiencies uncovered by Lead Counsel's investigation and confirmed by the facts uncovered by the Examiner as set forth in paragraphs 191-96 below.

This was a significant error, accounting for more than 50% of the dollar value of the repurchase reserve accounting errors.

\* \* \*

The Examiner investigated to determine if there were any particular developments in 2005 that might have suggested an awareness on the part of New Century or KPMG that the repurchase reserve calculation had flaws and/or needed to be reexamined.  The Examiner identified data that make clear that the proper calculation of the repurchase reserve, including the Backlog Claims issue, should have been an issue for both New Century and KPMG in 2005.

First, on January 26, 2005, as part of its 2004 audit of New Century's financial statements, KPMG specifically asked New Century's Accounting Department via e-mail  . . . why there had been a "big jump" in repurchases in November 2004.  This provoked an e-mail exchange within New Century, culminating with the following explanation from Cloyd to Walker:  "many of the loans repurchased were from prior quarters and months leading to the increased volume and discount."  This is a clear indication that New Century Accounting Department personnel knew that many loans that were ultimately repurchased in 2004 were Backlog Claims, *i.e.*, or loans sold outside the 90-day window that New Century used to calculate the volume of loans that might need to be repurchased. Notwithstanding this information, New Century did nothing to adjust its methodology for estimating the quantity of loans that might need to be repurchased as of the end of a financial reporting period. Examiner's Report at 205-06, 180, 189 (emphasis added).

93.    Moreover, the Examiner reported the fact that New Century's Treasurer, Jeffrey Goldberg, stated that the problem of the growing backlog of

repurchase claims was a matter of "<u>general knowledge</u>" within the Accounting, Finance and Secondary Marketing groups.  <u>Id.</u> at 206 (emphasis added).

94.    In addition to the growing backlog, another fact and "red flag" confirmed by the Examiner was that New Century reserved "significantly less" than smaller mortgage banking companies, a fact which led Taj Bindra to reveal the GAAP errors shortly after he was hired:

> [T]he failure to take a more critical look at the repurchase reserve calculation methodology is all the more inexplicable because the New Century repurchase reserve presented a red flag, as New Century reserved significantly less than smaller mortgage banking companies. Within a month [that] Taj Bindra started as New Century's CFO in November 2006, he asked New Century's Accounting personnel, and later KPMG, to justify the amounts and calculation methods for New Century's repurchase reserve.   Such inquiries by Bindra led in relatively short order to the discovery of material accounting errors in January 2007 and the restatement announcement on February 7, 2007.

> * * *

> [Bindra] told the Examiner that his concern was prompted, in large measure, by what he perceived as an apparent discrepancy between New Century's extremely high loan origination volume and relatively low repurchase reserve, which was $10.3 million when he arrived at New Century in November 2006.   Because he believed New Century's repurchase reserve was far less than the comparable reserve for other mortgage banking companies and that its potential exposure to repurchase obligations was greater given larger origination volumes, Bindra continued to question how the New Century repurchase reserve was calculated and whether it was consistent with

New Century's exposure to repurchase claims.  Examiner's Report at 181, 209-10 (emphasis added).

95.    The Examiner further reported the fact that the "magnitude of such accounting errors was significant:"

The magnitude of such accounting errors was significant.  The Examiner estimates that at year-end 2005, the repurchase reserve should have been approximately $17.0 million, rather than the $5.5 million reported by New Century in its 2005 Form 10-K.  Similarly, at September 30, 2006, the repurchase reserve should have been approximately $115.2 million, rather than the $10.3 million reported by New Century in its Form 10-Q for that quarter.  Examiner's Report at 177 (emphasis added, footnotes omitted).[7]

96.    In addition to the failure to consider Backlog Claims, the Examiner reported several other material facts demonstrating further GAAP violations in the calculation of New Century's Allowance for Repurchase Losses reserve including the failure to reserve for "Interest Recapture" at all times throughout 2005 and certain other GAAP violations starting in the second and third quarters of 2006:

New Century entered into sales agreements with [whole] loan purchasers ("Investors"), selling most loans at a premium to par value.  In 2005, on average, New Century appears to have sold loans at a 2.06% premium to par, meaning that a $100,000 loan, on average, was sold for $102,060.  In such sales agreements, New Century typically was obligated to repurchase a loan from Investors if the borrower defaulted on the loan soon after the sale or if New Century failed to

---

[7] As set forth below, the magnitude of these errors increases when combined with other errors and adjustments identified by the Examiner involving this same reserve including New Century's failure to account for its repurchased loans consistent with its own Lower of Cost or Market ("LOCOM") policy.  Examiner's Report at 222.

comply with representations and warranties contained in the loan purchase agreements.

When New Century repurchased loans, it incurred expenses and potential losses. First, New Century not only needed to pay the Investors then-existing full principal amount of the loan, but also was required to repay Investors the premium (or some portion of it) that had been paid at the time of the original sale ("Premium Recapture"). Second, New Century had to pay Investors for any interest due on the loan that had not been paid by the borrower ("Interest Recapture"). Third, New Century needed to account for any losses on the loan that it repurchased. Repurchased loans frequently were not performing as required, such as due to a continuing borrower payment default, and the loan might be worth substantially less than the full principal amount at which it was repurchased by New Century.

Under GAAP, New Century was obligated to establish a loss reserve for potential expenses and losses related to repurchases that could be expected. In its Form 10-K for 2005, and for earlier periods as well, New Century stated that its repurchase reserve was "the Company's estimate of the total losses expected to occur" in connection with the potential loan repurchase exposure related to loan sales.

There is no dispute that New Century failed to account properly for repurchase reserves. New Century admitted on February 7, 2007 and May 24, 2007, and the Examiner's investigation has confirmed, that New Century violated GAAP in multiple respects. KPMG, New Century's independent auditor, similarly has acknowledged that New Century did not satisfy GAAP requirements pertaining to repurchase reserves and repurchased loan valuation.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

<u>First, for all accounting periods up to the third quarter of 2006, New Century failed to include amounts in the repurchase reserve for Interest Recapture</u>.[8]  Second, starting in the second quarter of 2006, New Century failed in its repurchase reserve calculation to compute the LOCOM adjustment ("Inventory Severity") for loans that it had already repurchased but had not sold.  Third, starting in the third quarter of 2006, New Century failed to reserve for anticipated losses on loans that would need to be repurchased in the future ("Future Loss Severity"). Examiner's Report at 177-78 (emphasis added, footnotes omitted).

97.    The Examiner reported facts demonstrating that these additional GAAP violations were "perplexing," "troubling" and without "justification:"

<u>The failure to include Interest Recapture in the repurchase reserve calculation from the outset is perplexing because the Examiner understands that it was a long time requirement under loan purchase agreements for New Century to pay Investors the amount of interest that the borrower had failed to pay</u>.  Accordingly, this was a standard part of a repurchase arrangement, no different in substance than the Premium Recapture that was included at all times in the calculation of the repurchase reserve.

*   *   *

The Examiner is further troubled by the handling of the second quarter of 2006 change to the calculation methodology because this

---

[8] "The Examiner did not undertake a detailed review to quantify the dollar amounts of Interest Recapture that should have been included in the repurchase reserve for reporting periods before year end 2005.  However, the Examiner estimates that the unreported Interest Recapture component of the repurchase reserve for 2004 should have been approximately $790,000, compared to the reported repurchase reserve in the 2004 Form 10-K of $7.9 million, an understatement of about nine percent."  Examiner's Report at 184-85.