matter was not disclosed to the Audit Committee.  The Audit Committee met on July 26, 2006 and repurchase reserves were a specific topic of discussion.  The minutes indicate that "Mr. Sachs then asked a question about the adequacy of the Corporation's repurchase reserves and Mr. Donovan [KPMG] and Ms. Dodge [New Century] responded."  Neither Donovan nor Dodge disclosed the changes, although Kenneally advised the Examiner that he assumed that the changes had been discussed since repurchase reserves were on the agenda for that meeting.

*  *  *

The[] third quarter of 2006 changes to the repurchase reserve calculation methodology were not revealed to the Audit Committee despite many opportunities for KPMG and Management to do so.  In the fourth quarter of 2006, there were four meetings of the Audit Committee attended by Kenneally, Kim [KPMG] and Donovan [KPMG].  According to the minutes of these meetings, a report to the Committee from KPMG was always the first item on the agenda.  At the October 25 meeting, Donovan advised the Committee that "management's estimates with respect to its repurchase reserves were considered adequate when compared to historical experience."  At other meetings, Donovan and Kim reported to the Committee on the adequacy of internal controls over financial reporting and the lack of material concerns with respect to Management's preparation of financial information.  Despite these repeated and ample opportunities for Accounting and KPMG to apprise the Audit Committee of the significant modifications to the repurchase reserve calculation which had occurred in the prior two quarters, neither disclosed this information to the Committee.

* * *

The Future Loss Severity component was included in the calculation of the repurchase reserve through the quarter ended June 30, 2006 but was eliminated for the quarter ended September 30, 2006. <u>There is no justification for eliminating Future Loss Severity from the calculation, particularly in light of the significant increase in repurchase claims New Century was experiencing in 2006.</u> Examiner's Report at 188, 201, 204, 216 (emphasis added, footnotes omitted).

98.     The Examiner also reported facts demonstrating that New Century failed to apply LOCOM methodology consistent with industry practice and the Company's own LOCOM policy before eliminating the LOCOM adjustment for repurchased loans in the second quarter of 2006:

New Century reported repurchased loans pending resale on its balance sheet as part of LHFS [Loans Held for Sale]. In accordance with GAAP, New Century was required to report its LHFS at LOCOM [Lower of Cost or Market]. <u>The Examiner has determined that New Century not only failed to apply LOCOM consistent with industry practice, but also failed to account for its repurchased loans consistent with its own LOCOM policy.</u>

* * *

The Examiner further determined that the prices (or marks) that New Century used to value repurchase loans in the fourth quarter of 2005 and first quarter of 2006 were not consistent with the marks used in its LOCOM analysis for its LHFS portfolio. In addition, starting in the second quarter of 2006, New Century eliminated entirely this LOCOM adjustment for repurchase loans.

Second, the Examiner found that New Century did not apply LOCOM in a manner consistent with industry practice, thereby enabling the Company effectively to hide losses in its LHFS portfolio by offsetting losses in certain loan categories with gains in other loan categories. . . . By utilizing this practice, New Century consistently determined that a LOCOM adjustment was not required.  The result was that New Century did not mark down the value of the "scratch and dent" and other non-performing loans.

* * *

This practice of re-aggregating loans into a single category after the loans were priced, and using gains to offset losses, is inconsistent with industry practice and the interpretation of FAS 65 as applied by financial institutions and various other mortgage banking companies. In practice, mortgage banking companies typically recognize a LOCOM valuation allowance for categories of loans where the market value is below cost, especially for non-performing loans and repurchased loans.

By virtue of this practice, the Examiner determined that New Century's LHFS portfolio was overstated for at least the year ended December 31, 2005 and for the first three quarters of 2006. Examiners Report at 222-25 (emphasis added, footnotes omitted).

99.    For New Century's last four reported quarterly results, the Examiner calculated the total quarterly income statement impact of all of these GAAP violations in New Century's reported repurchase reserves as follows:  Year End 2005 ($21,320,000); Q1 2006 ($21,455,000); Q2 2006 ($60,515,000); and Q3 2006 ($87,325,000).  Examiner's Report at 222.

100.    Consistent with Lead Counsel's investigation, the Examiner also reported facts demonstrating that New Century's quarterly Forms 10-Q and 10-K

issued in 2005-06 were misleading for failing to disclose the existence and amount of the Company's growing repurchase claims backlog:

> As discussed in more detail in Section VI. of this Final Report, by the end of 2005 New Century appears to have had a backlog of approximately $143 million in repurchase claims that had not been taken into account in the Company's repurchase reserve calculation. That repurchase claim backlog grew significantly through the first three quarters of 2006. An internal New Century report dated August 30, 2006 showed a backlog of approximately $170 million in unresolved repurchase claims that were more than two months old at that time, and of those, approximately $75 million were more than six months old. Other internal New Century reports prepared in the fall of 2006 showed the following repurchase backlog amounts at the end of each month from January through September 2006:

| 2006 | Internally Reported Month-end Backlog |
|------|----------------------------------------|
| January | $209.1 [million] |
| February | $278.3 [million] |
| March | $281.6 [million] |
| April | $243.1 [million] |
| May | $225.8 [million] |
| June | $199.1 [million] |
| July | $212.8 [million] |
| August | $335.2 [million] |
| September | $399.8 [million] |

The Company's Form 10-K for 2005 and each of its Forms 10-Q for the first three quarters of 2006 reports the following under the heading "Allowance for Repurchase Losses," after describing generally what the allowance for repurchase losses was: "Generally,

repurchases are required within 90 days from the date the loans are sold. *Occasionally*, we may repurchase loans after 90 days have elapsed." (Emphasis added.) There is no mention in these filings of the repurchase backlog. In light of the large, and growing size of the repurchase backlog during this time period, it was misleading for New Century to report that it "occasionally" repurchased loans "after 90 days [had] elapsed" from the time of the loan sale – without at least also disclosing the existence and amount of the repurchase claims in the backlog that were more than 90 days old.

New Century's disclosure regarding the allowance for repurchase losses in the Form 10-K for 2005 also reports: "As of December 31, 2005 and December 31, 2004, the repurchase allowance totaled $7.0 million and $6.3 million, respectively. Approximately $10.7 billion and $8.3 billion of loans were subject to repurchase, *representing loans sold during the fourth quarter of 2005* and the fourth quarter of 2004, respectively." (Emphasis added.) The Form 10-Q filings for the first three quarters of 2006 have similar language that discloses the amount of the repurchase reserve for each period, but the Form 10-Q filings do not include the language about "representing loans sold" during the just-ended quarter.

In light of the repurchase backlog that existed at the end of 2005, it was misleading for New Century to report, as it did in the highlighted language in the paragraph above, that the amount of loans subject to repurchase "represent[ed] loans sold" during the just-ended quarter. In fact, New Century's August 2006 internal report regarding the repurchase backlog shows that there were more than $38 million of loans in the backlog that, as of August 2006, were more than 12 months old, meaning that those loans had been sold sometime before

August 2005, which was obviously before the start of the fourth quarter of 2005. Thus, the statement in the Form 10-K for 2005 that the loans subject to repurchase at year-end 2005 "represent[ed] loans sold during the fourth quarter of 2005" was neither complete nor accurate.

This inaccurate Form 10-K disclosure is all the more difficult to comprehend in light of the fact that New Century's Form 10-Q for the third quarter of 2005, filed just four months before the Form 10-K for 2005 was filed, contained the following language regarding the amount of the repurchase allowance and what it represented: "As of September 30, 2005 and December 31, 2004, the repurchase allowance totaled $5.9 billion and $6.3 billion, respectively, and approximately $10.0 billion and $8.3 billion of loans, respectively, were subject to repurchase, *generally* representing loans sold during the prior quarter." The use of "generally" in this disclosure, a word that was not used in this part of the Form 10-K for 2005, arguably makes this a more accurate disclosure in light of the backlog, even though it cannot be said to enhance the disclosure of information about the backlog. It is not clear why New Century did not continue with the use of "generally" in this part of the repurchase allowance disclosure in its Form 10-K for 2005.

In summary, New Century's failure to disclose the existence and amount of the repurchase backlog through the third quarter of 2006 is troubling. The Examiner believes that the existence and amount of the backlog during this time period was information that was necessary to make the information that was disclosed about the allowance for repurchase losses not misleading. Examiner's Report at

421-23 (emphasis added, except for where in italics which was added by the Examiner, and Examiner's footnotes omitted).

## 2.    Securitizations Structured As Sales - GAAP Violations

101.    In addition to admitting the need to restate its financial statements to correct material "errors" in reporting its Allowance for Repurchase Losses reserve, on and after February 7, 2007, New Century further admitted to material "errors" in its previously filed 2005 and 2006 financial statements in connection with the Company's valuation of residual interests in securitizations structured as sales.

102.    In a securitization structured as a sale for financial reporting purposes, New Century recognized a gain on sale at the time it sold a pool of loans. New Century also recorded on its balance sheet at the closing of a securitization structured as a sale a valuation of the residual interests ("Residual Interests") it retained in the securitized pool of loans. The Residual Interests were supposed to represent the present value of the future cash flows the Company expected to receive. In 2005, New Century completed four securitizations structured as sales totaling approximately $11 billion, recognized a gain on sale of $141.5 million on those transactions, and retained Residual Interests that the Company publicly reported at $97.5 million.

103.    New Century represented that it valued and accounted for its Residual Interests in accordance with GAAP, SFAS 140. In this regard, according to New Century's 2005 Form 10-K, the Company purportedly reviewed the underlying assumptions it used to value Residual Interests on a quarterly basis and adjusted the carrying value of the Residual Interests based on actual experience and industry experience. In valuing the Residual Interests, New Century, on a quarterly basis, purportedly estimated, inter alia, delinquencies, defaults and default loss severity as they affected the amount and timing of estimated cash flows. According to the 2005 Form 10-K, New Century purportedly based its estimates on historical loss data for the loans, the specific characteristics of the loans, and the general

economic environment.  According to New Century's 2005 Form 10-K and other SEC filings during the Class Period, as a result of these reported quarterly evaluations and purportedly consistent with GAAP, SFAS 140, New Century reported its Residual Interests at "fair value" throughout the Class Period.  New Century's total Residual Interests were reported at $234,930,000 as of December 31, 2005 and at $223,680,000 as of September 30, 2006.

104.  In fact, as now admitted, during the Class Period, New Century's reported Residual Interests were materially overstated as the Company failed to account for decreasing loan quality and underwriting practices and increasing delinquencies, defaults and default loss severity throughout 2005 and 2006. Importantly, New Century's reported Residual Interests would be paid only after all other senior interests in the securitization pools were satisfied and only if the securitization's over-collateralization requirements had been met.[9]  New Century's income from and valuation of its Residual Interests depended upon the pool of loans securitized actually producing a stream of payments in excess of that due to all senior certificate holders.  Thus, the value of the Residual Interests was directly related to the quality of the loans in the securitized pool and the strength of the Company's underwriting of those loans.

105.  It was only in connection with the Company's February 7, 2007 and May 24, 2007 disclosures, that the Company revealed that there were material "errors" in the Company's previous financial statements with respect to the

---

[9] "In general, New Century's residual interest in a securitization trust was related to the additional assets, above the aggregate principal value of the securitization, that New Century put into the trust's over-collateralizations ('OC') account when the trust was created.  The OC account represented a form of credit enhancement for investors in the trust, which gave them 'a margin for error' in case the loans in the trust did not produce adequate cash flows to meet their expectations.  As such, a trust's OC requirements could increase 'investor confidence' in a securitization.  Because of the 'credit enhancement' features of these securitization trusts, they were often referred to as Credit Enhancement 'CE' securities.  .  .  .  In general, New Century would not receive cash flow from its residual interest in a securitization trust unless the trust's over-collateralization requirements had been met."  Examiner's Report at 232.

Company's valuation of these Residual Interests.  Additional information regarding the Company's decreasing loan quality and underwriting practices and increasing delinquencies and defaults throughout 2005 and 2006 which the Company should have but failed to take into account in recording its Residual Interests throughout the Class Period is set forth in detail in paragraphs 120-90 below.

106.  Consistent with the results of Lead Counsel's investigation, the Examiner reported additional facts demonstrating that, in violation of GAAP, New Century failed to increase the discount rate it used to value its Residual Interests in 2005 and 2006 to reflect increased risk, which would have materially reduced the value of its reported Residual Interests throughout the Class Period:

> [A] critical assumption in each residual interest model was the discount rate that was used to compute the present value of the future cash flows to which New Century was entitled.  <u>The Examiner has determined that New Century insisted on using unduly low discount rates (of 12% for some residual interests and 14% for others) in both 2005 and 2006 that led to an overvaluation of New Century's residual interests of no less than $14.8 million (6.3%) as of December 31, 2005 and of comparable amounts in the quarters that followed.  Not only New Century's Management, but ultimately its independent Directors as well, repeatedly resisted warnings from specialists at KPMG, who warned that the discount rates New Century was using were below those used by most of its peers.</u>

* * *

> As previously discussed, the results produced by New Century's residual interest valuation models depended heavily upon the assumptions they used.  A key assumption for these purposes was the discount rate used in each model to compute the present value of the net cash flows associated with the residual interest in the

securitization to which that model related. The valuation of New Century's residual interests bore a direct but inverse relation to the discount rates used in the residual interest models. <u>If the discount rates increased, the residual interest valuations would necessarily decline</u>.

New Century's choice of discount rates – 12% for residual interests in CE securitizations and 14% for NIMS residuals – was a subject of continuous discussion by New Century and certain people within KPMG during 2005 and 2006.

\* \* \*

[T]here is evidence that Senior Management[10] within New Century had reason to believe as early as 2005 that its residual interest discount rates might be too low. Certain officers, including Cloyd, were aware, by at least July 2005, of the downward turn in the subprime mortgage market and the concomitant increase in risk associated with its residual interest portfolio. Internal e-mails in December 2005 suggest that senior executives were aware that any secured financing relating to residual interests would carry interest rates close to 25% and that an increase in New Century's residual interest discount rates to that level would result in a substantial reduction in the valuations of those residual interests.

\* \* \*

At least as far back as May 2005, [KPMG's Structured Finance Group "SFG"], led by [KPMG Partner] Carnahan, consistently produced memoranda that suggested New Century's discount rates might be too low and that urged KPMG's engagement team to require

---

[10] The Examiner defined "Senior Management" to include Defendants Cole, Morrice, Gotschall and Dodge from 2004-06.

New Century to supply information that would support those low rates.[11]

* * *

For example, in its memorandum for the December 31, 2005 year-end audit, SFG observed that "we are aware of numerous residual interest sales in the last year and [sic] with the average discount rate in the range of 18% to 25% depending on the other assumptions." Similarly, in an e-mail dated February 14, 2006, Carnahan advised the engagement team that numerous clients had sold residuals in the 2005 financial year and that the average discount rate was 18% to 23%, depending on other variables. In relation to New Century's residual interests in 2005 securitizations, Carnahan observed that for similar NIMS products, Washington Mutual had used a discount rate of 35%, and Countrywide Financial had used a 40% discount rate.[12]

* * *

[T]he Examiner concludes that New Century should have increased its residual interest discount rates before the end of 2005 to no less than 15% for its residual interests in CE securitizations and no less than 17% for its residual interests in NIMS and that, had it done so, the aggregate value of its residual interests as of year-end 2005

---

[11] KPMG, which is further discussed in paragraphs 204-35 below, requested such support starting at least for its quarterly review for the first quarter of 2005 and again for its second and third quarters of 2005 reviews, but "SFG never saw such documentation in 2005." Examiner's Report at 286.

[12] As reported by the Examiner and set forth below in detail, "SFG's concerns about New Century's discount rates appeared to become increasingly urgent during 2006." Examiner's Report at 288.

would have been almost $14.8 million less than New Century report on its financial statements.

The Examiner reaches this conclusion based upon the following considerations:

• SFG [KPMG] consistently found that most other firms in the mortgage industry were using higher residual interest discount rates in 2005 and 2006.

• Carnahan [KPMG], as the responsible SFG partner and a former audit partner of New Century, had the greatest qualifications to assess New Century's residual interest discount rates, and he consistently expressed concerns throughout 2005 and 2006 that those rates might be too low.

• A survey of discount rates by the Examiner found that the residual interest discount rates used by other subprime mortgage lenders ranged from 15% to 21% during 2005 and from 16% to 22% during 2006.

• Kenneally's [New Century Controller] own October 2006 survey of accounting policies used by peer firms suggested that those firms used residual interest discount rates that ranged from 18% to 22%.

* * *

• New Century decided to use an 18% discount rate for its on-balance sheet securitizations in 2005.

* * *

Based on recalculations using New Century's own residual interest models, the Examiner has determined that, had New Century used discount rates of 15% (for its residual interests in CE securitizations) and 17% (for its residual interests in NIMS) as of

December 31, 2005, the aggregate value of its residual interests as of year-end 2005 would have been at least $3.8 million less for New Century's residual interests pre-2003 securitizations and $11 million less for its residual interests in the 2005 off-balance sheet securitizations.  Thus, the Examiner concludes that, because New Century used unreasonably low discount rates to value its residual interests in 2005, those residual interests were over-valued on New Century's balance sheet as of December 31, 2005 by no less than $14.8 million.

The valuations of New Century's residual interests in its quarterly financial statements during 2006 were similarly inflated by New Century's continued reliance upon unduly low residual interest discount rates.  Examiner's Report at 230, 283-87, 303-04 (emphasis added).

107.  The Examiner found additional facts demonstrating additional material errors and overstatements in New Century's 2005 and 2006 reporting of Residual Interests as follows:

In general, the Examiner found that New Century relied for far too long on antiquated and flawed internally-developed Excel-based models to value residual interests that represented hundreds of millions of dollars of assets on New Century's books.  As of December 31, 2005, residual interests in off-balance sheet securitizations were valued at $234.9 million on New Century's balance sheet.  The Examiner found that the people at New Century most knowledgeable about these models were well aware of the models' flaws and had suggested that New Century use professionally developed third-party models instead.  KPMG's engagement team also repeatedly found evidence of those flaws.

* * *

Everyone at New Century who was familiar with the Company's models for valuing its residual interests – including members of the Board, the highest levels of New Century's Senior Management, the Company's chief financial and accounting officers, and the people within New Century's Secondary Marketing Department who built and operated the residual interest valuation models – understood that the accuracy of the results produced by those models depended heavily upon key assumptions.  <u>Yet many of those assumptions were flawed in ways that tended to result in inflated valuations of New Century's residual interests.</u>  New Century's own internal analyses in February 2007 concluded that, when proper assumptions were applied, New Century's residual interests would need to be written down by approximately $90 million from the amounts at which they were valued as of September 30, 2006.

* * *

New Century's residual interest models also relied upon improper assumptions about the likely values of the remaining loans in the off-balance sheet securitization trusts at the times when those trusts were "cleaned up" or terminated because the unpaid principal balances of those trusts made them uneconomic to service.  <u>New Century uniformly – and without much thought or any reexamination – assumed that all of those loans could be sold at par, regardless of their delinquency status or market conditions.</u>

* * *

The Examiner has determined that by improperly relying upon the par value assumption, New Century's residual interest valuations

as of December 31, 2005 were overstated by no less than $27.5 million (11.7%). The valuations reported in subsequent quarters were similarly overstated.

The Examiner found that there were flaws in other key assumptions used in New Century's residual models, including the assumptions regarding how quickly loans in the off-balance sheet securitization trusts would be prepaid, the losses they would incur, and the dates upon which the trusts would be terminated. Although the Examiner has not tried to quantify the specific financial statement impacts of these other flawed assumptions, the Examiner has observed that these flaws frequently results in inflated residual interest valuations and often persisted in the face of internal criticism and questions from New Century's independent auditors.

\* \* \*

[I]t does not appear that the Company's use of improper prepayment assumptions could be characterized as inadvertent. To the contrary, New Century's failure to adjust its prepayment rates to reflect changing market conditions was contrary to the advice it consistently received as far back as the first quarter of 2005 from KPMG's SFG, which repeatedly expressed concern about the Company's use of low prepayment speed assumptions. In fact, the changes made to prepayment assumptions that are described in the 2007 Hatch Memorandum seem consistent with what KPMG's SFG had been recommending for years before that time.

\* \* \*

1
2
3
        <u>Finally, the Examiner has found that New Century's residual interest valuation process was infected by a dangerous lack of internal controls.</u>[13]  Examiner's Report at 229-31, 325 (emphasis added).

4     108.   These facts directly contradict the New Century Officer Defendants'
5 repeated statements during the Class Period and at the time of the Offerings that
6 Residual Interests were fairly stated in accordance with GAAP.  Moreover, as set
7 forth in paragraph 364 below, these facts demonstrate that Defendant Gotschall's
8 repeated and reassuring public statements on September 6-7, 2005 that New
9 Century booked its Residual Interests "<u>conservatively,</u>" with "<u>very conservative</u>
10 <u>assumptions</u>" were materially misstated when made.

11     **3.     <u>Securitizations Structured As Financings - GAAP Violations</u>**

12     109.   According to New Century's 2005 Form 10-K, "Mortgage Loans Held
13 for Investment" represent loans securitized through transactions structured as
14 financings, or pending securitization through transactions that were expected to be
15 structured as financings.  According to the 2005 Form 10-K, Mortgage Loans Held
16 for Investment were stated at amortized cost, including the outstanding principal
17 balance, less an allowance for loan losses, plus net deferred origination costs.
18 According to the 2005 Form 10-K, New Century purportedly established an
19 allowance for loan losses ("Allowance for Loan Losses") reserve based on its
20 estimate of losses inherent and probable as of the balance sheet date, and charged
21 off uncollectible loans at the time they were liquidated.

22     110.   Throughout the Class Period, New Century represented that in
23 accordance with GAAP, it evaluated the adequacy of its Allowance for Loan
24 Losses reserve each quarter, giving consideration to factors such as the current

25
26
27
28

---

[13] As noted above, the New Century Officer Defendants repeatedly certified the adequacy of the Company's internal controls throughout the Class Period and at the time of the Offerings notwithstanding then-existing internal controls deficiencies uncovered by Lead Counsel's investigation and confirmed by the Examiner as set forth in paragraphs 191-96 below.

performance of the loans, credit characteristics of the portfolio, the value of the underlying collateral and the general economic environment.

111. However, a review of the Company's Allowance for Loan Losses reserve during the Class Period demonstrates that the Company's Allowance for Loan Losses reserve was actually decreasing throughout the Class Period as a percentage of Mortgage Loans Held for Investment ("MLI") that were 60 days or more delinquent (dollars in thousands):

| Quarter | MLI | Loan Loss Allowance | LLA as a % of MLI | MLI 60+ Delinquent | % of MLI 60+ Del. | LLA as a % of 60+ Del. |
|---------|-----|---------------------|-------------------|--------------------|-------------------|------------------------|
| 3Q'06 | 14,222,560 | 191,561 | 1.35% | 817,800 | 5.75% | **23.42%** |
| 2Q'06 | 16,115,525 | 209,889 | 1.30% | 710,300 | 4.41% | **29.55%** |
| 1Q'06 | 16,312,684 | 209,804 | 1.29% | 735,300 | 4.51% | **28.53%** |
| 4Q'05 | 16,341,996 | 198,131 | 1.21% | 666,800 | 4.08% | **29.71%** |
| 3Q'05 | 18,508,072 | 177,759 | 0.96% | 479,200 | 2.59% | **37.09%** |
| 2Q'05 | 18,628,555 | 145,565 | 0.78% | 319,500 | 1.72% | **45.56%** |
| 1Q'05 | 15,953,698 | 117,495 | 0.74% | 211,100 | 1.32% | **55.66%** |
| 4Q'04 | 13,285,551 | 90,227 | 0.68% | 179,200 | 1.35% | 50.35% |
| 3Q'04 | 10,975,111 | 84,656 | 0.77% | 75,900 | 0.69% | 111.54% |
| 2Q'04 | 9,207,779 | 61,307 | 0.67% | 78,500 | 0.85% | 78.10% |
| 1Q'04 | 6,044,873 | 45,596 | 0.75% | 48,600 | 0.80% | 93.82% |

112. In fact, as demonstrated by the above data, the Company unexplainably <u>reduced</u> its Allowance for Loan Losses reserve in the 2006 third quarter in the face of a material increase in loan delinquencies and when loan delinquencies were at their <u>highest</u> levels.

113. As reported by analyst Zach Gast of The Center for Financial Research and Analysis (the "CFRA"), New Century, at first, did not disclose the fact that it had actually reduced its Allowance for Loan Losses reserve in the quarter-ended September 30, 2006 and, instead, changed its public reporting in that quarter. As observed by Gast, for the first time, New Century publicly reported its Allowance for Loan Losses reserve in the 2006 third quarter on a <u>combined</u> basis with an allowance for Real Estate Owned (properties that New Century acquired as the result of foreclosures) masking the decline in its Allowance for Loan Losses reserve:

NEW's presentation of its loan loss allowance changed at 9/30/06, and does not appear to properly reflect reserve levels or loan losses. After adjusting for valuation allowances on [Real Estate Owned], it appears that reserves actually declined by 8.7% during the quarter. . . .

*  *  *

NEW significantly changed its presentation of the allowance for loan losses, combining it with the allowance on Real Estate Owned.

*  *  *

The Company's reported allowance for loan losses, which for the first time included valuation allowances on [Real Estate Owned], makes reserves appear to have increased, when they in fact declined by 8.7%.

After Zach Gast raised this fact with the Company and issued his report, the Company confirmed his calculations and corrected its presentation in the Form 10-Q for the quarter ended September 30, 2006 without any explanation for the change from the prior presentation. As set forth in paragraph 464 below, New Century disclosed, in the very next quarter after the end of the Class Period, that it expected to record an increase in its Allowance for Losses reserve to reflect "relevant data such as recent loss experience, changing market conditions and updated expectations regarding higher credit losses and faster prepayment speeds."

114.   In his report, analyst Zach Gast also questioned the credit quality of New Century's more recent loans (but did not have access to internal underwriting guidelines and practices to confirm his beliefs):

Credit quality on more recently originated loans appears to have weakened substantially for NEW.

*  *  *

Newer originations appear to be deteriorating more quickly than prior years, suggesting that underwriting may need to be tightened or that secondary market prices will suffer.[14]

115.   SEC Staff Accounting Bulletin No. 102, "Selected Loan Loss Allowance Methodology and Documentation Issues" ("SAB 102"), provides further guidance for setting loan loss reserves.  SAB 102 states:  "It is critical that loan loss allowance methodologies incorporate management's current judgments about the credit quality of the loan portfolio through a disciplined and consistently applied process . . . consider all known relevant internal and external factors that may affect loan collectiblity . . . [and] be based on current and reliable data . . . ."  SAB 102 provides:   "Factors that should be considered in developing loss measurements include . . . levels of and trends in delinquencies and impaired loans . . . [and] effects of any changes in risk selection and underwriting standards, and other changes in lending policies, procedures, and practices . . . ."

116.   During the Class Period, New Century's Allowance for Loan Losses reserve ("ALL") failed to comply with these SEC requirements and GAAP.  As the facts reported by the Examiner further demonstrate:

<u>First, New Century failed to document properly the methodology used to calculate its ALL, as required by GAAP. KPMG was aware that this was an issue, having concluded that it was a significant deficiency in 2004.</u>[15]   Furthermore, KPMG discussed

---

[14] The decreasing credit quality of New Century's loans is addressed in paragraphs 120-90 below in detail.

[15] "A significant deficiency is defined as an internal control deficiency or combination of control deficiencies that adversely affects the company's ability to initiate, authorize, record, process, or report external financial data reliably in accordance with GAAP such that there is a more-than-remote likelihood that a misstatement of the company's annual or interim financial statements that is more than inconsequential will not be prevented or detected. . . . A material weakness is defined as a significant deficiency or combination of significant deficiencies that result in a more-than-remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected."  Examiner's Report at 468-69 (footnotes omitted).

proper documentation with New Century and evidently concluded that the deficiency had been remediated in 2005, despite no apparent change in New Century's methodology or documentation policies. The issue persisted and, as part of its audit work for 2006, KPMG utilized a credit specialist who observed <u>continued deficiencies</u> in the Company's documentation of its methodology for calculating the ALL.[16]

> <u>Second, the Examiner obtained information that New Century models used to calculate its ALL were not regularly updated to reflect trends associated with the actual performance of the Company's loan portfolio. Moreover, the Company did not update or modify its models to reflect its then-current assumptions regarding future loan losses. As a result, the models produced ALL figures that deviated substantially from New Century's actual loan loss experience.</u> Neither New Century accounting personnel nor KPMG took steps to cause these models to be updated consistent with the Company's actual loan loss performance or anticipated future losses. <u>This was true even as market conditions began to change dramatically during 2006.</u> Examiner's Report at 336 (emphasis added).

117.   The Examiner further reported facts demonstrating a prior attempt to reduce the Company's Allowance for Loan Losses reserve apparently to manage earnings in the 2005 third quarter (similar to that reported by analyst Zach Gast in the 2006 third quarter):

> <u>The disconnect between New Century's ALL and both its actual and its anticipated loan losses was well-known within New</u>

---

[16] In 2006, "KPMG concluded preliminarily that the lack of documentation was a material weakness." Examiner's Report at 340.

1    Century.    Nonetheless, the Company's Management balked at
2    suggestions to change the base curves.

3                              *   *   *

4            In late 2005, [Audit Committee member] Zona contemplated
5    resigning from the Board, because, among other reasons, according to
6    him, Management suggested using a portion of the loss reserve to
7    boost quarterly earnings.    In October 2005, Zona said that
8    Management tried to adjust its loan loss reserves in order to achieve a
9    certain level of earnings.    As Zona reported to the Examiner, New
10   Century experienced a tax problem that reduced earnings by $0.26/per
11   share.    Dodge presented a report to the Board of Directors showing
12   that earnings would not be reduced because, as Management argued,
13   New Century was overreserved in its ALL by that exact same $0.26
14   per share.    Zona told the Examiner he was particularly frustrated by
15   what he viewed as Management's lack of integrity, the quality of its
16   financial reporting and New Century's business strategy.    Zona added
17   that he made clear he would not approve the financial reports if the
18   adjustment to the loan loss reserve was made.    Management did not
19   make the adjustment.    As stated in his draft resignation letters, dated
20   November 1, 2005 and December 6, 2005, Zona thought
21   Management's suggestion that the reserve should be reduced to permit
22   New Century to meet its earnings target "smacked of earnings
23   manipulation."    Examiner's Report at 341-42 (emphasis added,
24   footnotes omitted).

25   118.    The Examiner further report the fact that it was also Defendant Dodge
26   who decided to combine for the first time the reporting of the Company's
27   Allowance for Loan Losses reserve with the Company's Allowance for Real Estate
28   Owned in the third quarter of 2006, only after the Company's Allowance for Loan

Losses reserve had been reduced.  Examiner's Report at 425-26.  Dodge told the Examiner that she did so to provide investors with "a more complete picture of the Company's reserves," yet the Examiner noted the fact that Dodge referred to the entire combined figure of $240 million only as "allowance for loan losses" during the Company's 2006 third quarter conference call.  Id.  Moreover, as noted above, this combination was reversed without comment in the 2006 third quarter Form 10-Q, after analyst Zach Gast publicly raised issues with the Company's change in reporting and (according to facts uncovered by the Examiner) both KPMG and the Company's Controller then told Dodge that combining the two figures "violated GAAP."  Id.

### 4.    Other GAAP Violations

119.  The Examiner reported facts demonstrating additional GAAP violations and/or misleading disclosures at New Century during 2005-06 concerning accounting for:  (1) mortgage servicing rights ("MSRs"); (2) deferred loan origination fees and costs; (3) hedging; and (4) goodwill.  These facts are summarized as follows:

New Century made at least two errors when accounting for its interests in MSRs and made misleading disclosures about how it accounted for MSRs.  In addition, KPMG's engagement team failed to pursue issues raised by specialists within KPMG who had concerns about New Century's accounting for MSRs.

New Century did not initially record MSRs based on their relative fair value at the time of sale as required by GAAP.  Instead, the Company relied on internal estimates of market value that were based on "recent whole loan sale activity and market color."  Although KPMG's SFG recommended that New Century obtain at least one independent third-party valuation to validate its internal estimates, it does not appear that the KPMG engagement team ever

pushed New Century to do so.  In addition, New Century amortized its MSRs on an essentially straight-line basis and failed to apply proportionate method of amortization as required under FAS 140.

* * *

New Century also made inaccurate disclosures in its financial statements about its initial computation of the fair value of its MSRs, its amortization methodology and its impairment review.  These disclosures were inconsistent with the Company's accounting policies and suggest that the Company was in compliance with GAAP, when in fact the Company and the KPMG engagement team knew that it was not.

* * *

New Century made at least two errors over a period of years when accounting for the fees it received and the costs it incurred in originating mortgage loans.

* * *

First, New Century used an improper methodology to amortize deferred loan origination fees and costs that, according to KPMG, was inconsistent with FAS No. 91, *Accounting for Nonrefundable Fees and Costs Associated with Originating or Acquiring Loans and Initial Direct Costs of Leases* ("FAS 91").  Although KPMG preliminarily concluded that this violation of GAAP was not material for purposes of New Century's 2006 financial statements, neither New Century nor KPMG ever addressed the likely impact of this error on New Century's earlier financial statements.

Second, beginning in 2004, New Century improperly excluded certain costs from its deferral and amortization methodology on the basis that those costs were associated with correspondent loans.

Although KPMG discovered in the second quarter of 2006 that the loans at issue were not correspondent loans, neither New Century nor KPMG made any effort to determine the likely impact of this error on New Century's earlier financial statements.

\* \* \*

The Examiner identified several deficiencies related to New Century's hedge accounting practices.  First, the Company failed to adopt a comprehensive and effective set of policies, procedures and practices relating to hedging until 2006.  Its previous hedging policy documentation did not describe all the hedging strategies used by the Company, did not describe the methods used to test for hedging effectiveness, and failed to address other important aspects of its hedge accounting practices.  In addition, KPMG identified two significant deficiencies relating to New Century's hedging practices during the 2004 and 2005 SOX audits.

Second, New Century did not document adequately its hedge accounting practices "contemporaneously" with the inception of certain hedge relationships, as required under the relevant financial accounting standards.  New Century only provided "draft" documentation to KPMG in the first quarter of 2005 to support the designation of its hedge relationships at inception.

Third, New Century's hedge accounting documentation in 2005 was insufficient because it did not explain how the ineffectiveness portions of changes in the fair value of the derivatives accumulated in other comprehensive income ("OCI") would be reclassified into current earnings.  In addition, the Company's hedge documentation did not adequately support its projection of future cash flows from on-balance sheet securitizations because of volatile prepayment speeds.

1   These problems resulted in internal disagreements at KPMG and

2   almost prevented the timely filing of New Century's Form 10-K for

3   2005.

4       Fourth, the Company inaccurately disclosed that it accounted

5   for interest rate lock commitments ("IRLC") as derivatives at fair

6   value for all of its loans.  In fact, it did so only for prime mortgage

7   loans (and not subprime loans, which accounted for the vast majority

8   of its originations).  As a result, New Century failed to recognize the

9   effect of IRLC associated with subprime mortgage loans in its

10  financial statements.

11      All of the foregoing deficiencies in New Century's hedging

12  practices were identified by KPMG during the course of its SOX and

13  substantive audit work.  The deficiencies include poor documentation

14  and other accounting practices by New Century, and the lack of strict

15  compliance with applicable accounting standards in the hedging area.

16  In addition, several of these deficiencies were not resolved when

17  KPMG signed off on New Century's Form 10-K for 2005.

18                              *   *   *

19      In the first quarter of 2006, New Century booked an adjustment

20  of $3.7 million to account for the first issue raised by [KPMG] about

21  OCI effectiveness and an audit adjustment of $7.6 million to account

22  for the second issue raised by [KPMG] based on the Company's

23  inability to accurately estimate future debt balance beyond 24 months.

24  In effect, New Century conceded that it had made errors in the hedge

25  accounting reflected in its 2005 Form 10-K.

26                              *   *   *

27      The Examiner concludes that the Company's year-end

28  assessment of the goodwill associated with its acquisition of RBC

---

relied upon unsupported cash flow projections and a questionable discount rate.  The Examiner's investigation did not discover adequate evidence to support the revenue projections and other assumptions upon which New Century's 2005 goodwill impairment testing was based.  At a minimum, however, the absence of such evidence raises documentation and internal control issues.  Examiner's Report at 342-43, 349-50, 353, 359, 368, 376-77 (emphasis added).[17]

**D.    New Century's Underwriting And Loan Quality Declined, Rather Than Improved As Defendants Repeatedly Stated During The Class Period And At The Time Of The Offerings**

120.    While the New Century Officer Defendants stated repeatedly, during the Class Period and at the time of the Offerings, that the credit quality of the Company's mortgages was "strong," "excellent," "very high" and "higher" or "better" than it had been in the Company's past as the result of purportedly "strict," "improved" and "strong" underwriting controls and guidelines and risk management discipline, the data set forth in paragraph 111 above demonstrates that the percentage of New Century's Mortgage Loans Held for Investment which were 60+ days delinquent grew from the first quarter of 2005 through the third quarter of 2006.

121.    The same trend appears from a review of Mortgage Loans Held for Sale (loans that the Company was either planning to sell through whole loan sales or not yet categorized) (dollars in thousands):

---

[17] "The problematic themes these accounting issues shared included accounting practices and/or methodologies that were inconsistent with GAAP or otherwise subject to criticism by KPMG; not documenting key assumptions underlying New Century's accounting; using discount rates in key areas of accounting that were low when compared to discount rates used by peer firms or the rates used internally by the Company when developing New Century's business plans; and dismissing or minimizing the significance of New Century's accounting errors or departures from prescribed accounting practices on grounds that they were 'immaterial,' even in the absence of documented support for these conclusions."  Examiner's Report at 7.

| Quarter | Mortgage Loans Held for Sale ("MLS") | MLS 60+ Delinquent | % of MLS 60+ Delinquent |
|---|---|---|---|
| 3Q'06 | 8,945,134 | 235,000 | 2.63% |
| 2Q'06 | 9,303,086 | 173,300 | 1.86% |
| 1Q'06 | 6,352,645 | 99,300 | 1.56% |
| 4Q'05 | 7,825,175 | 80,200 | 1.02% |
| 3Q'05 | 8,570,862 | 58,600 | 0.68% |
| 2Q'05 | 5,989,211 | 31,300 | 0.52% |
| 1Q'05 | 3,874,414 | 29,600 | 0.76% |
| 4Q'04 | 3,922,865 | 23,400 | 0.60% |

122.   Additional, internal and non-public New Century access database data covering early payment defaults, over the time period from 2004 through 2007, obtained by Lead Counsel's investigation, demonstrates that early payment default rates increased year-over-year for mortgages purchased or originated from 2004 through 2006.

123.   The New Century Officer Defendants' repeated public statements during the Class Period and at the time of the Offerings that the Company had improved its loan quality by implementing "stricter" or "improved" underwriting standards were materially untrue and misleading when made.  As set forth herein, the Company's lower delinquency rates for 2003 and 2004 vintage loans were not the result of stricter underwriting standards, but rising home prices which, through loan servicing or otherwise, permitted borrowers who fell behind on mortgage payments to refinance their homes and "cash out" equity to temporarily catch up with their debt payments.  As interest rates increased and home prices stopped rising (and decreased in some regions), New Century's borrowers quickly fell behind on mortgage payments.

124.   The following charts demonstrate the increasing interest rates and softening of the real estate market prior to and during the Class Period:

Interest rates (January 2004-September 2007):



Housing prices (December 1996-December 2006):



125. Contrary to Defendants' repeated statements, underwriting standards were not increased, but actually loosened prior to and throughout the Class Period. Rather than increase the Company's underwriting standards and loan quality in the

face of rising interest rates and a softening of the real estate market, New Century actually made repeated exceptions to and loosened its underwriting and offered higher risk products to continue to reach record mortgage volume in the face of severe industry competition.    Moreover, New Century's account executives and employees were highly motivated to close as many loans as possible given that sales and/or loan volume were key components of the variable part of their compensation.    These facts are confirmed not only by the Company's increased default rates set forth above but by additional data and first-hand accounts from dozens of former New Century employees from all levels of the Company with direct knowledge as set forth herein.    As recently observed by United States Secretary of the Treasury Henry Paulson on September 12, 2007, the problems with sub-prime mortgages have arisen not because of weakness in the economy generally, but because of bad lending practices:    "If a market turbulence is precipitated by economic weakness or by the credit quality of the corporate sector, its one thing, but we have, again, strong economies, we have a healthy corporate sector, we have a healthy financial sector, major financial institutions, <u>so the problems we're experiencing right now are coming from bad lending practices</u>. And during extended periods of benign markets, excesses creep in.    <u>We've had some bad lending practices</u>."  (Emphasis added.)

126.    Contrary to Defendants' statements at the time of the Offerings and during the Class Period, those "bad lending practices" occurred in a substantial way at New Century throughout the Class Period.    As part of its investigation, Lead Counsel has compiled and reviewed data that New Century reported pursuant to SEC Regulation AB, 17 C.F.R. § 229.1100-1123.    These data track the performance of 25 large loan pools that New Century securitized between 2003 and 2006.    These data (when combined with the numerous first-hand accounts set forth in paragraphs 137-68 below and the additional facts uncovered by the Examiner set forth in paragraphs 173-90 below) establish two important points.

First, because the loans that New Century originated and underwrote during 2005-06 performed far worse than the loans that the Company made during 2003-04, the loans that New Century originated during the Class Period and at the time of the Offerings simply were not the product of "higher credit quality," "improved underwriting controls," "better discipline," or "strict underwriting," as Defendants repeatedly stated.  Second, the loans that New Century originated at the time of the Offerings and during the Class Period defaulted so quickly that general industry conditions are not a plausible explanation for their exceptionally poor performance. Instead, the speed with which the 2005 and 2006 vintage loans defaulted establishes that New Century's underwriting was to blame; in other words, the Company routinely and increasingly lent money to people who were unable to repay the debt shortly after the loans were closed, quite apart from any macroeconomic or industry trends.

127.   The sample size of this research is large and reliable.  The data set forth below reflect the performance of approximately $55 billion worth of loans that New Century grouped into 25 different multi-billion-dollar loan pools and securitized over four years.  Specifically, the data set forth below reflect the performance of the following loan pools: New Century Home Equity Loan Trust 2003-1, -2, -3, -4, -5, -6, and -B; New Century Home Equity Loan Trust 2004-1, -2, -3, -4, and -A; New Century Home Equity Loan Trust 2005-1, -2, -3, -4, -A, -B, -C, and -D; New Century Home Equity Loan Trust 2006-1, -2, and -S1; and New Century Alternative Mortgage Loan Trust 2006-ALT 1 and -ALT 2.

128.   Graph 1 below compares the total delinquencies, measured as a percent of pool balance, that occurred in loan pools securitized in 2003-04, 2005, and 2006.  Graph 1 reflects this comparison at three-month intervals up to 24 months after pool issuance, which is the point in time when a typical ARM resets, thus requiring potential refinancing and potentially exposing the borrower to general market trends, such as declining home prices.  Before that time, however,

1   the principal factor affecting loan performance was the Company's underwriting.

2   As Graph 1 reflects, at all time intervals before the typical ARM resets, the loans

3   originated in 2005 and 2006 became delinquent at substantially higher rates than

4   did those originated in 2003-04.  Importantly, loans originated in 2005 and 2006

5   immediately (at the three-month mark) became delinquent at appreciably higher

6   rates than did loans originated in 2003-04.  Specifically, within three months after

7   pool issuance, 2005 loans became delinquent at a rate 24% higher than the

8   delinquency rate for 2003-04 loans.  Even worse, just three months after pool

9   issuance, 2006 loans exhibited delinquencies at a rate 84% higher than the

10   delinquency rate for 2003-04 loans.  And, thereafter, these disparities widened

11   greatly throughout the very early life of these loans, well before general market

12   conditions (again, such as declining home prices at the time an ARM resets) might

13   cause an otherwise creditworthy borrower to become delinquent.  In particular,

14   2005 vintage loans accrued delinquencies at rates between 73% higher (six months

15   after issuance) and 130% higher (18 months after issuance) than 2003-04 vintage

16   loans.  Loans of 2006 vintage accrued delinquencies at rates between 100% higher

17   (15 months after issuance) and 243% higher (21 months after issuance) than 2003-

18   04 vintage loans.  Twenty-four months after issuance, 2006 vintage loans became

19   delinquent at a rate 738% higher than 2003-04 vintage loans.  These data are

20   summarized as follows:

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

**Graph 1: Total Delinquencies as a Percent of Pool Balance**



| | 3 | 6 | 9 | 12 | 15 | 18 | 21 | 24 |
|---|---|---|---|---|---|---|---|---|
| ■ 2003-2004 | 0.93% | 1.64% | 1.88% | 2.30% | 2.73% | 2.90% | 2.97% | 3.46% |
| ☐ 2005 | 1.15% | 2.83% | 3.63% | 4.37% | 5.06% | 6.66% | 5.89% | 6.76% |
| ■ 2006 | 1.71% | 4.51% | 5.54% | 6.36% | 5.45% | 8.08% | 10.20% | 29.01% |

**Pool Age in Months with Delinquency Rates**

16    129.   Similarly, data regarding reported loan repurchases, reflected in Graph

17  2 below, establish that the loans New Century underwrote and securitized in 2005

18  and 2006 were of poor quality compared to the loans the Company securitized in

19  2003-04.   Further, the reported repurchase data below establish that the loans of

20  2005 and 2006 vintage immediately performed far worse than the loans of 2003-04

21  vintage – well before general market forces could have affected them.   This is quite

22  astounding, given that as set forth in paragraphs 69-100 above, New Century's loan

23  repurchases were actually under-reported throughout 2005 and 2006 as a result of

24  its large and growing repurchase claims backlog.   Even notwithstanding those

25  circumstances, a mere three months after pool issuance, New Century had

26  repurchased .27% of 2005 vintage loans (measured by pool balance), as compared

27  to approximately none of its loans securitized in 2003-04.   Likewise, at the same

28  three-month interval, the Company had repurchased .30% of 2006 vintage loans

compared to none of 2003-04 vintage.   Six months after pool issuance, New Century had repurchased .28% of its 2005 vintage loans, as compared to only .07% of 2003-04 loans – an increase of 300%.   And, at that same point in time, the Company had repurchased .64% of its 2006 vintage loans – <u>an increase of 814%</u> over its repurchase rate for 2003-04 vintage loans.   These data are reflected as follows in Graph 2:



**Graph 2: Cumulative Repurchases as a Percent of Pool Balance**

| | 3 | 6 | 9 | 12 | 15 | 18 | 21 | 24 |
|---|---|---|---|---|---|---|---|---|
| 2003-2004 | 0.00% | 0.07% | 0.13% | 0.16% | 0.17% | 0.18% | 0.18% | 0.18% |
| 2005 | 0.27% | 0.28% | 0.28% | 0.28% | 0.28% | 0.28% | 0.28% | 0.28% |
| 2006 | 0.30% | 0.64% | 0.64% | 0.64% | 0.64% | 0.64% | 0.64% | 0.64% |

**Pool Age in Months with Repurchase Rate**

130.   The data set forth above in Graphs 1 and 2 in connection with the first-hand accounts from numerous witnesses below establish that New Century underwrote its 2005 and 2006 vintage loans so poorly as compared to its 2003-04 vintage loans that the later loans defaulted far more often and were repurchased far more often.   Further, the 2005 and 2006 vintage loans performed so badly, so quickly that general market forces are not a plausible explanation for their rapid failure.

131.   In addition to those comparisons of New Century's own underwriting over time, Lead Counsel also has reviewed other data that establish that New Century's lending practices were far looser than those of its peer sub-prime lending companies.   To compare New Century to its peer companies, Lead Counsel compiled and reviewed data concerning New Century's residential mortgage loans for one-to-four-family homes that New Century reported pursuant to the Home Mortgage Disclosure Act of 1975, 12 U.S.C. §§ 2801-2810, ("HMDA").   Lead Counsel also compiled and reviewed the same data reported by 21 other lenders that the U.S. Department of Housing & Urban Development categorized as sub-prime lenders in 2006.   These other lenders also had national reach and similar lending volume to New Century and are collectively designated as New Century's "Peers" in Graphs 3-6 below.

132.   Graph 3 below reflects the rates at which New Century and its peer companies originated first lien loans based upon the number of applications they received.  As these data make clear, New Century, as compared to its peer lending companies, was far more likely to make a first lien loan to any given applicant. During 2005, New Century was 50% more likely to make such a loan, and in 2006, the Company was 62% more likely to make such a loan.  The reported origination data are summarized as follows:



Graph 3: Originations as a Percent of All First Lien Applications

| | 2005 | 2006 |
|---|---|---|
| ■ New Century | 63.47 | 58.13 |
| □ Peers | 42.16 | 35.98 |

**Year and Origination Rates**

133.   New Century also rejected first lien applicants much less often than did its peers.  Graph 4 below reflects how often New Century and its peers rejected first lien applicants.   Specifically, in 2005 New Century's first lien applicant rejection rate was 55% lower than that of its peer companies.  The following year, the Company's first lien applicant rejection rate was 33% lower:



Graph 4: Denials as a Percent of All First Lien Applications

| | 2005 | 2006 |
|---|---|---|
| New Century | 21.73 | 35.51 |
| Peers | 48.04 | 52.85 |

**Year and Denial Rates**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

134.   The same basic trends hold true for the Company's second lien lending practices.  Although in 2005 New Century originated second lien loans at a rate only marginally higher than that of its peers, in 2006 the Company originated such loans at a rate 22% higher than that of its peers – evincing a substantial loosening of its underwriting for this type of loan.  Graph 5 below reflects those data:



Graph 5: Originations as a Percent of All Second Lien Applications

|  | 2005 | 2006 |
|---|---|---|
| ■ New Century | 65.08 | 58.55 |
| □ Peers | 63.00 | 47.97 |

Year and Origination Rates

135.   Likewise, New Century denied second lien applicants much less often than did its peer subprime lending companies.  As Graph 6 below reflects, in both 2005 and 2006, New Century rejected such applicants 31% less often:



Graph 6: Denials as a Percent of All Second Lien Applications

| Year and Denial Rates | 2005 | 2006 |
|---|---|---|
| New Century | 18.99 | 27.81 |
| Peers | 27.70 | 40.19 |

136.   Not surprisingly as a result of these practices, on December 6, 2007, The New York Times reported that New Century's mortgage loans resulted in some of the highest default rates in the industry:  "Loans made by New Century, which filed for bankruptcy protection in March, have some of the highest default rates in the industry – almost twice those of competitors like Wells Fargo and Ameriquest, according to data from Moody's Investor Services."   The undisclosed and increasingly "bad lending practices" at New Century in 2005 and 2006 are further revealed by numerous former employees with first-hand knowledge.

137.   According to a former New Century Vice President, Corporate Finance employed by the Company from 2002 until April 2007 (CW 3), New Century began originating loans with "risky increased LTVs [loan to values],"

"80/20" or "piggy back" loans which required no borrower down payment, increased stated income loans and began to lower credit standards starting in 2003. In addition, according to the former Vice President, Corporate Finance, at that time, the Company also changed its practice with respect to stated income loans. Although the Company had always had the program, it was originally used primarily with self-employed borrowers. According to the former Vice President, Corporate Finance, starting in 2004-05, the Company began allowing riskier stated income loans for W-2 wage earners, who should have been able to verify their stated income, but did not.

138. According to a former New Century fraud investigator and senior loan underwriter employed by the Company from January 1999 until April 2007 and who examined numerous New Century mortgage loans ("CW 5"), New Century's problems began when it "started to abandon prudent underwriting guidelines" at the end of 2003 in order to "push more loans through" the system. According to the former employee, New Century, in effect, "stopped underwriting" and adopted an approach that the Company would be "okay if [it] could out run [its] delinquency rate" which eventually caught up with the Company.

139. According to a former New Century regional operations manager in Scottsdale, Arizona employed by the Company from August 2003 until December 2006 ("CW 6"), starting in the second half of 2003, there was a concerted effort at the Company to make as many loans as they could. According to the former employee, problem loans included stated income loans, and problem loans increased because the Company was "willing to accept them."

140. According to a former New Century regional unit manager employed by the Company from 2002 until April 2007 and responsible for auditing and overseeing the work of New Century underwriters and account executives ("CW 7"), New Century "did loosen up guidelines" and began doing more 100% financing or 80/20 loans and more stated income loans. According to the former

employee, "exceptions were widespread" and "there was always someone to sign off on any loan."

141.   According to a former New Century regional Vice President, Region 20, employed by the Company from 1999 until May 2007 ("CW 8"), the mindset of New Century's operations division was that it did not matter if a loan was a good loan or a bad loan, as long as New Century could sell the loan, it was a good loan.  According to the former Vice President, New Century almost could not turn down a loan for most of 2005 and the first half of 2006.  According to the former Vice President, New Century booked "ugly" loans and there was significant pressure to continue approving loans, it was about "volume, volume, volume . . . pretty reckless volume."

142.   According to a former New Century Senior Vice President employed by the Company from July 2005 until April 2006 in Irvine, California ("CW 9"), there was no way other than through reduced underwriting standards that New Century could meet its increasing year-over-year sales projections.  According to the former Senior Vice President, New Century would just about approve any loan under New Century's "weak" underwriting standards and employees were financially incentivized to increase loan volume.

143.   According to a former New Century account manager employed by the Company from May 2006 until January 2007 in Atlanta, Georgia ("CW 10"), there was constant pressure at New Century to get loans closed and many loans had exceptions, mostly loan-to-value exceptions.

144.   According to a former New Century underwriter and risk manager employed by the Company from December 2001 until April 2007 ("CW 11"), New Century became more and more lenient over the years with its underwriting standards until the fall of 2006, when standards finally began to tighten up. According to the former employee, until that time, exceptions were prevalent and it was "more about quantity than quality" with the attitude being "get the volume on;

get the volume on." According to the former employee, New Century "got a little crazy" with high loan–to-value ratios and 80/20 loans. Further, CW 11 reported that as New Century's underwriting practices and guidelines loosened throughout CW 11's long tenure with the Company, she reviewed increasingly more loans that she recommended denying. Those mortgage loan applications were given to the operations manager with CW 11's recommendation of denial, but the operations manager overrode CW 11's recommendation nine out of ten times, and approved the loans.[18]

145.   According to a former New Century account executive employed by the Company from July 2005 until August 2006 in Bloomington, Minnesota ("CW 12"), New Century employee compensation was always related to loan production and, because of the pressure of sales quotas which got "rougher" in 2006, employees "wanted every single loan in" and account executives were constantly "looking for ways to make it work" causing the quality of loans to "go down."

146.   According to a former New Century senior training development manager employed by the Company from March 2003 until March 2006 responsible for training current employees and new hires in underwriting, mortgage processes, fair lending practices and compliance ("CW 13"), New Century's managers were constantly being pushed hard by corporate officers to produce more loan volume. CW 13 reported that beginning in 2004 and continuing through the end of CW 13's employment with the Company, because the Company's corporate officers constantly pushed underwriters to increase the volume of approved loans, the underwriters often allowed borrowers to resubmit a rejected full-documentation loan (which had been rejected because the borrower's income was too low) as a stated-income loan with a new and higher income, which

---

[18] According to the facts set forth in the Examiner's Report, New Century's regional managers reported to divisional managers, and regional and divisional managers could override the decisions of underwriters who reported to them. Examiner's Report at 60.

was then approved. CW 13 stated that this practice was "taboo" in the mortgage industry but routinely occurred at New Century. According to CW 13, the practice of allowing rejected full-documentation borrowers to "go stated" was a "running joke" with the Company's underwriters. CW 13 reported that "going stated" was the underwriters' answer to most problems that arose on any given loan application. CW 13 further reported that secondary market "kickouts" became extremely frequent during 2005 and 2006. Despite these continuing problems, CW 13 reported that the Company's managers instructed the underwriters to ignore their training in order to achieve "the numbers which California [headquarters] was pushing for." CW 13 stated that the Company's corporate officers simply did not want "to do the job right" and insisted on "skirting qualifications" to generate greater loan volume.

147. According to a former New Century regional sales manager employed by the Company from 2004 through March 2006 ("CW 14"), New Century was driven by volume goals and it was well known within the Company that as much as 30% of all loan files contained misstated income levels or employment information because of pressure to close loans. According to the former employee, New Century employees were motivated to increase loan volume because they were compensated based on volume, with half or more of their salary based on a percentage of total monthly volume.

148. According to a former New Century underwriter employed by the Company from July 2004 until November 2006 in Folsom, California ("CW 15"), his operations manager was compensated based on production and had an incentive to get as many loans through the system as possible. CW 15 reported that New Century's underwriting guidelines and practices were consistently poor throughout CW 15's employment. According to the former employee, his operations manager was "loose" with underwriting guidelines and did whatever it took to get loans closed before the end of a quarter. According to the former employee, his region

was driven hard to meet sales goals and the quality of the loans being issued was "unbelievable" and "just junk" and it was difficult to be an underwriter at New Century because "they didn't let you do your job." CW 15 also stated that there was "constant pressure to approve loans," and that underwriters were never given enough resources to verify stated incomes.[19]  As a result, underwriters routinely approved stated income loans with "ridiculous" salaries.  CW 15 further reported that, "I can't tell you how easy it was to get" a stated loan.  CW 15 reported that underwriters were viewed as "necessary evils" and that the Company was focused only on "getting the loan approved and getting it out of here."

149.  According to a former New Century underwriting unit manager employed by the Company from 1998 through October 2006 ("CW 16"), underwriting standards were loosened in order to increase sales volume. According to the former employee, exceptions to New Century's underwriting standards were "the norm" and he was told by his Divisional Vice President, branch managers and loan offices that he needed to make loans "work."  At one meeting in the late spring of 2006, the former employee and other underwriters were told by their operations manager that the underwriters had to do what was necessary to increase volume.

150.  According to a former New Century regional operations manager employed by the Company from 1996 until May 2007 and who directly supervised sales and underwriting ("CW 17"), New Century operated with "loose" underwriting standards for the past couple of years, beginning in 2003, especially with 100% finance and stated income loans.  According to the former employee, there was "always someone to sign off on a loan no matter how bad it was" and there was "heavy pressure" to close loans, especially at month-end.  CW 17 reported that she received monthly reports detailing first and second payment

---

[19] The Examiner also found that "such inquiries were often discouraged."  Examiner's Report at 127 n.314.

1  defaults in her region and that most of the defaulted loans were 80/20 stated

2  income loans.

3       151.   According to a former New Century senior loan funder employed by

4  the Company from May 2004 until January 2007 in Bloomington, Minnesota

5  ("CW 18"), New Century was underwriting lower quality loans in order to "get the

6  volume up."   According to the former employee, loan quality "definitely went

7  down" in 2006 and underwriters had to "dive deeply" into loan files to find

8  justification for approval.

9       152.   According to a former New Century wholesale mortgage processor

10  employed by the Company in 2006  ("CW 19"), New Century never wanted to

11  decline a loan and, in order to approve more loans and increase volume, was

12  willing to make numerous exceptions to its underwriting guidelines, including

13  credit score exceptions, prior credit history exceptions and rate exceptions.

14  According to the former employee, exceptions were frequent.

15       153.   According to a former New Century production risk manager

16  employed by the Company from April 2002 until April 2007 in Woodland Hills,

17  California who performed quality control audits on approximately fifteen funded

18  loans daily and, after February 2007, on loans claimed for repurchases ("CW 20"),

19  New Century's loans over the past few years were getting "riskier and riskier,"

20  especially with 100% financing or 80/20 loans introduced over the past two or

21  three years combined with stated income applications.  According to the former

22  employee, underwriters were told not to deny loans and, if they were denied,

23  applications would simply be re-worked and signed off by operations managers.

24  According to the former employee, volume mattered and over time it "became a

25  numbers game."  According to the former employee, the most "questionable loans"

26  were those with exceptions required to be signed off on by management and those

27  were about half of the total volume of loans she generally reviewed.   CW 20

28  reported that "a lot" of the time she recommended denying a loan, but her

operations manager "constantly" overrode her – mainly because operations and branch managers received bonuses for the number of funded loans they pushed through.

154.    According to a former New Century Vice President, Operations employed by the Company from February 2003 until October 2006 in Santa Ana, California ("CW 21"), New Century loosened its underwriting standards in order to gain volume in 2005 and 2006 and that was the only way that the Company could have increased its volume.  According to the former employee, a large percentage of New Century's mortgage defaults were from stated income loans.  According to the former employee, New Century had an internal system for detailing how loans were performing and Kevin Cloyd, who reported directly to Brad Morrice, received a monthly report detailing the number of loans with first, second and third payment defaults as well as an analysis of the defaulted loans.

155.    According to a former New Century underwriter employed by the Company from May 2005 to March 2006 in Itasca, Illinois and, previously, from 2000 until 2003 in Cincinnati, Ohio ("CW 22"), as an underwriter for New Century, he could not recall the last loan that he looked at that did not have an exception; he handled close to 200 loans a month; and nearly every loan had an exception such as debt ratio exceptions or loan-to-value exceptions.  According to the former employee, "the guidelines were thrown against a wall" and underwriters were instructed to "dig deep" in order to make loans work and all decisions were volume driven.  According to the former employee, appraisals even if turned down, were often accepted later as branch or regional sales manager "gave them hell" for rejecting appraisals.   According to the former employee, he was told by his superiors that New Century was a volume based company and that New Century needed to increase its volume to outrun "shrinkages" in the secondary market.  According to the former employee, underwriting standards were not increased from his prior tenure in 2000-03, but reduced and "the sales force ran the show"

which was not the case during his first term with the Company.  According to the former employee, the Company offered 80/20 100% financing loans in 2005, including stated income loans which were not offered in earlier years.  According to the former employee, had underwriting standards been tightened in 2005, volume would have gone down.

156.   According to a former New Century account manager employed by the Company from November 2004 until September 2006 in Englewood, Colorado ("CW 23"), New Century was very "loose" with its underwriting rules, waiving many conditions and she was personally told by her operations manager and her sales manager on a number of occasions to just sign off on loans because they needed to make their volume numbers.

157.   According to a former underwriter for New Century employed by the Company from November 2005 until January 2007 in Hawaii ("CW 24"), her operations manager would waive off conditions just to push loans through the system.

158.   According to a former New Century underwriter and risk manager employed by the Company from March 2001 until April 2007 ("CW 25"), beginning in 2004, the Company loosened its underwriting guidelines and made numerous exceptions to those already-loose guidelines.  According to the former employee, the Company further loosened its underwriting in 2005 and again in 2006, such that the Company's underwriting became progressively looser and the loans that the Company originated became progressively riskier.  CW 25 reported that beginning in 2004, the Company offered riskier programs, such as adjustable rate mortgages and stated income loans with 100% financing.  CW 25 also reported that beginning in 2004, the Company lowered the credit score requirements for stated-income loans, and originated a much larger volume of stated-income loans than it had in 2002 or 2003.  According to the former employee, adjustable rate

1    loans also became a problem as the housing market was softening and borrowers

2    who got in trouble could not refinance their loans.

3        159. According to a former New Century senior account manager

4    employed by the Company from December 2004 until September 2006 ("CW 26"),

5    New Century abandoned its guidelines, made exceptions to its underwriting

6    guidelines and allowed loans to be made that should not have been made, typically

7    for wholesale brokers who provided the Company with a large volume of business.

8    According to the former employee, account managers were overruled on a daily

9    basis and it was those exceptions that were the problem.

10        160. According to a former New Century underwriter employed by the

11    Company from September 2003 until March 2006 ("CW 27"), New Century did

12    not tighten its guidelines from 2003 until 2006, and "would approve just about

13    anybody for anything." According to the former employee, one out of every three

14    loans that he underwrote had an exception and management would always find a

15    way to push loans through.

16        161. According to a former New Century Vice President, Regional

17    Manager, Region 21, employed by the Company from October 1999 until March

18    2007 ("CW 28"), starting in 2003 and 2004, the Company was making more

19    exceptions to bring in more loan volume and that continued through 2006.

20    According to the former Vice President, numbers increased volume-wise from

21    2003 to 2006, and that was accomplished through aggressive underwriting.

22    According to the former Vice President, exceptions occurred frequently, with

23    roughly half of the loans having exceptions, and New Century would sometimes

24    change its guidelines to make repeated exceptions fit within its guidelines.

25        162. According to a former New Century Vice President and Regional

26    Manager, Region 12, employed by the Company from September 1996 until May

27    2007 and who received reports on all of his regions' first payment defaults ("CW

28

29"), New Century made very low quality and extremely risky loans, even for a sub-prime lender, noting that: "If you had a heartbeat, we would give you a loan."

163.    According to a former New Century underwriter employed by the Company from January 1999 until May 2007 who was responsible for underwriting an average of ten to fifteen loans per day ("CW 30"), New Century's underwriting guidelines were "loose" in 2006 with "risky" loans, especially stated income loans with "ridiculous" stated incomes and had New Century not loosened its guidelines, "business would have been lost."

164.    According to a former New Century Loan Counselor – Default Loan Specialist employed by the Company from June 2005 until August 2006 ("CW 31"), there were so many bad loans at New Century because the Company was "just pushing loans through" the system and he would often investigate early loan defaults and find out that a borrower's stated income was not correct.

165.    According to a former New Century Assistant Manager for High Risk employed by the Company from September 2004 until September 2006 and whose job involved reviewing high risk loans (loans at risk of default) and recommending mitigation strategies ("CW 32"), he saw "month by month increase in high risk assets" starting after the first quarter of 2006 and the factors that led to high defaults at New Century included:  (1) adjustable-rate mortgages that had reset to higher monthly payment rates; (2) property appraisals that were improperly inflated; (3) stated income loans; and (4) 80/20 loans enabling borrowers to finance 100% of purchase price, with 80/20 loans especially problematic for New Century.

166.    On May 7, 2007, the front page of The Washington Post reported: "Pressure at Mortgage Firm Led to Mass Approval of Bad Loans."   The Washington Post reported:

> "[Y]ou didn't want to turn away a loan because all hell would break
> loose," [former New Century employee Maggie Hardiman] recounted

in interviews.  <u>When she did, her bosses often overruled her and found</u> <u>another appraiser to sign off on it</u>.

Hardiman's account is one of several from former employees of New Century that shed fresh light on an unfolding disaster in the mortgage industry, one that could cost as many as 2 million American families their homes and threatens to spill over into the broader economy.

New Century has become the premier example of a group of companies that grew rapidly during the housing boom, selling working-class Americans with questionable credit huge numbers of "subprime" loans with "teaser" rates that typically rose after the first two years.  This business transformed the once-tiny New Century into a lending powerhouse that was held up as a model of the mortgage industry's success.

But now, with home values failing and adjustable loan rates rising, record numbers of homeowners are failing to make their payments. <u>And a detailed inquiry into the situation at New Century and other</u> <u>subprime lenders suggests that in the feeding frenzy for housing loans,</u> <u>basic quality controls were ignored in the mortgage business, while</u> <u>the big Wall Street investment banks that backed these firms looked</u> <u>the other way</u>.

New Century, which filed for bankruptcy protection last month, has admitted that it underreported the number of bad loans it made in its financial reports for the first three quarter of 2006.  <u>Hardiman and</u> <u>other former employees of New Century interviewed said there was</u>

intense pressure from bosses to approve loans, even those with obviously inflated housing appraisals or exaggerated homeowner incomes.

* * *

Hardiman said she was fired for refusing to approve weak loans. Others said they left because they were pressured to pump loans through the system.  A few were interviewed while they were worked at New Century but then lost their jobs after the firm filed for bankruptcy.

Although there were variations in their descriptions of the atmosphere in their offices, most said they were pushed to approve questionable loans.  Several of the employees interviewed said they faced "unofficial quotas" of loans that had to be approved each day.

* * *

A veteran appraiser who worked in Pearl River, N.Y., said he joined New Century because he heard the pay was good.  That turned out to be true, but he quickly discovered that the place was a pressure cooker.  He said he often was encouraged "to make loans work."

* * *

Hardiman, the former New Century appraiser, said she was not surprised by the Company's downfall.  Few at the Company seemed to be thinking long-term when she was there.  The message she heard constantly from headquarters, which was broadcast at work conferences and in e-mails, was to approve more loans.

"We were constantly told, 'If you look the other way and let an additional three to four loans in a day that would mean millions more