in revenue for New Century over the course of the week," Hardiman said. She added that it seemed "no one, from the top levels down to the lower levels of the office, didn't want those loans to go through." [Emphasis added.]

167. Similarly, on April 19, 2007, The Orange County Register reported:

[S]ome New Century employees said the Company was under pressure to relax standards to compete in an industry where customers could easily shop for a better deal. Amanda Milano, a former senior loan processor who worked at New Century for four years, said it was once a very solid company and that she felt like it was part of her family, but that she witnessed a deterioration in its guidelines last year.

* * *

Some former employees said New Century started making more exceptions to its guidelines in 2006, as the housing industry slowed down. Karen Waheed, an underwriter with the Home 123 retail unit of New Century, said some loan applicants called themselves landscapers or "tree surgeons" and reported dubious incomes of $10,000 to $15,000 a month.

* * *

Waheed, who was laid off April 2 after three years with the Company, said exceptions were also made that allowed elderly borrowers on fixed incomes to get adjustable-rate loans that would eventually become unaffordable.

* * *

"It got to a point where I literally got sick to my stomach," she said. "Every day I got home and would think to myself, I helped set someone up for failure." [Emphasis added.]

168.   According to a former New Century Vice President Division Operations Manager, Division 6, employed by the Company from 2000 until May 2007 and who received regular monthly reports on early payment defaults ("CW 33"), New Century finally tightened its underwriting guidelines and eliminated certain loan programs in the fall of 2006, including eliminating 80/20 loans, raising FICO scores and requiring additional asset information for stated income loans, but these changes took place too late.

169.   Indeed, New Century admitted only at the end of the Class Period that first payment defaults increased with the increased risk characteristics of its loans as a result of "layering" of risk characteristics, for example, a combination of borrower and collateral characteristics that included a first-time buyer with stated income, and a high loan to value ratio.  Only when it was too late and just months before it filed for bankruptcy, New Century announced that it was introducing "Additional Lending Best Practices" which included:

Tightening underwriting guidelines for its adjustable-rate mortgage programs for at-risk borrowers;

Offering existing adjustable-rate mortgage (ARM) and interest-only customers who qualify the option of refinancing into a low fee 30-year or 40-year fixed-rate mortgage;

Implementing plain language disclosures that go beyond legal requirements in explaining terms such as prepayment charges, interest-only features, adjustable-payment features, escrows for insurance and taxes and other key features of a loan;

Enhancing its processes for confirming the income information provided on stated income loans; and

Introducing a new front-end confirmation early in the loan process to assist applicants in better understanding the terms of their loan.

170. Prior to these changes, a significant number of New Century mortgage loans originated in 2005 and 2006 were adjustable rate mortgage loans. Because of increases in interest rates since those mortgage loans were made, New Century's home borrowers faced large payment increases once the initial two or three-year fixed "teaser" rate period ended. That was even more of a problem for interest-only borrowers who also faced higher monthly payments upon the expiration of the interest-only payment period, two to three years from origination, as they would, for the first time, also have to cover the fully-amortizing mortgage loan amount, not just interest. In 2005, New Century originated $16.6 billion of adjustable rate, interest-only loans, more than twice as much as it had originated in 2004. In addition, 40 year adjustable rate mortgage loans grew from only about six percent (or $3.3 billion) of all loans in 2005 to over 34% (or $15.7 billion) by the end of the third quarter of 2006.

171. Prior to the above-described changes and during the Class Period, under New Century's "Stated Income Documentation" loan program, a mortgage applicant could be qualified based upon monthly income as stated on the mortgage loan application. For the year-ended December 31, 2005, Stated Income Documentation loans totaled $24.2 billion, almost half of the total mortgage loans originated and purchased by the Company in 2005, and $5.5 billion more than the $18.7 billion of stated income loans originated and purchased in the prior year-ended December 31, 2004.

172. The volume-driven, exception-ridden, loose underwriting practices employed by the Company throughout the Class Period, revealed by the first-hand accounts of numerous former employees, and confirmed by New Century's sharply increasing default and delinquency rates, created a recipe for disaster given the significant number of high risk mortgage products offered by the Company,

including adjustable rate, interest-only, high loan-to-value and stated income loans. At the same time, the New Century Officer Defendants' repeated public statements about purportedly "improved" and "stricter" underwriting and "strong," or "excellent" loan quality were materially misstated when made.  Each of these statements is set forth below.

173.   As noted by the Examiner's Report:

New Century's financial success depended ultimately on the quality of its origination of inherently risky subprime mortgage loans.  Poor quality control in the origination of such loans could imperil New Century's financial success in multiple ways:  loans might be rejected by purchasers or might bring lower prices; loans sold to investors on which there were early defaults might result in a requirement that New Century repurchase the loan; and loans kept on New Century's balance sheet could result in lost interest income and lower valuations if borrowers had high delinquency rates.  In addition, the quality of New Century's loan originations had a significant impact on the various assumptions relied upon in preparing New Century's financial statements.

*   *   *

Second, loan quality was all the more important from 2004 onward because certain factors, such as rising interest rates, the leveling of housing prices, compressed margins in the loan origination and sale business, and the increased riskiness of New Century's loan products, all pointed to a more difficult and higher risk operating environment for New Century.  Examiner's Report at 109, 118.

174.   Nonetheless and consistent with the above facts uncovered by Lead Counsel's investigation, the Examiner's Report details facts demonstrating "serious

loan quality issues at [New Century] beginning as early as 2004;" numerous "red flags" relating to loan quality; and the failure of New Century's Senior Management and Board of Directors to devote sufficient attention to improving loan quality until the final quarter of 2006, when it "was too late to prevent the consequences of longstanding loan quality problems in an adversely changing market." Examiner's Report at 109-76.

175.   The Examiner reported numerous facts demonstrating that "New Century's Board of Directors and Senior Management failed for many years to give loan quality the attention that it deserved" notwithstanding that "[l]oans originated by New Century were critical to New Century's financial success." Id. at 175.  The Examiner reported the following facts:

> New Century knew from multiple data sources that its loan quality was problematic, starting no later than 2004.  Yet, as documented in this portion of the Final Report, the Board of Directors and Senior Management before 2006 took few steps to address the troubling loan quality trends.  . . .  The Examiner is also critical of Senior Management for failing to address sooner the increased riskiness of some of the loan products New Century was originating. With few exceptions, such as the cutback on the [interest only] product in September 2005, Senior Management was informed about the increasing risks associated with some [of] its products but took few timely actions to seek to address or mitigate those risks."  Id. at 175-76 (emphasis added).

176.   As a result of these findings and consistent with the allegations in this Second Amended Complaint, the Examiner reported facts demonstrating that public statements made by New Century regarding the purported quality of its loans and underwriting (including statements incorporated into the Offerings and

made during the Class Period) were "not supportable," without "justifiable basis" and untrue when made:

> The Examiner observes that this faulty disclosure relating to the quality of New Century's loans is similar to other questionable loan quality disclosures in New Century's periodic SEC filings. For example, New Century represented in its Forms 10-K for 2004 and 2005 that regardless of document type, New Century designed its underwriting standards and quality assurance standards to make sure that loan quality was consistent and met its guidelines, even when New Century originated stated document loans as opposed to full document loans. <u>This statement is not supportable</u>. First, as noted previously, New Century's Quality Assurance program was not held in high esteem until it was reconstituted and the program was outsourced in September 2005 for nine months.[20] Any suggestion of reliance on the New Century Quality Assurance program is questionable. More important, in October 2004, a New Century employee who regularly compiled statistics on the performance of New Century products stated: "We know that Stated Income loans do not perform as well as Full Doc loans."
>
> * * *
>
> <u>There appears, therefore, to be no justifiable basis for the statement in the Form 10-K for 2004</u>.
>
> Similarly, in the Form 10-K for 2005, the following statements appear:

---

[20] The new Quality Assurance Department began to function only in mid-2006. <u>Id.</u> at 138-39.

"Our loan origination standards and procedures are designed to produce high quality loans."

"We adhere to high origination standards in order to sell our loan products in the secondary mortgage market."

The Examiner questions these assertions, which together suggest that New Century in 2005 originated high quality loans.  <u>In fact, as previously set forth in Section V. of this Final Report, New Century did not produce "high quality" loans or have "high origination standards."</u>  <u>Id.</u> at 424-25 (emphasis added).

177.   The Examiner reported facts demonstrating that red flags regarding New Century's declining loan quality and underwriting practices began as early as 2004:

<u>New Century's Senior Management recognized that the Company had serious loan quality issues beginning as early as 2004</u>. For example, in April 2004, New Century's Chief Credit Officer reported that "the QA results [pertaining to the loan origination processes] are still at unacceptable levels" and that "Investor Rejects [kickouts] are at an incline as well."[21]  Two months later, in June 2004, the head of Secondary Marketing remarked in an e-mail that "<u>we have so many issues pertaining to quality and process</u>!"  Later, in September 2004, it was reported that investors had rejected 7.17% of loans that New Century had sought to sell in July 2004, which was

---

[21] In addition, "New Century's former Chief Credit Officer noted in 2004 that the Company had '<u>no standard for loan quality</u>.'"  Examiner's Report at 4, 132 (emphasis added).  Rather, as reported by the Examiner, the only criteria used by the Company was whether New Century could sell or securitize the loans in the secondary market.  <u>Id.</u>  This attitude resulted in an increasing probability that New Century would have to repurchase billions of dollars of the riskier loans because of significant defaults or loan defects.  <u>Id.</u>

more than two percentage points higher than the five percent rate that was viewed as the highest acceptable kickout rate. Finally, from approximately June 2004 through the rest of the year, there was a sharp rise in EPD. For all of 2004, the failure of borrowers to make the first, second or third payments on newly originated loans, stood at 7.24% and constituted $1.82 billion of loans, an EPD rate that was 2.86% higher than the 2003 rate.[22]

The Examiner finds that these 2004 developments, taken as a whole, should have prompted Senior Management to develop an action plan to address these troubling loan quality trends. However, despite some discussions, no member of Senior Management was directed to be responsible and accountable for improving loan quality. Rather, New Century continued to focus on generating greater quantities of ever riskier loans, devoting little effort to such basic issues as making sure that the Company's loan origination and underwriting policies and procedures were followed to avoid kickouts of loans offered for sale. Such lack of attention to quality had a stark result. For example, investors kicked out $1.035 billion of New Century loans in the last six months of 2004 alone. Examiner's Report at 110-11 (emphasis added).[23]

_____

[22] "Senior Management was aware of an alarming and steady increase in early payment defaults ("EPD") on loans originated by New Century, beginning no later than mid-2004." Examiner's Report at 4 (emphasis added).

[23] The Examiner reported that kickouts were caused by, inter alia, "property value and appraisal documentation issues," "unacceptable exceptions related to borrowers' mortgage or rental payment histories" and "LTV ratios that exceeded guidelines" and that one senior employee noted in 2004 "The number one issue is exceptions to guidelines." Examiner's Report at 143-44, 3-4 (emphasis in original).

178. Additional adverse trends in first, second and third payment default (FPD, SPD and TPD) and early payment default (EPD) trends, particularly from the middle of 2004 onward, are reported by the Examiner as follows:

| | FPD | EPD |
|---|---|---|
| January | 1.02% | 6.40% |
| February | 0.71% | 6.32% |
| March | 0.53% | 4.23% |
| April | 0.62% | 4.53% |
| May | 0.86% | 8.20% |
| June | 0.92% | 7.62% |
| July | 1.13% | 7.91% |
| August | 0.94% | 7.06% |
| September | 1.20% | 8.76% |
| October | 1.39% | 9.70% |
| November | 1.35% | 10.02% |
| December | 1.31% | 8.72% |

The upward trend of EPD did not go unnoticed. In an October 2004 e-mail copied to Cloyd, a New Century employee, in addressing various risks facing New Century in the types of products it was offering and citing the factors that the employee considered to be "troublesome," stated: "Early Defaults: This key indicator is increasing." (emphasis added). And the same employee commented in December 2004:

We have seen FPDs increasing rapidly and steadily since the low of .53% in March, reaching 1.39% in October, before falling slightly to 1.35% in November.

Shortly thereafter, the Secondary Marketing Department circulated the following summary of EPD in 2004 compared to 2003, showing the marked increase and financial consequences in all categories of EPD:

### Early Payment Default Summary

|  | 2003 | | 2004 | | | |
|---|---|---|---|---|---|---|
|  | Dollar | % | Dollar | % | Difference | % |
| FPD | 103,873,250 | 0.60% | 338,789,455 | 0.93% | 0.33% | 54% |
| SPD | 140,216,425 | 1.95% | 778,319,627 | 2.92% | 0.97% | 50% |
| TPD | 68,718,595 | 1.83% | 704,586,688 | 3.39% | 1.57% | 86% |
| Total EPD | 312,808,270 | 4.38% | 1,821,695,770 | 7.24% | 2.86% | 65% |

This summary documented the significant deterioration of New Century loan quality, as measured by EPD, in the first, FPD, SPD and TPD categories in 2004 when compared to 2003, and the large financial impact of such defaults. Examiner's Report at 141-42 (emphasis added).

179.    According to facts reported by the Examiner, Senior Management and the Board continued to ignore "striking" red flags that loan quality and underwriting practices were deteriorating in 2005, as loan quantity was emphasized over loan quality:

The situation in 2005 was little different from 2004, although the trend data pointed even more clearly to serious loan quality problems. Some of the 2005 trends were striking. For instance:

•    Kickout rates in 2005 exceeded New Century's five percent acceptable limit in 10 of 12 months, with the same sorts of deficiencies being cited month after month; investor kickouts for all of 2005 totaled $2.281 billion;

• EPD increased throughout the year, going from 6.86% of loans originated in the first quarter of 2005 to 9.86% of loans in the fourth quarter, with the overall 2005 average at 8.30% compared to 7.24% in 2004 and 4.38% in 2003;

• New Century's Secondary Marketing Department reported in September 2005 that the Company's 80/20 loans from 2004 had a four-times higher 60+ day default rate than other New Century products, presenting serious risk issues, especially since 80/20 loans amounted to more than 33% of New Century's loan production by September 2005; and

• The Internal Audit Department conducted nine field audits of New Century's loan origination processes in 2005, resulting in seven "Unsatisfactory" and two "Needs Improvement" ratings, as well as identification of numerous problems that suggested serious loan quality deficiencies.[24]

The response of Senior Management and the Board to these 2005 trends was similar to their response in 2004:  loan quality was a frequent topic of discussion but no effective remedial actions were implemented.    Indeed, at an October 25, 2005 Audit Committee meeting, there was a relatively full discussion of loan quality issues, including an observation by the Audit Committee Chairman that "the percentage of loans originated by the Corporation that contained

---

[24] "The Internal Audit Department's results consistently reported that the loan origination processes had significant flaws.  For example, in an audit dated September 19, 2005, the Internal Audit Department identified countless deficiencies in loan files it reviewed at a retail production center . . . ." Examiner's Report at 139.  These results were presented to New Century's Audit Committee and Senior Management, including Defendant Morrice, and generated "considerable discussion." Id. at 167.  Nonetheless, improving loan quality was not a high priority through the end of 2006 and change was resisted at the Company.  Id. at 170-74.  See also paragraph 196 below.

defects had traditionally been too high." Despite these discussions, however, loan quality was not a priority.  <u>Just as in 2004, no one was directed to be responsible and accountable for any loan quality improvement effort</u>.  Examiner's Report at 111-12 (emphasis added).[25]

180.  The Examiner noted the following negative trend in EPD and FPD in 2005:

| Month | FPD Rate | EPD Rate |
|---|---|---|
| April | 0.97% | 6.58% |
| May | 0.80% | 6.66% |
| June | 1.06% | 7.00% |
| July | 1.20% | 7.76% |
| August | 1.02% | 7.28% |
| September | 1.37% | 8.70% |
| October | 1.15% | 8.81% |
| November | 0.95% | 8.72% |
| December | 1.42% | 9.24% |

<u>The negative trends were promptly noticed</u>.  For example, in the April 2005 Capital Markets Report to Senior Management, one of the "Key Items Highlights" was as follows:

First Payment Defaults increased by 31 bps to 0.97%.

Total Early Defaults rose by 2.26 pctpts to 6.96%; this is the first month since November [2004] that Early Payment Defaults have increased.  In total, 40,364

---

[25] The Examiner further noted that at the October 25, 2005 Audit Committee meeting there was an "<u>acknowledgement by Senior Management and certain Directors that New Century had loan quality problems</u>."  Examiner's Report at 154.

> loans with first, second or third payments occurring in
> April were included.

The negative EPD rates continued to be reported regularly to Senior Management.  For example, the July 2005 Capital Markets Report included the following comment:

> The percent of units with an Early Payment Default
> rose by 67 bps to 8.65%.  The percent of units with a
> First Payment Default increased by 24 bps to 1.35%.

Id. at 148-49.

181.    Rising interest rates, leveling property values and riskier loan products provided additional red flags in 2004 and 2005.

182.    The facts reported by the Examiner's confirm that "New Century was well aware of the fact that interest rates were almost sure to increase" and property values were leveling in 2004-05:

> For example, in January 2005, in a presentation to Senior
> Management entitled "The View of the World," a Secondary
> Marketing employee commented:
>
> *   *   *
>
> The potential for trouble appears to manifest itself in
> 2006 (and beyond) with the hybrid loans (especially
> IO's) [Interest Only] resetting during that year.  We can
> assume that the rising rates we are currently
> experiencing will continue, resulting in the full initial
> cap (1.5%) being realized with the associated higher
> payments.

The rise in interest rates, over time, made it more difficult for borrowers to meet their payment obligations, particularly since most New Century borrowers held adjustable rate mortgages, whose rates

would adjust upward as interest rates increased. Significantly, ARM made up 70.1, 73.7 and 73.3% of New Century originations in years 2003, 2004 and 2005 respectively.

At the same time that interest rates were rising, property value appreciation began to slow and, in some regions, by 2006, values actually began to decline. The slowing of property appreciation had a potentially serious effect on borrowers, something that New Century clearly recognized. In the same View of the World presentation, the author noted that "lower housing price increases could hinder the ability of customers to refinance out of loans that are heading for trouble." In prior years, as property values increased, borrowers often could refinance their loans when ARM adjusted to higher interest rates. However, as property prices leveled, many borrowers discovered that they could no longer refinance and thus were facing higher monthly payments without a refinance option. Id. at 123-24.

183. The Examiner's Report also demonstrates the increasing risk profile of New Century's loan products which should have caused New Century to focus more carefully on loan quality in 2004-05. For example, with regard to Stated Income loans, increasing LTVs and ARM products, the Examiner found:

The risks associated with making loans on a "stated" basis were recognized by New Century personnel, one of whom stated to Senior Management in January 2005:

To restate the obvious, a borrower's true income is not known on Stated Income loans so we are unable to actually determine the borrowers ability to afford a loan.

Despite such risks and despite the fact that New Century knew by January 2005 that Stated Income loans had a "significantly higher

delinquency" rate than full documentation loans, Stated Income loans became an increasingly important part of New Century's mix of loan products. This trend caused a New Century employee to comment in an October 20, 2004 e-mail that was copied to Cloyd:

> Stated Income. This has been increasing dramatically to the point where Stated Income loans are the majority of production, and are teetering on being >50% of production. We know that Stated Income loans do not perform as well as Full Doc loans." (Emphasis supplied).

Notwithstanding these expressed concerns, Stated Income loans remained a high percentage of overall originations.

* * *

The same individual who expressed concerns about Stated Income loans, also commented on other risks that he perceived in the products being offered by New Century in fall 2004:

> Risk Layering. Adding the risk factors on top of each other such as Stated – IO – 80/20.
>
> 80/20. Increasing population of 80/20 is driving up CLTV [combined loan to value rations]. CLTV's are more important to default risk that straight LTV and while our LTV's are dropping, our CLTV's are increasing – thus increasing Default Risk . . .
>
> Stated Wage Earners. While I believe this is being addressed somewhat, I just can't get comfortable with W2'd borrowers who are unwilling or unable to prove their income."

Another senior officer similarly wrote to Morrice on October 24, 2004, commenting that "stated wage earner loans present a very high risk of early payment defaults and are generally a lower credit quality borrower than our self employed stated borrowers."

\* \* \*

The shift from core loans to 80/20 loans was dramatic, and starkly depicted the increasing risk profile of New Century's loans:

| Month | % Core | %80/20 |
|-------|--------|--------|
| 3/03  | 88.13  | 7.9    |
| 12/03 | 83.00  | 9.10   |
| 6/04  | 77.93  | 19.08  |
| 12/04 | 74.98  | 23.54  |
| 6/05  | 65.60  | 33.83  |
| 12/05 | 64.26  | 35.23  |

\* \* \*

The same trend toward higher risk was reflected in New Century's trend toward ever higher "combined LTV" ratios, meaning the total loans that a borrower had pertaining to the collateral compared to the appraised value of the collateral. As noted in the e-mail quoted above, a New Century executive noted that combined LTV ratios were increasing, therefore "increasing Default Risk . . . ." Those increasing values were as follows in the months listed below:

| Month | WACLTV [Weighted average combined LTV] |
|-------|----------------------------------------|
| 11/02 | 79.92%                                 |
| 3/03  | 82.2%                                  |
| 12/03 | 83.69%                                 |
| 6/04  | 83.77%                                 |
| 12/04 | 83.77%                                 |

| | |
|---|---|
| 6/05 | 86.92% |
| 12/05 | 87.07% |

\* \* \*

As shown, there was a consistent trend throughout the period to higher combined LTV ratios, with associated greater risks of borrower defaults.

\* \* \*

A further risk should be noted as well. New Century originated a large quantity of 2/28 and 3/27 ARM. Typically, these ARM would have a fixed low interest rate (often called a teaser rate) for the first two or three years and then would adjust at least annually thereafter, with the adjustment tied to an index such as LIBOR. Even if the index rate did not change over the two or three year fixed rate period, the loan payments would be expected to increase at the first adjustment date. New Century qualified its borrowers for such loans on the basis of their ability to pay the loan at the initial teaser rate, rather than the ability to pay the loan at the indexed rate after the initial fixed rate period. This circumstance presented an obvious risk of future default, which was specifically identified by New Century personnel. Thus, in discussing the 2/28 IO product in the fall 2004, New Century's General Counsel identified the potential "sticker shock" risk associated with this product . . . .

\* \* \*

In sum, New Century was aware that it was offering a variety of products that contained elements of high risk, especially when various risk factors were layered together. At the end of 2005, New Century prepared a Summary of "2005 Loan Characteristics and Delinquency Performance." The Summary set forth in stark detail the increasingly

risky loans made by New Century in 2005 when compared to earlier years:

\* \* \*

>**Overall, our volume has moved into loan cohorts that have weaker performance.  As a result of the higher volume coming from those poorer performing buckets, our delinquency rates are being negatively impacted.**  (emphasis in original)

These data evidence the ever-increasing risks incurred by New Century – a veritable ticking time bomb.  Under the circumstances, New Century should have been more concerned about – and taking greater steps to address – loan quality issues.  Examiner's Report at 127-32 (emphasis added).

184.   The facts reported by the Examiner confirm that the adverse trends continued in 2006, with efforts at improvement coming "too little too late:"

>The loan quality trends in 2006 continued to be negative, with kickout rates above the five percent acceptable level every month and reaching 14.95% by year-end, and with the same sorts of issues, such as defective appraisals and missing documentation, identified month after month as the primary reason for kickouts.  The value of the kicked out loans in 2006 was $4.622 billion.  Similarly, EPD continued to trend upward month after month, exceeding 10% in every month after March 2006 and reaching 16.82% in December 2006.

\* \* \*

>Loan quality improvement still never became a top priority for New Century in 2006, however, and most of the improvements noted above were not implemented until late in the year.

\* \* \*

Further, in March and September 2006, it became clear that loans originated by New Century in 2005 and early-2006 had significantly greater delinquency rates than similar loans originated by New Century in 2003 and 2004 and by other subprime lenders in 2006.

\* \* \*

In short, despite some efforts, New Century failed through most of 2006 to make substantial improvements in loan quality. New Century seems to have finally moved toward making loan quality improvement a priority in the fourth quarter of 2006 and announced at that time that it expected its efforts to result in better quality loans and fewer EPD and repurchase claims in 2007. This was "too little too late." Examiner's Report at 112, 157-58 (emphasis added).

185. The Examiner further noted the following negative trend in EPD and FPD which showed "alarming increases over the rates experienced in 2004 and 2005:"

| Month | FPD Rate | EPD Rate |
| --- | --- | --- |
| January 2006 | 1.18% | 8.37% |
| February 2006 | 1.67% | 8.83% |
| March 2006 | 1.57% | 7.76% |
| April 2006 | 2.00% | 12.30% |
| May 2006 | 1.67% | 10.58% |
| June 2006 | 1.98% | 11.19% |
| July 2006 | 1.94% | 12.85% |
| August 2006 | 2.08% | 13.42% |
| September 2006 | 2.05% | 14.88% |
| October 2006 | 2.29% | 12.94% |
| November 2006 | 2.26% | 14.16% |

| | | |
|---|---|---|
| December 2006 | 2.58% | 16.82% |
| January 2007 | 2.20% | 13.09% |
| February 2007 | 1.99% | 13.14% |

Examiner's Report at 159.

186.   In February 2006, New Century also internally identified "alarming delinquency trends among many of its higher risk 2005 loan originations, demonstrating significantly higher delinquency rates among certain 2005 originations compared to similar originations in 2003 and 2004" as follows:

> 60+ Delinquency performance has deteriorated in 2005 versus the 2003-2004 vintages.  Overall, the 2005 60+ delinquency at month 11 is twice as high as it was in 2003.  80/20 loans show similar trends and although they have higher FICOs, the delinquency is generally higher than the core products, across all vintages.

> Each FICO band was further segregated by Documentation type – either Full Doc or Stated Income.  It should come as no surprise the performance of the Stated Income loans is inferior to Full Doc loans.  In fact in most instances, the 60+ on the Stated Income loans is 50%-100% higher than the Full Doc across all vintages.

> Again we see the very negative performance of the Stated Income/80/20 loans, particularly in the 2005 Vintage.  This cohort is at least three times worse than any of the other 2005 Vintage cohorts in the 650+ FICO bucket, including the Full Doc/80/20 and Stated Income/Core populations.

> We again see terrible performance of the Stated Income\Single\80/20 loans in the 650+ FICO band.  The Single

Stated Wage Earner loans have by far the highest 60+ while the Single Stated – not Wage earners are at least as high as the Joint Loans.

Therefore, at the beginning of 2006, New Century's Senior Management knew that many of its loan products were performing extremely poorly from a delinquency perspective. Examiner's Report at 159-60 (emphasis added).

187. Consistent with the results of Lead Counsel's investigation, the Examiner also found facts demonstrating that New Century's Production Department was "highly motivated" to originate loans and "devoted its resources to generating high volumes of loans, with relatively little attention to loan quality." "Compensation within the Production Department, including significant bonuses, historically focused on loan origination volume." Id. at 113. The Examiner observed that "as late as November 2006, Internal Audit reported that commission payments to account executives and area sales managers were not affected by EPD, kickouts and repurchases." Id. at 114.

188. Consistent with the results of Lead Counsel's investigation, the Examiner also found that "New Century's own internal data showed that many of the loans it originated in 2005 had much higher delinquency rates than loans originated by New Century in 2003 and 2004. . . . For example, Senior Management identified Stated Income loans to single borrowers in an 80/20 product as performing much worse in 2005 compared to 2003 and 2004, stating '[w]e again see the horrendous performance of the Stated Income/Single/80/20 loans.' Nonetheless, little was done to curb such risks until late 2006." Examiner's Report at 115 (emphasis added). "New Century, however, not only did not properly address these risks, but continued to be an aggressive originator of ever-increasing volumes of high risk mortgage loans, with relatively little attention to meaningful efforts to improve loan quality." Id. (emphasis added).

189.  Consistent with the results of Lead Counsel's investigation, the Examiner also found facts demonstrating that New Century did not have a clear exceptions policy.  "Indeed, Morrice commented in a September 2004 memorandum that New Century's exceptions policy was 'unclear' and Kevin Cloyd in response stated 'Our exceptions policy – do we have one?'"  Examiner's Report at 117. "Notwithstanding the frequency of exceptions, New Century had no formal exceptions policy." Id. at 174.  The Examiner further noted:  "In the Form 10-K for 2005, New Century did not report on exception rates at all and available data indicate that between June 2005 and October 2006, New Century did not have accurate exception data." Id. at 118 (emphasis added).

190.  All of these facts reported by the Examiner further confirm the facts uncovered through Lead Counsel's investigation and demonstrate that Defendants' repeated public statements, during the Class Period and at the time of the Offerings, that the credit quality of the Company's mortgages was "strong," "excellent," "very high" and "higher" or "better" than it had been in the Company's past as the result of purportedly "strict," "improved" and "strong" underwriting controls and guidelines and risk management discipline were materially misstated when made and at the time of the Offerings.  Simply stated:

New Century had a brazen obsession with increasing loan originations, without due regard to the risks associated with that business strategy.  Loan originations rose dramatically in recent years, from approximately $14 billion in 2002 to approximately $60 billion in 2006.  The Loan Production Department was the dominant force within the Company and trained mortgage brokers to originate New Century loans in the aptly named "CloseMore University."  Although a primary goal of any mortgage banking company is to make more loans, New Century did so in an aggressive manner that elevated the risks to dangerous and ultimately fatal levels.

> The increasingly risky nature of New Century's loan originations created a ticking time bomb that detonated in 2007. Subprime loans can be appropriate for a large number of borrowers. New Century, however, layered the risks of loan products upon the risks of loose underwriting standards in its loan originations to high risk borrowers. Examiner's Report at 3 (emphasis added).

### E.    New Century's Misstatements Regarding Its Internal Controls

191.    Throughout the Class Period and at the time of the Offerings, New Century Officer Defendants Cole, Morrice, Gotschall and Dodge each repeatedly certified the design, operation and effectiveness of New Century's internal controls.  Each of these statements was materially misstated and misleading when made.

192.    As set forth by the above accounts from numerous former New Century employees with first-hand knowledge, New Century repeatedly made exceptions to its underwriting guidelines in order to originate larger mortgage volume.  In addition, as set forth above, the Company delayed payment of loan repurchase claims from its whole loan purchasers in an effort to cause its previously reported 2005 and 2006 financial results to appear better than they actually were.  These practices, among others set forth herein, evidence significant deficiencies and material weakness in the Company's internal controls and had the effect of distorting the Company's reporting of financial results and performance data at all times throughout the Class Period and at the time of the Offerings.

193.    Contrary to Defendants' repeated certifications, the Company acknowledged that it expected to conclude that the material errors leading to the restatement disclosed on February 7, 2007 "constitute[d] material weaknesses in its internal control over financial reporting for the year ended December 31, 2006." As set forth here and consistent with the Company's subsequent May 24, 2007 disclosures, significant deficiencies and material weaknesses existed in the

1    Company's internal controls not just as acknowledged (on February 7, 2007) for
2    the first three quarters of 2006, but throughout the Class Period commencing on
3    May 5, 2005.

4    194.   Indeed, contrary to the New Century Officer Defendants' repeated
5    internal control certifications, the Examiner's Report reveals numerous facts
6    demonstrating significant internal control deficiencies and material weaknesses at
7    New Century from 2004-06:

As a reporting company subject to the Securities Exchange Act
of 1934, New Century was required to establish and maintain a system
of internal controls over financial reporting sufficient to provide
reasonable assurances that, among other things, transactions were
recorded as necessary to permit the preparation of financial statements
in conformance with GAAP.  Under SOX Section 404 ("SOX 404"),
New Century's Management was responsible for assessing the
effectiveness of its internal controls over financial reporting as of each
year-end financial reporting period between 2004 and 2006.   In
addition, New Century's independent auditor, KPMG, was retained to
audit and express an opinion on Management's assessment of internal
financial controls and on the effectiveness of those internal financial
controls as of each year-end financial reporting period between 2004
and 2006.

*   *   *

The Examiner concludes that deeply-rooted and long-standing
failures to establish and monitor adequate internal controls over
financial reporting substantially contributed to New Century's
accounting errors.  Many of these control failures relate to the lack of
written and effective policies and procedures for calculating
accounting estimates.

* * *

The Examiner has identified a number of deficiencies concerning New Century's internal controls over financial reporting during the period covered by the 2004 through 2006 audits and the adequacy of the SOX assessment conducted by New Century. The most significant deficiencies are as follows:

• New Century failed to develop effective policies and procedures for performing accounting estimates requiring the exercise of considerable judgment. This created an environment devoid of safeguards that enabled the Accounting and Secondary Marketing Departments to revise certain accounting practices and related assumptions without adequate review and oversight. This led to material errors with various accounting matters, including the repurchase reserve and residual interest valuation. For example, in early 2006, the Secondary Marketing Department stopped updating the prepayment and loss rate assumptions used in its pre-2003 valuation models without any process controls in place to make certain that such inaction was warranted. Similarly, in the second and third quarters of 2006, Kennelly made several changes in the way that New Century calculated the repurchase reserve without notifying the Audit Committee.

• New Century did not remediate internal control deficiencies that existed at year-end 2004 and year-end 2005, despite representing to KPMG that it would. Many of these recurring deficiencies can be characterized as documentation issues. When viewed in isolation, they may seem insignificant. However, in the aggregate, these deficiencies demonstrate that New Century had poor documentation practices and weak internal controls in areas critical to

its financial reporting, including the repurchase reserve, residual interest valuation and hedging process.  The recurrence of such internal control deficiencies during the 2004 through 2006 SOX reviews also indicates that New Century's Senior Management was not effective in promoting a strong compliance culture.

•    New Century lacked adequate internal controls to log, process and track all repurchase requests presented to the Company, thereby creating a significant risk that the number of repurchase claims pending would not be identified accurately or processed efficiently.  This contributed to the development of a significant backlog of outstanding repurchase requests.  New Century also lacked adequate controls to ensure that the existence and magnitude of this backlog was factored into the repurchase reserve estimate.

* * *

New Century's lack of formal policies and procedures governing many of the accounting estimates requiring substantial judgment was frequently noted as an internal control deficiency by KPMG.  Management failed to develop written and effective policies and procedures for these processes after these deficiencies were brought to its attention on a recurring basis.  This epitomizes the lack of attention that Management gave to remediating internal control deficiencies.  Examiner's Report at 389-90, 400 (emphasis added).

195.   The Examiner further noted facts demonstrating how New Century's internal control deficiencies permeated six separate key areas of financial reporting during 2004-06.  These facts are summarized as follows:

### 1.    Repurchase Reserve:  Change in Methodology

A year-over-year analysis of the key controls surrounding the repurchase reserve estimation process reveals that New Century's

Management permitted certain recurring deficiencies to remain unaddressed. Most importantly, Management never adopted detailed written policies and procedures for the repurchase reserve calculation process. As part of its 2004 SOX audit, KPMG agreed with Management's observation that New Century lacked formal documentation memorializing its methodology for estimating the repurchase reserve. In response to this finding, Management represented to KPMG that it was taking steps to formalize its "informal" and "undocumented" policies and procedures and would include timelines, checklists and retention policies in that documentation. <u>This was never done</u>.

During its 2005 SOX walk-through of the repurchase reserve estimation process, KPMG again noted that Management failed to adopt "formal policies and procedures" for calculating the repurchase reserve. During KPMG's 2006 SOX walk-through of the repurchase reserve estimation process, KPMG again noted that New Century lacked "formal policies and procedures" for calculating the repurchase reserve. According to KPMG's narrative from the walk-through, Kenneally represented to KPMG that "the memo on Repurchase Reserve policies will be updated near the end of the year."

* * *

The failure to develop effective policies and procedures for calculating the repurchase reserve is more than a technical documentation issue. <u>It reflects the lack of adequate internal controls that New Century had in place to ensure that the repurchase reserve was being calculated on a consistent basis in accordance with GAAP</u>. The Examiner has concluded that the existence of written and effective repurchase reserve estimation policies and procedures would

have decreased the risk of an improper accounting error (which is one of the principal objectives for having such documentation controls) by imposing a review and approval framework that would have required Management and/or the Audit Committee to consider the rationale supporting the proposed changes and their consistency with GAAP. New Century's failure to develop and comply with such policies and procedures for calculating the repurchase reserve was at least a significant deficiency (if not a material weakness) in New Century's internal control environment that contributed to a material misstatement in its financial reports.

\* \* \*

### 2.    Whole Loan Sales:  Backlog in Repurchase Claims Processing

\* \* \*

New Century's failure to establish an effective mechanism for tracking, processing and handling repurchase claims contributed to its inability to promptly detect the increasing volume and (staleness) of repurchase claims.    This weak control environment led to the development of a substantial backlog of claims.    In addition, the Secondary Marketing Department's failure to track and disclose the increased volume of unresolved repurchase claims precluded the Accounting Department from making adjustments to the reserve that could have taken into account the increased repurchase volume.  New Century's failure to establish effective controls for handling repurchase claims prior to late 2006 prevented the Company from detecting early warnings about the development of the backlog.  The Examiner has concluded that this was a material weakness in the

control environment as early as 2005, when repurchase claims began to increase.

### 3. Valuation of Residual Interests

New Century also failed to establish sufficient internal controls with respect to its residual interest valuation process. As with the repurchase reserve calculation, New Century did not begin to develop written policies and procedures for the residual interest valuation process until early 2007, after KPMG applied increasing pressure on New Century to substantiate various aspects of its valuation approach. In addition, New Century had weak controls surrounding the process used to determine and update various assumptions used in its valuation models.

\* \* \*

As noted above, New Century failed to develop detailed, written policies and procedures for how it built, operated and updated the models it used to develop the residual interest valuation. New Century did not develop a manual which explained the design of the functions or routines within the valuation models. This was problematic because different vintages of the models were built by different people and therefore had different limitations and capabilities. In addition, New Century did not have written policies and procedures which set forth a methodology for establishing and changing assumptions within the models. This was an important control deficiency because the accuracy of the models depended on the reasonableness of the assumptions, which in turn depended on the exercise of judgment. Thus, these assumptions needed to be updated from time to time based on actual securitization performance and market trends. The lack of detailed policies and procedures for establishing and updating those

assumptions left New Century vulnerable to a high risk of misstatement from unreasonable assumptions because the models could be very sensitive to assumption changes.

\* \* \*

### 4.    Allowance for Loan Losses

A year-over-year review of the SOX deficiency listing reveals that New Century never adopted adequate written documentation of its methodology and assumptions for determining the ALL provision. The ALL is not a transactional balance, but rather a judgmental estimate. Therefore, it is important to have strong internal controls in this area. In addition to the documentation deficiencies, the ALL provision was not consistently reviewed and approved by the appropriate individuals within the organization. In 2004, KPMG noted the following significant deficiencies relative to ALL and communicated them to New Century through a formal letter:

• "Management neglected to create adequate documentation evidencing the appropriate application of GAAP in certain areas. These areas included the allowance for loan loss methodology and rationale..."

• "Management neglected to create adequate documentation supporting data inputs for Secondary Marketing's calculation of residual values and the loss curves used in determining the allowance for loan losses...."

During the 2005 SOX audit, KPMG's workpapers indicate that the ALL methodology deficiency persisted.

\* \* \*

In its March 2007 draft SOX memorandum, prepared after the February restatement announcement, KPMG concluded that, when aggregated the ALL deficiencies likely constituted a material weakness.

\* \* \*

### 6. Hedging

Over a three year period, beginning in 2004 and ending in 2006, KPMG noted a number of deficiencies related to the Company's internal controls for the hedging and derivatives process. Many of the deficiencies related to the Company's inadequate documentation of its hedging policies and procedures, including the lack of a comprehensive policy, inadequate designation documentation at inception and inadequate documentation in support of effectiveness testing of its hedging relationships. In addition to the documentation issues, KPMG noted a number of other deficiencies related to the Company's reconciliation procedures, spreadsheet controls, valuation procedures and approval procedures. The non-documentation deficiencies reflected ineffective controls in procedures used to calculate the financial impact of hedging and derivative transactions. In addition, the documentation deficiencies raised concerns about the adequacy of New Century's control environmental in the hedging area particularly since FAS 133 requires considerable documentation to substantiate the use of hedge accounting treatment.

For the year ended December 31, 2004, four non-documentation deficiencies (out of a total of six deficiencies) were identified by KPMG in the hedging area. For the year ended December 31, 2005, six of the 12 deficiencies identified related to non-documentation issues. For the year ended December 31, 2006, eight of 11 deficiencies identified by KPMG during the incomplete SOX review related to non-

documentation issues.  For example, KPMG noted in 2006 that New Century lacked proper segregation of duties with respect to derivative trading (one individual could enter, verify, and confirm a trade).

Based on the Examiner's review of the available data, it does not appear that New Century placed much emphasis on improving its controls related to the hedging and derivatives process.  To the contrary, the control deficiencies appear to have worsened over time, both in volume and significance.  As noted above, KPMG identified a significant deficiency with New Century's controls in the hedging area in 2004 and 2005.  Both of these significant deficiencies resulted in audit adjustments.  During its incomplete 2006 SOX audit, KPMG reached the preliminary conclusion that there was a material weakness in new Century's hedging control environment as a result of the aggregation of deficiencies (many of which were recurring from prior years).  Examiner's Report at 401, 403, 406-08, 411, 413-14 (emphasis added, footnotes omitted).

196.   In terms of loan quality and underwriting internal controls, the Examiner reported the following additional facts:

The areas of risk for Internal Audit review were typically identified by Zalle and reviewed by Sachs, with input from Management and Internal Audit personnel, and approved by the Audit Committee. One example of input from Internal Audit personnel was a January 16, 2004 e-mail from Brown to Zalle in which Brown urged that the level of field audits increase.  This request was made because Brown and his team of field auditors were conducting their own file reviews and "walk-throughs" of loans to make sure the Quality Assessment/Quality Control ("QA/QC") controls were satisfactory.  During this time, Internal Audit found many exceptions to underwriting standards, and concluded that

something was "falling apart" in the QA/QC function.  Internal Audit found that loans would get through the QA/QC process, even though the loans had problems with the LTV ratio or the stated income did not look accurate.

In response to the problems discovered by Internal Audit in the QA/QC function, Zalle expanded the scope of the underwriting/loan quality audits in 2005 to include both a compliance audit and a system of internal control walk-throughs.  Zalle designed the 2005 audit program to include the audit of a cross-section sample of eight wholesale processing centers and one retail center.  Internal Audit next identified a sample number of loan files per operating center, and then conducted a "walk-through" that involved reviewing the loan origination process from the time the loan first entered the system through loan funding.  Internal Audit then conducted testing to ensure that internal controls related to loan applications, such as verifications and exceptions, were handled properly.  Internal Audit also looked at underwriting procedures, account manager review/approval, appraisals and funding.  The results of the loan quality field audits were dismal.  Of the nine branches audited, none were rated satisfactory, seven were rated unsatisfactory and two were rated as needs improvement.  This should have been a strong signal to the Audit Committee and Senior Management that significant improvements in loan quality were needed.

* * *

The Audit Committee should have identified and analyzed, along with Management, the material risks facing the Company related to loan quality.  In other words, Management, with Audit Committee oversight, should have documented New Century's business objectives and identified the risks that could undermine those

objectives, such as the risks related to poor loan quality discussed in Section V. of this Final Report. Internal control processes should have been developed, such as specific policies, procedures and practices, for achieving the business objectives and mitigating risk.

<u>Finally, the Audit Committee should have understood the significant deficiencies and material weaknesses in Management's internal control structure related to loan quality, and held Management accountable for resolving these significant deficiencies and material weaknesses</u>. The Audit Committee identified and recognized the risks to New Century arising from poor loan quality. Each of the Audit Committee members interviewed by the Examiner acknowledged that poor loan quality would result in an increase, at a minimum, in repurchase requests and kickouts. Moreover, the Audit Committee understood that an increase in repurchase requests and kickouts would place a strain on New Century's liquidity, resulting in an aging inventory and lower profits.

<u>Although the Audit Committee recognized and appreciated the risks caused by poor loan quality, the Audit Committee did not require Management to establish and maintain an adequate internal control structure to minimize these risks.</u> Examiner's Report at 447-48, 454-55 (emphasis added).

**F.    New Century's Misstatements And Omissions During The Class Period And At The Time Of the Offerings Were Material**

197. The misstatements and omissions set forth below during the Class Period and at the time of the Offerings were material. In fact, by announcing the need to restate its financial statements, the Company admitted the materiality of the "errors" contained therein. The Company's failure to maintain effective underwriting and internal controls, its failure to report its 2005 and 2006 financial

statements in accordance with GAAP and its expected net losses resulting from the required restatements and related financial adjustments also triggered foreseeable and grave consequences for the Company given its highly leveraged balance sheet.

198.    At all relevant times, New Century needed to borrow substantial sums of money each quarter to originate and purchase mortgage loans and to support its operating activities.  The Company entered into credit arrangements to finance its mortgage loans until it aggregated one or more pools of loans for sale or securitization.  During the Class Period, New Century maintained credit facilities with, inter alia,  Bank of America N.A., Barclays Bank PLC, Citigroup Global Markets Realty Corp., Credit Suisse First Boston Mortgage Capital LLC, Morgan Stanley Mortgage Capital Inc., UBS Real Estate Securities Inc., Goldman Sachs Mortgage Company, Guaranty Bank and State Street Global Markets LLC.  The Company used these facilities to finance the funding of its loan originations and purchases pending sale or securitization.  Importantly, all of the Company's credit facilities contained certain customary covenants, which, among other provisions, required the Company to deliver timely financial statements prepared in accordance with GAAP to its lenders.   In addition, 11 of the Company's 16 financing arrangements required it to report at least $1 of net income for any rolling two-quarter period, a requirement the Company did not expect to meet as a result of the restatements and other adjustments disclosed at the end of the Class Period.

199.    As a result of these circumstances, after the Company's February 7, 2007 and subsequent disclosures, substantial doubt existed as to the Company's ability to continue as a going concern and, after the Company was unsuccessful in its discussions with its lenders and other third parties regarding a possible refinancing or other alternatives to obtain additional liquidity, the Company was forced to cease accepting new loan applications from prospective borrowers and to file for bankruptcy protection after its lenders declared the Company in default.

200.   All of the losses suffered by New Century investors following the Company's February 7, 2007 disclosures through the end of the Class Period were entirely foreseeable and **--** as demonstrated by the Company's unsuccessful efforts **--** unavoidable consequences of the materially misstated and misleading statements complained of herein.   As found by the Examiner's Report (at 105), "New Century's previously undisclosed financial and accounting problems created a crisis for the Company with respect to its warehouse lenders, on which New Century depended for financing."

201.   Further, the Examiner quantified the materiality of the GAAP violations in 2005 and 2006 as follows:

The Examiner concludes that at least the allowance for loan repurchase losses, the LOCOM valuation allowance for LHFS, and the valuation of residual interests were materially misstated based on an evaluation of quantitative and qualitative factors.   As a result of these material misstatements New Century:

•   overstated its reported pre-tax earnings for each of the four periods [ended December 31, 2005; March 31, 2006; June 30, 2006; and September 30, 2006] by at least $63.6 million; $7.4 million, $75.6 million and $116.4 million, respectively;[26]

•   met analysts' earnings expectations for 2005 and the first quarter of 2006 when it should have announced earnings below expectations;

---

[26] These income statement impacts were each quantitatively material using a five percent benchmark and KPMG's own internal guidelines.  Examiner's Report at 381.  Earnings before income taxes were overstated in the four quarters by at least the following amounts:   14.3%; 6.4%; 56.1% and 129.1%.  Id. at 383.

• paid bonuses for 2005 financial performance to the three founders of New Century, Cole, Gotschall and Morrice that were <u>at least 300% higher than they should have been</u>;

• paid bonuses to other officers of New Century for 2005 financial performance that were approximately 130% to 270% higher than they should have been;

• reported an increase in EPS of eight percent for the second quarter of 2006 as compared to the second quarter of 2005 when it should have reported a minimum of a 40% decline in EPS;

• reported a profit in the third quarter of 2006 of $63.5 million when New Century should have reported a loss in that quarter;

• understated its repurchase reserve <u>by as much as 1000%</u> in the third quarter of 2006;

• overstated its earnings by at least 129% in the third quarter of 2006; and

• paid mid-year bonuses to Cole, Gotschall and Morrice in 2006 <u>when none should have been paid</u>; and paying quarterly bonuses in 2006 to other officers that likely should not have been paid. Examiner's Report at 378-79 (emphasis added).

202.   In assessing materiality, the Examiner also considered the impact of the misstatements on New Century's balance sheet and determined the following:

• New Century's repurchase reserve was understated by at least 208%, 350%, 178%, and 1000% for the four periods, respectively.

• New Century's LOCOM valuation account was understated by at least 105% and 215% at December 31, 2005 and March 31, 2006. There was no LOCOM valuation amount for June

30, 2006 or September 30, 2006, when such amounts should have been $81.9 million and $85.8 million, respectively.

• Residual interests were overvalued by at least 17%, 13%, 20% and 32% for the four periods, respectively. Examiner's Report at 384-85.

203. The Examiner concluded that the misstatements were material to New Century's financial statements and "served to mask significantly the financial difficulties that the Company was facing for many months before [New Century] filed for bankruptcy." Id. at 387-88.

## G. Defendant KPMG's Numerous Violations Of Auditing Standards

204. Public investors, creditors and others rely on independent, registered public accounting firms to audit financial statements and assess internal controls when deciding whether to invest in or do business with a public company.

205. The PCAOB, established by the Sarbanes-Oxley Act of 2002, is responsible for the development of auditing and related professional practice standards that are required to be followed by registered public accounting firms. On April 16, 2003, the PCAOB adopted as its interim standards Generally Accepted Auditing Standards ("GAAS") as described by the American Institute of Certified Public Accountants Auditing Standards Board's Statement of Auditing Standards No. 95, *Generally Accepted Auditing Standards*, and related interpretations in existence on that date. Accordingly, an auditor's reference to "the standards of the Public Company Accounting Oversight Board (United States)" includes a reference to GAAS in existence as of April 16, 2003. For simplicity, all reference to GAAS hereinafter includes the standards of the PCAOB.

206. During the Class Period, KPMG issued an unqualified opinion on the Company's financial statements for the year-ended December 31, 2005, as well as an unqualified opinion regarding New Century management's assessment of

internal controls as of December 31, 2005.  KPMG also completed reviews of New Century's interim unaudited financial statements for the quarters ended March 31, 2006, June 30, 2006 and September 30, 2006.

207.  KPMG consented to the incorporation by reference in the registration statement for the Series B Preferred Stock offering of its unqualified opinion on the Company's financial statements for the year ended December 31, 2005, and its opinion regarding New Century management's assessment of internal controls over financial reporting as of December 31, 2005.

208.  In both of its opinions, KPMG publicly stated that it performed its audits and evaluations in accordance with the standards of the PCAOB.  As set forth herein in detail, each of these public statements was materially misstated when made and at the time of the Series B Preferred Stock offering as KPMG's audits failed to comply with the standards of the PCAOB for multiple reasons.

209.  There are ten GAAS provisions, which are divided into three types of standards:  (1) General Standards, which provide guidelines for auditor staffing and exercising due professional care;  (2) Standards of Field Work, which provide guidelines for audit planning, collecting evidential verification for audit findings, and the proper evaluation of internal controls; and (3) Standards of Reporting, which are primarily concerned with ensuring that a company's financial statements are presented in accordance with GAAP.

210.  GAAS General Standard No. 3 states that: "Due professional care is to be exercised in the performance of the audit and the preparation of the report." GAAS Standards of Field Work No. 1 states that:  "The work is to be adequately planned and assistants, if any, are to be properly supervised."  GAAS Standards of Field Work No. 2 states:  "A sufficient understanding of the internal control structure is to be obtained to plan the audit and to determine the nature, timing and extent of tests to be performed."  GAAS Standards of Field Work No. 3 states: "Sufficient competent evidential matter is to be obtained through inspection,

observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit." GAAS Standards of Reporting No. 1 states: "The report shall state whether the financial statements are presented in accordance with generally accepted accounting principles (GAAP)."

211. In order to effectively audit New Century's compliance with GAAP and the adequacy of the Company's internal controls, KPMG was required to, but did not, follow these GAAS standards in evaluating, inter alia, New Century's internal controls, reserving methodology and accounting for Residual Interests in securitizations structured as sales.

212. Given the nature of New Century's business and the massive volume of loans sold with repurchase obligations, nearly $40 billion in 2005 alone, it was incumbent upon KPMG to exercise due professional care in performing its audit; to adequately plan its audit; to obtain a sufficient understanding of New Century's internal controls; and to obtain sufficient competent evidential matter in auditing New Century's Allowance for Loan Repurchases reserve. KPMG failed to conduct its audit in compliance with all of these GAAS provisions. Had KPMG performed its audit consistent with GAAS, it would have uncovered New Century's growing repurchase claims backlog; related poor internal controls; and materially deficient Allowance for Loan Repurchases reserve. Indeed, as set forth above, the Company's materially deficient reserves were revealed within three months after the Company hired a new Chief Financial Officer who observed that the reserves were understated shortly after he joined the Company.

213. According to a former New Century Vice President, Assistant Controller, who was employed by the Company from September 2004 to July 2007 (CW 2), KPMG was provided access to New Century's financial data and specifically reviewed New Century's Allowance for Repurchase Losses reserve during each quarter and at year-end. Nonetheless, KPMG, in connection with its audit of the year-ended December 31, 2005 financial statements, failed to raise any

1  issue with regard to the Company's growing repurchase claims backlog, related

2  poor internal controls or materially deficient reserve. According to the former Vice

3  President, Assistant Controller, the first time KPMG raised any issue with the

4  Company's failure to include an estimated discount upon disposition of repurchase

5  loans was when KPMG concurring audit partner Marc Macaulay -- and not KPMG

6  audit partner John Donovan or the KPMG senior manager working on the audit

7  Mark Kim -- specifically noted that an expected discount upon disposition was

8  required in accordance with GAAP, SFAS 140, paragraph 55, at the time a

9  restatement already was being discussed in January 2007.

10  214.  According to New Century's former Senior Vice President, Director

11  of Internal Audit and Chief Ethics Officer, who was employed by the Company

12  from November 1999 to July 2007 and reported to New Century's Audit

13  Committee (CW 34), KPMG violated GAAS in connection with its 2005 audits of

14  New Century's financial statements and the adequacy and effectiveness of New

15  Century's internal controls, given the large, outstanding backlog of repurchase

16  claims at the time of KPMG's 2005 audit which caused New Century's Allowance

17  for Repurchase Losses reserve to be materially understated in 2005.  CW 34

18  reported that New Century's processing of repurchase claims was a critical matter

19  to the Company's financial statements and, had KPMG complied with GAAS, it

20  should have uncovered the material errors in New Century's Allowance for

21  Repurchase Losses reserve and the material weaknesses of New Century's related

22  internal controls at the time of its 2005 audits.  CW 34 further reported that when

23  KPMG was asked about its audit work by New Century's Audit Committee as the

24  restatement was being discussed in February 2007 and thereafter, KPMG (rather

25  than defend its audit work) repeatedly refused to discuss its audit work with the

26  Audit Committee and eventually resigned in April 2007.

27

28

215.   KPMG also failed to comply with the standards of the PCAOB in auditing, <u>inter</u> <u>alia</u>, New Century's reporting of Residual Interests in securitizations structured as sales.

216.   As set forth in paragraph 73 above, on May 24, 2007, New Century publicly reported that its Audit Committee determined that there were "errors" in the Company's previously-filed financial statements for the year-ended December 31, 2005 with respect to the Company's valuation of Residual Interests and that it is "more likely than not" that there was a material overstatement of pretax earnings in the 2005 financial statements.

217.   As set forth in paragraphs 101-08 above, the Company's reported Residual Interests were materially overstated as these reported Residual Interests failed to account for the Company's progressively decreasing loan quality and underwriting practices as well as New Century's increasing delinquencies, defaults and default loss severity throughout 2005.

218.   Given the size of New Century's Residual Interests, reported at $234,930,000 at December 31, 2005, and the ability of management to manipulate its value in multiple ways, it was incumbent upon KPMG to exercise due professional care in performing its audit; to adequately plan its audit; to obtain a sufficient understanding of New Century's internal controls; and to obtain sufficient competent evidential matter in auditing New Century's Residual Interests.  KPMG failed to conduct its audit in compliance with all of these GAAS provisions.

219.   At all times during the Class Period and at the time of KPMG's 2005 audit, New Century's reported Residual Interests were materially overstated as the Company failed to account for decreasing underwriting practices and loan quality and increasing delinquencies, defaults and default loss severity throughout 2005. Information regarding the Company's decreasing underwriting practices and loan quality and increasing delinquencies, defaults and default loss severity throughout

2005 and at the time of KPMG's audit was available to KPMG and, according to public statements by Defendant Dodge during the Class Period, KPMG purportedly spent significant time reviewing the Company's data in its 2005 audit.

220.  In auditing the Company's internal controls, KPMG also failed to comply with GAAS, to exercise due professional care in performing its audit; to adequately plan its audit; to obtain a sufficient understanding of New Century's internal controls; and to obtain sufficient competent evidential matter regarding New Century's adherence to internal controls, given KPMG's failure to uncover the Company's repeated lack of compliance and numerous exceptions to the Company's underwriting guidelines throughout the Class Period and at the time of KPMG's audit to boost its loan volume, as set forth above from first-hand accounts of numerous former New Century employees.  KPMG was required by GAAS, but failed to test on a sufficient basis whether New Century's mortgage loans were in compliance with its underwriting standards as part of its audit planning, assessment and testing of internal controls.  As set forth above, this lack of compliance with and numerous exceptions to underwriting guidelines was one of the major reasons why New Century's loans were experiencing increasing delinquencies, defaults and default loss severity throughout 2005 and at the time of KPMG's audit and causing significantly higher repurchase claims to the Company from its whole loan purchasers.

221.  The Examiner reports detailed facts demonstrating KPMG's numerous failures to comply with GAAS.  Among the categories of facts reported by the Examiner further demonstrating KPMG's numerous violations of GAAS are:  (1) KPMG's 2005 engagement team, in particular, was not staffed with auditors with sufficient experience in the industry and/or relating to the particular tasks to which they were assigned; (2) KPMG's audit team was unwilling to challenge its client New Century and, in some instances, KPMG's audit team acted as advocates for the Company and opposed other internal experts within KPMG; (3) KPMG failed

to act in accordance with GAAS in auditing New Century's Allowance for Loan Repurchase Losses reserve; (4) KPMG failed to audit New Century's Residual Interests in accordance with GAAS, notwithstanding noted internal control deficiencies and repeated warnings from KPMG's SFG group; (5) KPMG made numerous other GAAS violations in auditing New Century's financial statements demonstrating lack of professional skepticism and due care and acquiescence in New Century's aggressive accounting policies and practices; and (6) KPMG failed to audit New Century's internal controls in accordance with the standards of the PCAOB (particularly in 2005). The detailed facts supporting each of these six categories of findings is set forth below. Significantly, the Examiner concluded:

> [T]he Examiner finds that KPMG did not perform its reviews and audits in accordance with professional standards . . . .
>
> * * *
>
> The Examiner further concludes that, had KPMG conducted its audits and reviews prudently and in accordance with professional standards, the misstatements included in New Century's financial statements would have been detected long before February 2007.

Examiner's Report at 456-58 (emphasis added).[27]

222. First, the Examiner's Report identifies a number of facts demonstrating that KPMG's 2005 engagement team, in particular, was not staffed with auditors with sufficient experience in the industry and/or relating to the particular tasks to which they were assigned:

---

[27] The Examiner's relevant factual findings as to KPMG's failure to act in accordance with GAAS are quite lengthy and informative. Lead Counsel has organized these findings into the six general categories summarized above and presented them below with the factual support with which they were identified by the Examiner. All of these findings are consistent with the other facts uncovered by Lead Counsel's investigation and collectively demonstrate KPMG's numerous failures to comply with GAAS. KPMG's scienter (for Plaintiffs' Exchange Act claim against KPMG) is alleged in paragraphs 515-30 below.

Beginning with the first quarter 2005 review, the entire KPMG engagement team changed with the exception of two first-year associates who had participated in the 2004 audit. The senior level members of the new engagement team included John Donovan, the audit engagement partner, Marc Macaulay, the SEC concurring partner, and Mark Kim, the senior manager assigned to the engagement beginning with the second quarter 2005 review. Debbie Biddle, the senior associate on the engagement, primarily focused on the 2005 SOX 404 audit. Over the course of the 2005 interim reviews and year-end audit, as many as ten different junior level associates were utilized.

In addition to being new to the New Century matter, both Donovan and Kim were new to KPMG. Macaulay was new to his position as concurring partner, having been promoted to this position in early 2005. Biddle had just transferred to the Los Angeles office from KPMG in the United Kingdom. The senior members of the core engagement team had varying levels of experience with the mortgage banking industry.

Prior to joining KPMG, Donovan had been a partner at Ernst & Young ("E&Y") since 2002. Before E&Y, Donovan worked at Arthur Andersen for 17 years and was a partner when that firm ceased operations. Although Donovan had many years of experience in public accounting, he did not have substantial experience auditing companies in the mortgage banking industry.

Macaulay became the concurring partner on the New Century engagement in the summer of 2005, only a few months after he was named a concurring partner by KPMG. At the time, he had been a partner for less than three years. Macaulay worked primarily with

financial institutions, depository or finance-oriented companies, and leasing companies.

Kim joined KPMG for the second time in May 2005, as a senior manager. Kim had numerous jobs after college, few lasting more than two or three years. During his first tenure with KPMG, as a junior staff accountant, Kim mostly counseled Korean clients doing business in the United States. His subsequent experience elsewhere included working as an accountant in-house at Nissan Motors, working at the accounting firm PricewaterhouseCoopers ("PwC") on engagements involving private companies and companies in the automotive sector, and working at a boutique accounting firm that dealt primarily with private companies in the manufacturing, retail and distribution sectors. Before the New Century engagement, Kim's only experience in the mortgage banking industry was at Encore Credit, a small mortgage lending company, where he worked for three years as assistant controller. Kim left KPMG in April 2007.

Biddle played a major role in coordinating the SOX audit despite having virtually no experience auditing U.S. clients and no prior SOX experience. She did not work on the New Century engagement after the 2005 audit was completed in April 2006. Biddle returned to the U.K. in December 2007.

* * *

The 2005 engagement team, in particular, was not staffed with auditors with sufficient experience in the client's industry and/or relating to the particular tasks to which they were assigned. As discussed previously, the entire 2005 engagement team, with the exception of two junior auditors, was new to the New Century engagement. The team also consisted of auditors who were relatively inexperienced in the

mortgage banking industry.  The new engagement partner, Donovan, had many years of experience in public accounting but did not have significant experience in the mortgage banking industry, as he acknowledged in his self-evaluations.  Kim's experience in the industry was limited to his brief tenure at Encore before joining KPMG.

In addition to new supervisors, a substantial amount of the team's 2005 work with respect to two critical accounting policies—the repurchase reserve and residual interest valuation—was performed by first-year auditors with no substantive experience in these areas.  The auditor who reviewed the accounting related to residual interest valuation admitted to the Examiner that the models were more complex than he was comfortable evaluating and that he did not understand the complete models.  Although the team sought the input of KPMG's internal valuation specialists, the specialists had little or no control over the conclusions reached by the engagement team and their concerns were often dismissed by the engagement team leaders, as discussed above.

Moreover, as noted above, Biddle, the in-charge senior associate for the 2005 SOX 404 audit, had virtually no experience with auditing internal controls under SOX or even U.S. GAAP issues prior to beginning her work on the New Century audit.  In April 2006, as part of KPMG's engagement risk assessment and approval process, Macaulay indicated he had concerns about manager staffing, and a manager with relevant experience, Veronica Wong, was added to the team to focus specifically on the SOX component of the audit.  Examiner's Report at 458-60, 471-72 (emphasis added, footnotes omitted).

223.  Indeed, undisclosed to New Century investors, the Company's Audit Committee had questioned the decision by KPMG to replace its prior audit partner with Donovan and requested another partner to fill that role, but KPMG refused:

In exercising its oversight responsibilities, the Audit Committee questioned the decision by KPMG to replace Kinsella with Donovan as the partner in charge of the New Century account in early 2005. Kinsella was well respected by the Audit Committee and was viewed as a valued resource. Donovan, on the other hand, was new to KPMG, and concerns arose within the Audit Committee whether Donovan had a sufficient understanding of the issues facing the subprime industry, and whether he had sufficient stature within KPMG.

Although requested by the Audit Committee, KPMG refused to provide another engagement partner and the Audit Committee briefly considered replacing KPMG in early 2005.  Ultimately, the Audit Committee determined that a switch to a new accounting firm would be tremendously disruptive and would send a bad signal to its lenders. Accordingly, KPMG continued to be retained by the Audit Committee. Examiner's Report at 441 (emphasis added).

224.  Second, the Examiner noted how KPMG's audit team was unwilling to challenge its client New Century and how, in some instances, KPMG's audit team acted as advocates for the Company and opposed other internal experts within KPMG:

KPMG's engagement team seemed unduly willing to acquiesce in New Century's departures from prescribed accounting methodologies and often seemed to resist or ignore suggestions from specialists within KPMG that New Century improve its accounting practices or do a better job of explaining its departures from prescribed accounting practices.  At times, it appeared that senior people on the KPMG engagement team

became advocates for or defenders of New Century's accounting practices when those practices were questioned by KPMG specialists who had greater knowledge of relevant accounting guidelines and industry practices.

\* \* \*

[N]ot only was the engagement team weak in experience, but Donovan and, to some extent, Kim, appeared unwilling to challenge the client, and in some instances may have acted as advocates for the Company. For example, a dispute arose between a KPMG FDR [Financial Derivatives Resources] specialist and the engagement team in March 2006 that threatened the timely filing of New Century's Form 10-K for 2005, as discussed below. Donovan was frustrated with the specialist's concerns - which were later determined to be legitimate- and was able to get KPMG's "clean" opinion issued despite those concerns.

\* \* \*

Another example is how, despite repeated concerns from KPMG's own internal specialists (SFG) regarding the discount rate used to value New Century's residual interests, as discussed above in Section VI.B. and below, Donovan supported the Company's discount rates in the face of opposition first from New Century Management and later from a Board committee to increasing those rates.

A third example relates to an email request from a junior auditor to Tony Sanchez seeking what appeared to be legitimate information on a number of audit issues, which Sanchez forwarded to Kenneally. Kenneally then forwarded the e-mail to Kim, complaining about the junior auditor and stating that he is not the "KPMG Training Center." In response, instead of recognizing the validity of the auditor's questions, Donovan adopted Kenneally's view that the questions required obvious

answers and that the questions should have been filtered first, while Kim pointed out that "some of the answers were not straight forward [sic] (*e.g.,* Look for residuals to see if they are still on the books").

\* \* \*

Donovan's focus on preserving the client relationship is reflected in his performance evaluations for the applicable period. In particular, with respect to New Century, Donovan stated in three different appraisals in 2005—a "goal setting" review, an interim review and a year-end review—that there had been "no loss of client service" and that he had developed "good relationships" with the client's team. In another review in 2006, Donovan stated that he had to deal with "significant client service and technical issues that I was able to overcome and find a good middle ground for the client." Examiner's Report at 335, 472-73 (emphasis added, footnotes omitted).

225. Donovan's disregard of KPMG's internal derivatives and hedging specialists' concerns and inconsistent representations to New Century's Audit Committee are particularly revealing. The Examiner reported:

In the fall of 2005, [internal KPMG specialists] Klinge and Munoz were assigned to assist in the audit of the Company's 2005 financial statements in order to provide specialized expertise and "quality control" with respect to derivatives and hedging issues that arose in the context of the audit. Among Klinge's primary tasks was determining whether the Company's hedge accounting conformed to FAS 133 (*Accounting for Derivative Instruments and Hedging Activities*). Many weeks later, however, Klinge and Munoz had not received any of the documentation they had requested in order to begin their review. Klinge alerted Donovan to this fact in an e-mail dated January 17, 2006. Klinge cautioned Donovan that the delay might