complicate the timely resolution of any accounting issues discovered in connection with their analysis.

Despite the fact that Klinge had indicated on January 17 that he had received no documents to begin his analysis, two weeks later, on February 1, 2006, Donovan represented to New Century's Audit Committee that an "outside expert" had been engaged to review the Company's derivatives documentation, and that the Company's hedge accounting satisfied FAS 133. Donovan did not consult Klinge prior to making this representation of FAS 133 compliance to the Audit Committee because Donovan "didn't think there was going to be an issue." Klinge was unaware that Donovan had made this representation to the Audit Committee.

Over the course of February 2006, a disagreement arose between Donovan and Klinge stemming from Klinge's unwillingness to "sign-off" on the Company's hedge accounting because he had not seen sufficient documentation to support the Company's cash-flow hedging practices. Per KPMG policy, until the disagreement was resolved, KPMG could not release its opinion. Ultimately, in mid to late February, Donovan brought in KPMG's Department of Professional Practice ("DPP") to attempt to resolve the disagreement.

On March 2, 2006, Donovan participated in another Audit Committee meeting, and informed the Committee of an "open audit issue" regarding New Century's hedge accounting and a potential deficiency relating to the Company's hedging documentation. Donovan indicated that the issue "should be resolved in the next day or two after KPMG's [DPP] had finished reviewing all of the documentation." Soon thereafter, the DPP gave Donovan a "verbal approval" of the Company's hedge accounting, which he then passed along to Kenneally. On March

3, 2006, Kenneally sent an e-mail to the Board of Directors in which he stated: "KPMG's Department of Professional Practice has accepted our hedge accounting treatment . . . the result is a PASS, and as we discussed, there will be no adjustment to the financial statements." Kenneally forwarded this e-mail to Donovan and Kim. <u>Klinge informed the Examiner that he had never seen Kenneally's e-mail and did not know that any such representation had been made to the Board of Directors</u>.

The issue, however, had not yet been resolved to Klinge's satisfaction and it was still holding up KPMG's audit opinion, a fact that, according to then-CFO Dodge, was not communicated to New Century until just hours before the Company's Form 10-K filing deadline on March 16. In an e-mail exchange in the late evening of March 15, 2006, Kim learned that Klinge was not prepared to sign off on the FDR review and Kim informed Donovan. In an e-mail exchange with Klinge on the morning of March 16, Donovan stated: "<u>I am very disappointed we are still discussing this. As far as I am concerned we are done. The client thinks we are done. All we are going to do is piss everybody off</u>."

Ultimately, KPMG issued its audit opinion minutes before the Form 10-K was due and New Century timely completed its filing deadline. A high-ranking member of DPP, Terri Iannaconi, authorized Donovan to issue KPMG's audit report following a lengthy emergency conference call among Donovan, Macaulay, Kim and Klinge and various members of DPP. Iannaconi also instructed Klinge to prepare and forward to the engagement team a sign-off memorandum and directed Kim to prepare a "disagreement memorandum" to document the dispute. Examiner's Report at 474-76 (emphasis added, footnotes omitted).

226.  The Examiner further found that "<u>Iannaconi realized the following day when she reviewed Klinge's memorandum that open issues remained, which presented a potentially significant problem in that KPMG had issued its clean opinion already</u>.  The disagreement was not resolved completely, in fact, until the following month.  Klinge eventually received significant documentation to form a conclusion, <u>which was that the accounting treatment was improper and had resulted in a misstatement of several million dollars</u>."  Examiner's Report at 476, n.681 (emphasis added).

227.  <u>Third</u>, the Examiner identified numerous facts demonstrating that KPMG failed to follow GAAS in auditing New Century's Allowance for Loan Repurchase Losses reserve:

> New Century's Allowance for Loan Repurchase Losses was identified as a critical accounting policy in both the Company's public filings and in KPMG's audit planning documents.  As a critical accounting policy, the repurchase reserve was considered to have a high subjective element and a possible material impact on the Company's financial statements.  It also was an area of concern to New Century's Audit Committee and was generally discussed by KPMG at Audit Committee meetings throughout 2005 and 2006.

> <u>Despite its status as a critical accounting policy, New Century's repurchase reserve estimation process was not well organized and documented. KPMG noted in its audit of New Century's internal controls in 2004, 2005, and 2006 that New Century had an internal control weakness because it had not adopted formal policies and procedures for the repurchase reserve estimation process</u>.

> \* \* \*

> [T]o calculate its repurchase reserve, New Century multiplied whole loan sales in the current period by a fixed percentage.  This

percentage was derived from the ratio of actual repurchases made by the Company during a specified historical time period to all whole loan sales made over that same time period.

\* \* \*

New Century's repurchase reserve calculation assumed that all repurchases were made within 90 days of the date New Century sold the loans.   For this reason, New Century assumed that any potential repurchases outstanding at the end of any particular quarter (*e.g.,* first quarter) were either repurchased or no longer susceptible to repurchase as of the end of the next quarter (*e.g.,* second quarter).   Using this example, the calculation for the second quarter, therefore, only took into consideration potential repurchases related to whole loan sales for the second quarter (the previous 90 days) and assumed that no potential repurchases still existed from the first quarter or prior periods; that is, the calculation was based on an assumption that no Backlog Claims existed.

\* \* \*

The flawed 90-day look-back assumption enabled the backlog of repurchase claims to exist and grow from period to period.   By starting over each quarter and only reserving for potential repurchases of loans sold within the most recent quarter, New Century was failing to reserve for the Backlog Claims - any potential repurchases of loans sold in any prior periods.   As market conditions worsened, and repurchases increased, the number of Backlog Claims outstanding from prior periods grew substantially and rolled over from period to period.   New Century was aware as of the end of 2004 that repurchases were increasing as a result, at least in part, of repurchases rolling over from prior periods.   KPMG's SOX 404 audit process and audit apparently failed to detect this critical piece of information, or at least to realize its significance.

* * *

In connection with its 2005 audit, however, KPMG did, in fact, obtain this critical information but then did nothing with it.

On February 10, 2006, Christina Chinn, the KPMG junior auditor responsible for reviewing New Century's repurchase reserve calculation specifically solicited and obtained from Robert Lent in New Century's Secondary Marketing Group the amount of repurchase requests outstanding as of December 31, 2005. Chinn told the Examiner that Mark Kim asked her to obtain this information. Lent responded that New Century had $188 million in outstanding repurchase requests as of December 31, 2005. A substantial portion of these $188 million in outstanding repurchase requests likely were Backlog Claims relating to loans sold prior to the fourth quarter of 2005 that were not being accounted for in the repurchase reserve calculation.

While in possession of this critical information, KPMG approved New Century's repurchase reserve calculation which ignored the claims received by the Company. Instead, as with all prior periods, the calculation estimated the amount of repurchases based only on historical actual repurchases as a percentage of whole loan sales applied to the whole loan sales made in the fourth quarter of 2005. At year-end 2005, using New Century's traditional method of simply calculating the historical percentage of whole loan sales that the Company repurchased (0.659%) and applying that percentage to the whole loans sales from the fourth quarter of 2005 (approximately $10.7 billion), New Century estimated only approximately $70 million in potential future repurchases, although New Century was already in possession of repurchase claims totaling $188 million.

KPMG was aware of these $188 million in outstanding claims and even referenced them in the repurchase reserve workpaper for the period, but did not take them into consideration whatsoever in evaluating the sufficiency of New Century's repurchase reserve calculation. The audit workpapers contain no evidence of additional testing or any other substantive procedures performed on these outstanding repurchase claims as of December 31, 2005 to determine if any or all were Backlog Claims relating to loans sold prior to the fourth quarter of 2005 that were not being accounted for in the repurchase reserve calculation. Chinn could not even explain why KPMG requested this information or if KPMG had ever requested it from New Century in any prior or subsequent periods.

Applying even the simplest of calculations to this information - for example, the percentage of repurchase claims that New Century ultimately repurchased historically - would have revealed that New Century was substantially underreserved. A review of the loan sales that were the subject of the repurchase claims would have revealed that the claims related to sales made in prior periods such that reserving only for sales made in the last 90 days was a critical error. Comparing the number to prior periods and to subsequent periods would have revealed that the number of outstanding repurchase claims was growing period to period, which would have been a clear sign of a mounting problem, especially given that New Century itself had done nothing to adjust its methodology to account for the increasing amount of Backlog Claims. KPMG, however, appears to have done nothing with this critical information as well, and instead, merely made a passing reference to it in a workpaper. KPMG failed to consider the financial statement impact of these repurchase claims or further investigate the treatment of these

claims whatsoever.   Such an oversight constitutes a lack of due professional care, as required by GAAS, and a failure to obtain sufficient competent evidence to provide reasonable assurance that the accounting estimate was reasonable and presented in conformity with applicable accounting principles.

* * *

The same KPMG 2005 repurchase reserve analysis workpaper noted that repurchases had more than doubled during 2005 compared to 2004 from $135.4 million to $332.1 million.   Notwithstanding this substantial increase in repurchases, and direct knowledge of an additional $188 million in outstanding repurchase claims, New Century's repurchase reserve actually *decreased* slightly from the end of 2004 to the end of 2005.   KPMG made note of this in its workpaper but Chinn could not recall any related discussions or concerns by anyone within KPMG.   Instead, KPMG concluded that the amount reserved was reasonable without any additional inquiry.   This also demonstrates a lack of due professional care as required by GAAS.   Examiner's Report at 477-83 (emphasis added, footnotes omitted).

228.   Also concerning the Allowance for Repurchase Losses reserve, the Examiner reported facts demonstrating how KPMG violated GAAS in failing to test whether New Century's reserve included Interest Recapture:

Specifically, Chinn recalled a meeting she attended with Kenneally and Kim where Kim specifically asked Kenneally whether New Century's repurchase reserve included an interest component. Chinn recalled that Kenneally responded that interest was included in the component of the reserve known as "Estimated Losses on Future Repurchases."

KPMG did nothing, however, to test this representation.  Chinn confirmed that KPMG took Kenneally's representation at face-value and then repeated it in its repurchase reserve workpaper for the 2005 audit.  In fact, the "Estimated Losses on Future Repurchases" did not include an interest component.  It consisted solely of the estimated loss on the sale of repurchased loans based on the historical losses incurred over the prior three years.  Had KPMG performed even minimal testing of Management's representations, it would have determined that, in violation of GAAP, the reserve did not account for the Interest Recapture component.

* * *

KPMG's failure to test whether interest was, in fact, included in the repurchase reserve calculation for all applicable periods (as required by GAAP) violated GAAS.  KPMG's 2005 audit procedures and 2006 first and second quarter reviews failed to identify this departure from GAAP.  KPMG failed to obtain sufficient competent evidence to provide reasonable assurance that the accounting estimate was reasonable and presented in conformity with applicable accounting principles and in doing so, breached the standard of due care.  Examiner's Report at 483-84 (emphasis added, footnotes omitted).

229.  Also concerning the Allowance for Repurchase Losses reserve, the Examiner reported facts demonstrating how KPMG failed to follow GAAS in reviewing the Lower of Cost or Market ("LOCOM") adjustment New Century was applying to its repurchased loans:

[P]rior to the second quarter of 2006, New Century calculated a LOCOM adjustment for repurchased loans included in LHFS [Loans Held For Sale] as part of the repurchase reserve calculation, but reported this amount on its balance sheet as part of LHFS in the LOCOM

valuation account.  The Examiner determined that the prices (or marks) that New Century used to value repurchased loans in the fourth quarter of 2005 and first quarter of 2006 were not consistent with the marks used in its LOCOM analysis for its LHFS portfolio.  . . .  As a result of this misapplication of LOCOM for repurchased loans included in LHFS, the LHFS portfolio was overstated in the Company's financial statements by at least $9.8 million for the year-ended December 31, 2005 . . . .

*  *  *

Second, the Examiner found that New Century did not apply LOCOM in a manner consistent with industry practice, thereby enabling the Company to conceal losses in its LHFS portfolio by offsetting losses in certain loan categories with gains in other loan categories.  In applying LOCOM, New Century first determined the market value of LHFS separated by loan categories related to risk and loss.  However, it then collapsed those separate categories and re-aggregated the entire pool of LHFS for LOCOM purposes.  As a consequence, loan losses in some categories, such as non-performing loans, were offset by gains in other categories.  By utilizing this practice, New Century Management consistently determined that a LOCOM adjustment was not required and that it did not have to mark down the value of the "scratch and dent" and other non-performing loans.  The Examiner believes the practice of re-aggregating loans into a single category after the loans were priced, and using gains to offset losses, is inconsistent with industry practice in applying and interpreting FAS 65.

*  *  *

In its 2005 audit and 2006 quarterly reviews, KPMG examined New Century's LOCOM analysis and determined that it was reasonable.  When questioned about this practice by the Examiner, Kim and

Donovan both stated that the practice was acceptable because it was technically permitted under FAS 65.  <u>This conclusion does not evidence proper consideration of industry practice or the overall impact of the accounting treatment on the financial statements presented</u>.

<u>Minimal research and analysis by the KPMG engagement team would have revealed that New Century's LOCOM analysis was not only contrary to industry practice, but that it operated to conceal losses and prevent the mark-down of the value of non-performing repurchased loans.  KPMG's failure to recognize this valuation issue evidences a lack of due care in performing the audit and reviews</u>.  Moreover, as a result of this failure, KPMG did not properly advise Management or the Audit Committee that:  (1) New Century's LOCOM analysis was not consistent with industry practice; (2) the practice had the potential to conceal losses; and (3) the practice actually did cause New Century to conceal losses and overstate the LHFS balance.  Examiner's Report at 489-91 (emphasis added, footnotes omitted).

230.   Also concerning the Allowance for Repurchase Losses reserve, the Examiner reported facts demonstrating how KPMG violated Auditing Standard No. 2 ("AS 2") of the PCAOB in failing to reveal a material weakness in internal control:

During the 2004 SOX audit, KPMG concluded that New Century lacked written policies and procedures for estimating the repurchase reserve.  In 2005, despite the Company's failure to develop and implement a formal policy for the second year in a row, KPMG concluded that this deficiency was not significant.[28]

---

[28] "In addition, in its SOX review for 2005, KPMG identified New Century's failure to adopt a formal policy for estimating the repurchase reserve a control deficiency. . . .  KPMG observed in

1

\* \* \*

2

Despite its status as a significant financial account, KPMG's SOX walkthrough of New Century's repurchase reserve estimation process in 2004 and 2005 failed to detect the lack of effective controls relating to the communication of repurchase requests from New Century's Secondary Marketing Department to the Accounting Department. The Accounting Department was responsible for calculating the reserve, yet no procedures existed in either the Accounting Department or Secondary Marketing for communication between the two departments of anything other than actual repurchases made. KPMG's SOX walkthrough should have revealed this lack of communication. Indeed, as a result, New Century's repurchase reserve methodology only took into consideration repurchases actually made, and not repurchase requests received. <u>KPMG's internal control review was equally deficient because it started its review with repurchases actually made instead of beginning at the time when repurchase requests were first received</u>. As a result, KPMG missed the growing backlog of repurchase claims that should have been properly included as part of the repurchase reserve calculation methodology. <u>KPMG should not have issued an unqualified opinion on the adequacy of New Century's internal controls in light of this glaring disconnect between the two departments primarily responsible for this significant financial account</u>.

During the 2004 year-end audit, KPMG noted that the principal balance of loans repurchased in the fourth quarter of 2004 soared to $58.7 million as compared with $22.8 million in the prior quarter. KPMG workpapers note that "the bulk of Q4 2004 repurchases took

its 2005 SOX audit that New Century had failed to take steps to remedy the 2004 problem in 2005." Examiner's Report at 194.

place in November 2004." Some of the increase was attributed by KPMG to the repurchase of "a bulk of loans from Morgan Stanley due to first payment default." KPMG's workpapers do not indicate that any other follow-up or substantive testing was performed to confirm this response or calculate the impact on the applicable accounts. An internal New Century communication from Cloyd to Walker noted that the increase was due, in part, to the fact that "many of the loans repurchased were from prior quarters and months leading to the increased volume and discount." It is not clear whether this information was conveyed to KPMG, but it likely was conveyed because KPMG had specifically inquired regarding the November 2004 repurchase spike. <u>In any event, KPMG's lack of diligence during the SOX 404 audit process failed to detect the fact that as early as 2004, repurchase claims were rolling over from one quarter to the next. As a result, KPMG and New Century missed an important opportunity to identify this material weakness in the repurchase claims process at a time when KPMG was on notice of the issue</u>.

As a result of the material weakness with respect to New Century's repurchase reserve calculation process, KPMG's unqualified opinion in 2005 on the adequacy of New Century's internal controls over financial reporting violated AS 2. In addition, KPMG violated AS 2 by not informing the Audit Committee of the material weakness. Examiner's Report at 491-92 (emphasis added).

231. <u>Fourth</u>, the Examiner identified numerous facts demonstrating that KPMG's 2005 audit of New Century's Residual Interests violated GAAS:

KPMG identified New Century's residual interest valuations, like the repurchase reserve, as a critical accounting policy, which reflected KPMG's judgment that it was "both most important to the portrayal of

the company's financial condition ... and require[d] management's most difficult, subjective or complex judgments ...."  Nonetheless, KPMG failed to detect the material overstatement of the value of the Company's residual interests in the 2005 year-end financial statements and in its 2006 interim financial statements.  Indeed, KPMG consistently concluded—and represented to the Company's Audit Committee—that the Company's residual interest valuations were reasonable and KPMG issued an unqualified audit opinion on the 2005 year-end financial statements.

GAAS, as described above, requires independent auditors to exercise due care in the planning and performance of an audit.  The Examiner finds that KPMG failed in its duties.

* * *

In 2004, 2005 and 2006, KPMG identified a number of internal controls deficiencies with respect to the residual interest valuation process.  As discussed in greater detail in Section VIII., during its 2004 internal control review, KPMG documented a significant deficiency in internal controls surrounding residual interests, noting that New Century did not have adequate documentation supporting its valuation of residual interests.

* * *

KPMG reported this as a *significant deficiency* to New Century in its year-end management letter.  KPMG's 2004 workpapers indicate that the Company remediated this deficiency as of year-end based on KPMG's review of the minutes of a REIT Committee meeting in late January 2005 at which the topic of residual interest valuations was discussed.  Not only did the REIT Committee meeting occur after year

end, but the documentation provided does not appear to have addressed the specific concerns underlying the deficiency finding.

In 2005, KPMG also identified thirteen control deficiencies relating to the residual interest valuation process. Notably, the identified deficiencies included concerns relating to missing policies, support for assumptions and documentation. Similarly, KPMG's draft workpapers for its 2006 SOX 404 audit noted a number of deficiencies related to residual interest valuation, including the recurring theme that "[m]anagement does not have a regular, documented process in place to determine a threshold at which to adjust assumptions in the residual asset models."

\* \* \*

The assumptions underlying Management's residual interest valuations were accepted as reasonable by KPMG in the absence of sufficient evidence to support those assumptions. In light of the lack of internal controls surrounding residual interest valuation, and, in particular, a lack of documentation to support the assumptions, KPMG did not exercise appropriate professional skepticism in conducting its audits and reviews. Applicable professional auditing standards required KPMG to adopt "an attitude that includes a questioning mind and a critical assessment of the audit evidence," or to obtain sufficient evidence to support Management's assumptions. KPMG's acceptance of Management's assumptions without supporting evidence represents a clear departure from GAAS and a lack of professional care. Examiner's Report at 493-95 (emphasis added, footnotes omitted).

232.    The Examiner reports facts demonstrating numerous other GAAS violations in KPMG's audit of New Century's Residual Interests concerning KPMG's

disregard of New Century's aggressive discount rates and "par value" assumption and New Century's failure to update its models which had known reliability problems:

First, as discussed in Section VI.B., the Examiner has concluded that the discount rates used by New Century in calculating the value of its residual interests were too low as of year-end 2005 and through the first three quarters of 2006. Specifically, the Examiner has concluded that the discount rates should have been no less than 15% and 17%, respectively, for the CE securitizations and NIMS as of year-end 2005 and that New Century's financial statements overstated the value of the Company's residual interests for that period by at least $14.8 million because it relied upon unduly low discount rates of 12% and 14%. <u>KPMG effectively approved New Century's discount rates despite clear indications that they were not appropriate from, among others, KPMG's own internal SFG specialists.</u>

*   *   *

<u>As early as the first quarter of 2005, KPMG knew that the Company's discount rates were aggressive. Indeed, each SFG review revealed this fact, quarter after quarter.</u> Specifically, the audit assist memoranda Carnahan prepared in the first three quarters of 2005 stated that New Century's discount rate "is at the low end of the range compared to similar issuers" with "other issuers ... typically using residual asset discount rates principally ranging from 12% to 35%." SFG recommended that the engagement team obtain from New Century information supporting the use of its relatively low discount rates, such as a letter from an investment bank or market information for a comparable asset. <u>Despite SFG's findings, the engagement team repeatedly concluded that the residual interest valuations were</u>

<u>reasonable and proper, without insisting, during its quarterly reviews, on the documentation that the SFG had recommended</u>.

New Century ultimately provided supporting documentation to KPMG in January 2006 in connection with the 2005 audit. Although the engagement team determined that the discount rates were reasonable based on this documentation, the SFG considered the Company's documentation to be insufficient because New Century provided comparative market data for various bonds and had concluded that a corporate junk bond supported its low discount rates. <u>SFG did not view this as an appropriate comparison. Moreover, SFG expressed increasing concern that the Company's discount rates were inconsistent with rates used in comparable sales of residual interests by New Century's peers</u>. For example, in an e-mail dated February 14, 2006, Carnahan noted that "[w]e have numerous clients that have sold Residuals in the last year and the average discount rate . . . has been 18% to 23" for non-NIMS and two other clients use rates of 35% and 40% for N1MS .... *[T]his client [New Century] has the lowest sub-prime Residual discount rates of any client that I am aware of, which we have consistently communicated.*" (emphasis added) Nonetheless, less than two months later, the KPMG engagement team's conclusion memorandum states, as it had stated for the previous quarters: "Given the Company is in sub-prime lending, the assumed discount rates appear reasonable . . . ."[29]

\* \* \*

---

[29] "<u>The repeatedly expressed and increasingly strong expressions of concern by SFG seemed to have little impact on KPMG's engagement team</u>. Neither Donovan nor Kim was troubled that the engagement team may not have insisted upon the supporting documentation that SFG had recommended during each quarterly review in 2005 and 2006." Examiner's Report at 288 (emphasis added).

The Examiner also is critical of New Century's unquestioning reliance upon its assumption that remaining loans would be sold at par upon collapse of a securitization.  <u>The Examiner has not found any evidence, however, that KPMG challenged New Century's reliance upon this "par value" assumption throughout 2004, 2005 and 2006</u>.  In determining that the par value assumption was reasonable, KPMG appears to have relied only on information obtained from the Company that the remaining loans in a small number of older deals had been sold "at about par" when those deals collapsed, claiming that "the Company has enough internal historical data of its own in order to evaluate the reasonableness of assumptions."  New Century departed from the par value assumption on its own initiative in February 2007.

The par value assumption was embedded in all of the Company's many residual interest valuation models, including the models that the SFG reviewed each quarter.  At a minimum, KPMG's engagement team should have challenged this assumption as early as 2005 by requesting that New Century provide documentation that would explain and support its reliance upon the par value assumption.

* * *

[Since the first quarter of 2005,] <u>KPMG's SFG consistently recommended that the KPMG engagement team analyze New Century's prepayment assumptions because the Company's prepayment assumptions were considered "low compared to those of similar issuers, the prepayment performance in the industry, and the Pool's historical performance</u>."  As discussed above, SFG also recommended that New Century update these assumptions because New Century's actual prepayment results repeatedly differed from its projected results, but the engagement team did not press this point and New Century did not

adjust its assumptions until February 2007.  <u>The engagement team's conduct with regard to this critical assumption in New Century's residual interest valuation models is further evidence of a lack of due professional care.</u>

* * *

In sum, the Examiner finds that, particularly with respect to the discount rate and par value assumptions, KPMG's engagement team should have questioned Management and, in general, exhibited a far greater degree of professional skepticism with respect to the Company's assumptions by, for example, including demanding more evidence to support those assumptions.  In addition, KPMG's workpapers and the Examiner's interviews indicate that members of the engagement team believed that Management was not reviewing the validity of its own assumptions for pre-2003 securitizations as of at least late 2005.  Such a belief should have triggered further inquiry of Management, at minimum, to determine why they were no longer updating the assumptions and follow-up testing to determine whether the assumptions were adequate.

* * *

Moreover, as discussed in Section VI.B. and as summarized below, <u>KPMG personnel knew that the models used by Management to calculate residual interest valuations were flawed and had generated errors.  The reliability of the models was repeatedly called into question.</u>  In its audits and reviews of New Century's residual interest valuations, KPMG determined on a number of occasions that the models contained errors.  In early 2006, an error caused by the failure to include private mortgage insurance in one of the 2005 securitization models was deemed to be significant and required a $9 million write-down.  The

error, which existed at December 31, 2005 and which overstated the value of the Company's reported residual interest assets, was detected by SFG in its testing of a sample of models in the first quarter of 2006.

\* \* \*

The Examiner finds that, had KPMG exercised appropriate professional skepticism with respect to the reliability of the models and conducted more rigorous testing (instead of relying solely on Management's representations that variances were caused by "minor flaws"), these deficiencies would have been discovered much earlier. <u>That KPMG never challenged the continued use of the internally developed models is yet another example of a lack of professional skepticism exhibited by the engagement team and a failure of the team to obtain sufficient and competent evidence to support a valuation estimate</u>. This failure is particularly notable given that, several years before, with respect to New Century's financial statements for the year ended December 31, 2000, KPMG discovered a calculation error in the residual interest models that led to a $70 million write-down that resulted in the first loss in New Century's history.   Examiner's Report at 495-501 (emphasis added, footnotes omitted).

233.  <u>Fifth</u>, the Examiner identifies facts demonstrating numerous other GAAS violations by KPMG revealing a lack of professional skepticism and due care and acquiescence by KPMG in the Company's aggressive accounting policies and practices:

The Examiner's investigation also revealed other errors in New Century's financial statements, as discussed above, and corresponding audit and quarterly review failures by KPMG.  While the Examiner is not in a position to conclude whether these errors caused a material misstatement, <u>they nonetheless reflect, at best, a lack of professional</u>

skepticism and due care in KPMG's audits and reviews and, at worst, an acquiescence by KPMG in New Century's aggressive accounting policies and practices.

\* \* \*

Based on the Examiner's review, and the fact that KPMG assigned some risk to ALL [Allowance for Loan Losses] calculations year over year, the Examiner has concluded that KPMG's review and audit of ALL did not comport with applicable professional standards. KPMG commented at various times in 2004 through 2006, in both the general audit workpapers and those related to internal controls over financial reporting, that the Company did not adequately document its methodology for its ALL, and yet KPMG allowed the same deficiencies to remain unremediated each year. Additionally, the assumptions used to estimate the ALL were not updated for the trends in actual performance or Management's revised expectations. KPMG failed to insist that New Century update the models that KPMG knew were incorrect and which resulted in inaccurate amounts for the ALL. KPMG's failures likely violated its obligation to use due care and exercise professional skepticism in accordance with AU § 230. Additionally, KPMG failed to obtain sufficient evidence and improperly relied on assertions of Management regarding ALL estimates in violation of AU §§ 326 and 342. Finally, KPMG also did not modify its audit plan appropriately in light of the circumstances identified by KPMG as affecting ALL calculations for 2004 and 2005.

Lack of documentation for the ALL estimation was identified as an issue for New Century as early as 2004. On March 15, 2005, KPMG sent a letter to Dodge regarding the 2004 audit of internal controls over financial reporting. The letter identified the following

significant deficiencies with the ALL:  (i) Management's failure to create adequate documentation evidencing the appropriate application of GAAP to ALL; and (ii) Management's lack of adequate documentation to support the loss curves used in determining ALL.

* * *

The Examiner found no evidence that New Century provided KPMG with the missing ALL documentation identified by the specialist from 2004 through 2006.  Substantially similar deficiencies were noted at several points over the three-year period and there is no evidence that these deficiencies were remediated.  The substantive guidance in the area of ALL contained in SAB 102 and FRR 28 focuses predominantly on the necessity for documenting the Company's support for the amount and methodology of estimating the ALL.  There is no evidence for the years 2004 through 2006 that New Century had such documentation or that KPMG tested for remediation and documented the results in its workpapers.

* * *

New Century improperly recorded the initial values of its MSRs [Mortgage Servicing Rights] by using estimates of market value, as opposed to allocating the carrying amount of the loans transferred between the assets sold and the interests retained, as required by FAS 140.   As a result, although the Company claimed in its public disclosures that it conducted a quarterly impairment assessment of its MSRs, New Century *could not* have meaningfully undertaken that analysis in light of its failure to book the initial values of these assets appropriately.

In connection with the 2005 audit, KPMG observed that New Century did not perform a formal valuation of its MSRs portfolio

(relying instead upon quoted market prices on historical transactions to estimate the fair value of its MSRs). <u>KPMG's SFG recommended in February of 2006 that the Company obtain at least one independent, third-party valuation to support its internal valuation, but there is no indication that the KPMG engagement team pressed this recommendation with New Century</u>. Further, New Century did not conduct a formal valuation of its ongoing servicing operations, which created the possibility of a GAAP violation, as FAS 140 requires all institutions conducting loan sales and securitizations to perform ongoing valuations of their servicing portfolios, including amortization and impairment analysis.

To the extent that the Company attempted to amortize the net gains or losses from its MSRs, it did so using a simple, linear approach. This violates the requirement of FAS 140 that a net proportional amortization method be used for this purpose. <u>KPMG was aware of this departure from FAS 140, which was mentioned in a draft audit assistance memorandum from SFG relating to the 2005 audit</u>. In addition, that same draft contained a comment inquiring about the quantitative impact of this improper amortization method and raising the possibility of an audit difference. It does not appear that KPMG or the Company ever calculated that impact.

Nonetheless, the Company represented (inaccurately) in its 2005 financial statements that its accounting for MSRs complied with GAAP. <u>KPMG's awareness of potential GAAP shortfalls outlined above, and its failure to quantify their impact, reflect a lack of due professional care</u>. At a minimum, consistent with its obligations under applicable professional standards, KPMG should have conducted additional inquiry and testing to determine the impact of

the GAAP violations.    Its failure to do so was inconsistent with GAAS.

* * *

In connection with the 2005 audit, as discussed above, KPMG appointed FDR specialist John Klinge to the New Century engagement. In connection with his review of New Century's hedging for the 2005 audit, Klinge informed the engagement team that New Century had failed to account for at least some of its IRLC as derivatives, which represented a departure from GAAP.  In New Century's 2005 financial statements, however, the Company stated that its "interest rate lock commitments are considered to be derivatives and are recorded on our balance sheet at fair value."  The KPMG engagement team determined that the impact of the GAAP departure on the financial statements was immaterial, but does not appear to have identified the disclosure discrepancy.

Citing FAS 133, paragraph 29(b) (which deals with forecasting the probability of a given transaction's occurrence), Klinge also raised questions during the 2005 audit regarding New Century's use of a 48-month assumption for interest cash flows, in light of the possibility for borrower prepayment.  In particular, Klinge maintained that he had not seen adequate documentation to support this assumption.  As discussed above, the matter was ultimately escalated to KPMG's DPP, which considered and effectively set aside Klinge's concerns on March 16, 2006, the deadline for filing the Company's Form 10-K (thereby allowing KPMG to issue its audit opinion and the Company to file the Form 10-K).  Nonetheless, Klinge's documentation concerns do not appear to have been addressed at the time the Form 10-K was filed, and indeed, KPMG worked to document all matters to Klinge's satisfaction

<u>over the next 45 days and get appropriate sign-off memoranda from Klinge. Ultimately, KPMG required New Century to change its hedge accounting treatment going forward to conform to Klinge's concerns</u>.

In addition, FAS 133 requires that a company's hedge documentation must be prepared *contemporaneously* with the inception of the hedging relationship. Internal KPMG communications reveal that KPMG was aware, as of June 2005, that much of the Company's hedge documentation for the first quarter of 2005 was in draft form. Although "contemporaneous" is not defined in FAS 133, the SEC generally has held public companies to a strict interpretation of the rule, and thus, draft documentation that is not finalized until some time after the inception of the hedging relationship likely does not satisfy FAS 133. <u>KPMG should have required New Century to furnish final documentation under GAAP and its failure to do so reflects a lack of due care</u>.

\* \* \*

Of the $80.6 million purchase price for its Home123 subsidiary's acquisition of RBC Mortgage's prime mortgage origination platform in September 2005, New Century recorded $77.7 million in goodwill. The RBC Mortgage business unit sustained losses of approximately $17 million between the date of acquisition in September 2005 and the end of 2005, which was worse than New Century had forecasted. KPMG conducted goodwill impairment testing in connection with its 2005 audit, but concluded that no impairment was warranted despite the $17 million in losses.

\* \* \*

Although KPMG's 2005 audit workpapers contain New Century's discounted cash flow analysis for the RBC Mortgage business unit, <u>the workpapers do not appear to contain any evidence</u>

that KPMG ever tested or questioned, with any degree of professional skepticism, the Company's underlying revenue assumptions that were used to generate the cash flows. In addition, KPMG did not document its understanding of the source of the revenue projections or RBC's ability to achieve the forecasted revenues.

*  *  *

KPMG's 2005 audit workpapers also do not appear to contain any evidence that KPMG questioned or tested New Century's discount rate assumption of 15%. The Company used 20% when internally analyzing the prime mortgage platform's future business plans. Had a 20% discount rate been used rather than 15%, New Century would have been required to at least conduct the second step of impairment testing, the more detailed analysis, in order to determine if goodwill should have been impaired.

Similarly, the Examiner concludes that KPMG failed adequately to audit New Century's goodwill impairment testing in connection with its 2005 audit. KPMG's 2005 workpapers do not appear to contain any documentation that evidences testing of the revenue and gross profit projections upon which New Century relied or even the source of those projections. The KPMG audit team apparently did not question or rigorously test those revenue or gross profit projections, but instead focused on the mathematical accuracy of the calculations used by the Company's cash flow model. It also does not appear that the audit team raised questions during the 2005 audit concerning the 15% discount rate that the Company used in that model. KPMG's apparent failure to obtain sufficient competent audit evidence to support the reasonableness of the critical assumptions underlying the Company's fair value measurement, which were at the core of KPMG's

impairment testing at year-end 2005, was inconsistent with KPMG's obligations under GAAS.   Examiner's Report at 502-12 (emphasis added, footnotes omitted).

234.   Sixth, the Examiner identified facts demonstrating that KPMG failed to audit New Century's internal controls in significant respects in accordance with the standards of the PCAOB (particularly in 2005):

> The Examiner finds that KPMG's 2005 review of the adequacy of New Century's internal controls over financial reporting was not conducted in accordance with AS 2 in certain significant respects, as discussed below.  On a preliminary note, the Examiner observes that, in general, the 2005 review appears to have been less rigorous than either the 2004 review or the subsequent 2006 review.  The Examiner believes that this likely is attributable to the limited relevant experience of the senior associate primarily responsible for the review, Biddle, as discussed above.

> *   *   *

> As discussed above, KPMG failed to identify certain deficiencies in its 2005 audit of New Century's internal  controls with respect to repurchase reserves and residual interest valuations.  Many of these deficiencies were noted in the draft workpapers for the 2006 audit of internal controls as both material weaknesses and significant deficiencies, but they existed at the time of the 2005 audit and should have been identified at that time.

> *   *   *

> The Examiner found no evidence that the KPMG engagement team engaged in a formal process to compare year over year deficiency findings in connection with the 2005 SOX 404 audit.  Conducting this analysis would have been prudent given the wholesale turnover in the

KPMG engagement team.  This failure is significant, as it impacted the planning for the SOX 404 audit in 2005, the evaluation of findings in 2005 and the planning for the year-end audits.

Specifically, the Examiner found no evidence of any significant communication between the 2004 and 2005 engagement teams regarding the SOX issues in workpapers, e-mails or interviews.  Highlighting this point, Biddle told the Examiner that she never discussed the New Century audit engagement with the 2004 audit engagement partner, Kinsella, even though she knew Kinsella and was working with him on another engagement in 2005.  Biddle also stated that she did not perform a formal review of the internal control deficiencies identified in the prior year or Management's remediation of those deficiencies.

Under AS 2, an auditor is required to consider the following when planning a SOX 404 audit:

•       Knowledge of the company's internal control over financial reporting obtained during other engagements.

•       Control deficiencies previously communicated to the audit committee or management.

•       The extent of recent changes, if any, in the company, its operations, or its internal control over financial reporting.

By not considering the prior year's deficiencies, the planning for the 2005 SOX 404 audit did not comply with AS 2.

In addition, because they were not aware of certain recurring deficiencies, the KPMG SOX 404 audit team did not consider all of the information available to them when assessing the significance of the deficiencies noted in 2005.  For example, as discussed above, KPMG concluded in connection with its 2004 SOX 404 audit that New Century lacked adequate documentation supporting its valuation of residual

interests.    Although KPMG reported this deficiency to Management, KPMG's workpapers do not adequately explain how the documentation deficiency was remediated by the Company, and the Examiner does not believe, based on his review of the support provided, that the Company did remediate the deficiencies.

In 2005, KPMG identified 13 control deficiencies relating to the residual interest process.    However it raised *none* of them as significant deficiencies, which would have necessitated a report to New Century's Audit Committee.    Notably, the identified deficiencies included several of the same concerns that were raised as significant deficiencies in 2004 and again later in 2006.    Moreover, the KPMG team failed to document its methodology for determining the severity of various control deficiencies identified during the 2005 SOX 404 audit as required by AS 2.    The absence of this documentation corroborates the Examiner's conclusion that many of KPMG's severity determinations were based on minimal analysis.

Had the 2005 engagement team considered the 2004 findings, KPMG should have concluded that, at a minimum, significant control deficiencies had persisted with respect to residual interests.    These findings would have been reported to New Century's Audit Committee, as required by AS 2.    As a result of these inadequacies in KPMG's review, however, the Audit Committee was never provided with the opportunity to address the recurring deficiencies.

In connection with the 2006 SOX 404 review, KPMG documented multiple internal control deficiencies with respect to the residual interest valuation in its draft audit workpapers and assessed internal controls as not operating effectively.    These deficiencies, which

are as follows, also would have existed at the time of the 2005 audit but were not identified then by KPMG:

•    Management does not have a regular, documented process in place to determine a threshold at which to adjust assumptions in the residual asset models.

•    Management does not have adequate documentation to support the reasonableness of the 12-14% discount rates used in the valuation of the residual interests for the following reasons.

•    No external bid for residuals has been obtained.

•    Management analysis supports 13-18% discount rates for CMO securities.

•    Management benchmarking indicates the discount rates used by the Company are lower than competitors' rates for comparable transactions.

•    Company should independently validate the models to ensure mathematical accuracy of the models and accurate valuation based on market conditions.

A number of these deficiencies also were found by PwC in February 2007 when it was retained by Bindra at New Century to review certain models and the valuation process.  PwC noted, in particular, a lack of documentation to support certain assumptions and a lack of controls for changes in assumptions used in the models.  <u>The fact that KPMG did not identify in 2005 these same control issues, but instead assessed internal controls as effective, is evidence of a lack of professional care in the performance of the 2005 SOX 404 review</u>. Examiner's Report at 513-15 (emphasis added).[30]

_____

[30] "The Examiner finds that KPMG impropery acquiesced in New Century's reliance upon aggressive or stale assumptions in its residual interest valuation models.  The Examiner further

235.   All of these six categories of factual findings provide, in disturbing detail, the numerous ways in which KPMG violated GAAS in its 2005 audits and reviews and demonstrate that KPMG's 2005 unqualified audit opinions which stated that KPMG's 2005 audits were performed in accordance with the standards of the PCAOB were materially misstated when issued and at the time of the Series B Preferred Stock offering.

## VII.  THE OFFERING REGISTRATION STATEMENT AND PROSPECTUSES CONTAINED UNTRUE STATEMENTS OF MATERIAL FACT[31]

### A.    The Series A Preferred Stock Offering

236.   In June 2005, New Century sold approximately 4,500,000 shares of 9.125% Series A Cumulative Redeemable Preferred Stock, including approximately 300,000 shares sold to cover over-allotments, to the investing public raising net proceeds of approximately $109 million.   Defendants Bear Stearns, Deutsche Bank, Piper Jaffray, Stifel Nicolaus, JMP Securities and Roth Capital acted as underwriters for the offering.

237.   The Series A Preferred Stock was offered and sold pursuant to a shelf registration statement on Form S-3 and prospectus, dated April 26, 2005 and May 6, 2005, signed by Defendants Morrice, Dodge, Cole, Gotschall, Black, Forster, Lange, Popejoy, Sachs, Sandvik and Zona; a prospectus supplement filed on June 13, 2005, and a prospectus supplement, dated June 15, 2005   (the "Series A

---

finds that KPMG failed to insist that New Century cure significant internal control deficiencies with respect to the valuation of residual interests, such as the absence of documentation describing how the residual interest valuation models worked and how the assumptions used in the models were established, revised or approved."  Examiner's Report at 7.

[31]   In this section of the Second Amended Complaint, Plaintiffs have underlined all alleged material misstatements made in or incorporated by reference into the Series A or B Preferred Stock offerings and, in the paragraphs that follow, Plaintiffs explain why each underlined statement was materially misstated when made at the time of the relevant offering by referring only to facts set forth in the paragraphs above that were in existence at the time or prior to the relevant offering.  See also Exhibit D.

Preferred Stock Prospectus") which were filed with the SEC (collectively, the "Series A Preferred Stock Registration Statement").

238.   The Series A Preferred Stock Registration Statement expressly incorporated, inter alia, the following documents by reference:  New Century's 2004 Form 10-K, filed on or about March 16, 2005, and New Century's Form 10-Q for the quarter ended March 31, 2005, filed on or about May 10, 2005.  The Series A Preferred Stock Registration statement also presented selected balance sheet and statements of income data purporting to reflect the Company's financial performance and assets and liabilities for, inter alia, the three months ended March 31, 2005.  As set forth herein, the Series A Preferred Stock Registration Statement and the Forms 10-K and 10-Q incorporated therein by reference pursuant to which Plaintiff Carl Larson and other members of the Class were induced to purchase New Century Series A Preferred Stock contained untrue statements of material facts and omitted to state material facts required therein or necessary to make the statements contained therein not misleading.

239.   New Century's 2004 Form 10-K, filed on or about March 16, 2005, stated the following regarding the Company's underwriting standards and loan quality:

> We originate and purchase primarily first mortgage products nationwide.  We focus on lending to individuals whose borrowing needs are generally not fulfilled by traditional financial institutions because they do not satisfy the credit, documentation or other underwriting standards prescribed by conventional mortgage lenders and loan buyers.  We originate and purchase loans on the basis of the borrower's ability to repay the mortgage loan, the borrower's historical pattern of debt repayment and the amount of equity in the borrower's property, as measured by the borrower's loan-to-value ratio, or LTV.  We have been originating and

purchasing subprime loans since 1996 and believe <u>we have developed a comprehensive and sophisticated process of credit evaluation and risk-based pricing that allows us to effectively manage the potentially higher risks associated with this segment of the mortgage industry</u>.

* * *

We have experienced considerable growth of our interest only product.  During the year ended December 31, 2004, originations of interest-only loans totaled $8.1 billion, or 19.3%, of total originations.   Interest only originations during the year ended December 31, 2003 totaled $568.0 million, or 2.1%, of total originations during this period.  <u>We believe our strict underwriting guidelines and the stronger credit characteristics of these loans mitigate their perceived higher risk</u>.

* * *

For the year ended December 31, 2004, full documentation loans as a percentage of originations totaled $21.5 billion, or 51.0%, limited documentation loans totaled $2.0 billion, or 4.8%, and stated documentation loans totaled $18.7 billion, or 44.2%.  . . . <u>We designed our underwriting standards and quality assurance programs to ensure that loan quality is consistent and meets our guidelines, even as the documentation type mix varies</u>.

* * *

<u>We adhere to high origination standards in order to sell our loan products in the secondary mortgage market.</u>  [Emphasis added.]

240.   Even though these statements were originally made on or about March 16, 2005, they were expressly incorporated into the Series A Preferred Stock Registration Statement and thus, they were made again at the time of and in

connection with the Series A Preferred Stock offering in June 2005 when, undisclosed to investors and contrary to these statements, the Company's underwriting standards were greatly loosened. Indeed, portions of the above-quoted statements were repeated directly in the Series A Preferred Stock prospectus supplement filed on June 13, 2005 and prospectus supplement, dated June 15, 2005.

241. In addition, New Century's Form 10-Q filed on or about May 10, 2005, similarly stated:

> We originate and purchase primarily first mortgage loans nationwide. We focus on lending to individuals whose borrowing needs are generally not fulfilled by traditional financial institutions because they do not satisfy the credit, documentation or other underwriting standards prescribed by conventional mortgage lenders and loan buyers. We originate and purchase loans on the basis of the borrower's ability to repay the mortgage loan, the borrower's historical pattern of debt repayment and the amount of equity in the borrower's property, as measured by the borrower's loan-to-value ratio, or LTV. We have been originating and purchasing subprime loans since 1996 and believe we have developed a comprehensive and sophisticated process of credit evaluation and risk-based pricing that allows us to effectively manage the potentially higher risks associated with this segment of the mortgage industry.
>
> * * *
>
> We have experienced considerable growth of our interest-only product. During the three months ended March 31, 2005, originations of interest-only loans totaled $2.7 billion, or 26.7%, of total originations. Interest-only originations during the three

months ended March 31, 2004 totaled $963 million, or 11.4%, of total originations during the period. <u>We believe our strict underwriting guidelines and the stronger credit characteristics of these loans mitigate their perceived higher risk</u>.

\* \* \*

For the three months ended March 31, 2005, full documentation loans as a percentage of originations totaled $5.2 billion, or 50.7%, limited documentation loans totaled $569 million, or 5.6%, and stated documentation loans totaled $4.5 billion, or 43.7%. . . . <u>We designed our underwriting standards and quality assurance programs to ensure that loan quality is consistent and meets our guidelines, even as the documentation type mix varies</u>. [Emphasis added.]

242.    As set forth in paragraphs 137-39, 141, 144, 146, 148, 150, 153-55, 158, 161 above, numerous former New Century employees with first-hand knowledge report that contrary to the above-quoted statements regarding a purported "<u>comprehensive and sophisticated process of credit evaluation</u>," "<u>strict underwriting guidelines</u>," "<u>high origination standards</u>" and "<u>underwriting standards and quality assurance programs to ensure that loan quality is consistent</u>," New Century's underwriting standards were actually loosened substantially by the time of these statements and the Series A Preferred Stock offering so that the Company could continue to reach record mortgage origination volume notwithstanding intense industry competition, rising interest rates and a softening of the real estate market. Further, the 2005 data set forth in paragraphs 126-35 above establish that New Century's underwriting loosened precipitously before and at the time of the Series A Preferred Stock offering, such that its loans became delinquent and were repurchased at substantially higher rates as compared to the loans it made in 2003-04, and with such speed that generic market forces could not be to blame. The data

further demonstrate that given its loosened underwriting, New Century was far more likely to issue a sub-prime borrower a mortgage loan than were its peers. According to CWs 3, 5, 6, 8, 11, 13, 15, 17, 20, 21, 22, 25 and 28, as early as 2003, and progressively from 2004-05, New Century began originating riskier and riskier mortgage loans because of increased loan to values, including 80/20 100% financing loans requiring no down payment, and began increasing the amount of stated income loans which, starting in 2004-05, were being offered to W-2 wage earners who should have been able to verify their stated income, but were not required to.  According to CWs 13, 17, 20, 25 and 28, the Company's underwriting was loosened and the Company was issuing "riskier and riskier" mortgage loans beginning as early as 2003, with "heavy pressure" to close loans and operations managers signing off on the approval of riskier loans.  Quarterly loan performance data set forth in paragraph 111 further demonstrate a trend of increasing delinquencies from the first quarter of 2004 through the first quarter of 2005.  The fact that delinquencies continued to increase thereafter at a dramatic rate further demonstrates that contrary to the above-quoted statements, New Century's underwriting was not "<u>strict</u>" and "<u>comprehensive</u>" as represented at the time of the Series A Preferred Stock offering, but substantially loosened to produce growing origination volume.

243.   In addition, as set forth in paragraphs 173-78, 183, 187, 189, 196 above, by the time of these statements, the Examiner's Report details facts demonstrating "serious loan quality issues at [New Century] beginning as early as 2004;" numerous "red flags" relating to loan quality; and the failure of New Century's Senior Management and Board of Directors to devote sufficient attention to improving loan quality until the final quarter of 2006, when it "was too late to prevent the consequences of longstanding loan quality problems in an adversely changing market."  "Rather, New Century continued to focus on generating greater quantities of ever riskier loans, devoting little effort to such basic issues as making

sure that the Company's loan origination and underwriting policies and procedures were followed to avoid kickouts of loans offered for sale." Contrary to the above statements, New Century "devoted its resources to generating high volumes of loans, with relatively little attention to loan quality" and did not even have any "formal exceptions policy." The Examiner found these ever-increasing risks to be "a veritable ticking time bomb." As a result of these findings, the Examiner concluded that the above public statements made by New Century regarding the purported credit characteristics of its loans and strict and consistent underwriting guidelines were "not supportable" and without "justifiable basis" when made.

244. Given these then-existing facts, the generalized risk disclosures included in the Series A Preferred Stock Prospectus, including that "no assurance can be given that our underwriting criteria or methods will afford adequate protection against the higher risks associated with loans made to lower credit grade borrowers," were not sufficient to insulate Defendants from liability for the material misstatements made at the time of the offering regarding the purported "comprehensive and sophisticated process of credit evaluation," "strict underwriting guidelines" and "underwriting standards and quality assurance programs to ensure that loan quality is consistent," because those statements were materially misstated when made and at the time of the offering.

245. New Century's first quarter 2005 Form 10-Q also contained consolidated balance sheets and consolidated statements of earnings purporting to reflect the Company's financial performance and assets and liabilities for the three months ended March 31, 2005 in accordance with GAAP. The Form 10-Q stated:

> The Company has prepared the accompanying unaudited condensed consolidated financial statements in accordance with accounting principles generally accepted in the United States of America for interim financial information and with the instructions to Form 10-Q and Rule 10-01 of Regulation S-X. Accordingly, they do not include

all of the information and footnotes required by generally accepted accounting principles for complete financial statements.  <u>In the opinion of management, all adjustments (consisting of normal recurring accruals) considered necessary for a fair presentation have been included</u>.  [Emphasis added.]

246.   The first quarter 2005 Form 10-Q reported New Century's Residual Interests as of March 31, 2005 at <u>$143,928,000</u>.  The first quarter 2005 Form 10-Q purported to describe the Company's "Critical Accounting Policies" including New Century's methods for calculating "Residual Interests in Securitizations" and "Allowance for Repurchase Losses:"

*Residual Interests in Securitizations*

[T]he Residuals described above are a significant asset of the Company.  In determining the value of the Residuals, the Company estimates the future rate of prepayments, prepayment penalties that we will receive, delinquencies, defaults and default loss severity as they affect the amount and timing of estimated cash flows.  . . .  <u>The Company bases these estimates on historical loss data for the loans, the specific characteristics of the loans and the general economic environment</u>.  . . .  The Company performs an evaluation of the Residuals quarterly, <u>taking into consideration trends in actual cash flow performance, industry and economic developments, as well as other relevant factors</u>.

\* \* \*

*Allowance for Repurchase Losses*

<u>Generally, repurchases are required within 90 days from the date the loans are sold.  Occasionally, we may repurchase loans after 90 days have elapsed</u>.  [Emphasis added.]

247.   The first quarter 2005 Form 10-Q provided the following information regarding New Century's internal controls and procedures:

As of March 31, 2005, the end of our first quarter, our management, including our Chief Executive Officer, Vice Chairman – Finance, Chief Financial Officer and President and Chief Operating Officer, has evaluated the effectiveness of our disclosure controls and procedures, as such term is defined in Rule 13a-15(e) promulgated under the Securities Exchange Act of 1934, as amended.  <u>Based on that evaluation, our Chief Executive Officer, Vice Chairman – Finance, Chief Financial Officer and President and Chief Operating Officer concluded, as of March 31, 2005, that our disclosure controls and procedures were effective to ensure that information required to be disclosed by us in reports that we file or submit under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission rules and forms</u>.  There was no change in our internal control over financial reporting during the quarter ended March 31, 2005 that materially affected, or is reasonably likely to materially affect, our internal control over financial reporting. [Emphasis added.]

248.   Accompanying the first quarter 2005 Form 10-Q as exhibits were certifications signed by Defendants Cole, Dodge, Gotschall and Morrice which stated:

1.     I have reviewed this quarterly report on Form 10-Q of New Century Financial Corporation;

2.     <u>Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances</u>

under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15(d)-15(f)) for the registrant and have:

a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this quarterly report is being prepared;

b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of

the end of the period covered by this report based on such evaluation; and

      d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

      a) <u>All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information</u>; and

      b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

* * *

In connection with the Quarterly Report of New Century Financial Corporation (the "Company") on Form 10-Q for the period ended March 31, 2005 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I . . . certify, pursuant to 18 U.S.C. § 1350, as adopted pursuant to § 906 of the Sarbanes-Oxley Act of 2002, that, to my knowledge:

(1)  The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)  <u>The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company</u>.  [Emphasis added.]

249.  The above-referenced statements from New Century's Form 10-Q for the first quarter ended March 31, 2005, incorporated by reference into the Series A Preferred Stock Registration Statement, were materially misstated and omitted to state material facts required therein or necessary to make the statements contained therein not misleading, at the time of the offering.  At the time of the Series A Preferred Stock offering, and contrary to the above-referenced statements, New Century's financial statements for the first quarter ended March 31, 2005 were not presented in accordance with GAAP and the Company's internal controls suffered from significant deficiencies and material weaknesses.

250.  As set forth in paragraph 75 above, according to CW 1, New Century had intentionally delayed payment of valid repurchase claims, causing a massive backlog of repurchase claims, 80% of which, or hundreds of millions of dollars worth, were 18-24 months old as of September 2006 – meaning that the backlog went back to the 2005 first quarter.  According to CW 1, these repurchase claims already were determined to be valid and should have been paid 18-24 months earlier, but the Company delayed payment of them in an effort to cause its previously reported financial results to appear better than they actually were.  According to CW 1, by the end of the 2004 fourth quarter, New Century already had a large backlog of valid, unfunded repurchase claims.  Accordingly, hundreds of millions of dollars worth of these valid repurchase claims should have been funded prior to the start of the Class Period in May 2005 and the Series A Preferred Stock offering, but were not.  As set forth in paragraph 77 above, according to CW 3, New Century was "sitting on repurchase requests" hoping to ride out the market

and the Company failed to have good internal reporting of repurchase information. In addition, according to the internal New Century document quoted in paragraph 79 above, 61% of the Company's outstanding repurchase claims, or $167 million worth, had been received by July 31, 2005. The failure to properly account for these outstanding repurchase claims caused material errors in the Company's 2005 first quarter reported financial results and resulted from material weaknesses in the Company's internal controls at the time the claims were received and processed, but not funded, which included the time the above-statements were made and the time of the Series A Preferred Stock offering. Accordingly, the material financial misstatements and material weaknesses in internal controls relating to the repurchase claims backlog eventually reported by the Company on February 7, 2007 and thereafter, were in existence at the time of the Series A Preferred Stock offering, rendering the above-quoted statements made in connection with the Series A Preferred Stock offering materially misstated at the time of the offering.

251. As set forth in paragraphs 91-93, 96-97 above, the facts revealed by the Examiner's Report further demonstrate that "beginning no later than 2004, New Century was receiving repurchase requests related to loans sold outside of the previous 90-day period and it was taking much longer than 90 days to evaluate and process repurchase requests and repurchase loans." In violation of GAAP, "New Century was not reserving, however, for these loans that it might be required to repurchase, and on which it might incur losses and expenses, but for which no reserve was provided." By January 26, 2005, the Examiner found "clear indication that New Century Accounting Department personnel knew that many loans that were ultimately repurchased in 2004 were Backlog Claims. . . . Notwithstanding this information, New Century did nothing to adjust its methodology for estimating the quantity of loans that might need to be repurchased as of the end of a financial reporting period." In addition, at the time of the above-reported 2005 first quarter earnings and at all times throughout 2005, New Century "perplexingly" further

violated GAAP by failing to reserve for Interest Recapture as set forth in paragraphs 96-97 above.  Consistent with the Examiner's Report, New Century's above-quoted description of its Allowance for Repurchase Losses was materially misleading when made as it stated that the Company "occasionally" may repurchase loans after 90 days without disclosing the then-existing repurchase claims backlog.

252.  As set forth in paragraphs 106-08 above, the facts revealed by the Examiner's Report demonstrate that New Century's Residual Interests were overstated at the time of the above-reported 2005 first quarter earnings and at all times throughout 2005-06 as "New Century insisted on using unduly low discount rates;" New Century "repeatedly resisted warnings from specialists at KPMG [starting at least for its quarterly review for the first quarter of 2005], who warned that the discount rates New Century was using were below those used by most of its peers;" "New Century relied for far too long on antiquated and flawed internally-developed Excel-based models to value residual interests;" and New Century failed "to adjust its prepayment rates to reflect changing market conditions . . . contrary to the advice it consistently received as far back as the first quarter of 2005 from KPMG's SFG, which repeatedly expressed concern about the Company's use of low prepayment speed assumptions."

253.  As set forth in paragraphs 194-96 above, the facts revealed by the Examiner's Report demonstrate that that New Century's internal controls suffered from significant deficiencies and material weaknesses at the time of the above-reported 2005 first quarter internal control certifications and statements and at all times throughout 2005-06 as the result of "deeply-rooted and long-standing failures to establish and monitor adequate internal controls over financial reporting;" including failures to "develop effective policies and procedures for performing accounting estimates requiring the exercise of considerable judgment;" and to "remediate internal control deficiencies that existed at year-end 2004."

Among the deficiencies that New Century failed to remedy from year-end 2004 were "key controls surrounding the repurchase reserve estimation process;" "the allowance for loan losses methodology and rationale;" and "controls related to the hedging and derivatives process." "New Century also failed to establish sufficient internal controls with respect to its residual interest valuation process." As demonstrated by the facts obtained by the Examiner (as well as the numerous other facts set forth in paragraphs 242-43 above), New Century also suffered throughout 2005 (and 2006) from "significant deficiencies and material weaknesses in Management's internal control structure related to loan quality . . . ."

254.   Given these then-existing facts, the generalized risk disclosures included in the Series A Preferred Stock Prospectus, including those regarding the Company's reserves and financial condition, were not sufficient to insulate Defendants from liability for the material misstatements made at the time of the offering regarding the Company's purported compliance with GAAP and the effectiveness of its internal controls because those statements were materially misstated when made and at the time of the offering.

255.   As set forth below, when the adverse disclosures were made and the true facts were revealed after the Series A Preferred Stock offering was completed, the price of New Century Series A Preferred Stock declined by over 75%.

**B.     The Series B Preferred Stock Offering**

256.   In August 2006, New Century sold approximately 2,300,000 shares of 9.75% Series B Cumulative Preferred Stock, including approximately 300,000 shares sold to cover over-allotments, to the investing public raising net proceeds of approximately $55.6 million.   Defendants Bear Stearns, Morgan Stanley, Stifel Nicolaus and Jefferies & Co. acted as underwriters for the offering.

257.   The Series B Preferred Stock was offered and sold pursuant to a shelf registration statement on Form S-3 and prospectus, dated April 26, 2005 and May 6, 2005, signed by Defendants Morrice, Dodge, Cole, Gotschall, Black, Forster,

Lange, Sachs and Zona, a prospectus supplement dated August 14, 2006, and a prospectus supplement, dated August 15, 2006  (the "Series B Preferred Stock Prospectus") which were filed with the SEC (collectively, the "Series B Preferred Stock Registration Statement").

258.   The Series B Preferred Stock Registration Statement expressly incorporated, _inter alia_, the following documents by reference:  New Century's Form 10-K for the year-ended December 31, 2005; and New Century's Forms 10-Q for the quarters ended March 31, 2006 and June 30, 2006.   The Series B Preferred Stock Registration Statement also presented selected balance sheet and statements of income data purporting to reflect the Company's financial performance and assets and liabilities for, _inter alia_, the year ended December 31, 2005 and the six months ended June 30, 2006.  As set forth herein, the Series B Preferred Stock Registration Statement and Series B Preferred Stock Prospectus and the documents incorporated therein by reference pursuant to which plaintiff Carl Larson and other members of the Class were induced to purchase New Century Series B Preferred Stock contained untrue statements of material facts and omitted to state material facts required therein or necessary to make the statements contained therein not misleading.

259.   New Century's Form 10-K for the year ended December 31, 2005 was filed with the SEC on or about March 16, 2006.  The 2005 Form 10-K stated the following regarding New Century's underwriting standards:

> Our loan origination standards and procedures are designed to produce high quality loans.   These standards and procedures encompass underwriter qualifications and authority levels, appraisal review requirements, fraud prevention, funds disbursement controls, training of our employees and ongoing review of our employees' work.   We help to ensure that our origination standards are met by employing accomplished and

season managers, underwriters and processors and through the extensive use of technology.  We also have a comprehensive training program for the continuing development of both our existing staff and new hires.  In addition, we employ proprietary underwriting systems in our loan origination process that improve the consistency of underwriting standards, assess collateral adequacy and help to prevent fraud, while at the same time increasing productivity.

*  *  *

We have experienced considerable growth of our interest-only product.  During the year ended December 31, 2005, originations of adjustable-rate, interest-only loans totaled $16.6 billion, or 29.6%, of total originations.  Interest-only originations during the year ended December 31, 2004 totaled $8.1 billion, or 19.3%, of total originations during the period.  We believe our strict underwriting guidelines and the stronger credit characteristics of these loans mitigate their perceived higher risk.

*  *  *

For the year ended December 31, 2005, full documentation loans as a percentage of originations totaled $30.4 billion, or 54.2%, limited documentation loans totaled $1.5 billion, or 2.7%, and stated documentation loans totaled $24.2 billion, or 43.1%.  . . .  We designed our underwriting standards and quality assurance programs to ensure that loan quality is consistent and meets our guidelines, even as the mix among full, limited and stated documentation varies.

*  *  *

> We adhere to high origination standards in order to sell our loan
> products in the secondary mortgage market.  [Emphasis added.]

260.   New Century's Form 10-Q for the quarter ended March 31, 2006 was filed with the SEC on or about May 10, 2006.  The first quarter 2006 Form 10-Q stated as follows regarding the Company's underwriting standards:

> We originate and purchase primarily first mortgage loans
> nationwide.  Historically, we have focused on lending to
> individuals whose borrowing needs are generally not fulfilled by
> traditional financial institutions because they do not satisfy the
> credit, documentation or other underwriting standards prescribed
> by conventional mortgage lenders and loan buyers.
>
> *   *   *
>
> For the three months ended March 31, 2006, full documentation
> loans as a percentage of originations were $7.2 billion, or 53.9%,
> limited documentation loans were $301.1 million, or 2.2%, and
> stated documentation loans were $5.9 billion, or 43.9%.  . . .  We
> designed our underwriting standards and quality assurance
> programs to ensure that loan quality is consistent and meets our
> guidelines, even as the documentation type mix varies.  [Emphasis
> added.]

261.   New Century's Form 10-Q for the quarter ended June 30, 2006 was filed with the SEC on or about August 9, 2006.  The second quarter 2006 Form 10-Q stated as follows regarding the Company's underwriting standards:

> We originate and purchase primarily first mortgage loans
> nationwide.  Historically, we have focused on lending to
> individuals whose borrowing needs are generally not fulfilled by
> traditional financial institutions because they do not satisfy the

1  credit, documentation or other underwriting standards prescribed
2  by conventional mortgage lenders and loan buyers.

3  * * *

4  For the six months ended June 30, 2006, full documentation loans
5  as a percentage of originations were $16.4 billion, or 55.5%,
6  limited documentation loans were $627.7 million, or 2.1%, and
7  stated documentation loans were $12.5 billion, or 42.4%. . . . We
8  designed our underwriting standards and quality assurance
9  programs to ensure that loan quality is consistent and meets our
10  guidelines, even as the documentation type mix varies. [Emphasis
11  added.]

12    262.   These statements were materially misstated when made and materially
13  misstated at the time of the Series B Preferred Stock offering.  As set forth in
14  paragraphs 137–68 above, numerous former New Century employees with first-
15  hand knowledge report that contrary to the above-quoted statements regarding
16  "loan origination standards and procedures" that were purportedly designed to
17  produce "high quality loans;" "high origination standards," "proprietary
18  underwriting systems" that purportedly improved the "consistency of underwriting
19  standards" and "strict underwriting guidelines" and undisclosed to investors, New
20  Century's underwriting standards were actually loosened substantially by the time
21  of these statements and the Series B Preferred Stock offering so that the Company
22  could continue to reach record mortgage origination volume notwithstanding
23  intense industry competition, rising interest rates and a softening of the real estate
24  market.  As the data set forth in paragraphs 126-35 above establish, New Century
25  substantially loosened its underwriting in 2005 and 2006 and at the time of the
26  Series B Preferred Stock offering, such that its loans exhibited drastically higher
27  delinquency and repurchase rates as soon as they were made and with such speed
28  that generic market forces could not be to blame.  The data further establish that

New Century, given its loosened underwriting, was far more likely to issue a sub-prime borrower a mortgage loan than were its peers. According to CWs 3, 5, 6, 8, 9, 11, 12, 13, 15, 16, 17, 18, 20, 21, 22, 23, 25, 26, 28 and 31 before any of these statements were made, New Century already had loosened substantially its underwriting so that it could increase loan volume at the expense of loan quality and, rather than maintain consistent underwriting standards, actually allowed repeated exceptions to its underwriting standards, further reducing its loan quality. According to these witnesses, as early as 2003, and progressively from 2004-06, New Century began originating riskier and riskier mortgage loans because of increased loan to values, including 80/20 100% financing loans requiring no down payment, and began increasing the amount of stated income loans which, starting in 2004-05, were being offered to W-2 wage earners who should have been able to verify their stated income, but were not required to. Quarterly loan performance data set forth in paragraph 111 further demonstrate a trend of increasing delinquencies from the first quarter of 2004 through the second quarter of 2006. The fact that delinquencies continued to increase thereafter at a dramatic rate further demonstrates that contrary to the above-quoted statements, New Century's underwriting was not designed to produce "high quality loans" as represented at the time of the Series B Preferred Stock offering, but substantially loosened to produce growing origination volume at the expense of loan quality.

263.   In addition, as set forth in paragraphs 173-90, 196 above, by the time of these statements, the Examiner's Report details facts demonstrating "serious loan quality issues at [New Century] beginning as early as 2004;" numerous "red flags" relating to loan quality, including "striking" red flags throughout 2005 and "alarming" trends by February 2006; and the failure of New Century's Senior Management and Board of Directors to devote sufficient attention to improving loan quality until the final quarter of 2006, when it "was too late to prevent the consequences of longstanding loan quality problems in an adversely changing

market." "Rather, New Century continued to focus on generating greater quantities of ever riskier loans, devoting little effort to such basic issues as making sure that the Company's loan origination and underwriting policies and procedures were followed to avoid kickouts of loans offered for sale." Contrary to the above statements, New Century "devoted its resources to generating high volumes of loans, with relatively little attention to loan quality" and did not even have any "formal exceptions policy." The Examiner found these ever-increasing risks to be "a veritable ticking time bomb." As a result of these findings, the Examiner concluded that the public statements made by New Century regarding "<u>high origination standards</u>" designed to produce "<u>high quality loans</u>" were not correct when made as, in fact, "New Century did not produce 'high quality' loans or have 'high origination standards.'"

264. Given these then-existing facts, the generalized risk disclosures included in the Series B Preferred Stock Prospectus, including that "no assurance can be given that our underwriting criteria or methods will afford adequate protection against the higher risks associated with loans made to lower credit grade borrowers," were not sufficient to insulate Defendants from liability for the material misstatements made at the time of the offering regarding "loan origination standards and procedures" that were purportedly designed to produce "<u>high quality loans</u>;" "<u>high origination standards</u>," and "proprietary underwriting systems" that purportedly improved the "<u>consistency of underwriting standards</u>" and "<u>strict underwriting guidelines</u>" because those statements were materially misstated when made and at the time of the offering.

265. The 2005 Form 10-K also contained consolidated balance sheets and consolidated statements of earnings purporting to reflect the Company's financial performance and assets and liabilities for the three months and year ended December 31, 2005 in accordance with GAAP. The 2005 Form 10-K reported New Century's Residual Interests as of December 31, 2005 at <u>$234,930,000</u> and