Allowance for Loan Repurchase Losses as of December 31, 2005 at $7,000,000. The 2005 Form 10-K purported to describe the Company's "Critical Accounting Policies" including New Century's methods for calculating "Residual Interests in Securitizations" and "Allowance for Repurchase Losses:"

*Residual Interests and Securitizations Structured as Sales*

[T]he Residuals described above are a significant asset of the Company. In determining the value of the Residuals, the Company estimates the future rate of prepayments, prepayment penalties that it will receive, delinquencies, defaults and default loss severity as they affect the amount and timing of estimated cash flows. . . . These estimates are based on historical loss data for the loans, the specific characteristics of the loans, and the general economic environment. . . . The Company performs an evaluation of the Residuals quarterly, taking into consideration trends in actual cash flow performance, industry and economic developments, as well as other relevant factors.

\* \* \*

*Allowance for Repurchase Losses*

Generally, repurchases are required within 90 days from the date the loans are sold. Occasionally, we may repurchase loans after 90 days have elapsed. . . . As of December 31, 2005 and December 31, 2004, the repurchase allowance totaled $7.0 million and $6.3 million, respectively. Approximately $10.7 billion and $8.3 billion of loans were subject to repurchase, representing loans sold during the fourth quarter of 2005 and the fourth quarter of 2004, respectively. We believe the allowance for repurchase losses is adequate as of December 31, 2005 and 2004. [Emphasis added.]

266.   The 2005 Form 10-K provided the following information regarding New Century's internal controls and procedures:

As of December 31, 2005, the end of our fourth quarter, our management, including our Chief Executive Officer, Vice Chairman-Finance, Chief Financial Officer and President and Chief Operating Officer, has evaluated the effectiveness of our disclosure controls and procedures, as such term is defined in Rule 13a-15(e) promulgated under the Securities Exchange Act of 1934, as amended.  Based on that evaluation, our Chief Executive Officer, Vice Chairman-Finance, Chief Financial Officer and President and Chief Operating Officer concluded, as of December 31, 2005, that our disclosure controls and procedures were effective to ensure that information required to be disclosed by us in reports that we file or submit under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission rules and forms.

*   *   *

There have not been any changes in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the quarter to which this report relates that have materially affected, or are likely to materially affect, our internal control over financial reporting.  [Emphasis added.]

267.   Accompanying the 2005 Form 10-K as exhibits were certifications signed by Defendants Cole, Dodge, Morrice and Gotschall in the form set forth in paragraph 248 above.

268.   The 2005 Form 10-K contained a "Report of Independent Registered Public Accounting Firm" from Defendant KPMG dated March 15, 2006 which stated:

> We have audited the accompanying consolidated balance sheets of New Century Financial Corporation and subsidiaries as of December 31, 2005 and 2004, and the related consolidated statements of income, comprehensive income, changes in stockholders' equity, and cash flows for each of the years in the three-year period ended December 31, 2005.  These consolidated financial statements are the responsibility of the Company's management.  Our responsibility is to express an opinion on these consolidated financial statements based on our audits.
>
> We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement.  An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements.  An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation.  We believe that our audits provide a reasonable basis for our opinion.
>
> In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of New Century Financial Corporation and subsidiaries as of December 31, 2005 and 2004, and the results of their operations and their cash flows

for each of the years in the three-year period ended December 31, 2005, in conformity with U.S. generally accepted accounting principles.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the effectiveness of the Company's internal control over financial reporting as of December 31, 2005, based on criteria established in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO), and our report dated March 15, 2006 expressed an unqualified opinion on management's assessment of, and the effective operation of, internal control over financial reporting. [Emphasis added.]

269.    The 2005 Form 10-K also contained a "Report of Independent Registered Public Accounting Firm" on internal controls from Defendant KPMG dated March 15, 2006 which stated:

We have audited management's assessment, included in the accompanying *Management's Report on Internal Control Over Financial Reporting,* that New Century Financial Corporation and subsidiaries maintained effective internal control over financial reporting as of December 31, 2005, based on criteria established in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting.    Our responsibility is to express an opinion on management's assessment

and an opinion on the effectiveness of the Company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, evaluating management's assessment, testing and evaluating the design and operating effectiveness of internal control, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and

(3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, management's assessment that New Century Financial Corporation and subsidiaries maintained effective internal control over financial reporting as of December 31, 2005, is fairly stated, in all material respects, based on the COSO criteria. Also, in our opinion, New Century Financial Corporation and subsidiaries maintained, in all material respects, effective internal control over financial reporting as of December 31, 2005, based on the COSO criteria.

New Century Financial Corporation acquired certain assets and assumed certain liabilities of RBC Mortgage Company during 2005, and management excluded from its assessment of the effectiveness of New Century Financial Corporation's internal control over financial reporting as of December 31, 2005, RBC Mortgage Company's internal control over financial reporting associated with total assets of $1.2 billion and total revenues of $59.6 million included in the

(consolidated) financial statements of New Century Financial Corporation and subsidiaries as of and for the year ended December 31, 2005. Our audit of internal control over financial reporting of New Century Financial Corporation also excluded an evaluation of the internal control over financial reporting of RBC Mortgage Company.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheets of New Century Financial Corporation and subsidiaries as of December 31, 2005 and 2004, and the related consolidated statements of income, comprehensive income, changes in stockholders' equity, and cash flows for each of the years in the three-year period ended December 31, 2005, and our report dated March 15, 2006 expressed an unqualified opinion on those consolidated financial statements. [Emphasis added.]

270.   KPMG gave its consent to the incorporation by reference of its unqualified audit opinion on New Century's 2005 financial statements and its opinion regarding management's assessment of internal controls in the registration statement for the Series B Preferred Stock offering.

271.   New Century's first quarter 2006 Form 10-Q contained consolidated balance sheets and consolidated statements of earnings purporting to reflect the Company's financial performance and assets and liabilities for the three months ended March 31, 2006 in accordance with GAAP.  The Form 10-Q stated:

The Company has prepared the accompanying unaudited condensed consolidated financial statements in accordance with accounting principles generally accepted in the United States of America for interim financial information and with the instructions to Form 10-Q

and Rule 10-01 of Regulation S-X.  Accordingly, they do not include all of the information and footnotes required by generally accepted accounting principles for complete financial statements.  In the opinion of management, all adjustments (consisting of normal recurring accruals) considered necessary for a fair presentation have been included.  [Emphasis added.]

272.  The first quarter 2006 Form 10-Q reported New Century's Residual Interests as of March 31, 2006 at $208,791,000 and Allowance for Loan Repurchase Losses as of March 31, 2006 at $8,900,000.  The first quarter 2006 Form 10-Q purported to describe the Company's "Critical Accounting Policies" including New Century's methods for calculating "Residual Interests in Securitizations" and "Allowance for Repurchase Losses:"

> *Residual Interests in Securitizations*
>
> [T]he Residuals described above are a significant asset of the Company.  In determining the value of the Residuals, the Company estimates the future rate of prepayments, prepayment penalties that we will receive, delinquencies, defaults and default loss severity as they affect the amount and timing of estimated cash flows.  . . .  The Company estimates prepayments by evaluating historical prepayment performance of our loans and the impact of current trends. . . .  The Company performs an evaluation of the Residuals quarterly, taking into consideration trends in actual cash flow performance, industry and economic developments, as well as other relevant factors.
>
> *         *         *
>
> *Allowance for Repurchase Losses*
>
> Generally, repurchases are required within 90 days from the date the loans are sold.  Occasionally, we may repurchase loans after 90 days have elapsed.  . . .  As of March 31, 2006 and December 31,

2005, the repurchase allowance totaled $8.9 million and $7.0 million, respectively . . . .   We believe the allowance for repurchase losses is adequate as of March 31, 2006 and December 31, 2005.  [Emphasis added.]

273.   The first quarter 2006 Form 10-Q provided the following information regarding New Century's internal controls and procedures:

As of March 31, 2006, the end of our first quarter, our management, including our Chief Executive Officer, Chief Financial Officer and President and Chief Operating Officer, has evaluated the effectiveness of our disclosure controls and procedures, as such term is defined in Rule 13a-15(e) promulgated under the Securities Exchange Act of 1934, as amended.  Based on that evaluation, our Chief Executive Officer, Chief Financial Officer and President and Chief Operating Officer concluded, as of March 31, 2006, that our disclosure controls and procedures were effective to ensure that information required to be disclosed by us in reports that we file or submit under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission rules and forms.  There was no change in our internal control over financial reporting during the quarter ended March 31, 2006 that materially affected, or is reasonably likely to materially affect, our internal control over financial reporting. [Emphasis added.]

274.   Accompanying the first quarter 2006 Form 10-Q as exhibits were certifications signed by Defendants Cole, Dodge and Morrice in the form set forth in paragraph 248 above.

275. New Century's second quarter 2006 Form 10-Q contained consolidated balance sheets and consolidated statements of earnings purporting to

reflect the Company's financial performance and assets and liabilities for the three months ended June 30, 2006 in accordance with GAAP.  The Form 10-Q stated:

> The Company has prepared the accompanying unaudited condensed consolidated financial statements in accordance with accounting principles generally accepted in the United States of America for interim financial information and with the instructions to Form 10-Q and Rule 10-01 of Regulation S-X.  Accordingly, the statements do not include all of the information and footnotes required by generally accepted accounting principles for complete financial statements.  In the opinion of management, all adjustments (consisting of normal recurring accruals) considered necessary for a fair presentation have been included.  [Emphasis added.]

276.   The second quarter 2006 Form 10-Q reported New Century's Residual Interests as of June 30, 2006 at $209,335,000 and Allowance for Loan Repurchase Losses as of June 30, 2006 at $14,400,000.  The second quarter 2006 Form 10-Q purported to describe the Company's "Critical Accounting Policies" including New Century's methods for calculating "Residual Interests in Securitizations" and "Allowance for Repurchase Losses:"

> *Residual Interests in Securitizations*
>
> [T]he Residuals described above are a significant asset of the Company.  In determining the value of the Residuals, the Company estimates the future rate of prepayments, prepayment penalties that we will receive, delinquencies, defaults and default loss severity as they affect the amount and timing of estimated cash flows.  . . .  The Company bases these estimates on historical loss data for the loans, the specific characteristics of the loans and the general economic environment.  . . .  The Company performs an evaluation of the Residuals quarterly, taking into consideration trends in actual cash

flow performance, industry and economic developments, as well as other relevant factors.

* * *

*Allowance for Repurchase Losses*

Generally, repurchases are required within 90 days from the date the loans are sold. Occasionally, we may repurchase loans after 90 days have elapsed. . . . As of June 30, 2006 and December 31, 2005, the repurchase allowance totaled $14.4 million and $7.0 million, respectively . . . . We believe the allowance for repurchase losses is adequate as of June 30, 2006 and December 31, 2005. [Emphasis added.]

277. The second quarter 2006 Form 10-Q provided the following information regarding New Century's internal controls and procedures:

As of June 30, 2006, the end of our second quarter, our management, including our Chief Executive Officer, Chief Financial Officer and President and Chief Operating Officer, has evaluated the effectiveness of our disclosure controls and procedures, as such term is defined in Rule 13a-15(e) promulgated under the Securities Exchange Act of 1934, as amended. Based on that evaluation, our Chief Executive Officer, Chief Financial Officer and President and Chief Operating Officer concluded, as of June 30, 2006, that our disclosure controls and procedures were effective to ensure that information required to be disclosed by us in reports that we file or submit under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission rules and forms. There was no change in our internal control over financial reporting during the quarter ended June 30, 2006 that materially affected, or is reasonably likely to materially

1  affect, our internal control over financial reporting.    [Emphasis

2  added.]

3  278.   Accompanying the second quarter 2006 Form 10-Q as exhibits were

4  certifications signed by Defendants Cole, Dodge and Morrice in the form set forth

5  in paragraph 248 above.

6  279.   The above-referenced statements from New Century's Form 10-K for

7  the year-ended December 31, 2005 and Forms 10-Q for the three months-ended

8  March 31, 2006 and June 30, 2006, incorporated by reference into the Series B

9  Preferred Stock Registration Statement, were materially misstated and omitted to

10  state material facts required therein or necessary to make the statements contained

11  therein not misleading, at the time of the offering.   At the time of the Series B

12  Preferred Stock offering, and contrary to the above-referenced statements, New

13  Century's financial statements for the year-ended December 31, 2005 and the

14  quarters-ended March 31 and June 30, 2006 were materially misstated and

15  presented in violation of GAAP, the Company's internal controls suffered from

16  significant deficiencies and material weaknesses and KPMG's audits of New

17  Century's financial statements and internal controls were not performed in

18  accordance with GAAS and the standards of the PCAOB.

19  280.   As set forth in paragraph 72 above, New Century has now admitted

20  the need to restate the Company's previously-reported financial statements for the

21  first three quarters of 2006 (including the first two 2006 quarters incorporated by

22  reference into the Series B Preferred Stock offering) based on material violations

23  of GAAP in setting New Century's Allowance for Repurchase Losses reserve and

24  related material weaknesses in internal controls.   As set forth in paragraph 73

25  above, New Century also has admitted errors in the Company's previously-filed

26  annual financial statements for its fiscal year-ended December 31, 2005, with

27  respect to both the accounting and reporting of loan repurchase losses and the

28  Company's valuation of Residual Interests and a "more likely than not" material

overstatement in the Company's previously-issued 2005 financial statements (which also were incorporated by reference into the Series B Preferred Stock offering). In addition, as set forth in paragraphs 66-119 and 191-96 above, facts developed from Lead Counsel's investigation and set forth in the Examiner's Report further demonstrate that the Company's financial statements incorporated by reference into the Series B Preferred Stock offering were materially misstated in violation of GAAP at the time of the offering and the Company's internal control certifications, which were incorporated by reference into the Series B Preferred Stock offering, were materially misstated at the time of the offering.

281. As set forth in paragraph 75 above, according to CW 1, New Century had intentionally delayed payment of valid repurchase claims, causing a massive backlog of repurchase claims, 80% of which, or hundreds of millions of dollars worth, were 18 to 24 months old as of September 2006 – meaning that the backlog went back to the 2005 first quarter. According to CW 1, these repurchase claims already were determined to be valid and should have been paid 18 to 24 months earlier, but the Company delayed payment of them in an effort to cause its previously reported financial results to appear better than they actually were. According to CW 1, by the end of the 2004 fourth quarter, New Century already had a large backlog of valid, unfunded repurchase claims. Accordingly, hundreds of millions of dollars worth of these valid repurchase claims should have been funded prior to the start of the Class Period in May 2005 and the Series B Preferred Stock offering, but were not. As set forth in paragraph 77 above, according to CW 3, New Century was "sitting on repurchase requests" hoping to ride out the market and the Company failed to have good internal reporting of repurchase information. In addition, according to the internal New Century documents quoted in paragraphs 78 and 80 and the data provided by the Examiner in paragraph 100 above, New Century had a material repurchase claims backlog as of the end of the 2006 second quarter and the time of the Series B Preferred Stock offering. The

failure to properly account for these outstanding repurchase claims caused material errors in the Company's 2005 year-end and 2006 first and second quarter reported financial results and resulted from material weaknesses in the Company's internal controls at the time the claims were received and processed, but not funded, which included the time of the above statements.  In addition, as set forth in paragraph 83 above, according to CW 2, New Century, in violation of GAAP, did not include in its Allowance for Repurchase Losses reserve any estimated discount for disposition necessary to report loans repurchased in the 2006 second quarter at fair market value.

282.  As set forth in paragraphs 91-99 above, the facts revealed by the Examiner's Report demonstrate that "beginning no later than 2004, New Century was receiving repurchase requests related to loans sold outside of the previous 90-day period and it was taking much longer than 90 days to evaluate and process repurchase requests and repurchase loans."  In violation of GAAP, "New Century was not reserving, however, for these loans that it might be required to repurchase, and on which it might incur losses and expenses, but for which no reserve was provided."  By January 26, 2005, the Examiner found "clear indication that New Century Accounting Department personnel knew that many loans that were ultimately repurchased in 2004 were Backlog Claims. . . .  Notwithstanding this information, New Century did nothing to adjust its methodology for estimating the quantity of loans that might need to be repurchased as of the end of a financial reporting period."  In addition, at the time of the above-reported 2005 year-end and 2006 first and second quarter earnings, New Century "perplexingly" further violated GAAP by failing to reserve for Interest Recapture as set forth in paragraphs 96-97 above and by failing to apply LOCOM methodology consistent with industry practice and the Company's own LOCOM policy before improperly eliminating the LOCOM adjustment entirely for repurchased loans in the 2006 second quarter as set forth in paragraph 98 above.  As set forth in paragraph 99

above, the Examiner quantified the material impact of these GAAP violations as follows:    Year-End 2005 ($21,320,000); Q1 2006 ($21,455,000); Q2 2006 ($60,515,000).    Consistent with the Examiner's Report, New Century's above-quoted descriptions of its Allowance for Repurchase Losses were materially misleading when made as they stated that the Company "occasionally" may repurchase loans after 90 days without disclosing the then-existing repurchase claims backlog.

283.    As set forth in paragraphs 101-08 above, throughout the Class Period and at the time of the Series B Preferred Stock offering, New Century's reported Residual Interests were materially overstated as these reported Residual Interests failed to account for the Company's progressively decreasing loan quality and underwriting practices, as well as New Century's increasing delinquencies, defaults and default loss severity throughout 2005 and 2006.    As set forth in paragraphs 106-08 above, the facts revealed by the Examiner's Report demonstrate that New Century's Residual Interests were overstated at the time of the above-reported year-end 2005 and 2006 first and second earnings and at all times throughout 2005-06 as "New Century insisted on using unduly low discount rates;" New Century "repeatedly resisted warnings from specialists at KPMG [starting at least for its quarterly review for the first quarter of 2005], who warned that the discount rates New Century was using were below those used by most of its peers;" "New Century relied for far too long on antiquated and flawed internally-developed Excel-based models to value residual interests;" and New Century failed "to adjust its prepayment rates to reflect changing market conditions . . . contrary to the advice it consistently received as far back as the first quarter of 2005 from KPMG's SFG, which repeatedly expressed concern about the Company's use of low prepayment speed assumptions."    The Examiner quantified the material impact of these GAAP violations at the time of the offering as follows:    Q2 2006 ($15,200,000).    Examiner's Report at 383.

284.  As set forth in paragraphs 194-96 above, the facts revealed by the Examiner's Report demonstrate that that New Century's internal controls suffered from significant deficiencies and material weaknesses at the time of the above-reported 2005 year-end and 2006 first and second quarter internal control certifications and statements and at all times throughout 2005-06 as the result of "deeply-rooted and long-standing failures to establish and monitor adequate internal controls over financial reporting;" including failures to "develop effective policies and procedures for performing accounting estimates requiring the exercise of considerable judgment;" and to "remediate internal control deficiencies that existed at year-end 2004."  Among the deficiencies that New Century failed to remedy from year-end 2004 were "key controls surrounding the repurchase reserve estimation process;" "the allowance for loan losses methodology and rationale;" and "controls related to the hedging and derivatives process."  "New Century also failed to establish sufficient internal controls with respect to its residual interest valuation process."  As demonstrated by the facts obtained by the Examiner (as well as the numerous other facts set forth in paragraphs 262-63 above), New Century also suffered throughout 2005 and 2006 from "significant deficiencies and material weaknesses in Management's internal control structure related to loan quality . . . ."

285.  Accordingly, the material financial misstatements and significant deficiencies and material weaknesses in internal controls relating to the repurchase claims backlog and Residual Interests eventually reported by the Company on February 7, 2007 and thereafter, were in existence at the time of the above statements, rendering them materially misstated when made and at the time of the Series B Preferred Stock offering.

286.  In addition, as set forth in paragraphs 204-35 above in detail, KPMG's 2005 audits of New Century's financial statements and internal controls were not performed in accordance with GAAS as represented by KPMG in the Company's

2005 Form 10-K, which was incorporated by reference into the Series B Preferred Stock offering, rendering the above-quoted statements made by KPMG materially misstated at the time of the Series B Preferred Stock offering.

287.   Given these then-existing facts, the generalized risk disclosures included in the Series B Preferred Stock Prospectus, including those regarding the Company's reserves, Residual Interests and financial condition, were not sufficient to insulate Defendants from liability for the material misstatements made at the time of the offering regarding the Company's purported compliance with GAAP; the effectiveness of its internal controls; and KPMG's purported compliance with GAAS, because those statements were materially misstated when made and at the time of the offering.

288.   As set forth below, when the adverse disclosures were made and the true facts were revealed after the offering was completed, the price of New Century Series B Preferred Stock declined by over 75%.

## VIII.        CLAIMS FOR RELIEF UNDER THE SECURITIES ACT

### COUNT ONE

**For Violations Of Section 11 Of The Securities Act, On Behalf Of Purchasers Of New Century Series A Preferred Stock, Against New Century Officer Defendants Cole, Morrice, Gotschall And Dodge; New Century Director Defendants:  Forster, Sachs, Black, Lange, Sandvik, Zona, Alexander And Popejoy; And Underwriter Defendants:  Bear Stearns, Deutsche Bank, Piper Jaffray, Stifel Nicolaus, JMP Securities, And Roth Capital**

289.   Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.  For the purposes of this claim, Plaintiffs assert only strict liability and negligence claims and expressly disclaim any claim of fraud or intentional misconduct.

290.   This claim is brought pursuant to Section 11 of the Securities Act against New Century Officer Defendants Cole, Morrice, Gotschall and Dodge; New Century Director Defendants:  Forster, Sachs, Black, Lange, Sandvik, Zona,

Alexander and Popejoy; and Underwriter Defendants:  Bear Stearns, Deutsche Bank, Piper Jaffray, Stifel Nicolaus, JMP Securities and Roth Capital.

291.  This claim is brought on behalf of Plaintiff Carl Larson and other members of the Class who purchased or otherwise acquired New Century Series A Preferred Stock issued pursuant and/or traceable to the Series A Preferred Stock Registration Statement and were damaged by acts alleged herein.

292.  New Century issued the Series A Preferred Stock pursuant to the Series A Preferred Stock Registration Statement.

293.  Defendants Cole, Morrice, Gotschall, Dodge, Forster, Sachs, Black, Lange, Sandvik, Zona and Popejoy each signed the Series A Preferred Stock Registration Statement.

294.  As set forth above, at the time the Series A Preferred Stock Registration Statement and the prospectus supplements were filed, Defendants Cole, Morrice, Gotschall, Forster, Sachs, Black, Lange, Zona, Alexander and Popejoy were each directors of New Century.

295.  Defendants Bear Stearns, Deutsche Bank, Piper Jaffray, Stifel Nicolaus, JMP Securities and Roth Capital acted as underwriters for the Series A Preferred Stock offering.

296.  The Series A Preferred Stock Registration Statement contained untrue statements of material fact, including the financial statements of New Century.  In addition, the Series A Preferred Stock Registration Statement omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading, including New Century's violations of GAAP.  The facts misstated and omitted would have been material to a reasonable person reviewing the Series A Preferred Stock Registration Statement.

297.  Defendants named in this Count owed to Plaintiff and the Class the duty to make a reasonable and diligent investigation of the statements contained in the Series A Preferred Stock Registration Statement, to ensure that the statements

contained or incorporated by reference therein were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.

298.  Defendants did not make a reasonable investigation of the statements contained and incorporated by reference in the Series A Preferred Stock Registration Statement and did not possess reasonable grounds for believing that the Series A Preferred Stock Registration Statement did not contain an untrue statement of material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

299.  The Underwriter Defendants did not conduct a reasonable investigation of the statements contained in and incorporated by reference in the Series A Preferred Stock Registration Statement and did not possess reasonable grounds for believing that the statements contained therein were true and not materially misstated.  In particular, the Underwriter Defendants did not conduct a reasonable investigation into the accuracy of the statements regarding the Company's reported financial performance and internal controls, including New Century's statements regarding underwriting controls and loan quality.  The Underwriter Defendants could not simply rely on the work of New Century's auditors because the investing public relies on the underwriters to obtain and verify relevant information and then make sure that important facts are accurately disclosed.  Thus, the Underwriter Defendants must conduct their own, independent and reasonable investigation into the accuracy of the Company's financial statements and assessments of internal controls which they were negligent in failing to do sufficiently in connection with the offering.

300.  Similarly, the Company director Defendants were negligent in failing to conduct a reasonable investigation of the statements contained in the Series A Registration Statement regarding the Company's financial performance and internal controls and did not possess reasonable grounds for believing that the

statements contained therein were true and not materially misstated. The Company's directors, through its Audit Committee, failed to conduct their own independent and reasonable investigation into the Company's financial reporting and internal controls until March 2007, well after the offering was completed.

301.   Among the other facts set forth above, according to the Examiner's Report (at 441), the Audit Committee members of New Century's Board of Directors questioned KPMG's decision to replace audit partner Kinsella with Donovan in early 2005 because Kinsella was viewed as a valued resource while Donovan was new to KPMG and concerns arose as to whether Donovan had a sufficient understanding to the issues facing the sub-prime industry. Although requested by the Audit Committee, KPMG refused to provide another audit partner and the Audit Committee considered, but did not, replace KPMG as outside auditor. The Audit Committee was also on notice of the facts set forth above demonstrating declining underwriting and loan quality at New Century prior to the offering.

302.   Plaintiff and members of the Class purchased New Century Series A Preferred Stock issued in, or traceable to, the Series A Preferred Stock Registration Statement and were damaged thereby.

303.   Plaintiff and the Class did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements of material fact or omissions of material facts in the Series A Preferred Stock Registration Statement when they purchased or acquired the shares.

304.   By reason of the foregoing, Defendants are liable to Plaintiff and members of the Class for violations of Section 11 of the Securities Act.

## COUNT TWO

**For Violations Of Section 15 Of The Securities Act, On Behalf Of Purchasers Of New Century Series A Preferred Stock, Against New Century Officer Defendants Cole, Morrice, Gotschall And Dodge For Control Person Liability Based On Section 11 And 12(a)(2) Violations By New Century**

305.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.  For the purposes of this claim, Plaintiffs assert only strict liability and negligence claims and expressly disclaim any claim of fraud or intentional misconduct.

306.    This claim is brought pursuant to Section 15 of the Securities Act against Defendants Cole, Morrice, Gotschall and Dodge, on behalf of Plaintiff Carl Larson, and other members of the Class who purchased or acquired New Century Series A Preferred Stock issued pursuant and/or traceable to the Series A Preferred Stock Registration Statement and were damaged by acts alleged herein.

307.    Although not named as a defendant herein because of its bankruptcy filing, New Century violated Section 11 of the Securities Act by issuing the Series A Preferred Stock Registration Statement which included untrue statements of material fact and omitted to state material facts required to be stated therein or necessary in order to make the statements therein not misleading and violated Section 12(a)(2) of the Securities Act by soliciting the purchase of New Century Series A Preferred Stock by the use of means or instruments of transportation or communication in interstate commerce or of the mails and by means of the Series A Preferred Stock Prospectus which included untrue statements of material fact and omitted to state material facts required to be stated therein or necessary in order to make the statements therein not misleading.  The facts misstated and omitted would have been material to a reasonable person reviewing the New Century Series A Preferred Stock Registration Statement and Prospectus.

308.    Defendants Cole, Morrice, Gotschall and Dodge were controlling persons of New Century when the Series A Preferred Stock Registration Statement was filed and became effective, due to their senior executive positions therewith;

their direct involvement in its day-to-day operations, including its financial reporting and accounting functions; and their signatures on and participation in the preparation and dissemination of the registration statement. Defendants Cole, Morrice, Gotschall and Dodge participated in road shows to solicit Class members' purchases of New Century Series A Preferred Stock by means of the Series A Preferred Stock Prospectus.

309. By virtue of the foregoing, Defendants Cole, Morrice, Gotschall and Dodge each had the power to influence and control, and did influence and control, directly or indirectly, the decision making of New Century, including the content of its financial statements and of the Series A Preferred Stock Registration Statement.

310. Defendants Cole, Morrice, Gotschall and Dodge acted negligently and without reasonable care regarding the accuracy of the information contained and incorporated by reference in the Series A Preferred Stock Registration Statement and lacked reasonable grounds to believe that such information was accurate and complete in all material respects.

311. Plaintiff and members of the Class purchased New Century Series A Preferred Stock issued in, or traceable to, the Series A Preferred Stock Registration Statement and were damaged thereby.

312. Plaintiff and the Class did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements of material fact or omissions of material facts in the Series A Preferred Stock Registration Statement when they purchased or acquired the shares.

313. By reason of the foregoing, Defendants Cole, Morrice, Gotschall and Dodge are liable to Plaintiff and members of the Class for violations of Section 15 of the Securities Act.

## COUNT THREE

**For Violations Of Section 11 Of The Securities Act, On Behalf Of Purchasers Of New Century Series B Preferred Stock, Against New Century Officer Defendants Cole, Morrice, Gotschall And Dodge; New Century Director Defendants Forster, Sachs, Black, Lange, Zona, Alexander And Einhorn; Defendant KPMG; And Underwriter Defendants: Bear Stearns, Morgan Stanley, Stifel Nicolaus, And Jefferies & Co.**

314.   Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.  For the purposes of this claim, Plaintiffs assert only strict liability and negligence claims and expressly disclaim any claim of fraud or intentional misconduct.

315.   This claim is brought pursuant to Section 11 of the Securities Act against New Century Officer Defendants Cole, Morrice, Gotschall and Dodge; New Century Director Defendants: Forster, Sachs, Black, Lange, Zona, Alexander and Einhorn; Defendant KPMG; and Underwriter Defendants:  Bear Stearns, Morgan Stanley, Stifel Nicolaus and Jefferies & Co.

316.   This claim is brought on behalf of Plaintiff Carl Larson and other members of the Class who purchased or otherwise acquired New Century Series B Preferred Stock issued pursuant and/or traceable to the Series B Preferred Stock Registration Statement and were damaged by acts alleged herein.

317.   New Century issued Series B Preferred Stock pursuant to the Series B Preferred Stock Registration Statement.

318.   Defendants Cole, Morrice, Gotschall, Dodge, Forster, Sachs, Black, Lange and Zona each signed the Series B Preferred Stock Registration Statement.

319.   At the time the Series B Preferred Stock Registration Statement and prospectus supplements were filed, Defendants Cole, Morrice, Gotschall, Forster, Sachs, Black, Lange Zona, Alexander and Einhorn were each directors of New Century.

320.   Defendant KPMG was the auditor of New Century throughout the Class Period and consented to being named in the Series B Preferred Stock Registration Statement as a party who certified the audited financial statements

contained or incorporated by reference therein. KPMG's audit report incorrectly stated that KPMG's 2005 audits were performed in accordance with GAAS and that the Company's financial statements were fairly presented in accordance with GAAP.

321. Defendants Bear Stearns, Morgan Stanley, Stifel Nicolaus and Jefferies & Co. acted as underwriters for the Series B Preferred Stock offering.

322. As set forth above, the Series B Preferred Stock Registration Statement contained untrue statements of material fact, including the financial statements of New Century. In addition, the Series B Preferred Stock Registration Statement omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading, including New Century's violations of GAAP. The facts misstated and omitted would have been material to a reasonable person reviewing the Series B Preferred Stock Registration Statement.

323. Defendants named in this Count owed to Plaintiff and the Class the duty to make a reasonable and diligent investigation of the statements contained in the Series B Preferred Stock Registration Statement, to ensure that the statements contained or incorporated by reference therein were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.

324. Defendants did not make a reasonable investigation of the statements contained and incorporated by reference in the Series B Preferred Stock Registration Statement, and did not possess reasonable grounds for believing that the Series B Preferred Stock Registration Statement did not contain an untrue statement of material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

325. The Underwriter Defendants did not conduct a reasonable investigation of the statements contained in and incorporated by reference in the Series B Preferred Stock Registration Statement and did not possess reasonable

grounds for believing that the statements contained therein were true and not materially misstated. In particular, the Underwriter Defendants did not conduct a reasonable investigation into the accuracy of the statements regarding the Company's reported financial performance, internal controls and underwriting standards and loan quality. The Underwriter Defendants could not simply rely on the work of New Century's auditors because the investing public relies on the underwriters to obtain and verify relevant information and then make sure that important facts are accurately disclosed. Thus, the Underwriter Defendants must conduct their own, independent and reasonable investigation into the accuracy of the Company's financial statements and assessments of internal controls and other statements which they were negligent in failing to do sufficiently in connection with the offering.

326. Similarly, the Company director Defendants were negligent in failing to conduct a reasonable investigation of the statements contained in the Series B Preferred Stock Registration Statement regarding the Company's financial performance, internal controls and underwriting standards and loan quality and did not possess reasonable grounds for believing that the statements contained therein were true and not materially misstated. The Company's directors, through its Audit Committee, failed to conduct their own independent and reasonable investigation into the Company's financial reporting and internal controls until March 2007, well after the offering was completed.

327. Among the other facts set forth above, one of the Company's directors and Audit Committee members, Defendant Zona, actually drafted a letter on or about December 6, 2005, approximately eight months before the Series B offering, in which he stated he was going to resign from the Board of New Century because of, inter alia, "earnings manipulation," "extremely aggressive income recognition," and questions regarding New Century's "accounting for loan losses." Examiner's Report at 91. Other New Century Board members persuaded Defendant Zona not

to resign (id.), but no independent investigation of the issues he raised occurred until well after the Series B offering was completed. Similarly, Defendant Einhorn charged New Century with "aggressive accounting" during an August 4, 2005 meeting with the New Century Board of Directors, approximately one year before the Series B offering. Examiner's Report at 94. According to the Examiner's Report (at 98) some members of New Century's Board of Directors, including Zona and Einhorn, also had expressed doubts about Dodge's capabilities and competence to be the Company's CFO. Finally, according to the Examiner's Report (at 441), the Audit Committee members of New Century's Board of Directors questioned KPMG's decision to replace audit partner Kinsella with Donovan in early 2005 because Kinsella was viewed as a valued resource while Donovan was new to KPMG and concerns arose as to whether Donovan had a sufficient understanding to the issues facing the sub-prime industry. Although requested by the Audit Committee, KPMG refused to provide another audit partner and the Audit Committee considered, but did not, replace KPMG as outside auditor. The Audit Committee was also on notice of the facts set forth above demonstrating declining underwriting and loan quality at New Century prior to the offering.

328. Defendant KPMG, who consented to the inclusion of its opinions in the August 2006 Series B Preferred Stock Offering Registration Statement, negligently failed to perform its 2005 audits of New Century in a reasonable manner; as set forth above did not comply with the standards of the PCAOB; and, thus, its audit did not constitute a reasonable investigation of whether the Company's financial statements were presented in compliance with GAAP and management's assessment of internal controls was properly and accurately presented.

329. Plaintiff and members of the Class purchased New Century Series B Preferred Stock issued in, or traceable to, the Series B Preferred Stock Registration Statement and were damaged thereby.

330. Plaintiff and the Class did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements of material fact or omissions of material facts in the Series B Preferred Stock Registration Statement when they purchased or acquired the shares.

331. By reason of the foregoing, Defendants are liable to Plaintiff and members of the Class for violations of Section 11 of the Securities Act.

## COUNT FOUR

**For Violations Of Section 15 Of The Securities Act, On Behalf Of Purchasers Of New Century Series B Preferred Stock, Against Defendants Cole, Morrice, Gotschall And Dodge For Control Person Liability Based On Section 11 And 12(a)(2) Violations By New Century**

332. Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein. For the purposes of this claim, Plaintiffs assert only strict liability and negligence claims and expressly disclaim any claim of fraud or intentional misconduct.

333. This claim is brought pursuant to Section 15 of the Securities Act against Defendants Cole, Morrice, Gotschall and Dodge, on behalf of Plaintiff Carl Larson and other members of the Class who purchased or acquired New Century Series B Preferred Stock issued pursuant and/or traceable to the Series B Preferred Stock Registration Statement and were damaged by acts alleged herein.

334. Although not named as a defendant herein because of its bankruptcy filing, New Century violated Section 11 of the Securities Act by issuing the Series B Preferred Stock Registration Statement which included untrue statements of material fact and omitted to state material facts required to be stated therein or necessary in order to make the statements therein not misleading and violated Section 12(a)(2) of the Securities Act by soliciting the purchase of New Century

Series B Preferred Stock by the use of means or instruments of transportation or communication in interstate commerce or of the mails and by means of the Series B Preferred Stock Prospectus which included untrue statements of material fact and omitted to state material facts required to be stated therein or necessary in order to make the statements therein not misleading. The facts misstated and omitted would have been material to a reasonable person reviewing the New Century Series B Preferred Stock Registration Statement and Prospectus.

335. Defendants Cole, Morrice, Gotschall and Dodge were controlling persons of New Century when the Series B Preferred Stock Registration Statement was filed and became effective, due to their senior executive positions therewith; their direct involvement in its day-to-day operations, including its financial reporting and accounting functions; and their signatures on and participation in the preparation and dissemination of the registration statement. Defendants Cole, Morrice, Gotschall and Dodge participated in road shows to solicit Class members' purchases of Series B Preferred Stock by means of the Series B Preferred Stock Prospectus.

336. By virtue of the foregoing, Defendants Cole, Morrice, Gotschall and Dodge each had the power to influence and control, and did influence and control, directly or indirectly, the decision making of New Century, including the content of its financial statements and of the Series B Preferred Stock Registration Statement.

337. Defendants Cole, Morrice, Gotschall and Dodge acted negligently and without reasonable care regarding the accuracy of the information contained and incorporated by reference in the Series B Preferred Stock Registration Statement and lacked reasonable grounds to believe that such information was accurate and complete in all material respects.

338. Plaintiff and members of the Class purchased New Century Series B Preferred Stock issued in, or traceable to, the Series B Preferred Stock Registration Statement and were damaged thereby.

339.   Plaintiff and the Class did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements of material fact or omissions of material facts in the Series B Preferred Stock Registration Statement when they purchased or acquired the shares.

340.   By reason of the foregoing, Defendants Cole, Morrice, Gotschall and Dodge are liable to Plaintiff and members of the Class for violations of Section 15 of the Securities Act.

**IX.    FACTUAL ALLEGATIONS PERTINENT TO CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT**

341.   Plaintiffs repeat and reallege each of the allegations set forth above (except for those alleging negligence) as if fully set forth herein.

342.   Plaintiffs, on behalf of themselves and the Class, bring claims set forth below against Defendants Cole, Morrice, Gotschall and Dodge for violations of the Exchange Act for materially false and misleading statements and omissions made throughout the Class Period during their tenures at the Company and against Defendant KPMG for violations of the Exchange Act for materially false and misleading statements and omissions made in connection with its 2005 audit opinions issued on or about March 16, 2006.  As alleged herein, these Defendants acted with scienter, acting intentionally or with a deliberate reckless disregard of the true facts, in making or participating in the making of these misstatements and omissions during the Class Period.

1  **X.  THE NEW CENTURY OFFICER DEFENDANTS AND
2      DEFENDANT KPMG MADE MATERIALLY FALSE AND
       MISLEADING STATEMENTS DURING THE CLASS PERIOD**[32]

3      **A.     2005 First Quarter Statements**

4      343.   On May 5, 2005, the first day of the Class Period, the New Century

5  Officer Defendants Cole, Morrice, Gotschall and Dodge issued a press release

6  reporting the Company's earnings results for the first quarter ended March 31,

7  2005.  The Company reported net earnings for the first quarter of $84.8 million, or

8  $1.48 per share.  The press release contained income statement and balance sheet

9  data purporting to reflect the Company's financial performance and assets and

10 liabilities for the three months ended March 31, 2005 in accordance with GAAP.

11 The press release reported New Century's Residual Interests as of March 31, 2005

12 at $143,928,000.  The press release further stated:

13         Delinquencies and losses in the company's mortgage loan portfolio

14         continue to significantly outperform securitizations executed prior to

15         2003 due primarily to higher credit quality, the strength of our

16         servicing platform and improved underwriting controls and appraisal

17         review process.  Delinquency rates and cumulative loss experience for

18         the portfolio are trending better than previously anticipated.

19         [Emphasis added.]

20 The press release also contained the following quoted statement from Defendant

21 Cole:  "Our first quarter 2005 results provide a solid foundation to deliver record

22 financial results for fiscal 2005 despite a competitive marketplace and a rising

23 interest rate environment."

24 ───────────────────

25 [32]  In this section of the Second Amended Complaint, Plaintiffs have underlined all allegedly
26 false and misleading statements and pleaded them in the context in which they were made,
   grouping them by quarter.  For each allegedly false and misleading statement, Plaintiffs then
27 explain, after the statements from the quarter are presented in the context in which they were
   made, why each statement was materially false and misleading when made by referring only to
28 facts set forth in the paragraphs above that were in existence at the time or prior to the challenged
   statements.  See also Exhibit E.

344.   On May 5, 2005, the New Century Officer Defendants also held a conference call with analysts and investors.  During the call, Defendants Cole and Dodge reviewed the Company's reported financial results for the quarter ended March 31, 2005.  During the conference call, Defendant Cole described New Century's purported areas of "primary emphasis" as:  "cost savings initiatives; continued maintenance of our strong credit quality, which is []proving out in portfolio performance; and our loan servicing practices, which are keeping balance loans with low delinquencies and low losses.  Those three areas – cost, credit, and servicing – are control business functions that we think are very core to the contributors of long-term profitability, portfolio performance and dividend growth.  And we can control those areas, and I think you'll see from first quarter into April [2005] how we are doing on those three matters."  (Emphasis added.)  Defendant Cole further stated:  "Earnings were higher [than] expected due to portfolio losses [that] continued to be lower than expected.  As we have been mentioning in prior calls, the delinquency and the loss performance in both our REIT and our taxable sub-portfolios just continues to be better than anticipated."  During the conference call, Defendant Dodge presented a slide (made available over the Internet) purporting to demonstrate lower 60+ day delinquency rates for New Century's 2003 and 2004 loans and stated:  "Note the dramatically lower delinquency rates for the 2003 and 2004 vintages, which are vintages that are on our balance sheet.  This performance reflects a number of factors, including the credit quality of the loans, the impact of servicing the loans on our own platform, and the economic and interest rate environment."  (Emphasis added.)  Similarly, Cole stated:  "The effort started many years ago to improve the credit quality and underwriting standards of the Company and increase the average FICO score is really []proving benefits here in the '03, '04 full performance.  The superior credit performance measured by delinquencies or losses is supported by the strong servicing platform of Rich Cimino and his team – is really []proving very, very solid results."  (Emphasis

added.)    When he was asked during a question-and-answer session of the conference call regarding credit performance during the quarter, Defendant Cole again stated:

> We thought it was quite good measured by the delinquency and the losses.  And that's a result of a strategy adopted a number of years ago to move much higher up the FICO scale.  So the loans originated '03 and '04 that are on our balance sheet, either in the REIT or in the taxable sub, just have characteristics that perform better.  [Emphasis added.]

345.   On or about May 10, 2005, the New Century Officer Defendants Cole, Morrice, Gotschall and Dodge filed the Company's Form 10-Q for the quarter ended March 31, 2005.  The first quarter 2005 Form 10-Q contained consolidated balance sheets and consolidated statements of earnings purporting to reflect the Company's financial performance and assets and liabilities for the three months ended March 31, 2005 in accordance with GAAP.  The Form 10-Q stated:

> The Company has prepared the accompanying unaudited condensed consolidated financial statements in accordance with accounting principles generally accepted in the United States of America for interim financial information and with the instructions to Form 10-Q and Rule 10-01 of Regulation S-X.  Accordingly, they do not include all of the information and footnotes required by generally accepted accounting principles for complete financial statements.  In the opinion of management, all adjustments (consisting of normal recurring accruals) considered necessary for a fair presentation have been included.  [Emphasis added.]

The first quarter 2005 Form 10-Q was signed by Defendants Cole, Morrice, Gotschall and Dodge.

346.   The first quarter 2005 Form 10-Q reported New Century's Residual Interests as of March 31, 2005 at <u>$143,928,000</u>.  The first quarter 2005 Form 10-Q purported to describe the Company's "Critical Accounting Policies" including New Century's methods for calculating "Residual Interests in Securitizations" and "Allowance for Repurchase Losses:"

> *Residual Interests in Securitizations*
>
> [T]he Residuals described above are a significant asset of the Company.  In determining the value of the Residuals, the Company estimates the future rate of prepayments, prepayment penalties that we will receive, delinquencies, defaults and default loss severity as they affect the amount and timing of estimated cash flows.  . . .  <u>The Company bases these estimates on historical loss data for the loans, the specific characteristics of the loans and the general economic environment</u>.  . . .  The Company performs an evaluation of the Residuals quarterly, <u>taking into consideration trends in actual cash flow performance, industry and economic developments, as well as other relevant factors</u>.
>
> *   *   *
>
> *Allowance for Repurchase Losses*
>
> <u>Generally, repurchases are required within 90 days from the date the loans are sold.  Occasionally, we may repurchase loans after 90 days have elapsed</u>.  [Emphasis added.]

347.   The first quarter 2005 Form 10-Q stated as follows regarding the Company's underwriting standards:

> We originate and purchase primarily first mortgage products nationwide.  We focus on lending to individuals whose borrowing needs are generally not fulfilled by traditional financial institutions because they do not satisfy the credit, documentation or other

underwriting standards prescribed by conventional mortgage lenders and loan buyers. We originate and purchase loans on the basis of the borrower's ability to repay the mortgage loan, the borrower's historical pattern of debt repayment and the amount of equity in the borrower's property, as measured by the borrower's loan-to-value ratio, or LTV. We have been originating and purchasing subprime loans since 1996 and <u>believe we have developed a comprehensive and sophisticated process of credit evaluation and risk-based pricing that allows us to effectively manage the potentially higher risks associated with this segment of the mortgage industry</u>.

* * *

We have experienced considerable growth of our interest-only product. During the three months ended March 31, 2005, originations of interest-only loans totaled $2.7 billion, or 26.7%, of total originations. Interest-only originations during the three months ended March 31, 2004 totaled $963 million, or 11.4%, of total originations during the period. <u>We believe our strict underwriting guidelines and the stronger credit characteristics of these loans mitigate their perceived higher risk</u>.

For the three months ended March 31, 2005, full documentation loans as a percentage of originations totaled $5.2 billion, or 50.7%, limited documentation loans totaled $569 million, or 5.6%, and stated documentation loans totaled $4.5 billion, or 43.7%. . . . <u>We designed our underwriting standards and quality assurance programs to ensure that loan quality is consistent and meets our guidelines, even as the documentation type mix varies</u>. [Emphasis added.]

348. The first quarter 2005 Form 10-Q provided the following information regarding New Century's internal controls and procedures:

As of March 31, 2005, the end of our first quarter, our management, including our Chief Executive Officer, Vice Chairman – Finance, Chief Financial Officer and President and Chief Operating Officer, has evaluated the effectiveness of our disclosure controls and procedures, as such term is defined in Rule 13a-15(e) promulgated under the Securities Exchange Act of 1934, as amended.  Based on that evaluation, our Chief Executive Officer, Vice Chairman – Finance, Chief Financial Officer and President and Chief Operating Officer concluded, as of March 31, 2005, that our disclosure controls and procedures were effective to ensure that information required to be disclosed by us in reports that we file or submit under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission rules and forms.  There was no change in our internal control over financial reporting during the quarter ended March 31, 2005 that materially affected, or is reasonably likely to materially affect, our internal control over financial reporting. [Emphasis added.]

349.  Accompanying the first quarter 2005 Form 10-Q as exhibits were certifications signed by Defendants Cole, Morrice, Gotschall and Dodge which stated:

1.      I have reviewed this quarterly report on Form 10-Q of New Century Financial Corporation;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    <u>Based on my knowledge, the financial statements, and other</u> <u>financial information included in this report, fairly present in all</u> <u>material respects the financial condition, results of operations and</u> <u>cash flows of the registrant as of, and for, the periods presented in this</u> <u>report</u>;

4.    The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15(d)-15(f)) for the registrant and have:

a)    <u>Designed such disclosure controls and procedures, or caused</u> <u>such disclosure controls and procedures to be designed under our</u> <u>supervision, to ensure that material information relating to the</u> <u>registrant, including its consolidated subsidiaries, is made known to us</u> <u>by others within those entities, particularly during the period in which</u> <u>this quarterly report is being prepared</u>;

b)    <u>Designed such internal control over financial reporting, or</u> <u>caused such internal control over financial reporting to be designed</u> <u>under our supervision, to provide reasonable assurance regarding the</u> <u>reliability of financial reporting and the preparation of financial</u> <u>statements for external purposes in accordance with generally</u> <u>accepted accounting principles</u>;

c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a)    <u>All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information</u>; and

b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

\* \* \*

In connection with the Quarterly Report of New Century Financial Corporation (the "Company") on Form 10-Q for the period ended March 31, 2005 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I . . . certify, pursuant to 18 U.S.C. § 1350, as adopted pursuant to § 906 of the Sarbanes-Oxley Act of 2002, that, to my knowledge:

(1)    The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)    <u>The information contained in the Report fairly presents,</u>
<u>in all material respects, the financial condition and results of</u>
<u>operations of the Company.</u>  [Emphasis added.]

350.    The above-referenced statements from the New Century Officer
Defendants' press release, conference call and Form 10-Q for the first quarter
ended March 31, 2005 were materially misstated and omitted to state material facts
required therein or necessary to make the statements contained therein not
misleading, at all times throughout the Class Period.   Contrary to the above-
referenced statements, New Century's financial statements for the first quarter
ended March 31, 2005 were not presented in accordance with GAAP, the
Company's internal controls suffered from significant deficiencies and material
weaknesses and New Century did not improve its underwriting controls or loan
quality.

351.    As set forth in paragraphs 137-39, 141, 144, 146, 148, 150, 153-55,
158, 161 above, numerous former New Century employees with first-hand
knowledge report that contrary to the New Century Officer Defendants' statements
on May 5, 2005 regarding purported "<u>higher credit quality,</u>" and "<u>improved</u>
<u>underwriting controls;</u>" Defendant Cole's statements on May 5, 2005 regarding
purported "<u>continued maintenance of [] strong credit quality,</u>" and loan
"<u>characteristics that perform better;</u>" Defendant Dodge's statements on May 5,
2005 regarding the purported "<u>credit quality of the loans;</u>" and the New Century
Officer Defendants' statements in the 2005 first quarter 10-Q regarding a purported
"<u>comprehensive and sophisticated process of credit evaluation,</u>" "<u>strict</u>
<u>underwriting guidelines</u>" and "<u>underwriting standards and quality assurance</u>
<u>programs to ensure that loan quality is consistent;</u>" and undisclosed to investors,
New Century's underwriting practices were actually loosened substantially by the
time of these May 5 and 10, 2005 statements so that the Company could continue
to reach record mortgage origination volume notwithstanding intense industry

competition, rising interest rates, and a softening of the real estate market. Further, the 2005 data set forth in paragraphs 126-35 above establish that New Century's underwriting was loosened precipitously before and during the Class Period, such that its loans became delinquent and were repurchased at substantially higher rates as compared to the loans it made in 2003-04, and with such speed that generic market forces could not be to blame. The data further demonstrate that given its loosened underwriting, New Century was far more likely to issue a sub-prime borrower a mortgage loan than were its peers. According to CWs 3, 5, 6, 8, 11, 13, 15, 17, 20, 21, 22, 25 and 28, starting as early as 2003, and progressively from 2004-05, New Century began originating riskier and riskier mortgage loans because of increased loan to values, including 80/20 100% financing loans requiring no down payment, and began increasing the amount of stated income loans, which, starting in 2004-05, were being offered to W-2 wage earners who should have been able to verify their stated income, but were not required to. According to CWs 13, 17, 20, 25 and 28, the Company's underwriting was loosened and the Company was issuing "riskier and riskier" mortgage loans beginning as early as 2003, with "heavy pressure" to close loans and operations managers signing off on the approval of riskier loans. Quarterly loan performance data set forth in paragraph 111 further demonstrates a trend of increasing delinquencies from the first quarter of 2004 through the first quarter of 2005. The fact that delinquencies continued to increase thereafter at a dramatic rate further demonstrates that contrary to the New Century Officer Defendants' May 5 and 10, 2005 statements, New Century's underwriting was not "<u>strict</u>" or "<u>improved</u>" and did not result in "<u>higher credit quality</u>" loans, but was substantially loosened to produce growing origination volume.

352. In addition, as set forth in paragraphs 173-78, 183, 187, 189, 196 above, by the time of these statements, the Examiner's Report details facts demonstrating "serious loan quality issues at [New Century] beginning as early as

2004;" numerous "red flags" relating to loan quality; and the failure of New Century's Senior Management and Board of Directors to devote sufficient attention to improving loan quality until the final quarter of 2006, when it "was too late to prevent the consequences of longstanding loan quality problems in an adversely changing market." "Rather, New Century continued to focus on generating greater quantities of ever riskier loans, devoting little effort to such basic issues as making sure that the Company's loan origination and underwriting policies and procedures were followed to avoid kickouts of loans offered for sale." Contrary to the above statements, New Century "devoted its resources to generating high volumes of loans, with relatively little attention to loan quality" and did not even have any "formal exceptions policy." The Examiner found these ever-increasing risks to be "a veritable ticking time bomb." As a result of these findings, the Examiner concluded that the public statements made by New Century regarding the purported credit characteristics of its loans and strict and consistent underwriting guidelines were "not supportable" and without "justifiable basis" when made.

353.   As set forth in paragraph 75 above, according to CW 1, New Century had intentionally delayed payment of valid repurchase claims, causing a massive backlog of repurchase claims, 80% of which, or hundreds of millions of dollars worth, were 18 to 24 months old as of September 2006 – meaning that the backlog went back to the 2005 first quarter. According to CW 1, these repurchase claims already were determined to be valid and should have been paid 18 to 24 months earlier, but the Company delayed payment of them in an effort to cause its previously reported financial results to appear better than they actually were. According to CW 1, by the end of the 2004 fourth quarter, New Century already had a large backlog of valid, unfunded repurchase claims. Accordingly, hundreds of millions of dollars worth of these valid repurchase claims should have been funded prior to the start of the Class Period in May 2005, but were not. As set forth in paragraph 77 above, according to CW 3, New Century was "sitting on

repurchase requests" hoping to ride out the market and the Company failed to have good internal reporting of repurchase information prior to 2006. In addition, according to the internal New Century document quoted in paragraph 79 above, 61% of the Company's outstanding repurchase claims, or $167 million worth, had been received by July 31, 2005. The failure to properly account for these outstanding repurchase claims caused material errors in the Company's 2005 first quarter reported financial results and resulted from material weaknesses in the Company's internal controls at the time the claims were received and processed, but not funded, which included the time of the above statements. Accordingly, the material financial misstatements and material weaknesses in internal controls relating to the repurchase claims backlog eventually reported by the Company on February 7, 2007 and, thereafter, were in existence at the time of the above statements, rendering them materially false and misleading when made.

354. As set forth in paragraphs 91-93, 96-97 above, the facts revealed by the Examiner's Report further demonstrate that "beginning no later than 2004, New Century was receiving repurchase requests related to loans sold outside of the previous 90-day period and it was taking much longer than 90 days to evaluate and process repurchase requests and repurchase loans." In violation of GAAP, "New Century was not reserving, however, for these loans that it might be required to repurchase, and on which it might incur losses and expenses, but for which no reserve was provided." By January 26, 2005, the Examiner found "clear indication that New Century Accounting Department personnel knew that many loans that were ultimately repurchased in 2004 were Backlog Claims. . . . Notwithstanding this information, New Century did nothing to adjust its methodology for estimating the quantity of loans that might need to be repurchased as of the end of a financial reporting period." In addition, at the time of the above-reported 2005 first quarter earnings and at all times throughout 2005, New Century "perplexingly" further violated GAAP by failing to reserve for Interest Recapture as set forth in

paragraphs 96-97 above. Consistent with the Examiner's Report, New Century's above-quoted description of its Allowance for Repurchase Losses was materially misleading when made as it stated that the Company "occasionally" may repurchase loans after 90 days without disclosing the then-existing repurchase claims backlog.

355. As set forth in paragraphs 106-08 above, the facts revealed by the Examiner's Report demonstrate that New Century's Residual Interests were overstated at the time of the above-reported 2005 first quarter earnings and at all times throughout 2005-06 as "New Century insisted on using unduly low discount rates;" New Century "repeatedly resisted warnings from specialists at KPMG [starting at least for its quarterly review for the first quarter of 2005], who warned that the discount rates New Century was using were below those used by most of its peers;" "New Century relied for far too long on antiquated and flawed internally-developed Excel-based models to value residual interests;" and New Century failed "to adjust its prepayment rates to reflect changing market conditions . . . contrary to the advice it consistently received as far back as the first quarter of 2005 from KPMG's SFG, which repeatedly expressed concern about the Company's use of low prepayment speed assumptions."

356. As set forth in paragraphs 194-96 above, the facts revealed by the Examiner's Report demonstrate that that New Century's internal controls suffered from significant deficiencies and material weaknesses at the time of the above-reported 2005 first quarter internal control certifications and statements and at all times throughout 2005-06 as the result of "deeply-rooted and long-standing failures to establish and monitor adequate internal controls over financial reporting;" including failures to "develop effective policies and procedures for performing accounting estimates requiring the exercise of considerable judgment;" and to "remediate internal control deficiencies that existed at year-end 2004." Among the deficiencies that New Century failed to remedy from year-end 2004

were "key controls surrounding the repurchase reserve estimation process;" "the allowance for loan losses methodology and rationale;" and "controls related to the hedging and derivatives process." "New Century also failed to establish sufficient internal controls with respect to its residual interest valuation process." As demonstrated by the facts obtained by the Examiner (as well as the numerous other facts set forth in paragraphs 351-52 above), New Century also suffered throughout 2005 (and 2006) from "significant deficiencies and material weaknesses in Management's internal control structure related to loan quality . . . ."

## B.   2005 Second Quarter Statements

357.   On August 4, 2005, the New Century Officer Defendants Cole, Morrice, Gotschall and Dodge issued a press release reporting the Company's earnings results for the second quarter ended June 30, 2005.  The Company reported net earnings for the second quarter of $95.1 million, or $1.65 per share. The press release contained income statement and balance sheet data purporting to reflect the Company's financial performance and assets and liabilities for the three months and six months ended June 30, 2005 in accordance with GAAP.  The press release reported New Century's Residual Interests as of June 30, 2005 at $145,563,000.  The press release also contained the following quoted statement from Defendant Cole:  "In today's challenging environment, we are very pleased to report a strong second quarter 2005 delivering EPS of $1.65, an 11.5 percent increase compared with $1.48 for the first quarter of this year."

358.   On August 4, 2005, the New Century Officer Defendants also held a conference call with analysts and investors.  During the call, Defendants Cole and Dodge reviewed the Company's reported financial results for the quarter ended June 30, 2005.  During the conference call, Defendant Cole stated:  "We're very proud of the strict underwriting guidelines, the risk management discipline that we have."  (Emphasis added.)  Defendant Cole further stated:

So what are we focusing on?  Well, first and foremost, we're a Real Estate Investment Trust, we'll continue to grow the loan portfolio as Patti described in her comments, and <u>we'll continue to maintain strict underwriting and risk management disciplines</u>.  I think you can see from the portfolio that we've created at the REIT, plus the performance of the taxable REIT subsidiary, which goes back more than a year and a half to two years, that <u>there is a very high quality source of loans that go into the REIT portfolio</u>.  We've maintained that we've tried to be equal in what we sell in the cash market and what we put in the portfolio, and I think from loss assumptions delivered to date, or actual losses, we're delivering on that commitment.  [Emphasis added.]

359.  On or about August 9, 2005, the New Century Officer Defendants Cole, Morrice, Gotschall and Dodge filed the Company's Form 10-Q for the quarter ended June 30, 2005.  The second quarter 2005 Form 10-Q contained consolidated balance sheets and consolidated statements of earnings purporting to reflect the Company's financial performance and assets and liabilities for the three months ended June 30, 2005 in accordance with GAAP.  The Form 10-Q stated:

<u>The Company has prepared the accompanying unaudited condensed consolidated financial statements in accordance with accounting principles generally accepted in the United States of America for interim financial information and with the instructions to Form 10-Q and Rule 10-01 of Regulation S-X</u>.  Accordingly, they do not include all of the information and footnotes required by generally accepted accounting principles for complete financial statements.  <u>In the opinion of management, all adjustments (consisting of normal recurring accruals) considered necessary for a fair presentation have been included</u>.  [Emphasis added.]

The second quarter 2005 Form 10-Q was signed by Defendants Cole, Morrice, Gotschall and Dodge.

360.   The second quarter 2005 Form 10-Q reported New Century's Residual Interests as of June 30, 2005 at $145,563,000.  The second quarter 2005 Form 10-Q purported to describe the Company's "Critical Accounting Policies" including New Century's methods for calculating "Residual Interests in Securitizations" and "Allowance for Repurchase Losses:"

> *Residual Interests in Securitizations*
>
> [T]he Residuals described above are a significant asset of the Company.  In determining the value of the Residuals, the Company estimates the future rate of prepayments, prepayment penalties that we will receive, delinquencies, defaults and default loss severity as they affect the amount and timing of estimated cash flows.  . . .  The Company bases these estimates on historical loss data for the loans, the specific characteristics of the loans and the general economic environment.  . . .  The Company performs an evaluation of the Residuals quarterly, taking into consideration trends in actual cash flow performance, industry and economic developments, as well as other relevant factors.
>
> *  *  *
>
> *Allowance for Repurchase Losses*
>
> Generally, repurchases are required within 90 days from the date the loans are sold.  Occasionally, we may repurchase loans after 90 days have elapsed.  [Emphasis added.]

361.   The second quarter 2005 Form 10-Q stated as follows regarding the Company's underwriting standards:

> We originate and purchase primarily first mortgage products nationwide.  We focus on lending to individuals whose borrowing

needs are generally not fulfilled by traditional financial institutions because they do not satisfy the credit, documentation or other underwriting standards prescribed by conventional mortgage lenders and loan buyers.  We originate and purchase loans on the basis of the borrower's ability to repay the mortgage loan, the borrower's historical pattern of debt repayment and the amount of equity in the borrower's property, as measured by the borrower's loan-to-value ratio, or LTV.  We believe we have developed a comprehensive and sophisticated process of credit evaluation and risk-based pricing that allows us to effectively manage the potentially higher risks associated with this segment of the mortgage industry.

* * *

We have experienced considerable growth of our interest-only product.  During the six months ended June 30, 2005, originations of interest-only loans totaled $7.8 billion, or 33.0%, of total originations.  Interest-only originations during the six months ended June 30, 2004 totaled $3.5 billion, or 16.9%, of total originations during the period.  We believe our stricter underwriting guidelines and the stronger credit characteristics of these loans mitigate their perceived higher risk.

* * *

For the six months ended June 30, 2005, full documentation loans as a percentage of originations totaled $12.3 billion, or 52.1%, limited documentation loans totaled $923.0 million, or 3.9%, and stated documentation loans totaled $10.4 billion, or 44.0%.  . . .  We designed our underwriting standards and quality assurance programs to ensure that loan quality is consistent and meets our guidelines, even as the documentation type mix varies.  [Emphasis added.]

362.   The second quarter 2005 Form 10-Q provided the following information regarding New Century's internal controls and procedures:

As of June 30, 2005, the end of our second quarter, our management, including our Chief Executive Officer, Vice Chairman – Finance, Chief Financial Officer and President and Chief Operating Officer, has evaluated the effectiveness of our disclosure controls and procedures, as such term is defined in Rule 13a-15(e) promulgated under the Securities Exchange Act of 1934, as amended.   Based on that evaluation, our Chief Executive Officer, Vice Chairman – Finance, Chief Financial Officer and President and Chief Operating Officer concluded, as of June 30, 2005, that our disclosure controls and procedures were effective to ensure that information required to be disclosed by us in reports that we file or submit under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission rules and forms.   There was no change in our internal control over financial reporting during the quarter ended June 30, 2005 that materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.   [Emphasis added.]

363.   Accompanying the second quarter 2005 Form 10-Q as exhibits were certifications signed by Defendants Cole, Morrice, Gotschall and Dodge in the form set forth in paragraph 349 above.

364.   On September 6-7, 2005, New Century Officer Defendants Gotschall and Dodge participated in Investor Roundtables with analysts and investors. During the meetings, Defendants Gotschall and Dodge reviewed the Company's reported financial results and business strategy.   During the meetings, Defendant Gotschall discussed New Century's Residual Interests and stated:   "And while we

know that investors are concerned about residual assets, we do book them conservatively. We've been through that before." (Emphasis added.) Gotschall further stated: "We use very conservative assumptions as we've been going through in valuing that residual asset. . . . [T]he residual asset that's created is relatively small and we book that with very conservative assumptions." (Emphasis added.) During the meetings, Gotschall also reviewed the Company's underwriting standards. He stated that back in 1998-99 credit standards had "really eroded [a]nd I don't think that's happened this time in our business. In fact, we use an automated underwriting system so that we can make sure that that doesn't happen." (Emphasis added.) Gotschall further stated:

> You take into account that I really believe the losses that we saw back in '98 and '99 were the result of credit decisions. I don't think we have seen the lightening and loosening of credit this time. We use an automated underwriting system. So we cannot do that. And I think what happened the last time around everybody had loosened their guidelines, and we just made a lot of bad loans, and that is why the performance suffered. I think there is a much better borrower this time. [Emphasis added.]

During the meetings, Gotschall also stated that it was a "myth" that New Century focused "on volume and not profits." Gotschall added:

> Please don't imply by anything that we say that the housing bubble doesn't concern us; the rising interest rates don't concern us; that the industry competition and the players in the market don't concern us. But we have been through cycles before and we actually, especially from the finance perspective, we get excited about this because this is the time that we get to put better discipline into our business from what exists during the really good times. [Emphasis added.]

365.  The above-referenced statements from the New Century Officer Defendants' press release, conference call and Form 10-Q for the second quarter ended June 30, 2005 and September 6-7, 2005 Investor Roundtables were materially misstated and omitted to state material facts required therein or necessary to make the statements contained therein not misleading, at all times throughout the Class Period.  Contrary to the above-referenced statements, New Century's financial statements for the second quarter ended June 30, 2005 were not presented in accordance with GAAP, the Company's internal controls suffered from significant deficiencies and material weaknesses and New Century did not maintain "strict underwriting and risk management disciplines," a "comprehensive and sophisticated process of credit evaluation," "strict underwriting guidelines" or "underwriting standards and quality assurance programs to ensure that loan quality is consistent:" originate "very high quality source of loans," mitigate current real estate market conditions by putting "better discipline into [its] business," or book its Residual Interests "conservatively" with "very conservative" assumptions.

366.  As set forth in paragraphs 137-39, 141, 144, 146, 148, 150, 153-55, 158, 161 above, numerous former New Century employees with first-hand knowledge report that contrary to Defendant Cole's statements on August 4, 2005 regarding purportedly maintaining "strict underwriting and risk management disciplines" and originating "very high quality source of loans," the New Century Officer Defendants' statements in the 2005 second quarter 10-Q regarding a purported "comprehensive and sophisticated process of credit evaluation," "strict underwriting guidelines" and "underwriting standards and quality assurance programs to ensure that loan quality is consistent:" and Defendant Gotschall's statements on September 6-7, 2005 regarding purportedly mitigating current real estate market conditions by putting "better discipline into [its] business" and undisclosed to investors, New Century's underwriting practices were actually loosened substantially by the time of these statements so that the Company could

continue to reach record mortgage origination volume notwithstanding intense industry competition, rising interest rates, and a softening of the real estate market. Further, the 2005 data set forth in paragraphs 126-35 above establish that New Century's underwriting practices loosened precipitously before and during the Class Period, such that its loans became delinquent and were repurchased at substantially higher rates as compared to the loans it made in 2003-04, and with such speed that generic market forces could not be to blame. The data further demonstrate that given its loosened underwriting, New Century was far more likely to issue a sub-prime borrower a mortgage loan than were its peers. According to CWs 3, 5, 6, 8, 11, 13, 15, 17, 20, 21, 22, 25 and 28, as early as 2003, and progressively from 2004-05, New Century began originating riskier and riskier mortgage loans because of increased loan to values, including 80/20 100% financing loans requiring no down payment, and began increasing the amount of stated income loans, which, starting in 2004-05, were being offered to W-2 wage earners who should have been able to verify their stated income, but were not required to. According to CWs 13, 17, 20, 25 and 28, the Company's underwriting was loosened and the Company was issuing "riskier and riskier" mortgage loans beginning as early as 2003, with "heavy pressure" to close loans and operations managers signing off on the approval of riskier loans. Quarterly loan performance data set forth in paragraph 111 further demonstrates a trend of increasing delinquencies from the first quarter of 2004 through the second quarter of 2005. The fact that delinquencies continued to increase thereafter at a dramatic rate further demonstrates that contrary to the New Century Officer Defendants' August 4 and 9, 2005 and September 6-7, 2005 statements, New Century's underwriting was not "strict" and did not result in "very high quality" loans, but was substantially loosened to produce growing origination volume.

367.  In addition, as set forth in paragraphs 173-78, 183, 187, 189, 196 above, by the time of these statements, the Examiner's Report details facts