demonstrating "serious loan quality issues at [New Century] beginning as early as 2004;" numerous "red flags" relating to loan quality; and the failure of New Century's Senior Management and Board of Directors to devote sufficient attention to improving loan quality until the final quarter of 2006, when it "was too late to prevent the consequences of longstanding loan quality problems in an adversely changing market." "Rather, New Century continued to focus on generating greater quantities of ever riskier loans, devoting little effort to such basic issues as making sure that the Company's loan origination and underwriting policies and procedures were followed to avoid kickouts of loans offered for sale." Contrary to the above statements, New Century "devoted its resources to generating high volumes of loans, with relatively little attention to loan quality" and did not even have any "formal exceptions policy." The Examiner found these ever-increasing risks to be "a veritable ticking time bomb." As a result of these findings, the Examiner concluded that the public statements made by New Century regarding the purported credit characteristics of its loans and strict and consistent underwriting guidelines were "not supportable" and without "justifiable basis" when made.

368. As set forth in paragraph 75 above, according to CW 1, New Century had intentionally delayed payment of valid repurchase claims, causing a massive backlog of repurchase claims, 80% of which, or hundreds of millions of dollars worth, were 18 to 24 months old as of September 2006 – meaning that the backlog went back to the 2005 first quarter. According to CW 1, these repurchase claims already were determined to be valid and should have been paid 18 to 24 months earlier, but the Company delayed payment of them in an effort to cause its previously reported financial results to appear better than they actually were. According to CW 1, by the end of the 2004 fourth quarter, New Century already had a large backlog of valid, unfunded repurchase claims. Accordingly, hundreds of millions of dollars worth of these valid repurchase claims should have been funded prior to the start of the Class Period in May 2005, but were not. As set

forth in paragraph 77 above, according to CW 3, New Century was "sitting on repurchase requests" hoping to ride out the market and the Company failed to have good internal reporting of repurchase information prior to 2006. In addition, according to the internal New Century document quoted in paragraph 79 above, 61% of the Company's outstanding repurchase claims, or $167 million worth, had been received by July 31, 2005. The failure to properly account for these outstanding repurchase claims caused material errors in the Company's 2005 second quarter reported financial results and resulted from material weaknesses in the Company's internal controls at the time the claims were received and processed, but not funded, which included the time of the above statements. Accordingly, the material financial misstatements and material weaknesses in internal controls relating to the repurchase claims backlog eventually reported by the Company on February 7, 2007 and, thereafter, were in existence at the time of the above statements, rendering them materially false and misleading when made.

369. As set forth in paragraphs 91-93, 96-97 above, the facts revealed by the Examiner's Report further demonstrate that "beginning no later than 2004, New Century was receiving repurchase requests related to loans sold outside of the previous 90-day period and it was taking much longer than 90 days to evaluate and process repurchase requests and repurchase loans." In violation of GAAP, "New Century was not reserving, however, for these loans that it might be required to repurchase, and on which it might incur losses and expenses, but for which no reserve was provided." By January 26, 2005, the Examiner found "clear indication that New Century Accounting Department personnel knew that many loans that were ultimately repurchased in 2004 were Backlog Claims. . . . Notwithstanding this information, New Century did nothing to adjust its methodology for estimating the quantity of loans that might need to be repurchased as of the end of a financial reporting period." In addition, at the time of the above-reported 2005 second quarter earnings and at all times throughout 2005, New Century "perplexingly"

further violated GAAP by failing to reserve for Interest Recapture as set forth in paragraphs 96-97 above. Consistent with the Examiner's Report, New Century's above-quoted description of its Allowance for Repurchase Losses was materially misleading when made as it stated that the Company "occasionally" may repurchase loans after 90 days without disclosing the then-existing repurchase claims backlog.

370. As set forth in paragraphs 106-08 above, the facts revealed by the Examiner's Report demonstrate that New Century's Residual Interests were overstated at the time of the above-reported 2005 second quarter earnings and at all times throughout 2005-06 as "New Century insisted on using unduly low discount rates;" New Century "repeatedly resisted warnings from specialists at KPMG [starting at least for its quarterly review for the first quarter of 2005], who warned that the discount rates New Century was using were below those used by most of its peers;" "New Century relied for far too long on antiquated and flawed internally-developed Excel-based models to value residual interests;" and New Century failed "to adjust its prepayment rates to reflect changing market conditions . . . contrary to the advice it consistently received as far back as the first quarter of 2005 from KPMG's SFG, which repeatedly expressed concern about the Company's use of low prepayment speed assumptions."

371. As set forth in paragraphs 194-96 above, the facts revealed by the Examiner's Report demonstrate that that New Century's internal controls suffered from significant deficiencies and material weaknesses at the time of the above-reported 2005 second quarter internal control certifications and statements and at all times throughout 2005-06 as the result of "deeply-rooted and long-standing failures to establish and monitor adequate internal controls over financial reporting;" including failures to "develop effective policies and procedures for performing accounting estimates requiring the exercise of considerable judgment;" and to "remediate internal control deficiencies that existed at year-end 2004."

Among the deficiencies that New Century failed to remedy from year-end 2004 were "key controls surrounding the repurchase reserve estimation process;" "the allowance for loan losses methodology and rationale;" and "controls related to the hedging and derivatives process." "New Century also failed to establish sufficient internal controls with respect to its residual interest valuation process." As demonstrated by the facts obtained by the Examiner (as well as the numerous other facts set forth in paragraphs 366-67 above), New Century also suffered throughout 2005 (and 2006) from "significant deficiencies and material weaknesses in Management's internal control structure related to loan quality . . . ."

### C.    2005 Third Quarter Statements

372.    On November 3, 2005, the New Century Officer Defendants Cole, Morrice, Gotschall and Dodge issued a press release reporting the Company's earnings results for the third quarter ended September 30, 2005. The Company reported net earnings for the third quarter of $120.1 million, or $2.04 per share. The press release contained income statement and balance sheet data purporting to reflect the Company's financial performance and assets and liabilities for the three months and nine months ended September 30, 2005 in accordance with GAAP. The press release reported New Century's Residual Interests as of September 30, 2005 at $172,111,000.

373.    On November 3, 2005, the New Century Officer Defendants also held a conference call with analysts and investors. During the call, Defendants Cole and Morrice reviewed the Company's reported financial results for the quarter ended September 30, 2005. During the conference call, Defendant Morrice presented the following slide (made available over the Internet) regarding the claimed "strong loan performance" of New Century's loan portfolio:



Morrice described the slide as follows:

> [T]his slide illustrates a different approach to illustrating the strong loan performance of our portfolio than we have shown you before, so let me try to explain this graphic. The top line represents our modeled losses. This model is based on the entire history of New Century's loan loss experience, <u>including to a very large extent the performance of loans originated years ago with much lower FICO scores, and other less favorable credit characteristics compared to recent production</u>. The bottom lines, which are somewhat hard to see in several cases because they are so small, represent actual loss experienced to date on our 2003, 2004 and 2005 vintage loans. [Emphasis added.]

During the question-and-answer portion of the conference call, Defendant Morrice stated: "<u>[W]e have not seen any meaningful spike in first payment defaults, certainly something we track carefully, but at this point that has not been our experience</u>." (Emphasis added.) Defendant Dodge immediately followed by agreeing with Morrice's statement, noting that first payment defaults were "<u>very modest over the last 12 months</u>." (Emphasis added.)

374.   On or about November 9, 2005, the New Century Officer Defendants Cole, Morrice, Gotschall and Dodge filed the Company's Form 10-Q for the quarter ended September 30, 2005.  The third quarter 2005 Form 10-Q contained consolidated balance sheets and consolidated statements of earnings purporting to reflect the Company's financial performance and assets and liabilities for the three months ended September 30, 2005 in accordance with GAAP.  The Form 10-Q stated:

> The Company has prepared the accompanying unaudited condensed consolidated financial statements in accordance with accounting principles generally accepted in the United States of America for interim financial information and with the instructions to Form 10-Q and Rule 10-01 of Regulation S-X.  Accordingly, they do not include all of the information and footnotes required by generally accepted accounting principles for complete financial statements.  In the opinion of management, all adjustments (consisting of normal recurring accruals) considered necessary for a fair presentation have been included.  [Emphasis added.]

The third quarter 2005 Form 10-Q was signed by Defendants Cole, Morrice, Gotschall and Dodge.

375.   The third quarter 2005 Form 10-Q reported New Century's Residual Interests as of September 30, 2005 at $172,111,000 and New Century's Allowance for Loan Repurchase Losses as of September 30, 2005 at $5.9 million.  The third quarter 2005 Form 10-Q purported to describe the Company's "Critical Accounting Policies" including New Century's methods for calculating "Residual Interests in Securitizations" and "Allowance for Repurchase Losses:"

*Residual Interests in Securitizations*

[T]he Residuals described above are a significant asset of the Company.  In determining the value of the Residuals, the Company

estimates the future rate of prepayments, prepayment penalties that we will receive, delinquencies, defaults and default loss severity as they affect the amount and timing of estimated cash flows. . . . <u>The Company bases these estimates on historical loss data for the loans, the specific characteristics of the loans and the general economic environment</u>. . . . The Company performs an evaluation of the Residuals quarterly, <u>taking into consideration trends in actual cash flow performance, industry and economic developments, as well as other relevant factors</u>.

* * *

*Allowance for Repurchase Losses*

<u>Generally, repurchases are required within 90 days from the date the loans are sold. Occasionally, we may repurchase loans after 90 days have elapsed</u>. . . . <u>As of September 30, 2005 and December 31, 2004, the repurchase allowance totaled $5.9 million and $6.3 million, respectively, and approximately $10.0 billion and $8.3 billion of loans, respectively, were subject to repurchase, generally representing loans sold during the prior quarter</u>. [Emphasis added.]

376. The third quarter 2005 Form 10-Q stated as follows regarding the Company's underwriting standards:

We originate and purchase primarily first mortgage products nationwide. Historically, we have focused on lending to individuals whose borrowing needs are generally not fulfilled by traditional financial institutions because they do not satisfy the credit, documentation or other underwriting standards prescribed by conventional mortgage lenders and loan buyers. We originate and purchase mortgage loans on the basis of the borrower's ability to repay the loan, the borrower's historical pattern of debt repayment and

the amount of equity in the borrower's property, as measured by the borrower's loan-to-value ratio, or LTV.  We believe we have developed a comprehensive and sophisticated process of credit evaluation and risk-based pricing.

* * *

We have experienced considerable growth of our interest-only product.  During the nine months ended September 30, 2005, originations of interest-only loans totaled $13.7 billion, or 34.0%, of total originations.  Interest-only originations during the nine months ended September 30, 2004 totaled $5.7 billion, or 18.6%, of total originations during the period.  We believe our stricter underwriting guidelines and the stronger credit characteristics of these loans mitigate their perceived higher risk.

* * *

For the nine months ended September 30, 2005, full documentation loans as a percentage of originations totaled $21.6 billion, or 53.5%, limited documentation loans totaled $1.2 billion, or 3.0%, and stated documentation loans totaled $17.6 billion, or 43.5%. . . .  We designed our underwriting standards and quality assurance programs to ensure that loan quality is consistent and meets our guidelines, even as the documentation type mix varies.  [Emphasis added.]

377.   The third quarter 2005 Form 10-Q provided the following information regarding New Century's internal controls and procedures:

As of September 30, 2005, the end of our third quarter, our management, including our Chief Executive Officer, Vice Chairman – Finance, Chief Financial Officer and President and Chief Operating Officer, has evaluated the effectiveness of our disclosure controls and

procedures, as such term is defined in Rule 13a-15(e) promulgated under the Securities Exchange Act of 1934, as amended. <u>Based on that evaluation, our Chief Executive Officer, Vice Chairman – Finance, Chief Financial Officer and President and Chief Operating Officer concluded, as of September 30, 2005, that our disclosure controls and procedures were effective to ensure that information required to be disclosed by us in reports that we file or submit under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission rules and forms</u>. There was no change in our internal control over financial reporting during the quarter ended September 30, 2005 that materially affected, or is reasonably likely to materially affect, our internal control over financial reporting. [Emphasis added.]

378. Accompanying the third quarter 2005 Form 10-Q as exhibits were certifications signed by Defendants Cole, Morrice, Gotschall and Dodge in the form set forth in paragraph 349 above.

379. The above-referenced statements from the New Century Officer Defendants' press release, conference call and Form 10-Q for the third quarter ended September 30, 2005 were materially misstated and omitted to state material facts required therein or necessary to make the statements contained therein not misleading, at all times throughout the Class Period. Contrary to the above-referenced statements, New Century's financial statements for the third quarter ended September 30, 2005 were not presented in accordance with GAAP, the Company's internal controls suffered from significant deficiencies and material weaknesses and New Century's underwriting standards and loan quality were significantly worse than described.

380.   As set forth in paragraphs 137-39, 141, 144, 146, 148, 150, 153-55, 158, 161 above, numerous former New Century employees with first-hand knowledge report that contrary to the Defendant Morrice's statements on November 3, 2005 regarding the purportedly more "<u>favorable credit characteristics</u>" of the Company's recent loan production and the New Century Officer Defendants' statements in the 2005 third quarter 10-Q regarding a purported "<u>comprehensive and sophisticated process of credit evaluation,</u>" "<u>strict underwriting guidelines</u>" and "<u>underwriting standards and quality assurance programs to ensure that loan quality is consistent</u>" and undisclosed to investors, New Century's underwriting practices were actually loosened substantially by the time of these statements so that the Company could continue to reach record mortgage origination volume notwithstanding intense industry competition, rising interest rates, and a softening of the real estate market.  Further, the 2005 data set forth in paragraphs 126-35 above establish that New Century's underwriting standards were loosened precipitously before and during the Class Period, such that its loans became delinquent and were repurchased at substantially higher rates as compared to the loans it made in 2003-04, and with such speed that generic market forces could not be to blame.  The data further demonstrate that given its loosened underwriting, New Century was far more likely to issue a sub-prime borrower a mortgage loan than were its peers.  According to CWs 3, 5, 6, 8, 11, 13, 15, 17, 20, 21, 22, 25 and 28, as early as 2003, and progressively from 2004-05, New Century began originating riskier and riskier mortgage loans because of increased loan to values, including 80/20 100% financing loans requiring no down payment, and began increasing the amount of stated income loans, which, starting in 2004-05, were being offered to W-2 wage earners who should have been able to verify their stated income, but were not required to.  According to CWs 13, 17, 20, 25 and 28, the Company's underwriting was loosened and the Company was issuing "riskier and riskier" mortgage loans beginning as early as 2003, with

"heavy pressure" to close loans and operations managers signing off on the approval of riskier loans. Quarterly loan performance data set forth in paragraph 111 further demonstrates a trend of increasing delinquencies from the first quarter of 2004 through the third quarter of 2005. The fact that delinquencies continued to increase thereafter at a dramatic rate further demonstrates that contrary to Defendant Morrice's November 3, 2005 statements, New Century's underwriting was not resulting in loans with more "<u>favorable credit characteristics.</u>" but far worse as New Century's underwriting was substantially loosened to produce growing origination volume.

381. In addition, as set forth in paragraphs 173-78, 183, 187, 189, 196 above, by the time of these statements, the Examiner's Report details facts demonstrating "serious loan quality issues at [New Century] beginning as early as 2004;" numerous "red flags" relating to loan quality; and the failure of New Century's Senior Management and Board of Directors to devote sufficient attention to improving loan quality until the final quarter of 2006, when it "was too late to prevent the consequences of longstanding loan quality problems in an adversely changing market." "Rather, New Century continued to focus on generating greater quantities of ever riskier loans, devoting little effort to such basic issues as making sure that the Company's loan origination and underwriting policies and procedures were followed to avoid kickouts of loans offered for sale." Contrary to the above statements, New Century "devoted its resources to generating high volumes of loans, with relatively little attention to loan quality" and did not even have any "formal exceptions policy." The Examiner found these ever-increasing risks to be "a veritable ticking time bomb." As a result of these findings, the Examiner concluded that the public statements made by New Century regarding the purported credit characteristics of its loans and strict and consistent underwriting guidelines were "not supportable" and without "justifiable basis" when made.

382. As set forth in paragraph 75 above, according to CW 1, New Century had intentionally delayed payment of valid repurchase claims, causing a massive backlog of repurchase claims, 80% of which, or hundreds of millions of dollars worth, were 18 to 24 months old as of September 2006 – meaning that the backlog went back to the 2005 first quarter. According to CW 1, these repurchase claims already were determined to be valid and should have been paid 18 to 24 months earlier, but the Company delayed payment of them in an effort to cause its previously reported financial results to appear better than they actually were. According to CW 1, by the end of the 2004 fourth quarter, New Century already had a large backlog of valid, unfunded repurchase claims. Accordingly, hundreds of millions of dollars worth of these valid repurchase claims should have been funded prior to the start of the Class Period in May 2005, but were not. As set forth in paragraph 77 above, according to CW 3, New Century was "sitting on repurchase requests" hoping to ride out the market and the Company failed to have good internal reporting of repurchase information prior to 2006. In addition, according to the internal New Century document quoted in paragraph 79 above, 61% of the Company's outstanding repurchase claims, or $167 million worth, had been received by July 31, 2005. The failure to properly account for these outstanding repurchase claims caused material errors in the Company's 2005 third quarter reported financial results and resulted from material weaknesses in the Company's internal controls at the time the claims were received and processed, but not funded, which included the time of the above statements. Accordingly, the material financial misstatements and material weaknesses in internal controls relating to the repurchase claims backlog eventually reported by the Company on February 7, 2007 and, thereafter, were in existence at the time of the above statements, rendering them materially false and misleading when made. Moreover, Defendant Morrice's November 3, 2005 statement that New Century had "not seen any meaningful spike in first payment defaults, certainly something we track

carefully, but at this point that has not been our experience;" and Defendant Dodge's November 3, 2005 statement that first payment defaults were "very modest over the last 12 months," were materially misleading and incomplete when made given the massive undisclosed repurchase claims backlog in existence at the time of these statements.

383.  As set forth in paragraphs 91-93, 96-97 above, the facts revealed by the Examiner's Report further demonstrate that "beginning no later than 2004, New Century was receiving repurchase requests related to loans sold outside of the previous 90-day period and it was taking much longer than 90 days to evaluate and process repurchase requests and repurchase loans."  In violation of GAAP, "New Century was not reserving, however, for these loans that it might be required to repurchase, and on which it might incur losses and expenses, but for which no reserve was provided."  By January 26, 2005, the Examiner found "clear indication that New Century Accounting Department personnel knew that many loans that were ultimately repurchased in 2004 were Backlog Claims. . . . Notwithstanding this information, New Century did nothing to adjust its methodology for estimating the quantity of loans that might need to be repurchased as of the end of a financial reporting period."  In addition, at the time of the above-reported 2005 third quarter earnings and at all times throughout 2005, New Century "perplexingly" further violated GAAP by failing to reserve for Interest Recapture as set forth in paragraphs 96-97 above.  Consistent with the Examiner's Report, New Century's above-quoted description of its Allowance for Repurchase Losses was materially misleading when made as it stated that the Company "occasionally" may repurchase loans after 90 days without disclosing the then-existing repurchase claims backlog.

384.  As set forth in paragraphs 106-08 above, the facts revealed by the Examiner's Report demonstrate that New Century's Residual Interests were overstated at the time of the above-reported 2005 third quarter earnings and at all

times throughout 2005-06 as "New Century insisted on using unduly low discount rates;" New Century "repeatedly resisted warnings from specialists at KPMG [starting at least for its quarterly review for the first quarter of 2005], who warned that the discount rates New Century was using were below those used by most of its peers;" "New Century relied for far too long on antiquated and flawed internally-developed Excel-based models to value residual interests;" and New Century failed "to adjust its prepayment rates to reflect changing market conditions . . . contrary to the advice it consistently received as far back as the first quarter of 2005 from KPMG's SFG, which repeatedly expressed concern about the Company's use of low prepayment speed assumptions."

385. As set forth in paragraphs 194-96 above, the facts revealed by the Examiner's Report demonstrate that that New Century's internal controls suffered from significant deficiencies and material weaknesses at the time of the above-reported 2005 third quarter internal control certifications and statements and at all times throughout 2005-06 as the result of "deeply-rooted and long-standing failures to establish and monitor adequate internal controls over financial reporting;" including failures to "develop effective policies and procedures for performing accounting estimates requiring the exercise of considerable judgment;" and to "remediate internal control deficiencies that existed at year-end 2004." Among the deficiencies that New Century failed to remedy from year-end 2004 were "key controls surrounding the repurchase reserve estimation process;" "the allowance for loan losses methodology and rationale;" and "controls related to the hedging and derivatives process." "New Century also failed to establish sufficient internal controls with respect to its residual interest valuation process." As demonstrated by the facts obtained by the Examiner (as well as the numerous other facts set forth in paragraphs 380-81 above), New Century also suffered throughout 2005 (and 2006) from "significant deficiencies and material weaknesses in Management's internal control structure related to loan quality . . . ."

### D.    2005 Fourth Quarter Statements

386.    On February 2, 2006, the New Century Officer Defendants Cole, Morrice, Gotschall and Dodge issued a press release reporting the Company's earnings results for the fourth quarter and year ended December 31, 2005.  The Company reported net earnings for the fourth quarter of $116.6 million, or $2.00 per share, and net earnings for the year ended December 31, 2005 of $416.5 million, or $7.17 per share.  The press release contained income statement and balance sheet data purporting to reflect the Company's financial performance and assets and liabilities for the three months and the year ended December 31, 2005 in accordance with GAAP.  The press release reported New Century's Residual Interests as of December 31, 2005 at $234,930,000.  The press release also contained the following quoted statement from Defendant Cole:

> During a year of rising interest rates, intense competition and a challenging secondary market, we delivered record loan production, reduced loan acquisition costs to a historic low, grew our REIT portfolio of mortgage loans to $13.9 billion, and completed a strategic acquisition that broadened our product offerings and marketing channels.    All of these accomplishments were achieved while delivering four consecutive dividend increases.

387.    On February 2, 2006, the New Century Officer Defendants also held a conference call with analysts and investors.  During the call, Defendants Cole, Dodge and Morrice reviewed the Company's reported financial results for the quarter and year ended December 31, 2005.  During the call, Defendant Cole stated:

> [O]ur 60-plus-day delinquency rate was 3.36 at the REITs portfolio and 4.10 at the TRS which are both significantly lower than anticipated, indicating the good quality of loans and the great performance of those assets.  [Emphasis added.]

During the call, Defendant Dodge referred to the following a slide (made available over the Internet):



Dodge described the slide as follows:

> A strong housing market has certainly contributed to our performance but we have also benefited from our strong credit and underwriting standards and servicing platform. These factors are particularly evident when we compare our performance to our peers, third party comparisons of performance generally indicate that we outperform our peer group. The black line on the chart represents our modeled losses based on the entire history of our loan performance over ten years. It includes performance of loans originated years ago with much lower FICO scores and other less favorable credit characteristics compared to recent production. [Emphasis added.]

388. On or about March 16, 2006, the New Century Officer Defendants Cole, Morrice, Gotschall and Dodge filed the Company's Form 10-K for the quarter and year ended December 31, 2005. The 2005 Form 10-K contained consolidated balance sheets and consolidated statements of earnings purporting to reflect the Company's financial performance and assets and liabilities for the three months and year ended December 31, 2005 in accordance with GAAP. The 2005

Form 10-K also stated the following regarding New Century's underwriting standards:

> Our loan origination standards and procedures are designed to produce high quality loans. These standards and procedures encompass underwriter qualifications and authority levels, appraisal review requirements, fraud prevention, funds disbursement controls, training of our employees and ongoing review of our employees' work. We help to ensure that our origination standards are met by employing accomplished and season managers, underwriters and processors and through the extensive use of technology. We also have a comprehensive training program for the continuing development of both our existing staff and new hires. In addition, we employ proprietary underwriting systems in our loan origination process that improve the consistency of underwriting standards, assess collateral adequacy and help to prevent fraud, while at the same time increasing productivity.
>
> * * *
>
> We have experienced considerable growth of our interest-only product. During the year ended December 31, 2005, originations of adjustable-rate, interest-only loans totaled $16.6 billion, or 29.6%, of total originations. Interest-only originations during the year ended December 31, 2004 totaled $8.1 billion, or 19.3%, of total originations during the period. We believe our strict underwriting guidelines and the stronger credit characteristics of these loans mitigate their perceived higher risk.
>
> * * *
>
> For the year ended December 31, 2005, full documentation loans as a percentage of originations totaled $30.4 billion, or 54.2%, limited

documentation loans totaled $1.5 billion, or 2.7%, and stated documentation loans totaled $24.2 billion, or 43.1%. . . . <u>We designed our underwriting standards and quality assurance programs to ensure that loan quality is consistent and meets our guidelines, even as the mix among full, limited and stated documentation varies</u>.

\* \* \*

<u>We adhere to high origination standards in order to sell our loan products in the secondary mortgage market.</u> [Emphasis added.]

The 2005 Form 10-K was signed by, among others, New Century Officer Defendants Cole, Morrice, Gotschall and Dodge.

389. The 2005 Form 10-K reported New Century's Residual Interests as of December 31, 2005 at <u>$234,930,000</u> and Allowance for Loan Repurchase Losses as of December 31, 2005 at <u>$7,000,000</u>. The 2005 Form 10-K purported to describe the Company's "Critical Accounting Policies" including New Century's methods for calculating "Residual Interests in Securitizations" and "Allowance for Repurchase Losses:"

*Residual Interests and Securitizations Structured as Sales*

[T]he Residuals described above are a significant asset of the Company. In determining the value of the Residuals, the Company estimates the future rate of prepayments, prepayment penalties that we will receive, delinquencies, defaults and default loss severity as they affect the amount and timing of estimated cash flows. . . . <u>The Company bases these estimates on historical loss data for the loans, the specific characteristics of the loans and the general economic environment.</u> . . . The Company performs an evaluation of Residual interests in securitizations quarterly, <u>taking into consideration trends in actual cash flow performance, industry and economic developments, as well as other relevant factors</u>.

* * *

*Allowance for Repurchase Losses*

Generally, repurchases are required within 90 days from the date the loans are sold. Occasionally, we may repurchase loans after 90 days have elapsed. . . . As of December 31, 2005 and December 31, 2004, the repurchase allowance totaled $7.0 million and $6.3 million, respectively. Approximately $10.7 billion and $8.3 billion of loans were subject to repurchase, representing loans sold during the fourth quarter of 2005 and the fourth quarter of 2004, respectively. We believe the allowance for repurchase losses is adequate as of December 31, 2005 and 2004. [Emphasis added.]

390. The 2005 Form 10-K provided the following information regarding New Century's internal controls and procedures:

As of December 31, 2005, the end of our fourth quarter, our management, including our Chief Executive Officer, Vice Chairman-Finance, Chief Financial Officer, and President and Chief Operating Officer, has evaluated the effectiveness of our disclosure controls and procedures, as such term is defined in Rule 13a-15(e) promulgated under the Securities Exchange Act of 1934. Based on that evaluation, our Chief Executive Officer, Vice Chairman-Finance, Chief Financial Officer and President and Chief Operating Officer concluded, as of December 31, 2005, that our disclosure controls and procedures were effective to ensure that information required to be disclosed by us in reports that we file or submit under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission rules and forms.

* * *

There have not been any changes in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the quarter to which this report relates that have materially affected, or are likely to materially affect, our internal control over financial reporting.  [Emphasis added.]

391.  Accompanying the 2005 Form 10-K as exhibits were certifications signed by Defendants Cole, Morrice, Gotschall and Dodge in the form set forth in paragraph 349 above.

392.  The 2005 Form 10-K contained a "Report of Independent Registered Public Accounting Firm" from Defendant KPMG dated March 15, 2006 which stated:

We have audited the accompanying consolidated balance sheets of New Century Financial Corporation and subsidiaries as of December 31, 2005 and 2004, and the related consolidated statements of income, comprehensive income, changes in stockholders' equity, and cash flows for each of the years in the three-year period ended December 31, 2005.  These consolidated financial statements are the responsibility of the Company's management.  Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States).  Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement.  An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting

principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. <u>We believe that our audits provide a reasonable basis for our opinion</u>.

<u>In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of New Century Financial Corporation and subsidiaries as of December 31, 2005 and 2004, and the results of their operations and their cash flows for each of the years in the three-year period ended December 31, 2005, in conformity with U.S. generally accepted accounting principles</u>.

<u>We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States)</u>, the effectiveness of the Company's internal control over financial reporting as of December 31, 2005, based on criteria established in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO), and our report dated March 15, 2006 <u>expressed an unqualified opinion on management's assessment of, and the effective operation of, internal control over financial reporting</u>. [Emphasis added.]

393.   The 2005 Form 10-K also contained a "Report of Independent Registered Public Accounting Firm" on internal controls from Defendant KPMG dated March 15, 2006 which stated:

We have audited management's assessment, included in the accompanying *Management's Report on Internal Control Over Financial Reporting,* that New Century Financial Corporation and subsidiaries maintained effective internal control over financial

reporting as of December 31, 2005, based on criteria established in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting. Our responsibility is to express an opinion on management's assessment and an opinion on the effectiveness of the Company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, evaluating management's assessment, testing and evaluating the design and operating effectiveness of internal control, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the

maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, management's assessment that New Century Financial Corporation and subsidiaries maintained effective internal control over financial reporting as of December 31, 2005, is fairly stated, in all material respects, based on the COSO criteria. Also, in our opinion, New Century Financial Corporation and subsidiaries maintained, in all material respects, effective internal control over financial reporting as of December 31, 2005, based on the COSO criteria.

New Century Financial Corporation acquired certain assets and assumed certain liabilities of RBC Mortgage Company during 2005, and management excluded from its assessment of the effectiveness of New Century Financial Corporation's internal control over financial reporting as of December 31, 2005, RBC Mortgage Company's internal control over financial reporting associated with total assets of $1.2 billion and total revenues of $59.6 million included in the (consolidated) financial statements of New Century Financial Corporation and subsidiaries as of and for the year ended December 31, 2005. Our audit of internal control over financial reporting of New Century Financial Corporation also excluded an evaluation of the internal control over financial reporting of RBC Mortgage Company.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheets of New Century Financial Corporation and subsidiaries as of December 31, 2005 and 2004, and the related consolidated statements of income, comprehensive income, changes in stockholders' equity, and cash flows for each of the years in the three-year period ended December 31, 2005, and our report dated March 15, 2006 expressed an unqualified opinion on those consolidated financial statements. [Emphasis added.]

394. The above-referenced statements from the New Century Officer Defendants' press release, conference call and Form 10-K and KPMG for the fourth quarter and year ended December 31, 2005 were materially misstated and omitted to state material facts required therein or necessary to make the statements contained therein not misleading, at all times throughout the Class Period.

Contrary to the above-referenced statements, New Century's financial statements for the fourth quarter and year ended December 31, 2005 were not presented in accordance with GAAP, the Company's internal controls suffered from significant deficiencies and material weaknesses, KPMG's audits of New Century's financial statements and internal controls were not performed in accordance with GAAS and New Century's underwriting standards and loan quality were significantly worse than described.

395. As set forth in paragraphs 137-68 above, numerous former New Century employees with first-hand knowledge report that contrary to Defendant Cole's statement on February 2, 2006 regarding the purported "good quality of loans" New Century was originating; Defendant Dodge's statements on February 2, 2006 regarding New Century's purported "strong credit and underwriting standards" and the purportedly more "favorable credit characteristics" of its recent loan production; and Defendants Cole, Morrice, Gotschall and Dodge's statements in New Century's Form 10-K regarding "loan origination standards and procedures" that were purportedly designed to produce "high quality loans;" "high origination standards," "proprietary underwriting systems" that purportedly improved the "consistency of underwriting standards" and "strict underwriting guidelines" and undisclosed to investors, New Century's underwriting practices were actually loosened substantially by the time of these statements so that the Company could continue to reach record mortgage origination volume notwithstanding intense industry competition, rising interest rates and a softening of the real estate market. Further, as the data set forth in paragraphs 126-35 above establish, New Century substantially loosened its underwriting in 2005, such that its loans exhibited drastically higher delinquency and repurchase rates as soon as they were made and with such speed that generic market forces could not be to blame. The data further establish that New Century, given its loosened underwriting, was far more likely to issue a sub-prime borrower a mortgage loan

than were its peers.  According to CWs 3, 5, 6, 8, 9, 11, 12, 13, 15, 16, 17, 18, 20, 21, 22, 23, 25, 26, 28 and 31 before any of these statements were made, New Century already had loosened substantially its underwriting so that it could increase loan volume at the expense of loan quality and, rather than maintain consistent underwriting standards, actually allowed repeated exceptions to its underwriting standards, further reducing its loan quality.  According to these witnesses, as early as 2003, and progressively from 2004-05, New Century began originating riskier and riskier mortgage loans because of increased loan to values, including 80/20 100% financing loans requiring no down payment, and began increasing the amount of stated income loans which, starting in 2004-05, were being offered to W-2 wage earners who should have been able to verify their stated income, but were not required to.  Quarterly loan performance data set forth in paragraph 111 further demonstrate a trend of increasing delinquencies from the first quarter of 2004 through the fourth quarter of 2005.  The fact that delinquencies continued to increase thereafter at a dramatic rate further demonstrates that contrary to the above-quoted statements, New Century's underwriting was not designed to produce "high quality loans," but substantially loosened to produce growing origination volume at the expense of loan quality.

396.  In addition, as set forth in paragraphs 173-90, 196 above, by the time of these statements, the Examiner's Report details facts demonstrating "serious loan quality issues at [New Century] beginning as early as 2004;" numerous "red flags" relating to loan quality, including "striking" red flags throughout 2005 and "alarming" trends by February 2006; and the failure of New Century's Senior Management and Board of Directors to devote sufficient attention to improving loan quality until the final quarter of 2006, when it "was too late to prevent the consequences of longstanding loan quality problems in an adversely changing market."  "Rather, New Century continued to focus on generating greater quantities of ever riskier loans, devoting little effort to such basic issues as making sure that

the Company's loan origination and underwriting policies and procedures were followed to avoid kickouts of loans offered for sale." Contrary to the above statements, New Century "devoted its resources to generating high volumes of loans, with relatively little attention to loan quality" and did not even have any "formal exceptions policy." The Examiner found these ever-increasing risks to be "a veritable ticking time bomb." As a result of these findings, the Examiner concluded that the public statements made by New Century regarding "high origination standards" designed to produce "high quality loans" were not correct when made as, in fact, "New Century did not produce 'high quality' loans or have 'high origination standards.'"

397. As set forth in paragraph 73 above, New Century has admitted errors in the Company's previously-filed annual financial statements for its fiscal year-ended December 31, 2005 with respect to both the accounting and reporting of loan repurchase losses and the Company's valuation of Residual Interests and a "more likely than not" material overstatement in the Company's previously-issued 2005 financial statements. In addition, as set forth in paragraphs 66-119 and 191-96 above, facts developed from Lead Counsel's investigation and set forth in the Examiner's Report further demonstrate that the Company's financial statements were materially misstated in violation of GAAP at the time of these February 2, 2006 and March 16, 2006 statements, and the Company's internal control certifications were materially misstated when issued.

398. As set forth in paragraph 75 above, according to CW 1, New Century had intentionally delayed payment of valid repurchase claims, causing a massive backlog of repurchase claims, 80% of which, or hundreds of millions of dollars worth, were 18 to 24 months old as of September 2006 – meaning that the backlog went back to the 2005 first quarter. According to CW 1, these repurchase claims already were determined to be valid and should have been paid 18 to 24 months earlier, but the Company delayed payment of them in an effort to cause its

previously reported financial results to appear better than they actually were. According to CW 1, by the end of the 2004 fourth quarter, New Century already had a large backlog of valid, unfunded repurchase claims. Accordingly, hundreds of millions of dollars worth of these valid repurchase claims should have been funded prior to the start of the Class Period in May 2005, but were not. As set forth in paragraph 77 above, according to CW 3, New Century was "sitting on repurchase requests" hoping to ride out the market and the Company failed to have good internal reporting of repurchase information. In addition, according to the internal New Century document quoted in paragraph 78 above, New Century had a material repurchase claims backlog as of the end of the 2005 in excess of $120 million. The failure to properly account for these outstanding repurchase claims caused material errors in the Company's 2005 year-end reported financial results and resulted from material weaknesses in the Company's internal controls at the time the claims were received and processed, but not funded, which included the time the above statements were made.

399. As set forth in paragraphs 91-99 above, the facts revealed by the Examiner's Report demonstrate that "beginning no later than 2004, New Century was receiving repurchase requests related to loans sold outside of the previous 90-day period and it was taking much longer than 90 days to evaluate and process repurchase requests and repurchase loans." In violation of GAAP, "New Century was not reserving, however, for these loans that it might be required to repurchase, and on which it might incur losses and expenses, but for which no reserve was provided." By January 26, 2005, the Examiner found "clear indication that New Century Accounting Department personnel knew that many loans that were ultimately repurchased in 2004 were Backlog Claims. . . . Notwithstanding this information, New Century did nothing to adjust its methodology for estimating the quantity of loans that might need to be repurchased as of the end of a financial reporting period." In addition, at the time of the above-reported 2005 year-end

earnings, New Century "perplexingly" further violated GAAP by failing to reserve for Interest Recapture as set forth in paragraphs 96-97 above and by failing to apply LOCOM methodology consistent with industry practice and the Company's own LOCOM policy. As set forth in paragraph 99 above, the Examiner quantified the material impact of these GAAP violations at year-end 2005 at ($21,320,000). Consistent with the Examiner's Report, New Century's above-quoted description of its Allowance for Repurchase Losses was materially misleading when made as it stated that the Company "occasionally" may repurchase loans after 90 days without disclosing the then-existing repurchase claims backlog.

400. As set forth in paragraphs 101-08 above, at the time of these February 2, 2006 and March 16, 2006 statements, New Century's reported Residual Interests were materially overstated as these reported Residual Interests failed to account for the Company's progressively decreasing loan quality and underwriting standards, as well as New Century's increasing delinquencies, defaults and default loss severity throughout 2005. As set forth in paragraphs 106-08 above, the facts revealed by the Examiner's Report demonstrate that New Century's Residual Interests were overstated at the time of the above-reported year-end 2005 and at all times throughout 2005-06 as "New Century insisted on using unduly low discount rates;" New Century "repeatedly resisted warnings from specialists at KPMG [starting at least for its quarterly review for the first quarter of 2005], who warned that the discount rates New Century was using were below those used by most of its peers;" "New Century relied for far too long on antiquated and flawed internally-developed Excel-based models to value residual interests;" and New Century failed "to adjust its prepayment rates to reflect changing market conditions . . . contrary to the advice it consistently received as far back as the first quarter of 2005 from KPMG's SFG, which repeatedly expressed concern about the Company's use of low prepayment speed assumptions." The Examiner quantified

the material impact of these GAAP violations as year-end 2005 at ($42,300,000). Examiner's Report at 383.

401. As set forth in paragraphs 194-96 above, the facts revealed by the Examiner's Report demonstrate that that New Century's internal controls suffered from significant deficiencies and material weaknesses at the time of the above-reported 2005 year-end internal control certifications and statements and at all times throughout 2005-06 as the result of "deeply-rooted and long-standing failures to establish and monitor adequate internal controls over financial reporting;" including failures to "develop effective policies and procedures for performing accounting estimates requiring the exercise of considerable judgment;" and to "remediate internal control deficiencies that existed at year-end 2004." Among the deficiencies that New Century failed to remedy from year-end 2004 were "key controls surrounding the repurchase reserve estimation process;" "the allowance for loan losses methodology and rationale;" and "controls related to the hedging and derivatives process." "New Century also failed to establish sufficient internal controls with respect to its residual interest valuation process." As demonstrated by the facts obtained by the Examiner (as well as the numerous other facts set forth in paragraphs 395-96 above), New Century also suffered throughout 2005 (and 2006) from "significant deficiencies and material weaknesses in Management's internal control structure related to loan quality . . . ."

402. Accordingly, the material financial misstatements and significant deficiencies and material weaknesses in internal controls relating to the repurchase claims backlog and Residual Interests eventually reported by the Company on February 7, 2007 and, thereafter, were in existence at the time of the above statements, rendering them materially misstated when made.

403. In addition, as set forth in paragraphs 204-35 above in detail, KPMG's 2005 audits of New Century's financial statements and internal controls were not performed in accordance with GAAS and the standards of the PCAOB as

represented by KPMG in the Company's 2005 Form 10-K, rendering the above-quoted statements made by KPMG materially false and misleading at the time the 2005 Form 10-K was issued on or about March 16, 2006.

### E. 2006 First Quarter Statements

404. On May 4, 2006, the New Century Officer Defendants Cole, Morrice and Dodge issued a press release reporting the Company's earnings results for the first quarter ended March 31, 2006. The Company reported net earnings for the first quarter of $103.7 million, or $1.79 per share. The press release reported "strong first quarter 2006 results highlighted by a 21% growth in earnings per share ('EPS'), a 17% increase in REIT taxable income, and 31% growth in mortgage loan production compared with the same period last year." The press release contained income statement and balance sheet data purporting to reflect the Company's financial performance and assets and liabilities for the three months ended March 31, 2006 in accordance with GAAP. The press release reported New Century's Residual Interests as of March 31, 2006 at $208,791,000.

405. On May 4, 2006, the New Century Officer Defendants also held a conference call with analysts and investors. During the call, Defendants Cole, Dodge and Morrice reviewed the Company's reported financial results for the quarter ended March 31, 2006. During the call, Defendant Dodge stated: "[T]he credit performance in both delinquencies and losses is better than our historical experience and continues to exceed our expectations. This performance can be attributed to faster prepayments that have occurred due to the strength of the housing market as well as better credit quality and the success of our servicing platform." (Emphasis added.) In response to a specific question regarding "more activity on reps and warranties and putbacks [or repurchase claims] from some of the whole-loan buyers," Defendant Morrice stated: "I guess in terms of the putbacks, I think your antennae are correct. We see a modest rise in the tightness

of the buyers on that. <u>I would not call it material at this point, but a modest rise</u>. Certainly something we want to stay on top of." (Emphasis added.)

406. On or about May 10, 2006, the New Century Officer Defendants Cole, Morrice and Dodge filed the Company's Form 10-Q for the quarter ended March 31, 2006. The first quarter 2006 Form 10-Q contained consolidated balance sheets and consolidated statements of earnings purporting to reflect the Company's financial performance and assets and liabilities for the three months ended March 31, 2006 in accordance with GAAP. The Form 10-Q stated:

> <u>The Company has prepared the accompanying unaudited condensed consolidated financial statements in accordance with accounting principles generally accepted in the United States of America for interim financial information and with the instructions to Form 10-Q and Rule 10-01 of Regulation S-X</u>. Accordingly, they do not include all of the information and footnotes required by generally accepted accounting principles for complete financial statements. <u>In the opinion of management, all adjustments (consisting of normal recurring accruals) considered necessary for a fair presentation have been included</u>. [Emphasis added.]

The first quarter 2006 Form 10-Q was signed by Defendants Cole, Morrice and Dodge.

407. The first quarter 2006 Form 10-Q reported New Century's Residual Interests as of March 31, 2006 at <u>$208,791,000</u> and Allowance for Loan Repurchase Losses as of March 31, 2006 at <u>$8,900,000</u>. The first quarter 2006 Form 10-Q purported to describe the Company's "Critical Accounting Policies" including New Century's methods for calculating "Residual Interests in Securitizations" and "Allowance for Repurchase Losses:"

> *Residual Interests in Securitizations*

[T]he Residuals described above are a significant asset of the Company. In determining the value of the Residuals, the Company estimates the future rate of prepayments, prepayment penalties that we will receive, delinquencies, defaults and default loss severity as they affect the amount and timing of estimated cash flows. . . . <u>The Company estimates prepayments by evaluating historical prepayment performance of our loans and the impact of current trends.</u> . . . The Company performs an evaluation of the Residuals quarterly, <u>taking into consideration trends in actual cash flow performance, industry and economic developments, as well as other relevant factors.</u>

* * *

*Allowance for Repurchase Losses*

<u>Generally, repurchases are required within 90 days from the date the loans are sold. Occasionally, we may repurchase loans after 90 days have elapsed</u>. . . . <u>As of March 31, 2006 and December 31, 2005, the repurchase allowance totaled $8.9 million and $7.0 million, respectively</u> . . . . <u>We believe the allowance for repurchase losses is adequate as of March 31, 2006 and December 31, 2005</u>. [Emphasis added.]

408. The first quarter 2006 Form 10-Q stated as follows regarding the Company's underwriting standards:

We originate and purchase primarily first mortgage loans nationwide. Historically, we have focused on lending to individuals whose borrowing needs are generally not fulfilled by traditional financial institutions because they do not satisfy the credit, documentation or other underwriting standards prescribed by conventional mortgage lenders and loan buyers.

* * *

For the three months ended March 31, 2006, full documentation loans as a percentage of total mortgage loan originations were $7.2 billion, or 53.9%, limited documentation loans were $301.1 million, or 2.2%, and stated documentation loans were $5.9 billion, or 43.9%. . . . We designed our underwriting standards and quality assurance programs to ensure that loan quality is consistent and meets our guidelines, even as the documentation type mix varies. [Emphasis added.]

409. The first quarter 2006 Form 10-Q provided the following information regarding New Century's internal controls and procedures:

As of March 31, 2006, the end of our first quarter, our management, including our Chief Executive Officer, Chief Financial Officer and President and Chief Operating Officer, has evaluated the effectiveness of our disclosure controls and procedures, as such term is defined in Rule 13a-15(e) promulgated under the Securities Exchange Act of 1934, as amended. Based on that evaluation, our Chief Executive Officer, Chief Financial Officer and President and Chief Operating Officer concluded, as of March 31, 2006, that our disclosure controls and procedures were effective to ensure that information required to be disclosed by us in reports that we file or submit under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission rules and forms. There was no change in our internal control over financial reporting during the quarter ended March 31, 2006 that materially affected, or is reasonably likely to materially affect, our internal control over financial reporting. [Emphasis added.]

410. Accompanying the first quarter 2006 Form 10-Q as exhibits were certifications signed by Defendants Cole, Morrice and Dodge in the form set forth in paragraph 349 above.

411. The above-referenced statements from the New Century Officer Defendants' press release, conference call and Form 10-Q for the first quarter ended March 31, 2006 were materially misstated and omitted to state material facts required therein or necessary to make the statements contained therein not misleading, at all times throughout the Class Period. Contrary to the above-referenced statements, New Century's financial statements for the first quarter ended March 31, 2006 were not presented in accordance with GAAP, the Company's internal controls suffered from significant deficiencies and material weaknesses and New Century's underwriting standards and loan quality were significantly worse than described.

412. As set forth in paragraphs 137-68 above, numerous former New Century employees with first-hand knowledge report that contrary to Defendant Dodge's statement on May 4, 2006 regarding the purported "<u>better credit quality</u>" of the loans New Century was originating and Defendants Cole, Morrice and Dodge's statements in the Form 10-Q regarding "<u>underwriting standards and quality assurance programs to ensure than loan quality is consistent</u>" and undisclosed to investors, New Century's underwriting practices were actually loosened substantially by the time of this statement so that the Company could continue to reach record mortgage origination volume notwithstanding intense industry competition, rising interest rates and a softening of the real estate market. Further, as the data set forth in paragraphs 126-35 above establish, New Century substantially loosened its underwriting in 2005 and 2006, such that its loans exhibited drastically higher delinquency and repurchase rates as soon as they were made and with such speed that generic market forces could not be to blame. The data further establish that New Century, given its loosened underwriting standards,

was far more likely to issue a sub-prime borrower a mortgage loan than were its peers. According to CWs 3, 5, 6, 8, 9, 11, 12, 13, 15, 16, 17, 18, 20, 21, 22, 23, 25, 26, 28, 30 and 31 before Dodge's May 4, 2006 statement was made and the 2006 first quarter 10-Q was issued, New Century already had loosened substantially its underwriting so that it could increase loan volume at the expense of loan quality. According to these witnesses, as early as 2003, and progressively from 2004-06, New Century began originating riskier and riskier mortgage loans because of increased loan to values, including 80/20 100% financing loans requiring no down payment, and began increasing the amount of stated income loans which, starting in 2004-05, were being offered to W-2 wage earners who should have been able to verify their stated income, but were not required to. Quarterly loan performance data set forth in paragraph 111 further demonstrate a trend of increasing delinquencies from the first quarter of 2004 through the first quarter of 2006. The fact that delinquencies continued to increase thereafter at a dramatic rate further demonstrates that contrary to Defendant Dodge's above-quoted statement, New Century's underwriting was not producing "<u>better credit quality</u>" loans, but was substantially loosened to produce growing origination volume at the expense of loan quality.

413. In addition, as set forth in paragraphs 173-90, 196 above, by the time of these statements, the Examiner's Report details facts demonstrating "serious loan quality issues at [New Century] beginning as early as 2004;" numerous "red flags" relating to loan quality, including "striking" red flags throughout 2005 and "alarming" trends by February 2006; and the failure of New Century's Senior Management and Board of Directors to devote sufficient attention to improving loan quality until the final quarter of 2006, when it "was too late to prevent the consequences of longstanding loan quality problems in an adversely changing market." "Rather, New Century continued to focus on generating greater quantities of ever riskier loans, devoting little effort to such basic issues as making sure that

the Company's loan origination and underwriting policies and procedures were followed to avoid kickouts of loans offered for sale." Contrary to the above statements, New Century "devoted its resources to generating high volumes of loans, with relatively little attention to loan quality" and did not even have any "formal exceptions policy." The Examiner found these ever-increasing risks to be "a veritable ticking time bomb." As a result of these findings, the Examiner concluded that the public statements made by New Century regarding its underwriting and loan quality were not correct when made as, in fact, "New Century did not produce 'high quality' loans or have 'high origination standards.'"

414. As set forth in paragraph 72 above, New Century has now admitted the need to restate the Company's previously-reported financial statements for the first three quarters of 2006 based on material violations of GAAP in setting New Century's Allowance for Repurchase Losses reserve and related material weaknesses in internal controls. As set forth in paragraph 73 above, New Century has also admitted errors in the Company's previously-filed annual financial statements for its fiscal year-ended December 31, 2005 with respect to both the accounting and reporting of loan repurchase losses and the Company's valuation of Residual Interests and a "more likely than not" material overstatement in the Company's previously-issued 2005 financial statements. In addition, as set forth in paragraphs 66-119 and 191-96 above, facts developed from Lead Counsel's investigation and set forth in the Examiner's Report further demonstrate that the Company's financial statements were materially misstated in violation of GAAP at the time of these May 4, 2006 and May 10, 2006 statements, and the Company's internal control certifications were materially misstated when issued.

415. As set forth in paragraph 75 above, according to CW 1, New Century had intentionally delayed payment of valid repurchase claims, causing a massive backlog of repurchase claims, 80% of which, or hundreds of millions of dollars worth, were 18 to 24 months old as of September 2006 – meaning that the backlog

went back to the 2005 first quarter.  According to CW 1, these repurchase claims already were determined to be valid and should have been paid 18 to 24 months earlier, but the Company delayed payment of them in an effort to cause its previously reported financial results to appear better than they actually were.  According to CW 1, by the end of the 2004 fourth quarter, New Century already had a large backlog of valid, unfunded repurchase claims.  Accordingly, hundreds of millions of dollars worth of these valid repurchase claims should have been funded prior to the start of the Class Period in May 2005, but were not.  As set forth in paragraph 77 above, according to CW 3, New Century was "sitting on repurchase requests" hoping to ride out the market and the Company failed to have good internal reporting of repurchase information.  In addition, according to the internal New Century documents quoted in paragraphs 78 and 80 and the data reported by the Examiner in paragraph 100 above, New Century had a material repurchase claims backlog as of the end of the 2006 first quarter.  The failure to properly account for these outstanding repurchase claims caused material errors in the Company's 2006 first quarter reported financial results and resulted from material weaknesses in the Company's internal controls at the time the claims were received and processed, but not funded, which included the time of the above statements.

416.  As set forth in paragraphs 91-99 above, the facts revealed by the Examiner's Report demonstrate that "beginning no later than 2004, New Century was receiving repurchase requests related to loans sold outside of the previous 90-day period and it was taking much longer than 90 days to evaluate and process repurchase requests and repurchase loans."  In violation of GAAP, "New Century was not reserving, however, for these loans that it might be required to repurchase, and on which it might incur losses and expenses, but for which no reserve was provided."  By January 26, 2005, the Examiner found "clear indication that New Century Accounting Department personnel knew that many loans that were

ultimately repurchased in 2004 were Backlog Claims. . . . Notwithstanding this information, New Century did nothing to adjust its methodology for estimating the quantity of loans that might need to be repurchased as of the end of a financial reporting period." In addition, at the time of the above-reported 2006 first quarter earnings, New Century "perplexingly" further violated GAAP by failing to reserve for Interest Recapture as set forth in paragraphs 96-97 above and by failing to apply LOCOM methodology consistent with industry practice and the Company's own LOCOM policy. As set forth in paragraph 99 above, the Examiner quantified the material impact of these GAAP violations at the time of the above-reported 2006 first quarter earnings at ($21,455,000). Consistent with the Examiner's Report, New Century's above-quoted description of its Allowance for Repurchase Losses was materially misleading when made as it stated that the Company "occasionally" may repurchase loans after 90 days without disclosing the then-existing repurchase claims backlog.

417. Moreover, Defendant Morrice's May 4, 2006 statement that New Century had observed only a "<u>modest rise</u>" in repurchase claims, something that he said he "<u>would not call [] material at this point, but a modest rise,</u>" was materially misleading and incomplete when made given the massive undisclosed repurchase claims backlog in existence at the time of this statement. As set forth in paragraphs 78 and 100 above, at the time of Defendant Morrice's May 4, 2006 statement, New Century's undisclosed repurchase claims backlog was in excess of $250 million.

418. As set forth in paragraphs 101-08 above, at the time the 2006 first quarter results were reported, New Century's reported Residual Interests were materially misstated as these reported Residual Interests failed to account for the Company's progressively decreasing loan quality and underwriting practices, as well as New Century's increasing delinquencies, defaults and default loss severity throughout 2005 and 2006. As set forth in paragraphs 106-08 above, the facts revealed by the Examiner's Report demonstrate that New Century's Residual

Interests were misstated at the time of the above-reported 2006 first quarter earnings and at all times throughout 2005-06 as "New Century insisted on using unduly low discount rates;" New Century "repeatedly resisted warnings from specialists at KPMG [starting at least for its quarterly review for the first quarter of 2005], who warned that the discount rates New Century was using were below those used by most of its peers;" "New Century relied for far too long on antiquated and flawed internally-developed Excel-based models to value residual interests;" and New Century failed "to adjust its prepayment rates to reflect changing market conditions . . . contrary to the advice it consistently received as far back as the first quarter of 2005 from KPMG's SFG, which repeatedly expressed concern about the Company's use of low prepayment speed assumptions."

419.   As set forth in paragraphs 194-96 above, the facts revealed by the Examiner's Report demonstrate that that New Century's internal controls suffered from significant deficiencies and material weaknesses at the time of the above-reported 2006 first quarter internal control certifications and statements and at all times throughout 2005-06 as the result of "deeply-rooted and long-standing failures to establish and monitor adequate internal controls over financial reporting;" including failures to "develop effective policies and procedures for performing accounting estimates requiring the exercise of considerable judgment;" and to "remediate internal control deficiencies that existed at year-end 2004." Among the deficiencies that New Century failed to remedy from year-end 2004 were "key controls surrounding the repurchase reserve estimation process;" "the allowance for loan losses methodology and rationale;" and "controls related to the hedging and derivatives process." "New Century also failed to establish sufficient internal controls with respect to its residual interest valuation process." As demonstrated by the facts obtained by the Examiner (as well as the numerous other facts set forth in paragraphs 412-13 above), New Century also suffered throughout

2005 and 2006 from "significant deficiencies and material weaknesses in Management's internal control structure related to loan quality . . . ."

420.  Accordingly, the material financial misstatements and significant deficiencies and material weaknesses in internal controls relating to the repurchase claims backlog and Residual Interests eventually reported by the Company on February 7, 2007 and, thereafter, were in existence at the time of the above statements, rendering them materially misstated when made.

### F.    2006 Second Quarter Statements

421.  On August 3, 2006, the New Century Officer Defendants Cole, Morrice and Dodge issued a press release reporting the Company's earnings results for the second quarter ended June 30, 3006.  The Company reported net income for the second quarter of $105.5 million, or $1.81 per share.  The press release contained a quoted statement from Defendant Morrice as follows:  "Our second quarter results are evidence of the strength and stability of our franchise.  We achieved the second highest quarterly loan production volume in our history, while substantially improving our operating margin over the first quarter in a challenging environment."  The press release contained income statement and balance sheet data purporting to reflect the Company's financial performance and assets and liabilities for the three months and six months ended June 30, 2006 in accordance with GAAP.  The press release reported New Century's Residual Interests as of June 30, 2006 at $209,335,000.

422.  On August 3, 2006, the New Century Officer Defendants also held a conference call with analysts and investors.  During the call, Defendants Morrice and Dodge reviewed the Company's reported financial results for the quarter ended June 30, 2006.  During the call, Defendant Dodge responded to question regarding repurchase claims and loans sold at a discount as follows:

Yes, I would tell you that while we are seeing that – a modest upward in investor due diligence and loans that we are repurchasing as a result

of early payment defaults. Most of the reasons for the increase in the discounted sales is in terms of the second [trust deeds]. And the first [quarter] you might recall we did a securitization of those second [trust deeds] because the whole loan market at that time was very weak. The whole loan market for second [trust deeds] strengthened pretty meaningfully in the second quarter. And we took the opportunity to sell a pool of those loans for a price that was just barely under par. I would tell you that most of the second [trust deeds] that we originate are the 20% portion of what we call an 80/20 loan. And we generally price the combined 80/20 loan to achieve our target profit margin. So you shouldn't be concerned that if we carve out the 20% second [trust deeds] and sell that at a discount that that means that we have a particular issue with those loans. We look at the overall profitability of the combined loans. [Emphasis added.]

423. On or about August 9, 2006, the New Century Officer Defendants Cole, Morrice and Dodge filed the Company's Form 10-Q for the quarter ended June 30, 2006. The second quarter 2006 Form 10-Q contained consolidated balance sheets and consolidated statements of earnings purporting to reflect the Company's financial performance and assets and liabilities for the three months ended June 30, 2006 in accordance with GAAP. The Form 10-Q stated:

The Company has prepared the accompanying unaudited condensed consolidated financial statements in accordance with accounting principles generally accepted in the United States of America for interim financial information and with the instructions to Form 10-Q and Rule 10-01 of Regulation S-X. Accordingly, they do not include all of the information and footnotes required by generally accepted accounting principles for complete financial statements. In the opinion of management, all adjustments (consisting of normal

recurring accruals) considered necessary for a fair presentation have been included. [Emphasis added.]

The second quarter 2006 Form 10-Q was signed by Defendants Cole, Morrice and Dodge.

424. The second quarter 2006 Form 10-Q reported New Century's Residual Interests as of June 30, 2006 at $209,335,000 and Allowance for Loan Repurchase Losses as of June 30, 2006 at $14,400,000. The second quarter 2006 Form 10-Q purported to describe the Company's "Critical Accounting Policies" including New Century's methods for calculating "Residual Interests in Securitizations" and "Allowance for Repurchase Losses:"

*Residual Interests in Securitizations*

[T]he Residuals described above are a significant asset of the Company. In determining the value of the Residuals, the Company estimates the future rate of prepayments, prepayment penalties that we will receive, delinquencies, defaults and default loss severity as they affect the amount and timing of estimated cash flows. . . . The Company bases these estimates on historical loss data for the loans, the specific characteristics of the loans and the general economic environment. . . . The Company performs an evaluation of the Residuals quarterly, taking into consideration trends in actual cash flow performance, industry and economic developments, as well as other relevant factors.

\* \* \*

*Allowance for Repurchase Losses*

Generally, repurchases are required within 90 days from the date the loans are sold. Occasionally, we may repurchase loans after 90 days have elapsed. . . . As of June 30, 2006 and December 31, 2005, the repurchase allowance totaled $14.4 million and $7.0

million, respectively . . . .  We believe the allowance for repurchase losses is adequate as of June 30, 2006 and December 31, 2005. [Emphasis added.]

425.  The second quarter 2006 Form 10-Q stated as follows regarding the Company's underwriting standards:

We originate and purchase primarily first mortgage loans nationwide.  Historically, we have focused on lending to individuals whose borrowing needs are generally not fulfilled by traditional financial institutions because they do not satisfy the credit, documentation or other underwriting standards prescribed by conventional mortgage lenders and loan buyers.

\* \* \*

For the six months ended June 30, 2006, full documentation loans as a percentage of total mortgage loan originations were $16.4 billion, or 55.5%, limited documentation loans were $627.7 million, or 2.1%, and stated documentation loans were $12.5 billion, or 42.4%. . . . We designed our underwriting standards and quality assurance programs to ensure that loan quality is consistent and meets our guidelines, even as the documentation type mix varies.  [Emphasis added.]

426.  The second quarter 2006 Form 10-Q provided the following information regarding New Century's internal controls and procedures:

As of June 30, 2006, the end of our second quarter, our management, including our Chairman of the Board, President and Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures, as such term is defined in Rule 13a-15(e) promulgated under the Securities Exchange Act of 1934, as amended.  Based on that evaluation, our Chairman of the Board,

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

President and Chief Executive Officer and Chief Financial Officer concluded, as of June 30, 2006, that our disclosure controls and procedures were effective to ensure that information required to be disclosed by us in reports that we file or submit under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission rules and forms.  There was no change in our internal control over financial reporting during the quarter ended June 30, 2006 that materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.  [Emphasis added.]

427.  Accompanying the second quarter 2006 Form 10-Q as exhibits were certifications signed by Defendants Cole, Morrice and Dodge in the form set forth in paragraph 349 above.

428.  The above-referenced statements from the New Century Officer Defendants' press release, conference call and Form 10-Q for the second quarter ended June 30, 2006 were materially misstated and omitted to state material facts required therein or necessary to make the statements contained therein not misleading, at all times throughout the Class Period.  Contrary to the above-referenced statements, New Century's financial statements for the second quarter ended June 30, 2006 were not presented in accordance with GAAP, the Company's internal controls suffered from significant deficiencies and material weaknesses and New Century's underwriting standards and loan quality were significantly worse than described.

429.  As set forth in paragraphs 137-68 above, numerous former New Century employees with first-hand knowledge report that contrary to Defendants Cole, Morrice and Dodge's statement in the Form 10-Q regarding "underwriting standards and quality assurance programs to ensure than loan quality is consistent

and meets our guidelines" and undisclosed to investors, New Century's underwriting practices were actually loosened substantially by the time of this statement so that the Company could continue to reach record mortgage origination volume notwithstanding intense industry competition, rising interest rates and a softening of the real estate market. Further, as the data set forth in paragraphs 126-35 above establish, New Century substantially loosened its underwriting in 2005 and 2006, such that its loans exhibited drastically higher delinquency and repurchase rates as soon as they were made and with such speed that generic market forces could not be to blame. The data further establish that New Century, given its loosened underwriting practices, was far more likely to issue a sub-prime borrower a mortgage loan than were its peers. According to CWs 3, 5, 6, 8, 9, 11, 12, 13, 15, 16, 17, 18, 20, 21, 22, 23, 25, 26, 28, 30 and 31 before the 2006 second quarter Form 10-Q was issued, New Century already had loosened substantially its underwriting so that it could increase loan volume at the expense of loan quality. According to these witnesses, as early as 2003, and progressively from 2004-06, New Century began originating riskier and riskier mortgage loans because of increased loan to values, including 80/20 100% financing loans requiring no down payment, and began increasing the amount of stated income loans which, starting in 2004-05, were being offered to W-2 wage earners who should have been able to verify their stated income, but were not required to. Quarterly loan performance data set forth in paragraph 111 further demonstrate a trend of increasing delinquencies from the first quarter of 2004 through the second quarter of 2006. The fact that delinquencies continued to increase thereafter at a dramatic rate further demonstrates that contrary to Defendants' above-quoted statement, New Century's underwriting practices were substantially loosened to produce growing origination volume at the expense of loan quality.

430. In addition, as set forth in paragraphs 173-90, 196 above, by the time of these statements, the Examiner's Report details facts demonstrating "serious

loan quality issues at [New Century] beginning as early as 2004;" numerous "red flags" relating to loan quality, including "striking" red flags throughout 2005 and "alarming" trends by February 2006; and the failure of New Century's Senior Management and Board of Directors to devote sufficient attention to improving loan quality until the final quarter of 2006, when it "was too late to prevent the consequences of longstanding loan quality problems in an adversely changing market." "Rather, New Century continued to focus on generating greater quantities of ever riskier loans, devoting little effort to such basic issues as making sure that the Company's loan origination and underwriting policies and procedures were followed to avoid kickouts of loans offered for sale." Contrary to the above statements, New Century "devoted its resources to generating high volumes of loans, with relatively little attention to loan quality" and did not even have any "formal exceptions policy." The Examiner found these ever-increasing risks to be "a veritable ticking time bomb." As a result of these findings, the Examiner concluded that the public statements made by New Century regarding its underwriting and loan quality were not correct when made.

431. As set forth in paragraph 72 above, New Century has now admitted the need to restate the Company's previously-reported financial statements for the first three quarters of 2006 based on material violations of GAAP in setting New Century's Allowance for Repurchase Losses reserve and related material weaknesses in internal controls. As set forth in paragraph 73 above, New Century has also admitted errors in the Company's previously-filed annual financial statements for its fiscal year-ended December 31, 2005 with respect to both the accounting and reporting of loan repurchase losses and the Company's valuation of Residual Interests and a "more likely than not" material overstatement in the Company's previously-issued 2005 financial statements. In addition, as set forth in paragraphs 66-119 and 191-96 above, facts developed from Lead Counsel's investigation and set forth in the Examiner's Report further demonstrate that the

Company's financial statements were materially misstated in violation of GAAP at the time of these August 3, 2006 and August 9, 2006 statements and the Company's internal control certifications were materially misstated when issued.

432. As set forth in paragraph 75 above, according to CW 1, New Century had intentionally delayed payment of valid repurchase claims, causing a massive backlog of repurchase claims, 80% of which, or hundreds of millions of dollars worth, were 18 to 24 months old as of September 2006 – meaning that the backlog went back to the 2005 first quarter. According to CW 1, these repurchase claims already were determined to be valid and should have been paid 18 to 24 months earlier, but the Company delayed payment of them in an effort to cause its previously reported financial results to appear better than they actually were. According to CW 1, by the end of the 2004 fourth quarter, New Century already had a large backlog of valid, unfunded repurchase claims. Accordingly, hundreds of millions of dollars worth of these valid repurchase claims should have been funded prior to the start of the Class Period in May 2005, but were not. As set forth in paragraph 77 above, according to CW 3, New Century was "sitting on repurchase requests" hoping to ride out the market and the Company failed to have good internal reporting of repurchase information. In addition, according to the internal New Century documents quoted in paragraphs 78 and 80 and the data provided by the Examiner in paragraph 100 above, New Century had a material repurchase claims backlog as of the end of the 2006 second quarter. The failure to properly account for these outstanding repurchase claims caused material errors in the Company's 2006 second quarter reported financial results and resulted from material weaknesses in the Company's internal controls at the time the claims were received and processed, but not funded, which included the time of the above statements. In addition, as set forth in paragraph 83 above, according to CW 2, New Century, in violation of GAAP, did not include in its Allowance for

Repurchase Losses reserve any estimated discount for disposition necessary to report loans repurchased in the 2006 second quarter at fair market value.

433. As set forth in paragraphs 91-99 above, the facts revealed by the Examiner's Report demonstrate that "beginning no later than 2004, New Century was receiving repurchase requests related to loans sold outside of the previous 90-day period and it was taking much longer than 90 days to evaluate and process repurchase requests and repurchase loans." In violation of GAAP, "New Century was not reserving, however, for these loans that it might be required to repurchase, and on which it might incur losses and expenses, but for which no reserve was provided." By January 26, 2005, the Examiner found "clear indication that New Century Accounting Department personnel knew that many loans that were ultimately repurchased in 2004 were Backlog Claims. . . . Notwithstanding this information, New Century did nothing to adjust its methodology for estimating the quantity of loans that might need to be repurchased as of the end of a financial reporting period." In addition, at the time of the above-reported 2006 second quarter earnings, New Century "perplexingly" further violated GAAP by failing to reserve for Interest Recapture as set forth in paragraphs 96-97 above and by failing to apply LOCOM methodology consistent with industry practice and the Company's own LOCOM policy before improperly eliminating the LOCOM adjustment entirely for repurchased loans in the 2006 second quarter as set forth in paragraph 98 above. As set forth in paragraph 99 above, the Examiner quantified the material impact of these GAAP violations at the time of the above-reported 2006 second quarter earnings at ($60,515,000). Consistent with the Examiner's Report, New Century's above-quoted description of its Allowance for Repurchase Losses was materially misleading when made as it stated that the Company "occasionally" may repurchase loans after 90 days without disclosing the then-existing repurchase claims backlog.

434. Moreover, Defendant Dodge's August 3, 2006 statement that New Century had observed only a "modest upward" in repurchase claims, was materially misleading when made given the massive undisclosed repurchase claims backlog in existence at the time of this statement. As set forth in paragraphs 78, 85-86 and 100 above, at the time of Defendant Dodge's August 3, 2006 statement, New Century's repurchase claims backlog was in excess of $190 million and far greater than the repurchases disclosed in the Form 10-Q for the quarter ended June 30, 2006.

435. As set forth in paragraphs 101-08 above, at the time the 2006 second quarter results were reported, New Century's reported Residual Interests were materially overstated as these reported Residual Interests failed to account for the Company's progressively decreasing loan quality and underwriting practices as well as New Century's increasing delinquencies, defaults and default loss severity throughout 2005 and 2006. As set forth in paragraphs 106-08 above, the facts revealed by the Examiner's Report demonstrate that New Century's Residual Interests were overstated at the time of the above-reported 2006 second quarter earnings and at all times throughout 2005-06 as "New Century insisted on using unduly low discount rates;" New Century "repeatedly resisted warnings from specialists at KPMG [starting at least for its quarterly review for the first quarter of 2005], who warned that the discount rates New Century was using were below those used by most of its peers;" "New Century relied for far too long on antiquated and flawed internally-developed Excel-based models to value residual interests;" and New Century failed "to adjust its prepayment rates to reflect changing market conditions . . . contrary to the advice it consistently received as far back as the first quarter of 2005 from KPMG's SFG, which repeatedly expressed concern about the Company's use of low prepayment speed assumptions." The Examiner quantified the material impact of these GAAP