violations as of the 2006 second quarter at ($15,200,000).  Examiner's Report at 383.

436.  As set forth in paragraphs 194-96 above, the facts revealed by the Examiner's Report demonstrate that that New Century's internal controls suffered from significant deficiencies and material weaknesses at the time of the above-reported 2006 second quarter internal control certifications and statements and at all times throughout 2005-06 as the result of "deeply-rooted and long-standing failures to establish and monitor adequate internal controls over financial reporting;" including failures to "develop effective policies and procedures for performing accounting estimates requiring the exercise of considerable judgment;" and to "remediate internal control deficiencies that existed at year-end 2004." Among the deficiencies that New Century failed to remedy from year-end 2004 were "key controls surrounding the repurchase reserve estimation process;" "the allowance for loan losses methodology and rationale;" and "controls related to the hedging and derivatives process."  "New Century also failed to establish sufficient internal controls with respect to its residual interest valuation process."  As demonstrated by the facts obtained by the Examiner (as well as the numerous other facts set forth in paragraphs 429-30 above), New Century also suffered throughout 2005 and 2006 from "significant deficiencies and material weaknesses in Management's internal control structure related to loan quality . . . ."

437.  Accordingly, the material financial misstatements and significant deficiencies and material weaknesses in internal controls relating to the repurchase claims backlog and Residual Interests eventually reported by the Company on February 7, 2007 and, thereafter, were in existence at the time of the above statements, rendering them materially misstated when made.

### G.    2006 Third Quarter Statements

438.  On September 8, 2006, the New Century Officer Defendants Cole, Morrice and Dodge issued a press release reporting August 2006 total loan

production of $5.8 billion. The press release contained the following quoted statement from Defendant Morrice: "We are also pleased with the quality of the loans we are originating. . . . We believe our strict underwriting guidelines, skilled risk management and servicing teams and enhanced fraud detection tools have resulted in lower early payment default and repurchase rates than many of our peers. While we have seen an increase in early payment defaults from 2005 levels as a result of the macro-economic environment, the increase has been modest." (Emphasis added.)

439. On November 2, 2006, the New Century Officer Defendants Cole, Morrice and Dodge issued a press release reporting the Company's earnings results for the third quarter ended September 30, 2006. The Company reported net income for the third quarter of $66.6 million, or $1.12 per share. The press release contained income statement and balance sheet data purporting to reflect the Company's financial performance and assets and liabilities for the three months and nine months ended September 30, 2006 in accordance with GAAP. The press release reported New Century's Residual Interests as of September 30, 2006 at $223,680,000. The press release further stated:

> At September 30, 2006, the allowance for losses on mortgage loans held for investment and real estate owned was $239.4 million compared with $236.5 million at June 30, 2006. These amounts represent 1.68 percent and 1.47 percent of the unpaid principal balance of the mortgage loan portfolio, respectively. The company's 60-day-plus delinquency rate as of September 30, 2006 was 5.95 percent compared with 4.61 percent in the second quarter of 2006.

The press release also contained the following quoted statement from Defendant Morrice: "Excluding the hedging-related accounting charges, our operating results were solid. As expected, we maintained loan production volume at a level comparable to the previous quarter, achieved record low loan acquisition costs, and

improved portfolio interest spread before the impact of hedging during the third quarter."

440.   On November 2, 2006, the New Century Officer Defendants also held a conference call with analysts and investors.  During the call, Defendants Morrice and Dodge reviewed the Company's reported financial results for the quarter ended September 30, 2006.  During the conference call, Defendant Dodge misleadingly described the Company's total Allowance for Loan Losses reserve as $240 million: "<u>I'd point you to a table in the press release where we show the total amount in the allowance for loan losses at the end of the quarter, and it's roughly $240 million at the end of September</u>." (Emphasis added.)  During the call, Defendant Morrice also discussed first payment defaults as follows:

> [W]e are aware of the heightened concern over first payment defaults and loan repurchases.  While these issues certainly do not represent a highlight of the current environment, I do want to spend some time up front discussing these important topics.  In order to understand these issues, I think it is useful to work backwards through the chain of events.  As most of you know, the most significant financial issue is loan repurchases, which are at the end of the cycle, because it is generally non-performing repurchase loans that are sold at the deepest discounts.
>
> *   *   *
>
> So what is driving the increase in first payment defaults?  The answer is that there are two main drivers.   One is market conditions.  Specifically, interest rate increases over the last 12 to 18 months and the decline in the housing market.  Obviously there is not much we can do about these macro-economic conditions.

The other component, however, is the layering of risk characteristics in the loans. For example, a combination of borrower and collateral characteristics that includes a first-time home-buyer with stated income, and a high loan to value ratio. The bad news is that as rates have risen and the housing market has declined, the impact of this layering of risks is translating into higher levels of first-payment defaults and repurchases.

* * *

I also want to emphasize that we believe that many of the credit-risk management practices we employ, such as the FraudMark detection tool, various appraisal scoring tools, our risk-management practices, extensive analytics on broker and product performance, active credit administration, and our strong servicing processes, have all helped to reduce the amount of first payment default and repurchase activity that we are experiencing versus our peers. [Emphasis added.]

441. On or about November 9, 2006, the New Century Officer Defendants Cole, Morrice and Dodge filed the Company's Form 10-Q for the quarter ended September 30, 2006. The third quarter 2006 Form 10-Q contained consolidated balance sheets and consolidated statements of earnings purporting to reflect the Company's financial performance and assets and liabilities for the three months ended September 30, 2006 in accordance with GAAP. The Form 10-Q stated:

The Company has prepared the accompanying unaudited condensed consolidated financial statements in accordance with accounting principles generally accepted in the United States of America for interim financial information and with the instructions to Form 10-Q and Rule 10-01 of Regulation S-X. Accordingly, they do not include all of the information and footnotes required by generally accepted accounting principles for complete financial statements. In the

1  opinion of management, all adjustments (consisting of normal
2  recurring accruals) considered necessary for a fair presentation have
3  been included. [Emphasis added.]

4  The third quarter 2006 Form 10-Q was signed by Defendants Cole, Morrice and
5  Dodge.

6      442.  The third quarter 2006 Form 10-Q reported New Century's Residual
7  Interests as of September 30, 2006 at $223,680,000 and Allowance for Loan
8  Repurchase Losses as of September 30, 2006 at $13,900,000.  The third quarter
9  2006 Form 10-Q purported to describe the Company's "Critical Accounting
10 Policies" including New Century's methods for calculating "Residual Interests in
11 Securitizations" and "Allowance for Repurchase Losses:"

12     *Residual Interests in Securitizations*

13     [T]he Residuals described above are a significant asset of the
14 Company.  In determining the value of the Residuals, the Company
15 estimates the future rate of prepayments, the prepayment premiums
16 that we expect to receive and the manner in which expected
17 delinquencies, default and default loss severity are expected to affect
18 the amount and timing of the estimated cash flows.  .  .  .  The
19 Company bases these estimates on historical loss data for the loans,
20 the specific characteristics of the loans and the general economic
21 environment.  .  .  .  The Company performs an evaluation of the
22 Residuals quarterly, taking into consideration trends in actual cash
23 flow performance, industry and economic developments, as well as
24 other relevant factors.

25           *  *  *

26     *Allowance for Repurchase Losses*

27     Generally, repurchases are required within 90 days from the
28 date the loans are sold.  Occasionally, we may repurchase loans after

90 days have elapsed. . . . As of September 30, 2006 and December 31, 2005, the repurchase allowance totaled $13.9 million and $7.0 million, respectively . . . . We believe the allowance for repurchase losses is adequate as of September 30, 2006 and December 31, 2005. [Emphasis added.]

443. The third quarter 2006 Form 10-Q stated as follows regarding the Company's underwriting standards:

We originate and purchase primarily first mortgage products nationwide. Historically, we have focused on lending to individuals whose borrowing needs are generally not fulfilled by traditional financial institutions because they do not satisfy the credit, documentation or other underwriting standards prescribed by conventional mortgage lenders and loan buyers.

*  *  *

For the nine months ended September 30, 2006, full documentation loans as a percentage of originations were $25.3 billion, or 55.7%, limited documentation loans were $922.0 million, or 2.0%, and stated documentation loans were $19.2 billion, or 42.3%. . . . We designed our underwriting standards, including our recently adopted guidelines for adjustable-rate and interest-only loans, and quality assurance programs to ensure that loan quality is consistent and meets our guidelines, even as the documentation type mix varies. [Emphasis added.]

444. The third quarter 2006 Form 10-Q provided the following information regarding New Century's internal controls and procedures:

As of September 30, 2006, the end of our third quarter, our management, including our Chairman of the Board, President and Chief Executive Officer and Chief Financial Officer, has evaluated the

effectiveness of our disclosure controls and procedures, as such term is defined in Rule 13a-15(e) promulgated under the Securities Exchange Act of 1934, as amended. <u>Based on that evaluation, our Chairman of the Board, President and Chief Executive Officer and Chief Financial Officer concluded, as of September 30, 2006, that our disclosure controls and procedures were effective to ensure that information required to be disclosed by us in reports that we file or submit under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission rules and forms.</u> There was no change in our internal control over financial reporting during the quarter ended September 30, 2006 that materially affected, or is reasonably likely to materially affect, our internal control over financial reporting. [Emphasis added.]

445. Accompanying the third quarter 2006 Form 10-Q as exhibits were certifications signed by Defendants Cole, Morrice and Dodge in the form set forth in paragraph 349 above.

446. The above-referenced statements from the New Century Officer Defendants' September 8, 2006 press release and November 2, 2006 press release and conference call and November 9, 2006 Form 10-Q for the third quarter ended September 30, 2006 were materially misstated and omitted to state material facts required therein or necessary to make the statements contained therein not misleading, at all times throughout the Class Period. Contrary to the above-referenced statements, New Century's financial statements for the third quarter ended September 30, 2006 were not presented in accordance with GAAP, the Company's internal controls suffered from significant deficiencies and material weaknesses and New Century's underwriting practices and loan quality were significantly worse than described.

447.  As set forth in paragraphs 137-68 above, numerous former New Century employees with first-hand knowledge report that contrary to Defendants Cole, Morrice and Dodge's September 8, 2006 press release statements regarding the purported "<u>quality of the loans</u>" New Century was originating with purportedly "<u>strict underwriting guidelines [and] skilled risk management</u>" and undisclosed to investors, New Century's underwriting practices were actually loosened substantially by the time of these statements so that the Company could continue to reach record mortgage origination volume notwithstanding intense industry competition, rising interest rates and a softening of the real estate market.  Further, as the data set forth in paragraphs 126-35 above establish, New Century substantially loosened its underwriting practices in 2005 and 2006, such that its loans exhibited drastically higher delinquency and repurchase rates as soon as they were made and with such speed that generic market forces could not be to blame. The data further establish that New Century, given its loosened underwriting, was far more likely to issue a sub-prime borrower a mortgage loan than were its peers. According to CWs 3, 5, 6, 8, 9, 11, 12, 13, 15, 16, 17, 18, 20, 21, 22, 23, 25, 26, 28, 30, 31 and 32, before Defendants' statements were made on September 8, 2006, New Century already had loosened substantially its underwriting so that it could increase loan volume at the expense of loan quality.  According to these witnesses, as early as 2003, and progressively from 2004-06, New Century began originating riskier and riskier mortgage loans because of increased loan to values, including 80/20 100% financing loans requiring no down payment, and began increasing the amount of stated income loans which, starting in 2004-05, were being offered to W-2 wage earners who should have been able to verify their stated income, but were not required to.  Quarterly loan performance data set forth in paragraph 111 further demonstrate a trend of increasing delinquencies from the first quarter of 2004 through the third quarter of 2006.  The fact that delinquencies continued to increase demonstrates that contrary to Defendants' above-quoted statements, New

Century's underwriting was not producing better or higher quality loans, but was substantially loosened to produce growing origination volume at the expense of loan quality.

448.   In addition, as set forth in paragraphs 173-90, 196 above, by the time of these statements, the Examiner's Report details facts demonstrating "serious loan quality issues at [New Century] beginning as early as 2004;" numerous "red flags" relating to loan quality, including "striking" red flags throughout 2005 and "alarming" trends by February 2006; and the failure of New Century's Senior Management and Board of Directors to devote sufficient attention to improving loan quality until the final quarter of 2006, when it "was too late to prevent the consequences of longstanding loan quality problems in an adversely changing market." "Rather, New Century continued to focus on generating greater quantities of ever riskier loans, devoting little effort to such basic issues as making sure that the Company's loan origination and underwriting policies and procedures were followed to avoid kickouts of loans offered for sale."   Contrary to the above statements, New Century "devoted its resources to generating high volumes of loans, with relatively little attention to loan quality" and did not even have any "formal exceptions policy."   The Examiner found these ever-increasing risks to be "a veritable ticking time bomb."   As a result of these findings, the Examiner concluded that the public statements made by New Century regarding its underwriting and loan quality were not correct when made.

449.   As set forth in paragraph 72 above, New Century has now admitted the need to restate the Company's previously-reported financial statements for the first three quarters of 2006 based on material violations of GAAP in setting New Century's Allowance for Repurchase Losses reserve and related material weaknesses in internal controls.   As set forth in paragraph 73 above, New Century has also admitted errors in the Company's previously-filed annual financial statements for its fiscal year-ended December 31, 2005 with respect to both the

accounting and reporting of loan repurchase losses and the Company's valuation of Residual Interests and a "more likely than not" material overstatement in the Company's previously-issued 2005 financial statements. In addition, as set forth in paragraphs 66-119 and 191-96 above, facts developed from Lead Counsel's investigation and set forth in the Examiner's Report further demonstrate that the Company's financial statements were materially misstated in violation of GAAP at the time of these November 2, 2006 and November 9, 2006 statements, and the Company's internal control certifications were materially misstated when issued.

450.    As set forth in paragraph 75 above, according to CW 1, New Century had intentionally delayed payment of valid repurchase claims, causing a massive backlog of repurchase claims, 80% of which, or hundreds of millions of dollars worth, were 18 to 24 months old as of September 2006 – meaning that the backlog went back to the 2005 first quarter. According to CW 1, these repurchase claims already were determined to be valid and should have been paid 18 to 24 months earlier, but the Company delayed payment of them in an effort to cause its previously reported financial results to appear better than they actually were. According to CW 1, by the end of the 2004 fourth quarter, New Century already had a large backlog of valid, unfunded repurchase claims. Accordingly, hundreds of millions of dollars worth of these valid repurchase claims should have been funded prior to the start of the Class Period in May 2005, but were not. As set forth in paragraph 77 above, according to CW 3, New Century was "sitting on repurchase requests" hoping to ride out the market and the Company failed to have good internal reporting of repurchase information. In addition, according to the internal New Century documents quoted in paragraphs 78 and 80 and the data provided by the Examiner in paragraph 100 above, New Century had a material repurchase claims backlog as of the end of the 2006 third quarter. The failure to properly account for these outstanding repurchase claims caused material errors in the Company's 2006 third quarter reported financial results and resulted from

material weaknesses in the Company's internal controls at the time the claims were received and processed, but not funded, which included the time of the above statements.  In addition, as set forth in paragraph 83 above, according to CW 2, New Century, in violation of GAAP, did not include in its Allowance for Repurchase Losses reserve any estimated discount for disposition necessary to report loans repurchased in the 2006 second or third quarter at fair market value.

451.  As set forth in paragraphs 91-99 above, the facts revealed by the Examiner's Report demonstrate that "beginning no later than 2004, New Century was receiving repurchase requests related to loans sold outside of the previous 90-day period and it was taking much longer than 90 days to evaluate and process repurchase requests and repurchase loans."  In violation of GAAP, "New Century was not reserving, however, for these loans that it might be required to repurchase, and on which it might incur losses and expenses, but for which no reserve was provided."  By January 26, 2005, the Examiner found "clear indication that New Century Accounting Department personnel knew that many loans that were ultimately repurchased in 2004 were Backlog Claims.  . . .  Notwithstanding this information, New Century did nothing to adjust its methodology for estimating the quantity of loans that might need to be repurchased as of the end of a financial reporting period."  In addition, at the time of the above-reported 2006 third quarter earnings, New Century "perplexingly" further violated GAAP by failing to reserve for Interest Recapture as set forth in paragraphs 96-97 above and by failing to apply LOCOM methodology consistent with industry practice and the Company's own LOCOM policy before improperly eliminating the LOCOM adjustment entirely for repurchased loans in the 2006 second quarter and eliminating the Future Loss Severity reserve in the 2006 third quarter as set forth in paragraph 98 above.  As set forth in paragraph 99 above, the Examiner quantified the material impact of these GAAP violations at the time of the above-reported 2006 third quarter earnings at ($87,325,000).  Consistent with the Examiner's Report, New

Century's above-quoted description of its Allowance for Repurchase Losses was materially misleading when made as it stated that the Company "occasionally" may repurchase loans after 90 days without disclosing the then-existing repurchase claims backlog.

452. Moreover, Defendants' September 8, 2006 statement that New Century had observed only a "<u>modest</u>" increase in first payment defaults which was lower than that of its peers because of the Company's purported "<u>strict underwriting guidelines [and] skilled risk management</u>" and Defendant Morrice's November 2, 2006 statement that the credit-risk management practices that the Company employ had "<u>helped to reduce the amount of first payment default and repurchase activity that [New Century] [was] experiencing versus [its] peers</u>" were materially false and misleading and incomplete when made given the massive undisclosed repurchase claims backlog in existence at the time of these statements. As set forth in paragraphs 78, 87 and 100 above, at the time of these statements, New Century's repurchase claims backlog was in excess of $380 million and far greater than the repurchases disclosed in the Form 10-Q issued for the quarter ended September 30, 2006. As specifically noted by the Examiner, Defendants' September 8, 2006 statement that the increase in early payment defaults from 2005 was "<u>modest</u>" was "utterly without basis" when made. Examiner's Report at 423-24. As set forth in paragraph 185 above and noted by the Examiner, in January through August 2006, early payment default had ranged from a low of 7.76% in March 2006 to a high of 13.42% in August 2006, with July 2006 EPD rates being 12.85%. This compared to a range from a low of 4.47% in March 2005 to a high of 9.24% in December 2005. Thus, as noted by the Examiner, "the increase in EPD was hardly 'modest.'" <u>Id.</u> Moreover, the Examiner cited to a specific e-mail from Cloyd to Defendants Morrice and Dodge at 8:50 pm on the night before Defendant's September 8, 2006 press release which stated: "we got our teeth kicked in with regard to repurchase requests in Aug. and thus far in September."

Id.  Cloyd's email attached a Repurchase Claims Summary spreadsheet that showed rising early payment defaults.  Id.  Yet, "no one at New Century took any steps" to retrieve the September 8, 2006 press release before it was issued the next day.  Id.

453.  As set forth in paragraphs 101-08 above, at the time the 2006 third quarter results were reported, New Century's reported Residual Interests were materially overstated as these reported Residual Interests failed to account for the Company's progressively decreasing loan quality and underwriting practices as well as New Century's increasing delinquencies, defaults and default loss severity throughout 2005 and 2006. As set forth in paragraphs 106-08 above, the facts revealed by the Examiner's Report demonstrate that New Century's Residual Interests were overstated at the time of the above-reported 2006 third quarter earnings and at all times throughout 2005-06 as "New Century insisted on using unduly low discount rates;" New Century "repeatedly resisted warnings from specialists at KPMG [starting at least for its quarterly review for the first quarter of 2005], who warned that the discount rates New Century was using were below those used by most of its peers;" "New Century relied for far too long on antiquated and flawed internally-developed Excel-based models to value residual interests;" and New Century failed "to adjust its prepayment rates to reflect changing market conditions . . . contrary to the advice it consistently received as far back as the first quarter of 2005 from KPMG's SFG, which repeatedly expressed concern about the Company's use of low prepayment speed assumptions."  The Examiner quantified the material impact of these GAAP violations as of the 2006 third quarter at ($29,100,000).  Examiner's Report at 383.

454.  As set forth in paragraphs 194-96 above, the facts revealed by the Examiner's Report demonstrate that that New Century's internal controls suffered from significant deficiencies and material weaknesses at the time of the above-reported 2006 third quarter internal control certifications and statements and at all

times throughout 2005-06 as the result of "deeply-rooted and long-standing failures to establish and monitor adequate internal controls over financial reporting;" including failures to "develop effective policies and procedures for performing accounting estimates requiring the exercise of considerable judgment;" and to "remediate internal control deficiencies that existed at year-end 2004." Among the deficiencies that New Century failed to remedy from year-end 2004 were "key controls surrounding the repurchase reserve estimation process;" "the allowance for loan losses methodology and rationale;" and "controls related to the hedging and derivatives process." "New Century also failed to establish sufficient internal controls with respect to its residual interest valuation process." As demonstrated by the facts obtained by the Examiner (as well as the numerous other facts set forth in paragraphs 447-48 above), New Century also suffered throughout 2005 and 2006 from "significant deficiencies and material weaknesses in Management's internal control structure related to loan quality . . . ."

455.  As set forth in paragraphs 109-18 above, New Century's Allowance for Loan Losses reserve was unexplainably reduced in the 2006 third quarter in the face of a material increase in loan delinquencies and the Company misleadingly failed to disclose this fact either in its November 2, 2006 press release or during the November 2, 2006 conference call.  The Company disclosed the need to increase this reserve shortly after the end of the Class Period.  As set forth in paragraphs 109-18 above, during the Class Period, the Company failed to calculate and present this reserve in accordance with GAAP.

456.  Accordingly, the material financial misstatements and significant deficiencies and material weaknesses in internal controls relating to the repurchase claims backlog and Residual Interests eventually reported by the Company on February 7, 2007 and, thereafter, were in existence at the time of the above statements, rendering them materially misstated when made.

1

2

**H.    New Century's February 7, 2007**
**And Subsequent Disclosures**

457.    On February 7, 2007, after the close of trading and just one day before the Company was scheduled to report 2006 fourth quarter and year-end results, New Century issued a press release announcing that it would restate its reported financial results for the quarters ended March 31, June 30 and September 30, 2006. The press release stated:

> The Company establishes an allowance for repurchase losses on loans sold, which is a reserve for expenses and losses that may be incurred by the Company due to the potential repurchase of loans resulting from early-payment defaults by the underlying borrowers or based on alleged violations of representations and warranties in connection with the sale of these loans. When the Company repurchases loans, it adds the repurchased loans to its balance sheet as mortgage loans held for sale at their estimated fair values, and reduces the repurchase reserve by the amount the repurchase prices exceed the fair values. During the second and third quarters of 2006, the Company's accounting policies incorrectly applied Statement of Financial Accounting Standards No. 140 – Accounting for Transfers and Servicing of Financial Assets and Extinguishment of Liabilities. Specifically, the Company did not include the expected discount upon disposition of loans when estimating its allowance for loan repurchase losses.
>
> In addition, the Company's methodology for estimating the volume of repurchase claims to be included in the repurchase reserve calculation did not properly consider, in each of the first three quarters of 2006, the growing volume of repurchase claims outstanding that resulted from the increased pace of repurchase requests that occurred in 2006,

<u>compounded by the increasing length of time between the whole loan sales and the receipt and processing of the repurchase request</u>.

\* \* \*

Although the Company's full review of the legal, accounting and tax impact of the restatements is ongoing, at this time the Company expects that, once restated, its net earnings for each of the first three quarters of 2006 will be reduced.

<u>In light of the pending restatements, the Company's previously filed condensed consolidated financial statements for the quarters ended March 31, June 30 and September 30, 2006 and all earnings-related press releases for those periods should no longer be relied upon</u>.  The Company expects to file amended Quarterly Reports on Form 10-Q for the quarters ended March 31, June 30 and September 30, 2006 as soon as practicable, with a goal to file by March 1, 2007.  <u>The Company also expects that the errors leading to these restatements constitute material weaknesses in its internal control over financial reporting for the year ended December 31, 2006</u>.

\* \* \*

The Company's fourth quarter and full-year 2006 earnings announcement, originally scheduled for February 8, 2007, has been postponed to an undetermined future date, which will follow the Company's filing of its amended Quarterly Reports on Form 10-Q for the quarters ended March 31, June 30 and September 30, 2006.

The increasing industry trend of early-payment defaults and, consequently, loan repurchases intensified in the fourth quarter of 2006.  The Company continued to observe this increased trend in its

1    early-payment default experience in the fourth quarter, and the

2    volume of repurchased loans and repurchase claims remains high.

3    In addition, the Company currently expects to record a fair value

4    adjustment to its residual interests to reflect revised prepayment, loss

5    and discount rate assumptions with respect to the loans underlying

6    these residual interests, based on indicative market data. While the

7    Company is still determining the magnitude of these adjustments to its

8    fourth quarter 2006 results, the Company expects the combined

9    impact of the foregoing to result in a net loss for that period.

10    [Emphasis added.]

11    The Company's press release sought to minimize the market reaction to these

12    disclosures by stating: "Importantly, the foregoing adjustments are generally non-

13    cash in nature. Moreover, the company had cash and liquidity in excess of $350

14    million at December 31, 2006." With regard to internal controls, the press release

15    further stated: "[T]he Company has taken significant steps to remediate these

16    weaknesses and anticipates remediating them as soon as practicable." (The

17    Company's cash and liquidity disclosure, however, conveniently failed to disclose

18    the effect of the January 31, 2007 dividend payment on cash and liquidity.)

19        458. Also on February 7, 2007, after the close of trading, Defendant

20    Morrice held a listen-only conference call with analysts and investors to review the

21    Company's press release. During the call, Defendant Morrice read the Company's

22    February 7, 2007 press release and added only the following additional statement:

23        Let me conclude by saying that I certainly understand your interest in

24        learning more about these events and their ramifications, and I ask for

25        your patience in allowing us to continue our review so that we can

26        finalize the restatements and file our Form 10-K as soon as possible.

27        While we are unable to comment further about the restatements and

28        our 2006 results at this time, please know that we are working

diligently to complete the review and will be back to you with more complete information as soon as we can.    Thank you for your understanding and support.

459.   In response to the Company's disclosures, the price of New Century common stock closed on February 8, 2007, the next trading day, at $19.24 per share, a decline of $10.92 per share, or approximately 36%, from the closing price of $30.16 per share on February 7, 2007, on extraordinary trading volume. Similarly, the price of New Century Series A and B Preferred Stock declined by approximately 10% on heavy trading.

460.   The Company's February 7, 2007 announcements came less than three months after newly hired Tajvinder S. Bindra replaced Defendant Dodge as Chief Financial Officer, effective November 15, 2006, and just over one month after Defendant Cole retired as Chairman of the Board of the Company, effective December 31, 2006.

461.  On February 8, 2007, Roth Capital issued an analyst report suspending its coverage of New Century noting that:

> <u>Our previous set of estimates and valuation relied, to a large degree, on previously published and filed financial statements</u>. . . .  Because New Century's published financial statements no longer appear to reflect a fair representation of the Company's results of operations (its earnings power) and financial condition as of the end of the periods reported, we can no longer rely on stated book value – or, for that matter, any other balance reported as of 9/30/06 – as a starting point for our own calculations of the fair value of the Company's residual assets.
>
> * * *
>
> <u>Similarly, we do not believe we can use current or estimated production levels in arriving at an estimate of the Company's</u>

mortgage banking (origination) platform. Not knowing what portion of New Century's production is coming back to it in the form of repurchases, we cannot make a stab at the value of the Company's origination platform []. Because the skill, the value added in originating (or manufacturing) a loan is not the dollar volume of loans produced, but, rather, in the dollar volume of loans that have a market value in excess of the costs incurred (resources expended) to originate those loans.

\* \* \*

When interest rates are in free fall and home values are skyrocketing, the market value of just about every loan – even if it is delinquent – is rising because the value of the underlying collateral is increasing and the ability of all parties to the transaction to make themselves whole is improving. Any entity can originate a loan in that environment and make money. There are no early payment defaults in this environment. No repurchase requests. Why would a whole loan buyer or investor put back a loan to the originator when that loan is increasing in market value every day?

\* \* \*

The true value, in our opinion, is in the volume of loans an organization can produce at a profit . . . .

\* \* \*

The upshot of the foregoing is that we have no reasonable basis on which to calculate estimates of GAAP earnings, taxable income, dividends or fair value. Until the Company can provide restated operating results and statements of financial condition for 2006 interim periods and 4th quarter operating results and a December 31, 2006 balance sheet – as well as 2007 guidance – in which we feel

1   confident, we cannot arrive at what we deem to be reasonable
2   estimates of performance or value.  [Emphasis added.]

3   462.   Piper Jaffray issued a report on February 8, 2007 noting:  "We believe
4   that relaxed underwriting standards have been the main driver for the large number
5   of loan repurchases."  (Emphasis added.)  Friedman, Billings, Ramsey & Co., Inc.
6   also issued a report on February 8, 2007 noting:  "Liquidity Is The Big Question
7   Now.   As a result of the restatements, higher repurchases, and anticipated net
8   losses, we believe warehouse lines could be at risk of being pulled."

9   463.   On March 1, 2007, after the close of trading, New Century issued a
10  press release announcing that it expected to file a Form 12b-25 Notification of Late
11  Filing with the SEC with respect to its Form 10-K for the year-ended December
12  31, 2006.  The price of New Century common stock closed on Friday, March 2,
13  2007, the next trading day after New Century's disclosure, at $14.65 per share, a
14  decline of $1.20 per share, or approximately 7.6%, from the closing price of
15  $15.85 per share on March 1, 2007, on extraordinary trading volume.

16  464.   On Friday, March 2, 2007, after the close of trading, New Century
17  filed with the SEC a Form 12b-25 Notification of Late Filing.  The Form 12b-25
18  stated:

19      As previously announced, the Company will restate its consolidated
20      financial results for the quarters ended March 31, June 30 and
21      September 30, 2006 to correct errors the Company discovered in its
22      accounting and financial reporting of loan repurchase losses.

23

24      In connection with the restatement process, the Audit Committee of
25      the Company's Board of Directors (the "Audit Committee"), advised
26      by its independent counsel who is assisted by forensic accountants,
27      has initiated its own independent investigation into the issues giving
28      rise to the Company's need to restate its 2006 interim financial

statements, as well as issues pertaining to the Company's valuation of residual interests in securitizations in 2006 and prior periods. The Audit Committee will expand the scope of its investigation as may be necessary to cover other matters that are developed in the course of its investigation or otherwise come to its attention. The 2006 Form 10-K will be filed after this investigation is complete.

In addition, the Company is determining the amount of the adjustment to the estimated fair value of its residual interests in securitizations to reflect revised prepayment, cumulative loss and discount rate assumptions with respect to the mortgage loans underlying these assets. The Company is revising the assumptions to reflect relevant data such as recent loss experience, changing market conditions and updated expectations regarding higher credit losses and faster prepayment speeds.

In accordance with Section 404 of the Sarbanes-Oxley Act of 2002, the Company's management is assessing the effectiveness of its internal control over financial reporting as of December 31, 2006, and expects to conclude that there were material weaknesses in the internal control over financial reporting as of December 31, 2006. After management completes its assessment, the Company will include the assessment in the 2006 Form 10-K. The assessment will discuss the material weaknesses that management identifies and the actions that have been and will be taken to remediate these material weaknesses.

*   *   *

Estimated Effect of Restatement – Although a full review is ongoing, the Company currently expects that the modifications to the allowance for loan repurchase losses will result in restated net income for the first three quarters of 2006 that is significantly lower than previously reported in the Company's 2006 interim financial statements.

Estimated Fourth Quarter and Full-Year Results – Although the Company's mortgage loan origination volume increased in 2006 when compared to 2005, the Company's results of operations for the quarter and year ended December 31, 2006 will reflect declines in earnings and profitability when compared to the same periods in 2005.  The Company currently expects that it will report a pretax loss for both the fourth quarter and the full year ended December 31, 2006.

These negative trends in results compared to 2005 are attributable primarily to:

Lower Net Gain on Sale – The Company's net gain on sale of its mortgage loans declined over the course of 2006 due primarily to (i) increased exposure to repurchased loans from whole loan buyers, (ii) increases in the percent of loans rejected by whole loan investors during their due diligence review prior to purchase and (iii) increasing severity of loss upon disposition of repurchased and other loans in discounted loan sales.

Reduction in Carrying Value of Residual Assets – The Company expects to record an adjustment to the estimated fair value of its residual interests in securitizations to reflect revised prepayment,

cumulative loss and discount rate assumptions with respect to the mortgage loans underlying these residual interests.

<u>Reduction in Carrying Value of Mortgage Loans Held for Sale</u> – The Company expects to record a lower-of-cost-or-market valuation allowance reflecting the Company's current estimate of the fair value of its inventory of mortgage loans held for sale, which is lower than the Company's cost basis in those loans. This fair value estimate reflects changes in market conditions.

<u>Allowance for Losses on Loans Held for Investment</u> – The Company expects to record an increase in its allowance for losses on its portfolio of loans held for investment reflecting relevant data such as recent loss experience, changing market conditions and updated expectations regarding higher credit losses and faster prepayment speeds.

\* \* \*

The Company currently relies on its 15 short-term repurchase agreements and aggregation credit facilities and an asset-backed commercial paper facility that collectively provide the Company with an aggregate of approximately $13.0 billion of committed and $4.4 billion of uncommitted borrowing capacity to fund mortgage loan originations and purchases pending the pooling and sale of such mortgage loans.

These financing arrangements generally require the Company to deliver timely financial statements prepared in accordance with generally accepted accounting principles to its lenders. Because of the

previously announced restatement, the Company obtained written waivers from its various lenders with respect to compliance with this delivery requirement through March 15, 2007.  If, as may occur, the Company does not file its restated financial statements for the quarters ended March 31, June 30 and September 30, 2006 and the 2006 Form 10-K on or before March 15, 2007, the Company will seek to obtain additional written waivers from its various lenders with respect to this delivery requirement.

In addition, 11 of the Company's 16 financing arrangements require it to report at least $1 of net income for any rolling two-quarter period. The Company expects that it will not meet this requirement for the two-quarter period ended December 31, 2006.  As a result, the Company is seeking to obtain waivers with respect to this covenant.

*   *   *

In addition, where applicable, the Company is seeking amendments to its financing arrangements to modify this rolling two-quarter net income covenant for the remainder of 2007.  Although there can be no assurance that the Company will receive these amendments and waivers from all of its lenders, the Company is in active dialogue with these lenders and has made progress in this regard.

In the event the Company is unable to obtain satisfactory amendments to and/or waivers of the covenants in its financing arrangements from a sufficient number of its lenders, or obtain alternative funding sources, KPMG has informed the Audit Committee that its report on the Company's financial statements will include an explanatory

paragraph indicating that substantial doubt exists as to the Company's ability to continue as a going concern.

\* \* \*

The staff of the SEC has requested a meeting with the Company to discuss the events leading up to the announcement of the restatements and the Company intends to comply with the SEC's request.

On February 22, 2007, the Company received a letter dated February 21, 2007 from the NYSE Regulation Inc. indicating that its Market Trading Analysis Department is reviewing transactions in the Company's securities prior to the February 7, 2007 announcement of the restatement process and that the Company expected a loss in the fourth quarter of 2006. In that regard, the letter requested certain information from the Company, which the Company has agreed to provide.

On February 28, 2007, the Company received a letter from the United States Attorney's Office for the Central District of California (the "U.S. Attorney's Office") indicating that it was conducting a criminal inquiry under the federal securities laws in connection with trading in the Company's securities, as well as accounting errors regarding the Company's allowance for repurchase losses. The U.S. Attorney's Office is requesting voluntary assistance by the Company, which the Company has agreed to provide. [Emphasis added.]

465.   On Saturday, March 3, 2007, The New York Times highlighted the Company's disclosures that Federal prosecutors and securities regulators were

investigating stock sales and accounting "errors" at New Century.  The New York Times reported:

> It is unclear what stock sales investigators are looking at, but data from securities filings compiled by Thompson Financial show that two of the Company's top executives sold sizable blocks of shares in the second half of last year.  Robert K. Cole, a former chairman and a founder of the Company, sold stock worth $6.7 million in the third and fourth quarters after not selling significant numbers of shares for the previous three quarters.  And Edward F. Gotschall, another founder and vice chairman, sold shares worth $14.7 million after not selling significant numbers of shares for the previous six months.
>
> [Emphasis added.]

466.  On March 5, 2007, The New York Times reported that "New Century's disclosure of the federal investigations on Friday [March 2, 2007] was the most serious in a string of shocks to have rocked the industry in the last three months."  The New York Times further reported on the personal wealth and stock sales of New Century's senior executives:

> The three founders of New Century . . . together made more than $40.5 million in profits from selling shares in the Company from 2004 to 2006, according to an analysis by Thompson Financial.  They collected millions of dollars more in dividends, salaries bonuses and perks. . . .  In a series of sales from August to November [2006], two of the Company's founders sold shares for an average price of about $40 a share, for a total profit of $21.4 million. . . .  The founders' stock also rose in the social circles of southern California, the epicenter of the boom in subprime. . . .  Robert K. Cole, 60, a co-founder who retired as chairman and chief executive last year, lives in a 6,100 square foot oceanfront home in Laguna Beach that is valued at

tens of millions of dollars . . . .  Edward F. Gotschall, 52, another co-founder who is vice chairman of the board, donated $3 million for an expanded trauma center at Mission Hospital that will be named for him and his wife Susan.

The New York Times quoted former executive Kal Elsayed who spent nine years at New Century before leaving to start his own mortgage firm in 2005 as stating: "We made so much money you couldn't believe it.  And you didn't have to do anything.  You just had to show up."  The New York Times further reported:

[A]bout 13.8 percent of the loans in a group of mortgages New Century sold to investors in April [2006] were behind in payments or in foreclosure by January [2006].  By comparison, only 6 percent of loans in a pool sold to investors in March 2005 had met that same fate by January 2006.  Investors and regulators fear that problems will only worsen as so many borrowers have fallen behind so quickly, especially at a time when the overall economy is healthy.  The phenomenon suggests that lending standards were significantly weakened last year and that lenders were not as watchful for fraudulent transactions.  [Emphasis added.]

467.   The price of New Century common stock closed on Monday, March 5, 2007, the next trading day after New Century's March 2, 2007 disclosures and the news reports which followed, at $4.56 per share, a decline of $10.09 per share, or approximately 69%, from the closing price of $14.65 per share on March 2, 2007, on extraordinary trading volume.  Similarly, the price of New Century Series A and B Preferred Stock declined by approximately 55% and 58%, respectively, on heavy trading.

468.   On March 8, 2007, New Century filed with the SEC a Form SC 13D/A which disclosed:  "In a letter sent by David Einhorn to the Board of

1   Directors of New Century on March 7, 2007, Mr. Einhorn resigned as a director of

2   New Century effective as of 7:00 p.m. EST on March 7, 2007."

3      469.   In response to the Company's disclosure, the price of New Century

4   common stock closed on March 8, 2007, at $3.87 per share, a decline of $1.29 per

5   share, or approximately 25%, from the closing price of $5.16 per share on March

6   7, 2007, on extraordinary trading volume.   Similarly, the price of New Century

7   Series A and B Preferred Stock declined by approximately 9% and 5%,

8   respectively, on heavy trading.   The New York Times reported that the price of

9   New Century shares fell as "Einhorn's departure might mean that the Company's

10  troubles were intensifying."

11     470.   On March 8, 2007, after the close of trading, New Century issued a

12  press release announcing that as a result of "its current constrained funding

13  capacity," New Century had elected to cease accepting loan applications from

14  prospective borrowers "effective immediately" while the Company sought to

15  obtain additional funding capacity.   The press release further reported that New

16  Century was in discussions with lenders and other third parties regarding

17  refinancing or other alternatives to obtain additional liquidity, but that no assurance

18  could be given that any of the discussions would be successful.

19     471.   In response to the Company's disclosures, the price of New Century

20  common stock closed on March 9, 2007, at $3.21 per share, a decline of $0.66 per

21  share, or approximately 17%, from the closing price of $3.87 per share on March

22  8, 2007, on extraordinary trading volume.

23     472.   On March 12, 2007, before the start of trading, New Century filed

24  with the SEC a Form 8-K which stated:

25          As previously disclosed, the Company has been in discussions with its

26          lenders in an effort to obtain waivers for certain of the obligations of

27          the Company and its subsidiaries under these financing arrangements.

28          As described below, the Company has received notices from certain

of its lenders asserting that the Company and/or its subsidiaries have violated their respective obligations under certain of these financing arrangements and that such violations amount to events of default. Certain of these lenders have further advised the Company that they are accelerating the Company's obligation to repurchase all outstanding mortgage loans financed under the applicable agreements.

[Emphasis added.]

The Form 8-K disclosed that among the lenders who advised the Company that it was in default and/or accelerated the Company's obligation to repurchase outstanding mortgage loans were:  Bank of America, N.A.; Citigroup Global Markets Realty Corp.; Credit Suisse First Boston Mortgage Capital LLC; Goldman Sachs Mortgage Company; and Morgan Stanley Mortgage Capital Inc.  The Form 8-K further disclosed:

All of the Company's financing arrangements with its lenders contain cross default and cross acceleration provisions.  Accordingly, each of the Company's lenders that have not yet delivered notices of default or acceleration to the Company will be permitted to do so under the terms of their applicable financing arrangement with the Company.  If each of the Company's lenders were to accelerate the obligations of the Company and its subsidiaries to repurchase all outstanding mortgage loans financed under all of the Company's outstanding financing arrangements, the aggregate repayment obligations would be approximately $8.4 billion.  Further, under the respective financing arrangements, each of the Company's lenders have the right to cease providing financing to the Company and its subsidiaries during the pendency of an event of default.  As of March 9, 2007, all of the Company's lenders under its short-term repurchase agreements and

aggregation credit facilities had discontinued their financing with the Company or had notified the Company of their intent to do so.

\* \* \*

The Company and its subsidiaries do not have sufficient liquidity to satisfy their outstanding repurchase obligations under the Company's existing financing arrangements. The Company is continuing its discussions with its lenders and other third parties regarding refinancing and other alternatives to obtain adequate liquidity. No assurance can be given that any of these discussions will be successful. If the Company and its subsidiaries are not able to satisfy their repurchase obligations, one or more of the Company's lenders may seek to liquidate the mortgage loans or other assets financed under the applicable financing arrangement with the Company. If this were to occur and if such liquidation was for an amount less than the contractual amount at which the Company and its subsidiaries have agreed to repurchase such mortgage loans from the applicable lender, then the lender may seek to recover this deficiency from the Company and its subsidiaries. The Company and its subsidiaries may not have sufficient resources to satisfy any such deficiency.

\* \* \*

As previously announced, on March 2, 2007, the Company filed a Form 12b-25 with the Securities and Exchange Commission in which it reported that it had not yet filed its Annual Report on Form 10-K for its fiscal year ended December 31, 2006 (the "2006 Form 10-K"). In the Form 12b-25, the Company reported that it would not be able to complete its 2006 Form 10-K until (i) the Audit Committee of its Board of Directors completes its previously announced internal investigation into the issues giving rise to the Company's need to

restate its 2006 interim financial statements, as well as issues pertaining to the Company's valuation of residual interests in securitizations in 2006 and prior periods, and (ii) the Company provides its independent registered public accounting firm, KPMG LLP, with the information that it needs in order to complete its audit of the Company's financial statements and internal control over financial reporting.

The Company continues to work diligently to finalize its financial statements for the year ended December 31, 2006, <u>but does not expect to finalize its financial statements, or to file its 2006 Form 10-K, prior to March 16, 2007</u> (the fifteenth calendar day following the prescribed due date for the 2006 Form 10-K). If the Company does not file its 2006 Form 10-K with the SEC on or before March 16, 2007, the Company will be in violation of Section 203.01 (Annual Financial Statement Requirement) of the New York Stock Exchange's (the "NYSE") Listed Company Manual and will be subject to the procedures specified in Section 802.01E (SEC Annual Report Timely Filing Criteria) of the NYSE Listed Company Manual. [Emphasis added.]

473. In response to the Company's disclosures, the price of New Century common stock closed on March 12, 2007, at $1.66 per share, a decline of $1.55 per share, or approximately 48%, from the closing price of $3.21 per share on March 9, 2007, the prior trading day, on extraordinary trading volume.

474. On March 13, 2007, before the start of trading, New Century filed with the SEC a Form 8-K which disclosed additional lenders who advised the Company that it was in default and/or accelerated the Company's obligation to repurchase outstanding mortgage loans. These lenders included: Barclays Bank

PLC; Guaranty Bank; State Street Global Markets, LLC; and UBS Real Estate Securities Inc. The Form 8-K further disclosed:

> On February 28, 2007, the Company received a letter from the United States Attorney's Office for the Central District of California (the "U.S. Attorney's Office") indicating that it was conducting a criminal inquiry under the federal securities laws in connection with trading in the Company's securities, as well as accounting errors regarding the Company's allowance for repurchase losses. <u>The Company has subsequently received a grand jury subpoena requesting production of certain documents. The Company intends to cooperate with the requests of the U.S. Attorney's Office</u>.
>
> On March 12, 2007, the Company received a letter from the staff of the Pacific Regional Office of the Securities Exchange Commission stating that the staff was conducting a preliminary investigation involving the Company and requesting production of certain documents. The staff of the SEC had also previously requested a meeting with the Company to discuss the events leading up to the Company's previous announcement of the need to restate certain of its historical financial statements. The Company intends to cooperate with the requests of the SEC. [Emphasis added.]

475. In response to the Company's disclosures, the price of New Century common stock closed on March 13, 2007, the last day of the Class Period, at $0.85 per share, a decline of $0.82 per share, or approximately 49%, from the closing price of $1.67 per share on March 12, 2007, on extraordinary trading volume.

476. On March 13, 2007, after the close of trading, New Century issued a press release announcing that the New York Stock Exchange had determined that its common stock Preferred A and Preferred B stock were no longer suitable for

continued listing on the NYSE and would be suspended immediately. The press release reported that the NYSE made its decision based upon the Company's recent filings with the SEC and the uncertainty of its current liquidity position.

## I.    Post-Class Period Disclosures

477.    On March 14, 2007, New Century filed with the SEC a Form 8-K which disclosed:

> On March 13, 2007, the Company and certain of its subsidiaries received cease and desist orders from regulators in the States of Massachusetts, New Hampshire, New Jersey and New York. The cease and desist orders contain allegations that certain of the Company's subsidiaries have engaged in violations of applicable state law, including, among others, failure to fund mortgage loans after a mortgage closing, failure to meet certain financial requirements, including net worth and available liquidity, and failure to timely notify the state regulators of defaults and terminations under certain of its financing arrangements.
>
> The cease and desist orders seek to restrain the subsidiaries from taking certain actions, including, among others, engaging in further violations of state law, taking new applications for mortgage loans in the relevant jurisdiction, and paying dividends or bonuses to officers, directors or shareholders of the applicable subsidiaries. The cease and desist orders also seek to cause the subsidiaries to affirmatively take certain actions, including the creation of escrow accounts to hold fees relating to pending mortgage applications, the transfer to other lenders of the outstanding mortgage applications and unfunded mortgage loans held by the subsidiaries, and the provision of regular information to the state regulators regarding the subsidiaries' activities in the applicable state, including the status of all outstanding mortgage

applications and unfunded mortgage loans in that state.  Certain of the cease and desist orders also require one or more of the subsidiaries to show cause why their license should not be revoked or why administrative penalties should not be assessed.

478.   On March 14, 2007, the price of New Century common stock closed at just $0.67 per share, a new low closing price.

479.   On April 2, 2007, New Century issued a press release announcing that the Company had filed a voluntary petition for relief under Chapter 11 of the U.S. Bankruptcy Code.   In connection with the Chapter 11 filing, the Company disclosed that it would reduce its workforce by approximately 3,200 employees effective immediately.  Thousands more were fired in the months which followed.

480.   On May 3, 2007, New Century filed with the SEC a Form 8-K which disclosed that KPMG had notified the Chairman of New Century's Audit Committee by letter dated April 27, 2007 that KPMG had resigned as New Century's outside auditor.  The Form 8-K disclosed:

> On February 7, 2007, the Company filed a Form 8−K with the Securities and Exchange Commission (the "SEC") reporting that the Company's Board of Directors had concluded that the Company's previously filed interim financial statements for the quarters ended March 31, 2006, June 30, 2006, and September 30, 2006 (collectively, the "Interim Financial Statements"), should be restated to correct errors the Company discovered in its accounting and financial reporting of loan repurchase losses.   In connection with the restatement process, the Audit Committee of the Company's Board of Directors, on the advice of its independent counsel, initiated its own independent investigation into the issues giving rise to the Company's need to restate the Interim Financial Statements, and subsequently expanded the investigation, <u>at the request of KPMG, to include issues</u>

<u>pertaining to the Company's valuation of residual interests in securitizations in 2006 and prior periods</u> (the "Internal Investigation"). The Audit Committee retained independent counsel, forensic accountants and other professionals to assist it in connection with the Internal Investigation.

<u>Subsequent to the Company's discovery of the accounting errors and initiation of the Internal Investigation, KPMG communicated to the Company that as a result of the Internal Investigation KPMG would likely need to reassess its audit plan, and perform additional audit procedures, in order to obtain sufficient evidence concerning any conclusions reached by the investigating team</u>.     KPMG also communicated to the Company that (i) the pending regulatory investigations into the matters under investigation in connection with the Internal Investigation or (ii) the pendency of the Internal Investigation itself, could also impact KPMG's ability to conclude on the financial statement implications of the matters under investigation, including whether or not KPMG would be able to continue to rely on representations from management.  As of April 27, 2007, the date of KPMG's resignation, the Internal Investigation was ongoing and accordingly the Company had not received from KPMG its determination on these matters.  The Company has also been advised by KPMG that it expects that the evaluation of the impact of this matter on the Company's internal control over financial reporting and disclosure controls and procedures for the applicable periods could constitute a material weakness in the Company's internal control over financial reporting.  [Emphasis added.]

481.   On May 11, 2007, New Century filed a Form NT 10-Q with the SEC which stated:

> As previously disclosed, on April 2, 2007, the Company and certain of its subsidiaries filed voluntary petitions for reorganization under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the District of Delaware (Case No. 07-10416). Since that time, the Company has been immersed in bankruptcy-related matters.  The Company has not yet been able to file its Annual Report on Form 10-K for the year ended December 31, 2006. Further, the Company has experienced the resignation of its independent accounting firm, KPMG LLP.  Due to the resignation, as well as the additional time required to complete its financial statements to be included in its periodic reports as a result of, among other things, the complexities of bankruptcy accounting, the process of impairment testing and estimating the fair value of impaired assets, the determination of the tax provision together with the evaluation of tax deferred assets and the possible need for valuation allowances, the Company will not be able to file the Form 10-Q in a timely manner without unreasonable effort or expense.   For further information regarding these and other factors affecting the Company's ability to timely file the Form 10-Q, please see the Company's Form 12b-25 filed with the Securities and Exchange Commission (the "SEC") on March 2, 2007.  The Company anticipates that it will not be able to complete its financial statements and file the Form 10-Q by May 15, 2007 and the Company is uncertain as to whether or not it will ever be able to file its financial statements.

482.   On May 24, 2007, New Century filed a Form 8-K which disclosed a "more likely than not" material overstatement in pretax earnings in 2005:

On February 7, 2007, New Century Financial Corporation (the "Company") filed a Form 8−K with the Securities and Exchange Commission (the "SEC") reporting that the Company's Board of Directors had concluded that the Company's previously filed interim financial statements for the quarters ended March 31, 2006, June 30, 2006, and September 30, 2006 (collectively, the "Interim Financial Statements"), should be restated to correct errors the Company discovered in its accounting and financial reporting of loan repurchase losses.   In connection with the restatement process, the Audit Committee of the Company's Board of Directors, on the advice of its independent counsel, initiated an independent investigation into the issues giving rise to the Company's need to restate the Interim Financial Statements, and as previously reported, subsequently expanded the investigation to include issues pertaining to the Company's valuation of certain residual interests in securitizations in 2006 and prior periods (the "Internal Investigation").  In addition to its independent counsel, the Audit Committee also retained forensic accountants and other professionals (collectively, the "Investigative Team") to assist it in connection with the Internal Investigation.

Based on recent communications with members of the Investigative Team, the Audit Committee has determined that there were errors in the Company's previously filed annual financial statements for its fiscal year ended December 31, 2005 (the "2005 Financial Statements") with respect to both the accounting and reporting of loan repurchase losses and the Company's valuation of certain residual interests in securitizations.   The Company's ability to further investigate these matters is constrained as the Company is currently in

liquidation proceedings under chapter 11 of the Bankruptcy Code. However, based upon the work performed by the Investigative Team, the Audit Committee and management believe that it is more likely than not that these errors in the aggregate resulted in a material overstatement of pretax earnings in the 2005 Financial Statements. Accordingly, on May 23, 2007, the Company's Board of Directors concluded, based upon the recommendation of the Audit Committee, that the 2005 Financial Statements should no longer be relied upon.

As the Company is currently in liquidation proceedings under chapter 11 of the Bankruptcy Code, the Company does not expect to complete a restatement of either the 2005 Financial Statements or the Interim Financial Statements. [Emphasis added.]

## XI.  THE NEW CENTURY OFFICER DEFENDANTS ACTED WITH SCIENTER

483.   At all relevant times, Defendants Cole, Morrice, Gotschall and Dodge acted with scienter, in making the above-quoted materially false and misleading statements throughout the Class Period.  Each of these senior officer Defendants had actual knowledge that the statements made by them were false and misleading, or acted with deliberate reckless disregard for the truth or falsity of those statements.  These Defendants' intent to deceive or deliberate reckless disregard for the truth is demonstrated by substantial circumstantial evidence collectively supporting a strong inference of scienter.

484.   At the start of the Class Period, on May 5, 2005, as set forth in paragraph 344 above, these Defendants publicly described New Century's underwriting as a "very core" control business function and, thereafter, the New Century Officer Defendants repeatedly described the credit quality of the Company's mortgages as "strong," "excellent," "superior." "very high" and "higher" or "better" than it had been in the Company's past as the result of

purportedly "strict;" "improved;" and "strong" underwriting controls and guidelines and risk management discipline. Each of the New Century Officer Defendants Cole (¶¶ 343, 344, 347, 358, 361, 376, 387, 388, 408, 425, 438, 443); Morrice (¶¶ 343, 347, 361, 373, 376, 388, 408, 425, 438, 443); Gotschall (¶¶ 343, 347, 361, 364, 376, 388); and Dodge (¶¶ 343, 344, 347, 361, 376, 387, 388, 405, 408, 425, 438, 443) repeatedly made such statements. All the while, as set forth in detail in paragraphs 120-90 above, New Century's underwriting standards were actually loosened and the Company introduced higher risk products to continue to reach record loan volume. These Defendants were intentionally misstating the facts or acting in a deliberately reckless manner in making their repeated statements regarding purportedly improved underwriting and loan quality in light of what was actually occurring at the Company which, at the very least, provided no basis for these Defendants' repeated statements and was completely the opposite of these Defendants' repeated Class Period statements and descriptions. Each of these Defendants was well aware of the competitive market New Century faced (they described it as "severe" in the Company's 2005 Form 10-K) as well as the fact that the Company could not continue to increase its mortgage origination volume without loosening its underwriting practices and reducing loan quality. Yet, they repeatedly claimed the contrary to New Century's investors during the Class Period.

485. Moreover, as set forth in paragraphs 173-190 above, after an extensive investigation, the Bankruptcy Examiner reported numerous facts demonstrating that public statements made by New Century regarding the purported quality of its loans and underwriting were "not supportable," without "justifiable basis" and untrue when made. Examiner's Report at 423-25. As set forth in paragraphs 173-190 above, the Examiner's report details the multiple sources of data provided to these Defendants, starting no later than 2004, which demonstrated (contrary to these Defendants' repeated public statements) that New Century's underwriting

and loan quality was seriously problematic. These sources include: (1) an April 2004 report from New Century's Chief Credit Officer; (2) a June 2004 report from New Century's head of Secondary Marketing; (3) an alarming and steady increase in early payment defaults and investor kickouts, beginning no later than mid-2004; (4) reports in 2004 that New Century lacked any formal exceptions policy and had no standard for loan quality; (5) seven "Unsatisfactory" and two "Needs Improvement" ratings from Internal Audit in 2005; and (6) very poor performance on 80/20 and stated income loams which constituted a growing percentage of New Century's mortgage originations. As set forth above, the Examiner's Report demonstrates that rather than address these issues, "New Century continued to focus on generating greater quantities of ever riskier loans."

486. Similarly, as set forth above, each of these Defendants repeatedly signed sworn certifications attesting to the Company's compliance with GAAP and the adequacy of New Century's internal controls in each and every quarter during the Class Period. These Defendants acted intentionally or in a deliberately reckless manner in repeatedly issuing sworn certifications attesting to the Company's compliance with GAAP, when the facts alleged herein demonstrate that New Century's financial results were not presented in accordance with GAAP (in many different and material ways), and the adequacy of the Company's internal controls, when the facts alleged herein demonstrate that New Century suffered from significant deficiencies and material weaknesses in its internal controls.

487. As set forth in paragraphs 194-96 above, the Examiner's Report presents numerous facts demonstrating "deeply-rooted and long-standing failures to establish and monitor adequate internal controls over financial reporting [which] substantially contributed to New Century's accounting errors." Contrary to these Defendants' repeated certifications, the facts presented in the Examiner's Report demonstrate that "New Century did not remediate internal control deficiencies that existed at year-end 2004 and year-end 2005, despite representing to KPMG that it

would." These year-over-year reported deficiencies included: (1) "key controls surrounding the repurchase reserve estimation process" identified by KPMG at year-end 2004 and 2005; (2) "internal controls with respect to its residual interest valuation process" identified by KPMG at year-end 2004 and 2005; (3) New Century's "methodology and assumptions for determining the ALL [Allowance for Loan Losses] provision" identified by KPMG "year-over-year;" and (4) "internal controls for the hedging and derivatives process" noted by KPMG "[o]ver a three year period, beginning in 2004 and ending in 2006." New Century's Internal Audit findings on loan quality controls also were "dismal" with none of the nine branches audited rated satisfactory, seven rated "Unsatisfactory," and two rated "Needs Improvement." Notwithstanding all of this information, Defendants Cole, Morrice, Gotschall and Dodge repeatedly signed sworn certifications attesting to the adequacy of New Century's internal controls.

488. Moreover, each of these Defendants repeatedly signed the Company's filings with the SEC which described (correctly) the controlling GAAP requirements for setting, inter alia, the Company's Allowance for Repurchase Losses reserve and measuring Residual Interests at fair value. The Company's SEC filings stated that New Century had established accounting policies that governed the application of GAAP in the preparation of its financial statements and labeled its accounting policies for setting, inter alia, the Allowance for Repurchase Losses reserve and Residual Interests as "Critical Accounting Policies." At the same time, these Defendants repeatedly failed to follow these same GAAP requirements and the Company's own Critical Accounting Policies.

489. As set forth in paragraphs 23-26 above each of these individuals has substantial educational, financial and industry experience, including the application of these very same GAAP requirements. Defendant Cole served, inter alia, as one of the Company's founders and its CEO for over ten years. Prior to founding New Century, Cole served as the President and Chief Operating Officer, Finance, of

another publicly-traded savings and loan holding company specializing in the origination and servicing of residential mortgage loans.  Defendant Morrice, one of the Company's co-founders, served, <u>inter alia</u>, as President of New Century for over ten years and, prior to that time, the President and Chief Operating Officer of another mortgage lender.  Defendant Gotschall, one of the Company's co-founders, served, <u>inter alia</u>, as Chief Financial Officer of New Century for approximately six years and, prior to that time, as the Executive Vice President/Chief Financial Officer of another mortgage lender.  Defendant Dodge served as Chief Financial Officer of New Century for over four years and worked in similar capacities at other lenders before joining New Century.

490.  As set forth in paragraph 71 above, New Century's 2005 Form 10-K stated that the Company's Allowance for Repurchase Losses reserve represented "the Company's estimate of the <u>total losses</u> expected to occur" and was "considered to be adequate by management based upon the Company's evaluation of the potential exposure related to the loan sale agreements over the period of repurchase risk." (Emphasis added.)  Yet, as set forth in paragraphs 69-100 above and subsequently admitted by the Company, the Company's Allowance for Repurchase Losses reserve in 2005 and 2006 failed to account for the growing backlog of repurchase claims outstanding.

491.  There is significant evidence that Defendants Cole, Morrice, Gotschall and Dodge knew of or deliberately disregarded the growing backlog.  As set forth above in paragraphs 75 and 77 above, CWs 1 and 3 report that the backlog was created as the result of an intentional delay of funding repurchase claims and New Century "sitting on repurchase requests" and "trying to game the system."  As set forth in paragraphs 92-93 above, the Examiner's Report demonstrates that the repurchase claims backlog was "no secret" and "general knowledge" within New Century's Accounting, Finance and Secondary Marketing groups.  In addition, as set forth in paragraph 76 above, CW 2 reports that backlog information was shared

between Kevin Cloyd and Defendant Dodge and the Company's other senior executive officers.

492.   Not only did these Defendants fail to account for or disclose the growing backlog throughout the Class Period, but they also repeatedly made public statements that were materially misleading given the rising early payment defaults and undisclosed repurchase claims backlog.

493.   For example, as set forth in paragraphs 438 and 452 above, on September 8, 2006, Defendants Cole, Morrice and Dodge issued a press release which stated that the Company's increase in early payment defaults had been "modest" when, in fact, these Defendants knew that the increase in early payment defaults was anything but modest given the reports they were receiving and the growing repurchase claims backlog.   These adverse trends are demonstrated in paragraphs 178-80, 184-86 above.   In fact, as revealed by the Examiner, Defendants Morrice and Dodge specifically received an e-mail the night before the September 8, 2006 press release demonstrating the dramatic increase in early payment defaults, yet took no steps to stop the press release from being issued the next day.   Accordingly, the Examiner concluded that these Defendants' September 8, 2006 statement was "utterly without basis when made."

494.   In addition, as set forth in paragraph 373 above, Defendant Morrice admitted publicly on November 3, 2005, that first payment defaults were "certainly something we track carefully."   According to a former New Century Vice President, Corporate Finance employed by the Company from 2002 until April 2007 (CW 3), and a former New Century Vice President, Operations employed by the Company from February 2003 until October 2006 (CW 21), this was true, as Morrice received on a monthly basis, a "Capital Markets Package," which detailed information on delinquencies and early payment defaults.   According to CW 7, there was a great deal of data available to the New Century Officer Defendants detailing how New Century's loans were performing.   The Examiner's Report also

1    demonstrates that New Century regularly tracked first, second and third payment

2    defaults. Examiner's Report at 132.

3         495.  Notwithstanding the disturbing early payment default and repurchase

4    claim trends, Defendants Morrice, Cole and Dodge repeatedly characterized early

5    payment defaults and repurchases as "modest" on November 3, 2005 (paragraph

6    373); May 4, 2006 (paragraph 405); August 3, 2006 (paragraph 422); and

7    September 8, 2006 (paragraph 438).

8         496.  The Company's Forms 10-Q and 10-K also repeatedly failed to

9    disclose the repurchase claims backlog and, as identified by the Examiner

10   (paragraph 100 above), misleadingly stated that the Company "occasionally"

11   repurchased loans "after 90 days" had elapsed from whole loan sales.

12        497.  Finally, as set forth in paragraph 97 above, when New Century

13   inappropriately changed its repurchase reserve methodology in the 2006 second

14   and third quarters in violation of GAAP which had the effect of reducing the

15   repurchase reserve at a time when repurchase claims were growing, Defendant

16   Dodge failed to disclose those changes to the New Century's own Audit

17   Committee despite ample opportunity to do so.

18        498.  With regard to the Company's valuation of Residual Interests, New

19   Century's SEC filings repeatedly stated that the Company purportedly reviewed its

20   underlying assumptions on a quarterly basis and adjusted the carrying value of the

21   Residual Interests based on actual experience and industry experience and

22   presented its Residual Interests at "fair value" in accordance with GAAP. Yet, as

23   revealed by the facts contained in the Examiner's Report set forth in paragraphs

24   106-08 above, New Century insisted on using an unduly low discount rate in

25   valuing its Residual Interests and repeatedly resisted warnings from specialists at

26   KPMG that New Century was using discount rates below its peers. Nonetheless,

27   as set forth in paragraph 364 above, Defendant Gotschall specifically claimed

28

either intentionally or with deliberate recklessness that New Century used "very conservative assumptions" and booked its Residual Interests "conservatively."

499.  As set forth in paragraphs 109-18 above, these Defendants each signed SEC filings regarding the adequacy of the Company's Allowance for Loan Losses reserve despite the fact that the reserve was not presented in accordance with GAAP.   In fact, as pointed out by analyst Zach Gast of the Center for Financial Research, Defendants Cole, Morrice and Dodge, for the first time, deceptively combined the Company's Allowance For Loan Losses reserve with another unrelated reserve in reporting earnings for the third quarter-ended September 30, 2006, in order to make the reserve appear higher when, in fact, it had been <u>reduced</u>.  As set forth above, Defendants quickly reversed course after Zach Gast's questioning and disclosed that the Company's Allowance of Loan Losses reserve was, in fact, <u>reduced</u> in the 2006 third quarter Form 10-Q (without explaining the reason for the prior change in the Company's presentation).  As set forth in paragraph 464 above, New Century disclosed, in <u>the very next quarter</u>, that it expected to record an <u>increase</u> in its Allowance for Losses reserve to reflect "relevant data such as recent loss experience, changing market conditions and updated expectations regarding higher credit losses and faster prepayment speeds."

500.  As set forth in paragraphs 117-18 above, the Examiner further reports that it was Defendant Dodge who determined to combine <u>for the first time</u> the reporting of the Company's Allowance for Loan Losses reserve with the Company's Allowance for Real Estate Owned in the third quarter of 2006, only after the Company's Allowance for Loan Losses reserve had been reduced. Examiner's Report at 425-26.  Dodge told the Examiner that she did so to provide investors with "a more complete picture of the Company's reserves," yet the Examiner noted that she referred to the entire combined figure of $240 million only as "allowance for loan losses" during the Company's 2006 third quarter conference call.  <u>Id.</u>  As set forth in paragraph 117 above, the Examiner also

identified another instance when Defendant Dodge attempted to reduce the Company's Allowance for Loan Losses reserve to "plug" an earnings miss in the Company's 2005 third quarter, only for her attempt to be rejected by New Century's Audit Committee who noted that her suggestion "smacked of earnings manipulation."

501. Further evidencing Defendants Cole's, Morrice's, Dodge's and Gotschall's scienter, the Company's February 7, 2007 restatement announcement came less than three months after newly-hired Tajvinder S. Bindra replaced Defendant Dodge as Chief Financial Officer, effective November 15, 2006. As set forth in paragraphs 90 and 94 above, Bindra was one of the persons who helped reveal the Company's accounting misstatements and observed New Century's repurchase reserves were way too low as soon as he joined the Company and obtained access to its books and records. Indeed, as set forth above, the Examiner reported that "the failure to take a more critical look at the repurchase reserve calculation methodology is all the more inexplicable because the New Century repurchase reserve presented a red flag, <u>as New Century reserved significantly less than smaller mortgage banking companies</u>."

502. Each of these Defendants was also highly motivated to pump up the Company's mortgage origination volume at the expense of underwriting standards and to understate repurchase reserves and overstate Residual Interests throughout the Class Period. As New Century increased its loan production volume to record levels, understated its repurchase reserves and overstated its Residual Interests, the Company declared increasing dividends throughout the Class Period. During the Class Period, the Company declared the following dividends:

| First Quarter 2005 | $1.55 per share | paid April 29, 2005 |
| Second Quarter 2005 | $1.60 per share | paid July 29, 2005 |
| Third Quarter 2005 | $1.65 per share | paid October 31, 2005 |
| Fourth Quarter 2005 | $1.70 per share | paid January 30, 2006 |
| First Quarter 2006 | $1.75 per share | paid April 28, 2006 |
| Second Quarter 2006 | $1.80 per share | paid July 31, 2006 |
| Third Quarter 2006 | $1.85 per share | paid October 31, 2006 |
| Fourth Quarter 2006 | $1.90 per share | paid January 31, 2007 |

Defendants Cole, Morrice and Gotschall were each direct and significant beneficiaries of these increasing dividend payments. In the aggregate, they personally received over $50 million of dividend payments during the Class Period. Defendant Dodge also received, in the aggregate, over $500,000 of dividend payments during the Class Period.[33]

503. In addition, according to the Company's Schedule 14A Proxy Statement filed with the SEC on or about April 4, 2006, under employment agreements that existed throughout the Class Period, Defendants Cole, Morrice and Gotschall were each entitled to receive a percentage of New Century's pre-tax net income under a special bonus formula based upon the ratio of New Century's pre-tax net income to its average stockholder's equity, measured over a six-month and 12-month period as follows:

---

[33] In fact, as set forth below, Defendant Cole's purchases of New Century stock (pursuant to option exercises at below market prices) must be considered along with the dividend payments he received as a result of his option exercises. Thus, while Defendant Cole purchased 300,916 New Century shares on May 9, 2005, for an average price of $7.59 per share pursuant to option grants, or for a total cost of $1,793,712, during the remainder of the Class Period, Cole received dividends from those shares worth $3,204,755.50, representing a profit of $1,411,043.50 as a result of his below market option exercises on May 9, 2005. By contrast, Defendant Gotschall, as set forth below, engaged in a pattern during the Class Period of purchasing New Century shares at his lowest available option strike prices, which were prices well below the market price of New Century shares, and then immediately re-selling the shares at much higher open market prices, typically on the same day.

**6-Month Performance from January 1 – June 30**:

**Ratio of Pre-Tax Net Income**
**To Total Stockholders' Equity**          **Amount of Bonus**

Less than 9%                               0

Between 9-14%                              1.125% of pre-tax net income in excess of
                                           9% but not in excess of 14% of Total
                                           Stockholders' Equity

Between 14-19%                             The amount above plus 0.75% of pre-tax net
                                           income in excess of 14% but not in excess
                                           of 19% of Total Stockholders' Equity

More than 19%                             The amounts above plus 0.60% of pre-tax
                                           net income in excess of 19% of Total
                                           Stockholders' Equity

**12-Month Performance from January 1 – December 31**:

**Ratio of Pre-Tax Net Income**
**To Total Stockholders' Equity**          **Amount of Bonus**

Less than 18%                              0

Between 18-28%                             1.125% of pre-tax net income in excess of
                                           18% but not in excess of 28% of Total
                                           Stockholders' Equity

Between 28-38%                             The amount above plus 0.75% of pre-tax net
                                           income in excess of 28% but not in excess
                                           of 38% of Total Stockholders' Equity

More than 38%                             The amounts above plus 0.60% of pre-tax
                                           net income in excess of 38% of Total
                                           Stockholders' Equity

Based on the above formula, Defendants Cole, Morrice and Gotschall were each paid $1,070,236 in cash bonuses in 2005 and each received mid-year 2006 cash bonuses of $693,016.  By comparison, their salary in 2005 was $569,250.

504.   As reported by <u>Financial Week</u> on May 7, 2007, this "old-style" bonus formula "gave <u>a strong incentive</u> for managers to inflate earnings and when combined with the latitude in making judgments on securitization transactions" set up a situation that could have led to financial reporting problems.  According to the report by <u>Financial Week</u>, the incentives were as follows:

> The incentives to executives on pay-for-results bonus plans, however, are the same:  <u>originate lots of loans.</u>  The more loans made and securitized, the more income can be recognized in the financial statements.  Secondly, keep hoping for the best when it comes to the quality of the loans.  Increasing loan loss provisions when the credit quality of the pool of loans deteriorates results in lower income – and smaller bonuses.

> It's on this front that New Century executives may have pushed the accounting envelope, said Zach Gast, an analyst with the Center for Financial Research and Analysis.  "<u>Even if a company doesn't overstate income through gain-on-sale assumptions, if it doesn't make an adequate provision for loan losses, it overstates the value of the residual interests of securities it holds [and thereby income].</u>"

> \*   \*   \*

> New Century Financial appears to have used accounting gimmickry to reduce the provisions it should have been taking, according to Mr. Gast.  He said the Company changed the presentation of its loan loss data in the third quarter of last year and masked the deteriorating quality of the portfolio.

"Their actual loan loss provision declined from $209 million in the second quarter to $192 million in the third quarter as loan delinquencies were rising rapidly," Mr. Gast explained.

The Company also failed to book a contingent liability for the possibility that it would have to repurchase bad loans from the banks to that sold the loans to investors.  The volume of such loans thrown back at New Century this year eventually sent it into bankruptcy.

* * *

New Century didn't even book losses after the Company began repurchasing bad loans last year.  "In that regard they were different from the other lenders," he said.

Why?  Writing down the loans would have reduced income – and executive bonuses.  [Emphasis added.]

505.  The Examiner has found that Defendant Cole, Gotschall and Morrice's 2005 bonuses of $1,070,236 were at least 300% higher than they should have been given New Century's (mis)reported financial performance and that these Defendants were each paid bonuses in mid-2006 of $693,106 based on the Company's (mis)reported financial performance when they actually should have received none.  Examiner's Report at 387.

506.  During the Class Period, Defendants Cole, Morrice, Gotschall and Dodge also each took advantage of the artificial inflation in the price of New Century common stock by selling, in the aggregate, over one million shares of their personally held New Century common stock for aggregate proceeds of over $53 million as follows: