| DEFENDANT | DATE | SHARES | PRICE ($) | PROCEEDS ($) |
|---|---|---|---|---|
| Cole | 5/9/2005 | 250,000.00 | 46.55 | 11,637,500.00 |
| Dodge | 6/6/2005 | 6,878.00 | 51.81 | 356,349.18 |
| Gotschall | 6/8/2005 | 100,000.00 | 51.93 | 5,193,000.00 |
| Dodge | 6/30/2005 | 4,782.00 | 51.25 | 245,077.50 |
| Morrice | 7/1/2005 | 60,500.00 | 51.65 | 3,124,825.00 |
| Morrice | 7/5/2005 | 64,500.00 | 51.33 | 3,310,785.00 |
| Gotschall | 9/8/2005 | 32,800.00 | 42.75 | 1,402,200.00 |
| Gotschall | 9/9/2005 | 42,200.00 | 42.23 | 1,782,106.00 |
| Dodge | 7/18/2006 | 13,889.00 | 46.00 | 638,894.00 |
| Cole | 8/7/2006 | 100,000.00 | 46.60 | 4,660,000.00 |
| Gotschall | 8/15/2006 | 100,000.00 | 41.69 | 4,169,000.00 |
| Gotschall | 9/1/2006 | 20,000.00 | 37.97 | 759,400.00 |
| Gotschall | 9/5/2006 | 80,000.00 | 38.36 | 3,068,800.00 |
| Cole | 9/15/2006 | 25,000.00 | 41.43 | 1,035,750.00 |
| Gotschall | 10/2/2006 | 100,000.00 | 38.98 | 3,898,000.00 |
| Cole | 10/6/2006 | 25,000.00 | 40.32 | 1,008,000.00 |
| Gotschall | 11/20/2006 | 65,300.00 | 36.99 | 2,415,447.00 |
| Gotschall | 11/21/2006 | 136,145.00 | 36.62 | 4,985,629.90 |
| **Total** | | **1,226,994** | | **$53,690,763.58** |

507.   The above sales represent sales of approximately 77% of Defendant Dodge's total holdings as of the start of the Class Period (totaling 33,334 shares); sales of approximately 37% of Defendant Gotschall's total holdings as of the start of the Class Period (totaling 1,805,405 shares, including 572,696 of stock options then or about to be exercisable); and sales of approximately 31% of Defendant Cole's total holdings as of the start the Class Period (totaling 1,315,938 shares). All of the New Century Officer Defendants were able, through the above-listed insider sales, to receive very large sums of money that they never would have received if the truth were disclosed.  Moreover, as the corrective disclosures at the end of the Class Period were triggered not by any of these Defendants, but by a new CFO shortly after he was hired, these Defendants' failure to sell even more amounts of their personally held shares does not negate the inference of their scienter as their insider selling was cut short by newly-retained CFO Bindra's actions.

508.   In addition, New Century Officer Defendants Dodge and Gotschall sold their shares during the Class Period in a manner much greater in amount and

timing than they had before the start of the Class Period.  Dodge sold little, if any, of her personally-held New Century shares prior to 2005.  In fact, Dodge appears to have started selling her New Century shares only in 2005, when New Century had substantially loosened its underwriting for sub-prime mortgage loans and began building an undisclosed backlog of repurchase claims.  Defendant Gotschall also sold substantially more of his New Century shares during the Class Period than in the years before.  In 2006, Gotschall sold nearly twice as many shares than he had in any other single year and 2.5 times as many shares as he sold in 2005.  Moreover, none of the New Century Officer Defendants appear to have sold any significant amount of their personally-held New Century shares in 2004.

509.   All of the New Century Officer Defendants' insider sales further need to be analyzed in the context of undisclosed and confidential efforts to sell the Company between December 2005 and May 2006, during which time none of these Defendants sold any shares of New Century stock.  As reported by the Examiner, as early as December 2005, representatives of a large securities firm approached Defendant Cole to discuss whether New Century would entertain a bid for the Company which led to a process pursuant to which New Century marketed itself for sale and received, in April 2006, preliminary proposals from potential purchasers to acquire the Company for as high as $55 per share.  Examiner's Report at 92.  Discussions continued through May 2006, but did not result in a sale of the Company.  Id.

510.   In addition, these Defendants' exercise of New Century options to acquire additional New Century shares at below market prices shortly before or during the Class Period (and at prices well below the above listed open market sales) does not negate the inference of their scienter, but was motivated by the additional profits Defendants would obtain either through the receipt of dividend payments on the additional shares they acquired (which dividend amounts

increased as a result of the fraud throughout the Class Period) and/or through the sale of the newly-acquired securities at substantially higher open market prices.

511. Thus, while Defendant Cole purchased 300,916 New Century shares on May 9, 2005, for an average price of $7.59 per share pursuant to option grants, or for a total cost of $1,793,712, during just the remainder of the Class Period, Cole received dividends from those same shares worth $3,204,755.50, representing a profit of $1,411,043.50 as a result of his below market option exercises on May 9, 2005.

512. Defendant Gotschall profited from his option exercises by immediately selling the shares he acquired on the open market, typically on the same day. On June 8, 2005, Gotschall exercised a total of 100,000 stock options with strike prices of $2.33 and $5.00 per share and sold all of them on the same day in the open market at $51.93 per share. On September 8 and 9, 2005, Gotschall exercised a total of 75,000 stock options with strike prices of $5.00 per share and sold all of them on the same day in the open market at $42.23-42.75 per share. In August 2006, Gotschall exercised the last of his $5.00 options (71,079 options) and exercised 28,291 options at $7.33 per share, for a total of 100,000 shares and sold all of them in the open market at $41.69 per share. On September 1, 2006, Gotschall exercised his remaining options priced at $7.33 per share, all of his options priced at $8.50 per share, and 69,946 options at $6.65 per share, for a total of 100,000 shares. All of those shares were sold in the open market on September 1 and 5, 2006, at prices of $37.97-38.36 per share. On October 2, 2006, Gotschall exercised a total of 100,000 options with strike prices of $6.65 and $10.47 per share and sold all of those shares in the open market on the same day at $38.98 per share. On November 20, 2006, Gotschall exercised his remaining options priced at $6.65 (36,975 options) and exercised 28,325 options priced at $10.47, for a total of 65,300 shares, all of which were sold the same day in the open market at $36.99 per share. On November 21, 2006, Gotschall exercised

57,395 options at $10.47 and 78,750 at $18.66 per share, for a total of 136,145 shares, all of which were sold the same day in the open market at a price of $36.62 per share.

513.   On May 10, 2005, after the start of the Class Period, the Company issued a press release announcing that Defendant Cole's stock sales were made pursuant to a 10b5-1 sales plan.  That plan – commenced only during the time of the material misstatements complained of herein – cannot negate Defendant Cole's substantial motive and opportunity to profit from selling his personally-held New Century common stock during the Class Period.  To the contrary, as noted by the SEC's Director of Enforcement in a speech on March 8, 2007:

> In 2000, the SEC enacted Rule 10b5-1 in order to clarify the law about when executives who may come into possession of inside information can legally trade. Rule 10b5-1 allows corporate executives to make a plan, at a time when they are not in possession of inside information, to make prearranged trades at specified prices or dates in the future. The idea was to give executives "a safe harbor" to proceed with these prearranged trades without facing charges of insider trading. The Rule was intended to give executives regular opportunities to liquidate their stock holdings—to pay their kids' college tuition, for example—without risk of inadvertently facing an insider trading inquiry. However, recent academic studies suggest that the Rule is being abused.  The academic data shows that executives who trade within a 10b5-1 plan outperform their peers who trade outside of such a plan by nearly 6%; it ought to be the case that plan participants should be no more successful on average than those who trade outside a plan. The difference seems to be that executives with plans sell more frequently and more strategically ahead of announcements of bad news. This raises the possibility that plans are

1
2
3
4
5
6

being abused in various ways to facilitate trading based on inside information. We're looking at this—hard. We want to make sure that people are not doing here what they were doing with stock options. <u>If executives are in fact trading on inside information and using a plan for cover, they should expect the "safe harbor" to provide no defense</u>. [Emphasis added.]

7
8
9
10
11
12
13
14
15

514.   Indeed, all of the New Century Officer Defendants' 10b5-1 plans (none of which are public) are highly suspicious because they were all entered into in 2005 and 2006, five to six years after such plans were allowed by the SEC and just when (undisclosed to investors) the Company was building a large backlog of repurchase claims outstanding (and suffered from numerous other undisclosed internal control deficiencies) and (undisclosed to investors) New Century's underwriting practices were loosened substantially so that the Company could continue to originate record mortgage origination volume in the face of adverse market conditions.

16

## XII.      DEFENDANT KPMG ACTED WITH SCIENTER

17
18
19
20
21
22
23
24
25
26
27
28

515.   Defendant KPMG acted with scienter, acting with intent or deliberate recklessness, in issuing an unqualified opinion on the Company's financial statements for the year-ended December 31, 2005 representing that it had conducted its audit in accordance with the standards of the PCAOB, when, in fact, the Company's financial statements were materially misstated in violation of GAAP and KPMG failed to comply with GAAS for numerous reasons, and in issuing an unqualified opinion regarding New Century management's assessment of internal controls as of December 31, 2005 representing that it had conducted its audit in accordance with the standards of the PCAOB, when, in fact, New Century was suffering from numerous significant deficiencies and material weaknesses in internal control and KPMG failed to comply with the auditing standards of the PCAOB for numerous reasons.  KPMG's scienter is demonstrated by substantial

circumstantial facts collectively supporting a strong inference of scienter.  These facts are summarized below.

516.  <u>First</u>, as set forth in paragraphs 224-26 above, KPMG's 2005 audit team was "unduly willing to acquiesce" in New Century's numerous violations of GAAP and often resisted and ignored suggestions from KPMG's own internal experts that New Century improve its accounting practices or document its departures from GAAP.  As set forth above, "senior people on the KPMG engagement team became advocates for or defenders of New Century's accounting practices when those practices were questioned by KPMG specialists who had greater knowledge of relevant accounting guidelines and industry practices."

517.  For example, as set forth in paragraph 225 above, 2005 Engagement Partner Donovan represented to New Century's Audit Committee on February 1, 2006 that, according to an "outside expert" engaged by KPMG's audit team, the Company's hedge accounting satisfied FAS 133 when Donovan, in fact, knew that internal KPMG specialist Klinge had told Donovan just two weeks earlier that he had not even received any of the documentation necessary to begin his review.  Thereafter, on March 3, 2006, Donovan advised New Century's Controller that the Company's hedge accounting was acceptable without ever advising internal KPMG specialist Klinge that such a representation had been made.  Thereafter, when Klinge was not prepared to sign off on the audit, Donovan sent an email which stated:  "<u>I am very disappointed we are still discussing this.  As far as I am concerned we are done.  The client thinks we are done.  All we are going to do is piss everybody off</u>."  Ultimately, a high ranking DPP KPMG member authorized Donovan during an emergency telephone call to issue KPMG's unqualified audit report at the last minute when, in fact, <u>open issues remained</u>.  The DPP KPMG partner realized the following day when she received Klinge's memorandum that open issues remained.  Over the next 45 days, KPMG specialist Klinge ultimately received documentation

from New Century to form a conclusion that the accounting treatment violated GAAP and resulted in a misstatement of several million dollars.

518.  Similarly, as set forth in paragraphs 224 and 232 above, KPMG's 2005 audit team repeatedly disregarded concerns from KPMG's internal SFG specialists regarding the discount rate used by New Century to value its Residual Interests which was far below that used by its peers and repeatedly concluded that the Company's Residual Interest valuations were reasonable and proper without receiving the type of documentary evidence requested by KPMG's internal SFG specialists.

519.  As set forth in paragraph 224 above, Donovan's focus on preserving his relationship with New Century is further revealed by three different appraisals he authored in 2005 discussing "no loss of client service" and "good relationships" with the New Century.  In 2006, Donovan reported that he had to deal with "significant client service and technical issues that I was able to overcome and find a good middle ground for the client."  (Emphasis added.)

520.  Second, as set forth in paragraphs 222-23 above, in violation of GAAS, KPMG failed to staff its 2005 audits of New Century with auditors with sufficient experience relating to the industry and the particular tasks to which they were assigned.  In fact, in 2005, the entire KPMG engagement team changed with the exception of just two first-year associates.  Both Donovan and KPMG senior manager Mark Kim were new to the engagement team and new to KPMG. Concurring partner Macaulay was also new to his position.

521.  Moreover, KPMG associate Debbie Biddle played a major role in coordinating KPMG's 2005 internal controls audit despite having "virtually no experience with auditing internal controls under SOX or even U.S. GAAP issues prior to beginning her work on the New Century audit" in 2005.  Biddle had just been transferred from KPMG in the United Kingdom.  In addition, a substantial amount of the KPMG's audit team's work with respect to two critical accounting

1    policies – the repurchase reserve and Residual Interest valuations – was performed

2    by first-year auditors with no substantive experience in these areas.  The junior

3    auditor who reviewed New Century's Residual Interest models admitted to the

4    Examiner that the models he reviewed were more complex than he was

5    comfortable evaluating and that he did not understand the complete models.

6        522.    The 2005 audit team also consisted of auditors who were relatively

7    inexperienced in the mortgage banking industry including audit engagement

8    partner Donovan and senior manager Kim.    Indeed, New Century's Audit

9    Committee had requested that KPMG assign a different engagement partner with

10   more experience than Donovan to the 2005 audit, but KPMG refused to do so.

11       523.    Third, as set forth in paragraphs 227-30 above, KPMG failed to

12   conduct its audit of New Century's Allowance of Loan Repurchase Losses reserve

13   in accordance with GAAS for multiple reasons.  Among other things, KPMG noted

14   in its audit of New Century's internal controls in 2004 and 2005 that New Century

15   had an internal controls weakness because it had not adopted formal policies and

16   procedures for the repurchase reserve estimation process.  In 2005, despite the

17   Company's failure to develop and implement a formal policy for the second year in

18   a row, KPMG concluded that this deficiency was not significant.  In addition, in

19   connection with its 2005 audit, KPMG obtained critical information concerning

20   New Century's repurchase claims backlog, but the junior auditor responsible for

21   reviewing the reserve "did nothing with it."  KPMG did not take this information

22   "into consideration whatsoever in evaluating the sufficiency of New Century's

23   repurchase reserve calculation."  The junior auditor could not even explain to the

24   Examiner why she had requested this information or if it had ever been requested

25   before.    Moreover, "[a]pplying even the simplest of calculations to this

26   information" would have revealed that "New Century was substantially

27   underreserved."

28

524. KPMG further violated GAAS in failing to independently verify whether New Century's repurchase reserve included Interest Recapture. Again, "[h]ad KPMG performed even minimal testing of Management's representations, it would have determined that, in violation of GAAP, the reserve did not account for the Interest Recapture component." Similarly, "[m]inimal research and analysis by the KPMG engagement team would have revealed that New Century's LOCOM analysis was not only contrary to industry practice, but that it operated to conceal losses and prevent the mark-down of the value of non-performing repurchased loans."

525. Fourth, as set forth in paragraphs 231-32 above, KPMG failed to conduct its audit of New Century's Residual Interest valuations in accordance with GAAS for multiple reasons. During its 2004 audit, KPMG documented a significant deficiency in internal controls surrounding Residual Interests, noting that New Century did not have adequate documentation supporting its valuation of residual interests. The same deficiency, among others, was documented in 2005. Nonetheless, in "a clear departure from GAAS," KPMG repeatedly accepted New Century's assumptions for the Residual Interest calculations without supporting evidence. These included: (i) discount rates well below industry peers (notwithstanding repeated and increasingly strong warnings from KPMG's own internal SFG specialists which "seemed to have little impact on KPMG's engagement team"); (ii) par value assumptions which unrealistically assumed that remaining loans would be sold at par on the collapse of a securitization; and (iii) prepayment assumptions that KPMG's internal SFG specialists warned were low in comparison to New Century's peers, industry trends and New Century's own historical experience. Also, "KPMG personnel knew that the models used by Management to calculate residual interest valuations were flawed and generated errors." Yet, KPMG "never challenged the continued use of the internally developed models . . . ."

526. <u>Fifth</u>, as set forth in paragraph 233 above, the Examiner revealed numerous other GAAS violations by KPMG in other audit areas and acquiescence by the KPMG engagement team in the Company's aggressive accounting policies and practices. These included that: (i) KPMG commented at various times in 2004 through 2006, in both the general audit workpapers and those related to internal controls, that New Century did not adequately document its methodology for calculating its Allowance for Loan Losses reserve, "and yet KPMG allowed the same deficiencies to remain unremediated each year;" (ii) KPMG's engagement team failed to insist that New Century update its ALL (Allowance for Loan Losses) models that "KPMG knew were incorrect which resulted in inaccurate amounts for ALL;" (iii) KPMG's engagement team ignored KPMG's internal specialist SFG's recommendation in February 2006 that New Century obtain at least one independent third-party valuation to support is internal valuation of MSRs (mortgage servicing rights); (iv) KPMG's engagement team also was aware of another related departure from GAAP concerning New Century's amortization of the net gains or losses from its MSRs "which was mentioned in a draft audit assistance memorandum from SFG relating to the 2005 audit," but KPMG's engagement team never calculated the impact of that GAAP violation; (v) KPMG internal specialist Klinge had "informed the engagement team that New Century had failed to account for at least some of its IRLC derivatives, which represented a departure from GAAP," but the engagement team failed to identify the discrepancy in the Company's public disclosure; and (vi) KPMG's engagement team failed to test or question New Century's revenue or discount rate assumptions used to generate cash flows for testing goodwill impairment.

527. <u>Sixth</u>, KPMG failed to audit New Century's internal controls in accordance with the standards of the PCAOB in significant respects and, in 2005, engaged in an inappropriately less rigorous internal control audit given the limited experience of the senior associate primarily responsible for the review. In violation

of AS 2, KPMG's engagement team failed to compare year-over-year deficiencies findings with the 2004 SOX audit or to communicate with the members of that prior audit team.  Many deficiencies noted in the subsequent 2006 workpapers as both material weaknesses and significant deficiencies existed at the time of the 2005 audit, but were missed by the very junior and completely inexperienced auditor assigned with primary responsibility for the 2005 internal control audit. For example, none of the control deficiencies identified by the 2005 audit engagement team relating to the Residual Interests calculation process were identified as significant deficiencies.  The same concerns, however, were raised as significant deficiencies in 2004 and again later in 2006.  At least six of the significant deficiencies identified later in 2006 unquestionably existed at the time of the 2005 audit but were not identified by KPMG's 2005 engagement team, including:    (1) a failure to have a regular, documented process regarding assumption adjustments; (2) a failure to have adequate documentation to support the reasonableness of 12-14% discount rates which were below industry peers; (3) a failure to have external bids for Residual Interests; and (4) a failure to independently validate the models used to calculate Residual Interests to ensure mathematical accuracy.

528.  Seventh, KPMG failed to cooperate with the Examiner and the Examiner found senior members of the 2005 engagement team (Donovan and Kim) to be incredible witnesses at several times during his interviews of them. "KPMG did not voluntarily cooperate with the Examiner's investigation, and a number of KPMG witnesses, typically represented by five or six attorneys at their interviews, did not appear forthcoming."  Examiner's Report at 18.  See also id. at 485, 486, 489 and 497 (identifying specific instances during the interview process when the Examiner found Donovan and/or Kim to be incredible witnesses).

529.  All of these facts, viewed collectively, demonstrate a strong inference of scienter, that KPMG acted intentionally or with deliberate recklessness in

publicly stating that its 2005 audits were conducted in accordance with GAAS when, in fact, they were not for multiple reasons. In fact, KPMG's 2005 engagement team's audit practices were so deficient that its 2005 audits amounted to no audit at all and an egregious refusal to see the obvious and to investigate the doubtful, even when KPMG's internal specialists specifically and repeatedly warned the 2005 audit team members to further question New Century management or request additional support for management's erroneous positions. The Examiner reported that had KPMG's 2005 audit team conducted its audits in accordance with GAAS and the standards of the PCAOB (as KPMG specifically represented in its 2005 audit opinions), "the misstatements included in New Century's financial statements would have been detected long before February 2007." Indeed, as set forth in paragraphs 90 and 94 above, the Company's materially deficient repurchase reserve and materially overstated Residual Interests were revealed within just three months after the Company hired a new Chief Financial Officer who immediately observed that the Company's repurchase reserves were way too low given the size of its operations.

530. Moreover, as set forth in paragraph 214 above, according to CW 34, when KPMG was asked about its audit work by New Century's Audit Committee at the time the restatement was already being discussed with the Company's new CFO in February 2007, KPMG (rather than defend its audit work) repeatedly refused to discuss its audit work with the Audit Committee and eventually resigned in April 2007. As set forth in paragraph 222 above, KPMG's 2005 senior audit manager Kim also left KPMG in April 2007, at the time KPMG resigned as New Century's outside auditor.

## XIII.    LOSS CAUSATION

531. Throughout the Class Period, the price of New Century common stock, Series A and B Preferred Stock and call options were artificially inflated (and the price of New Century put options were artificially reduced) as a direct

result of Defendants' materially false and misleading statements and omissions. When the true facts became known by the market and investors and the materialization of the risks that had been fraudulently concealed by Defendants occurred, the price of New Century common stock and Series A and B Preferred Stock declined precipitously as the artificial inflation was removed from the price of these securities, causing substantial damage to Plaintiffs and members of the Class. Specific dates of adverse disclosures and corresponding declines in the price of New Century securities are set forth above.

532. Moreover, the adverse consequences of the New Century Officer Defendants' end of Class Period disclosures and the adverse impact of those circumstances on the Company's business going forward, were entirely foreseeable to Defendants at all relevant times. Defendants' conduct, as alleged herein, proximately caused foreseeable losses and damages to Plaintiffs and members of the Class.

533. As set forth above, the Company's failure to maintain effective internal controls; its substantially loosened underwriting; its failure to report its 2005 and 2006 financial statements in accordance with GAAP; and its expected net losses resulting from the required restatements and related financial adjustments not only were material, but they also triggered foreseeable and grave consequences for the Company given its highly leveraged balance sheet.

534. At all relevant times, New Century needed to borrow substantial sums of money each quarter to originate and purchase mortgage loans and support its operating activities. The Company entered into credit arrangements to finance its mortgage loans until it aggregated one or more pools of loans for sale or securitization. During the Class Period, New Century maintained credit facilities with, inter alia, Bank of America N.A., Barclays Bank PLC, Citigroup Global Markets Realty Corp., Credit Suisse First Boston Mortgage Capital LLC, Morgan Stanley Mortgage Capital Inc., UBS Real Estate Securities Inc., Goldman Sachs

Mortgage Company, Guaranty Bank and State Street Global Markets LLC.  The Company used these facilities to finance the actual funding of its loan originations and purchases and to aggregate pools of mortgage loans pending sale or securitization.  Importantly, all of the Company's credit facilities contained certain customary covenants, which, among other provisions, required the Company to deliver timely financial statements prepared in accordance with GAAP to its lenders.  In addition, 11 of the Company's 16 financing arrangements required it to report at least $1 of net income for any rolling two-quarter period, a requirement the Company did not expect to meet as a result of the restatements and other adjustments disclosed at the end of the Class Period.

535.   As a result of these circumstances, after the Company's February 7, 2007 and subsequent disclosures, substantial doubt existed as to the Company's ability to continue as a going concern and, after the Company was unsuccessful in its discussions with its lenders and other third parties regarding a possible refinancing or other alternatives to obtain additional liquidity, the Company was forced to cease accepting new loan applications from prospective borrowers and to file for bankruptcy protection after its lenders declared the Company in default.  As noted by the Examiner's Report (at 105), "New Century's previously undisclosed financial and accounting problems created a crisis for the Company with respect to its warehouse lenders, on which New Century depended for financing."  See  also id. at 103 (Defendant Morrice noted that on February 7, 2007 he was "very concerned" about loan covenants that were tied to the Company's profitability and stated in his interview with the Examiner that the Company's restatement announcement "undermined the confidence of New Century's warehouse lenders and created credibility issues for the Company.")

536.   Further demonstrating that New Century's demise was entirely foreseeable, Defendant Morrice identified -- approximately one year before the Company's April 2007 bankruptcy filing, at the Company's May 10, 2006 annual

shareholder meeting -- running out of capital liquidity as the very reason why mortgage companies go out of business (while claiming New Century was financially sound):

> Morrice:     The history of the mortgage business generally suggests that companies that run into big trouble and in some cases go out of business don't do that because they run out of customers.  They do it because they run out of money and, again, this is a very, very good business in the long run but you have to be there to enjoy that long run.  And so maintaining our capital liquidity basis is an important part of our strategy and an important part of our message to stockholders that this is a financially strong company and while we're excited and optimistic about what both 2006 and beyond can bring, we're also confident of doing that with safety and soundness and stability.  [Emphasis added.]

Defendant Gotschall made similar comments at the September 6-7, 2005 Investor Roundtables described above.

537.  Similarly, the fact that the Company's end-of-Class-Period adverse disclosures triggered governmental investigations into the Company's Class Period statements, reported financial results and insider selling was an entirely foreseeable consequence of the acts complained of herein.

538.  KPMG's material misstatements in its publicly-issued 2005 audit opinions and KPMG's extensive role in the accounting misstatements and internal control weaknesses that were disclosed, beginning on February 7, 2007 through the end of the Class Period, further demonstrate both the artificial inflation KPMG's conduct caused in the price of New Century securities and that KPMG's conduct proximately caused foreseeable losses and damages to Plaintiffs and members of the Class.

539.   The disclosures beginning on February 7, 2007 specifically concerned accounting and internal control issues with which KPMG was extensively involved in its 2005 audits and areas in which KPMG specifically violated GAAS and the standards of the PCAOB in connection with its 2005 audits, including the repurchase reserves backlog and related internal control weaknesses and the required adjustments to Residual Interests as set forth above.

540.   Thereafter, the price of New Century securities continued to decline on March 2, 2007, when additional disclosures were made, including, specifically, issues pertaining to the Company's valuation of Residual Interests in 2006 "and prior periods."   As alleged in this Second Amended Complaint, KPMG's 2005 audits specifically violated GAAS and the standards of the PCAOB in connection with its audit of New Century's Residual Interests and related internal controls and, as reported by the Examiner (at 329) and set forth in paragraph 480 above, KPMG's February 2007 report to the Special Investigation Committee of the Audit Committee (the "SIC") was "[t]he primary reason the SIC looked more closely at New Century's accounting for residual interests . . .in February 2007."

541.   Further, as the Examiner reported (at 105), "New Century's previously undisclosed financial and accounting problems created a crisis for the Company with respect to its warehouse lenders, on which New Century depended for financing."   KPMG was intimately involved in those previously undisclosed financial and accounting misstatements as set forth in this Second Amended Complaint and the liquidity problems experienced by the Company as a result of the accounting-related disclosures were a completely foreseeable consequence of the GAAP, GAAS and PCAOB standards violations complained of herein.   Indeed, it was KPMG who identified the "going concern" issue resulting from the Company's liquidity problems in March 2007, as set forth above.

542.   Finally, consistent with the allegations in this Second Amended Complaint, the Examiner concluded (at 458):   "had KPMG conducted its audits

and reviews prudently and in accordance with professional standards, the misstatements included in New Century's financial statements would have been detected long before February 2007."

## XIV.    THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

543.    The statutory safe harbor and/or bespeaks caution applicable to forward-looking statements under certain circumstances does not apply to any of the false or misleading statements pleaded in this Second Amended Complaint.

544.    First, none of the statements complained of herein was a forward-looking statement.   Rather the statements complained of herein were historical statements or statements of purportedly current facts and conditions at the time the statements were made, including statements of reported financial results and underwriting practices and loan quality.   Given the then-existing facts contradicting Defendants' statements, the generalized risk disclosures made by New Century, including those regarding the Company's underwriting, loan quality, reserves, Residual Interests and/or financial condition, were not sufficient to insulate Defendants from liability for the statements they made because those statements were materially misstated when made.

545.    Second, the statutory safe harbor does not apply to statements included in financial statements which purport to have been prepared in accordance with GAAP.

546.    To the extent any of the false or misleading statements alleged herein can be construed as forward-looking statements, the statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.   This is because, as set forth above in detail, the then-existing facts contradicted Defendants' statements regarding the Company's underwriting practices and loan quality, its purported compliance with GAAP and the purported effectiveness of its internal controls.

547.   Alternatively, to the extent the statutory safe harbor otherwise would apply to any forward-looking statements pleaded herein, Defendants are liable for those false and misleading forward-looking statements because at the time each of those statements was made, the speakers knew the statement was false or misleading, or the statement was authorized or approved by an executive officer of New Century who knew that the statement was materially false or misleading when made.

## XV.   THE PRESUMPTION OF RELIANCE

548.   The market for New Century common stock, Series A and B Preferred Stock and options was, at all relevant times, an efficient market that promptly digested current information with respect to the Company from all publicly-available sources and reflected such information in the price of these New Century securities.

549.   New Century common shares and Series A and Series B Preferred Stock were traded on the New York Stock Exchange, a highly efficient market. New Century options were traded on the Chicago Board of Options Exchange, also a highly efficient market.  The Company was consistently followed, before and throughout the Class Period, by the media, which issued over 1,000 news stories regarding the Company during the Class Period and by securities analysts who published over 100 analyst reports regarding New Century during the Class Period. The price of New Century securities reacted promptly to the dissemination of new information regarding the Company, as set forth above.  New Century securities were actively traded throughout the Class Period, with substantial trading volume and average weekly turnover and high institutional investor participation.

550.   Accordingly, Plaintiffs and other members of the Class did rely and are entitled to have relied upon the integrity of the market price for New Century securities and to a presumption of reliance on Defendants' materially false and misleading statements and omissions during the Class Period.   Additionally,

Plaintiffs are entitled to a presumption of reliance because the claims asserted herein against Defendants also are predicated upon omissions of material fact which there was a duty to disclose.

## XVI.    CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

## COUNT FIVE

**For Violations Of Section 10(b) Of The Exchange Act, On Behalf Of Plaintiffs, Against New Century Officer Defendants Cole, Morrice, Gotschall And Dodge**

551.   Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein, except Plaintiffs expressly disclaim any claim of strict liability or negligence.

552.   This claim is brought pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, on behalf of Plaintiffs and members of the Class against Defendants Cole, Morrice, Gotschall and Dodge.

553.   As alleged herein, throughout the Class Period, these Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails and/or the facilities of national securities exchanges, made untrue statements of material fact and/or omitted to state material facts necessary to make their statements not misleading and carried out a plan, scheme and course of conduct, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  These Defendants intended to and did, as alleged herein:  (i) deceive the investing public, including Plaintiffs and other members of the Class; (ii) artificially inflate and maintain the price of New Century common stock, Series A and B Preferred Stock and call options (and artificially reduce the price of New Century put options); and (iii) cause Plaintiffs and the members of the Class to purchase New Century securities at artificially inflated prices or sell New Century put options at artificially reduced prices.

554.  The New Century Officer Defendants were individually and collectively responsible for making the false and misleading statements and omissions alleged herein and having engaged in a plan, scheme and course of

conduct designed to deceive Plaintiffs and members of the Class, by virtue of having prepared, approved, signed and/or disseminated documents which contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

555.   As set forth above, these Defendants made their false and misleading statements and omissions and engaged in the fraudulent activity described herein knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful deceit and fraud upon Plaintiffs and the other members of the Class who purchased New Century common stock and/or Series A or B Preferred Stock and/or sold New Century put options during the Class Period.

556.   In ignorance of the false and misleading nature of these Defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market price for New Century common stock, Series A and B Preferred Stock or options, Plaintiffs and other members of the Class purchased New Century securities at artificially inflated prices during the Class Period and/or sold New Century put options at artificially reduced prices during the Class Period.  But for the fraud, Plaintiffs and members of the Class would not have purchased New Century securities at artificially inflated prices or sold New Century put options at artificially reduced prices.  As set forth herein, when the true facts were subsequently disclosed, the price of New Century common stock, Series A and B Preferred Stock declined precipitously and Plaintiffs and members of the Class were harmed and damaged as a direct and proximate result of their purchases of New Century securities at artificially inflated prices and/or their sale of New Century put options at artificially reduced prices and the subsequent decline in the price of New Century common stock and Series A and B Preferred Stock when the truth was disclosed.

557.   By reason of the foregoing, Defendants Cole, Morrice, Gotschall and Dodge are liable to Plaintiffs and the members of the Class for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT SIX

**For Violations Of Section 20(a) Of The Exchange Act, On Behalf Of Plaintiffs, Against New Century Officer Defendants Cole, Morrice, Gotschall And Dodge**

558.   Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein, except Plaintiffs expressly disclaim any claim of strict liability or negligence.

559.   This claim is brought pursuant to Section 20(a) of the Exchange Act against Defendants Cole, Morrice, Gotschall and Dodge, on behalf of Plaintiffs and members of the Class.

560.   Although not named as a defendant herein because of its bankruptcy filing, New Century violated Section 10(b) and Rule 10b-5 promulgated thereunder by making false and misleading statements in connection with the purchase and sale of securities and by participating in a fraudulent scheme and course of business or conduct throughout the Class Period.  This fraudulent conduct was undertaken with scienter and the Company is charged with the knowledge and scienter of Defendants Cole, Morrice, Gotschall and Dodge and others who knew of or acted with deliberate reckless disregarded the falsity of the Company's statements and the fraudulent nature of its scheme during the Class Period.

561.   Defendants Cole, Morrice, Gotschall and Dodge were controlling persons of New Century during the Class Period, due to their senior executive positions therewith; their direct involvement in its day-to-day operations, including its financial reporting and accounting functions; and their signatures on and participation in the preparation and dissemination of the Company's public filings.

562.   By virtue of the foregoing, Defendants Cole, Morrice, Gotschall and Dodge each had the power to influence and control, and did influence and control,

1  directly or indirectly, the decision making of New Century, including the content of

2  its financial statements and public statements.

3  563.  As set forth above, these Defendants acted knowingly and

4  intentionally, or in such a deliberately reckless manner as to constitute willful

5  deceit and fraud upon Plaintiffs and the other members of the Class who purchased

6  New Century securities during the Class Period.

7  564.  In ignorance of the false and misleading nature of the Company's

8  statements and omissions, and relying directly or indirectly on those statements or

9  upon the integrity of the market price for New Century securities, Plaintiffs and

10  other members of the Class purchased New Century common stock, Series A and B

11  Preferred Stock or call options at artificially inflated prices during the Class Period

12  and/or sold New Century put options at artificially reduced prices during the Class

13  Period.  But for the fraud, Plaintiffs and members of the Class would not have

14  purchased New Century securities at artificially inflated prices or sold New

15  Century put options at artificially reduced prices.  As set forth herein, when the

16  true facts were subsequently disclosed, the price of New Century common stock

17  and Series A and B Preferred Stock declined precipitously and Plaintiffs and

18  members of the Class were harmed and damaged as a direct and proximate result

19  of their purchases of New Century securities at artificially inflated prices and/or

20  their sale of New Century put options at artificially reduced prices and the

21  subsequent decline in the price of New Century common stock and Series A and B

22  Preferred Stock when the truth was disclosed.

23  565.  By reason of the foregoing, Defendants Cole, Morrice, Gotschall and

24  Dodge are liable to Plaintiffs and the members of the Class for violations of

25  Section 20(a) of the Exchange Act.

26

27

28

## COUNT SEVEN

**For Violations Of Section 10(b) Of The Exchange Act, On Behalf Of Plaintiffs, Against KPMG**

566.   Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein, except Plaintiffs expressly disclaim any claim of strict liability or negligence.

567.   This claim is brought pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, on behalf of Plaintiffs and members of the Class against Defendant KPMG.

568.   As alleged herein, on or about March 16, 2006, in connection with the issuance of its unqualified 2005 audit opinions through the end of the Class Period, Defendant KPMG, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails and/or the facilities of national securities exchanges, made and failed to correct untrue statements of material fact and/or omitted to state material facts necessary to make its statements not misleading and carried out a plan, scheme and course of conduct, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Defendant KPMG intended to or with deliberate recklessness did, as alleged herein:  (i) deceive the investing public, including Plaintiffs and other members of the Class; (ii) artificially inflate and maintain the price of New Century common stock, Series A and B Preferred Stock and call options (and artificially reduce the price of New Century put options); and (iii) cause Plaintiffs and the members of the Class, on and after March 16, 2006, to purchase New Century securities at artificially inflated prices or sell New Century put options at artificially reduced prices.

569.   As set forth above, Defendant KPMG made its false and misleading statements and omissions and engaged in the fraudulent activity described herein knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful deceit and fraud upon Plaintiffs and the other members of the

Class who purchased New Century common stock and/or Series A or B Preferred Stock and/or sold New Century put options during the Class Period.

570.    In ignorance of the false and misleading nature of Defendant KPMG's statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market price for New Century common stock, Series A and B Preferred Stock or options, Plaintiffs and other members of the Class purchased New Century securities at artificially inflated prices during the Class Period and/or sold New Century put options at artificially reduced prices during the Class Period.  But for the fraud, Plaintiffs and members of the Class would not have purchased New Century securities at artificially inflated prices or sold New Century put options at artificially reduced prices.  As set forth herein, when the true facts were subsequently disclosed, the price of New Century common stock, Series A and B Preferred Stock declined precipitously and Plaintiffs and members of the Class were harmed and damaged as a direct and proximate result of their purchases of New Century securities at artificially inflated prices and/or their sale of New Century put options at artificially reduced prices and the subsequent decline in the price of New Century common stock and Series A and B Preferred Stock when the truth was disclosed.

571.    By reason of the foregoing, Defendant KPMG is liable to Plaintiffs and the members of the Class for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## XVII.    **JURY DEMAND**

572.    Plaintiffs, on behalf of themselves and the Class, hereby demand a trial by jury.

## XVIII.    **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, pray for relief and judgment as follows:

A.     Determining that this action is a proper class action and certifying Lead Plaintiff, the New York State Teachers' Retirement System, and Plaintiffs Carl Larson and Charles Hooten as class representatives under Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding compensatory damages in favor of Plaintiffs and the other members of the Class against all Defendants for all damages sustained as a result of Defendants' violations in an amount to be proven at trial, together with interest thereon;

C.     Awarding rescission and/or rescissory damages in favor of Plaintiffs and the members of the Class;

D.     Awarding prejudgment interest and/or opportunity cost damages in favor of Plaintiffs and the other members of the Class;

E.     Awarding Plaintiffs and the Class the fees and expenses incurred in the prosecution of this action, including attorneys' fees and expert fees; and

F.     Granting such other and further relief as the Court may deem just and proper.

Dated:  April 30, 2008

BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP

_Blair A. Nichols_

BLAIR A. NICHOLAS

BLAIR A. NICHOLAS
TAKEO A. KELLAR
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Tel:  (858) 793-0070
Fax:  (858) 793-0323
-and-

SALVATORE J. GRAZIANO
HANNAH E. GREENWALD
1285 Avenue of the Americas
New York, NY  10019
Tel:   (212) 554-1400
Fax:   (212) 554-1444

Lead Counsel for The New York State
Teachers' Retirement System and the Class

MARVIN L. FRANK
Murray, Frank & Sailer LLP
275 Madison Avenue
New York, NY 10016
Tel:   (212) 682-1818
Fax:   (212) 682-1892
Counsel for Plaintiff Carl Larson

JEFFREY C. ZWERLING
RICHARD A. SPEIRS
Zwerling, Schachter & Zwerling, LLP
41 Madison Avenue
New York, NY 10010
Tel:   (212) 223-3900
Fax:   (212) 371-5969
Counsel for Plaintiff Charles Hooten

# EXHIBIT A

EXHIBIT ___A___
PAGE ___373___

# CERTIFICATION

Wayne Schneider, General Counsel of the New York State Teachers' Retirement System ("NYS Teachers") declares, as to the claims asserted under the federal securities laws, that:

1.     I am authorized to make this certification on behalf of NYS Teachers.

2.     I have reviewed a complaint filed in this matter.  NYS Teachers has retained Bernstein Litowitz Berger & Grossmann LLP to serve as counsel in this matter.

3.     NYS Teachers did not purchase the securities that are the subject of this action at the direction of its counsel or to participate in any private action arising under the federal securities laws.

4.     NYS Teachers is willing to serve as a lead plaintiff and class representative on behalf of the Class, including providing testimony at deposition and trial, if necessary.

5.     NYS Teachers' transactions in New Century Financial Corp. securities that are the subject of this action are set forth in the chart attached hereto.

5.     During the three years prior to the date of this Certification, NYS Teachers has not sought to serve, or served, as a representative party on behalf of a class under the federal securities laws.

6.     NYS Teachers will not accept any payment for serving as a representative party on behalf of the Class beyond its pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) relating to the representation of the Class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this _7ᵗʰ_ day of April 2007.

Wayne Schneider
General Counsel
*New York State Teachers' Retirement System*

**EXHIBIT** ___A___
**PAGE** ___374___

**New York State Teachers' Retirement System**
**Transactions in New Century Financial Corp.**
Class Period: 2/3/2005-3/2/2007

| Transaction | Trade Date | Shares | Price |
|---|---|---|---|
| Sale | 2/10/2005 | 8,800 | $ 51.8400 |
| Purchase | 3/9/2005 | 5,000 | $ 49.6554 |
| Purchase | 3/9/2005 | 14,800 | $ 49.6554 |
| Purchase | 3/9/2005 | 3,200 | $ 49.6554 |
| Sale | 4/6/2005 | 29,100 | $ 46.6605 |
| Sale | 4/6/2005 | 1,400 | $ 46.6605 |
| Purchase | 5/10/2005 | 14,900 | $ 46.9415 |
| Purchase | 5/10/2005 | 14,900 | $ 46.9415 |
| Purchase | 5/10/2005 | 47,700 | $ 46.9415 |
| Purchase | 5/10/2005 | 700 | $ 46.9415 |
| Purchase | 5/10/2005 | 46,800 | $ 46.9415 |
| Purchase | 6/14/2005 | 31,500 | $ 52.4247 |
| Purchase | 6/14/2005 | 14,600 | $ 52.4247 |
| Purchase | 6/14/2005 | 67,900 | $ 52.4247 |
| Purchase | 6/14/2005 | 12,500 | $ 52.4247 |
| Purchase | 6/14/2005 | 2,300 | $ 52.4247 |
| Purchase | 7/12/2005 | 4,700 | $ 51.9282 |
| Purchase | 7/12/2005 | 300 | $ 51.9282 |
| Purchase | 7/13/2005 | 5,600 | $ 51.9700 |
| Purchase | 7/13/2005 | 400 | $ 51.9700 |
| Purchase | 8/8/2005 | 200 | $ 44.4942 |
| Purchase | 8/8/2005 | 14,600 | $ 44.4942 |
| Purchase | 8/8/2005 | 3,200 | $ 44.4942 |
| Purchase | 8/8/2005 | 50,900 | $ 44.4942 |
| Purchase | 9/12/2005 | 2,100 | $ 43.3214 |
| Sale | 9/12/2005 | 3,900 | $ 43.7143 |
| Sale | 9/12/2005 | 800 | $ 43.7143 |
| Purchase | 9/13/2005 | 1,500 | $ 43.4160 |
| Sale | 9/23/2005 | 400 | $ 35.0500 |
| Purchase | 10/7/2005 | 4,900 | $ 35.2478 |
| Purchase | 10/7/2005 | 15,800 | $ 35.2478 |
| Purchase | 11/28/2005 | 9,300 | $ 38.0366 |
| Purchase | 11/28/2005 | 3,200 | $ 38.0366 |
| Purchase | 12/7/2005 | 11,600 | $ 35.3407 |
| Purchase | 12/7/2005 | 13,000 | $ 35.3407 |
| Sale | 12/22/2005 | 3,200 | $ 39.6644 |
| Purchase | 1/25/2006 | 5,100 | $ 37.2000 |
| Sale | 2/14/2006 | 4,000 | $ 38.2511 |
| Sale | 2/14/2006 | 7,900 | $ 38.2511 |
| Purchase | 3/20/2006 | 1,400 | $ 44.9811 |
| Purchase | 3/20/2006 | 25,900 | $ 44.9811 |
| Purchase | 3/20/2006 | 36,400 | $ 44.9811 |
| Purchase | 3/20/2006 | 36,400 | $ 44.9811 |
| Purchase | 3/20/2006 | 900 | $ 44.9811 |
| Purchase | 4/10/2006 | 200 | $ 45.8799 |

| Sale | 5/4/2006 | 400 | $ | 48.8801 |
|---|---|---|---|---|
| Sale | 5/4/2006 | 100 | $ | 48.8801 |
| Sale | 6/9/2006 | 800 | $ | 45.9167 |
| Sale | 6/9/2006 | 1,600 | $ | 45.9167 |
| Purchase | 7/11/2006 | 3,900 | $ | 45.7066 |
| Purchase | 7/11/2006 | 1,600 | $ | 45.7066 |
| Purchase | 7/11/2006 | 1,600 | $ | 45.7066 |
| Purchase | 8/7/2006 | 4,700 | $ | 46.7564 |
| Purchase | 8/7/2006 | 22,800 | $ | 46.7564 |
| Purchase | 8/7/2006 | 35,200 | $ | 46.7564 |
| Purchase | 8/7/2006 | 8,000 | $ | 46.7564 |
| Purchase | 9/14/2006 | 2,600 | $ | 40.5253 |
| Purchase | 9/14/2006 | 17,300 | $ | 40.5253 |
| Purchase | 9/14/2006 | 10,100 | $ | 40.5253 |
| Purchase | 9/18/2006 | 3,700 | $ | 41.5981 |
| Purchase | 9/18/2006 | 24,600 | $ | 41.5981 |
| Purchase | 9/18/2006 | 14,300 | $ | 41.5981 |
| Purchase | 10/6/2006 | 95,800 | $ | 40.7977 |
| Purchase | 10/6/2006 | 39,000 | $ | 40.7977 |
| Purchase | 10/6/2006 | 172,600 | $ | 40.7977 |
| Purchase | 10/6/2006 | 6,400 | $ | 40.7977 |
| Purchase | 11/8/2006 | 3,600 | $ | 36.6129 |
| Purchase | 11/8/2006 | 5,400 | $ | 36.6129 |
| Purchase | 11/9/2006 | 15,800 | $ | 36.6909 |
| Purchase | 11/9/2006 | 24,200 | $ | 36.6909 |
| Purchase | 12/8/2006 | 5,000 | $ | 34.8584 |
| Purchase | 12/8/2006 | 32,900 | $ | 34.8584 |
| Purchase | 12/8/2006 | 32,900 | $ | 34.8584 |
| Purchase | 12/8/2006 | 18,000 | $ | 34.8584 |
| Purchase | 1/8/2007 | 24,500 | $ | 29.6323 |
| Purchase | 1/8/2007 | 162,000 | $ | 29.6323 |
| Purchase | 1/8/2007 | 34,900 | $ | 29.6323 |
| Purchase | 2/8/2007 | 1,000 | $ | 21.4626 |
| Purchase | 2/8/2007 | 6,200 | $ | 21.4626 |
| Purchase | 2/8/2007 | 1,300 | $ | 21.4626 |
| Purchase | 2/8/2007 | 6,200 | $ | 21.4626 |

**EXHIBIT** A
**PAGE** 376

# EXHIBIT B

EXHIBIT ___B___
PAGE ___377___

## CERTIFICATION

I, Carl E. Larson, do hereby certify that:

1. I have reviewed the draft Consolidated Class Action Complaint and have authorized its filing.

2. I purchased the securities of New Century Financial Corp. which are included as a subject of the complaint, *but not* at the direction of my counsel or in order to participate in any private action arising under the Securities Act of 1933 or Securities Exchange Act of 1934, as amended by the Private Securities Litigation Reform Act of 1995.

3. I am willing to serve as a representative party on behalf of a class of Series A Preferred stock purchasers and Series B Preferred stock purchasers, including providing testimony at deposition and trial, if necessary.

4. In the three years prior to this certification, I have neither applied to serve nor served as a representative party on behalf of a class in an action brought under the federal securities laws.

5. During the Class Period, May 5, 2005 to March 13, 2007, inclusive, I engaged in the following transactions:

### TRANSACTION INFORMATION

| BUY OR SELL | TRADE DATE | NO. OF SHARES | PRICE PER SHARE |
|---|---|---|---|
| Buy | 12/23/2005 | 800 (Ser. A Preferred) | $23.25 |
| Buy | 09/11/2006 | 500 (Ser. B Preferred) | $24.90 |
| Buy | 09/19/2006 | 600 (Ser. B Preferred) | $25.00 |

6. I will not accept any payment for serving as a representative party on behalf of the Class beyond my *pro rata* share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class and my activities in the lawsuit, as ordered or approved by the Court.

7. Nothing herein shall be construed to be or constitute a waiver of my attorney-client privilege.

8. I certify under penalty of perjury that the foregoing is true and correct.

Executed on 9/ 7 / 2007.          Signature _Carl E. Larson_

                                          Carl E. Larson

EXHIBIT ___B___
PAGE ___378___

# EXHIBIT C

EXHIBIT _____ C _____
PAGE _____ 379 _____

## CERTIFICATION OF CHARLES HOOTEN

I, Charles Hooten, declare that:

1.     I have reviewed the Consolidated Class Action Complaint regarding New Century Financial Corp.

2.     I am willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial.

3.     My transactions in the security that is the subject of this action during the Class Period are as follows:  See Attachment.

I, Charles Hooten, declare under penalty of perjury that the foregoing is true and correct.

September 10, 2007

_Charles Hooten_

**Charles Hooten**

EXHIBIT ___C___
PAGE ___380___

<u>**ATTACHMENT TO HOOTEN CERTIFICATION**</u>

<u>**Common Stock – Individual Account**</u>

**Pre Class Period Holdings 12,000 Shares**

| Purchase Date | # Shares of Purchases | Price Per Share | Purchase Price |
|---|---|---|---|
| 2/8/05 | 1,000 | 57.50 | $57,500.00 |
| 2/8/05 | 1,000 | 56.40 | $56,400.00 |
| 2/8/05 | 1,000 | 56.00 | $56,000.00 |
| 2/8/05 | 1,000 | 54.97 | $54,970.00 |
| 2/8/05 | 1,000 | 54.50 | $54,500.00 |
| 2/8/05 | 1,000 | 54.15 | $54,150.00 |
| 2/8/05 | 1,000 | 57.00 | $57,000.00 |
| 2/9/05 | 1,000 | 51.75 | $51,750.00 |
| 2/24/05 | 1,000 | 51.50 | $51,500.00 |
| 2/25/05 | 1,000 | 51.00 | $51,000.00 |
| 2/25/05 | 1,000 | 50.00 | $50,000.00 |
| 2/25/05 | 1,000 | 49.00 | $49,000.00 |
| 3/16/05 | 1,000 | 48.75 | $48,750.00 |
| 3/18/05 | 1,000 | 48.00 | $48,000.00 |
| 3/18/05 | 1,000 | 47.70 | $47,700.00 |
| 3/18/05 | 1,000 | 47.00 | $47,000.00 |
| 3/18/05 | 1,000 | 46.50 | $46,500.00 |
| 4/19/05 | 1,000 | 44.00 | $44,000.00 |
| 6/27/05 | 1,000 | 50.45 | $ 50,450.00 |
| 6/27/05 | 1,000 | 49.94 | $ 49,940.00 |
| 8/15/05 | 1,000 | 43.955 | $ 43,955.00 |
| 8/15/05 | 1,000 | 42.85 | $ 42,850.00 |
| 8/18/05 | 1,000 | 42.00 | $ 42,000.00 |
| 8/31/05 | 1,000 | 42.26 | $ 42,260.00 |
| 8/31/05 | 1,000 | 41.90 | $ 41,900.00 |

**EXHIBIT** _____ _C_
**PAGE** _____ _381_

| Purchase Date | # Shares of Purchases | Price Per Share | Purchase Price |
|---|---|---|---|
| 9/1/05 | 1,000 | 41.50 | $ 41,500.00 |
| 9/1/05 | 1,000 | 41.31 | $ 41,310.00 |
| 9/2/05 | 1,000 | 41.10 | $ 41,100.00 |
| 9/13/05 | 1,000 | 43.00 | $ 43,000.00 |
| 9/21/05 | 1,000 | 41.50 | $ 41,500.00 |
| 9/26/05 | 1,000 | 40.50 | $ 40,500.00 |
| 9/26/05 | 1,000 | 39.69 | $ 39,690.00 |
| 9/26/05 | 1,000 | 39.26 | $ 39,260.00 |
| 9/28/05 | 1,000 | 35.05 | $ 35,050.00 |
| 9/30/05 | 1,000 | 35.50 | $ 35,500.00 |
| 10/3/05 | 1,000 | 35.22 | $ 35,220.00 |
| 10/13/05 | 1,000 | 34.50 | $ 34,500.00 |
| 10/13/05 | 1,000 | 34.00 | $ 34,000.00 |
| 10/17/05 | 1,000 | 33.39 | $ 33,390.00 |
| 10/17/05 | 1,000 | 33.00 | $ 33,000.00 |
| 10/18/05 | 1,000 | 32.20 | $ 32,200.00 |
| 10/24/05 | 1,000 | 31.00 | $ 31,000.00 |
| 10/31/05 | 1,000 | 31.90 | $ 31,900.00 |
| 11/1/05 | 1,000 | 30.80 | $ 30,800.00 |
| 11/1/05 | 1,000 | 30.50 | $ 30,500.00 |
| 11/1/05 | 1,000 | 30.40 | $ 30,400.00 |
| 11/3/05 | 12,000 | 42.24 | $506,880.00 |
| 1/3/06 | 1,000 | 37.00 | $ 37,000.00 |
| 1/27/06 | 1,000 | 38.92 | $ 38,920.00 |
| 2/15/06 | 1,100 | 38.86 | $ 42,746.00 |
| 2/22/06 | 1,800 | 38.22 | $ 68,796.00 |
| 2/23/06 | 2,100 | 37.17 | $ 78,057.00 |
| 12/26/06 | 1,000 | 34.50 | $ 34,500.00 |
| 12/27/06 | 1,200 | 32.29 | $ 38,748.00 |
| 1/3/07 | 1,000 | 31.34 | $ 31,340.00 |

EXHIBIT _____ *C*
PAGE _____ *382*

| Purchase Date | # Shares of Purchases | Price Per Share | Purchase Price |
|---|---|---|---|
| 2/9/07 | 2,500 | 25.00 | $62,500.00 |
| 2/9/07 | 8,400 | 30.00 | 252,000.00 |
| 2/12/07 | 2,500 | 30.00 | $75,000.00 |
| 2/16/07 | 19,100 | 30.00 | $573,000.00 |
| 2/20/07 | 7,500 | 25.00 | 187,500.00 |
| **TOTALS** | **108,200** | | **$4,021,382.00** |

**Common Stock IRA**

| Purchase Date | # Shares of Purchased | Price Per Share | Purchase Price | Sales Date | # Shares Sold | Sale Price |
|---|---|---|---|---|---|---|
| 12/7/06 | 120 | 34.50 | $4,140.00 | 2/13/07 | 120 | $2,042.40 |
| | | | | | | |

EXHIBIT ___C___
PAGE ___383___

3

**Sale of Put Options**

| Date | # of Contracts | Price | Strike Price | Expiration |
|---|---|---|---|---|
| 8/11/05 | 20 | $6.80 | $45.00 | 02/06 |
| 8/11/05 | 20 | $6.10 | $45.00 | 02/06 |
| 8/11/05 | 20 | $5.10 | $45.00 | 11/05 |
| 6/13/06 | 100 | $6.30 | $30.00 | 01/08 |
| 1/08/07 | 100 | $1.25 | $25.00 | 05/07 |
| 1/25/07 | 50 | $1.15 | $30.00 | 02/07 |
| 1/25/07 | 50 | $1.25 | $30.00 | 02/07 |
| 1/26/07 | 100 | $2.10 | $25.00 | 08/07 |
| 2/08/07 | 6 | $1.60 | $25.00 | 02/07 |
| 2/08/07 | 10 | $1.85 | $25.00 | 02/07 |
| 2/08/07 | 10 | $1.70 | $25.00 | 02/07 |
| 2/08/07 | 11 | $2.00 | $25.00 | 02/07 |
| 2/08/07 | 14 | $1.65 | $25.00 | 02/07 |
| 2/08/07 | 14 | $1.90 | $25.00 | 02/07 |
| 2/08/07 | 35 | $1.90 | $25.00 | 02/07 |
| 2/08/07 | 100 | $3.10 | $25.00 | 08/07 |
| 2/08/07 | 100 | $1.70 | $22.50 | 05/07 |
| 2/08/07 | 100 | $4.10 | $20.00 | 01/08 |

S:\New Century\Docs for filing Amended Complaint\Hooten Transactions During Class Period.doc

EXHIBIT ___*C*___
PAGE ___384___

# EXHIBIT D

EXHIBIT _D_

PAGE _385_

**EXHIBIT D**
*In re New Century, No. 2:07-cv-00931-DDP (JTLx)*
Series A and Series B Preferred Stock Offerings

SERIES A PREFERRED STOCK OFFERING

| Stmt. # | Date | Relevant Document | Responsible Defendant(s) | Material Misstatement(s) | Facts Demonstrating Why Statement Was Materially Misstated When Made |
|---|---|---|---|---|---|
| **1** (¶239) | 03/16/05 | Year-End 2004 Form 10-K, incorporated by reference into the Series A Preferred Stock Registration Statement | Individual Defendants: Morrice Dodge Cole Gotschall Black Forster Lange Popejoy Sachs Sandvik Zona Alexander<br><br>Underwriter Defendants: Bear Stearns Deutsche Bank Piper Jaffray Stifel Nicolaus JMP Securities Roth Capital | The year-end 2004 Form 10-K contained material misstatements regarding New Century's underwriting standards and loan quality stating, *inter alia*:<br><br>We have been originating and purchasing subprime loans since 1996 and believe we have developed a comprehensive and sophisticated process of credit evaluation and risk-based pricing that allows us to effectively manage the potentially higher risks associated with this segment of the mortgage industry.<br><br>* * *<br><br>We believe our strict underwriting guidelines and the stronger credit characteristics of these loans mitigate their perceived higher risk.<br><br>For the year ended December 31, 2004, full documentation loans as a percentage of originations totaled $21.5 billion, or 51.0%, limited | As set forth in ¶¶137-39, 141, 144, 146, 148, 150, 153-55, 158, 161, numerous former New Century employees with first-hand knowledge report that contrary to the quoted statements regarding a purported "comprehensive and sophisticated process of credit evaluation" and "strict underwriting guidelines," "high origination standards" and "underwriting standards and quality assurance programs to ensure that loan quality is consistent," New Century's underwriting standards were actually loosened substantially by the time of these statements and the Series A Preferred Stock offering so that the Company could continue to reach record mortgage origination volume notwithstanding intense industry competition, rising interest rates and a softening of the real estate market.<br><br>Further, the 2005 data set forth in ¶¶126-35 establish that New |

1

EXHIBIT ___D___
PAGE ___386___

**EXHIBIT D**
*In re New Century*, No. 2:07-cv-00931-DDP (JTLx)
**Series A and Series B Preferred Stock Offerings**

| Stmt. # | Date | Relevant Document | Responsible Defendant(s) | Material Misstatement(s) | Facts Demonstrating Why Statement Was Materially Misstated When Made |
|---|---|---|---|---|---|
| | | | | documentation loans totaled $2.0 billion, or 4.8%, and stated documentation loans totaled $18.7 billion, or 44.2%. . . . We designed our underwriting standards and quality assurance programs to ensure that loan quality is consistent and meets our guidelines, even as the documentation type mix varies. <br><br> * * * <br><br> We adhere to high origination standards in order to sell our loan products in the secondary mortgage market. <br><br> ¶239 (emphasis added). | Century's underwriting loosened precipitously before and at the time of the Series A Preferred Stock offering, such that its loans became delinquent and were repurchased at substantially higher rates as compared to the loans it made in 2003-04, and with such speed that generic market forces could not be to blame. The data further demonstrate that given its loosened underwriting, New Century was far more likely to issue a sub-prime borrower a mortgage loan than its peers. <br><br> According to CWs 3, 5, 6, 8, 11, 13, 15, 17, 20, 21, 22, 25 and 28, as early as 2003 and progressively from 2004-05, New Century began originating riskier and riskier loans because of increased loan to values, including 80/20 100% financing loans requiring no down payment, and began increasing the amount of stated income loans which, starting in 2004-05, were being offered to W-2 wage earners, who should have been able to verify their stated income, but were |

2

EXHIBIT   D
PAGE   387

**EXHIBIT D**
*In re New Century*, No. 2:07-cv-00931-DDP (JTLx)
**Series A and Series B Preferred Stock Offerings**

| Stmt. # | Date | Relevant Document | Responsible Defendant(s) | Material Misstatement(s) | Facts Demonstrating Why Statement Was Materially Misstated When Made |
|---|---|---|---|---|---|
| | | | | | not required to. *See* ¶¶137-39, 141, 144, 146, 148, 150, 153-55, 158, 161. |
| | | | | | According to CWs 13, 17, 20, 25 and 28, the Company's underwriting was loosened and the Company was issuing "riskier and riskier" loans beginning in early 2003 with "heavy pressure" to close loans and operations managers signing off on the approval of riskier loans. |
| | | | | | Quarterly loan performance data set forth in ¶111 further demonstrate a trend of increasing delinquencies from the first quarter of 2004 through the first quarter of 2005. The fact that delinquencies continued to increase thereafter at a dramatic rate further demonstrates that contrary to the above-quoted statements, New Century's underwriting was not "strict" and "comprehensive" as represented at the time of the Series A Preferred Stock offering, but substantially loosened to produce growing origination volume. |

3

EXHIBIT ___D___
PAGE ___388___

**EXHIBIT D**

*In re New Century*, No. 2:07-cv-00931-DDP (JTLx)

Series A and Series B Preferred Stock Offerings

| Stmt. # | Date | Relevant Document | Responsible Defendant(s) | Material Misstatement(s) | Facts Demonstrating Why Statement Was Materially Misstated When Made |
|---|---|---|---|---|---|
| | | | | | In addition, as set forth in ¶¶173-78, 183, 187, 189, 196, by the time of these statements, the Examiner's Report details facts demonstrating "serious loan quality issues at [New Century] beginning as early as 2004," numerous "red flags" relating to loan quality; and the failure of New Century's Senior Management and Board of Directors to devote sufficient attention to improving loan quality until the final quarter of 2006, when it "was too late to prevent the consequences of longstanding loan quality problems in an adversely changing market." "Rather, New Century continued to focus on generating greater quantities of ever riskier loans, devoting little effort to such basic issues as making sure that the Company's loan origination and underwriting policies and procedures were followed to avoid kickouts of loans offered for sale." Contrary to the above statements, New Century "devoted its resources to generating high volumes of loans, with relatively little attention to loan quality" and did |

4

**EXHIBIT D**
*In re New Century*, No. 2:07-cv-00931-DDP (JTLx)
Series A and Series B Preferred Stock Offerings

| Stmt. # | Date | Relevant Document | Responsible Defendant(s) | Material Misstatement(s) | Facts Demonstrating Why Statement Was Materially Misstated When Made |
|---|---|---|---|---|---|
| | | | | | not even have any "formal exceptions policy."<br><br>The Examiner found these ever-increasing risks to be "a veritable ticking time bomb." As a result of these findings, the Examiner concluded that the above public statements made by New Century regarding the purported credit characteristics of its loans and strict and consistent underwriting guidelines were "not supportable" and without "justifiable basis" when made. |

5

EXHIBIT  *D*
PAGE  390

**EXHIBIT D**
*In re New Century, No. 2:07-cv-00931-DDP (JTLx)*
Series A and Series B Preferred Stock Offerings

| Stmt. # | Date | Relevant Document | Responsible Defendant(s) | Material Misstatement(s) | Facts Demonstrating Why Statement Was Materially Misstated When Made |
|---|---|---|---|---|---|
| 2 (¶241) | 05/10/05 | First Quarter 2005 Form 10-Q, incorporated by reference into the Series A Preferred Stock Registration Statement | Individual Defendants: Morrice Dodge Cole Gotschall Black Forster Lange Popejoy Sachs Sandvik Zona Alexander  Underwriter Defendants: Bear Stearns Deutsche Bank Piper Jaffray Stifel Nicolaus JMP Securities Roth Capital | New Century's Form 10-Q filed on or about May 10, 2005, similarly stated:  We originate and purchase primarily first mortgage loans nationwide. We focus on lending to individuals whose borrowing needs are generally not fulfilled by traditional financial institutions because they do not satisfy the credit, documentation or other underwriting standards prescribed by conventional mortgage lenders and loan buyers. We originate and purchase loans on the basis of the borrower's ability to repay the mortgage loan, the borrower's historical pattern of debt repayment and the amount of equity in the borrower's property, as measured by the borrower's loan-to-value ratio, or LTV. We have been originating and purchasing subprime loans since 1996 and believe we have developed a comprehensive and sophisticated process of credit evaluation and risk-based pricing that allows us to effectively manage the potentially | This statement was materially misstated at the time it was made for all of the reasons stated above in Series A Preferred Stock Statement #1. |

6

**EXHIBIT D**
*In re New Century*, No. 2:07-cv-00931-DDP (JTLx)
Series A and Series B Preferred Stock Offerings

higher risks associated with this
segment of the mortgage industry.

* * *

We have experienced considerable
growth of our interest-only product.
During the three months ended March
31, 2005, originations of interest only
loans totaled $2.7 billion, or 26.7%, of
total originations.  Interest-only
originations during the three months
ended March 31, 2004 totaled $963
million, or 11.4%, of total originations
during the period.  We believe our
strict underwriting guidelines and the
stronger credit characteristics of these
loans mitigate their perceived higher
risk.

For the three months ended March 31,
2005, full documentation loans as a
percentage of originations totaled $5.2
billion, or 50.7%, limited
documentation loans totaled $569
million, or 5.6%, and stated
documentation loans totaled $4.5
billion, or 43.7%. . . .  We designed
our underwriting standards and quality
assurance programs to ensure that loan
quality is consistent and meets our
guidelines, even as the documentation

7

**EXHIBIT D**
*In re New Century*, No. 2:07-cv-00931-DDP (JTLx)
<u>Series A and Series B Preferred Stock Offerings</u>

<u>type mix varies</u>. ¶241 (emphasis added).

8

**EXHIBIT D**
*In re New Century*, No. 2:07-cv-00931-DDP (JTLx)
**Series A and Series B Preferred Stock Offerings**

| Stmt. # | Date | Relevant Document | Responsible Defendant(s) | Material Misstatement(s) | Facts Demonstrating Why Statement Was Materially Misstated When Made |
|---|---|---|---|---|---|
| 3<br><br>(¶245) | 05/10/05 | First Quarter 2005 Form 10-Q, incorporated by reference into the Series A Preferred Stock Registration Statement | Individual Defendants:<br>Morrice<br>Dodge<br>Cole<br>Gotschall<br>Black<br>Forster<br>Lange<br>Popejoy<br>Sachs<br>Sandvik<br>Zona<br>Alexander<br><br>Underwriter Defendants:<br>Bear Stearns<br>Deutsche Bank<br>Piper Jaffray<br>Stifel Nicolaus<br>JMP Securities<br>Roth Capital | The Form 10-Q, incorporated by reference in the Series A Preferred Stock Registration Statement, contained material misstatements regarding GAAP compliance:<br><br>The Company has prepared the accompanying unaudited condensed consolidated financial statements in accordance with accounting principles generally accepted in the United States of America for interim financial information and with the instructions to Form 10-Q and Rule 10-01 of Regulation S-X.  Accordingly, they do not include all of the information and footnotes required by generally accepted accounting principles for complete financial statements.  In the opinion of management, all adjustments (consisting of normal recurring accruals) considered necessary for a fair presentation have been included.  ¶245 (emphasis added). | As set forth in ¶75, according to CW 1, New Century had intentionally delayed payment of valid repurchase claims, causing a massive backlog of repurchase claims, 80% of which, or hundreds of millions of dollars worth, were 18-24 months old as of September 2006 – meaning that the backlog went back to the 2005 first quarter.  According to CW 1, these repurchase claims already were determined to be valid and should have been paid 18-24 months earlier, but the Company delayed payment of them in an effort to cause its previously reported financial results to appear better than they actually were.  According to CW 1, by the end of the 2004 fourth quarter, New Century already had a large backlog of valid, unfunded repurchase claims.<br><br>Accordingly, hundreds of millions of dollars worth of these valid repurchase claims should have been funded prior to the start of the Class Period in May 2005 and the Series A |

9

EXHIBIT D
*In re New Century*, No. 2:07-cv-00931-DDP (JTLx)
Series A and Series B Preferred Stock Offerings

| Stmt. # | Date | Relevant Document | Responsible Defendant(s) | Material Misstatement(s) | Facts Demonstrating Why Statement Was Materially Misstated When Made |
|---|---|---|---|---|---|
| | | | | | Preferred Stock offering, but were not.

As set forth in ¶77, according to CW 3, New Century was "sitting on repurchase requests" hoping to ride out the market and the Company failed to have good internal reporting of repurchase information. In addition, according to the internal New Century document quoted in ¶79, 61% of the Company's outstanding repurchase claims, or $167 million worth, had been received by July 31, 2005.

As set forth in ¶¶91-93, 96-97, the facts revealed by the Examiner's Report further demonstrate that "beginning no later than 2004, New Century was receiving repurchase requests related to loans sold outside of the previous 90-day period and it was taking much longer than 90 days to evaluate and process repurchase requests and repurchase loans." In violation of GAAP, "New Century was not reserving, however, for these |

10

EXHIBIT   D
PAGE     395

**EXHIBIT D**
*In re New Century*, No. 2:07-cv-00931-DDP (JTLx)
Series A and Series B Preferred Stock Offerings

| Stmt. # | Date | Relevant Document | Responsible Defendant(s) | Material Misstatement(s) | Facts Demonstrating Why Statement Was Materially Misstated When Made |
|---|---|---|---|---|---|
| | | | | | loans that it might be required to repurchase and on which it might incur losses and expenses, but for which no reserve was provided." By January 26, 2005, the Examiner found "clear indication that New Century Accounting Department personnel knew that many loans that were ultimately repurchased in 2004 were Backlog Claims. . . . Notwithstanding this information, New Century did nothing to adjust its methodology for estimating the quantity of loans that might need to be repurchased as of the end of a financial reporting period." <br><br> In addition, at the time of the above-reported 2005 first quarter earnings and at all times throughout 2005, New Century "perplexingly" further violated GAAP by failing to reserve for Interest Recapture as set forth in ¶¶96-97.  Consistent with the Examiner's Report, New Century's above-quoted description of its Allowance for Repurchase Losses was materially misleading when |

11

EXHIBIT    D
PAGE      396