BERNSTEIN LITOWITZ BERGER
    & GROSSMANN LLP
BLAIR A. NICHOLAS   (Bar No. 178428)
(blairn@blbglaw.com)
TAKEO A. KELLAR   (Bar No. 234470)
(takeok@blbglaw.com)
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Tel:   (858) 793-0070
Fax:   (858) 793-0323
        -and-
SALVATORE J. GRAZIANO
(sgraziano@blbglaw.com)
HANNAH GREENWALD
(hannah@blbglaw.com)
1285 Avenue of the Americas
New York, NY 10019
Tel:   (212) 554-1400
Fax:   (212) 554-1444

Lead Counsel for Lead Plaintiff the New
York State Teachers' Retirement System
and the Class

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE NEW CENTURY | Case No. 2:07-cv-00931-DDP (FMOx) (Lead Case) <br><br> CONSOLIDATED CLASS ACTION <br><br> **MEMORANDUM OF LAW IN OPPOSITION TO THE MOTIONS OF ALL DEFENDANTS TO DISMISS THE SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT AND IN OPPOSITION TO THE MOTION OF DEFENDANT KPMG LLP TO STRIKE** <br><br> Date:        Sept. 8, 2008 <br> Time:       10:00 a.m. <br> Place:      Courtroom 3 <br> Judge:     Hon. Dean D. Pregerson |

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................. vi

I.    PRELIMINARY STATEMENT ..............................................................1

II.   SUMMARY OF FACTS ......................................................................2

      A.    New Century's 2005 And 2006 Material
            Financial Misstatements ................................................3

      B.    New Century's Undisclosed Internal Control
            Deficiencies ................................................................4

      C.    The New Century Officer Defendants'
            Repeated Material Misstatements About
            Underwriting And Loan Quality ......................................4

      D.    KPMG's Unqualified 2005 Audit Opinions
            Were Materially Misstated When Issued ...........................5

      E.    The New Century Officer Defendants And
            KPMG Knew Of, Or Recklessly
            Disregarded, New Century's Material
            Misstatements And Inadequate Internal
            Controls ....................................................................8

            1.    The New Century Officer Defendants .....................8

            2.    KPMG ..........................................................11

      F.    The Prices Of New Century Securities
            Declined As The Truth Was Revealed ...............................14

III.  ARGUMENT .................................................................................15

      A.    Defendants' Arguments For Dismissal
            Under Rule 8(a) Are Without Merit .................................15

            1.    Plaintiffs Extensively Revised The
                  Originally Filed Complaint To
                  Comply With The Court's January 31,
                  2008 Order ...................................................15

            2.    The Second Amended Consolidated
                  Class Action Complaint Is Well
                  Organized ....................................................17

      B.    The Complaint States Exchange Act Claims
            Against The New Century Officer
            Defendants .................................................................22

1.     The Complaint Adequately Alleges That Each New Century Officer Defendant Made Actionable False And Misleading Statements .......................................23

        a.     The New Century Officer Defendants Made Actionable Misrepresentations And Omissions Regarding New Century's Underwriting And Loan Quality ....................................24

        b.     The Bespeaks Caution Doctrine And The Safe Harbor For Forward-Looking Statements Do Not Apply To The New Century Officer Defendants' Repeated Misstatements Regarding Loan Quality And Underwriting Standards.................................29

        c.     Plaintiffs May Rely On The Group Pleading Doctrine For Company-Issued Press Releases .............................................................33

2.     Plaintiffs' Factual Allegations Regarding The New Century Officer Defendants Collectively Give Rise To A Strong Inference Of Scienter.................................34

3.     The Inference That The Officer Defendants Acted With Scienter Is At Least As Strong As Any Innocent Competing Inference.................................42

        a.     Allegations Regarding KPMG's (Deficient) Audit Do Not Defeat The Strong Inference Of Scienter .............................................45

        b.     The New Century Officer Defendants' Repeated, Sworn Certifications Of Internal Control In The Face Of Contrary Facts Further Supports A Finding Of Scienter ......................47

        c.     The Facts Alleged From Confidential Sources Are Reliable And Give Further Support To A Strong Inference Of Scienter..................49

        d.     New Century's Admissions Of Material Accounting Errors And GAAP Violations Contribute To A Strong Inference Of Scienter .............................................................52

4.     The Complaint's Motive Allegations Are More Than Adequate When Considered Collectively With The Other Allegations Concerning Defendants' Knowledge And Recklessness.................................55

|   |   |   | a. | Dividends And Bonuses ...............................................56 |
|   |   |   | b. | Insider Selling ...............................................................58 |
|   |   |   |   | (1)  10b5-1 Plans ....................................................58 |
|   |   |   |   | (2)  Gotschall ..........................................................59 |
|   |   |   |   | (3)  Cole ...................................................................61 |
|   |   |   |   | (4)  Dodge ................................................................63 |
|   |   |   |   | (5)  Morrice .............................................................64 |

C.  The Complaint Alleges Numerous  Facts Giving Rise To A Strong Inference That KPMG Acted With Scienter ............................................................65

    1.  KPMG Made Materially False Statements ..............................................................................65

    2.  The Complaint's Factual Allegations Must Be Presumed True And Must Be Considered As A Whole ..................................................66

    3.  The Examiner's Report Supports The Inference That KPMG Was Deliberately Reckless ..........................................................67

    4.  The Inference That KPMG Refused To See The Obvious Or To Investigate The Doubtful Is At Least As Strong As Any Innocent Competing Inference ................................................68

        a.  Allowance For Loan Repurchases Reserve ....................68

        b.  Residual Interests ..............................................................73

        c.  Other Improper Accounting And KPMG's Undue Willingness To Acquiesce In New Century's GAAP Violations ...........................................77

            (1)  Hedge Accounting ..........................................77

            (2)  Allowance For Loan Losses ..............................79

            (3)  Mortgage Servicing Rights And Goodwill .................................................80

        d.  KPMG's Inadequate Audit Of New Century's Internal Controls ..........................................81

        e.  Inadequate Staffing Of The 2005 Audit Team ..................................................................................81

f.    The Rapid Discovery Of New Century's Improper Accounting By A New CFO..........................82

g.    KPMG's Failure To Cooperate With New Century's Audit Committee And The Bankruptcy Examiner .....................................84

D.    The Complaint States Claims For Violations Of Section 11 Of The Securities Act......................................85

1.    The Pleading Requirements For Claims Under Section 11 .......................................86

2.    The Complaint Adequately Alleges That The Series A And B Preferred Stock Registration Statements Were Materially Misstated ..............................88

a.    The Series A And B Preferred Stock Registration Statements Contained Material Misstatements And Omissions Regarding New Century's Financial Results And Compliance With GAAP ..............................88

b.    The Series A And B Preferred Stock Registration Statements Contained Material Misstatements And Omissions Regarding New Century's Internal Controls.....................................90

c.    The Series A And B Preferred Stock Registration Statements Contained Material Misstatements And Omissions Regarding New Century's Underwriting Standards And The Quality Of Its Loans ...............................91

3.    The Complaint Pleads Securities Law Violations And Not Corporate Mismanagement .................................92

4.    The Bespeaks Caution Doctrine And The  PSLRA's Safe Harbor For Forward-Looking Statements Do Not Apply To The Financial Misstatements Made In The Registration Statements .............................93

5.    The Misstatements And Omissions Regarding Underwriting Standards And Internal Controls Were Not Immaterial Statements Of "Opinion" Or "Subjective Belief" ..............................99

E.    Defendants' Arguments Regarding Loss Causation Should Be Rejected .......................102

1. The Court Should Not Dismiss Plaintiffs' Securities Act Claims Based On The Affirmative Defense Of "Negative Causation" At The Pleading Stage ........................................................ 102

   a. Defendants Cannot, On A Motion To Dismiss, Meet Their Burden Of Proving Negative Causation ........................................................ 103

   b. The Cases Cited By Defendants Are Neither Controlling Nor Persuasive ........................................................ 106

2. As To The Exchange Act Claims, The Complaint Sufficiently Alleges Loss Causation ........................................................ 109

   a. Loss Causation Is Well Established In The Complaint ........................................................ 109

   b. Defendants Misconstrue *Dura* And Other Case Law On Loss Causation ........................................................ 113

F. KPMG's Motion To Strike Is Without Basis And Should Be Denied ........................................................ 118

   1. Plaintiffs May Plead On The Basis Of A Bankruptcy Examiner's Report As A Reliable Source ........................................................ 119

   2. A Properly Pleaded Complaint May Be Based On Hearsay Evidence ........................................................ 122

   3. Plaintiffs' Complaint Complies With Rule 11 ........................................................ 123

IV. CONCLUSION ........................................................ 126

# TABLE OF AUTHORITIES

Case                                                                    Page

*In re Acceptance Ins. Cos. Sec. Litig.*,
    423 F.3d 899 (8th Cir. 2005) ...................................................................97

*Acito v. IMCERA Group, Inc.*,
    47 F.3d 47 (2d Cir. 1995) .......................................................................57

*Adair v. Bristol Tech. Sys., Inc.*,
    179 F.R.D. 126 (S.D.N.Y. 1998) ...........................................................103

*In re Adams Golf, Inc. Sec. Litig.*,
    381 F.3d 267 (3d Cir. 2004) .................................................................104

*In re Alamosa Holdings, Inc. Sec. Litig.*,
    382 F. Supp. 2d 832 (N.D. Tex. 2005) .................................................108

*Aldridge v. A.T. Cross Corp.*,
    284 F.3d 72 (1st Cir. 2002)....................................................................45

*In re Amgen Inc. Sec. Litig.*,
    544 F. Supp. 2d 1009 (C.D. Cal. 2008) ...................................27, 29, 65

*Argent Classic Convertible Arbitrage Fund L.P. v. Rite Aid Corp.*,
    315 F. Supp. 2d 666 (E.D. Pa. 2004)....................................................40

*Asher v. Baxter Int'l Inc.*,
    377 F.3d 727 (7th Cir. 2004) .................................................................32

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
    324 F. Supp. 2d 474 (S.D.N.Y. 2004) ...................................................49

*Atlas v. Accredited Home Lenders Holding Co.*,
    No. 07-CV-488 H(RBB), 2008 WL 80949 (S.D. Cal. Jan. 4, 2008)..........passim

*AUSA Life Ins. Co. v. Ernst & Young*,
    206 F.3d 202 (2d Cir. 2000) .......................................................112, 113

*Avis Budget Group, Inc. v. Cal. State Teachers' Ret. Sys.*,
    128 S. Ct. 1119 (2008)...........................................................................33

*Azzolini v. Corts Trust II for Provident Financial Trust I*,
    No. 1:03 CV 1003, 2005 WL 3448053 (E.D. Tenn. Dec. 14, 2005)..........passim

*Barrie v. Intervoice-Brite, Inc.*,
   397 F.3d 249 (5th Cir. 2005) ..................................................................96

*Berson v. Applied Signal Tech., Inc.*,
   527 F.3d 982 (9th Cir. 2008) ........................................................37, 116

*In re BISYS Sec. Litig.*,
   397 F. Supp. 2d 430 (S.D.N.Y. 2005) .....................................................62

*Bourjaily v. United States*,
   483 U.S. 171 (1987)................................................................................126

*In re BP Prudhoe Bay Royalty Trust Sec. Litig.*,
   No. C06-1505 MJP, 2007 WL 3171435 (W.D. Wash. Oct. 26, 2007) ..............34

*In re Bradley Pharms., Inc. Sec. Litig.*,
   421 F. Supp. 2d 822 (D.N.J. 2006)..........................................................114, 117

*Brumbaugh v. Wave Sys. Corp.*,
   416 F. Supp. 2d 239 (D. Mass. 2006)............................................................117

*Burket v. Hyman Lippitt, P.C.*,
   No. 05-72110, 2005 WL 3556202 (E.D. Mich. Dec. 29, 2005)........................111

*In re Burlington Coat Factory Sec. Litig.*,
   114 F.3d 1410 (3d Cir. 1997) ........................................................................96

*In re Cardinal Health Inc. Sec. Litig.*,
   426 F. Supp. 2d 688 (S.D. Ohio 2006) ....................................................115, 117

*Casella v. Webb*,
   883 F.2d 805 (9th Cir. 1989) ..............................................................99, 103

*Cats v. Protection One, Inc.*,
   No. CV 99-3755 DTRCX, 2001 WL 34070755 (C.D. Cal. June 5, 2001),
   *rev'd sub nom. Garbini v. Protection One, Inc.*, 49 Fed. Appx. 169 (9th
   Cir. 2002) ....................................................................................................107

*In re CBT Group PLC Sec. Litig.*,
   No. C-98-21014-RMW, 2000 WL 33339615 (N.D. Cal. Dec. 29, 2000)..........89

*Central Laborers' Pension Fund v. SIRVA, Inc.*,
   No. 04 C 7644, 2006 WL 2787520 (N.D. Ill. Sept. 22, 2006) ..........................79

*Cheney v. Cyberguard Corp.*,
  No. 98-6879-CIV-GOLD, 2000 WL 1140306 (S.D. Fla. July 31, 2000) .........45

*Ciresi v. Citicorp*,
  782 F. Supp. 819 (S.D.N.Y. 1991) ....................................................................93

*In re CIT Group, Inc. Sec. Litig.*,
  349 F. Supp. 2d 685 (S.D.N.Y. 2004) ..............................................................93

*Commc'ns Workers of Am. Plan for Employees' Pensions & Death Benefits*
  *v. CSK Auto Corp.*,
  525 F. Supp. 2d 1116 (D. Ariz. 2007) .......................................................35, 43

*In re Complete Mgmt. Inc. Sec. Litig.*,
  153 F. Supp. 2d 314 (S.D.N.Y. 2001) ..............................................................30

*In re Connetics Corp. Sec. Litig.*,
  542 F. Supp. 2d 996 (N.D. Cal. 2008) ............................................................124

*In re Cornerstone Propane Partners, L.P.*,
  355 F. Supp. 2d 1069 (N.D. Cal. 2005)......................................28, 56, 57, 101

*In re Cornerstone Propane Partners, L.P.*,
  416 F. Supp. 2d 779 (N.D. Cal. 2005)..............................................................57

*In re Credit Suisse-AOL Sec. Litig.*,
  465 F. Supp. 2d 34 (D. Mass. 2006)................................................................111

*In re CV Therapeutics, Inc.*,
  No. C 03-03709 SI, 2004 WL 1753251 (N.D. Cal. Aug. 5, 2004) .............30, 94

*In re Cylink Sec. Litig.*,
  178 F. Supp. 2d 1077 (N.D. Cal. 2001)............................................................54

*D.E. & J. Limited P'ship v. Conaway*,
  284 F. Supp. 2d 719 (E.D. Mich. 2003) .........................................................101

*In re DaimlerChrysler AG Sec. Litig.*,
  197 F. Supp. 2d 42 (D. Del. 2002)..................................................................123

*Danis v. USN Commc'ns, Inc.*,
  73 F. Supp. 2d 923 (N.D. Ill. 1999).................................................................83

*In re Daou Sys., Inc.*,
  411 F. 3d 1006 (9th Cir. 2005) ...............................................................passim

*In re DDi Corp. Sec. Litig.*,
   No. CV 03-7063 (SJHx), 2005 WL 3090882 (C.D. Cal. July 21, 2005) ....passim

*De La Fuente v. DCI Telecomms., Inc.*,
   259 F. Supp. 2d 250 (S.D.N.Y. 2003) ..............................................120

*DeFazio v. Hollister, Inc.*,
   No. Civ. S-04-1358 WBS GGH, 2007 WL 3231670 (E.D. Cal. Nov. 1,
   2007) ...........................................................................................22

*In re Digi Int'l, Inc. Sec. Litig.*,
   6 F. Supp. 2d 1089 (D. Minn. 1998)..................................................96

*In re DNAP Sec. Litig.*,
   No. C 99-00048 WHA, 2000 WL 1358619 (N.D. Cal. Sept. 13, 2000) ..........107

*DSAM Global Value Fund v. Altris Software, Inc.*,
   288 F.3d 385 (9th Cir. 2002) ..............................................54, 68, 72

*In re Dura Pharms., Inc. Sec. Litig.*,
   452 F. Supp. 2d 1005 (S.D. Cal. 2006) ..............................................117

*Dura Pharms., Inc. v. Broudo*,
   544 U.S. 336 (2005)...................................................................passim

*In re Dynex Capital, Inc. Sec. Litig.*,
   No. 05 Civ. 1897, 2006 WL 314524 (S.D.N.Y. Feb. 10, 2006), *rev'd on
   other grounds sub. nom., Teamsters Local 445 Freight Div. Pension
   Fund v. Dynex Capital Inc.*, No. 06-2902-cv, slip op. (2d Cir. June 26,
   2008) ....................................................................................25, 95

*Eldorado Stone, LLC v. Renaissance Stone, Inc.*,
   No. 04-cv-2562 JM(CAB), 2006 WL 4569360 (S.D. Cal. Feb. 6, 2006) ........119

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*,
   343 F.3d 189 (2d Cir. 2003) ........................................................110, 116

*Eminence Capital, L.L.C. v. Aspeon, Inc.*,
   316 F.3d 1048 (9th Cir. 2003) ......................................................16, 126

*In re Employee Solutions Sec. Litig.*,
   No. CIV 97545 PHX RGS(OMP), 1998 WL 1031506 (D. Ariz. Sept. 22,
   1998) ..................................................................................94, 96

*In re Enron Corp. Sec., Derivative & ERISA Litig.*,
  No. MDL-1446, Civ. A. H-01-3624, 2005 WL 3704688 (N.D. Tex. Dec.
  5, 2005) ...........................................................................101, 120, 121

*Fecht v. Price Co.*,
  70 F.3d 1078 (9th Cir. 1994) ....................................................32, 94

*In re First Merchants Acceptance Corp. Sec. Litig.*,
  No. 97 C 2715, 1998 WL 781118 (N.D. Ill. Nov. 4, 1998) ..............................83

*In re First Union Corp. Sec. Litig.*,
  128 F. Supp. 2d 871 (W.D.N.C. 2001) ..............................................62

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
  411 F. Supp. 2d 377 (S.D.N.Y. 2006) .......................................103, 106

*Fleet Nat'l Bank v. Boyle*,
  No. 04 CV 1277 LDD, 2005 WL 2455673 (E.D. Pa. Sept. 12, 2005) .............120

*Freedman v. Louisiana-Pacific Corp.*,
  922 F. Supp. 377 (D. Or. 1996) ...................................................92

*Freeland v. Iridium World Commc'ns, Ltd.*
  233 F.R.D. 40 (D.D.C. 2006) ...............................................103, 115

*In re Friedman's, Inc. Sec. Litig.*,
  385 F. Supp. 2d 1345 (N.D. Ga. 2005).............................................102

*In re Fritz Cos. Sec. Litig.*,
  282 F. Supp. 2d 1105 (N.D. Cal. 2003).............................................54

*Gaigiulo v. Isolagen, Inc.*,
  527 F. Supp. 2d 384 (E.D. Pa. 2007)..........................................50, 95

*Geinko v. Padda*,
  No. 00C5070, 2002 WL 276236 (N.D. Ill. Feb. 26, 2002) .............................124

*In re Genentech, Inc. Sec. Litig.*,
  No. C-88-4038-DLJ, 1990 WL 32070 (N.D. Cal. Jan. 19, 1990) .....................96

*Glen Holly Entm't, Inc. v. Tektronix, Inc.*,
  352 F.3d 367 (9th Cir. 2003) .....................................................101

*Goldstein v. MCI WorldCom*,
  340 F.3d 238 (5th Cir. 2003) ......................................................88

*Gray v. First Winthrop Corp.*,
    82 F.3d 877 (9th Cir. 1996) .............................................................32

*Haft v. Eastland Fin. Corp.*,
    755 F. Supp. 1123 (D.R.I. 1991) ...................................................93

*In re Hansen Natural Corp. Sec. Litig.*,
    527 F. Supp. 2d 1142 (C.D. Cal. 2007) ..............................107, 115

*Herman & MacLean v. Huddleston*,
    459 U.S. 375 (1983)...............................................................86, 87

*In re HiEnergy Tech., Inc. Sec. Litig.*,
    No. 8:04CV01226 DOC JTLX, 2006 WL 2780058 (C.D. Cal. Sept. 26,
    2006) .........................................................................................63

*Higginbotham v. Baxter Int'l, Inc.*,
    495 F.3d 753 (7th Cir. 2007) .........................................................50

*Holgate v. Baldwin*,
    425 F.3d 671 (9th Cir. 2005) ................................................123, 125

*In re Homestore.com, Inc. Sec. Litig.*,
    252 F. Supp. 2d 1018 (C.D. Cal. 2003) ...............................33, 71, 72

*In re Hutchinson Tech. Inc. Sec. Litig.*,
    502 F. Supp. 2d 884 (D. Minn. 2007)..............................................93

*In re ICG Commc'ns Sec. Litig.*,
    No. 1:00CV01864 RFB BNB, 2006 WL 416622 (D. Colo. Feb. 7, 2006) ......116

*In re Immune Response Sec. Litig.*,
    375 F. Supp. 2d 983 (S.D. Cal. 2005)................................29, 87, 113

*In re Impax Labs., Inc. Sec. Litig.*,
    No. C 04-04802, 2008 WL 1766943 (N.D. Cal. Apr. 17, 2008)......................107

*In re Intelligroup Sec. Litig.*,
    527 F. Supp. 2d 262 (D.N.J. 2007) ..................................................46

*In re J.P. Morgan Chase Sec. Litig.*,
    363 F. Supp. 2d 595 (S.D.N.Y. 2005) ..............................................58

*Kamerman v. Steinberg*,
    113 F.R.D. 511 (S.D.N.Y. 1986) .....................................................124

*Kensington Capital Mgmt. v. Oakley, Inc.*,
    No. SACV 97-808-GLT (EEx),
    1999 WL 816964 (C.D. Cal. Jan. 14, 1999) ..................................................30, 32

*Kowal v. MCI Commc'ns Corp.*,
    16 F.3d 1271 (D.C. Cir. 1994) ...........................................................................28

*Krim v. Banctexas Group*,
    99 F.3d 775 (5th Cir. 1996) ............................................................................123

*In re Lattice Semiconductor Corp. Sec. Litig.*,
    No. CV 04-1255-AA, 2006 WL 538756 (D. Or. Jan. 3, 2006)........37, 48, 49, 53

*In re LDK Solar Sec. Litig.*,
    No. C 07-051982 WHA, 2008 WL 2242185 (N.D. Cal. May 29, 2008) .....35, 37

*In re Leapfrog Enters., Inc. Sec. Litig.*,
    527 F. Supp. 2d 1033 (N. D. Cal. 2007)....................................................107, 115

*In re Levi Strauss & Co. Sec. Litig.*,
    527 F. Supp. 2d 965 (N.D. Cal. 2007) ...............................................................50

*Levine v. AtriCure, Inc.*,
    508 F. Supp. 2d 268 (S.D.N.Y. 2007) .......................................................104, 108

*Lipton v. Pathogenesis Corp.*,
    284 F.3d 1027 (9th Cir. 2002) ...........................................................................57

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*,
    416 F.3d 940 (9th Cir. 2005) .....................................................................passim

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
    513 F. 3d 702 (7th Cir. 2008) ........................................37, 50, 51, 119

*Marksman Partners, L.P. v. Chantal Pharm. Corp.*,
    927 F. Supp. 1297 (C.D. Cal. 1996) ......................................................45, 46, 60

*McCalden v. Cal. Library Assoc.*,
    955 F.2d 1214 (9th Cir. 1990) .........................................................................107

*In re McKesson HBOC, Inc. Sec. Litig.*,
    126 F. Supp. 2d 1248 (N.D. Cal. 2000)............................................52, 108, 122

*McPhail v. First Command Fin. Planning, Inc.*,
    No. 05cv0179 IEG (JMA), 2007 WL 2807744 (S.D. Cal. Sept. 19, 2007) .......63

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
    272 F. Supp. 2d 243 (S.D.N.Y. 2003) ...............................................21, 107, 108

*In re Metro. Sec. Litig.*,
    532 F. Supp. 2d 1260 (E.D. Wash. 2007).......................................................passim

*In re Micron Tech., Inc. Sec. Litig.*,
    247 F.R.D. 627 (D. Idaho 2007) ...........................................................................63

*In re MicroStrategy, Inc. Sec. Litig.*,
    115 F. Supp. 2d 620 (E.D. Va. 2000) ...................................................................83

*Middlesex Ret. Sys. v. Quest Software Inc.*,
    527 F. Supp. 2d 1164 (C.D. Cal. 2007) ....................................................35, 37, 49

*Morse v. Abbott Labs.*,
    No. 90C1982, 1991 WL 83148 (N.D. Ill. May 7, 1991) ...................................124

*In re Motorola Sec. Litig.*,
    505 F. Supp. 2d 501 (N.D. Ill. 2007)......................................................113, 114, 115

*MZ Ventures LLC v. Mitsubishi Motor Sales of Am. Inc.*,
    No. CV 9902395 DDP (AIJx),
    1999 WL 33597219 (C.D. Cal. Aug. 31, 1999) ...............................................107

*In re Nat'l Golf Props., Inc.*,
    No. CV 02-1383 GHK(RZX),
    2003 WL 23018761 (C.D. Cal. Mar. 19, 2003)...........................................49, 50

*In re Nextcard, Inc. Sec. Litig.*,
    No. C 01-21029 JF(RS),
    2006 WL 708663 (N.D. Cal. Mar. 20, 2006) ...............................................45, 46

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West
    Holding Corp.*,
    320 F.3d 920 (9th Cir. 2003) .............................................................................56

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000) ...............................................................................40

*In re NTL, Inc. Sec. Litig.*,
    No. 02 Civ. 3013 LAK AJP,
    2006 WL 330113 (S.D.N.Y. Feb. 14, 2006) ...................................................117

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
    380 F.3d 1226 (9th Cir. 2004) ...................................................................passim

*Ong v. Sears, Roebuck & Co.*,
    388 F. Supp. 2d 871 (N.D. Ill. 2004)............................................................26

*Ong v. Sears, Roebuck & Co.*,
    459 F. Supp. 2d 729 (N.D. Ill. 2006)...........................................................110

*In re Openwave Sys. Sec. Litig.*,
    528 F. Supp. 2d 236 (S.D.N.Y. 2007) ..........................................................113

*Overton v. Todman & Co., CPAs*,
    478 F.3d 479 (2d Cir. 2007) ...........................................................................62

*In re Parmalat Sec. Litig.*,
    375 F. Supp. 2d 278 (S.D.N.Y. 2005) ...................................................115, 117

*Pavelic & LeFlore v. Marvel Entm't Group*,
    493 U.S. 120 (1989)......................................................................................124

*In re Philip Servs. Corp. Sec. Litig.*,
    383 F. Supp. 2d 463 (S.D.N.Y. 2004) ................................................66, 71,72

*Plevy v. Haggerty*,
    38 F. Supp. 2d 816 (C.D. Cal. 1998) ..............................................................58

*Plumbers & Pipefitters Local 572 Pension Fund v. Cisco Sys., Inc.*,
    411 F. Supp. 2d 1172 (N.D. Cal. 2005)........................................................109

*Plumbers & Pipefitters Local 572 Pension Fund v. Cisco Sys., Inc.*,
    No. C 01-20418 JW, 2004 WL 5326262 (N.D. Cal. May 27, 2004) ................63

*In re PMA Capital Corp. Sec. Litig.*,
    No. 03-6121, 2005 WL 1806503 (E.D. Pa. July 27, 2005)............25, 88, 90, 100

*Ponce v. SEC*,
    345 F.3d 722 (9th Cir. 2003) ...................................................................62, 71

*In re Portal Software, Inc. Sec. Litig.*,
    No. C-03-5138 VRW, 2006 WL 2385250 (N.D. Cal. Aug. 17, 2006) ............106

*PR Diamonds, Inc. v. Chandler*,
    364 F.3d 671 (6th Cir. 2004) ..............................................................40, 41, 81

*In re Prestige Brands Holding, Inc.*,
    No. 05CV06924(CLB),
    2006 WL 2147719 (S.D.N.Y. July 10, 2006)...................................................101

*In re Proquest Sec. Litig.*,
    527 F. Supp. 2d 728 (E.D. Mich. 2007) .........................................37, 47, 49, 90

*In re Ramada Inns Sec. Litig.*,
    550 F. Supp. 1127 (D. Del. 1982).....................................................................124

*In re RasterOps Corp. Sec. Litig.*,
    No. C 92-20349 RMW EAI, 1993 WL 476661 (N.D. Cal. Aug. 13, 1993) ......20

*In re Real Estate Assoc. Ltd. P'ship Litig.*,
    223 F. Supp. 2d 1142 (C.D. Cal. 2002) ..............................................................33

*In re Refco, Inc. Sec. Litig.*,
    503 F. Supp. 2d 611 (S.D.N.Y. 2007) ..........................................................87, 88

*Reiger v. PriceWaterhouseCoopers LLP*,
    117 F. Supp. 2d 1003 (S.D. Cal. 2000) ...............................................................78

*In re Reliance Sec. Litig.*,
    91 F. Supp. 2d 706 (D. Del. 2000).....................................................................95

*Reyn's Pasta Bella, LLC v. Visa USA, Inc.*,
    442 F.3d 741 (9th Cir. 2006) ............................................................................122

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004) ...............................................................................87

*Ronconi v. Larkin*,
    253 F.3d 423 (9th Cir. 2001) ........................................................................59, 62

*Roth v. AON Corp.*,
    No. 04-C-6835, 2008 WL 656069 (N.D. Ill. Mar. 7, 2008) ...............................57

*Rothman v. Gregor*,
    220 F.3d 81 (2d Cir. 2000) .................................................................................72

*Ryan v. Flowserve Corp.*,
    444 F. Supp. 2d 718 (N.D. Tex. 2006) .............................................................110

*In re S. Pac. Funding Corp. Sec. Litig.*,
    83 F. Supp. 2d 1172 (D. Or. 1999) .....................................................................90

*Schlagal v. Learning Tree Int'l*,
    No. CV 98-6384 ABC (EX),
    1998 WL 1144581 (C.D. Cal. Dec. 23, 1998).....................................................57

*Schleicher v. Wendt*,
    529 F. Supp. 2d 959 (S.D. Ind. 2007).................................................110, 111, 114

*Schnall v. Annuity & Life Re (Holdings) Ltd.*,
    No. 3:02 Civ. 2133 (GLG),
    2004 WL 367644 (D. Conn. Feb. 22, 2004)................................................94

*In re Scottish Re Group Sec. Litig.*,
    524 F. Supp. 2d 370 (S.D.N.Y. 2007) ......................................38, 48, 50, 82

*SEC v. Caserta*,
    75 F. Supp. 2d 79 (E.D.N.Y. 1999) ....................................................46

*SEC v. Price Waterhouse*,
    797 F. Supp. 1217 (S.D.N.Y. 1992) ...................................................77

*In re Seitel, Inc. Sec. Litig.*,
    447 F. Supp. 2d 693 (S.D. Tex. 2006).................................110, 116, 117

*Shapiro v. UJB Fin. Corp.*,
    964 F.2d 272 (3d Cir. 1992) ..................................................95, 99, 100

*In re Silicon Graphics Inc. Sec. Litig.*,
    183 F.3d 970 (9th Cir. 1999) ...............................................................16

*Simpson v. AOL Time Warner Inc.*,
    452 F.3d 1040 (9th Cir. 2006) ............................................................33

*Simpson v. Homestore.com, Inc.*,
    519 F.3d 1041 (9th Cir. 2008) ............................................................33

*Sloman v. Presstek, Inc.*,
    No. 06-CV-377-JI, 2007 WL 2740047 (D.N.H. Sept. 18, 2007) ...................109

*In re SmarTalk Teleservices, Inc. Sec. Litig.*,
    124 F. Supp. 2d 505 (S.D. Ohio 2000) ..................................78, 83, 84

*In re Software Toolworks Inc.*,
    50 F.3d 615 (9th Cir. 1994) ......................................................68, 72

*South Ferry LP No. 2 v. Killinger*,
    399 F. Supp. 2d 1121 (W.D. Wash. 2005) .......................................27, 30, 31, 51

*In re Spiegel, Inc. Sec. Litig.*,
    382 F. Supp. 2d 989 (N.D. Ill. 2004).........................................................16, 120

*In re Splash Tech. Holdings, Inc. Sec. Litig.*,
    160 F. Supp. 2d 1059 (N.D. Cal. 2001).............................................................21

*Stafford v. Bakke*,
    No. 102 CV 1132, 2005 WL 1656855, at *5 (S.D. Ind. July 7, 2005)............108

*Stavroff v. Meyo*,
    No. 95-4119, 1997 WL 720475 (6th Cir. Nov. 12, 1997)..................................46

*Steiner v. MedQuist Inc.*,
    No. 04-5487 (JBS), 2006 WL 2827740 (D.N.J. Sept. 29, 2006) ....................116

*Suez Equity Investors, L.P. v. Toronto-Dominion Bank*,
    250 F.3d 87 (2d Cir. 2001) ..............................................................................110

*In re Surebeam Corp. Sec. Litig.*,
    No. 03 CV 1721 JM (POR),
    2005 WL 5036360 (S.D. Cal. Jan. 3, 2005) ..............................................92, 102

*In re Syntex Corp. Sec. Litig.*,
    855 F. Supp. 1086 (N.D. Cal. 1994), *aff'd*, 95 F.3d 922 (9th Cir. 1996)..........27

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*,
    No. 05 Civ. 1898(SAS),
    2005 WL 2148919 (S.D.N.Y. Sept. 6, 2005) ...........................................26, 110

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    127 S. Ct. 2499 (2007)................................................................................passim

*In re Telxon Corp. Sec. Litig.*,
    133 F. Supp. 2d 1010 (N.D. Ohio 2000) ...........................................................96

*Tripp v. Indymac Fin., Inc.*,
    No. CV07-1635 GW (VBKx),
    2007 WL 4591930 (C.D. Cal. Nov. 29, 2007) ..................................................51

*Tuchman v. DSC Commc'ns Corp.*,
    14 F.3d 1061 (5th Cir. 1994) .............................................................................58

*In re TyCom Ltd. Sec. Litig.*,
   No. 03-CV-1352-PB, 2005 WL 2127674 (D.N.H. Sept. 2, 2005) ...................113

*Vachon v. BayBanks, Inc.*,
   780 F. Supp. 79 (D. Mass. 1991) .......................................................................93

*Van Buskirk v. Cable News Network, Inc.*,
   284 F.3d 977 (9th Cir. 2002) ..........................................................................122

*In re Van Wagoner Funds, Inc. Sec. Litig.*,
   382 F. Supp. 2d 1173 (N.D. Cal. 2004) ............................................................76

*In re Vantive Corp. Sec. Litig.*,
   283 F.3d 1079 (9th Cir. 2002) ....................................................................59, 62

*Vess v. Ciba-Geigy Corp. USA*,
   317 F.3d 1097 (9th Cir. 2003) ..........................................................................87

*Virginia Bankshares, Inc. v. Sandberg*,
   501 U.S. 1083 (1991)..................................................................................27, 99

*In re Watchguard Sec. Litig.*,
   No. C05-678JLR, 2006 WL 2927663 (W.D. Wash. Oct. 12, 2006) ..................49

*In re Wells Fargo Sec. Litig.*,
   12 F.3d 922 (9th Cir. 1993) ..............................................................................92

*Wenger v. Lumisys, Inc.*,
   2 F. Supp. 2d 1231 (N.D. Cal. 1998) ................................................................21

*In re Westinghouse Sec. Litig.*,
   90 F.3d 696 (3d Cir. 1996), ..............................................................................98

*In re Wet Seal, Inc. Sec. Litig.*,
   518 F. Supp. 2d 1148 (C.D. Cal. 2007) ..................................................50, 51, 76

*Wieland v. Stone Energy Corp.*,
   No. 05-2088, 2007 WL 2903178 (W.D. La. Aug. 17, 2007) ............................50

*Wool v. Tandem Computers, Inc.*,
   818 F.2d 1433 (9th Cir. 1987) ..........................................................................33

*In re WorldCom, Inc. Sec. Litig.*,
   294 F. Supp. 2d 392 (S.D.N.Y. 2003), *aff'd*, 366 F.3d 70 (2d Cir. 2004) .........87

*In re Worlds of Wonder Sec. Litig.*,
    35 F.3d 1407 (9th Cir. 1994) ...............................................................58, 72, 77

*In re WRT Energy Sec. Litig.*,
    No. 96 Civ. 3610 (JFK), 2005 WL 323729 (S.D.N.Y. Feb. 9, 2005) .........passim

*In re Xethanol Corp. Sec. Litig.*,
    No. 06 Civ. 10234(HB), 2007 WL 2572088 (S.D.N.Y. Sept. 7, 2007) .............50

*XOMA Corp. Sec. Litig.*,
    No. C-91-2252 TEH, 1990 WL 357807 (N.D. Cal. Dec. 27, 1991) .................20

*In re ZZZZ Best Sec. Litig.*,
    864 F. Supp. 960 (C.D. Cal. 1994) ....................................................................62

STATUTES

11 U.S.C. § 1106 .............................................................................................125

15 U.S.C. § 77k .......................................................................................85, 103

15 U.S.C. § 77z-1 ............................................................................................103

15 U.S.C. § 78u-4 ......................................................................................passim

15 U.S.C. § 78u-5 ..............................................................................30, 94, 96

15 U.S.C. § 7241(a) ...........................................................................................48

18 U.S.C. § 1350(a) ...........................................................................................48

OTHER AUTHORITIES

17 C.F.R. § 210.4-01(a)(1)................................................................................88

Fed. R. Civ. P. 8 ........................................................................................passim

Fed. R. Civ. P. 9(b) ...................................................................................passim

Fed. R. Civ. P. 11 ......................................................................................passim

Fed. R. Civ. P. 12(f) ...............................................................................118, 119

Fed. R. Civ. P. 12(b)(6)............................................................................passim

Lead Plaintiff the New York State Teachers' Retirement System and Plaintiffs Carl Larson and Charles Hooten respectfully submit this memorandum of law in opposition to (i) the motions of all Defendants to dismiss the Second Amended Consolidated Class Action Complaint (the "Complaint") and (ii) the motion of Defendant KPMG LLP ("KPMG") to strike the Complaint's allegations based on the New Century Bankruptcy Examiner's Report.

## I.   PRELIMINARY STATEMENT

Defendants can no longer argue that New Century's 2005 financial statements were not materially misstated when issued or that the New Century Officer Defendants' repeated statements about purported "strict" underwriting and "strong" loan quality were true when made.   Now, on their second round of motions to dismiss, they argue that all of Plaintiffs' well-founded allegations should be dismissed with prejudice primarily because the Complaint is too long. These arguments disregard the pleading requirements Plaintiffs were required to satisfy, including the numerous changes Plaintiffs have made to carefully cross-reference each alleged misstatement to only then-existing facts demonstrating that each statement was materially misstated when made.   Plaintiffs diligently used the opportunity the Court granted them to amend their original complaint with many additional contemporaneous facts strongly supporting their allegations in an organized and compelling way.

Moreover, Plaintiffs have properly alleged reliable, contemporaneous facts reported by the Bankruptcy Examiner, which together with all of the other facts alleged in the Complaint, collectively demonstrate a "strong inference" of scienter at the pleading stage as to all Section 10(b) Defendants.   These Defendants may argue for competing inferences based upon the facts alleged in the Complaint – but they cannot prevail with their motions to dismiss unless their counter-asserted inferences are more compelling than those asserted by Plaintiffs at this stage.   All Section 10(b) Defendants fail to meet that burden, given the facts alleged.

1    The Underwriter Defendants' motion to dismiss is more generic and raises

2    numerous arguments regardless of their applicability to the facts of this case.

3    Given the specific, contemporaneous facts alleged in the Complaint, Plaintiffs'

4    Section 11 claims should be sustained against all Defendants.

5    While Defendants also have moved to dismiss some or all of the claims

6    asserted against them based on loss causation grounds, at this stage, these

7    Defendants cannot show sufficient "negative causation" to obtain a dismissal of

8    Plaintiffs' Section 11 claims against them and Plaintiffs have adequately pleaded

9    loss causation for their Section 10(b) claims under controlling standards.

10    Finally, KPMG's motion to strike is without basis.  While that motion is

11    styled as a separate motion, it repeats many of the same arguments raised by

12    KPMG in its motion to dismiss and, as such, Plaintiffs have responded to it in this

13    consolidated opposition.

14    Accordingly, all Defendants' motions to dismiss and KPMG's motion to

15    strike should be denied.

16    **II.    SUMMARY OF FACTS**[1]

17    Throughout the Class Period—May 5, 2005 through March 13, 2007—and

18    at the time of both the Series A and B Preferred Stock Offerings, in June 2005 and

19    August 2006, respectively, Defendants made numerous and repeated material

20    misstatements of fact.  These material misstatements concerned the Company's

21    reported financial results and internal controls in 2005 and 2006, the adequacy of

22    KPMG's audits, and the Company's purported "strict" underwriting and "strong"

23    loan quality.

24

25

26

27

28

---

[1]  All references to "¶__" are to paragraphs of the Second Amended Consolidated
Class Action Complaint filed on April 30, 2008 (Docket No. 269).

## A.    New Century's 2005 And 2006 Material Financial Misstatements

In 2005 and 2006, New Century's financial statements were materially misstated and failed to comply with Generally Accepted Accounting Principles ("GAAP") for numerous reasons set forth in the Complaint (¶¶ 66-119), including the following:

• New Century's Allowance for Repurchase Losses reserve was materially understated in violation of GAAP throughout the Class Period. ¶¶ 69-100. Throughout all of 2005 and the first three quarters of 2006, New Century never considered its material and growing backlog of repurchase claims in calculating this very important reserve. ¶¶ 75-91. The backlog, which was "no secret" and "general knowledge" within the Company (¶¶ 92, 93), started "no later than 2004" as a result of delayed payment of valid repurchase claims and was approximately $188 million at year-end 2005 (¶ 91). The repurchase reserve was materially understated by tens of millions of dollars throughout the Class Period and at the time of both Offerings. ¶¶ 74, 91, 95, 100.

• New Century overvalued its reported Residual Interests in securitizations by tens of millions of dollars in 2005 and the first three quarters of 2006. ¶¶ 101-08. In violation of GAAP, the Company relied upon unduly low discount rates and other flawed assumptions to materially inflate its Residual Interests throughout the Class Period and at the time of both Offerings. ¶¶ 104-07.

• New Century failed to document properly its methodology for calculating its Allowance for Loan Losses reserve throughout the Class Period and improperly reduced that reserve (¶¶ 109-18) and deceptively combined it with another unrelated reserve for the first time in the 2006 third quarter press release and conference call (¶¶ 112-13, 118).

• New Century committed numerous other GAAP violations, throughout the Class Period and at the time of the Offerings, concerning: (1)

1   Mortgage Servicing Rights; (2) deferred loan origination fees and costs; (3)

2   hedging; and (4) goodwill. ¶ 119.

3       **B.    New Century's Undisclosed Internal Control Deficiencies**

4       Despite the New Century Officer Defendants' repeated certifications

5   regarding the adequacy of the Company's internal controls, throughout the Class

6   Period and at the time of the Offerings, New Century suffered from "deeply-rooted

7   and long-standing failures to establish and monitor adequate internal controls"

8   which "substantially contributed" to the Company's material GAAP violations.

9   ¶ 194 at p. 120. These undisclosed internal control deficiencies (detailed in the

10  Complaint) were in areas critical to New Century's financial reporting, including

11  the Company's repurchase reserve (¶ 195 at pp. 122-24), residual interests (*id.* at

12  pp. 125-26), and allowance for loan losses accounting (*id.* at pp. 126-27).

13      **C.    The New Century Officer Defendants' Repeated Material
             Misstatements About Underwriting And Loan Quality**

14

15      In addition to these material financial misstatements, throughout the Class

16  Period and at the time of the Offerings, the New Century Officer Defendants stated

17  repeatedly that the credit quality of the Company's mortgages was "strong,"

18  "excellent," "very high" and "higher" or "better" than it had been in the

19  Company's past as the result of purportedly "strict," "improved" and "strong"

20  underwriting. ¶ 120. However, these Defendants knew "from multiple data

21  sources" set forth in detail in the Complaint that New Century's loan quality was

22  problematic, starting no later than 2004. ¶ 175. The Company also suffered from

23  significant deficiencies and material weaknesses in internal controls related to loan

24  quality and loan origination. ¶¶ 120-90, 196. Rather than address these serious

25  issues, the Company continued to focus on generating greater quantities of ever

26  riskier loans by loosening its underwriting standards and offering higher risk

27  mortgage products – creating a veritable "ticking time bomb." ¶ 190 at p. 119.

28  The New Century Officer Defendants' repeated public statements regarding loan

quality and origination standards were simply "not supportable" and without "justifiable basis" when made.  ¶ 176.  Because the Company's "financial success depended ultimately on the quality of its originations," Defendants' repeated misstatements about underwriting standards and loan quality were unquestionably material to investors.  ¶ 173.  Moreover, as the data in the Complaint show, New Century's 2005 and 2006 mortgages performed so badly, so quickly, that general market forces are not a plausible explanation for their rapid failure.  ¶¶ 125-30.

### D.    KPMG's Unqualified 2005 Audit Opinions Were Materially Misstated When Issued

On March 15, 2006, KPMG issued unqualified audit opinions on:  (i) New Century's financial statements for the year ended December 31, 2005; and (ii) the Company's internal controls as of December 31, 2005, both of which were materially misstated when issued and when incorporated into the Series B Stock Offering.  ¶¶ 204-35, 268-70.

In its publicly issued audit opinions, KPMG stated that it had performed its audits of New Century in accordance with the standards of the Public Company Accounting Oversight Board ("PCAOB"), that the Company's financial statements were presented fairly in accordance with GAAP, and that New Century maintained effective internal controls.  ¶¶ 268-70, 392-93, 403.

KPMG's 2005 audit opinions were materially misstated and KPMG failed to comply with the standards of the PCAOB for multiple reasons including the following:

• KPMG's 2005 audit team was staffed with auditors with insufficient experience in the industry and relating to the particular tasks they were assigned. ¶¶ 222-23.  For example, KPMG auditor Deborah Biddle played a "major role" in coordinating the 2005 New Century internal controls audit despite having just transferred from the United Kingdom and having virtually no experience auditing U.S. clients and no prior Sarbanes-Oxley experience.  *Id.* at pp. 142-43.  Key audit

1    work concerning two critical accounting areas in 2005 – the Company's repurchase

2    reserve and valuation of Residual Interests – was performed by first-year auditors

3    who had no substantive experience in these areas.  *Id.*  KPMG also refused to

4    assign a different and more subprime-industry-experienced audit-engagement

5    partner to the 2005 audit when specifically requested to do so by New Century's

6    Audit Committee.  *Id.*  As a result, New Century considered, but did not replace

7    KPMG.  *Id.*

8         •    Thereafter, KPMG's 2005 audit team was unwilling to challenge New

9    Century management and, in some instances, acted as advocates for the Company

10   and opposed other internal experts within KPMG.  ¶¶ 224-26.  For example,

11   despite repeated concerns expressed by KPMG's own internal specialists, KPMG

12   audit-engagement partner John Donovan supported the Company's unduly low

13   discount rates for valuing Residual Interests after New Century management and,

14   later, its Board, resisted changing those rates.  ¶ 224.  Donovan also told New

15   Century that KPMG's expert had found that the Company's hedge accounting

16   satisfied GAAP when that was not the case, and Donovan refused to revisit the

17   issue with New Century when the internal expert demanded he do so because "The

18   client thinks we are done."  ¶ 225.  When the expert ultimately obtained the

19   documentation he needed, one month *after* KPMG issued its clean 2005 audit

20   opinion, he concluded that the hedge accounting was misstated by several million

21   dollars. ¶ 226.

22        •    KPMG's 2005 audit team failed to audit New Century's repurchase

23   reserve in accordance with Generally Accepted Auditing Standards ("GAAS").  ¶¶

24   227-30.  Despite noting in its workpapers that: (i) in 2004, 2005, and 2006, New

25   Century had internal control weakness in calculating this very important reserve,

26   and (ii) at year-end 2005, the Company had $188 million in outstanding repurchase

27   requests – compared to only $70 million in anticipated repurchases estimated by

28   New Century's flawed calculations – KPMG, in violation of GAAS, performed no

additional testing or procedures to test the Company's repurchase reserve calculation. ¶ 227. KPMG also failed to test whether interest recapture was included in the Company's repurchase reserve (¶ 228) or to detect the Company's failure to apply a Lower of Cost or Market adjustment consistently with how that adjustment was used in other areas of the Company's financial statements or industry practice (¶ 229). Even minimal testing would have revealed these material GAAP violations and that New Century was substantially under-reserved. ¶¶ 228-29.

• KPMG's 2005 audit team failed to audit New Century's reported Residual Interest valuations in accordance with GAAS. ¶¶ 231-32. In 2004, 2005 and 2006, KPMG documented significant deficiencies in New Century's Residual Interest valuations. ¶ 231. Nonetheless, KPMG's 2005 audit team accepted management's flawed discount rate and par value assumptions notwithstanding clear and repeated indications from internal KPMG experts that they were not appropriate. ¶ 232.

• KPMG's 2005 audit team committed numerous other GAAS violations in auditing the Company's aggressive accounting policies and practices. ¶ 233. These included overlooking the fact that New Century's Allowance for Loan Losses reserve documentation and methodology were deficient and inaccurate, year after year (*id.* at pp. 166-67), as was the Company's accounting for mortgage servicing rights (*id.* at pp. 167-68), hedging (*id.* at pp. 169-70), and goodwill (*id.* at pp. 170-72).

• KPMG's 2005 audit team failed to audit New Century's internal controls in accordance with the standards of the PCAOB. ¶ 234. Material weaknesses and significant deficiencies noted in 2004 and 2006 were also in existence at the time of KPMG's 2005 audit, but KPMG's completely inexperienced U.K. auditor Biddle failed to even identify them. *Id.* at p. 172. KPMG's 2005 audit team, in violation of PCAOB standards, also failed to

communicate with members of the 2004 audit team, which would have revealed numerous recurring deficiencies. *Id.* at pp. 173-74.

### E. The New Century Officer Defendants And KPMG Knew Of, Or Recklessly Disregarded, New Century's Material Misstatements And Inadequate Internal Controls

#### 1. The New Century Officer Defendants

The Complaint alleges numerous facts demonstrating a strong inference that New Century Officer Defendants Cole, Morrice, Gotschall, and Dodge acted with scienter in making materially false and misleading statements throughout the Class Period. ¶¶ 483-514. These facts include, but are not limited to, the following:

• At the start of the Class Period, these Defendants publicly described New Century's underwriting as a "very core" business control function (¶ 344) and, thereafter, these Defendants repeatedly described the credit quality of the Company's mortgages as "strong," "excellent," "superior," "very high" and "higher" or "better" than it had been in the Company's past as the result of purportedly "strict," "improved" and "strong" underwriting controls and risk management discipline. Each of the New Century Officer Defendants repeatedly made such statements: Cole (¶¶ 343, 344, 347, 358, 361, 376, 387, 388, 408, 425, 438, 443); Morrice (¶¶ 343, 347, 361, 373, 376, 388, 408, 425, 438, 443); Gotschall (¶¶ 343, 347, 361, 364, 376, 388); and Dodge (¶¶ 343, 344, 347, 361, 376, 387, 388, 405, 408, 425, 438, 443). All the while, as set forth in detail in the Complaint (¶¶ 120-90), New Century's underwriting guidelines were actually loosened substantially, and the Company was introducing higher-risk mortgage products to subprime borrowers so that it could continue to reach record loan volume. These Defendants were intentionally misstating the facts or acting in a deliberately reckless manner in making their repeated statements regarding purportedly improved underwriting in light of what was actually occurring at the Company. Numerous contemporaneous facts demonstrate that these repeated

public statements were "not supportable," without "justifiable basis" and simply untrue when made. ¶ 485.

• Similarly, each of these Defendants repeatedly signed quarterly certifications attesting to the Company's compliance with GAAP and the adequacy of New Century's internal controls, when the facts detailed in the Complaint and admitted by the need for a restatement demonstrate the Company's lack of compliance with GAAP and material weaknesses in and "deeply-rooted" problems with New Century's internal controls. ¶¶ 486-87. New Century did not remediate serious internal control deficiencies at year-end 2004 and 2005, despite representing to KPMG that it would. *Id.* These year-over-year deficiencies included key controls relating to the Company's repurchase reserve and residual interests valuations and "dismal" loan quality and underwriting controls. *Id.* Notwithstanding all of this information, Defendants Cole, Morrice, Gotschall, and Dodge repeatedly certified the adequacy of the Company's internal controls. *Id.*

• Each of these Defendants repeatedly signed the Company's SEC filings which described (correctly) the controlling GAAP requirements for setting the Company's required reserves as well as reporting the Company's residual interests in securitizations at fair value. ¶ 488. Yet, at the same time, these Defendants failed to follow these same GAAP requirements and New Century's own "critical accounting policies." *Id.* Moreover, each of these Defendants has substantial educational, financial, and industry experience, including in the application of these very same GAAP requirements. ¶¶ 23-26, 489.

• Each of these Defendants knew of or recklessly disregarded the building repurchase claims backlog at the Company and made repeated public statements that were materially misleading, given the undisclosed backlog. ¶¶ 490-97. The backlog was created by an intentional delay in funding valid repurchase claims in an effort to "game the system." ¶¶ 75, 77. Further, the Examiner's Report documents that the backlog was "no secret" and "general knowledge"

within New Century's Accounting, Finance, and Secondary Marketing groups. ¶¶ 92-93. Backlog information was shared between Kevin Cloyd of Secondary Marketing and Defendant Dodge and the Company's other senior executive officers. ¶ 76.

• Defendants Cole, Morrice, and Dodge issued a press release on September 8, 2006 stating that the increase in the Company's early payment defaults had been "modest" when, in fact, these Defendants knew that the increase was anything but modest, given the contemporaneous reports they were receiving (including an email the night before the press release) and the growing repurchase-claims backlog. ¶¶ 438, 452. Given information that these Defendants had at the time, this statement was "utterly without basis when made." *Id.*

• Notwithstanding contemporaneous contrary information within their possession, Defendants Cole, Morrice, and Dodge also falsely characterized early payment defaults and repurchases as "modest" on November 3, 2005 (¶ 373), May 4, 2006 (¶ 405), and August 3, 2006 (¶ 422).

• Defendant Gotschall publicly stated that the Company used "very conservative assumptions" and booked its Residual Interests "conservatively" when, in fact, the Company used the lowest discount rates of any of its peers, and KPMG's specialists repeatedly warned that New Century's assumptions were not conservative or sufficiently supported. ¶ 498.

• Defendant Dodge failed to disclose changes to the Company's repurchase reserve methodology to the Company's Audit Committee despite ample opportunity to do so. ¶ 497. She also deceptively combined the Company's allowance for loan losses reserve with another unrelated reserve in the 2006 third quarter press release and conference call to mask the fact that the allowance for loan losses reserve had been reduced (which improved reported earnings). ¶¶ 499-500. She tried to reduce the same reserve to "plug" an earnings gap in the 2005 third quarter, but was stopped by New Century's Audit Committee. ¶ 500.

1    • Further evidence of the scienter of Defendants Cole, Morrice, Dodge,

2  and Gotschall is that the Company's February 7, 2007 restatement announcement

3  came less than three months after New Century's newly hired Chief Financial

4  Officer Tajvinder Bindra replaced Dodge. ¶ 501.  Bindra immediately observed

5  that New Century's repurchase reserves were much too low as soon as he joined

6  the Company. *Id.*

7    • Defendants Cole, Morrice, Dodge, and Gotschall were each highly

8  motivated to pump up the Company's mortgage origination volume at the expense

9  of underwriting standards and to understate reserves and overstate residual

10  interests. ¶¶ 502-14.  These Defendants were direct and significant beneficiaries of

11  New Century's growing dividend payments (over $50 million to them collectively)

12  which increased along with the Company's growing mortgage origination volume.

13  *Id.*  Defendants Cole, Morrice, and Gotschall also received special bonus awards

14  which were 300% higher than they should have been and gave them strong

15  incentives to originate more mortgage loans and to minimize reserves.  *Id.*  And, in

16  the aggregate, these Defendants sold over one million shares of their personally

17  held New Century common stock for total proceeds of over $53 million, benefiting

18  greatly from the artificial inflation in New Century's shares before the

19  misstatements were revealed by the newly hired CFO.  *Id.*  Dodge sold 77% of her

20  total holdings, Gotschall sold 37%, and Cole sold 31% during the Class Period.  *Id.*

21  Suspiciously, all of these Defendants entered into 10b5-1 trading plans in 2005 and

22  2006, five to six years after such plans were first allowed by the SEC, and at a time

23  when there already were serious undisclosed problems at the Company.  *Id.*

24        2.    **KPMG**

25    KPMG publicly stated that it had conducted its 2005 audits in accordance

26  with the standards of the PCAOB, but it actually failed to comply with those

27  standards for numerous reasons.  The facts alleged in the Complaint give rise to a

28  strong inference that KPMG acted intentionally or with deliberate recklessness in

issuing its unqualified audit opinion letters stating that its 2005 audits were conducted in accordance with the standards of the PCAOB when they had not been conducted in accordance with those controlling standards. ¶¶ 515-30. These facts include:

• KPMG's 2005 audit team often resisted and ignored suggestions from KPMG's own internal experts that New Century improve its accounting practices or document its departures from GAAP. ¶¶ 516-19. "Senior people on the KPMG engagement team became advocates for or defenders of New Century's accounting practices when those practices were questioned by KPMG specialists who had greater knowledge of relevant accounting guidelines and industry practices." ¶ 516.

• KPMG failed to staff its 2005 audits with auditors with sufficient experience. ¶¶ 520-22. Biddle was assigned to and played a major role in coordinating KPMG's 2005 internal controls audit despite having "virtually no experience with auditing internal controls under SOX or even U.S. GAAP." ¶ 521. A substantial amount of work with respect to two critical accounting areas in 2005 – the repurchase reserve and Residual Interest valuations – was performed by first-year auditors who admittedly did not have sufficient experience to understand the information they were assigned to audit. *Id.* KPMG also refused to replace 2005 audit-engagement partner Donovan when the Company's Audit Committee specifically requested that he be replaced out of concern with his lack of subprime-industry experience. ¶ 522.

• KPMG noted internal control weaknesses with New Century's repurchase reserve estimation process in both 2004 and 2005, yet it concluded that the 2005 deficiency was not significant despite the Company's failure to address these weaknesses for a second year in a row. ¶¶ 523-24. Moreover, KPMG's 2005 audit team obtained critical information regarding New Century's repurchase claims backlog before completing its 2005 audit, but "did nothing with it." *Id.*

Applying even the simplest of calculations or minimal testing would have revealed that New Century was substantially under-reserved. *Id.*

• With regard to New Century's reported Residual Interests valuations, KPMG documented significant deficiencies in internal controls both in 2004 and again in 2005. ¶ 525. Yet, KPMG's 2005 audit team repeatedly accepted New Century's aggressive assumptions for its Residual Interest valuations without supporting evidence, including: (i) discount rates well below industry peers, notwithstanding repeated warnings from KPMG's own internal experts; (ii) par value assumptions which unrealistically assumed that New Century's remaining loans would be sold at par on the collapse of a securitization; and (iii) prepayment assumptions that KPMG's internal experts warned were too low in comparison to industry peers and the Company's own historical experience. *Id.*

• KPMG's 2005 audit team failed to follow PCAOB audit standards in numerous other areas of its 2005 audit, including: (i) New Century's allowance for loan losses reserve; (ii) New Century's accounting for mortgage servicing rights; and (iii) New Century's assumptions used to test goodwill for impairment. ¶ 526.

• KPMG's 2005 audit team failed to audit New Century's internal controls in accordance with the standards of the PCAOB and, critically, in violation of Auditing Standard 2, failed to compare year-over-year deficiencies or communicate with members of the 2004 audit team. ¶ 527. At least six of the significant deficiencies later identified in 2006 unquestionably existed at the time of the 2005 audit, yet were not identified at that time by KPMG's 2005 audit team. *Id.*

• Senior members of KPMG's 2005 audit team were found to be incredible witnesses by the Bankruptcy Examiner, and KPMG failed to cooperate with the Examiner's investigation. ¶ 528. KPMG also refused to discuss its audit work with New Century's Audit Committee at the time of the restatement investigation, and KPMG's senior manager for the 2005 audit left KPMG in April

1  2007, at the time of KPMG's resignation as outside auditor to New Century.  ¶
2  530.

3  **F.  The Prices Of New Century Securities
   Declined As The Truth Was Revealed**
4

5      On February 7, 2007, after the close of trading and just one day before the
6  Company was scheduled to report 2006 fourth-quarter and year-end results, New
7  Century issued a press release announcing that it would restate its reported
8  financial results for the quarters ended March 31, June 30, and September 30, 2006
9  and that it expected to conclude that the errors leading to the restatement
10  constituted material weaknesses in internal control over financial reporting.  ¶ 457.
11  The Company stated that the impact of the restatement plus an expected
12  adjustment to its valuation of residual interests would result in a net loss for the
13  fourth quarter of 2006.  *Id.* at p. 313.   The prices of New Century securities
14  declined immediately after this announcement, with New Century common stock
15  closing down approximately 36% from the prior trading day, on extraordinary
16  trading volume.  ¶ 459.

17      On March 2, 2007, New Century filed with the SEC a Form 12b-25 which
18  further disclosed that:  (i) New Century's Audit Committee was conducting its own
19  independent investigation "into the issues giving rise to the Company's need to
20  restate its 2006 interim financial statements, as well as issues pertaining to the
21  Company's valuation of residual interests in securitizations in 2006 *and prior*
22  *periods*" (¶ 464 at pp. 316-17) (emphasis added); (ii) the Company now expected
23  to report a pretax loss for both the 2006 fourth quarter and full year ended
24  December 31, 2006, as a result of, *inter alia*, the restatement, the residual interest
25  valuation adjustments, and an expected increase in the Company's Allowance for
26  Loan Losses reserve (*id.* at pp. 318-19); (iii) as a result of these circumstances and
27  its highly leveraged balance sheet, the Company needed waivers from its lenders
28  and, according to KPMG, substantial doubt now existed as to the Company's

ability to continue as a going concern (*id.* at pp. 320-21); and (iv) the Company had received requests for information from the SEC, the NYSE Market Trading Analysis Department, and the U.S. Attorney's Office for the Central District of California, which was conducting a criminal investigation (*id.* at p. 321). The prices of New Century securities declined again in response to these disclosures, with the price of New Century common stock closing down $10.09 per share the next trading day, a decline of approximately 69% from its closing price on March 2, 2007, on heavy trading volume. ¶ 467.

Additional adverse disclosures and immediate trading declines followed, including adverse disclosures on March 8 (relating to New Century ceasing to accept loan applications effective immediately) and March 12 and 13, 2007 (relating to New Century's lenders declaring defaults against New Century). ¶¶ 468-76. On March 14, 2007, the price of New Century common stock closed at just $0.67 per share, a decline of approximately 97% from where it traded during the Class Period. ¶¶ 9, 478. The prices of New Century Series A and B Preferred Shares declined by over 75% during the same time period. ¶ 9. All of these declines were an entirely foreseeable consequence of and proximately caused by Defendants' materially false and misleading statements during the Class Period, including KPMG's material misstatements. ¶¶ 197-203, 531-42.

## III.   ARGUMENT

### A.   Defendants' Arguments For Dismissal Under Rule 8(a) Are Without Merit

#### 1.   Plaintiffs Extensively Revised The Originally Filed Complaint To Comply With The Court's January 31, 2008 Order

In response to the Court's January 31, 2008 Order, Plaintiffs amended the Complaint to: (a) "clearly identify the allegedly false statements"; (b) identify "which of the factual allegations support an inference that particular statements are false or misleading"; (c) distinguish allegations with respect to the Series A and

Series B stock offerings; and (d) provide charts—separated by claim—setting forth: "(i) the alleged false or misleading statements, including the source of the statement in a registration statement where a required element of the claim; (ii) the supporting factual allegations; and (iii) the ultimate conclusion."[2]  Additionally, in light of the release of the Examiner's Report, Plaintiffs were able to add numerous contemporaneous facts to support their claims against Defendants, further strengthening and clarifying the Complaint.

The release of the Examiner's Report, combined with additional facts gathered through Plaintiffs' investigation and the clarifications requested by the Court resulted in a longer complaint, but not at the expense of clarity or organization, and not in contravention of this Court's January 31, 2008 Order or Rule 8(a).  Nor is there any easily followed "bright-line" rule in the PSLRA context – which is "not operating in the world of notice pleadings" – of "how much detail is *enough* detail" at this stage.  *Eminence Capital, L.L.C. v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) (per curiam) (emphasis in original).  Indeed, the Ninth Circuit has emphasized that the PSLRA requires securities fraud plaintiffs to plead facts "in great detail."  *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 974 (9th Cir. 1999).  It would be unfair to penalize Plaintiffs in the name of Rule 8(a) for complying with the PSLRA.  In addition, the Complaint's length does not prejudice Defendants because "Rule 8 does not set out a page limit, but rather requires that '[e]ach averment of a pleading shall be simple, concise and direct.'"  *In re Spiegel, Inc. Sec. Litig.*, 382 F. Supp. 2d 989, 1014 (N.D. Ill. 2004) (citation omitted) (denying motion to dismiss 216-page complaint).

The Complaint's length is a result of the extensive revisions Plaintiffs were required to make.  Indeed, a redline submitted by Defendants comparing the Complaint to Plaintiffs' originally filed consolidated complaint readily

---

[2] January 31, 2008 Order at 6-7 (Docket No. 245).

1  demonstrates:  (i) the numerous additional supporting facts Plaintiffs added to the

2  Complaint (including, but not limited to, facts revealed by the Examiner);[3] (ii) the

3  cross-referencing of only contemporaneous facts demonstrating the falsity and

4  materiality of each identified and underlined statement that was misstated by

5  Defendants when made;[4] (iii) the deletion of Section 12(a)(2) claims against the

6  Underwriter Defendants;[5] (iv) the deletion of certain alleged misstatements as to

7  other Section 10(b) Defendants to eliminate arguments raised by Defendants

8  during the last round of motions to dismiss;[6] (v) the addition of numerous facts

9  demonstrating a strong inference of scienter as to all Section 10(b) Defendants;[7]

10  and (vi) the addition of facts further demonstrating loss causation.[8]

11       Moreover, Plaintiffs provided a Table of Contents that gives the Court and

12  Defendants a roadmap to the allegations.  In sum, Plaintiffs expended significant

13  effort and resources to use the opportunity granted to them by the Court to

14  organize, clarify and strengthen the Complaint.

15              **2.    The Second Amended Consolidated
                       Class Action Complaint Is Well Organized**

16

17       Based primarily on the length of the Complaint and the charts required by

18  the Court's January 31, 2008 Order (and ignoring all other Rule 9(b) and PSLRA

19  pleading requirements applicable to the Exchange Act Claims), all Defendants

20  argue that the Complaint should be dismissed under Rule 8(a).  Contrary to

21  _____

22  [3]  *See, e.g.*, Declaration of Daniel A. Lyons In Support Of Motion To Dismiss The
    Second Amended Consolidated Class Complaint, Exhibit A, at ¶¶ 91-119, 126-36,

23  144-45, 173-96, 201-03, 221-35, 301, 327.

24  [4]  *See, e.g., id.* at ¶¶ 242-44, 250-55, 262-64, 280-85, 351-56, 380-85, 395-401,
    412-19, 429-36, 447-55.

25  [5]  *See, e.g., id.* at pp. 204-08, 214-17.

26  [6]  *See, e.g., id.* at pp. 219, 230, 240, 251, 264-65, 274-75.

27  [7]  *See, e.g., id.* at ¶¶ 484-530.

28  [8]  *See, e.g., id.* at ¶¶ 535, 538-42.

Defendants' arguments, however, the Complaint is well organized and does not violate Rule 8(a).[9]

The Complaint alleges detailed facts separately demonstrating:  (i) each of New Century's core GAAP violations (¶¶ 69-119); (ii) New Century's misstated underwriting and loan quality standards (¶¶ 120-90); (iii) New Century's misstatements regarding the Company's internal controls (¶¶ 191-96); and (iv) KPMG's violations of GAAS (¶¶ 204-35).  Thereafter, the Complaint specifically identifies the misstatements in each of the Offerings (¶¶ 236-88) and the Section 10(b) Defendants' misstatements during the Class Period (¶¶ 343-456), and cross-references only contemporaneous facts demonstrating why each of those statements was materially misstated when made (*id.*).  Contrary to the arguments raised by Defendants, Plaintiffs did not merely incorporate all of the facts identified by the Examiner in his 551-page report into the Complaint, but carefully cite only those facts which were both well supported in his report and highly relevant to Plaintiffs' allegations.  Numerous other detailed facts were not referenced in the Complaint because, Plaintiffs were mindful of the length of the Complaint and worked to minimize its length while incorporating available new information and complying with the pleading requirements of Rule 9(b) and the PSLRA.  Indeed, the biggest factor in the length of the Complaint is the great number of misstatements made by Defendants throughout the Class Period and the numerous contemporaneous facts demonstrating that Defendants' statements were materially misstated when made.

---

[9]  *See* Director Defendants' Memorandum ("Dir. Defs. Mem.") at 10-13; Morrice, Gotschall, and Dodge Memorandum ("MGD Mem.") at 5-7; KPMG Memorandum ("KPMG Mem.") at 6-8.  Defendant Cole and the Underwriter Defendants incorporate those same arguments.  Nonetheless, Cole also argues that the Complaint "selectively" quotes documents and "omits" important facts.  Cole Mem. at 3.

1    Although Defendants are eager to label the Complaint too long or

2    disorganized, a reasonable reader can readily follow and comprehend Plaintiffs'

3    allegations. For instance, KPMG's Rule 8(a) argument is pure rhetoric. KPMG

4    incorrectly argues that "allegations against KPMG are scattered throughout

5    multiple sections and without any clear or plain statement of why those allegations

6    state a claim against KPMG." KPMG Mem. at 7. In fact, the allegations related to

7    KPMG are clearly identified in the Table of Contents, and are grouped together in

8    Sections VI(G) and XII of the Complaint. To the extent allegations in other

9    sections of the Complaint support Plaintiffs' allegations against KPMG, they are

10   specifically cross-referenced within the Complaint.[10]

11   Defendants Morrice, Gotschall, and Dodge criticize the Complaint as

12   containing "scattered," "vague," and "irrelevant" allegations and argue that

13   Plaintiffs incorporated facts from the Examiner's Report that are not "germane to

14   their claims" (MGD Mem. at 6 (quoting cases)), yet they can cite to no specific

15   allegations from the Complaint to support these conclusory statements. Merely

16   borrowing quotations from other cases that found fault with completely different

17   pleadings is not sufficient to support dismissal of the Complaint in this case,

18   especially given Plaintiffs' extensive reorganization and clarification of their

19   allegations.

20   Other than criticizing the length of the Complaint, and ignoring Plaintiffs'

21   detailed specification of why each alleged statement was materially misstated

22   when made (and at the time of the Offerings) by cross-referencing only then-

23

24   [10]  *See, e.g.*, ¶¶ 216-17, 268-70, 286, 392-93, 403, 516-20, 523, 525-26, 530.
     KPMG also complains about the charts contained in Exhibits D and E, arguing that
25   KPMG is listed as a responsible defendant for statements that it did not make.
26   However, the Complaint clearly alleges that KPMG's liability is based only on its
     own misstatements, and nothing in the Exhibits was designed to change those
27   allegations. ¶¶ 268-70, 286, 392-93, 403. Accordingly, KPMG's motion to strike
28   these exhibits is without basis and should be denied.

existing facts, the Director Defendants primarily take issue with just two entries in Exhibit D, the chart that chronologically summarizes the material misstatements in the Offerings.

These Defendants' arguments regarding these two entries (out of eighteen) in the chart are completely without merit.  First, they merely fault Exhibit D, Statement #9 (Series B chart) for referencing and not repeating verbatim the statements quoted in paragraphs 273-74 of the Complaint.  Next they argue that Plaintiffs did not underline certain statements in Exhibit D, Statement #4 (Series B chart) to identically match the referenced misstatement and underlining in the Complaint.  However, in making that argument, the Director Defendants erroneously compare Exhibit D with paragraph 389 of the Complaint, when the correct paragraph is 265.  In any event, to the extent any discrepancies between the exhibits and the Complaint actually exist, the text of the Complaint should control and not the exhibits.  To the best of their ability, Plaintiffs used the exhibits as a guide within which they referenced and/or summarized the relevant allegations in the Complaint.  The charts are intended as an aid to the Court and to Defendants, and Plaintiffs believe that they fulfill this role.  Defendants' attempt to count up all of the pages of the exhibits to make the Complaint appear longer is not productive.

Moreover, the mere length of a complaint—regardless of the sufficiency, breadth, adequacy and organization of the allegations—is not an appropriate ground for dismissal.[11]  The Complaint's length and complexity are proportional to

_____

[11]  *See, e.g.*, *XOMA Corp. Sec. Litig.*, No. C-91-2252 TEH, 1990 WL 357807, at *15 (N.D. Cal. Dec. 27, 1991) (noting that "what constitute[d] a 'short and concise' statement of the case depends on the nature of the individual case," and finding that a court, when considering a motion to dismiss based on Rule 8(a)(2), "must take into account the nature of the action, the relief sought, and the respective positions of the parties in terms of the availability of information and a number of other pragmatic matters"); *In re RasterOps Corp. Sec. Litig.*, No. C 92-20349 RMW EAI, 1993 WL 476661, at *4 (N.D. Cal. Aug. 13, 1993) (rejecting defendants' Rule 8(a) arguments, and finding that the length of a complex

Defendants' alleged securities law violations in this case. Defendants have not demonstrated how the Complaint is so confusing or overly cumbersome that it should be dismissed under Rule 8(a) because they cannot do so.

Plaintiffs were faced with the task of adequately pleading facts against KPMG, four Officer Defendants, a group of Director Defendants, and a group of Underwriter Defendants to support independent Securities Act claims for two separate offerings and Exchange Act claims for a nearly two-year Class Period. Defendants' basic argument is that there are too many factual allegations in the Complaint, not that they are unable to decipher these facts, identify their own alleged misstatements, or respond to the allegations. These arguments are without merit and should be rejected. [12]

---

securities complaint was "reasonable given the complexity of the issues involved in the case and the numerous parties to the action").

[12] The cases cited by Defendants are inapposite, as the Complaint would pass the test set by each case cited by Defendants. The Complaint is not a "puzzle pleading" of the kind rejected by the courts in *Wenger v. Lumisys, Inc.*, 2 F. Supp. 2d 1231 (N.D. Cal. 1998), and *In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059 (N.D. Cal. 2001). In the Complaint, Plaintiffs identify each material misstatement, the date of the misstatement, and the party making the misstatement, and follow with an explanation of why the statement was materially misstated when made. This is in direct contrast to the allegations in *Wenger* and *Splash*, where the alleged misstatements were lumped together, and only at the conclusion of the false statements did plaintiffs have a "laundry list" of why all the statements were false. *Wenger*, 2 F. Supp. 2d at 1243; *Splash*, 160 F. Supp. 2d at 1073. The court in *In re Metropolitan Sec. Litig.*, 532 F. Supp. 2d 1260, 1277-79 (E.D. Wash. 2007), dismissed claims for the same reasons cited in *Wenger*, and, ultimately, because the allegations did not satisfy the pleading standards of Rule 9(b), because they failed to specify which statements were allegedly false or attribute them to any particular defendant. Neither of these inadequacies is present here. The Director Defendants' citation of *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243, 268 (S.D.N.Y. 2003), is equally irrelevant. In that opinion, the court rejected plaintiffs' request for leave to amend their complaint on the grounds of the failure of the proposed amended complaint to satisfy loss causation, scienter, and other basic elements.

Indeed, Defendants' arguments in support of dismissal pursuant to Rule 8(a) are entirely undercut by the fact that they were able to comprehend the claims and allegations against them sufficiently to file five separate, detailed motions to dismiss.[13]  Defendants' arguments are further diminished by their abandonment of certain arguments related to Plaintiffs' original complaint.[14]    Thus, although Defendants now fall back on Rule 8(a) as a primary basis for seeking dismissal, their arguments demonstrate more than anything else that there is simply no complaint Defendants would deem acceptable at the pleading stage, given the serious liability they face in this case.  As such, Defendants' Rule 8(a) arguments should be rejected.

## B.    The Complaint States Exchange Act Claims Against The New Century Officer Defendants

The Complaint alleges claims arising under Sections 10(b) and 20(a) of the Exchange Act against the New Century Officer Defendants.  New Century is not named as a Defendant in these counts due to its bankruptcy filing.  ¶ 22.  These allegations are subject to the pleading requirements of Fed. R. Civ. P. 9(b) and the PSLRA.  *See Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir. 2004).

Rule 9(b) requires that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."

---

[13]  *See DeFazio v. Hollister, Inc.*, No. Civ. S-04-1358 WBS GGH, 2007 WL 3231670, at *7 (E.D. Cal. Nov. 1, 2007) (rejecting defendants' Rule 8(a) arguments because the complaint could not have been "so unintelligible" if "defendants managed to file six other motions to dismiss and a motion to strike").

[14]  For example, the Director Defendants have abandoned their argument that the Series A Registration Statement did not contain any misstatements.  Likewise, KPMG no longer argues that Plaintiffs do not sufficiently allege that New Century's 2005 financial statements were not presented in accordance with GAAP or that its GAAS violations are not sufficiently particularized.

Fed. R. Civ. P. 9(b).  *See Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005).  The PSLRA requires that:

> the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78 u-4(b)(1)(B); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2508 (2007).  The PSLRA also requires that "the complaint shall . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2); *see Tellabs*, 127 S. Ct. at 2508.  The required state of mind is one of "deliberate recklessness." *Nursing Home Pension Fund*, 380 F.3d at 1230, 1235 ("The PSLRA was designed to eliminate frivolous or sham actions, but not actions of substance.") (reversing 12b(6) dismissal).

Plaintiffs demonstrate below that:  (1) the misstatements and omissions they challenge as to the Officer Defendants are actionable under the securities laws; and (2) the Complaint pleads sufficient facts to give rise to a strong inference of scienter.

### 1.    The Complaint Adequately Alleges That Each New Century Officer Defendant Made Actionable False And Misleading Statements

Plaintiffs allege that the Officer Defendants knowingly or recklessly made materially false and misleading statements regarding the Company's loan origination and underwriting standards, internal controls, and financial statements, which artificially inflated the prices of New Century's securities.

The Officer Defendants challenge the falsity of only a few of these alleged misrepresentations and omissions.  First, they argue that Plaintiffs have not

adequately alleged the falsity of certain statements regarding New Century's underwriting guidelines and loan quality. MGD Mem. at 8-10; Cole Mem. at 15-16, 19-21. Second, they argue that New Century provided sufficient warnings and disclosures of risks related to its loans such that some of the alleged misstatements are protected by the "bespeaks caution" doctrine and the PSLRA safe harbor for forward-looking statements. Cole Mem. at 16-19. For the reasons stated below, these arguments are without legal or factual support.[15]

### a. The New Century Officer Defendants Made Actionable Misrepresentations And Omissions Regarding New Century's Underwriting And Loan Quality

As alleged in the Complaint, while the New Century Officer Defendants stated repeatedly during the Class Period that the credit quality of New Century's mortgages was "strong," "excellent," "very high" and "higher" or "better" than it had been in the Company's past as the result of purportedly "strict," "improved," and "strong" underwriting controls and guidelines and risk management discipline, the Company's underwriting standards were actually reduced, rather than improved, in the face of rising interest rates and the softening of the real estate market. ¶¶ 120-90.[16] These allegations are based on:

• statements of dozens of former employees with first-hand knowledge of Company operations that, as early as 2003, and progressively from 2004-05, New Century began originating riskier and riskier loans (¶¶ 137-68);

---

[15] The Officer Defendants do not challenge the falsity of statements with respect to the reporting of Residual Interests or repurchase reserves, the Company's internal controls, or the Company's other violations of GAAP.

[16] These false statements are clearly identified, and their falsity demonstrated, in the Complaint and in Exhibit E. *See, e.g.*, Exhibit E, Statement Nos. 1, 3, 4, 6, 10, 12, 15, 18, 23, 26, 27, 28, 33, 37, 43, 45, 51.

• the Company's increasing defaults and delinquencies, as evidenced by Plaintiffs' analysis of data showing that New Century's loan quality weakened significantly by 2005 (¶¶ 120-25);

• specific data set forth in the Complaint concerning the growing number of high risk mortgage products offered by the Company and that these loans defaulted far too quickly for general industry conditions to be a plausible explanation for their failure (¶¶ 126-36); and

• additional contemporaneous facts gathered by the Examiner in his detailed Report, including facts related to "serious" issues and numerous "red flags" relating to loan quality; that Defendants' statements regarding loan quality were "not supportable" and were without "justifiable basis" when made; and the failure of the New Century Officer Defendants "to devote sufficient attention to improving loan quality until the final quarter of 2006," when it was "too late." (¶¶ 173-90, 196, 485).

The Officer Defendants' misrepresentations and omissions relating to the Company's underwriting and credit quality are actionable under the securities laws because, as a mortgage lender, New Century's "underwriting practices would be among the most important information looked to by investors." *Atlas v. Accredited Home Lenders Holding Co.*, No. 07-CV-488 H(RBB), 2008 WL 80949, at *8-9 (S.D. Cal. Jan. 4, 2008) (plaintiffs alleged actionable false and misleading statements regarding defendants' underwriting practices). *See also In re Dynex Capital, Inc. Sec. Litig.*, No. 05 Civ. 1897, 2006 WL 314524, at *10 (S.D.N.Y. Feb. 10, 2006) (plaintiffs adequately alleged actionable misrepresentations and omissions regarding defendants' underwriting practices), *rev'd on other grounds sub. nom., Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, No. 06-2902-cv, slip op. (2d Cir. June 26, 2008); *In re PMA Capital Corp. Sec. Litig.*, No. 03-6121, 2005 WL 1806503, at *10 (E.D. Pa. July 27, 2005) (misrepresentations regarding a company's underwriting practices are actionable);

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, No. 05 Civ. 1898(SAS), 2005 WL 2148919, at *12 (S.D.N.Y. Sept. 6, 2005) (misrepresentations regarding company's underwriting practices sufficient to state claim and allege loss causation); *Ong v. Sears, Roebuck & Co.*, 388 F. Supp. 2d 871, 898-99 (N.D. Ill. 2004) (misrepresentation regarding underwriting standards along with other misrepresentations regarding portfolio quality and loan loss reserves was sufficient to withstand dismissal).

Thus, courts have repeatedly rejected arguments that descriptions of underwriting controls and credit quality boil down to a "dispute over the proper choice of adjectives" or reflect defendants' "overly-optimistic subjective opinions about Company practices."[17]  The Officer Defendants' use of the adjectives listed above did not constitute "forward-looking statements of optimism;" those words were used specifically to describe past performance and admittedly "core" underwriting controls and address any then-existing market concerns.  In fact, similar statements were recently found to be actionable in *In re Countrywide Financial Corp. Derivative Litigation*, CV-07-06923-MRP (MANx), 2008 WL 2064977, at *5 (C.D. Cal. May 14, 2008).

In *Countrywide*, the court expressed no doubt whether the following types of statements made in press releases and conference calls regarding underwriting guidelines and credit quality were actionable:

•    Countrywide was "well-positioned with a . . . high quality credit profile in our loan portfolio;" and

•    "Countrywide has . . . very strong discipline in the origination of sub-prime loans."

*Id.*  Taken together, "Plaintiffs' allegations create[d] a cogent and compelling inference that the Individual Defendants misled the public with regard to the rigor

---

[17]  MGD Mem. at 8-10; Cole Mem. at 15-16.

of Countrywide's loan origination process, the quality of its loans, and the Company's financial situation—even as they realized that Countrywide had virtually abandoned its own loan underwriting practices." *Id.* at *9.

The statements made by the New Century Officer Defendants regarding the Company's "strong," "excellent," "very high" and "higher" or "better" credit quality that resulted from "strict," "improved," and "strong" underwriting controls are similar, if not stronger (given the facts uncovered by Plaintiffs and revealed by the Examiner), than those alleged in *Countrywide*, and are thus actionable. *See also Accredited*, 2008 WL 80949, at *3-4, *8 (defendants' statements that Accredited's "underwriting procedures were better and more conservative" than other lenders and that "Accredited was committed to a disciplined approach that focused on credit quality" were actionable).[18]

Only statements that are "'so vague or amorphous that no reasonable investor could rely on them'" are considered non-actionable "puffery." *See South Ferry LP No. 2 v. Killinger*, 399 F. Supp. 2d 1121, 1129 (W.D. Wash. 2005) (citing *In re Syntex Corp. Sec. Litig.*, 855 F. Supp. 1086, 1096 (N.D. Cal. 1994), *aff'd*, 95 F.3d 922 (9th Cir. 1996)). Here, the Officer Defendants' statements

---

[18]    None of the challenged misrepresentations regarding the Company's underwriting practices and loan quality may be dismissed as mere non-actionable expressions of personal "opinion." Even if the Court finds that some of the alleged misstatements constitute statements of opinion or belief, as opposed to factual statements relating directly to the purported quality of the Company's core underwriting practices and loan quality, these statements are actionably false and misleading. As another court in this District recently noted, "the Supreme Court made clear that statements couched as opinion or belief may be actionable if the opinion is (1) known by the speaker to be false when made or (2) made without a reasonable basis in fact." *In re Amgen Inc. Sec. Litig.*, 544 F. Supp. 2d 1009, 1027 (C.D. Cal. 2008) (citing *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1093-94 (1991) and holding that optimistic statements made in press releases were actionable because defendants allegedly knew or lacked a reasonable basis for not knowing the falsity of the statements).

1    admittedly related to the "very core" of New Century's business strategies and

2    were purportedly supported by contemporaneous data.[19]

3    　　　　Defendants further challenge the falsity of their statements regarding loan

4    quality by making improper and unsubstantiated factual arguments relating to

5    certain reported statistics concerning the average FICO scores of borrowers, the

6    percentage of Stated Income Loans in 2004-06, and rising property values through

7    2006.  Cole Mem. at 19-21; MGD Mem. at 9.  These arguments ignore the

8    governing standard on a motion to dismiss:  Defendants may not dispute the facts

9    alleged in the Complaint.  *See Tellabs*, 127 S. Ct. at 2509.  They also ignore the

10   extensive facts in the Complaint detailing why the Officer Defendants' statements

11   regarding New Century's loan quality and underwriting practices were false when

12   made, including:

13   　　　　•　　Numerous former New Century employees with first-hand knowledge

14   reported that the Company's underwriting practices were loosened substantially

15   and progressively throughout the Class Period, and provided detailed explanations

16   of the Company-wide breakdown of underwriting standards (¶¶ 137-68);

17

18

19   _____

20   [19]  None of the cases cited by Defendants to the contrary are persuasive.  *Kowal v.
     MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994), is distinguishable

21   because that court merely affirmed dismissal of plaintiffs' § 10(b) claims on the
     grounds that the claims were based entirely on "certain forward-looking statements

22   of optimism and projections that the company voluntarily disclosed to the market,"
     and not on "historical data about the company's financial performance."  *Id.*  The

23   Officer Defendants' use of the adjectives listed above did not constitute "forward-

24   looking statements of optimism," but described past performance and admittedly
     "core" underwriting controls.    The Officer Defendants' citation to *In re*

25   *Cornerstone Propane Partners, L.P.*, 355 F. Supp. 2d 1069, 1087 (N.D. Cal.

26   2005), is equally unpersuasive because unlike the "parade of rosy adjectives—
     unmoored to any objective measures" in that case, the misstatements here

27   concerned the operational bedrock of New Century's business—the quality of

28   underwriting standards and loan quality.  *See, e.g.*, ¶ 173.

1    •    New Century's loans exhibited drastically higher delinquency and

2    default rates as soon as they were made throughout the Class Period (¶¶ 126-36);

3    and

4    •    Numerous "alarming" and "striking" red flags regarding loan quality

5    were contemporaneously revealed to, and ignored by, the Officer Defendants

6    throughout the Class Period (¶¶ 173-90).

7    Discovery will demonstrate whether the reported statistical figures regarding

8    FICO scores and stated income loans were sufficient to reveal the Company's

9    undisclosed and substantially reduced mortgage quality, but making a

10    determination that loan quality at New Century was not falsely reported based only

11    on reported FICO scores and a percentage of stated income loans and,

12    notwithstanding all of the contemporaneous facts alleged in the Complaint, would

13    be inappropriate on a motion to dismiss.  Though not labeled as such, the Officer

14    Defendants are asserting a highly fact-specific "truth-on-the-market" defense.

15    Dismissal on such grounds is most often inappropriate.  *See Amgen*, 544 F. Supp.

16    2d at 1025; *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1036-37 (S.D.

17    Cal. 2005).  Moreover, the disclosure of data regarding FICO scores and stated

18    income loans, even if these data were correctly reported, is irrelevant because such

19    disclosure does nothing to negate Defendants' repeated false assurances of New

20    Century's strict underwriting discipline and excellent loan quality.  *See*

21    *Countrywide*, 2008 WL 2064977, at *14.

       **b.    The Bespeaks Caution Doctrine And The**
22         **Safe Harbor For Forward-Looking Statements**
23         **Do Not Apply To The New Century Officer**
           **Defendants' Repeated Misstatements Regarding**
24         **Loan Quality And Underwriting Standards**

25    Defendant Cole further asserts that the Officer Defendants' repeated

26    misstatements about loan quality are insulated from liability by the PSLRA safe

27    harbor and the judicially created "bespeaks caution doctrine."  Cole Mem. at 18-

28    19.  Cole is mistaken.

1      To qualify for protection under the PSLRA's safe harbor for forward-

2 looking statements and the bespeaks caution doctrine, a statement must be (1)

3 forward-looking and (2) accompanied by meaningful cautionary language

4 identifying important factors that could cause actual results to differ materially

5 from those projected in the forward-looking statement. *See* 15 U.S.C. § 78u-5; *see*

6 *also, Livid*, 416 F.3d at 948 ("[E]xtension of the bespeaks caution doctrine to

7 statements of historical fact is inappropriate"); *In re CV Therapeutics, Inc.*, No. C

8 03-03709 SI, 2004 WL 1753251, at *10-11 (N.D. Cal. Aug. 5, 2004) (same).[20]

9      "The threshold requirement for the PSLRA's safe harbor is that a statement

10 be forward-looking." *Killinger*, 399 F. Supp. 2d at 1131. Statements of present or

11 historical fact, statements of fact attributing results to specific actions or factors,

12 and statements that communicate current expectations are all actionable and do not

13 invoke any safe harbor. *Id.* at 1133. In this case, none of the challenged

14 misrepresentations regarding New Century's loan quality and underwriting

15 standards are forward-looking. For instance, in the first quarter of 2006, the

16 Officer Defendants stated that the good performance of the Company's loans, as

17 reflected in its reported delinquencies and losses, "exceed[ed] [their] expectations,"

18 and was due in part to the "better credit quality" of the loans. ¶ 405. A reasonable

19 investor would construe this statement to mean that New Century's loans were

20 performing well, which was misleading, and that this good performance was

21 attributable to the "better credit quality" demanded by New Century as opposed to

22 other lenders, another false and misleading statement of present fact. In a similar

23 vein, statements regarding underwriting standards and loan performance from the

24 ────────────────

25 [20]  *See also Kensington Capital Mgmt. v. Oakley, Inc.*, No. SACV 97-808-GLT
   (EEx), 1999 WL 816964, at *2-3 (C.D. Cal. Jan. 14, 1999) (same); *In re DDi*
26 *Corp. Sec. Litig.*, No. CV 03-7063 (SJHx), 2005 WL 3090882, at *15-16 (C.D.
   Cal. July 21, 2005) (same); *In re WRT Energy Sec. Litig.*, No. 96 Civ. 3610 (JFK),
27 2005 WL 323729, at *8 (S.D.N.Y. Feb. 9, 2005) (same); *In re Complete Mgmt.*
   *Inc. Sec. Litig.*, 153 F. Supp. 2d 314, 340 (S.D.N.Y. 2001) (same).

28

2005 first quarter are representations of presently existing or historical fact, and are not forward-looking.  ¶¶ 343-44.  In the first quarter earnings conference call, Defendant Cole stated that a "primary emphasis" of the Company was "continued maintenance of our strong credit quality, which is []proving out in portfolio performance," and that the effort to "improve the credit quality and underwriting standards of the Company" started "many years ago."  ¶ 344.  A reasonable investor would construe this statement to mean that New Century had a past and present record of maintaining loans with strong credit quality, that the loan quality and underwriting standards had improved over time, and that the Company continued to maintain and improve its underwriting standards.  None of these inferences relate to forward-looking statements of corporate optimism.

Cole does not identify how each, or in fact any, of the misrepresentations are forward-looking statements.  He merely points to a laundry list of boilerplate "forward-looking statements" in the Company's 2005 Form 10-K, highlighting one particular statement relating to interest-only loans.  Cole Mem. at 18.  The general classification of statements as "forward-looking" does not automatically convert all statements regarding the very core of the Company's operations into protected statements.  Each of the New Century Officer Defendants made false statements regarding the historical or present status of the Company's loan quality and underwriting standards, and no safe harbor applies to those statements.  *See Killinger*, 399 F. Supp. 2d at 1133-37.

In any event, should this Court find that any of Defendants' misstatements regarding the Company's underwriting standards and loan quality were forward-looking when made, and are subject to either the PSLRA safe harbor or the bespeaks caution doctrine, the cautionary language in the Company's SEC filings is insufficient to protect Defendants from liability as a matter of law at this stage.  *See* ¶¶ 244, 264, 543-47.  "The Ninth Circuit has consistently held that dismissal of a complaint on the basis of the bespeaks caution doctrine is only appropriate when

there is 'sufficient cautionary language or risk disclosure [such] that reasonable minds could not disagree that the challenged statements were not misleading.'" *Metropolitan*, 532 F. Supp. 2d at 1291 (quoting *Livid*, 416 F.3d at 947); *see also Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 734-35 (7th Cir. 2004) (holding that (1) a motion to dismiss "is too early in the litigation to reach a conclusion" on whether cautionary statements are "meaningful" so as to invoke the safe harbor, and (2) discovery was necessary to resolve the issue); *Kensington Capital*, 1999 WL 816964, at *3 ("[s]howing Defendant has provided enough cautionary language as a matter of law is a high standard").

In this case, general disclaimers that the Company historically focused on "lower credit grade borrowers" and the risk factors associated with issuing loans to subprime borrowers (Cole Mem. at 17-18 and Appendix A) were insufficient to cure repeated statements of "strong," "excellent," "very high," "higher" or "better" loan quality purportedly achieved by "strict," "improved" and "strong" underwriting guidelines that were materially misstated at the time they were issued. Rote cautionary language does nothing to counter the impact of present factual misstatements. *See Livid*, 416 F.3d at 947 ("Dismissal on the pleadings under the bespeaks caution doctrine . . . requires a stringent showing: There must be sufficient 'cautionary language or risk disclosure [such] that reasonable minds could not disagree that the challenged statements were not misleading.'") (citation omitted); *Gray v. First Winthrop Corp.*, 82 F.3d 877, 884 (9th Cir. 1996) (cautionary language was inadequate where plaintiffs alleged specific factual misrepresentations and the risk disclosures were "so generalized in nature that a reasonable jury could nonetheless find the prospectus misleading"); *Fecht v. Price Co.*, 70 F.3d 1078, 1082 (9th Cir. 1994) ("A motion to dismiss for failure to state a claim will succeed only when the documents containing defendants' challenged statements include 'enough cautionary language or risk disclosure,' that 'reasonable minds' could not disagree that the challenged statements were not

1    misleading.") (citation omitted); *Metropolitan*, 532 F. Supp. 2d at 1293 (dismissal

2    was inappropriate where "reasonable minds could disagree as to whether the

3    challenged statements were misleading").

              **c.    Plaintiffs May Rely On The Group Pleading**
4                          **Doctrine For Company-Issued Press Releases**

5

6          A review of the Complaint's allegations demonstrates that Plaintiffs have

7    alleged each element of their claims sufficiently, including the name of each

8    individual Officer Defendant who signed each SEC filing, was quoted in a

9    Company press release, or spoke during a Company conference call with analysts.

10   However, the group pleading doctrine also allows for a presumption that false and

11   misleading statements in Company press releases (which, unlike the SEC filings,

12   were not signed by individual executives) were made by the collective action of

13   these four senior executive officers during their tenures as senior New Century

14   officers. *Accredited*, 2008 WL 80949, at *8 ("[t]he Ninth Circuit has held that it is

15   'reasonable to presume' that false or misleading information conveyed in

16   'prospectuses, registration statements, annual reports, press releases, or other

17   group-published information ... are the collective action of the corporate officers,'"

18   *citing Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1441-42 (9th Cir. 1987));

19   *In re Homestore.com, Inc. Sec. Litig.*, 252 F. Supp. 2d 1018, 1031 (C.D. Cal.

20   2003).[21]   This Court has affirmed the viability of the group pleading doctrine in

21   this narrow circumstance. *In re Real Estate Assoc. Ltd. P'ship Litig.*, 223 F. Supp.

22   2d 1142, 1150 (C.D. Cal. 2002) ("where it is alleged that the 'corporation's

23

24   [21]   The Ninth Circuit's affirmance of this decision under the name *Simpson v. AOL
Time Warner Inc.*, 452 F.3d 1040 (9th Cir. 2006), was vacated on unrelated

25   grounds (concerning third-party "scheme liability") under the name *Avis Budget
Group, Inc. v. Cal. State Teachers' Ret. Sys.*, 128 S. Ct. 1119 (2008), after which

26   the Ninth Circuit vacated the District Court's decision and remanded for further
proceedings under the name *Simpson v. Homestore.com, Inc.*, 519 F.3d 1041 (9th

27   Cir. 2008).   This subsequent history in no way affects the Ninth Circuit case law
upholding the group pleading doctrine.

28

officers and directors are few in number and make corporate decisions on a group basis'"). *See also In re BP Prudhoe Bay Royalty Trust Sec. Litig.*, No. C06-1505 MJP, 2007 WL 3171435, at *7 (W.D. Wash. Oct. 26, 2007) (a majority of district courts within the Ninth Circuit have concluded that group pleading survives the PSLRA).

As required by the group pleading doctrine, Plaintiffs have alleged that the Officer Defendants participated in the day-to-day operations of the Company, including its financial reporting and accounting functions, and participated in preparing and disseminating the press releases at issue in this action. ¶¶ 27-29. These were the same four officers who were regularly quoted in the Company's press releases, signed the Company's SEC filings, and spoke during and participated in the Company's analyst conference calls. Thus, the Court may presume that the false and misleading statements in the challenged press releases were made by the collective action of these four Officer Defendants during their time as senior officers and directors of the Company.

## 2. Plaintiffs' Factual Allegations Regarding The New Century Officer Defendants Collectively Give Rise To A Strong Inference Of Scienter

A complaint alleging claims under § 10(b) of the Exchange Act must allege facts giving rise to a strong inference that defendants acted with the required state of mind. 15 U.S.C. § 78u-4(b)(2). The required state of mind is satisfied where, as in this case, the Complaint alleges facts giving rise to a strong inference that defendants acted either knowingly or with deliberate recklessness. *See Nursing Home Pension Fund*, 380 F.3d at 1230.

In *Tellabs*, the Supreme Court recently defined the "strong inference" standard as follows: "When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" 127 S. Ct. at 2511. Importantly, at the pleading stage, "[t]he inference that the defendant acted with scienter need not be

irrefutable, *i.e.*, of the 'smoking gun' genre, or even the 'most plausible of competing inferences.'" *Id.* at 2510 (citation omitted). A complaint must "plead facts rendering an inference of scienter *at least as likely as* any plausible opposing inference." *Id.* at 2513 (emphasis in original). If the competing inferences of scienter are equally strong, "a tie goes to the Plaintiff." *Commc'ns Workers of Am. Plan for Employees' Pensions & Death Benefits v. CSK Auto Corp.*, 525 F. Supp. 2d 1116, 1120 (D. Ariz. 2007) ("If the Plaintiff presents facts from which an inference of scienter may be drawn, and that inference is as likely as any nonculpable explanation, the complaint will survive a Rule 12(b)(6) challenge under the PSLRA.").[22]

The Supreme Court also cautioned in *Tellabs* that a "court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." 127 S. Ct. at 2511; *see also id.* at 2509 ("whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard") (emphasis in original).[23]

The Complaint alleges numerous facts demonstrating a strong inference that Defendants Cole, Morrice, Gotschall and Dodge acted with scienter in making materially false and misleading statements throughout the Class Period. ¶¶ 483–514. The following summary of the Complaint's allegations, viewed collectively,

---

[22] Although *Tellabs* strengthened the pleading standards for some Circuits, it did not elevate the pleading standard of the Ninth Circuit. *See Middlesex Ret. Sys. v. Quest Software Inc.*, 527 F. Supp. 2d 1164, 1169 (C.D. Cal. 2007).

[23] *See generally In re LDK Solar Sec. Litig.,* No. C 07-051982 WHA, 2008 WL 2242185, at *7 (N.D. Cal. May 29, 2008) (citing *Tellabs*); *Countrywide*, 2008 WL 2064977, at *8 (applying *Tellabs* and noting that the court's responsibility in evaluating scienter, "'is not to scrutinize each allegation in isolation but to assess all the allegations holistically'"); *Middlesex*, 527 F. Supp. 2d at 1180 (applying *Tellabs* and confirming that after "analyz[ing] each of the relevant facts and allegations individually," the court must then "weigh them in their totality to determine whether the scienter requirement has been sufficiently pled").

1    establishes a strong inference that the Officer Defendants knew, and at the very

2    least, recklessly disregarded the true facts throughout the Class Period, leading to

3    the ultimate demise of New Century, and costing investors many millions of

4    dollars in losses.

5         At the start of the Class Period, Defendants publicly described New

6    Century's underwriting as a "very core" business control function (¶ 344) and,

7    thereafter, the New Century Officer Defendants repeatedly described the credit

8    quality of the Company's mortgages as "strong," "excellent," "superior," "very

9    high" and "higher" or "better" than it had been in the Company's past as the result

10   of purportedly "strict," "improved" and "strong" underwriting controls and risk

11   management discipline.  Each of the New Century Officer Defendants repeatedly

12   made such statements:  Cole (¶¶ 343, 344, 347, 358, 361, 376, 387, 388, 408, 425,

13   438, 443); Morrice (¶¶ 343, 347, 361, 373, 376, 388, 408, 425, 438, 443);

14   Gotschall (¶¶ 343, 347, 361, 364, 376, 388); and Dodge (¶¶ 343, 344, 347, 361,

15   376, 387, 388, 405, 408, 425, 438, 443).  All the while, as set forth in detail in the

16   Complaint (¶¶ 120-90), New Century's underwriting guidelines were actually

17   loosened substantially, and the Company was introducing higher-risk mortgage

18   products to subprime borrowers so that it could continue to reach record loan

19   volumes.  These Defendants were intentionally misstating the facts or acting in a

20   deliberately reckless manner in making their repeated statements regarding

21   purportedly improved underwriting in light of what was actually occurring at the

22   Company.  ¶ 484.  Numerous contemporaneous facts demonstrate that these

23   repeated public statements were "not supportable," without "justifiable basis," and

24   simply untrue when made.  ¶ 485.[24]

25   _____

26   [24] *See, e.g., Countrywide*, 2008 WL 2064977, at *12-14; *Accredited*, 2008 WL
     80949, at *10 (scienter adequately pled when the complaint "alleges in detail that
27   Defendants during the class period knew about Accredited's deviation from the
     company's underwriting standards and that Defendants therefore knew their public
28   statements regarding Accredited's compliance with those standards were false and

Similarly, each of these Defendants repeatedly signed quarterly certifications attesting to the adequacy of New Century's internal controls, when the facts detailed in the Complaint and admitted by the restatement demonstrate material weaknesses and "deeply-rooted" and "long-standing" problems with New Century's internal controls. ¶¶ 486-87. New Century did not remediate serious internal control deficiencies at year-end 2004 and 2005, despite representing to KPMG that it would. ¶ 487. These year-over-year deficiencies included key controls relating to the Company's repurchase reserve and reported Residual Interests valuations and "dismal" loan quality and underwriting controls. *Id.* Notwithstanding all of this information, Defendants Cole, Morrice, Gotschall, and Dodge repeatedly certified the adequacy of the Company's internal controls. *Id.*[25]

Moreover, each of these Defendants repeatedly signed the Company's SEC filings which described (correctly) the controlling GAAP requirements for setting the Company's required reserves as well as reporting the Company's Residual

---

misleading"). *See also Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008) (plaintiffs alleged stop-work orders with particularity, and appropriately inferred that senior officers knew about them given their importance to the Company's operations); *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F. 3d 702, 711 (7th Cir. 2008) (although it was "conceivable" at the pleading stage that CEO was unaware of problems with the company's key products, it was "exceedingly unlikely"); *In re LDK Solar*, 2008 WL 2242185, at *15 ("[U]pon the laying of a proper factual foundation that information was known within a corporation, it may be inferred that facts critical to a business's core operations or an important transaction are known to a company's responsible officers.").

[25] In order "[f]or these certifications to have any substance, signatories to the certifications must be held accountable for the statements." *Middlesex*, 527 F. Supp. 2d at 1189; *see also In re Proquest Sec. Litig.*, 527 F. Supp. 2d 728, 743 (E.D. Mich. 2007) ("The SOX certifications give rise to an inference of [defendant's] scienter because they provide evidence either that he knew about the improper accounting practices or, alternatively, knew that the controls he attested to were inadequate."); *In re Lattice Semiconductor Corp. Sec. Litig.*, No. CV 04-1255-AA, 2006 WL 538756, at *17-18 (D. Or. Jan. 3, 2006).

1  Interests in securitizations at fair value.  ¶ 488.  Yet, at the same time, these

2  Defendants repeatedly failed to follow these same GAAP requirements and New

3  Century's own "critical accounting policies."  *Id.*  Each of these Defendants has

4  substantial educational, financial, and industry experience, including in the

5  application of these very same GAAP requirements.  ¶¶ 23-26, 489. [26]

6      Each of these Defendants knew of or recklessly disregarded the increasing

7  repurchase-claims backlog and made repeated public statements that were

8  materially misleading, given the undisclosed backlog.  ¶¶ 490-97.  The backlog

9  was created by the intentional delay in funding valid repurchase claims in an effort

10  to "game the system."  ¶¶ 75, 77.  Further, the Examiner's report documents that

11  the backlog was "no secret" and was in fact "general knowledge" within New

12  Century's Accounting, Finance, and Secondary Marketing groups.  ¶¶ 92-93.

13  Specifically, backlog information was shared between Kevin Cloyd, President of

14  the Secondary Marketing Division and Defendant Dodge and the Company's other

15  senior executive officers.  ¶ 76.[27]

16      Notably, Officer Defendants Cole, Morrice, and Dodge issued a press

17  release on September 8, 2006 stating that the increase in the Company's early

18  payment defaults had been "modest" when, in fact, these Defendants knew that the

19  increase was anything but modest, given the contemporaneous reports they were

20  receiving (including an email the night before the press release) and the growing

21  repurchase-claims backlog.  ¶¶ 438, 452, 493.  Given information that these

22  Defendants had at the time this statement was made, the Examiner noted that it was

---

24  [26]  *See, e.g., In re Scottish Re Group Sec. Litig.*, 524 F. Supp. 2d 370, 393-94
25  (S.D.N.Y. 2007) (strong inference of scienter supported by defendants' knowledge
   of applicable GAAP through repeated publication of the standard in the company's
26  financial statements).

27  [27]  *See In re Daou Sys., Inc.*, 411 F. 3d 1006, 1015-16 (9th Cir. 2005) (scienter
28  adequately alleged based on information from a former employee in a position to
   know the alleged facts).

1    "utterly without basis when made." *Id.*    Notwithstanding contemporaneous

2    contrary information within their possession, Defendants Cole, Morrice, and

3    Dodge also falsely characterized early payment defaults and repurchases as

4    "modest" on November 3, 2005 (¶ 373), May 4, 2006 (¶ 405), and August 3, 2006

5    (¶ 422). *See also* ¶¶ 494-96. [28]

6        The Officer Defendants also knowingly or recklessly misrepresented the

7    Company's valuation of residual interests.    For instance, Defendant Gotschall

8    publicly stated that the Company used "very conservative assumptions" and

9    booked its residual interests "conservatively" when, in fact, the Company used the

10   lowest discount rates of any of its peers, and KPMG's specialists repeatedly

11   warned that New Century's assumptions were not conservative.    ¶ 498.[29]

12   _____

13   [28]    The Officer Defendants disingenuously argue that the email chain between

14   Defendants Morrice and Dodge, and Kevin Cloyd, demonstrating Defendants'
     knowledge of the falsity of the September 8, 2006 statement regarding "modest"

15   early payment defaults, was sent *after* the press release was issued and the data was

16   subject to interpretation, and thus cannot give rise to a strong inference that they
     knew the statement to be false at the time it was made. MGD Mem. at 11-12. As

17   discussed in both the Complaint and the Examiner's Report, the email was actually
     sent the night *before* the press release was issued to the public, and the New

18   Century Officer Defendants had ample time to withdraw their knowingly false
     statements but did not even attempt to do so. ¶ 452; Examiner's Report at 423-25.

19   Moreover, Morrice's exact words in the email were "we got our teeth kicked in

20   with regard to repurchase requests in Aug. and thus far in September." *Id.*

21   [29]    The New Century Officer Defendants argue that the Company's low discount

22   rates cannot give rise to an inference of scienter, because the rates were disclosed
     and there is no support that the Company's rates should be compared to that of its

23   peers. MGD Mem. at 20. These arguments ignore that it was the New Century

24   Officer Defendants who touted the Company's purported "conservative
     assumptions" despite KPMG's admonition to the contrary. Thus, the inference at

25   this stage that the Officer Defendants knowingly or with deliberate recklessness

26   misrepresented the purportedly conservative nature of the Company's accounting
     is stronger than any competing inference, given that the Officer Defendants,

27   despite warnings from KPMG specialists that the Company's discount rates were
     lower than those of any of its peers, publicly claimed that the Company booked its

28   residual interests "conservatively." ¶ 498. *See also* ¶ 364.

The Officer Defendants' attempts to conceal the actual methodologies and practices used to calculate the Company's reserves further provide a compelling inference of scienter. Defendant Dodge failed to disclose changes to the Company's repurchase reserve methodology to the Company's Audit Committee despite ample opportunity to do so. ¶ 497. Dodge also deceptively combined the Company's allowance for loan losses reserve with another unrelated reserve for the first time in the 2006 third quarter press release and conference call to mask the fact that the allowance for loan losses reserve had been reduced. ¶¶ 499-500. She tried to reduce that same reserve to "plug" an earnings gap in the 2005 third quarter, but was stopped by New Century's Audit Committee. *Id.* [30]

Further evidence of the scienter of Officer Defendants Cole, Morrice, Dodge, and Gotschall is that the Company's February 7, 2007 restatement announcement came less than three months after New Century's newly-hired CFO Tajvinder Bindra replaced Dodge. ¶ 501. Whereas the Officer Defendants, including the founders of the Company involved in the day-to-day operations of the Company since 1995, argue that they remained unaware of (a) the rapidly declining credit quality and underwriting standards as evidenced by increased early payment defaults, (b) a skyrocketing repurchase claims backlog, and (c) the numerous GAAP violations that helped conceal the Company's financial troubles, Bindra was able to rapidly uncover these faults. [31]

---

[30] *See Novak v. Kasaks*, 216 F.3d 300, 312 (2d Cir. 2000) (deceptive acts such as covering-up business problems by adopting new management practices support a strong inference of scienter).

[31] *See, e.g., Argent Classic Convertible Arbitrage Fund L.P. v. Rite Aid Corp.*, 315 F. Supp. 2d 666, 685 (E.D. Pa. 2004) (there is a "strong inference" of scienter when the "accounting practices [are] so flawed . . . and so blatant that outsiders perceived them almost immediately"). Defendants' reliance on *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 691 (6th Cir. 2004), is misplaced because in that case the consultant was hired specifically "to investigate problems in the Company's accounting and internal control systems." In addition, plaintiffs failed in that case

Finally, Officer Defendants Cole, Morrice, Dodge, and Gotschall were each highly motivated to pump up the Company's mortgage origination volume at the expense of underwriting standards and to understate reserves and overstate residual interests, further solidifying the strong inference of scienter established throughout the Complaint.  ¶¶ 502-14.  These Defendants were direct and significant beneficiaries of New Century's growing dividend payments (over $50 million to them collectively), which increased along with its mortgage origination volume. *Id.*  Defendants Cole, Morrice, and Gotschall also received special bonus awards which were 300% higher than they should have been and gave them strong incentives to originate more mortgage loans and to minimize reserves.  *Id.*  And, in the aggregate, these Defendants sold over one million shares of their personally held New Century common stock for proceeds of over $53 million, benefiting greatly from the artificial inflation in New Century's shares before the misstatements were revealed by a newly hired CFO.  ¶¶ 506-07.  Dodge sold 77% of her total holdings, Gotschall sold 37%, and Cole sold 31% during the Class Period.  *Id.*  Suspiciously, all of these Defendants entered into 10b5-1 trading plans in 2005 and 2006, five to six years after such plans were first allowed by the SEC, and at a time when there were serious undisclosed problems at the Company.  *Id.*  Yet, none of them sold any shares pursuant to their "trading plans" at a time when

---

to allege with any specificity relevant facts regarding "what the consultant learned and how he learned it."  *Id.* at 692.  In any event, *PR Diamonds* is no longer good law because it applied the Sixth Circuit pre-*Tellabs* interpretation of the PSLRA that "the 'strong inference' requirement means that a plaintiff is entitled to only the most plausible of competing inferences."  *Id.* at 682.  The Supreme Court expressly overruled that Sixth Circuit standard.  *Tellabs*, 127 S. Ct. at 2510 ("The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences'") (citing Sixth Circuit cases).

1    the Company was negotiating a sale of its stock at a premium to a large securities

2    firm from December 2005 through April 2006.  *Id.*[32]

3        All of the above allegations, together, combine to create a strong inference

4    of scienter at the pleading stage that is "at least as compelling," and, in fact,

5    exceedingly more compelling, than any inference posited by the Officer

6    Defendants.  Moreover, according to the Supreme Court, these allegations should

7    be considered collectively; Defendants' attempt to treat each of these allegations in

8    isolation is improper under *Tellabs*.  Defendants' various arguments are addressed

9    below.

### 3.    The Inference That The Officer Defendants Acted With Scienter Is At Least As Strong As Any Innocent Competing Inference

12       The Officer Defendants set forth an assortment of piecemeal arguments to

13   counter the compelling inferences of scienter alleged in the Complaint and

14   summarized above, encouraging the Court to dissect both the Complaint and the

15   Examiner's Report in order to locate any innocent competing inferences that will

16   shield them from liability.  The Officer Defendants' scattershot tactic, however,

17   misconstrues both the applicable law and the Complaint's allegations, and should

18   be denied.

19       First, as the Supreme Court has recently reaffirmed, "when faced with a

20   Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion

21   to dismiss for failure to plead a claim on which relief can be granted, accept all

22   factual allegations in the complaint as true."  *Tellabs,* 127 S. Ct. at 2509.  It

---

[32]   Cole claims without any factual support whatsoever that New Century "spurned" this premium offer.  Cole Mem. at 2.  Defendants may not introduce facts outside the pleading at this stage to dispute the facts alleged.  In any event, such an argument does nothing to disprove the facts alleged in the Complaint, that none of these Individual Defendants sold any of their personally held shares at a time when they hoped to sell the Company for a premium to its trading price (and notwithstanding their supposedly automatic 10b5-1 trading plans).

1    remains the role of the jury, not the Court, "to assess the credibility of witnesses,

2    resolve any genuine issues of fact, and make the ultimate determination whether

3    [Defendant] . . . acted with scienter." *Id.* at 2513.

4        Second, not only must Plaintiffs' allegations be presumed to be true, but

5    "[t]he inquiry . . . is whether *all* of the facts alleged, taken collectively, give rise to

6    a strong inference of scienter, not whether any individual allegation, scrutinized in

7    isolation, meets that standard." *Id.* at 2509 (emphasis in original). Whereas the

8    Officer Defendants urge the Court to dissect the Complaint into discrete

9    allegations, *Tellabs* emphasizes that "the court's job is not to scrutinize each

10   allegation in isolation but to assess all the allegations holistically." *Id.* at 2511.[33]

11   Defendants cannot prevail even if both parties' inferences are equally compelling;

12   Defendants' competing inferences must be more compelling than those alleged in

13   the Complaint. *See CSK Auto Corp.*, 525 F. Supp. 2d at 1120 (if the competing

14   inferences of scienter are equally strong, "a tie goes to the Plaintiff"). The Officer

15   Defendants do not satisfy this burden, and the Court should find that the scienter of

16   each Officer Defendant has been adequately pled based on a review of the

17   collective facts pled against each of them.

18       The Officer Defendants' purported innocent competing inferences are not

19   more compelling than Plaintiffs' allegations of scienter. Although the Officer

20   Defendants' arguments are not organized, they can be grouped into four areas. The

21   Officer Defendants seek to negate Plaintiffs' compelling inferences of scienter

22   through: (a) reliance on KPMG's audit of New Century's financial statements and

23   internal controls;[34] (b) reliance on New Century's inadequate internal controls;[35]

24

25   [33] Defendants' argument that Plaintiffs must show scienter "as to *each* statement"
26   (MGD Mem. at 7) (emphasis in original) is erroneous and inconsistent with the
     holding of *Tellabs*. Nor did the Court request this type of information in the charts
27   requested on page seven of its January 31, 2008 Order.

     [34] MGD Mem. at 10-11, 17-19, 21-22; Cole Mem. at 10-13.
28
     [35] MGD Mem. at 19, 23; Cole Mem. at 13-15.

(c) the purported unreliability of the statements of dozens of confidential sources;[36] and (d) their purported lack of knowledge of New Century's GAAP violations related to reserve methodologies and valuation of residual interests.[37]  None of these arguments give rise to innocent competing inferences that are more compelling than Plaintiffs' allegations of scienter.  Moreover, the Officer Defendants' contention that scienter is negated by the Examiner's silence as to "the scienter of any of the Defendants with respect to any statements about loan quality or underwriting standards" (MGD Mem. at 11) is without merit.

The Examiner considered whether the bankruptcy estate could bring a claim against former New Century officers and directors based on their breach of fiduciary duty and corporate waste.  The Examiner had no mandate to investigate possible securities law claims against the Officer Defendants on behalf of Plaintiffs and the Class of purchasers of New Century securities, and naturally reached no conclusions regarding any such claims.  *See also* Section III(C)(3) below.  Nonetheless, the Examiner's finding that certain of the Defendants' public statements were contrary to the true facts and "utterly without basis when made" (¶¶ 173-76) supports rather than contradicts a strong inference of scienter at this stage.  Moreover, it is the analysis of all of the facts set forth in the Complaint (including those facts obtained from the Examiner's Report) that controls on this motion and not any independent conclusions reached by the Examiner as to a "strong inference" of scienter at the pleading stage (had he even reached any conclusions about Plaintiffs' Complaint, which, of course, he did not).[38]

---

[36]  MGD Mem. at 12-13, 16-17; Cole Mem. at 22-23

[37]  MGD Mem. at 14-16, 19-21; Cole Mem. at 9-13.

[38]  *See, e.g.*, ¶¶ 91-94, 97, 100, 106, 117-18, 173-90, 194.  Similarly, the Underwriter Defendants' argument that the Examiner made no findings whatsoever as to the Series A and B Offerings discussed in Section III(D) below or as to the conduct of any of the individual underwriters for those Offerings (Und. Mem. at 10), ignores that the Complaint properly cites to facts revealed by the Examiner,

### a. Allegations Regarding KPMG's (Deficient) Audit Do Not Defeat The Strong Inference Of Scienter

The Officer Defendants argue that Plaintiffs' allegations regarding KPMG's audit of New Century's 2005 financial statements, and KPMG's access to New Century's financial data during each quarter and at year-end, somehow negate the many detailed allegations that raise a strong inference of the New Century Officer Defendants' scienter. Cole Mem. at 10-11. These arguments simply ignore that KPMG, itself, is alleged to have violated the applicable auditing standards. ¶¶ 204-35. *See, e.g., In re Nextcard, Inc. Sec. Litig.*, No. C 01-21029 JF(RS), 2006 WL 708663, at *5 (N.D. Cal. Mar. 20, 2006). Thus, the Complaint's allegations of KPMG's access to New Century's financial information do not in any way bar Plaintiffs' numerous and detailed allegations regarding the Officer Defendants' knowledge of or reckless disregard for the falsity of the Company's financial statements.

It is well established that "[t]he fact that [a company's] independent auditor may have approved the accounting methods will not shield [the company] from liability for deception such methods may have caused." *Marksman Partners, L.P. v. Chantal Pharm. Corp.*, 927 F. Supp. 1297, 1314 n.13 (C.D. Cal. 1996); *see also Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002) (no negative inference of scienter can be drawn from the fact that the company's financial statements were audited by an independent accounting firm because "[t]o hold otherwise would shift to accountants the responsibility that belongs to the courts"); *Cheney v. Cyberguard Corp.*, No. 98-6879-CIV-GOLD, 2000 WL 1140306, at *6 (S.D. Fla. July 31, 2000) (defendant is "not absolved from liability" through

---

not the Examiner's opinions regarding potential claims that may be brought by the bankruptcy estate. Thus, the fact that the Examiner did not even discuss either of the Offerings is irrelevant to the Court's determination of Defendants' motions to dismiss. It is all of the facts that are alleged in the Complaint that control.

1    reliance on the audit advice of the company's auditor).  The Officer Defendants'

2    reliance on KPMG's work is even less relevant in this instance where an action is

3    "based upon allegations that [KPMG] was a knowing participant in a scheme to

4    defraud the market and colluded in accounting improprieties." *Nextcard,* 2006 WL

5    708663, at *5 (rejecting defendants' arguments that a clean audit negated an

6    inference of scienter).[39]

7        This is especially true at the pleading stage, given that the Officer

8    Defendants' arguments would mean that no officer of a public company audited by

9    an independent accounting firm (as all public companies are) could pass their

10   scienter standard.   Obviously such arguments are inappropriate at this pre-

11   discovery stage.[40]  Moreover, in this case, Plaintiffs have specifically pleaded facts,

12   including "dismal" reports from Internal Audit on loan quality (¶ 196), repeated

13   warnings from KPMG on residual interest valuations (¶ 106), and unfulfilled

14   representations to KPMG to improve New Century's internal controls at year-end

15   2004 and 2005 (¶ 194, at p. 121), that demonstrate Defendants cannot rely on

16

17   ───────────────

18   [39]  The Officer Defendants' citation to *In re Intelligroup Sec. Litig.*, 527 F. Supp.

19   2d 262, 348 n.63 (D.N.J. 2007), is misplaced.  In that case, the independent auditor

20   was not charged with any wrongdoing.  Whereas the court noted "in passing" that

     in general, officer defendants could rely on the existence of a clean audit to help

21   negate allegations supporting scienter, the court rejected this general premise for

22   all cases, noting that a clean audit did not necessarily negate scienter in cases

     where the auditor was also alleged to have participated in the fraudulent

23   accounting (as is the case here) (citing *Nextcard*, 2006 WL 708663, at *5) and

24   where plaintiffs alleged that "'the allegedly misleading financial and other public

     statements bore [individual] defendants' imprimatur'" (as is also the case here)

25   (citing *Marksman*, 927 F. Supp. at 1314).

26   [40]  The two other cases cited by the Officer Defendants are remarkably inapposite:

     not only are they post-discovery opinions deciding summary judgment motions,

27   but they also do not involve situations where an auditor was also charged with

     wrongdoing.  *See Stavroff v. Meyo*, No. 95-4119, 1997 WL 720475 (6th Cir. Nov.

28   12, 1997), and *SEC v. Caserta*, 75 F. Supp. 2d 79, 94-95 (E.D.N.Y. 1999).

KPMG's 2005 audit opinions to show lack of scienter at the pleading stage. *See also* ¶¶ 75-77, 91-94, 97, 100, 117-18.

**b.    The New Century Officer Defendants' Repeated, Sworn Certifications Of Internal Control In The Face Of Contrary Facts Further Supports A Finding Of Scienter**

In announcing the need for a restatement, the Company stated that it expected the errors leading to the restatement constituted "material weaknesses" in its internal controls over financial reporting.   ¶ 72.   The Complaint alleges additional specific facts regarding the Company's poor internal controls regarding both reserves and underwriting.   ¶¶ 191-96.   While the Officer Defendants attempt to argue that these allegations "undercut" scienter (MGD Mem. at 12-13, 19, 23), their arguments fail as the Complaint specifically alleges, in detail, that the facts demonstrating the Company's poor internal controls were known to or were deliberately ignored by these Officer Defendants at the time they (repeatedly) signed their certifications.   *See Proquest*, 527 F. Supp. 2d at 743 ("The SOX certifications give rise to an inference of [defendant's] scienter because they provide evidence either that he knew about the improper accounting practices or, alternatively, knew that the controls he attested to were inadequate.").

For example, while the Complaint alleges that New Century had poor internal reporting on repurchase claims, it also demonstrates that the Company's growing repurchase backlog was known or deliberately ignored by the Officer Defendants and quotes from specific documents presented to them showing the growing backlog on a monthly basis.   ¶¶ 75-77, 92-94.   Another factor weighing in favor of the Officer Defendants' scienter was their awareness of (or deliberate recklessness in not being aware of) a 2005 Internal Audit investigation that concluded the Company's loan quality was "dismal," with none of the Company's nine branches audited rated "satisfactory," seven rated "unsatisfactory," and two rated "needs improvement."   ¶ 196.   The Complaint alleges several other facts,

1    including "an alarming and steady increase in early payment defaults and investor

2    kickouts" that provide a compelling inference of scienter as to each Officer

3    Defendant.  ¶ 485.  Moreover, the fact that these same Defendants repeatedly

4    signed sworn certifications that they purportedly evaluated the effectiveness of the

5    Company's internal controls and attested to the adequacy of those controls during

6    every quarter of the Class Period despite these facts,[41] supports rather than

7    undercuts a finding of scienter.[42]

8        The Officer Defendants' Sarbanes-Oxley certifications assured investors that

9    New Century's internal controls were reviewed regularly and were sound, thus

10   rendering the Company's financial disclosures reliable.[43] These repeated false

11   assurances in the face of the detailed facts alleged in the Complaint further

12   establish Defendants' scienter.  Indeed, courts in this Circuit and elsewhere have

---

[41]  *See* ¶¶ 348-89, 362-63, 377-78, 390-91, 409-10, 426-27, 444-45.

[42]  Defendant Cole argues that Plaintiffs' allegations as to his knowledge of internal control failures are insufficient to plead scienter.  He is wrong.  First, as founder of New Century, former CEO and Chairman of the Board, he was in a position to be uniquely aware of the Company's internal control problems. Additionally, scienter may be inferred against those with high-level executive positions (like Cole) who repeatedly sign false Sarbanes-Oxley certifications, especially if the Complaint alleges additional facts showing that Defendants knew or should have known of the weaknesses in internal controls.  *See, e.g.*, ¶¶ 194-96.

[43]  The Sarbanes-Oxley Act of 2002 requires certain officers of a public company to execute certifications that are filed with the company's Forms 10-K and 10-Q. *See* 18 U.S.C. § 1350(a).  These certifications must discuss the company's internal control systems and must explain the effectiveness of those internal controls.  *See* 15 U.S.C. § 7241(a); *see also Scottish Re*, 524 F. Supp. 2d at 390-91.  The Officer Defendants' attempt to evade responsibility for their sworn certifications through reliance on the "mini-certifications" signed by other New Century executives and the control procedures designed by outsiders (including KPMG) is not sufficient to evade liability for their failure to ensure the accuracy of their sworn statements to the public.  *See Lattice*, 2006 WL 538756, at *18 ("Sarbanes-Oxley certification requirements were expressly intended to prevent top executives from using a 'head in the sand' defense to actions for securities fraud committed on their watch.").

held that in similar circumstances, scienter can be inferred against those who signed false Sarbanes-Oxley certifications because in order "[f]or these certifications to have any substance, signatories to the certifications must be held accountable for the statements." *Middlesex*, 527 F. Supp. 2d at 1189. *See also Proquest*, 527 F. Supp. 2d at 743; *Lattice*, 2006 WL 538756, at *17-18.[44]

c.    **The Facts Alleged From Confidential Sources Are Reliable And Give Further Support To A Strong Inference Of Scienter**

Plaintiffs' allegations regarding the internal control failures that led to and concealed New Century's increasingly poor underwriting standards and credit quality are further supported by dozens of consistent accounts from former New Century employees with first-hand knowledge of the Company's poor underwriting practices – first-hand accounts further confirmed by data concerning New Century's riskier and poorer performing loan portfolio and end-of-Class-Period admissions. ¶¶ 120-90. Reliance on accounts from former employees with first-hand knowledge is appropriate. *See, e.g., Nursing Home Pension Fund*, 380 F.3d at 1232 ("Plaintiffs' witnesses' evaluations of Oracle's financial health in the United States thus offer a substantial window into the overall financial health of the corporation."); *Countrywide*, 2008 WL 2064977, at *9-11 (crediting the accounts of former employees at various levels as evidence of scienter, finding that the confidential sources collectively "paint a compelling portrait of a dramatic loosening of underwriting standards in Countrywide branch offices across the United States"); *In re Nat'l Golf Props., Inc.,* No. CV 02-1383 GHK(RZX), 2003

---

[44] *See also In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 490-91 (S.D.N.Y. 2004) (knowledge of falsity can be imputed to key officers who should have known of facts relating to the "core operations" of their company). Defendants' authorities are inapposite because in the cases they cite, the plaintiffs failed to allege facts demonstrating that defendants had any knowledge that internal controls were deficient at the time of their Sarbanes-Oxley certifications. *See, e.g., In re Watchguard Sec. Litig.*, No. C05-678JLR, 2006 WL 2927663, at *10 (W.D. Wash. Oct. 12, 2006).

WL 23018761, at *6-7(C.D. Cal. Mar. 19, 2003) (holding that plaintiffs do not need to identify confidential witnesses by name and that allegations describing "the position each witness held at the relevant time that allowed them to personally observe or know the facts they assert" are sufficient at the pleading stage).

Moreover, numerous courts throughout the country have continued to credit information from confidential sources in the wake of *Tellabs*, including the Seventh Circuit when addressing *Tellabs* on remand from the Supreme Court. *See Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 711-12 (7th Cir. 2008) ("*Tellabs II*") (holding that the confidential sources referred to in the complaint supported allegations of falsity and scienter); *see also Scottish Re* (finding that unnamed former employees provided an adequate basis for strongly inferring defendants' statements were false post-*Tellabs* where the complaint identified the positions occupied by the former employees that "would have allowed for relevant hands-on experience in various parts of the Company"); *Gaigiulo v. Isolagen, Inc.*, 527 F. Supp. 2d 384 (E.D. Pa. 2007); *In re Levi Strauss & Co. Sec. Litig.*, 527 F. Supp. 2d 965 (N.D. Cal. 2007); *In re Xethanol Corp. Sec. Litig.*, No. 06 Civ. 10234(HB), 2007 WL 2572088 (S.D.N.Y. Sept. 7, 2007); *Wieland v. Stone Energy Corp.*, No. 05-2088, 2007 WL 2903178 (W.D. La. Aug. 17, 2007).[45]

---

[45] The fact that the confidential sources are all former employees, some of whom may have been laid off, does not discount the accuracy of their statements; credibility of potential witnesses is an issue that cannot be determined at this stage. Defendant Cole's citation to *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753 (7th Cir. 2007), for the proposition that accounts of anonymous sources may not be relied upon should be rejected. Cole Mem. at 22. *Higginbotham* is not controlling law, was subsequently modified by the Seventh Circuit in *Tellabs II*, and is directly contrary to the controlling standard in the Ninth Circuit. *See, e.g., In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1170 n.7 (C.D. Cal. 2007) (rejecting *Higginbotham* to the extent *Higginbotham* enacted a "more sweeping rule"). Moreover, *Higginbotham* is easily distinguished because, as the Seventh Circuit explained in *Tellabs II*, "[t]here was no basis [for scienter in *Higginbotham*] other than the confidential sources, described merely as three ex-employees . . . and two

1    In *Wet Seal,* 518 F. Supp. 2d 1148, the court summarized the Ninth Circuit's

2    controlling standard as follows:  The complaint must describe the source with

3    "sufficient particularity to support the probability that a person in the position

4    occupied by the source would possess the information alleged" and "contain

5    adequate corroborating details to support the inference that the defendants'

6    statements were false."  *Id.* at 1170 (citing *Daou*, 411 F.3d at 1015-16).  *See also*

7    *Countrywide*, 2008 WL 2064977, at *9 ("Corroboration from multiple sources also

8    supports an inference of scienter"); *Killinger*, 399 F. Supp. 2d at 1140 ("In

9    addition, the Court finds that the consistent and interlocking nature of the evidence

10    provided by each witness bolsters the evidence's reliability and credibility.").

11    The Complaint contains witness accounts from 34 former New Century

12    employees who attest in remarkably similar fashion to major deficiencies in the

13    Company's internal controls, the deliberate delay of funds to pay the repurchase

14    claims, and the abandonment of prudent underwriting standards.  Some of these

15    witnesses also confirm that the Officer Defendants, along with other high level

16    executives, received contemporaneous information documenting the backlog of

17    repurchase claims.  Details of the growing repurchase claims backlog are also

18    provided from internal New Century documents.[46]  These witnesses, who worked

19    in several geographic areas, and "span different levels of the Company's

20    hierarchy," "support a strong inference of a Company-wide culture that, at every

21

22    _____

23    consultants."  *Tellabs II*, 513 F.3d at 712.  Similarly, plaintiffs in *Tripp v. Indymac*
     *Fin., Inc.*, No. CV07-1635 GW (VBKx), 2007 WL 4591930 (C.D. Cal. Nov. 29,
24    2007), failed to corroborate the facts alleged from former employees with
     additional supporting facts.
25

26    [46] While the Officer Defendants argue that the Complaint fails to allege that they
     were aware of the failure to fund repurchase claims and the growing claims
27    repurchase backlog, that argument is inconsistent with the restatement and the facts
     alleged in the Complaint, along with the additional facts quoted from the
28    Examiner's Report.  *See* ¶¶ 72-80, 91-94.

1  level, emphasized increased loan origination volume in derogation of underwriting

2  standards." *Countrywide*, 2008 WL 2064977, at *10.[47]  Yet, these New Century

3  Officer Defendants *repeatedly* each made statements claiming the *opposite*.  ¶ 484.

4  Because the confidential witnesses and the Complaint provide "adequate

5  corroborating details" and because each witness is described in sufficient detail,

6  Plaintiffs meet the Ninth Circuit's standard, and the Court should accept the

7  statements of the confidential witnesses as true and part of the totality of the facts

8  giving rise to a strong inference of scienter.  *See Daou*, 411 F.3d at 1015.

### d.    New Century's Admissions Of Material Accounting Errors And GAAP Violations Contribute To A Strong Inference Of Scienter

11  Contrary to Defendants' arguments, New Century's admission that nearly

12  two years of financial statements needed to be restated or were more likely than

13  not in material error due to GAAP violations and material deficiencies in internal

14  controls (wiping out over $270 million in previously reported net income in 2006

15  alone) contributes to a strong inference of scienter.  Many courts have held that

16  pervasive and repeated GAAP violations, as well as significant restatements, help

17  give rise to a strong inference of scienter.  *See Daou*, 411 F.3d at 1016 ("Violations

18  of GAAP standards can also provide evidence of scienter") (citations omitted); *In*

19  *re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1273 (N.D. Cal. 2000)

20  ("[W]hen significant GAAP violations are described with particularity in the

21  complaint, they may provide powerful indirect evidence of scienter. After all,

---

[47]  As described above, the nature of the confidential accounts used to create a compelling inference of scienter in *Countrywide* are nearly identical to those cited by Plaintiffs in the Complaint.  Cole's attempt to distinguish *Countrywide* (Cole Mem. at 22-23) only further emphasizes these similarities and supports reliance on the statements as additional evidence of scienter here.  Contrary to Cole's statement, in this case, as in *Countrywide*, documents and reports regarding underwriting and loan quality at New Century were provided to and/or made available to each of the Officer Defendants, further strengthening the inference of scienter provided by the confidential sources. *See, e.g.,* ¶¶ 175, 177-90.

1    books do not cook themselves."); *Lattice*, 2006 WL 538756, at *12 ("[V]iolations

2    of GAAP standards can provide evidence of scienter.").

3           Of course, in addition to the admission of errors and need to restate, the

4    Complaint describes in great detail the contemporaneous facts leading to the many

5    GAAP violations within each of the financial statements issued throughout the

6    Class Period.  ¶¶ 69-119.  These facts include, for example, with regard to New

7    Century's Allowance for Repurchase Losses reserve:  (i) that the Company

8    intentionally delayed payment of valid repurchase claims and was "sitting on

9    repurchase requests" (¶¶ 74-77); (ii) that New Century had a growing backlog of

10   repurchase claims, hundreds of millions of dollars of which were 18-24 months old

11   (¶¶ 75, 91-93) which was "no secret" and (according to the Company's former

12   Treasurer) "general knowledge" within the Company (¶¶ 92-93); (iii) monthly

13   details of the growing backlog as presented in internal New Century documents

14   (¶¶ 78-81); (iv) the failure to include any estimated discount in valuing

15   repurchased delinquent loans (¶¶ 82-83); (v) the Company's misleading reporting

16   of only a portion of repurchases in SEC filings (¶¶ 84-86, 100); and (vi) the fact

17   that New Century's materially deficient Allowance for Repurchase Losses reserve

18   was identified by the Company's new CFO as soon as he gained access to New

19   Century's books and records (¶¶ 90, 94).   These factual allegations provide a

20   strong inference of scienter on the part of the Officer Defendants, whether viewed

21   alone or (as they should be) in conjunction with the many other allegations

22   establishing an inference of scienter within the Complaint.[48]

23   ────────────────

24   [48]  The Officer Defendants argue that the Company's alleged overstatement of its
     (unrelated) allowance for loan losses reserve negates the inference of scienter
25   because those misstated reserves did not result in inflated earnings for the entire
     Class Period.  MGD Mem. at 22.  The crux of Plaintiffs' allegations regarding the
26   allowance for loan losses reserves, however, revolves around the deceptive
     conduct of the Officer Defendants in failing to properly document the Company's
27   methodology for those reserves (¶¶ 109-18), and particularly the conduct of
     Defendant Dodge, who reduced the allowance for loan losses reserve and
28

The Officer Defendants rely on a handful of cases for the uncontroversial proposition that GAAP errors and restatements, without more, do not create a strong inference of scienter.  MGD Mem. at 14-16; 19-21; Cole Mem. at 9-13 (citing, *e.g., DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 390 (9th Cir. 2002); *In re Fritz Cos. Sec. Litig.*, 282 F. Supp. 2d 1105, 1113 (N.D. Cal. 2003)).  While the cases cited by the Officer Defendants support the general proposition that GAAP restatements, in and of themselves, do not give rise to a strong inference of scienter, particular factual allegations about significant and specific violations of GAAP – in this case, quarter after quarter for a period of nearly two years and in areas that were all "critical" to New Century's finances – certainly support a strong inference that the Officer Defendants intentionally or recklessly made the misstatements at issue in this case.  *See, e.g., In re Cylink Sec. Litig.*, 178 F. Supp. 2d 1077, 1082 (N.D. Cal. 2001) ("[P]articular facts about significant and specific . . . violations [of GAAP] can support an inference that the individuals responsible for such violations acted with scienter.") (citations omitted); *In re Adaptive Broadband Sec. Litig.*, No. C 01-1092 SC, 2002 WL 989478, at *14 (N.D. Cal. Apr. 2, 2002) (same).

---

deceptively combined it with another reserve for the first time in the 2006 third quarter press release and conference call (¶¶ 112-13, 118), and attempted to do the same in the 2005 third quarter but was stopped by the Company's Audit Committee (¶ 117).  That reserve had to be increased in the very next quarter.  *Id.* The fact that false and misleading statements related to New Century's allowance for loan losses did not necessarily lead to an overstatement of income for the entire Class Period does not negate the inference of scienter to be drawn as the result of this highly deceptive conduct.  ¶¶ 499-500.

### 4. The Complaint's Motive Allegations Are More Than Adequate When Considered Collectively With The Other Allegations Concerning Defendants' Knowledge And Recklessness

In addition to the detailed allegations regarding the Officer Defendants' knowledge or reckless disregard of the contemporaneous facts discussed above, the Complaint alleges detailed facts showing these Defendants' motive to mislead the public. Collectively, the Officer Defendants' motive was a massive *$103 million* — the amount realized by the Officer Defendants from inflated bonuses and dividends, as well as sales of stock at artificially inflated market prices.

The Officer Defendants received dividends of more than *$50 million* directly attributable to the inflated financials. ¶ 502. Defendants Cole, Morrice, and Gotschall also received special bonuses based upon the ratio of New Century's pre-tax net income to its average stockholder's equity. ¶¶ 503-04. The Examiner found that Cole, Gotschall, and Morrice's 2005 bonuses were at least 300% higher than they should have been, given New Century's actual financial performance, and that their mid-2006 bonuses of $693,106 based on the Company's misreported results should never have been paid. ¶ 505. In addition, the Officer Defendants sold stock for proceeds of over *$53 million*, benefiting greatly from the artificial inflation in New Century stock before the misstatements were revealed by a new CFO. ¶ 506. These stock sales were unusual and suspicious in light of Defendants' prior trading, as was the commencement of the Officer Defendants' 10b5-1 plans during the time of the undisclosed material problems. ¶¶ 507-14.[49]

The Officer Defendants argue that all of these compensation and insider trading allegations are insufficient to support a strong inference of scienter as to

---

[49] Defendants argue that Plaintiffs have failed to allege enough detail regarding their prior trading histories. MGD Mem. at 25. However, Plaintiffs have done so. ¶¶ 506-14. Nor have these Defendants been hesitant to supplement the record with numerous requests for judicial notice. So, their complaint is an empty one.

1    any of them.  Cole Mem. at 23-26; MGD Mem. at 24-29.  These arguments are

2    erroneous, as shown below.

### a.    Dividends And Bonuses

4        The Officer Defendants argue that compensation such as bonuses and

5    dividends is never a basis for inferring scienter.  Cole Mem. at 23-26; MGD Mem.

6    at 24-29.  They are incorrect.  Motive based on compensation strengthens the

7    inference when the motive is connected to the fraud and there are other supporting

8    facts showing conscious misbehavior.  *See, e.g., No. 84 Employer-Teamster Joint*

9    *Council Pension Trust Fund v. Am. West Holding Corp.*, 320 F.3d 920, 944 (9th

10   Cir. 2003).  In *America West*, plaintiff alleged that the officers misled the market

11   concerning maintenance problems which eventually caused the FAA to impose

12   fines and expensive remediation requirements.  The officers' motives included

13   both insider selling and the desire to earn bonuses and stock options based on the

14   company's reported performance, which would have been worse if they had

15   truthfully disclosed the maintenance problems.  The Ninth Circuit held that these

16   allegations sufficiently connected motive with the misleading information.

17       *In re Cornerstone Propane Partners L.P.*, 355 F. Supp. 2d 1069, 1091 (N.D.

18   Cal. 2005), cited in Cole Mem. at 25, further supports the allegations in this case.

19   That case recognizes that compensation that incentivizes a specific form of

20   accounting malfeasance strengthens the inference of scienter.  There were two

21   alleged "perverse incentives" in *Cornerstone*.  One was an "Acquisition Incentive

22   Plan," which encouraged acquisitions of other businesses as a hedge against the

23   price fluctuations inherent in the commodity market for propane, and which tied

24   bonuses to the gross acquisition purchase price.  *Id.* at 1074-75.  The other was an

25   "Annual Operating Performance Incentive Plan," which tied executive bonuses to

26   the budgeted levels of net income and EBITDA.  *Id.*  Collectively, the plans

27   encouraged defendants to pay too much for acquisitions in order to increase their

28   incentive bonuses, to improperly capitalize costs in connection with acquisitions,

and to fail to timely write down the inflated goodwill caused by the excessive purchase prices. *Id*. In turn, by developing a fraudulent system of propping up Cornerstone's net income and operating cash flows, defendants could avoid violations of debt covenants. *Id*. In dismissing the complaint with leave to replead, the court held that these incentive allegations "squarely contribute to a strong inference of scienter, however they are legally and factually insufficient to carry that burden alone." *Id*. at 1092. In a later opinion, the court upheld these same allegations against the company's chief operating officer. *See In re Cornerstone Propane Partners, L.P.*, 416 F. Supp. 2d 779, 790-91 (N.D. Cal. 2005). *See also Adaptive Broadband*, 2002 WL 989478, at *15-16 (defendants' motive to dispose of their stock at high prices in a merger supported inference of scienter "when read in light of the facts supporting the deliberately reckless accounting violations"); *Schlagal v. Learning Tree Int'l*, No. CV 98-6384 ABC (EX), 1998 WL 1144581, at *17 (C.D. Cal. Dec. 23, 1998) (results-based compensation was "relevant when combined with other alleged incentives"); *Roth v. AON Corp.*, No. 04-C-6835, 2008 WL 656069, at *6 (N.D. Ill. Mar. 7, 2008) (motive to maintain higher credit and debt ratings, along with motive to conceal contingent commission arrangements from clients, contributed to overall inference of scienter).

In this case, the Officer Defendants' bonus structure peculiarly motivated them to commit fraud, as was independently recognized by a financial reporter and financial analyst in May 2007, quoted at ¶ 504 of the Complaint.

Other cases cited by Defendants are inapplicable because they hold only that routine forms of compensation are insufficient by themselves to raise the requisite inference of scienter. *See Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1038 (9th Cir. 2002) ("routine business objectives, without more, cannot normally be alleged to be motivations for fraud"); *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 54 (2d Cir. 1995) (routine allegation that defendants wanted to increase their

compensation, without more, was insufficient); *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061 (5th Cir. 1994) (same); *Plevy v. Haggerty*, 38 F. Supp. 2d 816, 833 (C.D. Cal. 1998) (compensation motives were insufficient "standing by themselves"); *In re J.P. Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 621 (S.D.N.Y. 2005) (plaintiffs failed to connect alleged motive with the fraudulent activity).

### b.    Insider Selling

### (1)    10b5-1 Plans

The Officer Defendants argue that they sold their shares pursuant to 10b5-1 plans, negating any possible inference of scienter.  MGD Mem. at 28-29; Cole Mem. at 25.  However, the 10b5-1 plans do not negate the strong inference of scienter because they were instituted only after the Company began recklessly generating increasing loan volume by loosening underwriting standards (as early as 2003) and was suffering from serious internal control and accounting issues dating back to the end of 2004, if not earlier.  ¶ 514.  When a 10b5-1 plan is instituted in the midst of a company's reckless business practices and undisclosed material problems, it can provide no defense to insider trading.  *See Countrywide*, 2008 WL 2064977, at *19 (CEO's 10b5-1 plan was no defense because it was instituted and amended during the fraud).  The only case cited by the Officer Defendants, *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1427 (9th Cir. 1994) (MGD Mem. at 27), did not involve a 10b5-1 plan at all, let alone one instituted at the very time that the Company was engaged in a reckless and fraudulent course of conduct.

More generally, the continued viability of 10b5-1 plans as a defense to insider trading allegations is in serious doubt.  The SEC's Director of Enforcement has stated that studies indicate that Rule 10b5-1 is possibly being abused to provide a cover for trading on inside information.  ¶ 513.  Further, a recent academic study supports the contention that 10b5-1 plans have not accomplished their goal of permitting preplanned, uninformed trading while deterring insiders from trading

when in possession of material undisclosed information.  That study shows that the "Rule appears to enable strategic trade" and that "[p]articipating insiders' sales systematically follow positive and precede negative firm performance, generating abnormal forward-looking returns larger than those earned by non-participating colleagues."  Alan D. Jagolinzer, *SEC Rule 10b5-1 and Insiders' Strategic Trade*, (Sept. 2007).[50]    That is certainly true in this case, where all four individual defendants waited to enter into 10b5-1 plans until 2005 and 2006, five to six years after such plans were first allowed by the SEC and just when (undisclosed to investors) the Company's problems were really starting to get serious.  ¶ 514.

## (2)    Gotschall

Gotschall sold stock during the Class Period for proceeds of more than $28 million.  ¶¶ 506-08.  The sales were 37% of his total holdings as of the beginning of the Class Period.  ¶ 507.  Moreover, he repeatedly exercised options to purchase shares and immediately resold those shares at huge profits which he would not have made but for Defendants' fraudulent course of conduct.  ¶ 512.

Gotschall's sales during the Class Period are unusual and suspicious because they are not in line with his previous selling history.  He sold substantially more shares during the Class Period than in the years before.  In 2006, he sold nearly twice as many shares than he had in any other single year and 2.5 times as many as he sold in 2005.  ¶ 508.

Gotschall (and the other Officer Defendants) cite cases in which defendants' sales of large portions of their stock were held not to be suspicious.  *See, e.g., In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1093-94 (9th Cir. 2002); *Ronconi v. Larkin*, 253 F.3d 423, 435-36 (9th Cir. 2001) (MGD Mem. at 29).  But those cases, unlike this case, did not have compelling allegations of underlying fraudulent conduct.  The issue is not simply what percentage of a defendant's holdings has

---

[50]  *Available at* www.ssrn.com/abstract=541502.

1   been sold, but whether those sales are sufficient, when taken collectively with

2   other facts, to raise the requisite inference.  *See, e.g., Daou*, 411 F.3d at 1024

3   (discussing defendants' sales of $30 million worth of stock during the fraudulent

4   period without discussing how much they continued to hold, and holding such

5   allegations sufficient "when considered as a whole," *i.e.*, in the context of the

6   information alleged to have been known to defendants); *Marksman*, 927 F. Supp.

7   at 1312-13 (sales of 20% of insider's shares, "especially where the dollar amounts

8   involved are high, may constitute a 'suspicious amount' sufficient to support a

9   scienter allegation;" insider sold $6.3 million of stock; inference was strengthened

10  because sales took place "while the market was still receiving allegedly misleading

11  revenue information" and the insider had not sold in the previous three years).

12  Moreover, the importance of the percentage of total shares sold declines as the

13  absolute magnitude of the sales increases.  *Countrywide*, 2008 WL 2064977, at

14  *19, *citing Nursing Home Pension Fund,* 380 F.3d at 1232.

15      Finally, Gotschall's retention of shares after the end of the Class Period is of

16  little moment because his insider trading was cut short by the actions of newly

17  hired CFO Bindra.  ¶ 507.  Moreover, those shares he continued to hold do not

18  eliminate the large profits he made on his sales.  *See Countrywide*, 2008 WL

19  2064977, at *20 (that CEO held shares while market was falling was irrelevant

20  given his large profits from his sales).[51]

21

22

23

24  ---

[51]  While Gotschall and Cole also cite to their "retirements" from the Company in

25  June 2006 to explain their massive insider selling (MGD Mem. at 28-29; Cole

26  Mem. at 24), the timing of those departures shortly after Defendants failed to sell

    New Century at a premium to a large securities firm (¶ 509), and in light of the

27  undisclosed facts known to them at the time of their departures, is highly

    suspicious.  In any event, Gotschall made actionable false and misleading

28  statements as late as March 16, 2006 (¶¶ 388-91), and Cole until the very end of

    the Class Period (¶¶ 438-45).

1

2                                    **(3)    Cole**

3          Cole sold stock during the Class Period for proceeds of more than $18

4   million.  The sales were 31% of his total holdings as of the start of the Class

5   Period.  ¶¶ 506-07.

6          Cole argues that he held 90% of his shares at the end of the Class Period.

7   Cole Mem. at 23-24.  The argument is meritless because it is based on Cole's

8   holdings only after his huge sale in 2005 of 250,000 shares for proceeds of more

9   than $11 million.  It also ignores that his sales were cut short by newly hired CFO

10  Bindra's findings.

11         Further, the argument includes Cole's acquisition of over 300,000 shares at

12  option prices far below the market price.  ¶ 511.  These newly acquired shares

13  generated dividends which were twice as great as the below-market exercise price,

14  for a profit of over $1.4 million.  ¶¶ 510-11.  Thus, the eventual loss of the value of

15  those shares was not an out-of-pocket loss to Cole at all.  Cole's argument that he

16  acquired more shares than he sold in 2005 (Cole Mem. at 23-24) is similarly

17  without merit because, again, it is based entirely on his below-market acquisition

18  of over 300,000 shares at option exercise prices.

19         Cole also argues that his sales of 250,000 shares in 2005 were ordered

20  shortly prior to the beginning of the Class Period and therefore should be

21  discounted.  Cole Mem. at 24.  However, the Complaint alleges that the reckless

22  lending practices and build-up of undisclosed repurchase claims began before the

23  first day of the Class Period.[52]

24  ─────────────────

25  [52]  *See* ¶ 75 ("hundreds of millions of dollars worth of these valid repurchase

26  claims should have been funded prior to the start of the Class Period in May 2005

27  (and the Offerings), but were not"); ¶¶ 79, 92 (detailing repurchase claims received

28  in 2005 before start of Class Period); ¶ 125 ("underwriting standards . . . actually
    loosened prior to and throughout the Class Period); ¶¶ 137-168 (confidential
    witnesses' information shows poor underwriting and credit quality standards

By contrast, cases cited by Cole (Cole Mem. at 24) involved sales that were completed before the alleged misconduct began, as Cole admits. *See Ronconi v. Larkin*, 253 F.3d 423, 436 (9th Cir. 2001); *In re Broadcom Sec. Litig.*, SA CV 01-275-GLT (MLGx), 2004 U.S. Dist. LEXIS 28090, at *7-8 (C.D. Cal. Nov. 27, 2004); *In re First Union Corp. Sec. Litig.*, 128 F. Supp. 2d 871, 898 (W.D.N.C. 2001).[53]

Cole argues that his 2006 sales are not connected with any misstatement. Cole Mem. at 26. This is incorrect. His August 7, 2006 sale occurred in the same week that the Officer Defendants were misstating the Company's second quarter 2006 results. ¶¶ 357-63. His October 6, 2006 sale took place right between the Company's September 8 misstatements (¶ 438) and the November 2 and 9 misstatements (¶¶ 439-41). *See Countrywide*, 2008 WL 2064977, at *19. Further, Defendants were engaged in a continuous, deliberately reckless course of conduct which, given the misstatements, they had a continuing duty to correct. *See Ponce v. SEC*, 345 F.3d 722, 736-37 (9th Cir. 2003) (duty to correct statements that were false when made); *Overton v. Todman & Co., CPAs*, 478 F.3d 479, 487-88 (2d Cir. 2007) (same); *In re ZZZZ Best Sec. Litig.*, 864 F. Supp. 960, 970-71 (C.D. Cal. 1994) (same).

Cole makes two other meritless arguments. Cole Mem. at 25. First, he argues that the fact that the outstanding repurchase backlog was lower in June 2006 than in other months during that year negates an inference of scienter. This is incorrect because it ignores the Complaint's allegations that the repurchase

_____

beginning in 2003); ¶¶ 175, 177-78, 182-83, 189 ("New Century knew from multiple data sources that its loan quality was problematic, starting no later than 2004."); and ¶ 194 (internal control problems dating back to 2004).

[53] *Vantive* and *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 444-45 (S.D.N.Y. 2005), cited in Cole Mem. at 24-25, involved trading allegations far weaker than this case; *Vantive* had only one sale with no suspicious circumstances, and *BISYS* had sales evenly throughout the Class Period which, again, were not suspicious.

1    backlog was far higher throughout 2006 than it had previously been, and because

2    Cole, according to his own account, decided to sell before the ending June 2006

3    balance would have been known.

4         Second, Cole argues that Lead Plaintiff has arbitrarily chosen a long class

5    period to coincide with the insider trading.    Cole Mem. at 25, n.7.    The

6    Complaint's detailed allegations, discussed throughout this Memorandum, rebut

7    any notion that the Class Period is arbitrary.  In any event, a Class Period of one

8    year and ten months is not unusual at all, as shown by recent class certification

9    opinions in this Circuit.  *See, e.g., In re Micron Tech., Inc. Sec. Litig.*, 247 F.R.D.

10   627 (D. Idaho 2007) (two year class-period); *McPhail v. First Command Fin.*

11   *Planning, Inc.*, No. 05cv0179 IEG (JMA), 2007 WL 2807744 (S.D. Cal. Sept. 19,

12   2007) (four years);  *In re HiEnergy Tech., Inc. Sec. Litig.*, No. 8:04CV01226

13   DOCJ TLX, 2006 WL 2780058 (C.D. Cal. Sept. 26, 2006) (two years and four

14   months); *Plumbers & Pipefitters Local 572 Pension Fund v. Cisco Sys., Inc.,* No. C

15   01-20418 JW, 2004 WL 5326262 (N.D. Cal. May 27, 2004) (one year and six

16   months).  By contrast, *Vantive*, cited by Cole, had a class period of five years and

17   three months.  283 F.3d at 1093-94.

18                    **(4)    Dodge**

19        Dodge sold 77% of her total holdings as of the start of the Class Period.  She

20   does not deny this, but argues that the Court should also count the 30,328 shares

21   she acquired during the Class Period.  However, she admits that she, like Cole,

22   acquired those 30,328 shares at below market prices and made an immediate large

23   profit of $722,122.  MGD Mem. at 26.  Thus, this transaction, rather than negate

24   the inference of scienter, bolsters it because the acquisition resulted in an

25   immediate profit resulting from the Company's artificially inflated stock price.

26        Dodge also argues that the Complaint says nothing about her pre-Class

27   Period sales and points to her sale of 10,278 shares in the six months prior to the

28   Class Period to negate the inference that her sales were suspicious.  However, as

the Complaint alleges, her sales did not begin until the Company had already loosened its underwriting standards and begun accumulating an undisclosed backlog of repurchase claims.  ¶ 508.  Thus, her sales shortly prior to the Class Period do not undercut the allegation that she had a strong motive to commit fraud.[54]

Dodge also argues that there is no link between her sales and Defendants' misstatements.  MGD Mem. at 27.  There again, she is mistaken.  Her first Class Period sale was on June 6, 2005, less than three weeks after the misleading first quarter 2005 announcements commencing the Class Period.  ¶¶ 343-46.  Her second sale was on September 15, 2006, a week after the September 8 misstatements in a press release issued by Dodge, Gotschall and Morrice.  ¶ 438.  Further, as discussed above, Defendants were engaged in a continuous, deliberately reckless course of conduct, and Dodge had a continuing duty to correct prior misstatements.  Selling at the time of these uncorrected statements allowed her to benefit from the artificially inflated price of New Century common stock.

### (5)    Morrice

Morrice sold stock during the Class Period for more than $4 million.  Morrice argues that (i) his sales were a small portion of his holdings, and (ii) there is no link between his sales and any misstatements.  MGD Mem. at 27-28.

These arguments are not persuasive for the reasons discussed above with respect to the other Officer Defendants – namely, that Morrice's holdings were augmented by his exercise of options during the Class Period and there was a continuing course of misconduct and insider selling cut short only by newly hired CFO Bindra.

\* \* \*

---

[54]  Dodge's argument that her sales of 77% of shares only total 2% of the aggregate sold by all four of the Individual Defendants (MGD Mem. at 26) does not change the fact that she sold 77% of her total holdings, a very large percentage.

As discussed above, all of the facts alleged in the Complaint, viewed collectively, give rise to a strong inference at this pre-discovery stage that the New Century Officer Defendants acted knowingly or with deliberate recklessness.[55]

**C.    The Complaint Alleges Numerous Facts Giving Rise To A Strong Inference That KPMG Acted With Scienter**

**1.    KPMG Made Materially False Statements**

New Century's 2005 Form 10-K included KPMG's unqualified audit report on the Company's 2005 financial statements, which stated that: "We conducted our audits in accordance with the standards of the [PCAOB]" and that the financial statements presented New Century's financial position, results of operations, and cash flows in conformity with GAAP.  ¶ 392.  The 2005 Form 10-K also included KPMG's unqualified audit report on the Company's internal controls, which stated that "We conducted our audit in accordance with the standards of the [PCAOB]" and that New Century "maintained, in all material respects, effective internal control over financial reporting as of December 31, 2005 . . . ."  ¶ 393.

The Complaint alleges that these statements in KPMG's audit reports on New Century's 2005 financial statements and internal controls were materially misstated when issued, as KPMG's 2005 audits failed to comply with the standards of the PCAOB for multiple reasons.  ¶ 208.  KPMG does not and cannot dispute at this stage its failure to audit New Century in accordance with these standards. KPMG, instead, argues unpersuasively that the factual allegations from the Examiner's Report should be stricken and the Complaint fails to give rise to a strong inference of scienter as to KPMG.  KPMG's scienter is addressed below. Its motion to strike is addressed in Section III(F) *infra*.

---

[55]  Plaintiffs' Section 20(a) claims against these four Individual Defendants also should be sustained as Plaintiffs have sufficiently alleged underlying Section 10(b) violations by the Company as well as these Defendants' control over New Century's public statements and reporting.  *See, e.g., Daou*, 411 F.3d at 1030; *Amgen*, 544 F. Supp. 2d at 1037.

### 2. The Complaint's Factual Allegations Must Be Presumed True And Must Be Considered As A Whole

KPMG seeks dismissal of Plaintiffs' 10b-5 claims against it by mounting a piecemeal critique of the Complaint's factual allegations demonstrating a strong inference that KPMG acted with deliberate recklessness in issuing its materially misstated audit reports. KPMG's arguments misconstrue both the law and the Complaint's allegations, and should be denied.

KPMG's attempt to pick apart the Complaint and minimize the allegations one by one is contrary to basic principles under Rule 12(b)(6). As the Supreme Court has recently reaffirmed, when "faced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true." *Tellabs*, 127 S.Ct. at 2509. It remains the role of the jury, not the Court, "to assess the credibility of witnesses, resolve any genuine issues of fact, and make the ultimate determination whether [Defendant] . . . acted with scienter." *Id.* at 2513.

As set forth above, not only must Plaintiffs' allegations be presumed to be true, but "[t]he inquiry . . . is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 2509 (emphasis in original). Whereas KPMG urges the Court to dissect the Complaint into discrete allegations, *Tellabs* emphasizes that "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." *Id.* at 2511. As then-Judge Mukasey held in denying an auditor's motion to dismiss 10b-5 claims against it, auditors "cannot secure dismissal by cherry-picking only those allegations susceptible to rebuttal and disregarding the remainder." *In re Philip Servs. Corp. Sec. Litig.*, 383 F. Supp. 2d 463, 476 (S.D.N.Y. 2004).

1

2

### 3.   The Examiner's Report Supports The Inference That KPMG Was Deliberately Reckless

3

As discussed in section III(F) below, Plaintiffs properly rely, in part, on facts stated in the Examiner's Report. KPMG, however, argues that the Report supports only an inference of negligence, which is insufficient for scienter under Section 10(b). KPMG Mem. at 16; Motion to Strike at 7-8. This argument misconstrues the Examiner's mandate from the Bankruptcy Court and Plaintiffs' use of the facts contained in the Examiner's Report in the Complaint. First, the Examiner was mandated to investigate claims that New Century's bankruptcy estate might have against KPMG for accounting malpractice, which is a state-law claim for professional negligence or negligent misrepresentation. Examiner's Report at 517, 520, 522-30. The Examiner had no mandate to investigate possible federal securities law claims against KPMG on behalf of Plaintiffs and the Class of purchasers of New Century securities, and reached no conclusions regarding the merit of any such claims. The Examiner's conclusion that the estate has claims for professional malpractice, measured by state-law negligence standards, is perfectly consistent with Plaintiffs' allegations that KPMG's misfeasance also rose to the level of deliberate recklessness under Section 10(b). *See, e.g.,* Examiner's Report at 8 (noting that KPMG's audit failure, "*[w]hether careless or intentional*," contributed significantly to the Company's misstatements) (emphasis added).

Second, the Complaint does not in any way rely on the Examiner's conclusions regarding the bankruptcy estate's possible state law claims. Rather, Plaintiffs cite to contemporaneous facts contained in the Examiner's Report, along with the facts revealed by their own investigation. As set forth below, it is the collective facts regarding KPMG's 2005 audits and knowledge of New Century's improper accounting and inadequate internal controls that support a strong

1   inference at the pleading stage that KPMG acted with deliberate recklessness in

2   issuing its 2005 audit reports.[56]

3                 **4.**      **The Inference That KPMG Refused**

4                        **To See The Obvious Or To Investigate**
                       **The Doubtful Is At Least As Strong**

5                        **As Any Innocent Competing Inference**

6       Upon assessing Plaintiffs' scienter allegations holistically in accordance

7   with *Tellabs*, the Court should sustain the Complaint "if a reasonable person would

8   deem the inference of scienter cogent and at least as compelling as any opposing

9   inference one could draw from the facts alleged." 127 S. Ct. at 2510. The

10   Complaint specifies numerous facts demonstrating KPMG's "'refusal to see the

11   obvious, or to investigate the doubtful,'" such as the Ninth Circuit has held

12   constitutes scienter for an auditor. *DSAM*, 288 F.3d at 390 (quoting *In re Software*

13   *Toolworks Inc.,* 50 F.3d 615, 628 (9th Cir. 1994)).

14                  **a.**      **Allowance For Loan Repurchases Reserve**

15       The Allowance for Loan Repurchase Losses was identified as a critical

16   accounting policy in New Century's public reports and in KPMG's audit planning

17   documents and was an area of concern for the Company's Audit Committee. ¶ 227

18   at p. 149. *See also* ¶ 214. KPMG knew that the Company's repurchase reserve

19   estimation process was deficient, but did not insist that the deficiencies be

20   corrected: "KPMG noted in its audit of New Century's internal controls in 2004,

21   2005, and 2006 that New Century had an internal control weakness because it had

22   not adopted formal policies and procedures for the repurchase reserve estimation

23   process." ¶ 227 at p. 149. "In 2005, despite the Company's failure to develop and

24

25   ————————

26   [56] KPMG's Motion to Strike includes six pages of argument regarding the
Complaint's scienter allegations (Motion to Strike at 7-13), which are largely

27   repetitive of KPMG's brief in support of its motion to dismiss. Plaintiffs respond
in this section to KPMG's arguments in both its filings regarding scienter and in

28   section III(F) below to KPMG's Motion to Strike.

implement a formal policy for the second year in a row, KPMG concluded that this deficiency was not significant." ¶ 230 at p. 156.

KPMG actually obtained critical information indicating that the 2005 Allowance for Loan Repurchase Losses was understated by many millions of dollars, "but then did nothing with it." ¶ 227 at p. 151.  New Century calculated its repurchase reserve by assuming that all repurchases were made within 90 days of the date New Century sold the loans, such that at the end of every quarter, only loans made during that quarter were taken into account in estimating the reserve. ¶ 227 at p. 150.  In fact, New Century had a substantial and growing backlog of repurchase claims in 2004 and 2005.  *Id.*  KPMG learned that the repurchase backlog was more than twice as large as the Company's year-end 2005 repurchase reserve, but did not correct the reserve in light of this information:

> On February 10, 2006, Christina Chinn, the KPMG junior auditor responsible for reviewing New Century's repurchase reserve calculation specifically solicited and obtained from Robert Lent in New Century's Secondary Marketing Group the amount of repurchase requests outstanding as of December 31, 2005. . . . Lent responded that New Century had $188 million in outstanding repurchase requests as of December 31, 2005.  A substantial portion of these $188 million in outstanding repurchase requests likely were Backlog Claims relating to loans sold prior to the fourth quarter of 2005 that were not being accounted for in the repurchase reserve calculation.

> While in possession of this critical information, KPMG approved New Century's repurchase reserve calculation which ignored the claims received by the Company. . . . At year-end 2005, ... New Century estimated only approximately $70 million in potential future repurchases, although New Century was already in possession of repurchase claims totaling $188 million.

1
2
3
4
5

        KPMG was aware of these $188 million in outstanding claims and even referenced them in the repurchase reserve workpaper for the period, but did not take them into consideration whatsoever in evaluating the sufficiency of New Century's repurchase reserve calculation. . . .

6
7
8

        Applying even the simplest of calculations to this information ... would have revealed that New Century was substantially underreserved.  ¶ 227 at pp. 151-52; *see also* ¶¶ 228-30, 523.

9
10
11
12
13
14
15
16

KPMG also failed to perform even "minimal" testing, research or analysis which would have revealed other material errors in the reserve relating to the interest recapture and Lower of Cost or Market components of the reserve calculation.  ¶¶ 228-29.  Contrary to KPMG's assertions (KPMG Mem. at 23), these GAAP violations resulted in a material impact of $21,320,000 on New Century's year-end 2005 income statement.  ¶ 99.  *See also* ¶¶ 201-03 (summarizing materiality of New Century's GAAP violations, individually and collectively).

17
18
19
20

Courts in numerous cases have held that an auditor's disregard of errors in a company's accounting and failure to conduct any meaningful investigation supports a strong inference of scienter.  For example, the Ninth Circuit affirmed the SEC's determination that an auditor violated Rule 10b-5 where there was:

21
22
23
24
25
26
27
28

[E]vidence that [the auditor] was aware of, yet chose to disregard, the impropriety of recording [the company's] prototype and tooling costs as assets for projects that were still in development.  First, [the auditor] testified that he initially disagreed with [the company]'s management about how to characterize these costs and believed they should be recorded as research and development expenses, not assets. [The auditor] fails to give reasons, other than that he had "substantial discussions with management and management's representations that

1  contracts were on hand for immediate production," for changing his

2  mind. [The auditor]'s failure to conduct any meaningful investigation

3  into management's representations is inexcusable. . . . GAAS requires

4  that [the auditor] inquire into management's representations and

5  conduct his own, independent research to determine whether its

6  assertions are true.

7  *Ponce*, 345 F.3d at 732-33.

8       *Ponce* was a decision after trial, and the evidence of scienter was therefore

9  fully developed. Plaintiffs' allegations that KPMG knew, *inter alia*, that (i) New

10  Century's internal procedures for calculating its Allowance for Loan Repurchase

11  Losses were deficient and unremedied during the 2004 and 2005 audits, and (ii) the

12  outstanding repurchase backlog at year-end 2005 was more than twice as large as

13  the repurchase reserve at that date, adequately allege at the pleading stage a

14  "failure to conduct any meaningful investigation into management's

15  representations." *Id.* at 733.

16       An auditor's disregard of known "red flags" was held to support a strong

17  inference of deliberate recklessness in *In re Homestore.com, Inc. Sec. Litig.*, 252 F.

18  Supp. 2d 1018 (C.D. Cal. 2003) (Pechman, J.). Homestore's auditor knew that

19  Homestore engaged in barter transactions with other companies, which should

20  have been netted in accordance with GAAP, but the auditor only objected to some

21  of them and allowed others to go uncorrected. *Id.* at 1044.[57]

22       Similarly, on a motion to dismiss in *Philip Services*, then-Judge Mukasey

23  held that an audit firm's scienter was adequately alleged where it allowed its client

24  to capitalize losses as "training expenses" even though there had been no training

25  and there was no supporting documentation; one of the auditors expressed concern

26  about accounting adjustments by the company; and the auditors did not insist that

27

28

---

[57] *Homestore.com* was vacated on unrelated grounds. *See* note 21 *supra.*

1    the company reverse other improperly recorded revenue.  383 F. Supp. 2d at 471-

2    72 (holding that auditor engaged in "conscious misbehavior").  These and other

3    "red flags" sufficed for a strong inference of recklessness at the pleading stage.  *Id.*

4    at 475-76.[58]

5         The warning signs in *Homestore.com* and *Philip Services* closely resemble

6    the facts known to KPMG about New Century's improper accounting for

7    repurchase losses, as well as residual interests and the other misreported financial

8    items discussed below.  These facts known to KPMG (viewed collectively) justify

9    an inference of deliberate recklessness that is at least as strong as any contrary

10   inference.  Accordingly, the Complaint satisfies the test set by the Ninth Circuit's

11   decisions in *DSAM*, *Software Toolworks*, and *Worlds of Wonder*.  In each of those

12   cases, claims failed where plaintiffs failed to allege (in *DSAM*) or prove on

13   summary judgment (in *Software Toolworks* and *Worlds of Wonder*) any specific

14   facts indicating that the auditor was actually aware of – as opposed to merely

15   having access to – information indicating that its client's accounting was

16   inaccurate.  *See DSAM*, 288 F.3d at 390-91; *Software Toolworks*, 50 F.3d at 627;

17   *Worlds of Wonder*, 35 F.3d at 1426; *Homestore.com*, 252 F. Supp. 2d at 1042-43

18   (analyzing *DSAM* and *Software Toolworks*).  But in *Software Toolworks*, the Ninth

19   Circuit reversed the district court's grant of summary judgment for an auditor with

20   respect to other claims based on false statements to the SEC, where the complaint

21   alleged specific facts indicating that the auditor was aware of the falsity.  *See* 50

22   F.3d at 628-29.

23        KPMG quotes the Examiner's Report as having found no persuasive

24   evidence that KPMG purposefully miscalculated the repurchase reserve to increase

25

26   _____

     [58]  An auditor's scienter under Second Circuit law must "'approximate an actual

27   intent to aid in the fraud being perpetrated by the audited company,'" *Philip

     *Services*, 383 F. Supp. 2d at 474 (quoting *Rothman v. Gregor*, 220 F.3d 81, 98 (2d

28   Cir. 2000)), which is substantially the same as the Ninth Circuit's standard.

1    earnings.  KPMG Mem. at 22.  The Report also, however, emphasized, *inter alia*,

2    that KPMG specifically *knew* about the $188 million repurchase backlog at year-

3    end 2005 and *knew* that New Century's lack of a formal policy for calculating the

4    reserve was a control deficiency.  Examiner's Report at 180-81.  Another "red

5    flag" identified in the Complaint and by the Examiner, further discussed below,

6    was that New Century reserved significantly less than smaller mortgage banking

7    companies for loan repurchases, a fact identified within just one month after a new

8    CFO joined New Century.  *Id.* at 181.  All of these facts viewed collectively

9    support a strong inference that KPMG was deliberately reckless.

### b.    <u>Residual Interests</u>

11    New Century's residual interest valuation, like the repurchase reserve, was

12    identified as a "critical" accounting policy for New Century.  ¶ 231 at p. 158.  It

13    also was an area in which KPMG identified deficiencies in the Company's internal

14    controls during its 2004-05 (and 2006) audits.  *Id.* at 159-60.

15    Moreover, the Complaint alleges that "despite repeated concerns from

16    KPMG's own internal specialists (SFG) regarding the discount rate used to value

17    New Century's residual interests . . . [KPMG's 2005 audit-engagement partner]

18    Donovan supported the Company's discount rates in the face of opposition first

19    from New Century Management and later from a Board committee to increasing

20    those rates."  ¶ 224 at p. 145 (quoting Examiner's Report at 472); *see also* ¶ 232 at

21    p. 161 ("KPMG knew that the Company's discount rates were aggressive.  Indeed,

22    each SFG review revealed this fact, quarter after quarter.").

23    As a result of using improperly low discount rates, "New Century's financial

24    statements overstated the value of the Company's residual interests for [year-end

25    2005] by at least $14.8 million . . . ."  ¶ 232 at p. 161.  KPMG accepted the

26    Company's inflated valuations notwithstanding repeated warnings from its internal

27    specialists that they were not properly documented and without insisting on any

28    further support from New Century:

1  KPMG effectively approved New Century's discount rates
2  despite clear indications that they were not appropriate from, among
3  others, KPMG's own internal SFG specialists.

4  * * *

5  As early as the first quarter of 2005, KPMG knew that the
6  Company's discount rates were aggressive. Indeed, each SFG review
7  revealed this fact, quarter after quarter. . . . SFG recommended that
8  the engagement team obtain from New Century information
9  supporting the use of its relatively low discount rates, such as a letter
10  from an investment bank or market information for a comparable
11  asset. Despite SFG's findings, the engagement team repeatedly
12  concluded that the residual interest valuations were reasonable and
13  proper, without insisting, during its quarterly reviews, on the
14  documentation that the SFG had recommended.

15  New Century ultimately provided supporting documentation to
16  KPMG in January 2006 in connection with the 2005 audit. Although
17  the engagement team determined that the discount rates were
18  reasonable based on this documentation, the SFG considered the
19  Company's documentation to be insufficient because New Century
20  provided comparative market data for various bonds and had
21  concluded that a corporate junk bond supported its low discount rates.
22  SFG did not view this as an appropriate comparison. Moreover, SFG
23  expressed increasing concern that the Company's discount rates were
24  inconsistent with rates used in comparable sales of residual interests
25  by New Century's peers.

26  *Id.* at pp. 161-62.   Other critical assumptions were not tested by KPMG
27  notwithstanding SFG's concerns. *Id.* at 162-63.

28

KPMG's workpapers also reflect that KPMG knew, as of late 2005, that Company management was not "reviewing the validity of its own assumptions for pre-2003 securitizations" and that the Company's models for valuing residual interests were flawed and had generated errors, including an error that existed as of year-end 2005, but KPMG did not insist that the Company review the validity of the outdated assumptions or correct the erroneous models. *Id.* at pp. 164-65. *See also* ¶ 525.

KPMG's failure to detect and correct New Century's material overvaluation of residual interests resulted, at least in part, from KPMG's failure to adequately audit the Company's internal controls:

In 2004, 2005 and 2006, KPMG identified a number of internal controls deficiencies with respect to the residual interest valuation process. . . . [D]uring its 2004 internal control review, KPMG documented a significant deficiency in internal controls surrounding residual interests, noting that New Century did not have adequate documentation supporting its valuation of residual interests.

* * *

In 2005, KPMG also identified thirteen control deficiencies relating to the residual interest valuation process. Notably, the identified deficiencies included concerns relating to missing policies, support for assumptions and documentation.

* * *

In light of the lack of internal controls surrounding the residual interest valuation. . . . KPMG's acceptance of Management's assumptions without supporting evidence represents a clear departure from GAAS and a lack of professional care.

¶ 231 at pp. 159-60 (quoting Examiner's Report at 494-95).

KPMG argues that the Complaint's allegations about the residual interests amount to no more than an assertion that KPMG had access to information contradicting the Company's valuations, and that mere access to information does not support a strong inference of scienter. KPMG Mem. at 18-19 (citing *In re Van Wagoner Funds, Inc. Sec. Litig.*, 382 F. Supp. 2d 1173 (N.D. Cal. 2004), and *Wet Seal*, 518 F. Supp. 2d 1148). KPMG's argument ignores Plaintiffs' allegation that KPMG's specialists challenged New Century's residual valuations, repeatedly expressed concern that its discount rate assumptions were too low, requested supporting documentation such as a third-party valuation that was never provided, and deemed the junk-bond comparison documentation that was provided to be inadequate. KPMG's argument also ignores Plaintiffs' allegation that KPMG identified specific deficiencies in New Century's internal controls relating to residual valuations, but nevertheless accepted management's representations about these valuations.

By contrast, in *Van Wagoner*, where plaintiffs complained of defendants' valuing restricted securities at cost instead of lower market prices, the court held that the company disclosed all the relevant facts and there was no misstatement. 382 F. Supp. 2d at 1182. Regarding scienter, the court held that plaintiffs alleged only that the auditor "had continual and complete access to Van Wagoner Funds' records" and alleged no specific facts indicating that the auditor was aware of indications that the accounting was improper. *Id.* at 1186. Similarly, in *Wet Seal*, the court held that the complaint failed to plead any false statements. 518 F. Supp. 2d 1148. Not surprisingly, the absence of falsity again led to an absence of scienter. *Id.* at 1163 (noting that the complaint failed to plead any specific facts indicating that defendants knew the accounting was improper). Here, unlike those cases, Plaintiffs plead not merely that KPMG had access to information contradicting New Century's financial statements, but that KPMG knew that the residual valuations were unreliable, requested supporting documentation, and knew

1    that the documentation provided was inadequate.   None of these facts were

2    disclosed to investors at the time of KPMG's unqualified 2005 audit opinion.

3        KPMG also cites *Worlds of Wonder*, but the Ninth Circuit in that case

4    affirmed summary judgment for an auditor where the record *after discovery*

5    showed a thorough audit and reasonable accounting.  35 F.3d at 1425-26.  *Worlds*

6    *of Wonder* does not support KPMG's argument that its rejection of its own internal

7    specialists' concerns about New Century's aggressive discount rates and

8    inadequate documentation was appropriate.  Similarly in *SEC v. Price Waterhouse*,

9    797 F. Supp. 1217 (S.D.N.Y. 1992), the court held *after trial* that the challenged

10   accounting was correct.

11       By contrast, New Century's inadequate internal controls, lack of proper

12   supporting documentation, and use of inadequate supporting documentation for

13   valuing its residual interests, all of which were specifically known to KPMG, and

14   the resulting overvaluation of the interests cannot be dismissed as "complex issues

15   of accounting as to which reasonable accountants could reach different

16   conclusions."  *Id.* at 1241.

17             **c.    Other Improper Accounting And**
                       **KPMG's Undue Willingness To Acquiesce**
18                     **In New Century's GAAP Violations**

19                 **(1)    Hedge Accounting**

20       The Complaint also alleges that audit-engagement partner Donovan falsely

21   told New Century's Audit Committee that KPMG had confirmed with an "outside

22   expert" that the Company's hedge accounting satisfied GAAP, when Donovan

23   actually knew that KPMG's internal hedge accounting specialist had unresolved

24   objections to the Company's accounting.   ¶¶ 225-26, 517.   When the KPMG

25   specialist later refused to approve the audit without receiving necessary

26   documentation to check the hedge accounting, Donovan told New Century's Audit

27   Committee that the issue "should be resolved in the next day or two" and berated

28   KPMG's internal specialist in an email two weeks later:  "I am very disappointed

1   we are still discussing this. As far as I am concerned we are done. The client

2   thinks we are done. All we are going to do is piss everybody off." ¶ 225 at pp.

3   147-48. Only *after* KPMG issued its clean 2005 audit opinion, did the specialist

4   receive the necessary documents and determine that New Century's hedge

5   accounting violated GAAP and resulted in a misstatement of several million

6   dollars. ¶ 226.

7       KPMG argues that these allegations demonstrate no more than "KPMG's

8   desire to preserve its relationship with New Century," such as courts have found

9   inadequate to support a strong inference of deliberate recklessness. KPMG Mem.

10  at 16-17 (*citing Reiger v. PriceWaterhouseCoopers LLP*, 117 F. Supp. 2d 1003,

11  1007 (S.D. Cal. 2000) and *In re SmarTalk Teleservices, Inc. Sec. Litig.*, 124 F.

12  Supp. 2d 505, 518 (S.D. Ohio 2000)). This argument fails.

13      In *Reiger*, the complaint alleged only that the auditor had access to contracts

14  whose terms, if analyzed, would have indicated that the company should not have

15  recognized revenue from the contracts. 117 F. Supp. 2d at 1011-12. The *Reiger*

16  complaint, unlike the Complaint here, alleged no specific facts indicating that the

17  auditor "consciously entertained doubts about the veracity of its client's financial

18  disclosures, either from a client or third party informing the accountant of the

19  client's fraud, or from contemporaneous statements made by the accountant." *Id.*

20  at 1012.

21      Likewise in *SmarTalk*, the court dismissed claims that were supported by no

22  specific allegations that the auditor was aware of impropriety in the relevant

23  accounting. 124 F. Supp. 2d at 516. The *SmarTalk* court sustained a claim relating

24  to an item that the auditor said it was "reconsidering" – but failed to correct – in

25  light of an internal publication indicating that the company's accounting for that

26  item was incorrect. *Id.* at 519.

27      KPMG also argues that the financial impact of the incorrect hedge

28  accounting was too small to support a strong inference of scienter. KPMG Mem.

at 18.  This argument misses the point, because KPMG's decision to complete its audit of New Century's financial statements without satisfying its internal expert's objections to this item is highly probative of KPMG's deliberate refusal to pursue known accounting problems at the Company and its undue willingness to acquiesce in New Century's demands in the face of specific "red flags." ¶¶ 224-26, 516-19.  As such, it forms an important part of the holistic mosaic of KPMG's scienter under *Tellabs*.

## (2)    Allowance For Loan Losses

KPMG's workpapers show that it was also aware that New Century's Allowance for Loan Losses calculations for 2004-06 were not adequately documented and used incorrect models that produced inaccurate amounts, but KPMG "allowed the same deficiencies to remain unremediated each year" and failed to insist that these known errors be corrected.  ¶ 233 at pp. 166-67; ¶ 526. KPMG argues that the Examiner concluded that the Allowance for Loan Losses was overstated in 2005, resulting in lower earnings, and that this negates any inference of scienter.  KPMG Mem. at 23-24.  The principal relevance of the Allowance for Loan Losses, however, is that it is one more example of the many instances in which KPMG knew that New Century was misstating its financial results but failed to correct the errors.  Thus, the known error in this reserve contributes to the totality of the Complaint's scienter allegations.  *See Central Laborers' Pension Fund v. SIRVA, Inc.*, No. 04 C 7644, 2006 WL 2787520, at *8-9 (N.D. Ill. Sept. 22, 2006) (accounting errors that *increase* net income are material where they indicate material weaknesses in internal controls).

KPMG's argument also overlooks the problem of earnings smoothing, in which companies book excess "cookie jar" reserves in order to be able to draw down the reserves to increase earnings in later periods.  The Complaint alleges that this is exactly what New Century tried to do in 2005, and that Audit Committee member Zona considered resigning in late 2005 because he believed that

management was using the reserve to engage in "earnings manipulation."  ¶ 117 at p. 67.  *See* SEC Staff Accounting Bulletin No. 99 – Materiality, Aug. 12, 1999 ("The staff believes that investors generally would regard as significant a management practice to over- or under-state earnings up to an amount just short of a percentage threshold in order to 'manage' earnings.").[59]   Thus, the Company's failure to comply with GAAP could not properly be ignored, as KPMG would have it.  Indeed, this same reserve was suspiciously drawn down in 2006.  ¶¶ 112-13, 118.

### (3)    Mortgage Servicing Rights And Goodwill

Similarly, KPMG was aware during the 2005 audit that New Century did not formally value its mortgage servicing rights and that its valuation was contrary to GAAP; in fact, KPMG specialists recommended obtaining an independent valuation of these rights, but KPMG's 2005 audit team did not insist on obtaining the independent valuation or correcting the errors.  ¶ 233 at pp. 167-68; ¶ 526.  The 2005 audit team also was aware of New Century's departure from GAAP in failing to use a net proportional amortization method.  *Id.*  KPMG's 2005 audit team also failed to adequately audit New Century's goodwill impairment testing.  *Id.* at 170-72.  Rather than test or question the Company's projections or discount rate, KPMG limited its work to focusing on the mathematical accuracy of the Company's model.  *Id.*  Nonetheless, KPMG argues that any overvaluation of the MSRs or goodwill was too small to support a strong inference of scienter.  KPMG Mem. at 24-26.  Again, KPMG seeks to slice the totality of the Complaint's scienter allegations into little immaterial pieces, each of which it can deride as insufficient.  *Tellabs* does not countenance KPMG's argument.[60]

---

[59]  *Available at* www.sec.gov/interps/account/sab99.htm.

[60]  The Examiner also criticized KPMG for "dismissing or minimizing the significance of New Century's accounting errors or departures from prescribed accounting practices on grounds that they were 'immaterial,' even in the absence

1     Indeed, KPMG relies on *PR Diamonds*, 364 F.3d 671, which applies a

2 scienter pleading standard that the Supreme Court overruled in *Tellabs*. *See* note

3 31 *supra*.

### d.     KPMG's Inadequate Audit Of New Century's Internal Controls

6     KPMG's unqualified 2005 audit opinion regarding New Century's internal

7 controls was contrary to KPMG's own contemporaneous knowledge of serious

8 deficiencies in those controls. As discussed above, KPMG noted, but did not insist

9 on correcting, New Century's inadequate internal controls relating to the

10 Allowance for Loan Repurchases Losses reserve and the valuation of Residual

11 Interests. ¶¶ 227, 231, 523. Although KPMG noted numerous internal control

12 deficiencies in its 2004 audit, in violation of PCAOB standard AS 2, KPMG's

13 2005 engagement team failed to compare year-over-year deficiencies or even to

14 communicate with the prior year's team. ¶ 527. As a result, numerous significant

15 deficiencies relating to residual interest valuation and other critical accounting

16 items, which were noted in the 2004 and 2006 audits and unquestionably also

17 existed at the time of the 2005 audit, were not even identified as significant

18 deficiencies in the 2005 audit. *Id.* While KPMG argues that Plaintiffs have failed

19 "to tie their internal control allegations into their theory of scienter" (KPMG Mem.

20 at 26), the facts alleged are completely consistent with a knowing or deliberately

21 reckless failure to staff and conduct KPMG's 2005 audits adequately and further

22 support a strong inference of deliberate recklessness at this stage.

### e.     Inadequate Staffing Of The 2005 Audit Team

24     KPMG knowingly assigned inadequately qualified personnel to the 2005

25 New Century audit and refused to replace 2005 engagement partner Donovan when

27
28 of documented support for these conclusions." Examiner's Report at 7; *see also id.* at 278, 335, 353, 500.

1    New Century's Audit Committee raised concerns with his lack of subprime

2    experience.    ¶¶ 222-23, 520-22.    Taken together with the many other facts

3    indicative of scienter, KPMG's reliance on auditors who were inexperienced in

4    auditing mortgage companies, and of an U.K. auditor completely unfamiliar with

5    U.S. GAAP and Sarbanes-Oxley requirements to audit internal controls,

6    contributes to the strong inference that KPMG's failure to conduct a proper audit

7    was deliberately reckless.

8         *Scottish Re*, 524 F. Supp. 2d 370, cited by KPMG (KPMG Mem. at 21),

9    does not justify a contrary result.    In that case, the court held that plaintiffs'

10   allegations that the auditor's team members were too junior to perform effectively

11   were "conclusory and implausible."    *Id.* at 397.    Here, the Complaint alleges

12   specific details about the 2005 KPMG audit team's inadequacies: KPMG associate

13   Biddle coordinated the 2005 internal controls audit despite having "virtually no

14   experience with auditing internal controls under SOX or even U.S. GAAP issues

15   prior to beginning her work on the New Century audit" just after transferring from

16   the U.K.; much of the 2005 audit team's work on the critical issues of the

17   repurchase reserve and residual interest valuations was done by first-year auditors

18   with no substantive experience in these areas; and the junior auditor who reviewed

19   the residual interest models admitted that they were too complex for him to

20   understand.    ¶ 222 at pp. 142-43; ¶ 521.    Even the more senior members of the

21   team lacked adequate experience in the mortgage banking industry, but KPMG

22   rejected the Audit Committee's request for a more industry-experienced audit-

23   engagement partner than Donovan for the 2005 audit.    ¶ 222 at pp. 141-42; ¶¶ 223,

24   522.

25              **f.    The Rapid Discovery Of New Century's
                        Improper Accounting By A New CFO**

26

27        The speed with which a newly hired CFO uncovered New Century's

28   erroneous accounting also supports the inference that KPMG was deliberately

reckless in not earlier uncovering the errors.  Promptly after becoming CFO on November 15, 2006, Tajvinder Bindra discovered that the loan repurchase reserve was too low, and his inquiries led to the Company's public acknowledgement of its accounting problems less than three months later on February 7, 2007.  ¶¶ 90, 94.  Such a quick uncovering of the fraud by another party supports the inference of KPMG's scienter.  ¶ 529 at p. 358.  *See In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 652 (E.D. Va. 2000) ("The alleged fact that MicroStrategy and PwC were able to conduct, within two weeks after the publication of [a critical] article, 'a . . . detailed review of MicroStrategy's significant contracts' from the preceding two years further supports the inference of scienter. . . .");[61]  *Danis v. USN Commc'ns, Inc.*, 73 F. Supp. 2d 923, 942 (N.D. Ill. 1999) ("conditions readily discoverable by a third party suggests [sic] that an auditor and consultant was likely aware of those conditions");[62] *In re First Merchants Acceptance Corp. Sec. Litig.*, No. 97 C 2715, 1998 WL 781118, at *11 (N.D. Ill. Nov. 4, 1998) ("The magnitude of the fraud combined with the allegation that First Merchants' new Chief Financial Officer almost immediately discovered the discrepancies in the financial statements, suggests a deliberate ignorance on the part of Deloitte.").[63]

---

[61]  *MicroStrategy* held that allegations of auditor scienter must include "facts tending to show that the 'accounting practices were so deficient that the audit amounted to no audit at all or that no reasonable accountant would have made the same decisions if confronted with the same facts,'" 115 F. Supp. 2d at 651 (citation omitted), which is substantially the same as the Ninth Circuit standard.

[62]  *Danis* held that allegations of auditor scienter under a recklessness theory must "support an inference that the auditor's conduct was 'highly unreasonable . . . , involving not merely, simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it," 73 F. Supp. 2d at 941 (citation omitted), which is as demanding as the Ninth Circuit standard.

[63]  *SmarTalk*, cited by KPMG on a different point, is not contrary to Plaintiffs' position regarding speed of discovery of the fraud by another party as a factor

1
2

### g.    KPMG's Failure To Cooperate With New Century's Audit Committee And The Bankruptcy Examiner

3    Another strong indication of KPMG's deliberate recklessness is its failure to

4    cooperate with the Company's Audit Committee and the Bankruptcy Examiner in

5    their investigations.  The Complaint alleges, based on Plaintiffs' own investigation,

6    that KPMG did not cooperate with the Audit Committee, and, based on the

7    Examiner's Report, that KPMG failed to cooperate with and gave unbelievable

8    testimony to the Examiner:

9    New Century's former Senior Vice President, Director of Internal

10   Audit and Chief Ethics Officer [CW 34] further reported that when

11   KPMG was asked about its audit work by New Century's Audit

12   Committee as the restatement was being discussed in February 2007

13   and thereafter, KPMG (rather than defend its audit work) repeatedly

14   refused to discuss its audit work with the Audit Committee and

15   eventually resigned in April 2007.

16                                        * * *

17   KPMG failed to cooperate with the Examiner and the Examiner found

18   senior members of the 2005 engagement team (Donovan and Kim) to

19   be incredible witnesses at several times during his interviews of them.

20   "KPMG did not voluntarily cooperate with the Examiner's

21   investigation, and a number of KPMG witnesses, typically represented

22   by five or six attorneys at their interviews, did not appear

23   forthcoming."  Examiner's Report at 18.  *See also id.* at 485, 486, 489

24

25

26   favoring scienter.  The *SmarTalk* court held that another party's rapid discovery of
     the fraud "*alone* is not sufficient to support a 'strong inference' of [scienter]," but
27   acknowledged that "it is not unreasonable to infer that the less time it takes another
     set of accountants to discover a mistake the more obvious the mistake was."  124
28   F. Supp. 2d at 517 (emphasis added).

1   and 497 (identifying specific instances during the interview process

2   when the Examiner found Donovan and/or Kim to be incredible

3   witnesses).

4   ¶¶ 214, 528, 530.   KPMG's failure to provide candid assistance in the Audit

5   Committee's and Examiner's investigations further supports an inference of

6   culpability that is stronger than any competing innocent inference.  At a minimum,

7   KPMG's stonewalling makes the inference that its 2005 audits were deliberately

8   reckless at least equally compelling as any contrary inference, and that is all that

9   *Tellabs* requires at this stage.

10                                        *  *  *

11      In sum, viewed as a whole, the Complaint establishes a strong inference at

12   the pleading stage that KPMG was deliberately reckless in failing to inquire further

13   about the many specific facts it knew indicating that New Century's accounting

14   was inaccurate and the Company's internal controls were deficient at the critical

15   time of its 2005 audits.

16   **D.   The Complaint States Claims For**
     **Violations Of Section 11 Of The Securities Act**

17

18      The Complaint adequately alleges claims under Section 11 of the Securities

19   Act with respect to New Century's two preferred stock offerings during the Class

20   Period:  the June 15, 2005 Offering of 9.125% Series A Cumulative Redeemable

21   Preferred Stock (Count One) and the August 15, 2006 Offering of 9.75% Series B

22   Cumulative Redeemable Preferred Stock (Count Three).[64]   These claims are

23   asserted against the New Century Officer Defendants who signed and controlled

24   the content of the registration statements for the Offerings; the Director Defendants

25   _____

26   [64]   Section 11 provides a private cause of action against issuers, underwriters,
     auditors and all persons signing a registration statement that "contain[s] an untrue

27   statement of a material fact or omit[s] to state a material fact required to be stated
     therein or necessary to make the statements therein not misleading."  15 U.S.C. §

28   77k(a).

who signed the registration statements for the Offerings;[65] the Underwriter Defendants who sold the preferred stock to members of the Class for each offering;[66] and KPMG, who consented to its 2005 audit opinions appearing in the Registration Statement for the Series B Preferred Stock Offering.

The Underwriter Defendants (joined by the other Defendants) contend that the material misstatements and omissions in both the Series A and B Preferred Stock Offerings concerning the Company's accounting practices, underwriting standards and internal controls for are not actionable by mischaracterizing the misrepresentations as statements of "mismanagement," "opinion," "puffery" or "forward-looking" statements. As set forth below, the Complaint adequately alleges that the registration statements for the Series A and Series B Preferred Stock Offerings: (i) contained untrue statements of material facts; and (ii) omitted to state material facts necessary to make the statements therein not misleading. Accordingly, the Complaint sufficiently pleads actionable material misstatements and omissions under Section 11.

### 1.    The Pleading Requirements For Claims Under Section 11

Section 11 imposes a "stringent standard of liability." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381-82 (1983). Fraud is not an element of a Section 11 claim, nor are plaintiffs required to allege any sort of intentional, knowing or reckless misconduct. *Id.* at 383. "No scienter is required for liability under . . .

---

[65]    The Director Defendants are Alexander, Black, Einhorn, Forster, Lange, Popejoy, Sachs, Sandvik and Zona. Einhorn is not named in connection with the Series A Preferred Stock Offering, and Popejoy and Sandvik are not named in connection with the Series B Preferred Stock Offering.

[66]    Defendants Bear Stearns, Deutsche Bank, Piper Jaffray, Stifel Nicolaus, JMP Securities and Roth Capital acted as underwriters for the Series A Preferred Stock Offering. Defendants Bear Stearns, Morgan Stanley, Stifel Nicolaus, and Jefferies & Co. acted as underwriters for the Series B Preferred Stock Offering.

section 11." January 31, 2008 Order at 5 (citing *Daou*, 411 F.3d at 1027). In addition, neither reliance nor loss causation is required to be pleaded by plaintiffs asserting Section 11 claims. *Daou,* 411 F.3d at 1027, 1029 (causation); *Immune Response,* 375 F. Supp. 2d at 1037-38 (reliance); *Rombach v. Chang*, 355 F.3d 164, 169 n.4 (2d Cir. 2004) (reliance). Accordingly, a plaintiff "need only show a material misstatement or omission to establish his prima facie case," which "places a relatively minimal burden on a plaintiff." *Herman & MacLean*, 459 U.S. at 382.

Because fraud is not an element of a Section 11 claim, the pleading of a violation of this provision requires only "a short and plain statement of the claim showing that the pleader is entitled to relief" under Rule 8(a). *See In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 406 (S.D.N.Y. 2003), *aff'd*, 366 F.3d 70 (2d Cir. 2004); *DDi Corp.*, 2005 WL 3090882, at *9. It is well-established that for a complaint to pass muster under Rule 8(a), a complaint must give "fair notice to defendants of what plaintiff's claim is and the grounds upon which it rests." January 31, 2008 Order at 5-6 (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346 (2005) and citing *Tellabs*, 127 S. Ct. at 2507). *See also Daou*, 411 F.3d at 1027 (quoting *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1105 (9th Cir. 2003)) ("In a case where fraud is not an essential element of a claim . . . '[a]llegations of non-fraudulent conduct need satisfy only the ordinary notice pleading standards of Rule 8(a)'").[67]

---

[67] The Securities Act claims are entirely self-contained and pleaded separately from the Exchange Act claims. In fact, Plaintiffs expressly allege that the Securities Act Defendants acted negligently and failed to conduct reasonable investigations, and expressly disclaim fraud. *See, e.g.,* ¶¶ 289, 298-300, 314, 324-26, 328. As the Ninth Circuit observed in *Vess,* 317 F.3d at 1103-05, such allegations are not subject to Rule 9(b) simply because they appear in the same complaint as other allegations of fraud. Rather, where a complaint pleads both fraud and non-fraud claims, the heightened pleading requirements of Rule 9(b) apply only to the fraud claims, not to the non-fraud claims. *Id. See also In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 632-33 (S.D.N.Y. 2007) (finding that

As detailed below, the Complaint satisfies these pleading standards, and adequately places Defendants on notice of the nature of the claims against them.

### 2. The Complaint Adequately Alleges That The Series A And B Preferred Stock Registration Statements Were Materially Misstated

#### a. The Series A And B Preferred Stock Registration Statements Contained Material Misstatements And Omissions Regarding New Century's Financial Results And Compliance With GAAP

"[F]inancial statements that are not prepared in conformity with GAAP are presumed to be misleading and inaccurate." *Goldstein v. MCI WorldCom*, 340 F.3d 238, 249 (5th Cir. 2003) (citing SEC Regulation S-X, 17 C.F.R. § 210.4-01(a)(1)); *Adaptive Broadband*, 2002 WL 989478, at *12 (same). As such, it is well established that misrepresentations concerning the preparation and presentation of financial results in accordance with GAAP are actionable. *See Refco*, 503 F. Supp. 2d at 656 (statement that financial statements conformed with GAAP held to be an actionable statement under the securities laws when plaintiffs sufficiently alleged that financial statements did not conform with GAAP); *PMA Capital Corp.*, 2005 WL 1806503, at *16 ("[m]isleading statements regarding GAAP procedures are actionable").

In this case, the Complaint alleges numerous facts demonstrating that the Company's 2005-06 financial results failed to comply with GAAP and that the 2005-06 Forms 10-Q and 10-K and the financial statements incorporated in the Series A and B Preferred Stock Registration Statement were materially misstated when issued.

---

Rule 9(b) only applies to the Exchange Act fraud claims, not the Securities Act non-fraud claims because, like here, the complaint was "carefully structured so as to draw a clear distinction between negligence and fraud claims"). Otherwise, plaintiffs would be forced to file two separate complaints in all such cases.

Specifically, the Complaint alleges that, at the time of the Series A Preferred Stock Offering, New Century, in violation of GAAP: (i) failed to account for its massive backlog of repurchase claims outstanding, causing its Allowance for Repurchase Losses reserve to be materially understated at the time of the Offering (¶¶ 250-51), and failed to account for the Company's decreasing loan quality and underwriting standards and increasing delinquencies, defaults and default loss severity in valuing the Company's residual interests in securitizations, causing the residual interests to be materially overstated at the time of the Offering (¶ 252). Notwithstanding these GAAP violations and their material impact on the Company's financial results, the first quarter 2005 10-Q represented that the Company's financial results were prepared in accordance with GAAP. ¶ 245. *See, e.g., DDi Corp.*, 2005 WL 3090882, at *12 (finding that statements relating to misstated historical financial results are actionable).

Likewise, the Complaint alleges, in detail, that the statements concerning New Century's financial performance and compliance with GAAP for the year ended December 31, 2005 and the quarters ended March 31 and June 30, 2006, incorporated by reference into the Series B Preferred Stock Registration Statement, were materially misstated at the time of the Offering. ¶¶ 279-85.

Thus, the Complaint adequately alleges under Rule 8(a) notice pleading standards that the Series A and B Preferred Stock Registration Statements contained untrue statements and omitted material facts regarding the Company's financial results and compliance with GAAP at the time of each Offering. *See DDi Corp.*, 2005 WL 3090882, at *12-13 (finding allegations that defendants' "accounting improprieties" caused prospectus to be "materially" misleading met the liberal pleading standards of Rule 8(a)); *In re CBT Group PLC Sec. Litig.*, No. C-98-21014-RMW, 2000 WL 33339615, at *4 (N.D. Cal. Dec. 29, 2000) (finding violations of Section 11 were adequately pled where complaint alleged that financial misstatements were contained in the registration statement).

1
2
3

**b.    The Series A And B Preferred Stock
Registration Statements Contained
Material Misstatements And Omissions
Regarding New Century's Internal Controls**

4    The Complaint also alleges detailed facts demonstrating that the Series A

5    and Series B Preferred Stock Registration Statements contained materially

6    misstated Sarbanes-Oxley certifications, among other misrepresentations,

7    regarding the effectiveness of the Company's internal controls at the time of the

8    Offerings.  ¶¶ 247-248, 250, 253 (for Series A); ¶¶ 266-67, 273-74, 277-78, 281,

9    284 (for Series B).  Material misstatements regarding internal controls appearing in

10   Sarbanes-Oxley certifications are actionable.  *See Proquest*, 2007 WL 3275109, at

11   *12-13, *16 (finding defendant's Sarbanes-Oxley certification as to adequacy of

12   internal controls to be an actionable "false certification" when such controls were

13   revealed to be inadequate); *PMA Capital Corp.*, 2005 WL 1806503, at *10 ("The

14   Sarbanes-Oxley certifications are relevant because the Defendants claimed therein

15   that all internal control deficiencies had been disclosed."); *see also In re S. Pac.*

16   *Funding Corp. Sec. Litig.*, 83 F. Supp. 2d 1172, 1179 (D. Or. 1999) (denying

17   motion to dismiss claims related to inadequate internal controls).

18   As set forth in the Complaint, the facts revealed by the Examiner's Report

19   demonstrate that New Century's internal controls suffered from "deeply-rooted and

20   long-standing" deficiencies and material weaknesses at the time of the 2005 first

21   quarter, 2005 year-end and 2006 first and second quarter internal control

22   certifications and statements.  ¶¶ 194-96, 253, 284.  Based on these and other

23   factual allegations in the Complaint, the representations and attestations regarding

24   the effectiveness of New Century's internal control system incorporated by

25   reference into the Series A and B Preferred Stock Registration Statements are

26   actionable.  *See, e.g., Proquest*, 2007 WL 3275109, at *12.

27
28

1
2
3

**c.    The Series A And B Preferred Stock
Registration Statements Contained
Material Misstatements And Omissions
Regarding New Century's Underwriting
Standards And The Quality Of Its Loans**

4    For a lending company, underwriting is fundamental information and

5  statements about its loan quality are clearly material to reasonable investors.  *See*

6  *Accredited*, 2008 WL 80949, at *3-4, *8 (denying lending company's motion to

7  dismiss and noting that "underwriting practices would be among the most

8  important information looked to by investors").  *See also* cases cited in section

9  III(B)(1)(a) *supra*.

10    Incorporated into the Series A Preferred Stock Registration Statement were

11  the Company's statements of its "comprehensive and sophisticated process of

12  credit evaluation," "strict underwriting guidelines," "high origination standards"

13  and "underwriting standards and quality assurance programs to ensure that loan

14  quality is consistent."  ¶¶ 239, 241.  Undisclosed to investors, New Century's

15  underwriting standards were actually loosened substantially by the time of these

16  statements and the Series A Preferred Stock Offering, and there were serious loan

17  quality issues at New Century beginning as early as 2004.  ¶¶ 242-43.

18    Likewise, incorporated into the Series B Preferred Registration Statement

19  were the Company's repeated statements of its "loan origination standards and

20  procedures" that were purportedly designed to produce "high quality loans;"

21  "proprietary underwriting systems" that purportedly improved the "consistency of

22  underwriting standards;" and "strict underwriting guidelines."  ¶¶ 259-61.

23  Undisclosed to investors, New Century's underwriting standards were actually

24  *further* loosened by the time of these statements and the Series B Preferred Stock

25  Offering, and there were "striking" red flags throughout 2005 and "alarming" loan

26  quality trends by February 2006.  ¶¶ 262-63.

27
28

1    Accordingly, the Series A and B Preferred Stock Registration Statements

2    contained actionable misstatements and material omissions regarding New

3    Century's underwriting standards and the quality of its loans.

4         **3.    The Complaint Pleads Securities Law
              Violations And Not Corporate Mismanagement**

5

6         The Underwriter Defendants seek to immunize themselves from liability by

7    labeling New Century's material misrepresentations and omissions concerning the

8    Company's financial statements as nothing more than mere "corporate

9    mismanagement." Und. Mem. at 14-18. This is incorrect; the Complaint alleges

10   that Defendants made material misstatements and omitted material facts *in*

11   *violation of the securities laws*. "The fact that Lead Plaintiffs' allegations could

12   potentially state claims for corporate mismanagement or a breach of fiduciary duty

13   does not negate the applicability of federal securities laws, if the statements in the

14   Prospectus were materially false or misleading at the time they were made." *In re*

15   *Surebeam Corp. Sec. Litig.*, No. 03 CV 1721 JM (POR), 2005 WL 5036360, at *13

16   (S.D. Cal. Jan. 3, 2005) (sustaining Section 11 claims against underwriter

17   defendants); *see also In re Wells Fargo Sec. Litig.*, 12 F.3d 922, 926 (9th Cir.

18   1993) (finding that the "failure to recognize problem loans, thus understating the

19   reserve, constitutes an actionable omission or misrepresentation of existing fact

20   which cannot be dismissed as a mere matter of internal mismanagement, unsound

21   business practice, or poor accounting judgment"); *Freedman v. Louisiana-Pacific*

22   *Corp.*, 922 F. Supp. 377, 391 n.11 (D. Or. 1996) ("[A] complaint does allege an

23   actionable misrepresentation if it alleges that a defendant was aware that

24   mismanagement had occurred and made a material public statement about the state

25   of corporate affairs inconsistent with the existence of the mismanagement.")

26   (internal citation and quotations omitted).

27        The Complaint alleges that New Century's financial statements violated

28   GAAP, by, among other things, failing to properly account and reserve for

outstanding repurchase claims and overstating residual interests.    Taking the allegations of the Complaint to be true, as the Court must on a Rule 12(b)(6) motion, this is not a case of second-guessing business decisions by management; rather, the Complaint specifically identifies material facts contemporaneously misstated by Defendants, which are actionable under Section 11.    Simply labeling these material misstatements as "mismanagement" does not insulate Defendants from liability.    Accordingly, the Underwriter Defendants' "corporate mismanagement" defense should be rejected.[68]

### 4. The Bespeaks Caution Doctrine And The PSLRA's Safe Harbor For Forward-Looking Statements Do Not Apply To The Financial Misstatements Made In The Registration Statements

The Underwriter Defendants assert that the misstatements in the Series A and B Preferred Stock Registration Statements related to the Company's repurchase reserves and valuation of residual interests are insulated from liability

---

[68] The Underwriter Defendants' authorities are easily distinguished.  In their cited cases, unlike the Complaint here, plaintiffs did not allege specific facts that showed the then-existing falsity of the statements concerning reserves at the time those statements were made.  *See, e.g., In re CIT Group, Inc. Sec. Litig.*, 349 F. Supp. 2d 685, 690 (S.D.N.Y. 2004) (other than the fact that defendants "decided to increase loan loss reserves . . . three weeks after the IPO . . . Plaintiffs provide no additional facts from which to infer that defendants did not believe that reserves were adequate or had no reasonable basis for such a belief"); *Haft v. Eastland Fin. Corp.*, 755 F. Supp. 1123, 1129 (D.R.I. 1991) (alleging that corporation "failed to provide adequate loan loss reserves . . . promptly and properly" without pleading any historical facts showing the falsity of the statements); *Ciresi v. Citicorp*, 782 F. Supp. 819, 821 (S.D.N.Y. 1991) (complaint provided "no basis" for allegations regarding misstated reserves); *Vachon v. BayBanks, Inc.,* 780 F. Supp. 79, 81 (D. Mass. 1991) (same); *In re Hutchinson Tech. Inc. Sec. Litig.*, 502 F. Supp. 2d 884, 894-95 (D. Minn. 2007) (plaintiffs alleged "virtually nothing" to support their claims).  In this case, by contrast, the Complaint alleges numerous contemporaneous facts showing that New Century's financial statements were materially incorrect *at the time* of the Offerings.  *See, e.g.*, ¶¶ 75, 77, 91-100.

1    by the PSLRA safe harbor and the judicially created "bespeaks caution doctrine."

2    Und. Mem. at 18-25.  These Defendants are mistaken.

3            As set forth in section III(B)(1)(b) above, to qualify for protection under the

4    PSLRA's safe harbor for forward-looking statements and the bespeaks caution

5    doctrine, a statement must be (1) forward-looking; and (2) accompanied by

6    meaningful cautionary language identifying important factors that could cause

7    actual results to differ materially from those projected in the forward-looking

8    statement.  *See* 15 U.S.C. § 78u-5(i); *see also Livid*, 416 F.3d at 948; *CV

9    Therapeutics,* 2004 WL 1753251, at *10-11.[69]

10           In this case, none of the challenged misstatements are "forward-looking

11   statements."  *See, e.g., In re Employee Solutions Sec. Litig.*, No. CIV 97545 PHX

12   RGS(OMP), 1998 WL 1031506, at *5 (D. Ariz. Sept. 22, 1998) (finding that

13   company's statements related to its reserves were not forward-looking but were

14   statements of historical fact); *Schnall v. Annuity & Life Re (Holdings) Ltd.*, No.

15   3:02 Civ. 2133 (GLG), 2004 WL 367644, at *8 (D. Conn. Feb. 22, 2004)

16   ("Statements regarding loss reserves are not projections, they are directed to the

17   then-present state of the Company's financial condition.") (citation and internal

18   quotations omitted).

19           Defendants' misstatements regarding New Century's compliance with

20   GAAP and reported repurchase reserves and residual interests in securitizations

21   reflected historical and current information (and omissions) regarding, *inter alia*,

22   the growing number of repurchase claims, the increasing amount of loan

---

23

24   [69]  The "bespeaks caution" doctrine is "nothing more than 'the unremarkable
      proposition that statements must be analyzed in context.'" *Fecht v. Price Co.*, 70
25   F.3d 1078, 1082 (9th Cir. 1995) (citation omitted).  "The Ninth Circuit has
      consistently held that dismissal of a complaint on the basis of the bespeaks caution
26   doctrine is only appropriate when there is 'sufficient cautionary language or risk
      disclosure [such] that reasonable minds could not disagree that the challenged
27   statements were not misleading.'" *In re Metropolitan Sec. Litig.*, 532 F. Supp. 2d
      1260, 1292 (E.D. Wash. 2007) (quoting *Livid*, 416 F.3d at 947).
28

delinquencies, and the Company's declining underwriting and credit standards and guidelines.  *See* ¶¶ 245-46, 249-52 (Series A); ¶¶ 265, 271-72, 275-76, 279-83 (Series B).  These are not forward-looking statements subject to extra protection.  When "plaintiff[s] allege[] that the reserve understatement concealed present facts . . . plaintiff has adequately alleged that the reserve provisions encompassed a representation of present fact." *Dynex Capital,* 2006 WL 314524, at *12.  *See also In re Reliance Sec. Litig.*, 91 F. Supp. 2d 706, 721 (D. Del. 2000) ("In light of plaintiffs' allegations that the Company's loss reserves were declining as its loan loss rates were increasing, the court finds that Barlow's statements regarding the strength of its reserve position may have been misleading."); *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 281 (3d Cir. 1992) ("There is nothing unique about representations and omissions regarding loan loss reserves that removes them from the purview of the antifraud provisions of the federal securities laws.").  Defendants' statements regarding reserves and residual interests were in error *when made* because they materially misstated the current financial state of New Century, not because the reserves failed to predict what would happen in the future.[70]

Moreover, the PSLRA's safe harbor for forward-looking statements specifically does not apply to misstatements appearing in financial statements.  *See*

---

[70] Strangely, the Underwriter Defendants attempt (again) to insert a scienter requirement into Section 11 (Und. Mem. at 21-23) ("Plaintiff must plead facts supporting the Underwriter's knowledge of falsity"), which is a clear misstatement of well established law as Securities Act violations do not require scienter and can be based even on negligence alone. *See* Court's January 31, 2008 Order at 5 (citing *Daou*, 411 F.3d at 1027).  Moreover, since the specific statements at issue are not forward-looking statements protected by the PSLRA safe harbor, actual knowledge of the misstatements by *any* Defendant is not required.  *Gargiulo*, 527 F. Supp. 2d at 391-92 (sustaining Section 11 claims against underwriter defendants where "actual knowledge of the misstatements has not been alleged against them" because the alleged misstatements were not forward-looking statements and thus were not protected by the safe harbor provision).

15 U.S.C. § 78u-5(b)(2)(A).  *See also In re Telxon Corp. Sec. Litig.*, 133 F. Supp. 2d 1010, 1032 (N.D. Ohio 2000) ("[T]he clear language of the PSLRA expressly excludes from the safe harbor statements that are 'included in a financial statement prepared in accordance with generally accepted accounting principles.'") (citation omitted); *Employees Solutions*, 1998 WL 1031506, at *1 ("The safe harbor provision also specifically excluded representations set forth in financial statements.").

The Underwriter Defendants also make the inherently factual argument that the misstatements are not sufficiently alleged because, under *their* interpretation of GAAP, there was no GAAP violation and the GAAP guidelines "merely support the conclusion that reserves and allocations are forward-looking."  Und. Mem. at 23-24. This argument involves a discussion about the purported complexities of applying GAAP, the appropriate methods that are to be used, and whether the manner in which the Company applied GAAP was proper.  *Id.*  Such factual disputes are simply inappropriate on a motion to dismiss.  *See In re Genentech, Inc. Sec. Litig.*, No. C-88-4038-DLJ, 1990 WL 32070, at *3 (N.D. Cal. Jan. 19, 1990) (whether accounting method used conformed with GAAP was question of fact not appropriate to be considered on a motion to dismiss); *see also Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 257 (5th Cir. 2005) (whether defendants used accounting method for revenue recognition in proper manner was "fact-based and . . .  insufficient to support a motion to dismiss"); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1421 (3d Cir. 1997) (whether a company's accounting practices were consistent with GAAP is a factual question best resolved by expert testimony and should not be addressed on a motion to dismiss); *In re Digi Int'l, Inc. Sec. Litig.*, 6 F. Supp. 2d 1089, 1098 (D. Minn. 1998) (question as to whether accounting method was properly applied not appropriately resolved on a motion to dismiss).  This is especially true in this case where the Complaint's allegations are

1  supported, *inter alia*, by New Century's eventual admissions and a detailed report

2  by the Examiner demonstrating numerous GAAP violations.

3      The Underwriter Defendants also rely on an Eighth Circuit case involving

4  SFAS No. 5 to argue that a failure to have adequate reserves does not constitute a

5  GAAP violation, but Defendants' authority is easily distinguished.   In *In re*

6  *Acceptance Ins. Cos. Sec. Litig.*, 423 F.3d 899, 903-04 (8th Cir. 2005), plaintiffs

7  failed to assert any contemporaneous facts in support of their claim.   In this case,

8  by contrast, the Complaint specifically alleges contemporaneous facts to show the

9  falsity of the statements in the Registration Statements.   For example, as explained

10  above, the Complaint alleges that, throughout all of 2005 and the first three

11  quarters of 2006, New Century never considered its material and growing backlog

12  of repurchase claims in calculating its Allowance for Repurchases Losses reserve,

13  although the backlog was "no secret" and "general knowledge" within the

14  Company.  *See, e.g.*, ¶¶ 75, 92.   Because the allegations involve misstatements

15  about past or present facts, regardless of Underwriter Defendants' attempt to

16  miscast them as "forward-looking," these misstatements are not protected by the

17  PSLRA safe harbor or the bespeaks caution doctrine.

18      In any event, should this Court find that any of New Century's

19  misstatements regarding the Company's reserves or residual interests were

20  forward-looking when made and subject to either the PSLRA safe harbor or

21  bespeaks caution doctrine, the accompanying cautionary language in the

22  Registration Statements is insufficient to protect Defendants from liability as a

23  matter of law.  *Livid*, 416 F.3d at 947; *Metropolitan*, 532 F. Supp. at 1292.  In this

24  case, the Complaint specifically alleges that the Company's general and boilerplate

25  disclaimers that its loans were made to subprime borrowers and that its allowance

26  for loan losses and residual interests included complex judgments about matters

27  that were "inherently uncertain" (Und. Mem. at 21) were insufficient to cure

28  financial data that was alleged to have been materially misstated *at the time*, and

1  such rote cautionary language does nothing to counter the impact of such present

2  misstatements.  *See* ¶¶ 244, 254, 264, 287.

3       In an analogous case, the Third Circuit in *In re Westinghouse Sec. Litig.*, 90

4  F.3d 696 (3d Cir. 1996), reversed the district court's dismissal of Sections 10(b),

5  11 and 12(a)(2) claims and concluded:

6       In our view, a reasonable investor would be very interested in

7       knowing, not merely that future economic developments might

8       cause further losses, but that (as plaintiffs allege) current reserves

9       were known to be insufficient under current economic conditions.

10       A reasonable investor might well be willing to take some chances

11       with regard to the future of the economy, but might be quite

12       unwilling to invest in a company that knew that its reserves were

13       insufficient under current conditions and knew it would be taking

14       another major write-down in the near future (as plaintiffs allege).

15       Thus, notwithstanding the cautionary language stressed by

16       defendants, we think that there is a substantial likelihood that

17       defendants' alleged misrepresentations – *i.e.*, that the loan loss

18       reserves were established in compliance with GAAP and were

19       believed to be adequate to cover expected future losses given the

20       then-existing economic conditions – would have assumed actual

21       significance to a reasonable investor contemplating the purchase of

22       securities.

23  *Id.* at 709-10.  In light of the Complaint's detailed allegations, the Court should

24  reach the same conclusion in this case at the pleading stage.

25

26

27

28

### 5.    The Misstatements And Omissions Regarding Underwriting Standards And Internal Controls Were Not Immaterial Statements Of "Opinion" Or "Subjective Belief"

The Underwriter Defendants also attempt to immunize themselves from liability by characterizing the repeated misstatements about underwriting and internal controls as mere "corporate optimism," "puffery," or "non-actionable statements of opinion." Und. Mem. at 25-26. It is well established that affirmative misstatements concerning important business and management practices that are based on objective, verifiable facts are actionable. *See Virginia Bankshares,* 501 U.S. at 1094-95; *Casella v. Webb*, 883 F.2d 805, 808 (9th Cir. 1989) ("What might be innocuous 'puffery' or mere statement of opinion standing alone may be actionable as an integral part of a representation of material fact when used to emphasize and induce reliance upon such a representation.") (citation omitted).

For example, in *Shapiro*, 964 F.2d at 282, a case involving a higher Rule 9(b) pleading standard, the court found similar statements actionable, stating:

> [W]here a defendant affirmatively characterizes management practices as "adequate," "conservative," "cautious," and the like, the subject is "in play." For example, if a defendant represents that its lending practices are "conservative" and that its collateralization is "adequate," the securities laws are clearly implicated if it nevertheless intentionally or recklessly [or negligently] omits certain facts contradicting these representations. Likewise, if a defendant characterizes loan loss reserves as "adequate" or "solid" even though it knows they are inadequate or unstable, it exposes itself to possible liability for securities fraud. By addressing the quality of a particular management practice, a defendant declares the subject of its representation to be material to the reasonable shareholder, and thus is bound to speak truthfully.

1    *Id.*   In this case, as in *Shapiro*, the Company described the quality of its

2    underwriting practices as "improving" and omitted to disclose that they were, in

3    fact, dramatically loosening.   Importantly, given the nature of the Company's

4    business, such statements and omissions — as they admittedly go to the "very

5    core" of New Century's business (¶ 344) — are unquestionably material, and a

6    reasonable shareholder would have attached significance to them in deciding

7    whether to purchase New Century's Series A and B Preferred Stock.   *See PMA*

8    *Capital Corp.*, 2005 WL 1806503, at *2 (sustaining § 11 claim based on, *inter alia*,

9    statement that PMA was "'committed to a philosophy of strict underwriting

10   discipline'" and focused on "sound underwriting and prudent reserving" where

11   Complaint alleged that the statements were materially incorrect when made);

12   *Accredited*, 2008 WL 80949, at *4, *9 ("underwriting practices would be among

13   the most important information looked to by investors" in a mortgage lending

14   company). *See also* cases cited in section III(B)(1)(a) *supra*.

15       Similarly, the Underwriter Defendants' general characterization of the

16   repeated misrepresentations concerning the adequacy of the Company's internal

17   controls as mere opinion is without merit.   The Complaint alleges numerous facts

18   revealed by the Examiner's Report demonstrating that New Century had "deeply-

19   rooted and long-standing failures to establish and monitor adequate internal

20   controls," and "a number of deficiencies concerning New Century's internal

21   controls over financial reporting during the period covered by the 2004 through

22   2006 audits and the adequacy of the SOX assessment conducted by New Century."

23   ¶¶ 194-96.   This is further confirmed by the Company's February 7, 2007

24   admission that it expected the errors leading to the restatement to constitute

25   "material weaknesses" in its internal controls.   ¶ 193.   This was contrary to the

26   New Century Officer Defendants' repeated certification of the design, operation

27

28

and effectiveness of New Century's internal controls incorporated into the Offerings. ¶¶ 248, 266-67, 273-74, 277-78.[71]

In any event, whether a statement or omission is material is ordinarily a question of fact for the jury. *See DDi Corp.,* 2005 WL 3090882, at *11 ("[T]he issue of whether a statement or omission is material is usually a question for the fact finder.") (citations omitted).[72]

---

[71]  In support of their position, the Underwriter Defendants rely on several inapplicable cases, none of which deal with statements concerning misstated underwriting standards or affirmative misstatements concerning core business practices. For example, Defendants cite to *Glen Holly Entm't, Inc. v. Tektronix, Inc.,* 352 F.3d 367, 379 (9th Cir. 2003), an antitrust case, not a securities case, where the statements at issue concerned a dispute between two commercial entities and whether a quasi-contract existed between those entities. In *Glen Holly,* the statements that the court found to be "generalized, vague and unspecific assertions" did not include misstatements of historical financial results and practices (as they do here), but rather indefinite statements of future acts, such as that the company "was going to develop a more aggressive marketing campaign." *Id.* at 379-80. Defendants also erroneously rely on *Cornerstone,* 355 F. Supp. 2d at 1087 (not discussing misstated underwriting standards and only holding that vague, unspecific assertions such as "industry leading," "positions us beautifully," "measurable progress," and "continuing improvements" constitute non-actionable corporate optimism). By contrast, the statements alleged to be misleading in the Complaint include statements concerning the Company's present and historical underwriting standards and practices and internal controls. In *D.E. & J. Limited P'ship v. Conaway,* 284 F. Supp. 2d 719, 736 (E.D. Mich. 2003), unlike here, the passage at issue was not a certified Sarbanes-Oxley attestation.

[72]  In addition, the Underwriter Defendants assert that they were allowed to rely on KPMG's audited financial statements, and thus had no duty to investigate. Und. Mem. at 25 n.11. This circuitous way of asserting their affirmative "due diligence" defense should be rejected on a motion to dismiss. *See, e.g., In re Prestige Brands Holding, Inc.*, No. 05CV06924(CLB), 2006 WL 2147719, at *9 (S.D.N.Y. July 10, 2006) (denying underwriter defendants' motion to dismiss, and noting that defendants were "free to attempt to avail themselves of the affirmative defense of 'due diligence' . . . [but] [n]aturally, this Court takes no position on the merits of such a defense at this time"); *In re Enron Corp. Sec., Derivative & ERISA Litig.*, No. MDL-1446, Civ. A. H-01-3624, 2005 WL 3704688, at *15 (N.D. Tex. Dec. 5, 2005) ("Affirmative defense [] of due diligence . . . is [a] fact-specific

**E.    Defendants' Arguments Regarding
Loss Causation Should Be Rejected**

**1.    The Court Should Not Dismiss Plaintiffs'
Securities Act Claims Based On The
Affirmative Defense Of "Negative
Causation" At The Pleading Stage**

Count One, a claim for violation of Section 11 of the Securities Act, alleges that the June 2005 Offering incorporated material misstatements in the Company's: (i) 2004 Form 10-K and 2005 first quarter Form 10-Q (regarding the Company's purported "strict" underwriting guidelines and "high" origination standards) (¶¶ 239-44); and (ii) 2005 first quarter Form 10-Q (regarding the Company's purported compliance with GAAP and the purported adequacy of New Century's internal controls) (¶¶ 245-54). The Underwriter and Director Defendants argue that the Court should dismiss this Count on "negative causation" grounds – *i.e.,* that the 2005 Offering, even if materially misstated, could not have caused the Class's losses. Dir. Defs. Mem. at 18-20; Und. Mem. at 27-30.

Count Three, also a claim for violation of Section 11, alleges that the August 2006 Offering incorporated material misstatements in the Company's: (i) 2005 Form 10-K and 2006 first and second quarter Forms 10-Q (regarding the Company's purported "strict" underwriting guidelines and "high" quality loans) (¶¶ 259-64); and (ii) 2005 Form 10-K and 2006 first and second quarter Forms 10-

---

determination of the 'reasonableness' of a defendant's investigation or of his reliance on the opinion of an expert [which is] 'a question [not] properly resolved on a motion to dismiss.'") (citation omitted); *In re Friedman's, Inc. Sec. Litig.*, 385 F. Supp. 2d 1345, 1369 (N.D. Ga. 2005) (due diligence defense involves "determinations of reasonableness of a . . . defendant's reliance on expert opinion [which] are fact-intensive inquiries . . . not properly resolved on a motion to dismiss.") (internal quotation and citation omitted). Once discovery is completed, the Underwriter Defendants may argue their reliance on KPMG. But that is not an appropriate argument on a motion to dismiss. *See Surebeam*, 2005 WL 5036360, at *15 (sustaining Section 11 claims against underwriter defendants and noting that "dismissal of an Underwriter Defendant based upon a showing of a reasonable, independent investigation must come at a later time, not at this pleading stage").

1 Q (regarding the Company's purported compliance with GAAP, the purported

2 adequacy of New Century's internal controls, and KPMG's purported compliance

3 with PCAOB standards in conducting its 2005 audits) (¶¶ 265-87). Even though

4 all Defendants are named in this Count, KPMG is the only Defendant moving to

5 dismiss Count Three on "negative causation" grounds. KPMG Mem. at 8-14.[73]

6                    **a.    Defendants Cannot, On A Motion**
                              **To Dismiss, Meet Their Burden**
7                             **Of Proving Negative Causation**

8         "Because Section 11 imposes strict liability for misrepresentations contained

9 in a registration statement, any decline in value is presumed to be caused by the

10 alleged misrepresentation." *DDi Corp.*, 2005 WL 3090882, at *14, citing *Casella*,

11 883 F.2d at 808. A complaint asserting claims under Section 11 is not required to

12 plead loss causation. *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 411 F. Supp. 2d

13 377, 382 (S.D.N.Y. 2006); *Freeland v. Iridium World Commc'ns, Ltd.* 233 F.R.D.

14 40, 47 (D.D.C. 2006) (plaintiff's "failure to show loss causation is not fatal to

15 Section 11 and 12 claims because he does not bear the burden of proof on loss

16 causation vis-à-vis those claims"); *WRT Energy*, 2005 WL 2088406, at *1; *Adair v.*

17 *Bristol Tech. Sys., Inc.*, 179 F.R.D. 126, 135 (S.D.N.Y. 1998). Rather, a defendant

18 bears the burden of *proving* that a plaintiff's loss "represents [something] other

19 than the depreciation in value of such security resulting from such part of the

20 registration statement . . . not being true or omitting to state a material fact. . . ."

21 15 U.S.C. § 77k(e).[74]

22

23

24 [73] KPMG is not named as a Defendant in Count One. The Officer Defendants

25 incorporate the motion of the Underwriter Defendants as to Count One.

26 [74] The PSLRA amended both the Exchange Act and the Securities Act, codifying a
   loss causation element under Section 10(b) of the Exchange Act, placing on the
27 plaintiff the burden of proving loss causation at trial under Section 10(b), 15
   U.S.C. § 78u-4(b)(4), but leaving completely undisturbed defendants' burden of
28 proving negative causation under Section 11. *See* 15 U.S.C. § 77z-1, *et seq.*

1    "Because an analysis of causation is often fact-intensive, negative causation

2    is generally established by a defendant on a motion for summary judgment or at

3    trial." *Levine v. AtriCure, Inc.*, 508 F. Supp. 2d 268, 272-73 (S.D.N.Y. 2007); *see*

4    *also In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 277 (3d Cir. 2004) (the

5    negative causation defense "may not be used to dismiss a plaintiff's complaint

6    under Rule 12(b)(6)"); *WRT Energy*, 2005 WL 3288142, at *2 (allowing plaintiffs

7    to assert a Section 11 claim for damages based on declines *prior* to the first alleged

8    disclosure because "[t]o conclude otherwise places a burden of pleading loss

9    causation on the plaintiffs, and removes the burden of establishing negative

10    causation from the defendants, where it properly lies").

11    Nonetheless, the Director and Underwriter Defendants argue that the

12    Complaint affirmatively establishes that there is no causal connection between the

13    losses and the misstatements in the 2005 Offering, and KPMG argues the same for

14    the 2006 Offering. Dir. Defs. Mem. at 13-20; Und. Mem. at 27-30; KPMG Mem.

15    at 8-14. These arguments should be rejected.

16    New Century's February 7, 2007 disclosures revealed material GAAP errors

17    and internal control weaknesses that the Complaint specifically alleges date back

18    to, and were in existence at the time of, the Offerings. ¶ 457. *See also* ¶¶ 250-53,

19    280-85. The Company's February 7, 2007 disclosures also revealed New Century's

20    "relaxed underwriting standards." ¶ 462. *See also* ¶¶ 242-43, 262-63 (New

21    Century's substantially loosened underwriting was a "veritable ticking time bomb"

22    at the time of the Offerings). The prices of New Century common stock and

23    preferred shares fell by 36% and 10%, respectively, the day after these disclosures.

24    ¶ 459.

25    New Century's March 2, 2007 SEC filing disclosed, among other things,

26    that the Company's Audit Committee had commenced an independent

27    investigation into the Company's valuation of residual interests in 2006 "*and prior*

28    *periods*." ¶ 464 at pp. 316-17 (emphasis added). The March 2, 2007 filing also

1  disclosed: (i) an expected pretax loss for both the 2006 fourth quarter and full

2  year; (ii) KPMG's substantial doubt as to the Company's ability to continue as a

3  "going concern;" and (iii) investigations by government agencies regarding the

4  Company's disclosures. ¶ 464. These disclosures were a materialization of the

5  risks that had been concealed at the time of the Offerings and were entirely

6  foreseeable consequences of Defendants' material misstatements in the Offerings.

7  ¶¶ 197-203, 531-42. The prices of New Century common stock and preferred

8  shares fell by 69% and over 50%, respectively, the day after these disclosures. ¶

9  467. Additional adverse disclosures and immediate stock price declines followed.

10  ¶¶ 470-75.[75]

11      Thus, the Complaint alleges that by concealing and misstating the truth

12  concerning (i) the Company's reckless lending and underwriting practices, its lack

13  of adequate internal controls, and its misstated financial misstatements and (ii)

14  KPMG's failure to audit New Century's financial statements and internal controls

15  in accordance with the standards of the PCAOB, Defendants misstated material

16  facts in the Offerings, which proximately caused losses to investors. Defendants'

17  "negative causation" arguments should be denied under these circumstances.

18      Indeed, courts routinely reject "negative causation" arguments when the

19  complaint on its face does not affirmatively establish such a defense. For example,

20  in *DDi Corp.*, 2005 WL 3090882, at *15, the court rejected a "negative causation"

21  argument because: (i) the "[complaint] does not affirmatively assert that the

22  alleged misrepresentations and omissions in the Prospectus were revealed only

23  after the value of DDi common stock plummeted;" (ii) it was "unclear when the

24  _____

25  [75]  The Director Defendants' argument that Plaintiffs rely on the Examiner's

26  Report as a corrective disclosure (Dir. Defs. Mem. at 15-16) is inconsistent with
   the Complaint and without basis. In fact, Plaintiffs sued on both Offerings before

27  the Examiner's Report was prepared or released. These Defendants apparently
   confuse pleading with particularity (in light of the additional facts revealed by the

28  Examiner) and loss causation.

1    'accounting improprieties' were revealed;" and (iii) it was not "apparent on the

2    face" of the complaint that the stock's loss in value was caused by something other

3    than the alleged misrepresentations and omissions in the prospectus. *Accord In re*

4    *Portal Software, Inc. Sec. Litig.*, No. C-03-5138 VRW, 2006 WL 2385250, at *3-

5    *4 (N.D. Cal. Aug. 17, 2006) (denying motion "because the complaint on its face

6    does not foreclose the possibility that defendants caused plaintiff's losses"); *WRT*

7    *Energy*, 2005 WL 2088406, at *2 (denying motion because "[defendants] cite

8    nothing in the pleadings establishing some reason other than the alleged

9    misstatements … for the drop in the value of the WRT securities"); *Flag Telecom*,

10   411 F. Supp. at 383 (finding that defendants could not meet the "heavy burden" of

11   establishing negative causation on a motion to dismiss and sustaining Section 11

12   claim because plaintiffs alleged facts sufficient to demonstrate material

13   misstatements in the prospectus).

14       In this case, even though not required for their Section 11 claims, Plaintiffs

15   have alleged specific corrective disclosures which revealed misstatements that

16   dated back to the time of the Offerings and which triggered immediate losses.[76]

17            **b.    The Cases Cited By Defendants Are
                     <u>Neither Controlling Nor Persuasive</u>**

18

19       *Dura*, 544 U.S. 336, cited by Defendants (KPMG Mem. at 8; Dir. Defs.

20   Mem. at 16; Und. Mem. at 28), does not control with respect to Section 11 and is

21   addressed below in the context of KPMG's loss causation arguments as to

22   Plaintiff's Section 10(b) claims. "*Dura* is just not controlling here [in a Section 11

23   case]. The case arose under Rule 10b-5 and Section 10(b) of the Securities

24   Exchange Act of 1934, under which the plaintiff has the burden of pleading loss

25   _____

26   [76] Thus, even if Plaintiffs were required to plead loss causation for their Section 11
     claims, which they are not, the Complaint's allegations are more than sufficient to
27   demonstrate proximate cause under applicable notice pleading standards as further
     discussed in section III(E)(2) below.
28

1    causation." *WRT Energy,* 2005 WL 3288142, at *1.   Other cases cited by

2    Defendants are similarly inapplicable to a motion based on "negative causation"

3    because they deal with claims under Section 10(b).  *See Daou*, 411 F.3d at 1025-

4    26; *In re Hansen Natural Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1161-62 (C.D.

5    Cal. 2007); *In re Leapfrog Enters., Inc. Sec. Litig.*, 527 F. Supp. 2d 1033, 1041 (N.

6    D. Cal. 2007); *In re Impax Labs., Inc. Sec. Litig.*, No. C 04-04802, 2008 WL

7    1766943, at *3 (N.D. Cal. Apr. 17, 2008).

8         KPMG also cites three cases (KPMG Mem. at 9) that are not even remotely

9    applicable.  The first case was reversed by the Ninth Circuit on the exact ground

10   for which KPMG cites it – negative causation.  *See Cats v. Protection One, Inc.*,

11   No. CV 99-3755 DTRCX, 2001 WL 34070755 (C.D. Cal. June 5, 2001), *rev'd sub*

12   *nom. Garbini v. Protection One, Inc.*, 49 Fed. Appx. 169 (9th Cir. 2002)

13   (specifically rejecting the district court's finding that the alleged facts established

14   negative causation).  The second is *In re DNAP Securities Litigation*, No. C 99-

15   00048 WHA, 2000 WL 1358619 (N.D. Cal. Sept. 13, 2000), which was not a

16   Section 11 case and was dismissed purely on materiality grounds.  The third is

17   *McCalden v. California Library Association*, 955 F.2d 1214, 1219 (9th Cir. 1990),

18   which was not a securities case and reversed the district court's dismissal on the

19   ground that the defense of impossibility in a contract claim did not clearly appear

20   on the face of the pleading.

21        The Underwriter Defendants' citation of *MZ Ventures LLC v. Mitsubishi*

22   *Motor Sales of Am. Inc.*, No. CV 9902395 DDP (AIJx), 1999 WL 33597219 (C.D.

23   Cal. Aug. 31, 1999), is also off point.  That case was not a securities case, and the

24   court there held that a different affirmative defense, release, was substantiated by

25   documents referenced in the complaint.

26        The Director Defendants also rely on cases that are inapplicable because the

27   losses in those cases occurred before *any* adverse disclosure was made, thus

28   precluding the possibility of loss causation.  *See Merrill Lynch*, 272 F. Supp. 2d at

1  254; *McKesson*, 126 F. Supp. 2d at 1262.  That is not the case here, because very

2  significant losses occurred immediately after the February 7 and March 2, 2007

3  disclosures, proximately causing Plaintiffs' losses.  While Plaintiffs do not have

4  the burden to allege loss causation for their Section 11 claims, their analysis of

5  why proximate cause is well established for their Section 10(b) claims is set forth

6  below.

7        Other cases cited by Defendants are erroneous and should not be followed.

8  *In re Alamosa Holdings, Inc. Sec. Litig.*, 382 F. Supp. 2d 832 (N.D. Tex. 2005),

9  was incorrectly decided because, in the words of *Levine*, it "fail[ed] to recognize

10  the possibility that declines in stock price prior to broad public disclosure may be

11  reflective of leaking of relevant information into the marketplace."  *Levine*, 508 F.

12  Supp. 2d at 273 n.5.  This oversight "improperly ignores the presumption of

13  causation."  *Id.  Stafford v. Bakke*, No. 102 CV 1132, 2005 WL 1656855, at *5

14  (S.D. Ind. July 7, 2005) is also not applicable because the plaintiffs *admitted* that

15  the event they claimed was not disclosed, a default under a contract with a third

16  party, had been excused by the third party and therefore could not have caused any

17  loss.  *Azzolini v. Corts Trust II for Provident Financial Trust I*, No. 1:03 CV 1003,

18  2005 WL 3448053, at *5 (E.D. Tenn. Dec. 14, 2005), granted a motion to dismiss

19  because certain misstatements regarding due diligence in connection with an

20  acquisition were made two years before the earnings shortfall which plaintiffs

21  claimed caused the loss.  Finally, *Davidco Investors, LLC*, No. 8:04CV2561 T-24

22  EAJ, 2006 WL 547989 (M.D. Fla. Mar. 6, 2006), dismissed the claims of some

23  plaintiffs who sold before the corrective disclosure because they failed to allege

24  that the truth began to leak out before they sold.

25

26

27

28

### 2.    As To The Exchange Act Claims, The Complaint Sufficiently Alleges Loss Causation

KPMG argues that Count Seven of the Complaint against KPMG under Section 10(b) does not adequately allege loss causation.  KPMG Mem. at 8-14.  KPMG's arguments fail for two reasons.  First, KPMG misconstrues the loss causation pleading requirement as articulated in *Dura* and other relevant case law.  Second, KPMG ignores numerous factual allegations demonstrating that New Century's adverse disclosures in this case were entirely foreseeable in light of, and proximately caused by, *inter alia*, KPMG's own failures to conduct its 2005 audits in accordance with the standards of the PCAOB.

### a.    Loss Causation Is Well Established In The Complaint

In *Dura*, 544 U.S. at 346, the Supreme Court held that the standard for proving loss causation for Exchange Act claims at trial is one of "proximate cause."  That is, loss causation may be proven at trial by demonstrating that defendants concealed or misrepresented a risk that later foreseeably materialized, causing plaintiff's losses.  *See id.,* citing Restatement (Second) of Torts § 548A ("the misrepresentation is a legal cause only of those pecuniary losses that are within the foreseeable risk of harm that it creates").

At the pleading stage, the Ninth Circuit has held that plaintiffs are only required to satisfy notice pleading requirements to allege loss causation for Exchange Act claims.  *Daou*, 411 F.3d at 1026 (allegations sufficient to provide defendants with "some indication of the loss and the causal connection plaintiff has in mind") (quoting *Dura*, 544 US at 346); *Plumbers & Pipefitters Local 572 Pension Fund v. Cisco Sys., Inc.*, 411 F. Supp. 2d 1172, 1177 (N.D. Cal. 2005) (*Dura* does not affect applicability of Rule 8(a)(2) and requires "some indication" of causal link, citing *Daou*).  *See also Sloman v. Presstek, Inc.*, No. 06-CV-377-JI, 2007 WL 2740047, at *10-11 (D.N.H. Sept. 18, 2007) (Rule 8(a)(2) applies to loss

1  causation allegations, quoting *Dura*); *Ong v. Sears, Roebuck & Co.*, 459 F. Supp.

2  2d 729, 742-43 (N.D. Ill. 2006) (loss causation is subject to notice pleading

3  requirement); *In re Seitel, Inc. Sec. Litig.*, 447 F. Supp. 2d 693, 710-11 (S.D. Tex.

4  2006) (same); *Ryan v. Flowserve Corp.*, 444 F. Supp. 2d 718, 725 (N.D. Tex.

5  2006) (same); *CMS Energy*, 403 F. Supp. 2d at 629-30 (*Dura* requires only

6  compliance with Rule 8(a)(2)).  This is not a demanding burden at the pleading

7  stage.

8      In *Livid*, 416 F.3d at 949, for example, the Ninth Circuit held that plaintiff

9  sufficiently pleaded loss causation by alleging that the misrepresented facts led to

10  the eventual bankruptcy of the company plaintiff had invested in.[77]

11      *Bombardier*, 2005 WL 2148919, at *12, is also squarely on point.  In that

12  case, the court held that the complaint adequately pleaded loss causation by

13  alleging that the company's misrepresentations concerning its rigorous loan

14  underwriting standards concealed risks that materialized when the loans

15  experienced high delinquency rates and repossessions, rating agencies downgraded

16  the company, and the company had to write off the assets.

17      Other examples of cases in which frauds were alleged to have caused

18  investor losses by concealing risks that later materialized include *Suez Equity*

19  *Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 97 (2d Cir. 2001)

20  (defendant failed to disclose its CEO's prior poor management history evidencing

21  poor management skills which proximately caused the loss, even though there was

22  no specific "corrective disclosure" of the CEO's poor management history);

23  *Schleicher v. Wendt*, 529 F. Supp. 2d 959, 974 (S.D. Ind. 2007) (undisclosed risks

24

25  [77]  Both *Dura*, 544 U.S. at 344, and *Livid*, 416 F.3d at 949, favorably cite *Emergent*

26  *Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189 (2d Cir. 2003), in
   defining loss causation.  *Emergent Capital* states:  "We have often compared loss

27  causation to the tort law concept of proximate cause, 'meaning that the damages
   suffered by plaintiff must be a foreseeable consequence of any misrepresentation

28  or material omission.'"  *Id.* at 197.

of a loan materialized when company increased reserves and missed bond payments); *In re Credit Suisse-AOL Sec. Litig.*, 465 F. Supp. 2d 34, 45-50 (D. Mass. 2006) (analysts' bullish reports on AOL did not disclose shaky financial condition of AOL or their true beliefs about the company; loss was caused when negative financial information reached the market from other sources); and *Burket v. Hyman Lippitt, P.C.*, No. 05-72110, 2005 WL 3556202, at *10 (E.D. Mich. Dec. 29, 2005) (embezzlement of investment funds was a foreseeable event given non-disclosure).

KPMG appears to be arguing that the Company's adverse announcements on February 7 and March 2, 2007 (and thereafter) were completely unrelated to (i) the Company's 2005 financial misstatements, poor internal controls, and reckless underwriting and (ii) KPMG's failure to audit New Century's 2005 financial statements and internal controls in accordance with PCAOB standards.[78]  However, this is not so, as all of the adverse announcements on both February 7 and March 2, 2007 (and thereafter), were entirely foreseeable consequences of the previously misrepresented facts, including those by New Century in 2005 and KPMG's 2005 audit opinions.  In addition, the adverse announcement on March 2, 2007 (causing the most severe one-day drop in the price of New Century securities) specifically referred (as a result of KPMG's February 2007 report to New Century's Audit Committee) to an investigation of the previously reported financials for "2006 and *prior periods*."  ¶ 464 at pp. 316-17, ¶ 540.  Thus, Plaintiffs have sufficiently placed KPMG and all Defendants on notice of their theory of loss causation in the Complaint.  *See also* ¶¶ 197-203, 531-42.

Moreover, the Supreme Court in *Dura* cited the Restatement (Second) of Torts § 548A, which provides that only a subsequent event that "has no connection with or relation to" the misrepresented information can break the chain of

---

[78]  *See also* Dir. Defs. Mem. at 18 (arguing that declines resulted from "*other causes*" and "*other material events*") (emphasis in original).

proximate causation such as "the sudden death of the corporation's leading officers." In this case, the 2006 financial misstatements were not unrelated to those in 2005 and those in existence at the time of KPMG's 2005 audits. In fact, the Restatement cited by *Dura* specifically states:

> In determining what is foreseeable as a result of the misrepresentation, the possibility of intervening events is not to be excluded altogether. Thus, when the financial condition of a corporation is misrepresented and it is subsequently driven into insolvency by reason of the depressed condition of an entire industry, which has no connection with the facts misrepresented, it may still be found that the misrepresentation was a legal cause of the recipient's loss, since it may appear that if the company had been in sound condition it would have survived the depression, and hence that a loss of this kind might reasonably have been expected to follow.

Restatement (Second) of Torts § 548A. This language demonstrates quite well why Defendants' arguments based on loss causation are misplaced. *See also Countrywide*, 2008 WL 2064977, at *16 ("Independent of any turmoil in the capital markets, the widespread violations of underwriting standards, as alleged, would significantly raise the risk of loan default. When combined with what Plaintiffs alleged are misrepresentations concerning the quality of Countrywide's loans, these underwriting issues would ultimately undermine confidence in the secondary market for Countrywide products."); *AUSA Life Ins. Co. v. Ernst & Young*, 206 F.3d 202, 219-20 (2d Cir. 2000) (quoting above Restatement and remanding for findings on the foreseeability of the loss, specifically as to whether E&Y's misstatements caused the loss).[79]

---

[79] In *AUSA Life Ins.*, the district court on remand found that it was unforeseeable to E&Y that the company would make an unprecedentedly risky acquisition after E&Y's misstatements which would precipitate its bankruptcy. *AUSA Life Ins. Co.*

Accordingly, Plaintiffs have sufficiently alleged proximate cause for notice pleading purposes. In any event, loss causation in this disputed context is a question for the jury, not for resolution at the pleading stage. *See, e.g., In re TyCom Ltd. Sec. Litig.*, No. 03-CV-1352-PB, 2005 WL 2127674, at *13 (D.N.H. Sept. 2, 2005) ("Even if, as defendants maintain, there had been an intervening event that interrupted the chain of causation, such a determination is a matter of proof after discovery, either at summary judgment or at trial, and is not to be decided here on a Rule 12(b)(6) motion to dismiss."); *In re Openwave Sys. Sec. Litig.*, 528 F. Supp. 2d 236, 252-53 (S.D.N.Y. 2007) (determining which event caused the stock price decline is a question for the jury); *Immune Response,* 375 F. Supp. 2d at 1024-25 (complaint met *Dura* standard, and the issue of loss causation was for the jury).

### b.    **Defendants Misconstrue *Dura* And Other Case Law On Loss Causation**

KPMG argues that *Dura* requires a "corrective disclosure – *i.e.*, an announcement containing factual information that discloses wrongdoing or corrects a misstatement *made by KPMG*; and (ii) a drop in stock price following this corrective disclosure." KPMG Mem. at 9 (emphasis in original).[80] This is not the law. *Dura* did not set forth any particular criteria for proving proximate cause at trial, nor did the Court consider the notice pleading requirement particularly rigorous. *See, e.g., In re Motorola Sec. Litig.*, 505 F. Supp. 2d 501, 540 (N.D. Ill. 2007) (*Dura* "did not, however, indicate what form a disclosure must take, how completely it should reveal previously misrepresented or concealed information, or

---

*v. Ernst &* Young, 119 F. Supp. 2d 394, 400 (S.D.N.Y. 2000), *aff'd*, 39 Fed. Appx. 667 (2d Cir. 2002). There is no comparable unforeseeable event in this case. The 2006 misstatements naturally followed those from 2005. Moreover, the issue of whether there was an intervening event is a matter for proof after discovery.

[80]    The Underwriter and Director Defendants argue similarly with respect to "negative causation." Und. Mem. at 28; Dir. Def. Mem. at 16.

how specifically it must refer to that information."); *Flowserve*, 444 F. Supp. 2d at 727 (rejecting defendants' argument that *Dura* requires "fact-for-fact" corrective disclosure); *In re Bradley Pharms., Inc. Sec. Litig.*, 421 F. Supp. 2d 822, 827-28 (D.N.J. 2006) (rejecting defendants' "'true' corrective disclosure" argument).

In fact, the Supreme Court stated in *Dura* that "it should not prove burdensome for a plaintiff who has suffered an economic loss to provide a defendant with *some indication* of the loss and the causal connection that the plaintiff has in mind." *Dura,* 544 U.S. at 347 (emphasis added). The Court's discussion of the possibility that a plaintiff might sell "before the relevant truth begins to leak out," *id.* at 342, further demonstrates that the market need only be put on some notice as to a possible misstatement for there to be enough to allege loss causation. *See Schleicher*, 529 F. Supp. 2d at 966 ("The phrase 'leak out' suggests that the bad news could be revealed to the market in a less obvious, piecemeal way."); *Motorola*, 505 F. Supp. 2d at 540 ("This language suggests that a disclosure sufficient to satisfy loss causation can occur in ways other than an announcement that points directly to a previous representation and proclaims its falsity."). Thus, KPMG misreads *Dura* to require "fact-for-fact" disclosure, *i.e.,* that the market be fully informed as to a fraud committed by KPMG for there to be sufficient evidence of loss causation.

*Daou*, like *Dura*, also did not require a complete admission of fraud for loss causation. On the contrary, the Ninth Circuit held that disclosures which revealed that the company's "operating expenses and margins were deteriorating" were sufficient for pleading loss causation where plaintiff alleged that the company had previously prematurely and fraudulently recognized revenue. 411 F.3d at 1026. *See also Schleicher*, 529 F. Supp. 2d at 965-67 (*Dura* did not limit the ways plaintiff may show loss causation or require a "mea culpa" followed by "a sharp drop in the company's stock price"); *Motorola*, 505 F. Supp. 2d at 543 (one method of loss causation is "a series of earlier, smaller disclosures by the issuer or

1   others that gradually leads market participants whose actions set price to conclude

2   that the misstatement was false"); *In re Cardinal Health Inc. Sec. Litig.*, 426 F.

3   Supp. 2d 688, 760-61 (S.D. Ohio 2006) (rejecting defendants' argument that *Dura*

4   requires a complete corrective disclosure); *In re Parmalat Sec. Litig.*, 375 F. Supp.

5   2d 278, 305-06 (S.D.N.Y. 2005) ("An allegation that a corrective disclosure caused

6   the plaintiff's loss may be sufficient to satisfy the loss causation requirement. It is

7   not, however, necessary.").[81]

8       Indeed, KPMG's misinterpretation of *Dura* would permit companies to

9   manipulate their disclosures so as never to be liable for a fraud, no matter how

10  blatant, by simply announcing bad results without admitting anything about a

11  fraud, or by a series of partial disclosures, even if the fraud clearly caused the bad

12  results. *See Motorola*, 505 F. Supp. 2d at 544 (defendants' restricted version of

13  loss causation would permit companies to avoid liability by issuing "some

14  damaging announcement that appears on its face unrelated to any fraudulent

15  scheme, … wait[ing] for its share price to plummet, and then disclos[ing] the

16  wrongdoing once the damage has been done"); *Freeland,* 233 F.R.D. at 47

17  ("reading *Dura* to require proof of a complete, corrective disclosure would allow

18  wrongdoers to immunize themselves with a protracted series of partial

19  disclosures.").

20       Thus, loss causation may be established in many ways other than a "fact-for-

21  fact" corrective disclosure fully admitting the fraud. Some already established

22  examples:

23       (a) A company may suffer financial reversals or have to report poor results

24  which are due in whole or in part to fraudulent accounting, without any disclosure

---

26  [81] *Hansen Corp.*, 527 F. Supp. 2d at 1162, and *Leapfrog*, 527 F. Supp. 2d at 1041

27  (cited in KPMG Mem. at 9), to the extent that they required a full "corrective

     disclosure" admission of the fraud, misconstrued *Dura* and *Daou* exactly as

28  KPMG does here and should not be followed in light of this authority.

of fraud. This is what happened with the first disclosures in *Daou*, 411 F.3d at 1026, and in *Berson v. Applied Signal Technology, Inc.*, 527 F.3d 982, 989-90 (9th Cir. 2008).[82] *See also In re ICG Commc'ns Sec. Litig.*, No. 1:00CV01864 RFB BNB, 2006 WL 416622, at *10 (D. Colo. Feb. 7, 2006) (announcement of substantially reduced earnings expectations; no disclosure of cause or of a fraud); *Steiner v. MedQuist Inc.*, No. 04-5487 (JBS), 2006 WL 2827740, at *20 (D.N.J. Sept. 29, 2006) (stock delisting was due to investigation of fraudulent billing scheme; no admission of a fraud).

(b) A company may go bankrupt due to financial problems which it never disclosed. *See Livid*, 416 F.3d at 949 ("Defendants' misrepresentation concealed PCI's financial situation. As a result of its dire financial situation, PCI eventually went bankrupt, which caused Livid to lose the entire value of its investment in PCI."). *See also Emergent*, 343 F.3d at 197-98 (company's stock became "virtually worthless" due to defendants' pump-and-dump scheme; defendants failed to disclose their previous history of pump-and-dumps; loss causation was adequately alleged).

(c) As *Dura* put it, the "relevant truth" may "begin to leak out," 544 U.S. at 347, without specific disclosure of fraud or misstatement. *See, e.g., Steiner*, 2006 WL 2827740, at *20 (disclosure that company would not meet SEC filing deadline and was reviewing billing practices; no indication of a fraud, held sufficient for loss causation); *Seitel*, 447 F. Supp. 2d at 711 (truth about accounting fraud began to leak out when analysts started questioning revenue recognition practices);

---

[82]   In *Berson*, the company, which did business almost exclusively with the government, failed to disclose that the government had issued major stop-work orders. 527 F.3d at 989-90. The company's announcement of a 25% fall in revenue from the preceding quarter caused the stock to drop 16%. *Id.* The announcement was not a complete "corrective disclosure" or admission, because it said nothing about the stop-work orders. Nevertheless, the Ninth Circuit held that loss causation had been sufficiently pleaded because the loss in revenue was proximately caused by the stop-work orders. *Id.*

*Bradley*, 421 F. Supp. 2d at 828 (truth about the fraud leaked out through a series of disclosing events; first event merely announced an SEC inquiry and said nothing about the subject of the fraud); *Cardinal Health*, 426 F. Supp. 2d at 707-08, 759-61 (first adverse disclosure was an article criticizing a revenue recognition practice; ultimately, far more wide-ranging illegal accounting practices were disclosed after the class period ended; loss causation held adequately alleged); *Brumbaugh v. Wave Sys. Corp.*, 416 F. Supp. 2d 239, 256 (D. Mass. 2006) (loss causation adequately alleged when SEC investigation was announced with no disclosure that a fraud occurred); *In re NTL, Inc. Sec. Litig.*, No. 02 Civ. 3013 LAK AJP, 2006 WL 330113, at *9 (S.D.N.Y. Feb. 14, 2006) (truth leaked out in a series of disclosing events that "slowly revealed the false information regarding NTL"). [83]

---

[83] *Seitel* is of particular interest because in that case, defendants argued that the announcement of a restatement caused the stock price to increase and therefore the fraudulent revenue recognition practices could not have caused the loss. 447 F. Supp. 2d at 711. The court rejected this argument because plaintiffs alleged that previous questioning by analysts had already put the market on notice of the fraudulent practices. *Id.* Similarly, KPMG argues that the disclosure of 2005 misstatements did not occur until after the end of the Class Period (May 24, 2007) and did not cause a further stock price decrease. KPMG Mem. at 10, n.6. However, as in *Seitel*, previous disclosures (namely, the February and March 2007 disclosures) put the market on notice of the material misstatements in this case. *See also Bradley*, 421 F. Supp. 2d at 828 (final disclosure after end of Class Period followed by price rise did not negate loss causation as to earlier, partial disclosures); *Parmalat,* 375 F. Supp. 2d at 307 ("That the true extent [of] the fraud was not revealed to the public until February – after Parmalat shares were worthless and after the close of the Class Period – is immaterial where, as here, the risk allegedly concealed by defendants materialized during that time and arguably caused the decline in shareholder and bondholder value."); *Cardinal Health*, 426 F. Supp. 2d at 761(denying motion to dismiss despite defendants' argument "that the Company did not reveal the truth about the Company's accounting violations until … *after* the Class Period had ended"); *In re Dura Pharms., Inc. Sec. Litig.*, 452 F. Supp. 2d 1005, 1023 (S.D. Cal. 2006) (following remand from Supreme Court, holding that disclosures after the end of the Class Period could be alleged to have caused investors' losses).

1    The above list is not exhaustive; there are many other possibilities. "For

2  example, short sellers may suspect the fraud and lead an attack that gradually

3  reduces the market price. Or there may be no market decline at the time of the

4  corrective disclosure because of offsetting favorable news." John C. Coffee, *Loss*

5  *Causation After Dura: Something For Everyone*, N.Y.L.J., May 20, 2005.

                                *  *  *

7    Accordingly, Defendants' arguments in favor of dismissal on the grounds

8  that New Century did not make a full and complete admission of each of its and

9  KPMG's 2005 and 2006 material misstatements before its stock price declined

10  should be rejected. At the pleading stage, Defendants cannot meet their

11  demanding burden of demonstrating "negative causation" to dismiss Plaintiffs'

12  Section 11 claims in light of the facts alleged in the Complaint, and Plaintiffs have

13  easily satisfied notice pleading requirements for their Section 10(b) claims.

14    **F.    KPMG's Motion To Strike Is
       <u>Without Basis And Should Be Denied</u>**

16    Plaintiffs have conducted an independent and extensive investigation into

17  Defendants' wrongdoing. Each factual allegation in the Complaint is premised on

18  a reliable source and corroborated by multiple sources, including confidential

19  witnesses who are adequately identified to demonstrate that they were in a position

20  to know the information they provided. Among Plaintiffs' sources are the facts

21  reported in the Examiner's Report. Disregarding Plaintiffs' extensive investigatory

22  efforts and the well accepted use of a bankruptcy examiner's report as a reliable

23  source in a securities fraud complaint, KPMG moves to strike Plaintiffs'

24  allegations.

25

26

27

28

KPMG, however, does not establish the predicate requirements for striking allegations pursuant to Federal Rule of Civil Procedure 12(f).[84]  "To succeed on a motion to strike, one must demonstrate that no evidence in support of the allegation would be admissible, that the allegations have no bearing on the issues in the complaint, and that to permit the allegations to stand would result in prejudice to the movant."  *Eldorado Stone, LLC v. Renaissance Stone, Inc.*, No. 04-cv-2562 JM(CAB), 2006 WL 4569360, at *5 (S.D. Cal. Feb. 6, 2006).

Rather than moving pursuant to Rule 12(f), KPMG's motion to strike is predicated upon Plaintiffs' purported failure to conduct a reasonable inquiry pursuant to Rule 11 and the assertion that the Examiner's Report is inadmissible hearsay and therefore immaterial as a matter of law.   Neither Rule 11 nor established precedent supports KPMG's motion to strike.[85]

### 1.    Plaintiffs May Plead On The Basis Of A Bankruptcy Examiner's Report As A Reliable Source

In pleading securities fraud, a plaintiff may rely upon any reliable source of information.   The operative question is not whether the plaintiff has personally verified a fact alleged but, rather, whether the plaintiff is relying upon a source in a position likely to have had access to the information attributed to that source.  *See, e.g., Daou*, 411 F.3d at 1015 ("sources of information relied upon in a complaint should be 'described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged'"); *accord Tellabs II*, 513 F.3d at 711-12.

---

[84]   Rule 12(f) authorizes the Court to strike from a pleading "any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f).

[85]   Although KPMG argues to strike allegations based on the Examiner's Report both in KPMG's motion to dismiss (Docket No. 282 at 15) and its separately filed Motion to Strike (Docket No. 283), Plaintiffs' opposition to all of those arguments is addressed in this section.

1    There can be no doubt that the Examiner – having conducted an extensive

2    and well documented investigation – was in a position to know the facts that he

3    publicly set forth in his signed Report.  The Examiner's 551-page report is based

4    on a review of over a million pages of documents, including hard-copy files and

5    electronically stored information from the Company and KPMG, and 110

6    interviews of 85 fact witnesses, including Company employees and several

7    accountants from KPMG.  Complaint at p. 1 n.1.  *See Spiegel*, 382 F. Supp. 2d at

8    1013 (rejecting Rule 11 challenge to plaintiff's reliance on court-appointed

9    examiner's report for some allegations in complaint because, among other things,

10   the report was based on numerous documents and witness interviews).   In

11   preparing his Report, "'[t]he Examiner sought to assess each of the relevant issues

12   in a thorough, objective, fair, efficient and responsible manner, without the use of

13   hindsight.'"  Complaint at p. 1 n.1 (quoting Examiner's Report at p. 13).  Given the

14   thoroughness of his investigation and the authority vested in him by the

15   Bankruptcy Court, there can be no question that the Examiner was in a position to

16   "possess the information alleged."  *Daou*, 411 F.3d at 1015.

17       Recognizing the reliability of an examiner as a source, courts regularly allow

18   pleadings on the basis of a bankruptcy examiner's report.  *See, e.g., In re Enron*

19   *Corp. Sec. Litig.*, MDL No. 1446, C.A. No. H-01-3624, 2005 U.S. Dist. LEXIS

20   41240, at *23, n.11 (S.D. Tex. Dec. 22, 2005); *Fleet Nat'l Bank v. Boyle*, No. 04

21   CV 1277 LDD, 2005 WL 2455673, at *2 (E.D. Pa. Sept. 12, 2005); *WRT Energy*,

22   No. 96 Civ. 3610 (JFK), 1999 WL 178749, at *13 (S.D.N.Y. Mar. 29, 1999).[86]

23       In *Enron*, defendant Royal Bank of Canada ("RBC") argued that plaintiffs'

24   complaint improperly relied upon factual findings made by the Enron bankruptcy

25   examiner, which RBC argued were insufficient to state a claim under the PSLRA

26

27   [86] Courts also have rejected the very same arguments that KPMG makes as to the

28   use of SEC complaints in pleading claims.  *See, e.g., De La Fuente v. DCI*
     *Telecomms., Inc.*, 259 F. Supp. 2d 250, 260 (S.D.N.Y. 2003).

1    or to satisfy plaintiffs' Rule 11 obligations.  As summarized by the court, RBC

2    argued:

> These bankruptcy examinations were not conducted to determine if
> there was securities fraud involving Enron and thus they lack the
> requisite particularity to state securities law violations.  Moreover,
> charge RBC Defendants, the complaint is not based on Plaintiff's
> independent, personal investigation of the facts that form the basis of
> the suit, but "piggybacks on contested hearsay allegations by a third
> party," circumventing Rule 11.

10   *Enron*, 2005 U.S. Dist. LEXIS 41240, at *22, n.11.  However, the *Enron* court

11   rejected these arguments.  *Id.*  Specifically, the *Enron* court:  (i) detailed the

12   examiner's duties under the Bankruptcy Code (*id.* at *35-40); (ii) noted the

13   bankruptcy examiner's report was "a central part of the Complaint" (*id.* at *35);

14   (iii) concluded the bankruptcy report was documentary evidence satisfying the

15   PSLRA's particularity requirements (*id.* at *23 n.11); and (iv) denied the motion to

16   dismiss (*id.* at *74).[87]

17

18   [87]  KPMG's motion to strike attempts to distinguish *Enron* on the basis that the
19   *Enron* plaintiffs attached the examiner's report to the complaint.  Docket No. 283,
20   at 5 n.4.  The opinion, however, does not turn on that basis.  Moreover,
     Defendants, including KPMG, have requested judicial notice of the entire Report
21   or portions thereof, and have provided the Court with copies.  KPMG also tries to
     distinguish *Enron* by arguing that the *Enron* examiner's conclusions were
22   "consistent" with the inferences "the plaintiffs asked the court to draw from the
23   examiner's report" and here, "the inferences of fraud that plaintiffs ask this Court
     to draw are directly contrary to the conclusions of the examiner's report. . . ."  *Id.*
24   at 5, n.4.  This argument is without basis, as set forth in section III(C)(3) above.
     Nonetheless, the *Enron* court specifically rejected this same argument.  *Enron*,
25   2005 U.S. Dist. LEXIS 41240, at *24 n.12.
26
     In any event, Plaintiffs in this case were careful to cite only those facts that
27   were both well supported in the Examiner's Report and highly relevant to
     Plaintiffs' allegations, as well as consistent with facts revealed in Plaintiffs' own
28   investigation.  It is those facts that support a strong inference of KPMG's scienter

1

### 2.    A Properly Pleaded Complaint
### May Be Based On Hearsay Evidence

2

3      KPMG's contention that the Examiner's Report is an "inadmissible hearsay

4   document" and therefore "immaterial as a matter of law" is without basis.  Motion

5   to Strike at 6.   The PSLRA requires only that, "if an allegation regarding the

6   statement or omission is made on information and belief, the complaint shall state

7   with particularity all facts on which that belief is formed."   15 U.S.C. § 78u-

8   4(b)(1).   At the pleading stage, "plaintiffs are only required to plead facts, not to

9   produce admissible evidence."   *McKesson*, 126 F. Supp. 2d at 1272 (specifically

10  rejecting hearsay argument).[88]

11  _____

12  as set forth herein, and not the absence of other potential findings that the
   Examiner did not make because he was not asked to consider Plaintiffs' federal
13  securities fraud claims in his report.   KPMG's argument that Plaintiffs cited the
   Examiner's facts "selectively," "misleadingly" or "out of context" is without basis
14  and further contradicted by Defendants' arguments that the Complaint is too long.
15  It is precisely for this reason that Plaintiffs were careful to cite the Examiner's
   factual statements in the context in which they were made.   *See, e.g.,* ¶¶ 221-34.
16  By contrast, KPMG cites to an interview statement made by KPMG SFG partner
   Carnahan (Motion to Strike at 10) even though the Examiner specifically notes that
17  Carnahan's statement appears "inconsistent with the language and tone of the
18  memoranda he signed during 2005 and 2006."  Examiner's Report at 286.

19

20  [88]  Further, KPMG's contention that the Examiner's Report is an unreliable source
   is inconsistent with the other Defendants' acknowledgment of the authenticity and
21  verifiability of the Report.   For instance, Defendants Morrice, Gotschall, and
   Dodge's Request for Judicial Notice (Docket No. 280) admits that the Report is
22  authentic, quoting the law of the Ninth Circuit which allows for the consideration
   of "'documents that were referenced extensively in the complaint and *were*
23  *accepted by all parties as authentic*.'"   *Id.* at 2 (quoting *Van Buskirk v. Cable News*
24  *Network, Inc.*, 284 F.3d 977, 930 (9th Cir. 2002)) (emphasis added).   Defendants
   add that "[j]udicial notice of the Examiner's Report is also proper because the
25  document is a court filing and thus readily verifiable under Rule 201."  Officers'
26  Request for Judicial Notice, at 3 (citing *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*,
   442 F.3d 741, 746 n.65 (9th Cir. 2006) (noting the Court "may take judicial notice
27  of court filings and other matters of public record" because such documents "are
28  readily verifiable and, therefore, the proper subject of judicial notice")).

### 3.    **Plaintiffs' Complaint Complies With Rule 11**

Federal Rule of Civil Procedure 11(b) requires "an inquiry reasonable under the circumstances . . . [and that] the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed. R. Civ. P. 11(b). When a "complaint is the primary focus of Rule 11 proceedings, a district court must conduct a two-prong inquiry to determine (1) whether the complaint is legally or factually baseless from an objective perspective, and (2) if the attorney has conducted a reasonable and competent inquiry before signing and filing it." *Holgate v. Baldwin*, 425 F.3d 671, 676 (9th Cir. 2005) (citations omitted). "As shorthand for this test, we use the word 'frivolous' to denote a filing that is *both* baseless *and* made without a reasonable and competent inquiry." *Id.* at 676 (emphasis in original).

In assessing the reasonableness of a plaintiff's investigation under Rule 11(b), it is appropriate to consider that "the nature of a securities fraud action is such that the information necessary to support the allegations of fraud must come primarily, if not exclusively, from discovery. . . ." *Krim v. Banctexas Group*, 99 F.3d 775, 779 (5th Cir. 1996) (overturning district court's imposition of Rule 11 sanctions). Accordingly, "a party should be given some leeway in making allegations about such matters, as long as the lawyer's investigation is otherwise reasonable." *Id.* For instance, a securities fraud plaintiff may satisfy his obligation to conduct a reasonable inquiry under Rule 11 and the PSLRA by relying upon an investigation performed by another, such as an expose published in a major newspaper. *See, e.g., In re DaimlerChrysler AG Sec. Litig.*, 197 F. Supp. 2d 42, 80 (D. Del. 2002) (noting "the Court has been unable to locate any cases forbidding pleadings based on newspaper and media accounts" and holding "the Court concludes that Class Plaintiffs' allegations derived from reputable media sources and clearly identified as such in the Amended Class Complaint are sufficient to

1   meet the requirement of the PSLRA") (following *McKesson*); *Morse v. Abbott*
2   *Labs.*, No. 90C1982, 1991 WL 83148, at *1 (N.D. Ill. May 7, 1991) ("the court
3   agrees that reliance on reliable news sources can constitute a reasonable
4   investigation, especially in a case like this one which alleges that material
5   information was not made available to the public"); *Kamerman v. Steinberg*, 113
6   F.R.D. 511, 515 (S.D.N.Y. 1986) (same); *In re Ramada Inns Sec. Litig.*, 550 F.
7   Supp. 1127, 1135 (D. Del. 1982) (same).   The Examiner, appointed as a
8   "disinterested" officer of the Bankruptcy Court and who detailed his sources and
9   findings in a thorough 551-page report, is certainly more reliable than a newspaper.

10   Defendant KPMG contends that Plaintiffs did not personally investigate
11   their claims in violation of Rule 11 because Plaintiffs relied on the Examiner's
12   Report for certain allegations and that "[a]n attorney's FRCP 11 responsibility to
13   conduct an independent investigation is 'non-delegable'; the attorney must
14   'personally. . . validate the truth and legal reasonableness of the papers filed.'"
15   Motion to Strike at 4 (quoting *Pavelic & LeFlore v. Marvel Entm't Group*, 493
16   U.S. 120, 126 (1989)).   While it is true that an attorney has a non-delegable
17   responsibility to investigate, it is also true that an attorney's investigation can
18   include the sources described above, including contemporaneous and reliable facts
19   in a bankruptcy examiner's report.[89]

20   Applying the foregoing standards, the Complaint complies with Rule 11.  As
21   explained above, the indicia of reliability of the Examiner's Report, not to mention

---

23   [89]  The cases cited by KPMG are inapposite.  In *In re Connetics Corp. Sec. Litig.*,
24   542 F. Supp. 2d 996, 1005 (N.D. Cal. 2008), in striking allegations taken from an
SEC complaint, the court stated its belief the allegations were not verified by any
25   independent investigation.  Here, Plaintiffs have conducted an independent and
26   diligent investigation and cited passages from the Examiner's Report which are
consistent with Plaintiffs' investigation.  Similarly, in *Geinko v. Padda*, No.
27   00C5070, 2002 WL 276236, at *6 (N.D. Ill. Feb. 26, 2002), the court directed
28   plaintiffs to amend their complaint because plaintiffs merely recited allegations
from SEC and other complaints and did not conduct an independent investigation.

the case law allowing allegations based on examiner reports and other reliable sources, should be more than sufficient to satisfy the Court that Plaintiffs' claims are not based on mere speculation, innuendo, or the unsupported "hearsay" of another attorney. Moreover, Plaintiffs have conducted a thorough and independent investigation to establish that the facts set forth in the Examiner's Report are true and correct and premised upon a strong foundation.[90]

The Court should also deny KPMG's Rule 11 motion to strike Plaintiffs' allegations because KPMG cannot satisfy the requirements for such a motion under Ninth Circuit law. In particular, KPMG cannot establish that Plaintiffs' claims are "factually baseless from an objective perspective . . . ." *Holgate*, 425 F.3d at 676. Under the order of the Bankruptcy Court, the Examiner had a duty to conduct a thorough and detailed investigation to discover what assets may exist for the New Century estate. *See* 11 U.S.C. § 1106. The Examiner's 551-page report, based on 110 interviews, his review of over one million pages of documents, and the assistance of forensic accountants and financial advisors, was a thorough and factually based investigation. The Examiner's Report is also consistent with, and corroborated by, numerous former employees of the Company that Lead Counsel interviewed as part of its investigation and quoted in the Complaint. These factors further support the conclusion that the facts set forth in the Examiner's Report have

---

[90] Plaintiffs have conducted an extensive independent investigation that is more than sufficient to satisfy their obligation to conduct a reasonable inquiry under the circumstances. Plaintiffs' investigation included, *inter alia*, interviews with 34 former New Century employees; a detailed review of public filings, other public statements by the Company, and analyst reports; and consultation with experts in mortgage and accounting practices. Indeed, Plaintiffs had an independent basis to sue KPMG even before the Examiner's Report was issued, and the Examiner's Report is but one of many sources cited by Plaintiffs. Plaintiffs' counsel also met with the Examiner and his staff before his final report was issued and observed, first-hand, the thoroughness of his investigation.

1  a sufficient basis.  *See, e.g., Bourjaily v. United States*, 483 U.S. 171, 179-80

2  (1987) (corroborating sources strengthen reliability of evidence).[91]

3  **IV.   CONCLUSION**

4       For the foregoing reasons, all Defendants' motions to dismiss the Complaint

5  and KPMG's motion to strike should be denied in their entirety.[92]

6  Dated:  July 7, 2008              Respectfully submitted,

7                                    BERNSTEIN LITOWITZ BERGER
                                       & GROSSMANN LLP

8

9                                        /s/ *Blair A. Nicholas*

10                                    BLAIR A. NICHOLAS

11                                    BLAIR A. NICHOLAS
                                      TAKEO A. KELLAR
12                                    12481 High Bluff Drive, Suite 300
                                      San Diego, CA 92130
13                                    Tel:   (858) 793-0070
                                      Fax:   (858) 793-0323

14

---

15  [91]  Indeed, to Plaintiffs' knowledge, KPMG has not made any objections to the
16  Examiner's Report in the Bankruptcy Court.

17  [92]  Alternatively, if the Court disagrees for any reason with Plaintiffs' arguments in
18  opposition to Defendants' motions to dismiss the Complaint, Plaintiffs respectfully
    seek leave to amend.  While the Court granted Plaintiffs leave to amend their
19  original complaint in the January 31, 2008 Order and Plaintiffs diligently used that
20  opportunity to strengthen their Complaint, Plaintiffs and Defendants have
    expressed very different views of what the Court was seeking in that Order.  In
21  addition, Plaintiffs' counsel has not had the benefit of any oral argument on
22  Defendants' prior motions to dismiss.  Thus, leave to amend would provide
    Plaintiffs with a meaningful opportunity to correct any pleading errors identified
23  by the Court.  By seeking such leave in the alternative, Plaintiffs do not concede
24  that the Complaint should be dismissed for any reason.  Rather, Plaintiffs maintain
    that this is a very strong case brought on behalf of investors who lost all or nearly
25  all of their investments in New Century because of Defendants' repeated material
26  misstatements, and Plaintiffs do not believe that Defendants should be entitled to
    dismissal with prejudice based on claimed pleading errors in such circumstances.
27  *See Eminence Capital*, 316 F.3d at 1052 (drafting a PSLRA complaint can be "a
28  matter of trial and error," and freely granting leave to amend is "especially
    important in the context of the PSLRA").

---

SALVATORE J. GRAZIANO
HANNAH GREENWALD
1285 Avenue of the Americas
New York, NY 10019
Tel:    (212) 554-1400
Fax:    (212) 554-1444

Lead Counsel for Lead Plaintiff The New York State Teachers' Retirement System and the Class


MARVIN L. FRANK
Murray, Frank & Sailer LLP
275 Madison Avenue, Suite 801
New York, NY 10016
Tel:    (212) 682-1818
Fax:    (212) 682-1892

Counsel for Plaintiff Carl Larson

JEFFREY ZWERLING
Zwerling, Schachter & Zwerling, LLP
41 Madison Avenue
New York, NY 10010
Tel:    (212) 223-3900
Fax:    (212) 371-5969

Counsel for Plaintiff Charles Hooten