1

2

3

4

5

6

7

8        UNITED STATES DISTRICT COURT        

9        CENTRAL DISTRICT OF CALIFORNIA

10

|                              |                                                                                 |
|------------------------------|---------------------------------------------------------------------------------|
|                              | Case No. CV 07-00931 DDP (JTLx)                                                  |
| IN RE NEW CENTURY            | **ORDER DENYING DEFENDANTS' MOTIONS TO DISMISS AND DENYING MOTION TO STRIKE**    |
|                              | [Motions to Dismiss and Motion to Strike filed on June 2, 2008]                 |

18        This is a securities class action that arises in the wake of

19   the sub-prime mortgage lending crisis and the collapse of one of

20   the industry's formerly largest sub-prime mortgage lenders, New

21   Century Financial Corporation ("New Century").  Lead Plaintiff New

22   York State Teachers Retirement System ("NYSTRS") brings this action

23   on behalf of all persons and entities, other than Defendants, who

24   purchased or acquired New Century common stock, New Century Series

25   A Cumulative Redeemable Preferred Stock ("Series A Stock"), New

26   Century Series B Cumulative Redeemable Preferred Stock ("Series B

27   Stock"), and/or New Century call options, or who sold New Century

28   put options, between May 5, 2005 and March 13, 2007 (the "Class

Period"). (Compl. ¶ 1.) Defendants are New Century officers ("Officer Defendants"), its directors ("Director Defendants"), its auditor KPMG ("KPMG"), and the underwriters of the stock offering ("Underwriter Defendants").

Sub-prime lending involves originating and purchasing loans for borrowers considered high-risk by traditional credit and underwriting standards. (Compl. ¶ 2.) The recent sub-prime mortgage lending crisis has caused many mortgage lending companies – and the value of their stocks – to collapse. New Century became one of the nation's largest mortgage finance companies by focusing on sub-prime lending. (Compl. ¶ 2.) In 1996, when New Century was formed, it had $357 million in total loan originations and purchases. For the year-ended December 31, 2005, New Century reported $56.1 billion in total loan originations and purchases. (Compl. ¶¶ 55-60.) Sub-prime loans accounted for $32.8 billion, or 62.2% of total loans financed or sold. (Compl. ¶ 65.)

In June 2005 and August 2006, New Century made offerings of the Series A stock and Series B stock respectively. On February 7, 2007, a day before 2006 fourth-quarter and year-end results were scheduled to be released, New Century issued a press release that disclosed a restatement of earnings for the previous three quarters of 2006. New Century stated that material weaknesses in internal controls over financial reporting caused the reporting errors. (Compl. ¶ 457.) Upon this announcement, New Century stock plummeted by 36% the following day. (Id. at ¶ 459) In the period subsequent to these and additional disclosures, (Id. at ¶¶ 464, 468-476), New Century stock further declined. On March 14, 2007, New Century stock closed at $ 0.67 per share, a 97% decline from

1  the over $30 per share prior to the disclosures.  (<u>Id.</u> at ¶ 9)  The

2  Series A and Series B stock likewise fell by 75% during this

3  period.  (<u>Id.</u> at ¶¶ 9, 478.)

4        Plaintiffs filed this lawsuit alleging securities violations

5  in connection with New Century's Series A and Series B stock.

6  Plaintiffs maintain that these declines were foreseeable, and that

7  Defendants made numerous material misstatements regarding New

8  Century's financial situation and business operations.  In summary,

9  Plaintiffs allege that Defendants, during the Class Period,

10 misrepresented New Century's ability to repurchase defaulted loans;

11 overvalued its residual interests in securitizations; falsely

12 certified the adequacy of its internal controls, loan origination

13 standards, and the quality of its loans; and failed to identify

14 these problems in public statements, registration documents,

15 audits, or elsewhere.  They claim that Defendants' material

16 misrepresentations and omissions violated Section 11 of the

17 Securities Act of 1933, 15 U.S.C. § 77k.  They further claim that

18 the New Century Officer Defendants and KPMG violated sections 10(b)

19 and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §

20 78u-4(b), and Rule 10b-5 of the regulations promulgated by the

21 Securities and Exchange Commission ("SEC").

22       On April 30, 2008, Plaintiffs filed their second amended

23 consolidated class action complaint.[1]  There are currently five

24 _____

25      [1] Lead Plaintiff New York State Teachers' Retirement System
   originally filed its consolidated class action complaint on
26 September 14, 2007.  Defendants filed several motions to dismiss
   all or some of the claims alleged in Plaintiffs' complaint, and the
27 Court granted the motions with leave for Plaintiffs to file an
   amended consolidated class action complaint.  (Order Granting
28 Motions to Dismiss With Leave to Amend, January 31, 2008.)  The
                                            (continued...)

1   motions to dismiss and one motion to strike before the Court.  The

2   Officer Defendants move to dismiss the securities fraud claims

3   under section 10(b) and Rule 10b-5, as well as the derivative

4   control person liability claims.  Officer Defendant Robert Cole

5   files his own motion to dismiss the same claims.  The Director

6   Defendants and Underwriter Defendants move to dismiss claims

7   alleging violations of section 11 of the Securities Act of 1933, 15

8   U.S.C. 77k, in connection with the Series A and Series B stock.

9   Those motions are joined by the Officer Defendants against whom

10  Plaintiffs also allege violations of section 11 of the Securities

11  Act.  Defendant KPMG moves to dismiss the claim against it alleging

12  violations of section 11 of the Securities Act in connection with

13  Series B stock, and the securities fraud claim against it under

14  section 10(b) and Rule 10b-5. Defendant KPMG also moves to strike

15  all references in the Complaint to the Bankruptcy Report.

16       After reviewing the extensive briefing, hearing oral argument,

17  and considering the arguments raised by all parties, the Court

18  denies Defendants' motions to dismiss and denies Defendant KPMG's

19  motion to strike.

20  **I.    BACKGROUND**

21       The Court's review on a motion to dismiss is generally limited

22  to the allegations in the Complaint, taken as true and construed in

23  the light most favorable to the non-moving party.  <u>Resnick v.</u>

24

25

26        [1](...continued)

27  Court's dismissal focused entirely on the organization of the
    complaint, and its difficulty in evaluating the basis for

28  Plaintiffs' claims of securities law violations.  The Court again
    addresses the organization of the complaint below.

1   <u>Hayes</u>, 213 F.3d 443, 447 (9th Cir. 2000).  The following background

2   is derived from Plaintiffs' second amended complaint ("Complaint").

3        A.   <u>The Parties</u>

4             1.   <u>Plaintiffs</u>

5        Lead Plaintiff New York State Teachers Retirement System

6   ("NYSTRS") has over 400,000 active members, retirees, and

7   beneficiaries.[2]  NYSTRS provides retirement, disability, and death

8   benefits to eligible public school teachers in New York State.

9   NYSTRS purchased New Century common stock during the Class Period

10  and claims to have suffered damages due to the alleged wrongful

11  conduct.  (Compl. ¶ 19.)  Plaintiff Carl Larson acquired New

12  Century Series A and B Preferred Stock during the Class Period and

13  claims to have suffered damages due to the alleged wrongful

14  conduct.  (<u>Id.</u> at ¶ 20.)  Plaintiff Charles Hooten sold New Century

15  put options during the Class Period and claims to have suffered

16  damages due to the alleged wrongful conduct.  (<u>Id.</u> at ¶¶ 21.)

17            2.   <u>Defendants</u>

18       On April 2, 2007, New Century filed for Chapter 11 bankruptcy

19  protection.  For this reason, the action against New Century has

20  been stayed.  (Compl. ¶ 22.)  Plaintiffs assert claims against

21  several other Defendants in this action.  To be consistent, the

22  Court follows the categorization from the Complaint: New Century

23  Officer Defendants, New Century Director Defendants, KPMG, and New

24  Century Underwriters.

25

26

27  _____

28       [2]On June 26, 2007, the Court appointed NYSTRS as Lead
    Plaintiff in this case.

1    The Officer Defendants were corporate officers of New Century

2  during the Class Period.[3]  (Compl. ¶¶ 23-26.)  The officers' duties

3  included disseminating prompt, accurate information about the

4  Company's business, operations, financial statements and internal

5  controls, and correcting any previously issued statements that had

6  become materially untrue.  They were involved in drafting,

7  producing, reviewing, and/or disseminating the alleged material

8  misstatements at issue in this case.  (Id. at ¶¶ 27-29.)

9    The Director Defendants served as directors of New Century

10  during the Class Period.[4]  (Compl. ¶¶ 30-38.)  Each of the Director

11  Defendants either signed the registration statements for Series A

12  and Series B stock, or were directors when the stock was offered to

13  the public.  (Id.)

14    Defendant KPMG served as New Century's outside auditor during

15  the Class Period.  (Compl. ¶ 39.)  The Underwriter Defendants are

16  the investment banks that acted as underwriters to the public

17  offerings of New Century stock in June 2005.[5]  (Id. at ¶¶ 40-47.)

18

19

20  _____

21    [3]Robert K. Cole was Chairman of the Board of Directors
    ("Board"), Chief Executive Officer, and a Director of the Company.
22  Brad A. Morrice was Vice Chairman of the Board and Company
    President.  Edward F. Gothschall was Vice Chairman of Finance and a
    Director of the Company.  Pattie M. Dodge was Executive Vice
23  President, Chief Financial Officer and Investor Relations.

24    [4]The Directors were Federic J. Forster, Michael M. Sachs,
    Harold A. Black, Donald E. Lange, Terrence P. Sandvik, Richard A.
25  Zona, Marilyn A. Alexander, William J. Popejoy, and David Einhorn.

26    [5]The Underwriter Defendants, all investment banks that acted
27  as underwriters for various public offerings, are Bear, Stearns &
    Co. Inc; Piper Jaffray & Co.; Stifel, Nicolaus & Compan,
    Incorporated; JMP Securities LLC; Roth Capital Partners, LLC;
28  Morgan Stanley & Co., Inc.; and Jefferies & Co., Inc.

B.   <u>New Century's Mortgage Lending, Whole Loan Sales, and</u>
<u>Securitizations</u>

New Century primarily originated sub-prime mortgage loans. Sub-prime lending refers to providing loans with typically high interest rates to high-risk borrowers, who may have poor credit histories, the lack of income documentation, or debt.  The sub-prime mortgage lending industry collapsed, in part, because high-risk adjustable-rate interest-only loans, and "stated income" loans resulted in increased default rates among borrowers.  (Compl. ¶ 4.)

New Century's business was not limited to originating loans. New Century, like many sub-prime lenders, sought to sell its loans in a secondary market and recognize a "gain on sale" of those loans.  New Century either made (1) whole loan sales; (2) securitizations structured as sales; or (3) securitizations structured as "financings."  (Compl. ¶ 61.)  In whole loan sales, New Century realized gains upon sale of a pool of loans to third-parties.  In securitizations structured as sales, New Century realized gains by selling a pool of loans to a trust, and receiving cash flows from its residual interests in the securitized pool of loans.  In securitizations structured as financings, New Century did not record a gain on sale when it sold a pool of loans, but rather, received interest income as payments on the mortgages were made.  (Compl. ¶¶ 61-64.)

C.   <u>New Century's Series A and Series B Preferred Stock</u>
<u>Offerings</u>

In June 2005, New Century sold its Series A preferred stock, for net proceeds of approximately $109 million.  The Underwriter Defendants, excluding Morgan Stanley and Jefferies & Co., provided

1  underwriting for the offering.  The Series A stock was sold

2  pursuant to a Form S-3 registration statement and prospectus.

3  These documents are collectively referred to as "Series A

4  Registration Statement."[6]  (Compl. ¶¶ 236-238.)  The Series A

5  Registration Statement incorporated by reference the following

6  documents: New Century's quarterly report (Form 10-Q) for the

7  quarter ended March 31, 2005 and current report (Form 8-K) filed on

8  or around May 5, 2005.  (Id. at ¶ 238.)  The Form 8-K had a May 5,

9  2005 press release attached as an exhibit.

10      In August 2006, New Century sold its Series B preferred stock,

11  for net proceeds of approximately $55.6 million.  The Underwriter

12  Defendants, excluding Deutsche Bank, Piper Jaffray, JMP Securities,

13  and Roth Capital, provided underwriting for the offering.  The

14  Series B stock was also sold pursuant to a Form S-3 registration

15  statement and general prospectus.  These documents are collectively

16  referred to as "Series B Registration Statement."[7]  (Compl. ¶¶ 256-

17  258.)  The Series B Registration Statement incorporated by

18  reference the following documents: New Century's annual report

19  (Form 10-K) for the year-ended December 31, 2005, quarterly reports

20  (Forms 10-Q) for the quarters ending March 31, 2006 and June 30,

21  2006.  (Id. at ¶ 258.)

22      D.   New Century's Disclosures

23      On February, 7, 2007, New Century disclosed that during

24

25

─────────────────────

26      [6]In the Complaint, the documents are referred to as "Series A
    Preferred Stock Registration Statement." (177)

27

28      [7]In the Complaint, the documents are referred to as "Series B
    Preferred Stock Registration Statement." (185)

1   the first three quarters of 2006, it did not properly discount the

2   allowance for loan repurchase losses "by the amount the repurchase

3   prices exceed the fair values" and "did not properly consider . . .

4   the growing volume of repurchase claims that resulted from the

5   increased pace of repurchase requests that occurred in 2006 . . .

6   ." (Compl. ¶ 457.) It explained that "earnings-related press

7   releases for those periods should no longer be relied upon" and to

8   expect "a net loss for that period." (Id.) It further noted that

9   "errors leading to these restatements constitute material

10  weaknesses in its internal control over financial reporting for the

11  year ended December 31, 2006." New Century additionally explained

12  that adjustments were expected for its residual interests held as

13  securities. (Id.)

14      On March 1, 2007, New Century disclosed that it would be

15  unable to file a timely 2006 year-end financial report (Form 10-K).

16  On March 2, 2007, New Century filed a notification of late filing

17  with the SEC, in which it stated that its Audit Committee had

18  initiated an independent investigation of the issues related to the

19  need for financial restatements; that it expected to conclude that

20  there were material weaknesses in internal control over financial

21  reporting; that modifications to the ALL would result in lower,

22  restated net income for the first three quarters of 2006; that

23  there were declines in earnings and profitability for 2006; and

24  provided additional disclosures, including that the SEC requested a

25  meeting with the company and the U.S. Attorney's Office had

26  initiated a criminal investigation. (Compl. ¶ 464.)

27      On March 12, 2007, New Century disclosed that certain lenders

28  discontinued financing for the company, that this would allow

1   lenders to accelerate the company's obligations to repurchase

2   loans, and that this could total $8.4 billion in repayment

3   obligations.  New Century further disclosed that it lacked the

4   liquidity to keep pace with the repurchase requests.  (<u>Id.</u> at ¶

5   472.)  After close of trading on March 13, 2007, the New York Stock

6   Exchange delisted New Century stock.  (<u>Id.</u> at ¶ 476.)

7       On May 24, 2007, New Century filed a Form 8-K providing that,

8   in addition to its restatements with respect to 2006, the Audit

9   Committee had found "errors in the Company's previously filed

10  annual financial statements [for 2005] . . . with respect to both

11  the accounting and reporting of loan repurchase losses," and found

12  it "more likely than not that these errors . . . resulted in a

13  material overstatement of pretax earnings . . . [such that] the

14  [annual financial statements for 2005] should no longer be relied

15  upon."  (Compl. ¶ 482.)  The Form 8-K further explained that New

16  Century had overstated its residual interests.  (<u>Id.</u> at ¶ 96)

17      On April 2, 2007, New Century filed for Chapter 11 bankruptcy

18  protection.  (<u>Id.</u> at ¶ 480.)  On February 29, 2008 the Bankruptcy

19  Examiner's Report was filed, and was publicly released on March 26,

20  2008.

21      E.   <u>Plaintiffs' Allegations of Material Misstatements and</u>

22           <u>Scienter</u>

23      The Complaint alleges that Defendants were responsible for

24  false and misleading statements regarding New Century's financial

25  condition, internal controls, underwriting standards and loan

26  quality, and in audits of the company, and improper underwriting

27  and auditing standards.  The Complaint further alleges that the

28  Officer Defendants and KPMG's alleged misrepresentations were

10

1  fraudulently made.  The Complaint asserts that these misstatements

2  caused damages to New Century shareholders.

3        1.   New Century's Financial Statements and GAAP

4             Compliance

5        Plaintiffs' Complaint alleges that New Century's financial

6  statements in 2005 and 2006, during the Class Period, contained a

7  number of false and misleading statements in violation of generally

8  accepted accounting principles ("GAAP").  (Compl. ¶ 66.)

9        First, the Complaint alleges that New Century materially

10 understated its reserve fund for repurchase of loans in default.

11 (Id. at ¶¶ 69-100.)  The GAAP required New Century to maintain an

12 allowance for repurchase losses ("reserve"), which provides a

13 reserve to repurchase loans purchased by third-parties in the event

14 of payment defaults by borrowers.  (Id. at ¶¶ 70, 457.)  Upon

15 repurchase of the loans, New Century was required to list those

16 loans on its balance sheet as "Mortgage Loans Held for Sale", and

17 to reduce the repurchase reserve by the amount that the repurchase

18 prices exceeded fair value.  (Id. at ¶ 70.)

19       In its 2005 Form 10-K, New Century represented that the

20 reserve was "adequate" based on a risk evaluation.  (Id. at ¶ 71.)

21 In its disclosures on February 7, 2007, New Century provided that

22 its financial statements for the first three quarters of 2006 were

23 inaccurate because the reserve was understated, due to improper

24 accounting and weak internal controls over financial reporting.

25 (Id. at ¶ 72.)  In disclosures on May 24, 2007, New Century further

26 provided that the 2005 financial statements needed restatement due

27 to "errors" in "both the accounting and reporting of loan

28 repurchase losses."  (Id. at ¶ 73.)  Based on these disclosures,

information provided by several former employees, and additional documents, the Complaint alleges that the reserve was inadequate to keep up with mounting repurchase claims, the reserve was materially understated by tens of millions of dollars during the Class Period, and in effect, this overstated New Century's income. (<u>Id.</u> at ¶ 74, 91, 95, 100.)

Second, the Complaint alleges that New Century materially misstated the value of residual interests in securitizations structured as sales. (<u>Id.</u> at ¶ 101.) New Century reflected the present value of residual interests in a securitized pool of loans on its balance sheet. Its quarterly valuation involved an estimation of the effect of delinquencies and defaults on the expected cash flows from these residual interests. (<u>Id.</u> at ¶¶ 102-103.) The February 7, 2007 and May 24, 2007 disclosures referred to "errors" in the valuation of residual interests. (<u>Id.</u> at ¶¶ 105.) The Complaint alleges that the value of New Century's residual interests were inflated as a result of a failure to account for decreasing loan quality and underwriting standards, and for increased rates of delinquencies and defaults during 2005 and 2006. (<u>Id.</u> at ¶¶ 104-105.)

Third, the Complaint alleges that New Century misrepresented its Allowance for Loan Losses ("ALL"), which was a reserve of funds to cover losses on "Mortgage Loans Held for Investment." (Compl. ¶ 109-118.) New Century evaluated the ALL based upon "the performance of loans, credit characteristics of the portfolio, the value of the underlying collateral and the general economic environment. (<u>Id.</u> at ¶ 110.) Yet the ALL was actually decreasing as a percentage of "Mortgage Loans Held for Investment" that were

60 or more days delinquent, and was being reduced as the rate of
delinquent loans was rising. (<u>Id.</u> at ¶¶ 111-112.) The Complaint
alleges that New Century's ALL failed to meet GAAP and SEC
requirements during the Class Period. (<u>Id.</u> at ¶ 115.)

Finally, the Complaint alleges a number of additional GAAP
violations related to mortgage servicing rights, deferred
origination fees, hedging, and goodwill. These alleged violations
are based upon the Bankruptcy Examiner's report. (<u>Id.</u> at ¶ 119.)

              2.   <u>New Century's Underwriting and Loan Quality</u>

The Complaint alleges that Defendants made false and
misleading statements regarding New Century's underwriting
standards and loan quality. During the Class Period, the Officer
Defendants made public statements regarding the company's "strong,"
"excellent," "very high" credit quality, and that the credit
quality was "better" than in the past because the Company used
"strict," "improved," and "strong" underwriting guidelines.
(Compl. ¶ 120.) These public statements were contrary to data on
increasing defaults. (<u>Id.</u> at ¶¶ 120-121.) Also contrary to these
statements, and notwithstanding the increasing interest rates and
downturn in the real estate market, the underwriting standards were
loosened in order to increase the volume of loans. (<u>Id.</u> at ¶ 125.)
The Complaint recites data and confidential witness statements that
purport to show the rising rates of delinquent New Century loans,
the poor quality of loans issued by New Century, weak internal
controls, and lenient loan origination standards. (<u>Id.</u> at ¶¶ 126-
168.) The convergence of these factors created a "recipe for
disaster[.]" (<u>Id.</u> at ¶ 172.)

1    The Complaint alleges that New Century Officer Defendants
2    touted the company's internal controls, loan quality, and
3    underwriting standards throughout the Class Period. (Compl. ¶ 191.)
4    The Complaint points to specific statements by individual officers.
5    These statements are alleged to have been false and misleading
6    given evidence of inadequate lending practices including
7    significant deficiencies and material weaknesses in internal
8    controls, some which the company admitted and others which were
9    undisclosed.  (Id. at ¶¶ 193-194.)  The Complaint maintains that
10   these were material misrepresentations, and cannot be explained
11   away by market forces.  (Id. at ¶¶ 125-130.)

12   The Complaint further alleges, with respect to the Officer
13   Defendants, that each made knowing and reckless misstatements. Each
14   signed quarterly certifications that the company's internal
15   controls were adequate.  These certifications were made in spite of
16   overwhelming evidence that internal controls and loan quality were
17   inadequate.  (Id. at ¶¶ 486-487.)  Each also signed the SEC filings
18   attesting that its accounting practices complied with GAAP in
19   relation to the loan repurchase reserve and the reporting of
20   residual interests.  Similarly, the Complaint alleges violations of
21   the GAAP in maintenance of the reserve and valuation of residual
22   interests.  (Id. at ¶¶ 23-26, 489.)  Several statements, such as
23   describing the repurchase requests as "modest", are alleged to be
24   knowing and reckless misstatements in light of the known rise in
25   defaults and inadequacy of the reserve.  (Id. at ¶¶ 438, 452.)
26   Moreover, Defendant Dodge is alleged to have failed to disclose to
27   the Audit Committee a change in the methodology for calculating the
28   repurchase reserve, although she had the opportunity to do so.

1    (<u>Id.</u> at ¶ 497.)  The Officer Defendants received over $50 million

2    in dividend payments as New Century's loan origination increased.

3    The Complaint further alleges a motivation to enlarge loan volume

4    and reduce repurchase reserves to inflate earnings no matter the

5    risk to the company and its investors.  (<u>Id.</u> at ¶¶ 502-514.)

6              3.   <u>KPMG's Audit Opinions</u>

7         The Complaint alleges that KPMG issued audit opinions

8    regarding (i) New Century's 2005 year-end financial statements and

9    (ii) New Century's internal controls as of December 31, 2005, that

10   contained material misstatements in violation of the Public Company

11   Accounting Oversight Board ("PCAOB") standards.  (Compl. ¶ 206.)

12   Both of these opinions were incorporated into the Series B stock

13   offering.  (<u>Id.</u> at ¶ 207.)

14        The PCAOB has adopted the generally accepted auditing

15   standards ("GAAS").  (<u>Id.</u> at ¶ 205.)  The GAAS require an auditor

16   to exercise due professional care, to adequately plan its audit, to

17   sufficiently understand a business's internal structure, and to

18   obtain sufficient evidence to reach reasonable conclusions.  (<u>Id.</u>

19   at ¶ 210.)  KPMG allegedly failed to adhere to the GAAS by having

20   an inexperienced audit team, (<u>id.</u> ¶ 222-223); failed to challenge

21   New Century management for its low discount rates on residual

22   interests or its hedge accounting (<u>id.</u> at ¶ 224-226); failed to

23   test the repurchase reserve despite evidence of internal control

24   weaknesses and apparently inaccurate estimates of outstanding

25   repurchase requests (<u>id.</u> at ¶¶ 227-229); failed to properly

26   identify the flaws in valuation of residual interests (<u>id.</u> at ¶¶

27   231-32); and failed to raise deficiencies and inaccuracies in New

28

1  Century's accounting practices or internal controls. (<u>Id.</u> at ¶¶
2  233-234.)

3      The Complaint further alleges that KPMG's misstatements were
4  deliberately or recklessly false and misleading.  KPMG auditors
5  simply ignored evidence that New Century needed to improve its
6  accounting practices, including recommendations from other KPMG
7  experts.  (<u>Id.</u> at ¶¶ 516-519.)  KPMG made conscious decisions to
8  allow inexperienced staff, including first-year auditors in some
9  instances, to conduct analyses of accounting and internal controls.
10  (<u>Id.</u> at ¶¶ 520-522.)  In 2004, KPMG identified New Century's
11  failure to adopt appropriate procedures for calculation of the
12  repurchase reserve, but when that problem was again identified in
13  2005, KPMG still determined that the problem was not a significant
14  deficiency.  (<u>Id.</u> at ¶¶ 523-524.)  KPMG identified weaknesses in
15  valuation of residual interests, but accepted New Century's
16  valuations in spite of evidence that indicated those valuations
17  were predicated on doubtful assumptions.  (<u>Id.</u> at ¶¶ 525.)  The
18  Complaint sets KPMG's failure to challenge New Century's business
19  practices in its audits against the findings of significant
20  deficiencies in 2006 and since.  (<u>Id.</u> at ¶¶ 527-528.)

21      F.   <u>Plaintiff's Claims</u>

22      This action alleges the following claims: (1) violations of
23  Section 11 of the Securities Act in connection with the Series A
24  stock against the Officer Defendants, the Director Defendants, and
25  the Underwriter Defendants Bear Stearns, Deutsche Bank, Piper
26  Jaffray, Stifel Nicolaus, JMP Securities, and Roth Capital; (2)
27  violations of Section 15 of the Securities Act in connection with
28  the Series A stock against the Officer Defendants for control

1   person liability based upon Section 11 and Section 12(a) violations
2   by New Century; (3) violations of Section 11 of the Securities Act
3   in connection with the Series B stock against the Officer
4   Defendants, the Director Defendants,[8] and the Underwriter
5   Defendants Bear Stearns, Morgan Stanley, Stifel Nicolaus, and
6   Jeffries & Company; (4) violations of Section 15 of the Securities
7   Act in connection with the Series B stock against the Officer
8   Defendants for control person liability based upon Section 11 and
9   Section 12(a) violations by New Century; (5) violations of Section
10  10(b) of the Exchange Act against the Officer Defendants; (6)
11  violations of Section 20(a) of the Exchange Act against the Officer
12  Defendants; and (7) violations of Section 10(b) of the Exchange Act
13  against KPMG.  (Compl. ¶¶ 289-340, 551-571.)

14  **II.   DISCUSSION**

15          A.   <u>Legal Standard - Motions to Dismiss</u>

16          Federal Rule of Civil Procedure 8(a) provides that a complaint
17  need only contain "(1)a short and plain statement of . . .
18  jurisdiction, . . . (2) a short and plain statement of the claim
19  showing that the pleader is entitled to relief, and (3) a demand
20  for judgment for the relief the pleader seeks."  Federal Rule of
21  Civil Procedure 9(b) provides that the "circumstances constituting
22  fraud or mistake shall be stated with particularity" in a
23  complaint.  Under Federal Rule of Civil Procedure 12(b)(6), a
24  complaint must be dismissed when a plaintiff's allegations fail to
25  state a claim upon which relief can be granted.

26

27          [8]Count One with respect to Series A Stock is not raised
28  against director Einhorn.  Count Three with respect to Series B
    stock is not raised against directors Sandvik and Popejoy.

17

1    When considering a 12(b)(6) motion to dismiss for failure to

2  state a claim, "all allegations of material fact are accepted as

3  true and should be construed in the light most favorable to the

4  plaintiff." Resnick v. Hayes, 213 F.3d 443, 447 (9th Cir. 2000);

5  accord Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S. Ct.

6  2499, 2509 (2007).  A court properly dismisses a complaint on a

7  Rule 12(b)(6) motion based upon the "lack of a cognizable legal

8  theory" or "the absence of sufficient facts alleged under the

9  cognizable legal theory." Balistreri v. Pacifica Police Dept., 901

10 F.2d 696, 699 (9th Cir. 1990).[9]

11    B.   The Organization of the Second Amended Complaint

12    On January 31, 2008, the Court granted Defendants' motions to

13 dismiss with leave for Plaintiffs to amend their Complaint.  The

14 Court's Order focused almost entirely on its difficulty evaluating

15 whether Plaintiffs stated a claim in light of the organization and

16 length of the Complaint.  The Court granted leave to amend so that

17 Plaintiffs could reorganize and revise their allegations with an

18 eye toward clarity.

19

20 _____

21    [9]Recently, in Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955
   (2007), the Supreme Court emphasized that "a plaintiff's obligation
22 to provide the grounds of his entitlement to relief requires more
   than labels and conclusions, and a formulaic recitation of the
23 elements of a cause of action will not do." Id. at 1964-65
   (internal quotation marks and alterations omitted).  The Court made
24 clear, however, that its holding did "not require heightened fact
   pleading of specifics, but only enough facts to state a claim to
25 relief that is plausible on its face." Id. at 1974.  Twombly warns
   of the insufficiency complaints filled with "legal conclusion[s]
26 couched as [] factual allegation[s]." Id. at 1965 (internal
   quotation marks omitted).  Yet it does not fundamentally alter Rule
27 8's pleading requirements, which is designed to "give the defendant
   fair notice." Id. at 1964 (internal quotation marks omitted).

28

1    Defendants read this Court's prior Order to require dismissal
2    here.  Having once before dismissed Plaintiffs' Complaint for lack
3    of organization, Defendants sense that they may again prevail on
4    this basis.  Defendants go to great lengths to point out all of the
5    ways that Plaintiffs have failed to comply with the Court's prior
6    Order, have persisted in drafting disorganized, meandering
7    allegations, and have engaged in "puzzle-pleading."

8    The Court shares Defendants' frustration with the length of
9    the Second Amended Complaint.  It is truly massive.  As the Officer
10   Defendants pointed out at oral argument, the Consolidated Complaint
11   that was subject to the Court's January 31, 2008 Order ran roughly
12   100 pages.  The Second Amended Complaint weighs in at nearly 375
13   pages of allegations, with nearly 200 additional pages of charts.
14   Although the Court recognizes that a complicated case necessarily
15   requires a complicated complaint, the Court finds it difficult to
16   fathom that the Complaint could not have been significantly more
17   concise.  It appears to the Court that Plaintiffs' approach in the
18   Second Amended Complaint was to reproduce much of the Bankruptcy
19   Examiner's Report in the Complaint alongside Plaintiffs' other
20   allegations.[10]  The Court questions whether the Complaint provides
21   manageable roadmap for litigation.

22   Nevertheless, despite these remaining reservations, the Court
23   does not consider its prior Order to serve as a basis for dismissal
24   on the instant motions.  The Court finds Plaintiffs' Second Amended
25   Complaint to be responsive to the concerns with clarity it

26

27        [10]In addition to quoting the Report at length, the Complaint
28   also cites lengthy chunks of pages from it. (See, e.g., Compl.
     ¶ 174 (citing pages 109-76 of the Bankruptcy Examiner's Report).)

1   expressed in the January 31, 2008 Order.  The Complaint has been

2   extensively revised.  Plaintiffs have both eliminated certain

3   allegations and added additional information.  Plaintiffs have

4   provided charts that provide additional structure to allegations of

5   false and misleading statements.  And despite the lengthy quotation

6   from the Bankruptcy Examiner's Report, Plaintiffs' organization

7   shows that this quotation was deliberate and selective.  The Court

8   is now able to evaluate whether the allegations sufficiently state

9   a claim.  To the extent that the Complaint fails to identify false

10  and misleading statements, or lacks sufficient particularity when

11  required, the Court will rule accordingly.  Any continuing lack of

12  simplicity and conciseness in the allegations will likely hurt

13  rather than help Plaintiffs' position.

14      This Court, like many others, will not hesitate to dismiss

15  long, unwieldy pleadings.  See, e.g., In re Splash Technology

16  Holdings, Inc. Securities Litig., 160 F. Supp. 2d 1059, 1073 (N.D.

17  Cal. 2001).  Neither courts nor defendants should have to wade

18  through the morass of "puzzle pleadings" as this wastes judicial

19  resources and undermines the requisite notice for a defendant to

20  respond.  See id. at 1073-75.  Yet a long and detailed complaint is

21  not a work of "puzzle pleading" as a matter of law.  Furthermore,

22  in the securities class action context, the stringent pleading

23  requirements appear to invite both parties to throw everything and

24  the kitchen sink into their respective pleadings and motions to

25  dismiss.  The plaintiff creates an inevitably detailed complaint in

26  anticipation of defendants' rigorous 12(b)(6) motions, and the

27  plaintiff's expectations are confirmed when defendants in due

28  course file those motions.

 1    The plaintiff has the responsibility to craft a clear and

 2  concise complaint, but the allegations that discharge this

 3  responsibility will depend on the type of action, the specific

 4  facts, the number of parties, and other variables.  Here,

 5  Plaintiffs' Complaint provides adequate organization and

 6  sufficiently clear allegations such that this Court is able to rule

 7  on Defendants' motions, and Defendants have adequate notice of the

 8  allegations against them.  Is the pleading still long?  Yes.  Is it

 9  still extremely detailed and complex?  Yes.  Is this by itself a

10  reason to dismiss the complaint?  No.

11    Nevertheless, the Court notes that the complexity of pleadings

12  and motions to dismiss in securities cases appears to be endemic.

13  In the future, the Court may consider alternative mechanisms, in

14  addition to the regular noticed motion process, to resolve issues

15  in this case in a manner that streamlines arguments, avoids

16  overlap, and conserves judicial resources.  For now, the Court

17  proceeds to review Plaintiffs' Complaint and Defendants' motions.

18    C.   Defendants' Requests for Judicial Notice

19    In deciding motions to dismiss, a court may "generally

20  consider only allegations contained in the pleadings, exhibits

21  attached to the complaint, and matters properly subject to judicial

22  notice."  Swartz v. KPMG LLP, 476 F.3d 756, 763 (9th Cir. 2007).  A

23  court may take judicial notice of facts that are "not subject to

24  reasonable dispute."  Fed. R. Evid. 201(b).  A court also may

25  consider documents that are referred to in the complaint, that are

26  "central" to the plaintiff's claims, and whose authenticity is

27  undisputed.  See, e.g., Branch v. Tunnell, 14 F.3d 449, 454 (9th

28

1  Cir. 1994), <u>overruled on other grounds</u>, 307 F.3d 1119, 1127 (9th

2  Cir. 2002).

3      Here, Defendants have requested that the Court take judicial

4  notice of a number of documents, mostly SEC filings.  (<u>See</u> Officer

5  Defendants' Request for Judicial Notice ("RJN"); Officer

6  Defendants' Suppl. RJN; Underwriter Defendants RJN; Defendant

7  Robert Cole's RJN; Defendant KPMG's RJN.)  It is well-established

8  that courts may take judicial notice of SEC filings.  <u>See</u> <u>Dreiling</u>

9  <u>v. Am. Express Co.</u>, 458 F.3d 942, 946 n.2 (9th Cir. 2006).  The

10  Court takes judicial notice of the SEC documents submitted by

11  Defendants.  The Officer Defendants also request that the Court

12  take judicial notice of the Bankruptcy Examiner's Report.  The

13  Court finds that it may consider the Report either as a document

14  referred to in Plaintiffs' Complaint or as a document subject to

15  judicial notice.  The Underwriter Defendants request judicial

16  notice of excerpts from the Statement of Financial Accounting

17  Standards ("SFAS").  The Court also grants that request.

18      D.   <u>Defendant KPMG's Motion to Strike</u>

19      Under Federal Rule of Civil Procedure 12(f), a court

20  "may order stricken from any pleading . . . any redundant,

21  immaterial, impertinent, or scandalous matter."  Motions to strike

22  are not favored and "should not be granted unless it is clear that

23  the matter to be stricken could have no possible bearing on the

24  subject matter of the litigation."  <u>Colaprico v. Sun Microsystem,</u>

25  <u>Inc.</u>, 758 F. Supp. 1335, 1339 (N.D. Cal. 1991).  This is "because

26  of the limited importance of pleadings in federal practice and

27  because [a motion to strike] is usually used as a delaying tactic."

28

1  RDF Media Ltd. B. Fox Broad. Co., 372 F. Supp. 2d 556, 561 (C.D.

2  Cal. 2005).

3      Courts will not grant motions to strike unless "convinced that

4  there are no questions of fact, that any questions of law are clear

5  and not in dispute, and that under no set of circumstances could

6  the claim or defense succeed." Id.  When ruling on a motion to

7  strike, this Court "must view the pleading under attack in the

8  light most favorable to the pleader." Id.  For a motion to strike

9  to be granted, the grounds for the motion must appear either on the

10 face of the complaint or from matters of which the Court may take

11 judicial notice.  See SEC v. Sands, 902 F. Supp. 1149, 1165 (C.D.

12 Cal. 1995).

13     Here, Defendant KPMG moves to strike all references in the

14 Complaint to the Bankruptcy Examiner's Report.  KPMG argues that

15 Plaintiffs' reliance on the Examiner's Report violates their duty

16 under Federal Rule of Civil Procedure 11 to conduct "a 'reasonable

17 and competent inquiry' into the facts of the case before signing

18 and filing the complaint."  (KPMG's Mot. Strike 4 (citing Christian

19 v. Mattel, Inc., 286 F.3d 1118, 1127 (9th Cir. 2002))).  KPMG

20 points to several cases where a plaintiff's adoption of allegations

21 drawn from non-party's complaint or report have been stricken, at

22 least until such time as the plaintiff has conducted an independent

23 investigation of those allegations.  See, e.g., In re Connetics

24 Corp. Secs. Litig., 542 F. Supp. 2d 996, 1004-06 (N.D. Cal. 2008)

25 (striking allegations drawn from SEC complaint, but allowing

26 amendment if plaintiff conducted a reasonable investigation into

27 those allegations).

28

1    Plaintiffs counter that the relevant inquiry is not whether

2  attorneys personally verify allegations from such a report, but

3  rather, whether the source is reliable.  See Daou, 411 F.3d at 1015

4  (finding that "sources relied upon in a complaint should be

5  'described in the complaint with sufficient particularity to

6  support the probability that a person in the position occupied by

7  the source would possess the information alleged").  Plaintiffs

8  maintain that the Examiner's Report is a reliable source.  Contrary

9  to KPMG's cited authority, Plaintiffs point to case law where

10  allegations drawn from a bankruptcy examiner's report were allowed,

11  and were not stricken.  See In re Enron Corp. Secs. Litig.,

12  MDL-1446, CV No. H-01-3624, 2005 U.S. Dist. LEXIS 41240, at *23

13  (N.D. Tex. Dec. 22, 2005).

14    The Ninth Circuit in Daou determined that a plaintiff must

15  state with particularity the sources of information alleged, and

16  that satisfaction of this requirement allows a court to accept

17  allegations issuing from those sources, as long as there are

18  "adequate corroborating details."  Daou, 411 F.3d at 1015

19  (citations omitted).  The court noted that it adopted this standard

20  from the Second Circuit's decision in Novak v. Kasaks, 216 F.3d

21  300, 314 (2d Cir. 2000).  In the Enron litigation, the district

22  court also relied on Novak in allowing the plaintiff's allegations

23  drawn from the bankruptcy examiner's report.  The court explained

24  that the PSLRA does not require a plaintiff to plead facts from

25  personal knowledge, id. at *23 n. 11, and indicated that a

26  plaintiff may meet the PSLRA pleading requirements "by providing

27  documentary evidence and/or sufficient general description of the

28  personal sources of the plaintiffs' beliefs," id. (quoting Novak,

1  216 F.3d at 314).  The court found that the bankruptcy examiner's

2  report was documentary evidence, noted the examiner's statutory

3  obligation to perform a "disinterested" investigation, and thus

4  found that the plaintiff was permitted to rely on the report.  Id.

5  at *23 n.11, *35-40.

6      Here, Plaintiffs have recited a significant number of

7  statements from the Examiner's Report.  Plaintiffs do not indicate

8  that they have independently investigated the Examiner's statements

9  in the report.  Instead, Plaintiffs emphasize the reliability of

10  the report as a source of information regarding New Century and

11  Defendants' practices, and that the report only supplements the

12  investigation made in preparation of the Complaint.[11]  The Court

13  will allow the allegations drawn from the Examiner's Report because

14  the allegations are derived from documentary evidence that

15  qualifies as a reliable source for pleading purposes.  See Daou,

16  411 F.3d at 1015; In re Enron Corp. Secs. Litig., 2005 U.S. Dist.

17  LEXIS 41240, at *23 n.11.

18      Plaintiffs are thus entitled to rely on the report in framing

19  allegations to satisfy the PSLRA's pleading requirements.[12]

20  Although Plaintiffs did not attach the Examiner's Report as an

21  exhibit to their Complaint, the Court may consider the report

22  because it is referred to in the complaint, is "central" to the

23  plaintiff's claims, and its authenticity is undisputed.  See, e.g.,

24  _____

25      [11]The Complaint makes clear that Plaintiffs have investigated other allegations in the Complaint.

26      [12]KPMG's objection that the report is hearsay is a non-issue

27  at the pleading stage.  See In re McKesson HBOC, Inc. Sec. Litig., 126 F. Supp. 2d 1248, 1272 (N.D. Cal. 2000) (noting that

28  plaintiffs, at the pleading stage, "are only required to plead facts, not to produce admissible evidence").

Branch, 14 F.3d at 454.  The Court has already taken judicial notice of the report.  Moreover, as was noted by the Enron court, there is no requirement that consideration of the report be limited to those excerpts quoted by Plaintiffs in their complaint; rather, because the complaint refers to the report, "the Court can view any statement selectively quoted or referenced in the context from which it was drawn to protect against any misrepresentation or misinterpretation."  See In re Enron Corp. Secs. Litig., 2005 U.S. Dist. LEXIS 41240, at *40 n.20.

KPMG additionally moves to strike Exhibits D and E to the Complaint, which are the charts requested by the Court in its January 31, 2008 Order.  The Court declines to strike the charts. To the extent that Plaintiffs may misrepresent KPMG's responsibility for any statements, the Court will review the Complaint and the attached exhibits, and make any appropriate determinations.

E.   Plaintiffs' Claims Under Sections 10(b) and 20(a) of the Exchange Act Against the Officer Defendants

The Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4, requires securities fraud claims to satisfy the heightened pleading requirement "that a complaint plead with particularity both falsity and scienter."  In re Vantive Corp. Sec. Litig., 283 F.3d 1079, 1084 (9th Cir. 2002) (citing Ronconi v. Larkin, 253 F.3d 423, 429 (9th Cir. 2001)).  The PSLRA provides that

the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation . . . is made on information

26

1    and belief, the complaint shall state with particularity all

2    facts on which that belief is formed."

3  15 U.S.C. § 78u-4(b)(1).

4      A plaintiff must also "state with particularity . . . facts

5  giving rise to a strong inference that the defendant acted with the

6  required state of mind." 15 U.S.C. § 78u-4(b)(2).  The "required

7  state of mind" is "deliberate[] reckless[ness] or conscious

8  misconduct."  In re Silicon Graphics Sec. Litig., 183 F.3d 970, 974

9  (9th Cir. 1999).  The facts alleged in a complaint will give rise

10 to a "strong inference" of scienter when it "plead[s] facts

11 rendering an inference of scienter *at least as likely* as any

12 plausible opposing inference."  Tellabs, Inc., et al. v. Makor

13 Issues & Rights, Inc., 127 S. Ct. 2499, 2513 (2007).

14 In evaluating whether the pleadings suggest a strong inference of

15 scienter, the Court must consider the allegations in the Complaint

16 "holistically."  Id. at 2511.

17          1.   Section 10(b) of the Exchange Act

18     Section 10(b) of the Securities Exchange Act provides, in

19 part, that it is unlawful "to use or employ in connection with the

20 purchase or sale of any security registered on a national

21 securities exchange or any security not so registered, any

22 manipulative or deceptive device or contrivance in contravention of

23 such rules and regulations as the [SEC] may prescribe."  15 U.S.C.

24 § 78j(b). Rule 10b-5 makes it unlawful for any person to use

25 interstate commerce:

26     (a) To employ any device, scheme, or artifice to defraud,

27     (b) To make any untrue statement of a material fact or to omit

28     to state a material fact necessary in order to make the

27

1    statements made, in the light of the circumstances under which

2    they were made, not misleading, or

3    (c) To engage in any act, practice, or course of business

4    which operates or would operate as a fraud or deceit upon any

5    person, in connection with the purchase or sale of any

6    security.

7    17 C.F.R. § 240.10b-5.

8        The elements of a claim under section 10(b) are (1) the

9    misrepresentation or omission of a material fact, (2) scienter, (3)

10   plaintiff's reliance on the misrepresentation, and (4) damages.

11   See <u>Paracor Finance, Inc. v. General Electric Capital Corp.</u>, 96

12   F.3d 1151, 1157 (9th Cir. 1996) (en banc).  A plaintiff's complaint

13   must satisfy the PSLRA's particularity requirements.  <u>See In re</u>

14   <u>Silicon Graphics</u>, 183 F.3d at 983.

15                a.   <u>Materially False and Misleading Statements</u>

16       Plaintiffs claim three primary categories of

17   misrepresentations that give rise to liability under Section 10(b)

18   and Rule 10b-5: (1) misrepresentations in New Century's reporting

19   of its earnings, repurchase reserve, and residual interest

20   valuations; (2) misrepresentations of New Century's internal

21   controls; and (3) misrepresentations of New Century's loan quality

22   and underwriting.  These misrepresentations are alleged to have

been made in press releases,[13] investor conference calls and meetings,[14] and SEC 10-Q and 10-K forms.[15]

### i.   Group Pleading

Plaintiffs argue that they may rely on the group pleading doctrine for company-issued press releases. (Opp. at 33-34.)[16] The Officer Defendants contest the viability of the group pleading doctrine.

A question not decided by the Supreme Court in <u>Tellabs</u>, and that remains open within the Ninth Circuit, is whether group pleading remains viable after the PSLRA.  <u>See</u> <u>Tellabs</u>, 127 S. Ct. at 2511 n.6.  A judicially-created way of satisfying the particularity requirement of Rule 9(b), the group pleading doctrine

---

[13]1st quarter 2005 earnings press release Statements [hereinafter St. or Sts.] 1,2), 2nd quarter 2005 earnings press release (), 3rd quarter 2005 earnings press release (9), 4th quarter 2005 earnings press release), 1st quarter 2006 earnings press release (32-34), 2nd quarter 2006 earnings press release (39), September 2006 press release (45), 3rd quarter earnings press release (46) .  (Compl. Exh. E.)

[14]1st quarter 2005 earnings conference call (3,4), 2nd quarter 2005 earnings conference call (3,4), September 2005 investor roundtable (15, 16), 3rd quarter 2005 earnings conference call (18-20), 4th quarter and year-end earnings conference call (26-27), 4th quarter earnings conference call (42), 3rd quarter 2006 investor and analyst conference call (47-48) (Compl. Exh. E.)

[15]1st quarter 2005 Form 10-Q (5 ), 2nd quarter 2005 Form 10-Q (11-14), 3rd quarter 2005 Form 10-Q (21), year-end 2005 10-K Form (28-31), 1st quarter 2006 Form 10-Q (35-38), 2nd quarter 2006 Form 10-Q (41-44), 3rd quarter 2006 Form 10-Q (49-52). (Compl. Exh. E.)

[16]Where the Officer Defendants are *quoted* in press releases or have signed documents, the defendants are properly held liable for those statements, and the group pleading doctrine does not apply. Although the Officer Defendants contest the accuracy of some of these attributions, they do not appear to challenge the principle that properly attributed quotations or signatures are not "group pled" and may be a basis for liability. <u>See</u> <u>Howard v. Everex Systems, Inc.</u>, 228 F.3d 1057, 1061-62 (9th Cir. 2000)(discussing the importance of holding signers of SEC documents responsible for the statements they are signing).

1   establishes a presumption, for purposes of drafting a complaint,

2   that statements in "group-published information" such as

3   prospectuses, registration statements, annual reports, or press

4   releases are "the collective work of those individuals with direct

5   involvement in the day-to-day affairs of the company."   <u>In re</u>

6   <u>Silicon Graphics Sec. Litig.</u>, 970 F. Supp. 746, 759 (N.D. Cal.

7   1997) (quotations and citation omitted); <u>In re GlenFed, Inc. Sec.</u>

8   <u>Litig.</u>, 60 F.3d 591, 593 (9th Cir. 1995).

9        The courts that have considered whether the group pleading

10  doctrine still stands in the wake of the PSLRA have come to

11  conflicting conclusions. The Ninth Circuit has not expressly

12  rejected the group pleading doctrine, and some courts still apply

13  it.  <u>See, e.g.</u>, <u>In re Secure Computing Corp. Sec. Litig.</u>, 120 F.

14  Supp. 2d 810, 821-22 (N.D. Cal. 2000); <u>In re BP Prudhoe Bay Royalty</u>

15  <u>Trust Sec. Litig.</u>, No. 06-1505, 2007 U.S. Dist. LEXIS 83007, 2007

16  WL 3171435 at *7 (W.D. Wash. 2007) (listing cases).  The trend,

17  however, is against the continued viability of the doctrine.  All

18  of the Circuit courts that have expressly considered whether group

19  pleading is compatible with the PSLRA have concluded that it is

20  not. <u>See</u> <u>Winer Family Trust v. Queen</u>, 503 F.3d 319, 334-37 (3d Cir.

21  2007); <u>Makor v. Tellabs</u>, 437 F.3d 588, 602-03 (7th Cir. 2006),

22  <u>overruled on other grounds by</u> <u>Tellabs</u>, 127 S. Ct. at 2511 n.6;

23  <u>Southland Secs. Corp. v. INSpire Ins. Solutions, Inc.</u>, 365 F.3d

24  353, 365-66 (5th Cir. 2004).[17]  Additionally, several district

25

26       [17]Other Circuits have recognized the split in authority, but
    have found it unnecessary to decide the issue in the context of the
27  particular case. <u>See</u> <u>In re Hutchinson Tech., Inc. Sec. Litig.</u>, 536
    F.3d 952, 961 n.6 (8th Cir. 2008); <u>Miss. Public Employees Ret.</u>
28  <u>Sys.</u>, 523 F.3d 75, 93 (1st Cir. 2008); <u>Phillips v. Scientific-</u>
                                                      (continued...)

1  courts have refused to apply the group pleading doctrine after

2  <u>Tellabs</u>, and the majority of reported district court cases in the

3  Ninth Circuit appear to hold that the doctrine is no longer viable.

4  <u>See, e.g.</u>, <u>In re Impac Mortgage Holdings, Inc. Sec. Litig.</u>, 554 F.

5  Supp. 2d 1083, 1092 (C.D. Cal. 2008); <u>In re Amgen Secs. Litig.</u>, 544

6  F. Supp. 2d 1009, 1036-37 (C.D. Cal. 2008); <u>In re Hansen Natural</u>

7  <u>Corp. Sec. Litig.</u>, 527 F. Supp. 2d 1142, 1153-54 (C.D. Cal.

8  2007).[18]

9      Those courts that have found the group pleading doctrine in

10  conflict with the PSLRA have tended to rest their analysis on two

11  points.  First, they emphasize the statute's use of "the

12  defendant."  <u>See</u> <u>In re Immune Response Sec. Litig.</u>, 375 F. Supp. 2d

13  983, 1029 (S.D. Cal. 2005); <u>Southland</u>, 365 F.3d at 364-65.  That

14  is, the PSLRA expressly requires that the untrue statements or

15  omissions be set forth with particularity as to "the defendant,"

16  and that "with respect to each act or omission alleged to violate

17  this chapter, [the complaint must] state with particularity facts

18  giving rise to a strong inference that the defendant acted with the

19  required state of mind." 15 U.S.C. § 78u-4(b)(1),(2); <u>Southland</u>,

20  365 F.3d at 364-65 ("These PSLRA references to 'the defendant' may

21  only reasonably be understood to mean 'each defendant' in multiple

22

23      [17](...continued)
    <u>Atlanta, Inc.</u>, 374 F.3d 1015, 1018-19 (11th Cir. 2004) (declining

24  to rule, but acknowledging that "the most plausible reading in
    light of congressional intent is that a plaintiff, to proceed

25  beyond the pleading stage, must allege facts sufficiently
    demonstrating each defendant's state of mind regarding his or her

26  alleged violations").

27      [18]District Courts in the Southern District of New York
    continue to hold that the group pleading doctrine is viable. <u>In re</u>

28  <u>BISYS Sec. Litig.</u>, 397 F. Supp. 2d 430, 439 n.42 (S.D.N.Y. 2005)
    (listing cases).

1   defendant cases, as it is inconceivable that Congress intended

2   liability of any defendants to depend on whether they were all sued

3   in a single action or were sued each alone in several separate

4   actions."). Second, they argue that the continuation of the group

5   pleading doctrine would undermine the effectiveness of the PSLRA.

6   By enacting the PSLRA, Congress intended to impose heightened

7   pleading requirements for plaintiffs bringing fraud actions and, in

8   doing so, to erect a hurdle that would protect against

9   unmeritorious litigation. See Tellabs, 127 S. Ct. at 2508. If

10  courts were to allow plaintiffs to impute misstatements or intent

11  from one defendant to another, courts have reasoned, plaintiffs

12  would be able to skirt the heightened pleading standards by making

13  detailed allegations against one defendant and imputing those

14  statements to other defendants. Immune Response, 375 F. Supp. 2d at

15  1029-30. The courts have qualified this ban on group pleading,

16  however, by leaving open the possibility that, even when allegedly

17  problematic statements do not have a stated author, plaintiffs may

18  still meet the requirements of the PSLRA by alleging facts that

19  connect a particular defendant to an otherwise unattributed press

20  release. See Southland, 365 F.3d at 365 ("[C]orporate documents

21  that have no stated author or statements within documents not

22  attributed to any individual may be charged to one or more

23  corporate officers provided specific factual allegations link the

24  individual to the statement at issue.").

25      The Court is persuaded by this reasoning. Joining the

26  majority of other courts in this Circuit, the Court holds that

27  group pleading is no longer viable under the PSLRA. Thus, to the

28  extent Plaintiffs' allegations attributing statements to the

32

1  Officer Defendants rest solely on the group pleading doctrine, the

2  Complaint does not sufficiently plead liability for those

3  statements.  While the group pleading doctrine is not fatal to

4  allegedly misleading statements in SEC filings signed by the

5  Officer Defendants, see Howard, 228 F.3d at 1061-62, the Officer

6  Defendants cannot be liable for the press releases, except to the

7  extent there are specific statements attributed to them, or the

8  press releases are otherwise connected to them, see Southland, 365

9  F.3d at 365.  Because the Complaint alleges violations of

10  statements for each of the Officer Defendants that do not rest on

11  the group pleading doctrine, this holding does not preclude any of

12  the Officer Defendants from liability.

13                  ii.  Loan Quality and Underwriting

14       The Complaint alleges material misstatements regarding loan

15  quality and underwriting.  In a number of documents, New Century is

16  described, for example, as having loans of "higher credit quality,"

17  "improved underwriting controls and appraisal review process," "a

18  strategy [of selecting borrowers with increasing credit scores],"

19  "strict underwriting and risk management disciplines," and "better

20  credit quality."  (See, e.g., Compl. ¶¶ 343, 344, 347, 358, 361,

21  364, 387, 388, 405, 422, 443.)  The Complaint ushers an array of

22  confidential witness statements that attest to New Century's

23  progressively riskier loan origination practices leading up to and

24  throughout the Class Period (Compl. ¶¶ 137-168); analyzes data

25  indicating rising defaults and delinquent loans (Compl. ¶¶ 120-

26  125); and sets forth data, that corroborates the witnesses, showing

27  a proliferation of high-risk loans such as adjustable-rate

28

1  mortgages provided to less-qualified borrowers (Compl. ¶¶ 126-
2  136.).

3       The pleadings adequately support a finding that these
4  statements were false and misleading when made.  Two recent
5  district court cases in the Ninth Circuit have found similar
6  statements regarding loan quality and underwriting to provide a
7  basis for actionable securities law violations.  In re Countrywide
8  Fin. Corp. Derivative Litig., 542 F. Supp. 2d 1160 (C.D. Cal.
9  2008); Atlas v. Accredited Home Lenders Holding Co., No.
10 07-CV-488H, 2008 U.S. Dist. LEXIS 3863, 2008 WL 80949, at *10 (S.D.
11 Cal. Jan. 4, 2008).  This Court likewise agrees that these
12 statements are actionable, and that Plaintiffs' Complaint alleges
13 sufficient facts that the statements were material
14 misrepresentations of New Century's loan quality and underwriting
15 practices.

16      The Officer Defendants specifically challenge Plaintiffs'
17 allegations that statements about loan quality and underwriting
18 were false when made.  The Officer Defendants first argue that
19 Plaintiffs are unable to allege material false statements when New
20 Century disclosed data to the public revealing the nature of its
21 loan portfolio and included cautionary language in stock offering
22 documents.  It is also asserted in the Officer Defendants' and
23 Defendant Cole's motions, and more fully articulated in the
24 Underwriter Defendants' motion, albeit in the Section 11 context,
25 that Plaintiffs cannot challenge "forward-looking statements" and
26 that statements of "mere puffery" do not qualify as actionable
27 misstatements.

28

1    The "bespeaks caution" doctrine is a limit on defendant's
2    liability under the securities laws.  This doctrine "developed to
3    address situations in which optimistic projections are coupled with
4    cautionary language . . . affecting the reasonableness of reliance
5    on and the materiality of those projections."  In re Worlds of
6    Wonder Sec. Litig., 35 F.3d 1407, 1414 (9th Cir. 1994).  The
7    PSLRA's safe harbor provision, which is the codified equivalent of
8    the "bespeaks caution" doctrine, see Employers Teamsters Local Nos.
9    175 & 505 Pension Trust Fund v. Clorox Co., 353 F.3d 1125, 1132
10   (9th Cir. 2004), provides that forward-looking statements cannot be
11   the basis for a securities fraud claim if: (1) the statement is
12   identified as forward looking and is accompanied by sufficient
13   cautionary statements; or (2) the person who made the
14   forward-looking statement did so without actual knowledge that the
15   statement was false or misleading.  See 15 U.S.C. §
16   78u-5(c)(1)-(2).[19]  Similarly, statements that "are vague and
17   constitute run-of-the-mill corporate optimism on which no
18   reasonable investor would rely" fall into this category.  Copper
19   Mountain, 311 F. Supp. 2d at 869.
20       The Court cannot determine as a matter of law that the PSLRA's
21   safe harbor provision is applicable to the statements regarding
22   loan quality and underwriting.  A "forward-looking statement" "is
23   any statement regarding (1) financial projections, (2) plans and
24   objectives of management for future operations, (3) future economic
25   performance, or (4) the assumptions 'underlying or related to' any

26   _____

27       [19]It is appropriate to consider the application of the
     bespeaks caution doctrine and safe harbor provision simultaneously.
28   In re Copper Mountain Sec. Litig., 311 F. Supp. 2d 857, 876 (N.D.
     Cal. 2004).

1   of these issues." No. 84 Employer-Teamster Jt. Council Pension

2   Trust Fund v. Am. W. Holding Corp., 320 F.3d 920, 938 (9th Cir.

3   2003).  The statements here, when made, seem to have concerned

4   explanation of New Century's then-current loan origination,

5   underwriting, and performance, at times in relation to the past.

6   Moreover, the references to generalized cautionary language

7   regarding the sub-prime industry appear largely unrelated to

8   whether the alleged statements here were false and misleading.  The

9   inconclusive nature of these references cannot support dismissal at

10  the pleading stage.  See Livid Holdings Ltd. v. Salomon Smith

11  Barney, Inc., 416 F.3d 940, 947 (9th Cir. 2005) ("Dismissal on the

12  pleadings under the bespeaks caution doctrine . . . requires a

13  stringent showing: There must be sufficient 'cautionary language or

14  risk disclosure [such] that reasonable minds could not disagree

15  that the challenged statements were not misleading.").  The Court

16  therefore similarly cannot resolve application of the PSLRA safe

17  harbor provision in favor of Defendants at this time.

18      The Court also finds that the alleged statements cannot be

19  chalked up to "mere puffery."  The allegations suggest New

20  Century's repeated assurances of strong credit quality and strict

21  underwriting practices.  Even in the sub-prime world, there must be

22  a basis for distinction between loans to at-risk borrowers that

23  meet basic standards of good lending practice and loans that

24  plainly do not.  Those standards may provide the measure for

25  evaluating Defendants' statements.  Here, Plaintiffs offer New

26  Century's statements that it observed standards of high-quality

27  credit and underwriting, and set those statements against detailed

28  allegations of practices that utterly failed to meet those

1  standards.  That is sufficient to plead false and misleading

2  statements.

3                    iii. <u>Financial Reporting and Internal Controls</u>

4        The Court finds sufficient allegations of materially false and

5  misleading statements in financial reporting.  The Complaint

6  details reported information on financial results, the repurchase

7  reserve, and valuation of residual interests, coupled with

8  disclosures in the 2005 10-K, and elsewhere, that those reports

9  were inaccurate.  The disclosures support the allegation that the

10 financial reports were false and misleading when made.  These

11 disclosures specifically mentioned a failure to track repurchase

12 claims and problems with internal controls as reasons for the

13 inaccurate statements.  The Court similarly finds the disclosures

14 referenced in the Complaint sufficient to support the allegations

15 that Officer Defendants made material false and misleading

16 statements regarding the adequacy of internal controls during the

17 Class Period.

18        The Court does not consider the PSLRA safe harbor or the "mere

19 puffery" rule to bar Plaintiffs from pleading Defendants' liability

20 for alleged misrepresentations regarding internal controls and

21 accounting violations.  There certainly may be a dispute whether

22 the statements of repurchase reserves and residual interests were

23 representations articulating the present state of historical facts,

24 or rather projections estimating a future state of affairs.  That

25 dispute notwithstanding, Plaintiffs have alleged an understatement

26 of the repurchase reserve and an improper valuation of residual

27 interests that were both misrepresentations when made.  The

28 Complaint details declining loan performance, an increase in

1  defaults, and a concomitant rise in repurchase claims, that were

2  baldly disregarded in setting the reserve and valuing residual

3  interests.  This suggests misrepresentations that did not turn on

4  the outcome of future events.  Based on Plaintiffs' allegations,

5  the rule barring liability for "forward-looking" statements or

6  "mere puffery" does not warrant dismissal at this time.

7                    b.  <u>Scienter</u>

8       The Ninth Circuit treats falsity and scienter as "a single

9  inquiry, because falsity and scienter are generally inferred from

10 the same set of facts."  <u>In re Read Rite Corp. Sec. Litig.</u>, 335

11 F.3d 843, 846 (9th Cir. 2003); <u>Ronconi v. Larkin</u>, 253 F.3d 423, 429

12 (9th Cir. 2001).  This inquiry requires that a district court on a

13 motion to dismiss "determine whether particular facts in the

14 complaint, taken as a whole, raise a strong inference that

15 defendants intentionally or [with] deliberate recklessness made

16 false or misleading statements to investors."  <u>Ronconi</u>, 253 F.3d at

17 429 (internal quotations omitted).

18      A district court must address competing inferences, whether

19 favorable to the plaintiff or not, that may be inferred from the

20 facts in the complaint.  <u>Daou</u>, 411 F.3d at 1022.  The inference of

21 scienter must be "more than merely plausible or reasonable - it

22 must be cogent and at least as compelling as any opposing inference

23 of nonfraudulent intent."  <u>Tellabs</u>, 127 S. Ct. at 2504-05.

24 However, it need not be the "most plausible of competing

25 inferences."  <u>Id.</u> at 2510.  "To meet this pleading requirement [for

26 scienter], the complaint must contain allegations of specific

27 contemporaneous 'statements or conditions' that demonstrate the

28 intentional or the deliberately reckless false or misleading nature

1  of the statements when made." <u>Ronconi</u>, 253 F.3d at 432; <u>cf.</u>

2  <u>Metzler Inv. GMBH v. Corinthian Colleges, Inc.</u>, 540 F.3d 1049,

3  1065-69 (9th Cir. 2008) (analyzing the scienter inferences with

4  respect to individual allegations, and then as a whole).

5      The Ninth Circuit recently addressed the PSLRA's scienter

6  requirement and the Supreme Court's opinion in <u>Tellabs</u> in <u>South</u>

7  <u>Ferry LP, No. 2 v. Killinger</u>, 542 F.3d 776 (9th Cir. 2008). In

8  light of <u>Tellabs</u>, the <u>South Ferry</u> court explained, a court

9  assessing whether a complaint raises a strong inference of scienter

10 considers the complaint as a whole, though a high level of detail

11 is still required. <u>South Ferry</u>, 542 F.3d at 784. That is, "<u>Tellabs</u>

12 permits a series of less precise allegations to be read together to

13 meet the PSLRA requirement, the prior holdings of [the Ninth

14 Circuit in] <u>Silicon Graphics</u>, <u>Vantive</u>, and <u>Read-Rite</u>

15 notwithstanding." <u>Id.</u>  With respect to allegations relying on an

16 inference of scienter from knowledge of the company's core

17 operations, the <u>South Ferry</u> court explained that

18     [A]llegations regarding management's role in a company may be

19     relevant and help to satisfy the PSLRA scienter requirement in

20     three circumstances. First, the allegations may be used in any

21     form along with other allegations that, when read together,

22     raise an inference of scienter that is "cogent and compelling,

23     thus strong in light of other explanations." . . . Second,

24     such allegations may independently satisfy the PSLRA where

25     they are particular and suggest that defendants had actual

26     access to the disputed information . . . . Finally, such

27     allegations may conceivably satisfy the PSLRA standard in a

28     more bare form, without accompanying particularized

39

1    allegations, in rare circumstances where the nature of the

2    relevant fact is of such prominence that it would be "absurd"

3    to suggest that management was without knowledge of the

4    matter.

5  Id. at 785-86 (internal citations omitted).

6         The parties dispute the nature of the Court's inquiry into

7  scienter at the 12(b)(6) stage.  The Officer Defendants urge the

8  Court to analyze scienter separately as to each violation and each

9  defendant.  Plaintiffs emphasize the language in Tellabs that "the

10 court's job is not to scrutinize each allegation in isolation but

11 to assess all the allegations holistically." 127 S. Ct. at 2511.

12 As noted above with respect to group pleading, see

13 § II(E)(1)(a)(i), supra, the PSLRA's heightened pleading standard

14 appears to require individualized allegations as to scienter. 15

15 U.S.C. § 78u-4(b)(2).[20]  The Court does not read Tellabs as

16 excusing Plaintiffs from the plain requirements of the statute that

17 the complaint shall "with respect to each act or omission alleged

18 to violate this chapter, state with particularity facts giving rise

19 to a strong inference that the defendant acted with the required

20 ─────────────────

21       [20]The jurisprudence on the group pleading doctrine addresses
both whether a statement may be attributed to a particular
22 defendant and whether scienter may be imputed from one defendant to
another. As the Court's discussion of the group pleading doctrine
23 suggests, for the most part, courts have found that group
allegations as to scienter run afoul of the particularity
24 requirements of the PSLRA. See In re Lockheed Martin Corp. Sec.
Litig., 272 F. Supp. 2d 928, 936 (C.D. Cal. 2002)("Under no
25 circumstances does the group-published information doctrine relieve
plaintiffs of their burden to pled scienter under sub-paragraph 2
26 of the Act."). The discussion of the core operations doctrine in
South Ferry does not conflict with the Court's analysis on group
27 pleading. The core operations doctrine is distinct from group
pleading, but some of the analytical points - e.g., imputing
28 knowledge from the defendant's position in the company and the
nature of the information - overlap.

state of mind." Id.  That is not to say, however, that, in the context of a holistic analysis, allegations will only be relevant to scienter for one statement or one type of statement.  Rather, the Court reads the language in Tellabs as cautioning courts to view the scienter allegations holistically with respect to each allegedly violative act committed by each defendant.  Below, the Court considers Plaintiffs' scienter allegations for each of the three types of allegedly fraudulent acts.  The Court finds that Plaintiffs have sufficiently alleged facts giving rise to a strong inference that the Officer Defendants were at least deliberately reckless in making misrepresentations as to loan quality, internal controls, and various financial statements.[21]

---

[21]In the interest of a clearer analysis, the Court discusses scienter of the Officer Defendants together.  The Court finds, however, that the allegations are sufficient to create a strong inference that each of the Officer Defendants acted with scienter. In their papers and at oral argument, the Officer Defendants argued that the Complaint does not make sufficient connections between each of the Officer Defendants and knowledge of information contrary to what their statements conveyed. The Court disagrees. The Complaint perhaps most clearly connects knowledge that statements were false and misleading to Defendants Morrice and Dodge.  (E.g., Compl. ¶¶ 179 & n.24, 189 (loan quality, underwriting, and internal controls); id. ¶¶ 75-78, 491, 494 (financial misstatements).)  Other allegations, however, connect knowledge of contemporaneous conditions and contrary knowledge to all four Officer Defendants.  The Examiner's Report defines Senior Management to include Cole, Gotschall, Morrice, and Dodge from 2004-2006.  (Compl. at 56 n.10; e.g., BER 77-78.) For example, relying on and quoting from the Examiner's Report, the Complaint alleges that New Century's Senior Management "knew from multiple data sources that its loan quality was problematic, starting no later than 2004." (Compl. ¶ 175.)  Moreover, the Complaint alleges that loan quality was crucial to the core operations of the company, with which these central officers were familiar.  (Compl. ¶ 344.)  See South Ferry, 542 F.3d at 785.  With respect to internal controls, the Complaint alleges that Senior Management knew about problems with its internal controls, and represented to KPMG that it would fix them.  (Compl. ¶¶ 194-96; 486-87.)

1                     i.    <u>Loan Quality and Underwriting; Internal</u>

2                        <u>Controls</u>

3       The Court finds that Plaintiffs' Complaint creates a

4 compelling inference that the Officer Defendants were deliberately

5 reckless in their public statements regarding loan quality and

6 underwriting.  First, the confidential witness statements describe

7 a staggering race-to-the-bottom of loan quality and underwriting

8 standards as part of an effort to originate more loans for sale

9 through secondary market transactions.  The witnesses catalogue an

10 explosive increase in risky loan products, including interest-only

11 loans,[22] stated income loans, and adjustable-rate loans, and a

12 serious decline in loan quality and underwriting.  The Court finds

13 that these witnesses are described with sufficient particularity

14 and that "adequate corroborating details" for their statements are

15 provided.  <u>See</u> <u>Daou</u>, 411 F.3d at 1015.

16       Several witnesses portray an underwriting system driven by

17 volume and riddled with exceptions.  They state that the goal was

18 to "push more loans through" (Compl. ¶¶ 138, 139, 151-154), that

19 "there was always someone to sign off on any loan" (Compl. ¶ 140),

20 that nearly any loan was approved to meet its sales projections

21 (Compl. ¶¶ 141, 142), and that exceptions were commonly made for

22 the otherwise unqualified (Compl. ¶¶ 140, 144, 152, 155).  There

23 are specific instances of loose standards, as when an employee

24 recommended denial of a loan application but higher-level managers

25

26       [22]For example, a former Vice President states that New

27 Century, which always had a stated income loans program for self-
employed borrowers, expanded the program to wage-earners starting

28 in 2004 and 2005.  (Compl. ¶ 137.)

1  repeatedly approved those loans, (Compl. ¶ 144), or when

2  underwriters allowed rejected loans, usually because borrowers'

3  incomes were too low, a second chance and approved the formerly

4  rejected loans.  (Compl. ¶ 146.)  There is testimony that

5  instructions, according to managers, came from the corporate

6  officers (Compl. ¶ 146), and that officers had access to

7  information on the effects of these practices, including the rising

8  defaults (Compl. ¶ 154).  There are also indications that the

9  compensation for sales reinforced the disregard for standards and

10  quality as volume was linked to reward.

11      The Examiner's Report found knowledge within high-levels of

12  the company of its declining loan quality and underwriting as early

13  as 2004.  (Compl. ¶ 177.)  The Report mentions the internal reports

14  by New Century's Senior Management and negative internal audits

15  that acknowledged serious problems with loan quality and

16  underwriting, as well as the poor performance of the company's

17  high-risk products, and concludes that the New Century failed to

18  respond to "red flags."  (Compl. ¶ 179.)  It is as plausible an

19  inference as any other that the Officer Defendants were aware of

20  the alleged pervasive company-wide practice of issuing loans of

21  poor quality without complying with any basic set of underwriting

22  standards.  Moreover, the image of a company's falling standards

23  coincide with allegations supported by data of a rise in both

24  delinquency rates and repurchase claims that was also disclosed in

25  internal documentation.  (Compl. ¶¶ 126-136, 173-190.)

26      These same allegations also give rise to a strong inference of

27  scienter with respect to alleged misstatements regarding internal

28  controls in the company.  Moreover, the Complaint discloses prior

knowledge of problems with internal controls from before the time

of the alleged misrepresentations, (Compl. ¶¶ 486-87), and of the

growing backlog in repurchase claims, (Compl. ¶¶ 75, 77, 92-93).

Despite these causes for concern, the Officer Defendants repeatedly

certified the internal controls in Sarbanes-Oxley certifications.

(Compl. ¶¶ 348-49, 362-63, 377-78, 390-91, 409-410, 426-27, 444-

45.)

The Complaint may not disclose the kind of "smoking gun

evidence" that establishes a clear intent to deceive, but neither

does it need to do so.  Tellabs, 127 S. Ct. at 2510.  The

allegations are sufficient to infer a deliberately reckless set of

statements telling the public one thing when New Century was doing

something quite different – the loans were of poor, not great,

quality; the underwriting was all but absent, not strict; and the

internal controls were slack rather than searching.  The Examiner's

Report, to the extent that it does not explicitly find fraud, does

not preclude Plaintiffs from pleading fraud.  The inference of

deliberate recklessness as to false statements regarding loan

quality and underwriting is at least as compelling as inferring

that the Officer Defendants were simply unaware of New Century's

practices when the statements were made, or taken by surprise when

the market took an unexpected turn for the worse.

ii.  GAAP Violations, the Repurchase

Reserve, Valuation of Residual

Interests, and ALL

The Complaint alleges scienter with respect to several

accounting misrepresentations, including misstatements regarding

the adequacy of the repurchase reserve and the valuation of

1   residual interests.  "Violations of GAAP standards can . . .

2   provide evidence of scienter."  Daou, 411 F.3d at 1016.  For GAAP

3   violations to serve as a predicate for scienter, a Plaintiff must

4   allege "enough information so that a court can discern whether the

5   alleged GAAP violations were minor or technical in nature, or

6   whether they constituted widespread and significant inflation of

7   revenue."  Id. at 1017.

8       The Complaint alleges that the Officer Defendants represented

9   that the reserve was adequate when the repurchase reserve was

10  actually inadequate to cover the growing backlog of repurchase

11  claims and later disclosures admitted the inadequacy of the

12  reserve.  This backlog, according to the Examiner's Report, was "no

13  secret" and "general knowledge" within the company's accounting,

14  finance, and secondary marketing departments.  In a September 8,

15  2006 press release, however, Defendant Morrice referred to the rise

16  in loan payment defaults as merely "modest", when contemporaneously

17  available information indicated a significant rise in repurchase

18  claims and thus suggested otherwise.  Further, the Officer

19  Defendants attested to the reserve's adequacy in accordance with

20  GAAP.  There is confidential witness testimony that the repurchase

21  claims backlog was intentionally designed to delay payment of

22  repurchase claims to inflate earnings in an effort to "game the

23  system."  (Compl. ¶¶ 75, 77.)

24      Having reviewed the detailed allegations, the Court finds that

25  the Complaint contains particularized allegations of scienter with

26  respect to the accounting improprieties at New Century.  The

27  allegations indicate an acute awareness within New Century of the

28  backlog making it highly unlikely that officers were unaware that

45

1    the reserve was inadequate to cover the growing number of

2    repurchase claims.   These allegations of reckless accounting

3    violations are bolstered by the particularized allegations of

4    scienter in statements about loan quality and underwriting, which

5    suggest that the Officer Defendants were similarly reckless in

6    appreciating the gravity of the repurchase claims backlog and the

7    inadequacy of the reserve.[23]

8        The Complaint additionally alleges that the Officer Defendants

9    misstated the value of residual interests in a number of SEC

10   filings.   The Court similarly finds that alleged GAAP violations

11   related to residual interests, along with allegations of the

12   backlog, are sufficient for a strong inference of scienter.

13   Further, the fact that the new CEO, Tajvinder Bindra discovered the

14   accounting violations within months of taking the position is a

15   strong indication that these accounting violations were obvious

16   enough that a new officer found them quickly.   The allegations of a

17   misstated repurchase claims reserve, along with misrepresentations

18   of the residual interests' value, depict a profound effort to mask

19   New Century's declining loan performance.   Therefore, the Court

20   also finds that Plaintiffs have created a compelling inference that

21   the Officer Defendants were deliberately reckless in their

22   misstatements regarding the repurchase reserve and the valuation of

23   residual interests.

24       The Complaint, however, fails to adequately allege scienter

25   with respect to alleged misrepresentations of the ALL.   The

26   _____

27       [23]The Court similarly finds that the allegations support a
     strong inference of scienter as to the unexplained combination of
28   two unrelated reserves and the questionable methods utilized in
     setting the ALL.

1  Examiner concluded that any accounting violations in setting the

2  ALL actually reduced earnings.  The Complaint does not dispute this

3  finding.  Even though there are allegations that the ALL was

4  misstated due to GAAP violations, these alleged violations cannot

5  support an inference of fraudulent intent to inflate earnings in an

6  effort to misrepresent New Century's financial condition in a

7  positive light.  The reduction in earnings actually suggests

8  otherwise.

9                        iii. KPMG Audit

10     The Officer Defendants argue that their reliance on KPMG's

11  audit opinion precludes a strong inference of scienter.  "Although

12  a clean outside audit opinion does not rule out a finding of

13  scienter, 'a clean audit may be considered in determining whether

14  there is scienter.'" In re Wet Seal, Inc., 518 F. Supp. 2d 1148,

15  1166 (C.D. Cal. 2007) (citations omitted).  The Court does not,

16  however, consider the KPMG audit opinion to warrant a different

17  conclusion than reached above.

18     The Officer Defendants do not point to specific references in

19  the KPMG audit opinion that bear on their alleged recklessness in

20  making statements regarding loan quality or underwriting.  As for

21  any reliance on KPMG's opinion with respect to accounting

22  violations, the Court does not consider the existence of the audit

23  to preclude a strong inference of scienter under the circumstances

24  here.  The Complaint alleges both serious accounting violations by

25  the Officer Defendants and serious auditing violations by KPMG.

26  Especially in the presence of allegations that the officers and the

27  auditor were complicit in the ultimate misrepresentations of New

28  Century's financial condition, "[t]he fact that [New Century's]

                        47

1   independent auditor may have approved the accounting methods will

2   not shield [the officers] from liability for deception such methods

3   may have caused."   See Marksman Partners, L.P. Chantal Pharm.

4   Corp., 927 F. Supp. 1297, 1314 n.13 (C.D. Cal. 1996).   The extent

5   of the Officer Defendants' reliance, the scope of any independent

6   obligations for accounting violations, and whether they were

7   reckless in a spite of the audit opinion remain open questions at

8   this stage.   The Court therefore does not consider the audit

9   opinion to undermine the particularity with which Plaintiffs have

10  alleged scienter.

11                  iv.   Stock Sales, Compensation, and Motive

12                              Allegations

13       The pleading of insider trading may support a strong

14  inference of scienter.   Here, the Complaint discloses a number of

15  stock sales by the Officer Defendants in or around the Class

16  Period.   A court must address whether the allegations suggest a

17  compelling inference that "suspicious" sales of stock occurred that

18  were "dramatically out of line with prior trading practices at

19  times calculated to maximize the personal benefit from undisclosed

20  inside information."   Silicon Graphics, 183 F.3d at 986.   A court

21  will consider the following factors: (1) the amount and percentage

22  of shares sold by insiders; (2) the timing of the sales; and (3)

23  whether the sales were consistent with the insider's prior trading

24  practices.   Id.   A motive to defraud based on compensation

25  incentives such as bonuses and dividends also may strengthen an

26  inference of scienter.   See Am. West, 320 F.3d at 944.

27       The Complaint alleges that the Officer Defendants sold stock

28  for proceeds of $53 million during the Class Period.   These sales

                                48

accounted for 77% of Defendant Dodge's total holdings, 37% of Defendant Gotschall's total holdings, and 31% of Defendant Cole's total holdings.[24] (Compl. ¶¶ 507-514.) The Complaint further alleges that the Officer Defendants were beneficiaries of the inflated earnings caused by their misrepresentations, as they received dividends of $50 million during the Class Period and also bonuses that the Examiner's Report found were 300% higher than they should have been because based on the inflated earnings rather than New Century's actual financial performance. (Compl. ¶¶ 502-505.)

The Officer Defendants contend that the allegations contain scant reference to their prior trading history, and do not indicate a substantial unloading of their holdings. More specifically, the Officer Defendants provide explanations for the sales: Dodge's sales were less than estimated by Plaintiffs; Morrice only made two sales that were less than 10% of his holdings; and Gotschall's sales were part of a plan for retirement and pursuant to a 10b5-1 plan. Defendant Cole, in his motion, also links his sales to retirement in early 2006 and notes that many of his sales occurred before the Class Period. All of the Officer Defendants argue that they held onto a substantial portion of shares for which they suffered losses. They also provide explanations for their bonuses and dividends.

The Court agrees that the Officer Defendants' maintenance of substantial stock holdings for which they suffered losses upon New Century's collapse cut against any insider trading. Nevertheless, the allegations of insider stock sales, dividends,

---

[24]There is no specific allegation calculating the percentage of total holdings sold in stock sales by Defendant Morrice.

1  and options at least provides some additional support for the

2  otherwise strong inference of scienter.  Notably, the timing of the

3  10b-5 plans, several years after they became available, at least

4  raises the question precisely why there was a delay in creating

5  those plans, and why they were formed during the Class Period.

6  Although not the strongest set of allegations of insider trading

7  and suspicious compensation, the Court finds that the motive

8  allegations offer minimal additional support for a conclusion of

9  scienter.

10                    v.    Summary

11      The Court finds that the pleadings support a strong inference

12  of scienter.[25]  The Court, at this stage, does not view the

13  alternative inferences to be any more compelling than the inference

14  that the Officer Defendants were deliberately reckless in their

15  misrepresentations to the public.  The only exception are

16  statements regarding the ALL.

17              2.    Section 20(a) of the Exchange Act

18      Section 20(a) imposes joint and several liability on persons

19  who directly or indirectly control a violator of the securities

20  laws.  It provides

21      Every person who, directly or indirectly, controls any person

22          liable under any provision of this chapter or of any rule or

23          regulation thereunder shall also be liable jointly and

24          severally with and to the same extent as such controlled

25

26      [25]A plaintiff must properly allege reliance and loss causation
27  to state a claim under section 10(b) or Rule 10(b)(5).  Here, the
    Complaint contains allegations of loss causation.  The Officer
28  Defendants do not raise a challenge to Plaintiffs' allegations of
    loss causation.

1    person . . . is liable, unless the controlling person acted in

2    good faith and did not directly or indirectly induce the act

3    or acts constituting the violation or cause of action.

4   15 U.S.C. § 78t(a).  A prima facie case of control person liability

5   requires evidence (a) that a primary violation of the securities

6   laws occurred and (b) that defendant directly or indirectly

7   controlled the person or entity committing the primary violation.

8   See, e.g., Paracor Finance, 96 F.3d at 1161.

9        The Court has found that the pleadings sufficiently allege a

10  primary violation of section 10(b) and Rule 10(b)(5) against each

11  of the Officer Defendants.  The Complaint alleges that the Officer

12  Defendants controlled the operation of New Century, and that this

13  caused it to violate section 10(b) and Rule 10(b)(5).  This

14  sufficiently pleads control person liability under section 20(a).

15       F.   Plaintiffs' Claims Under Section 10(b) of the Exchange

16            Act Against Defendant KPMG

17            1.   Materially False and Misleading Statements

18       To reiterate, the Complaint alleges that KPMG's audit opinion

19  of New Century's 2005 year-end financial statements and internal

20  controls as of December 31, 2005 - incorporated in the Series B

21  stock offering - contained material misstatements in violation of

22  the Public Company Accounting Oversight Board ("PCAOB") standards.

23  (See supra Part I.E.3.)  The Court has reviewed the allegations in

24  the Complaint, and concludes that it satisfactorily sets forth

25  allegations that KPMG made material misrepresentations in its audit

26  opinion.  KPMG does not challenge Plaintiffs' section 10(b) claim

27  on these grounds, however.  KPMG focuses on scienter and loss

28  causation.

1          2.    <u>Scienter</u>

2      To plead scienter allegations against an auditor, the Ninth

3 Circuit has held that a plaintiff must show "more than a

4 misapplication of accounting principles,' and allege with

5 particularity that the auditor's "accounting practices were so

6 deficient that the audit amounted to no audit at all, or an

7 egregious refusal to see the obvious, or to investigate the

8 doubtful, or that . . . no reasonable accountant would have made

9 the same decisions[.]" <u>DSAM Global Value Fund v. Altris Software</u>,

10 288 F.3d 385, 390 (9th Cir. 2002) (quoting <u>In re Software Toolworks</u>

11 <u>Inc.</u>, 50 F.3d 615, 627-28 (9th Cir. 1994).

12          a.    <u>Repurchase Reserve</u>

13      The Complaint alleges that KPMG was aware of weaknesses in New

14 Century's internal controls prior to its 2005 audit because it

15 noted in its 2004 audit that the company failed to adopt

16 appropriate procedures for calculation of the repurchase reserve.

17 (Compl. ¶¶ 523-524.)  In working on the 2005 audit, one of KPMG's

18 junior auditors assigned to New Century specifically requested

19 information on outstanding repurchase claims.  She learned that

20 approximately $188 million in outstanding requests existed as of

21 year-end 2005.  KPMG, while noting in its paperwork that it was

22 aware of the approximate amount of outstanding repurchase claims,

23 did not consider this information in determining the adequacy of

24 the reserve.  KPMG endorsed a reserve amount of $70 million despite

25 the significantly larger amount outstanding for repurchase claims.

26 (Compl. ¶ 227.)  Moreover, the Examiner found that KPMG failed to

27 perform even "minimal" testing in making its reserve calculation,

28 and that such tests would have revealed its material errors.

(Compl. ¶¶ 228-229.)  These failures resulted in inflation of $21 million in New Century's 2005 year-end financial statements. (Compl. ¶ 99.)

Here, the Court finds that the Complaint alleges particularized facts of scienter.  If the allegations are true, KPMG knew that New Century was utilizing a faulty method for calculating its reserve and that its repurchase claims far outpaced its reserve amount, but did nothing to correct the deficiency.  The absence of a meaningful investigation into the flawed accounting methods used in setting the reserve supports a strong inference of scienter.  See Ponce v. SEC, 345 F.3d 722, 733-34 (9th Cir. 2003). Moreover, the absence of any explanation for its failure to correct New Century's severely underfunded reserve in the face of "red flags" further supports a strong inference of scienter.  See, e.g., Homestore.com, Inc. Sec. Litig., 252 F. Supp. 2d at 1044.

The Court is not persuaded that the Examiner's finding that there was no evidence of intentional misrepresentation to be dispositive at the pleading stage.  The Court is required to make an independent investigation of any facts obtained through discovery.  Moreover, it is matter for summary judgment whether the repurchase claims backlog was not material until 2006 as asserted by KPMG.

### b.   Residual Interests

Similarly for residual interests valuation, the Complaint alleges that KPMG was aware of internal control deficiencies regarding New Century's methods for determining the value of residual interests based upon its findings in its 2004 audit. (Compl. ¶ 231.)  During 2005 and in connection with the 2005 audit,

1  KPMG internal specialists raised "red flags" regarding New

2  Century's aggressively low discount rate and its potential to

3  inflate valuations. (Compl. ¶ 224) The internal specialists also

4  considered New Century's documentation insufficient for the audit

5  team to proceed in evaluating the valuations, but the team

6  nevertheless proceeded in finding the valuations adequate.  The

7  Complaint also refers to New Century's outdated valuation models.

8  This resulted in an overstatement of residual interests of

9  approximately $14 million (Compl. ¶ 232.)

10      Viewing the allegations as a whole, the Court again finds a

11  compelling inference of scienter.  The Complaint contains

12  particularized allegations of KPMG's willful failure to consider

13  the opinions of internal specialists when "red flags" were raised

14  about New Century's low discount rate and valuation models.  The

15  allegations support an awareness on the part of KPMG's audit team

16  that internal controls were problematic, but the team nevertheless

17  accepted incomplete documentation in reaching its determinations.

18  The allegations, therefore, suggest more than a simple

19  mistake—willful ignorance of a company's valuation methods may

20  support a strong inference of scienter.  Here, Plaintiffs'

21  Complaint meets this standard.  KPMG's suggestion that the audit

22  team gave due consideration to its internal specialists opinions

23  may ultimately establish that any misrepresentations in the audit

24  were not reckless.  That is a matter properly determined at summary

25  judgment.

26              c.   Hedge Accounting

27      The Complaint describes a hedge accounting dispute between a

28  KPMG internal specialist and an audit team partner named Donovan

that arose in 2005.  (Compl. ¶¶ 225-226.)  The specialist objected
to New Century's accounting method, and told Donovan that he
refused to approve the audit until he was able to review particular
documentation.  Before the specialist had the opportunity to review
the documents, Donovan informed New Century's Audit Committee that
the dispute would be resolved.  Donovan also sent an e-mail to the
specialist in which he expresses dismay that the specialist was
raising questions.  It was only after the audit was completed that
the specialist obtained the documentation.  The specialist found an
accounting violation that resulted in a misstatement of several
million dollars.  (Id.)

     The allegations support an inference that KPMG was aware of a
specialist's objection to a particular accounting method, but
nevertheless certified the audit without fully exploring the merits
of this objection.  Yet KPMG points to the attention that was given
to the hedge accounting dispute.  KPMG's Department of Professional
Practice ("DPP") attempted to resolve the disagreement, and the DPP
ultimately authorized issuance of the audit after further internal
discussion of the issue.

     The Court, while finding that KPMG supplies an alternative
inference that it made a reasoned judgment whether to issue the
audit opinion in spite of the dispute, cannot conclude that
Plaintiff has failed to plead at least an equally compelling
inference of scienter as to the hedge accounting misstatement.
KPMG may be read to have made a reasoned judgment, but also may be
interpreted to have intentionally accepted the audit opinion
without confirming whether the basis for the specialist's
objections were valid.  The allegations, along with KPMG's

1   arguments, support the notion that the issuance of the audit

2   opinion without complete resolution of the objection was a knowing

3   decision.   As opposed to KPMG's suggestion of a reasoned judgment,

4   Plaintiffs offer an equally compelling inference of a deliberate

5   choice not to verify the merits of the specialist's objections,

6   which appears to have been valid.

7                    d.   <u>ALL</u>

8       Based on the Court's earlier discussion of the ALL

9   allegations, the Court concludes that the allegations do not

10  support a claim of scienter where the ALL did not inflate earnings

11  nor misrepresent New Century's financial health in a positive

12  light.

13                   e.   <u>Mortgage Servicing Rights and Goodwill</u>

14      As with other areas already discussed, the Complaint suggests

15  that KPMG internal specialists recommended an independent valuation

16  of the mortgage servicing rights, but the audit team did not do so,

17  despite the fact that New Century had not conducted a proper

18  valuation of those rights. (Compl. ¶ 233.)   Again, this allegation

19  supports a strong inference of a deliberate willingness to state

20  that there was GAAP compliance when there clearly was not.   (<u>See</u>

21  <u>id.</u>)   As for goodwill testing, the Examiner found that KPMG simply

22  failed to obtain the necessary evidence to even audit the testing.

23  (<u>Id.</u>)   At this stage and in the context of strong inferences of

24  scienter on several grounds, the Court also finds that Plaintiffs

25  have adequately alleged a strong inference with respect to

26  goodwill.

27                   f.   <u>Summary</u>

28

1    The Court concludes that Plaintiffs have stated particularized
2    facts that give rise to a strong inference of scienter as to KPMG's
3    alleged misrepresentations in the 2005 audit opinion.  The only
4    exception at this stage are statements regarding the ALL.  The
5    Court notes that Plaintiffs have linked the allegations regarding
6    KPMG's knowledge of internal control deficiencies with the
7    allegations of misrepresentations.  Moreover, the allegations
8    regarding inadequate and inexperienced staff, and the rapid
9    discovery of the alleged accounting violations are further support
10   for the several strong inferences that KPMG's audit contained
11   deliberately reckless misstatements regarding New Century's
12   accounting practices.

13            3.    <u>Loss Causation</u>

14       A plaintiff in a § 10(b) case must also plead loss causation.
15   As the Supreme Court explained the plaintiff's pleading burden in
16   <u>Dura Pharms., Inc. v. Broudo</u>, 544 U.S. 336 (2005), a plaintiff must
17   provide allegations of loss causation that show investors paid an
18   artificially inflated price for stock and that the stock price fell
19   "after the truth became known" regarding the defendant's material
20   misrepresentations.  544 U.S. at 344.  A plaintiff satisfies this
21   pleading requirement by alleging "some indication of the loss and
22   the causal connection plaintiff has in mind."  <u>Daou</u>, 411 F.3d at
23   1026; <u>see</u> <u>Dura</u>, 544 U.S. at 347 (suggesting that Rule 8(a)(2)
24   notice pleading applies and noting that "it should not prove
25   burdensome for a plaintiff who has suffered an economic loss to
26   provide a defendant with some indication of the loss and the causal
27   connection that the plaintiff has in mind.").  In raising the
28   affirmative defense of "negative causation," a defendant asserts

1   that the alleged misrepresentation did not cause a plaintiff's

2   damages.  See 15 U.S.C. § 77k(e).

3        KPMG argues that Dura requires Plaintiffs to plead a fact-for-

4   fact corrective disclosure to sufficiently allege loss causation.

5   The law does not clearly support this interpretation.  As stated by

6   one court, the Supreme Court in Dura "did not . . . indicate what

7   form a disclosure must take, how completely it should reveal

8   previously misrepresented or concealed information, or how

9   specifically it must refer to that information."  In re Motorola

10  Sec. Litig., 505 F. Supp. 2d 501, 540 (N.D. Ill. 2007).  Rather,

11  Plaintiffs must plead facts giving rise to a reasonable inference

12  that the market became aware of the misrepresentations.

13  Corinthian, 540 F.3d at 1064.  The truth need not be revealed to

14  the market through a single, complete disclosure.  See Daou, 411

15  f.3d at 1026-27; accord Freeland v. Iridium World Commc'ns, Ltd.,

16  233 F.R.D. 40, 47 (D.D.C. 2006)("[R]eading Dura to require proof of

17  a complete, corrective disclosure would allow wrongdoers to

18  immunize themselves with a protracted series of partial

19  disclosures.").  Courts have cast doubt, however, on whether the

20  announcement of an investigation can be sufficient as a matter of

21  law to plead loss causation.  See Hansen, 527 F. Supp. 2d at 1162

22  (suggesting that a disclosure of wrongdoing is required); Weiss,

23  527 F. Supp. 2d at 945-48 (only announcement was a voluntary

24  investigation that did not disclose any facts to the market).

25       Here, Plaintiffs allege that KPMG's statements in its audit

26  opinion caused their damages.  KPMG raises the "negative causation"

27  defense.  It argues that the chain of events leading to the decline

28  of Plaintiffs' stock did not implicate disclosure of any

1  misstatements by KPMG.  Specifically, the only relevant KPMG

2  representations occurred in its 2005 audit opinion concerning New

3  Century's 2005 financial statements; the February 7, 2007

4  disclosures concerned the 2006 financial statements for which KPMG

5  did not provide an audit opinion; the March 2, 2007 disclosures did

6  not clearly correct a KPMG statement; and thus, the decline in

7  Plaintiffs' stock was the result of disclosures related to

8  financial statements that were not reviewed by KPMG.  Therefore,

9  KPMG argues, Plaintiffs cannot plead loss causation as a matter of

10  law.

11       Plaintiffs do not argue that the February 7, 2007 disclosures

12  concerned KPMG's statements.[26]  However, Plaintiffs argue, and

13  plead, that additional disclosures on March 2, 2007 concerned

14  KPMG's opinion regarding the 2005 financial statements.  On that

15  date, New Century announced that the Audit Committee of the Board

16  of Directors had "initiated its own independent investigation into

17  the issues giving rise to the Company's need to restate its 2006

18  interim financial statements, as well as issues pertaining to the

19  Company's valuation of residual interests in securitizations in

20  2006 and prior periods." (Compl. ¶ 464.)  Plaintiffs emphasize

21  that this reference to "prior periods" can be read to refer to the

22  2005 financial statements reviewed by KPMG.  Also, Plaintiffs

23  explain that this Audit Committee decision followed a February 2007

24  report by KPMG to the Committee.  Since the most significant

25  decline in stock price occurred after the March 2, 2007

26

27       [26]KPMG cannot be liable for losses that occurred prior to
28  disclosures that implicated its misrepresentations.  See Daou, 411
    F.3d at 1026-27.

1  disclosures, Plaintiffs maintain that they have sufficiently pled

2  loss causation.

3        The Court finds that Plaintiffs have sufficiently pled loss

4  causation.  The March 2, 2007 disclosure indicates the need to

5  reevaluate at least certain financial statements in "prior

6  periods."  This includes the 2005 financial statements reviewed by

7  KPMG.  As a significant stock decline followed this disclosure,

8  Plaintiffs have properly alleged loss causation.  KPMG frames the

9  reference to "prior periods" as merely a two-word passing reference

10 to an investigation.  (KPMG's Mot. at 12.)  Plaintiffs' allegations

11 suggest, however, that the import of the reference to "prior

12 periods" was not so limited, particularly in the context of the

13 other disclosures.  Unlike the disclosure of an investigation in

14 Weiss, for example, the disclosure of New Century's investigation

15 into prior periods was made in the context of other information

16 about New Century's financial state.  (Compl. ¶¶ 458-65.)  See

17 Weiss, 527 F. Supp. 2d at 947.[27]  Plaintiffs appear to allege that

18 the relationship between the disclosed problems with the 2006

19 statements and the 2005 misstatements were integrally overlapping

20 such that they had become known to the market.  Admittedly, the

21

22        [27]The Court considers the allegations here to be distinct from
23 those the Ninth Circuit found inadequate in Corinthian.  In
   Corinthian, the court was troubled by the suggestion that the
24 market could become aware through (1) the announcement of a
   location-specific investigation and (2) a company-issued
25 "euphemism."  540 F.3d at 1063-64.  The plaintiffs had argued that
   the disclosure that there would be "higher than anticipated
26 attrition" was a "euphemism" for an admission of the company's
   broad alleged fraud.  Id. at 1064.  In this case, however, the
27 disclosures that allegedly caused the drop in stock price were
   significantly more detailed in suggesting how previous statements
28 were problematic than simply a suggestion that revenue might be
   lower than anticipated.

connection between the March 2, 2007 disclosure and KPMG's

allegedly misleading statements may be found too attenuated, or the

existence of intervening causes may be too significant, for

Plaintiffs to establish loss causation.   Those are factual

questions that this Court does not resolve on a 12(b)(6) motion.

The Complaint sufficiently provides KPMG with an "indication of the

loss and the causal connection that [Plaintiffs] [have] in mind."

Dura, 544 U.S. at 347.   Thus, the Court considers Plaintiffs'

allegations of loss causation adequate.

G.   Plaintiffs' Claims Under Section 11 and Section 15 of the Securities Act

Plaintiffs bring claims under Section 11 of the Securities Act

against the Officer Defendants, Director Defendants, Defendant

KPMG, and the Underwriter Defendants.   Plaintiffs also bring claims

under Section 15 of the Securities Act for control person liability

against the Officer Defendants.

A defendant may be liable for violations of Section 11 for

innocent or negligent misstatements or omissions of material fact

in a securities registration statement.   15 U.S.C. § 77k(a).   Those

against whom a plaintiff may bring a Section 11 claim include but

are not limited to "every person who signed the registration

statement," "every person who was a director . . . of the issuer at

the time of the filing of the part of the registration statement

with respect to which his liability is asserted," "any person . . .

[who has] prepared or certified any report or valuation which is

used in connection with the registration statement," and "every

underwriter with respect to such security."   Id.

1    "The plaintiff in a § 11 claim must demonstrate (1) that the

2    registration statement contained an omission or misrepresentation,

3    and (2) that the omission or misrepresentation was material, that

4    is, it would have misled a reasonable investor about the nature of

5    his or her investment." In re Stac Elecs. Sec. Litig., 89 F.3d

6    1399, 1403-04 (9th Cir. 1996) (citation and internal quotations

7    omitted).  "No scienter is required for liability under § 11;

8    defendants will be liable for innocent or negligent material

9    misstatements or omissions." Id. (citing Herman & MacLean v.

10   Huddleston, 459 U.S. 375, 382 (1983)).

11       Although a plaintiff need not plead loss causation in a § 11

12   claim, negative causation is an affirmative defense.  See 15 U.S.C.

13   § 77k(e).  A court may dismiss a complaint for lack of causation if

14   the affirmative defense is apparent from the face of the pleading.

15   See McCalden v. Cal. Library Ass'n, 955 F.2d 1214, 1219 (9th Cir.

16   1990) (quoting 5A C. Wright & A. Miller, Federal Practice and

17   Procedure § 1357 (2d ed. 1990)).  In raising the affirmative

18   defense of negative causation, "the defendant has a heavy burden of

19   proving that the decline in stock price was caused by factors other

20   than the misstatement(s) in the registration statement." In re

21   Flag Telecom Holdings, Ltd. Sec. Litig., 411 F. Supp. 2d 377, 383

22   (S.D.N.Y. 2006) (internal quotation marks omitted).

23           1.   Section 11 and Control Person Liability Claims

24                Related to Series A Stock

25       The Underwriter Defendants and the Director Defendants

26   challenge the Section 11 and control person liability claims

27   related to the Series A preferred stock.  New Century sold its

28   Series A preferred stock in June 2005, for approximately $109

million.  (Compl. ¶ 236.)  The Underwriter Defendants and Director Defendants argue that the Complaint (1) fails to sufficiently allege material misstatements or omissions and (2) discloses on its face the affirmative defense of negative causation.

a.   <u>Material Misstatements or Omissions</u>

The Court's discussion of Plaintiffs' allegations of false and misleading statements, <u>supra</u> Part II.E.1, is fully applicable to the Section 11 claims.  The Court determined that the Complaint adequately alleges false and misleading statements with respect to financial accounting, internal controls, and loan quality and underwriting.  The Court also determined that exceptions from liability for "forward-looking statements" and "mere puffery" cannot be found to conclusively apply based on the particular circumstances alleged in the pleadings.  The Complaint alleges Section 11 claims in connection with the Series A stock against the Officer Defendants, Director Defendants, and Underwriter Defendants.  These are appropriate defendants under 15 U.S.C. § 77k(a).  The false and misleading statements for the Section 11 claim are largely the same as those alleged in Plaintiffs' Section 10(b) claims.  The Court therefore finds that the Complaint supports reasonable inferences of material false and misleading statements.

b.   <u>Loss Causation</u>

The Underwriter Defendants and the Director Defendants argue that the alleged misstatements regarding the Series A stock did not cause Plaintiffs to suffer a loss, and thus the Court should dismiss the Section 11 claim with respect to Series A stock.  Specifically, the Underwriter Defendants and Director Defendants

63

1   emphasize that the disclosures between February 7, 2007 and March
2   13, 2007 "have nothing to do with the alleged misstatements in the
3   Series A Registration Statement."  (Underwriter Defs.' Mot. at 30.)
4   The Court addressed this argument in connection with the claims
5   against KPMG, and incorporates that analysis here.  Notwithstanding
6   any factual arguments regarding Plaintiffs inability to prove loss
7   causation, Plaintiffs have sufficiently alleged loss causation to
8   survive the pleading stage.  The Section 11 claims regarding the
9   Series A stock, and the derivative Section 15 claims against the
10  Officer Defendants, may stand.

11          2.   Section 11 and Control Person Liability Claims
12               Related to Series B Stock

13       Additionally, the Underwriter Defendants and the Director
14  Defendants challenge the allegations as to the Series B stock
15  offering, issued in August 2006.  Defendants' arguments focus on
16  false and misleading statements rather than loss causation.  The
17  Court incorporates its earlier analysis of false and misleading
18  statements, supra Part II.E.1.  For the same reasons stated,
19  Plaintiffs may proceed with their Section 11 claims regarding the
20  Series B stock, and the derivative Section 15 claims against the
21  Officer Defendants.
22  //
23  //
24  //
25  //
26  //
27  //
28  //

**III. CONCLUSION**

    For the foregoing reasons, the Court substantially DENIES Defendants' motions to dismiss and DENIES Defendant KPMG's motion to strike.  The Court dismisses allegations of false and misleading statements that rely on the group pleading doctrine.

IT IS SO ORDERED.

Dated: December 3, 2008

_____
DEAN D. PREGERSON
United States District Judge