1  Michael C. Kelley (SBN 090062)
   mkelley@sidley.com
2  Bradley H. Ellis (SBN 110467)
   bellis@sidley.com
3  Jose F. Sanchez (SBN 161362)
   jose.sanchez@sidley.com
4  Jodi E. Lopez (SBN 231117)
   jlopez@sidley.com
5  SIDLEY AUSTIN LLP
   555 West Fifth Street, 40th Floor
6  Los Angeles, California 90013
   Telephone:   (213) 896-6000
7  Facsimile:   (213) 896-6600

8  Michael L. Rugen (SBN 85578)
   mrugen@sidley.com
9  Robert B. Martin III (SBN 235489)
   rbmartin@sidley.com
10 SIDLEY AUSTIN LLP
   555 California Street, Suite 2000
11 San Francisco, California 94104
   Telephone:   (415) 772-1200
12 Facsimile:   (415) 772-7400

13 Attorneys For Defendant KPMG LLP

14                  UNITED STATES DISTRICT COURT

15                 CENTRAL DISTRICT OF CALIFORNIA

16
   IN RE NEW CENTURY                    )  Consolid. Case No. 2:07-cv-00931-DDP
17                                       )  (FMOx)
                                         )  Assigned to:  Hon. Dean D. Pregerson
18                                       )
                                         )  **DEFENDANT KPMG LLP'S NOTICE**
19                                       )  **OF MOTION AND MOTION FOR**
                                         )  **SUMMARY JUDGMENT OR, IN THE**
20                                       )  **ALTERNATIVE, SUMMARY**
                                         )  **ADJUDICATION; MEMORANDUM**
21                                       )  **OF POINTS AND AUTHORITIES;**
                                         )  **DECLARATION OF ALLAN W.**
22                                       )  **KLEIDON**
                                         )
23                                       )  [Filed concurrently with Declaration of
                                         )  Jodi E. Lopez; [Proposed] Statement Of
24                                       )  Uncontroverted Facts And Conclusions Of
                                         )  Law; [Proposed] Order; [Proposed]
25                                       )  Judgment]
                                         )
26                                       )  Date:    March 29, 2010
                                         )  Time:    10:00 a.m.
27                                       )  Place:   Courtroom 3
                                         )
28 _____ )

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT on March 29, 2010, at 10:00 a.m., before the Honorable Dean D. Pregerson, in Courtroom 3 on the second floor of the United States District Court for the Central District of California, located at 312 N. Spring Street, Los Angeles, California, Defendant KPMG LLP ("KPMG") will and hereby does move pursuant to Federal Rules of Civil Procedure 56(c) and 56(d) for an Order granting summary judgment on the Second Amended Consolidated Class Action Complaint or, in the alternative, for an Order granting partial summary judgment.

Plaintiffs have sued KPMG under Section 11 of the Securities Act of 1933 (Count Three) and Section 10(b) of the Securities Exchange Act of 1934 (Count Seven). Plaintiffs allege that KPMG, which served as the outside auditor for New Century Financial Corporation ("New Century"), made material misrepresentations and omissions in the audit report it issued after its audit of New Century's annual financial statements for the year ended December 31, 2005.

KPMG now moves for summary judgment because the evidence demonstrates that KPMG's alleged misstatements and omissions did not cause any of Plaintiffs' investment losses. Plaintiffs' New Century stock lost 97% of its value in response to a series of adverse disclosures between February 7 and March 13, 2007. KPMG's expert economist, Dr. Allan W. Kleidon, has studied the analyst and press coverage following those disclosures and has concluded that the market did not understand any of those disclosures to indicate a misstatement in KPMG's 2005 audit report and that no portion of the stock drops following those disclosures was caused by KPMG. On the contrary, all of those disclosures involved events occurring in 2006 and 2007, well after the December 31, 2005 date of the financial statements audited by KPMG.

The evidence thus demonstrates that Plaintiffs' stock did not decline in value in response to disclosures about KPMG's alleged misstatements, that those alleged misstatements did not cause Plaintiffs' losses, that Plaintiffs cannot prove "loss causation," and that KPMG is entitled to summary judgment on both of Plaintiffs'

1   claims.  *See Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 347 (2005) (loss

2   causation requires a showing that a company's "share price fell significantly after the

3   truth became known"); 15 U.S.C. § 78u-4(b)(4); 15 U.S.C. § 77k(e).

4          In the alternative, KPMG hereby moves for summary adjudication as follows:

5   the Court should separately consider each of the announcements made by New

6   Century on February 7 and March 1, 2, 8, 12, and 13, 2007 and summarily adjudicate

7   that Plaintiffs cannot recover from KPMG for any of the losses caused by those

8   announcements.

9          KPMG met and conferred with counsel for Plaintiffs about this Motion on

10  several occasions between mid-August and late October 2009.

11         This Motion is based upon this Notice of Motion and Motion, the attached

12  Memorandum of Points and Authorities and Declaration of Dr. Allan W. Kleidon, the

13  Declaration of Jodi E. Lopez , and the [Proposed] Statement of Uncontroverted Facts

14  and Conclusions of Law, filed concurrently, all documents on file in this action, and

15  such further or additional evidence or argument as may be presented before or at the

16  time of the hearing on this Motion.

17                                        Respectfully submitted,

18

19  Dated:  January 13, 2010           /s/ Michael L. Rugen

20  Michael C. Kelley (No. 090062)     Michael L. Rugen (No. 85578)
21  Bradley H. Ellis (No. 110467)      Robert B. Martin III (No. 235489)
    Jose F. Sanchez (No. 161362)       SIDLEY AUSTIN LLP
22  Jodi E. Lopez (No. 231117)         555 California Street, Suite 2000
23  SIDLEY AUSTIN LLP                  San Francisco, California 94104
    555 West Fifth Street              (415) 772-1200
24  Los Angeles, California 90013
25  (213) 896-6000                     *Attorneys For Defendant KPMG LLP*

26

27

28

DEFENDANT KPMG LLP'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT, OR, IN THE
ALTERNATIVE, SUMMARY ADJUDICATION – CASE NO. 2:07-CV-00931-DDP (FMO)

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION .................................................................................................. 1

FACTUAL AND PROCEDURAL BACKGROUND ........................................... 3

    A.    The 2006/2007 "Subprime Meltdown" ................................................ 3

    B.    The "Corrective" Disclosures ............................................................... 4

        1.    February 7, 2007 Press Release ................................................. 4

        2.    March 1, 2007 Press Release ..................................................... 5

        3.    March 2, 2007 Form 12b-25 Notification of Late Filing ............... 5

        4.    March 8, 2007 Form SC 13D/A .................................................. 7

        5.    March 8, 2007 Press Release ..................................................... 7

        6.    March 12, 2007 Form 8-K ......................................................... 7

        7.    March 13, 2007 Form 8-K and Press Release ............................ 8

    C.    New Century's Bankruptcy and the May 24, 2007 Disclosure ............ 8

    D.    The SEC Complaint ............................................................................. 9

    E.    The Ruling on KPMG's Motion to Dismiss ........................................ 9

    F.    The Expert Report of Dr. Allan Kleidon ............................................ 10

LEGAL STANDARDS ........................................................................................ 12

    A.    Summary Judgment Standard .............................................................. 12

    B.    Loss Causation .................................................................................... 12

ARGUMENT ....................................................................................................... 13

I.    THE MARKET DID NOT UNDERSTAND ANY OF THE DISCLOSURES BETWEEN FEBRUARY 7 AND MARCH 13, 2007 TO HAVE REVEALED ERRORS IN KPMG'S 2005 AUDIT REPORT. ...... 13

i

II.    KPMG DID NOT CAUSE ANY PORTION OF THE STOCK PRICE DECLINES BETWEEN FEBRUARY 7 AND MARCH 13, 2007...................17

III.    ALTERNATIVELY, THE COURT SHOULD SUMMARILY ADJUDICATE THAT KPMG DID NOT CAUSE THE STOCK DECLINES FOLLOWING THE FEBRUARY 7, MARCH 1, MARCH 8, MARCH 12, AND MARCH 13 DISCLOSURES. ........................................21

CONCLUSION...........................................................................................23

DEFENDANT KPMG LLP'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION – CASE NO. 2:07-CV-00931-DDP (FMO)

# <u>TABLE OF AUTHORITIES</u>

Page(s)

CASES

*Amorosa v. Ernst & Young LLP*,
   2009 WL 4434943 (S.D.N.Y. Nov. 30, 2009) ............................................15, 18

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)..............................................................................................12

*Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co.*,
   2008 WL 4791492 (N.D. Tex. Nov. 4, 2008) ......................................................14

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)..............................................................................................12

*Dura Pharm., Inc. v. Broudo*,
   544 U.S. 336 (2005)..............................................................................................12

*El Dorado Irrigation Dist. v. Traylor Bros., Inc.*,
   2006 WL 38953 (E.D. Cal. Jan. 4, 2006) ............................................................21

*Gordon Partners v. Blumenthal*,
   2007 WL 1438753 (S.D.N.Y. May 16, 2007) ......................................................18

*In re Daou Sys., Inc., Sec. Litig.*,
   411 F.3d 1006 (9th Cir. 2005) .............................................................................16

*In re Fortune Sys. Sec. Litig.*,
   680 F. Supp. 1360 (N.D. Cal. 1987).....................................................................22

*In re Leapfrog Enters., Inc. Sec. Litig.*,
   527 F. Supp. 2d 1033 (N.D. Cal. 2007)................................................................16

*In re Omnicom Group, Inc. Sec. Litig.*,
   541 F. Supp. 2d 546 (S.D.N.Y. 2008) ......................................................16, 17, 18

*In re Oracle Corp. Sec. Litig.*,
   2009 WL 1709050 (N.D. Cal. June 19, 2009)................................................14, 15

*In re Retek, Inc. Sec. Litig.*,
   621 F. Supp. 2d 690 (D. Minn. 2009) ............................................................13, 14

*In re Williams Sec. Litig. – WCG Subclass*,
    558 F.3d 1130, 1137 (10th Cir. 2009) .......................................................17, 18

*In re WorldCom, Inc. Sec. Litig.*,
    2005 WL 375314 (S.D.N.Y. Feb. 17, 2005) ......................................................13

*Kramer v. Thomas*,
    2006 WL 4729242 (C.D. Cal. Sept. 28, 2006).............................................21, 22

*L.A. County Employees Ret. Ass'n v. Towers, Perrin, Forster & Crosby, Inc.*,
    2002 WL 32919576 (C.D. Cal. June 20, 2002)...................................................22

*Lattanzio v. Deloitte & Touche LLP*,
    476 F.3d 147 (2d Cir. 2007) .......................................................................18, 19

*Lentell v. Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005) ...............................................................................19

*Lies v. Farrell Lines, Inc.*,
    641 F.2d 765 (9th Cir. 1981) ..............................................................................21

*Luminent Mortgage Capital Inc. v. Merrill Lynch & Co.*,
    652 F. Supp. 2d 576 (E.D. Pa. 2009)..................................................................19

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)............................................................................................12

*McAdams v. McCord*,
    584 F.3d 1111,1114-15 (8th Cir. 2009)..............................................................18

*Metzler Investment GMBH v. Corinthian Colleges, Inc.*,
    540 F.3d 1049 (9th Cir. 2008) .................................................................14, 15, 18

*Tricontinental Industries, Ltd. v. Pricewaterhouse Coopers, LLP*,
    475 F.3d 824 (7th Cir. 2007) ..............................................................................15

**STATUTES/RULES**

15 U.S.C. § 77k............................................................................................................3

15 U.S.C. § 77k(e) .....................................................................................................13

15 U.S.C. § 78j(b) ........................................................................................................3

15 U.S.C. § 78u-4(b)(4) .............................................................................................12

iv

Fed. R. Civ. P. 56(b) ................................................................................21

Fed. R. Civ. P. 56(c) ................................................................................12

Fed. R. Civ. P. 56(d) ...............................................................................21

**OTHER AUTHORITIES**

6 James Wm. Moore *et al.*, Moore's Federal Practice § 56.20

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

Plaintiffs, a putative class of investors in New Century Financial Corporation ("New Century" or the "Company"), allege that their *2007* investment losses were caused by purported misstatements in the audit report issued by Defendant KPMG LLP ("KPMG") on New Century's *2005* year-end financial statements. To succeed on their claims, Plaintiffs must prove "loss causation" – that is, that the 2007 decline in the value of their New Century stock occurred in reaction to the market's learning "the truth" about alleged misstatements in KPMG's 2005 audit report. The evidence plainly demonstrates that Plaintiffs cannot do so. Between February 7 and March 13, 2007, Plaintiffs' stock lost 97% of its value in reaction to numerous announcements by New Century – announcements that disclosed the well-chronicled meltdown of the subprime markets *in 2006 and 2007*, and the effects of that meltdown on New Century's business. Those disclosures said nothing at all about New Century's 2005 financials or KPMG's 2005 audit report.

In ruling on KPMG's June 2, 2008 motion to dismiss for, among other things, failure to plead loss causation, the Court found that Plaintiffs did not even suggest that most of the announcements in question alerted the market to the alleged misstatements in KPMG's 2005 audit report. The Court denied KPMG's motion, however, focusing on a single phrase in New Century's March 2, 2007 announcement, which stated (amidst an array of more current and more dire disclosures) that the Company's Audit Committee was investigating "issues pertaining to the Company's valuation of residual interests in securitizations in 2006 *and prior periods*." (Emphasis added.) The Court observed that, "[a]dmittedly, the connection between the March 2, 2007 disclosure and KPMG's allegedly misleading statements may be found too attenuated, or the existence of intervening causes may be too significant for Plaintiffs to establish loss causation." Nevertheless, the Court ruled that whether the market understood the March 2 announcement to disclose problems with KPMG's 2005 audit report, and

1

1    whether any portion of the ensuing stock drop was caused by that disclosure, were

2    factual questions that could not be resolved on a motion to dismiss.

3          Subsequent investigation has determined that Plaintiffs' loss causation theory is

4    even more "attenuated" than appeared from the pleadings.  Dr. Allan Kleidon, a

5    highly respected economist, has reviewed all of the relevant analyst and press reports

6    about New Century and found that not a single one even hinted during the class period

7    that New Century's 2005 financials might have been misstated, let alone that KPMG's

8    2005 audit report was erroneous.  Dr. Kleidon has concluded that *the market did not*

9    *understand* any of the announcements between February 7 and March 13 to reveal the

10   alleged "truth" about KPMG's 2005 audit report.  Rather, those announcements, and

11   the commentary about them, focused entirely on more recent events at New Century

12   and in the subprime market generally – all of which occurred after December 31,

13   2005.  Thus, the decline in price of Plaintiffs' shares was caused by those intervening

14   events, not by anything relating to KPMG's 2005 statements.

15         The Securities and Exchange Commission has similarly concluded that any

16   accounting fraud at New Century involved misstatements about events occurring in

17   2006 or later.  On December 7, 2009, the SEC filed a complaint accusing three former

18   officers of New Century of  "misleading investors *as New Century's subprime*

19   *mortgage business was collapsing in 2006.*"  The SEC alleges that defendants

20   *changed the company's repurchase reserve accounting in the second and third*

21   *quarters of 2006*, in order to hide the Company's deteriorating financial condition.

22   The SEC complaint does not name KPMG as a defendant – in fact, it includes one

23   count accusing the defendants of lying to the KPMG auditors – nor does it hint at any

24   misstatements in the 2005 financials.

25         The evidentiary vacuum in which the Court decided KPMG's motion to dismiss

26   has now been filled and summary judgment should be granted in KPMG's favor.

27   *First*, none of the disclosures during the class period, other than the March 2, 2007

28   disclosure, even arguably mentioned any alleged misstatements in KPMG's 2005

2

1   audit report; KPMG thus did not cause the investment losses that followed those

2   disclosures; and partial summary judgment should be granted on all claims seeking to

3   recover for those losses.  *Second*, as to the March 2, 2007 disclosure, the evidence

4   demonstrates conclusively that the market did not understand the words "and prior

5   periods" – or any other aspect of that disclosure – to indicate alleged errors in

6   KPMG's 2005 audit report; none of the ensuing decline in the value of Plaintiffs'

7   shares was caused by KPMG's alleged misstatements; and the Court should grant

8   summary judgment on that remaining portion of Plaintiffs' claims as well.

9   **FACTUAL AND PROCEDURAL BACKGROUND**

10   Plaintiffs allege that KPMG committed securities fraud by making material

11   misrepresentations in its 2005 audit report.  (*See* 12/03/08 Order on Motions to

12   Dismiss ("Order") at 58-60.)  Plaintiffs seek to hold KPMG liable for violating

13   Section 11 of the Securities Act of 1933, 15 U.S.C. § 77k (Count Three), and Section

14   10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (Count Seven).

15   **A.    The 2006/2007 "Subprime Meltdown"**

16   The subprime mortgage market suffered significant deterioration after the date

17   of the 2005 New Century financials audited by KPMG.  Housing prices had risen at

18   an annual rate of  9% from 2000 through 2005, but began to decline in 2006 and 2007.

19   Subprime mortgage foreclosures held steady from 2004 to 2005, but rose sharply in

20   2006, as did the rate of mortgage delinquencies.  Home sales and new housing

21   construction increased in 2005, but fell sharply in 2006.  New Century's subprime

22   originations rose by 24.88% in 2005, but fell by 2.09% in 2006.  (Declaration of Allan

23   W. Kleidon, Ph.D. ("Kleidon Report") (attached hereto as Exhibit A) ¶¶ 36-39.)

24

25

26

27

28

DEFENDANT KPMG LLP'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT, OR, IN THE
ALTERNATIVE, SUMMARY ADJUDICATION – CASE NO. 2:07-CV-00931-DDP (FMO)

**B.    The "Corrective" Disclosures[1]**

Plaintiffs allege that they suffered losses when New Century's stock price declined in response to a series of adverse disclosures between February 7 and March 13, 2007, the last day in the class period.  (Dkt. No. 269, Second Amended Consolidated Class Action Complaint ("Complaint" or "Cmplt.") ¶ 9.)  But those disclosures reflected the effects of the 2006/2007 industry downturn on New Century's business and said nothing at all about KPMG's 2005 audit report.

**1.    February 7, 2007 Press Release**

The first adverse disclosure that Plaintiffs allege caused their losses was a press release issued on February 7, 2007.  (*Id.* ¶ 457.)  In its ruling on KPMG's motion to dismiss, the Court observed that "Plaintiffs do not argue that the February 7, 2007 disclosures concerned KPMG's statements," and therefore that KPMG cannot be liable for losses suffered in the wake of that disclosure.  (Order at 59 & n.26.)  That release disclosed that New Century would not be able to report its fourth quarter results the following day, as previously scheduled, and that New Century needed to restate its previously reported *unaudited* financial statements for the first three quarters of *2006*.  (Cmplt. ¶ 457.)  The press release made clear that these restatements reflected events that had occurred after December 31, 2005:

- "*During the second and third quarters of 2006*," the Company failed to record the expected discount upon disposition of loans when estimating its allowance for loan repurchase losses;

- The Company's "methodology for estimating the volume of repurchase claims to be included in the repurchase reserve calculation did not properly consider, *in each of the first three quarters of 2006,* the growing volume of repurchase

---

[1] KPMG has filed a copy of each of New Century's announcements from February 7, 2007 through March 13, 2007 as Exhibits A-I to the Declaration of Jodi Lopez ("Lopez Decl.") filed concurrently herewith.

4

DEFENDANT KPMG LLP'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION – CASE NO. 2:07-CV-00931-DDP (FMO)

claims outstanding that resulted from the *increased pace of repurchase requests that occurred in 2006*, compounded by the increasing length of time between the whole loan sales and the receipt and processing of the repurchase request";

- "In light of the pending restatements, the Company's previously filed condensed consolidated financial statements for the quarters ended March 31, June 30 and September 30, *2006* and all earnings-related press releases for those periods should no longer be relied upon"; and

- Once restated, the Company expects that its "net earnings for each of the *first three quarters of 2006* will be reduced."

(*Id.* (emphases added).)  The press release also disclosed operational and market difficulties in *2006* and *2007*, including that:

- "The increasing industry trend of early-payment defaults and, consequently, loan repurchases intensified in the *fourth quarter of 2006*";

- "[T]he volume of repurchased loans and repurchase claims *remains high*"; and

- The Company expected to report a "net loss" for the *fourth quarter of 2006*.

(*Id.*) (emphases added).  The press release said nothing whatsoever about either KPMG or New Century's 2005 financials.

### 2.    March 1, 2007 Press Release

The second adverse disclosure was New Century's March 1, 2007 press release, which likewise addressed only issues occurring after December 31, 2005.  The Company announced that it would not be timely filing its 10-K for the year ended *December 31, 2006.*  (*Id.* ¶ 463.)  This disclosure plainly had nothing whatsoever to do with KPMG's 2005 audit report or New Century's 2005 financials.

### 3.    March 2, 2007 Form 12b-25 Notification of Late Filing

The third adverse disclosure was New Century's announcement on March 2, 2007 that it filed a Notification of Late Filing with the SEC.  (*Id.* ¶ 464.)  Plaintiffs argued at the motion to dismiss stage that "disclosures on March 2, 2007 concerned KPMG's opinion regarding the 2005 financial statements."  (Order at 59.)  But

Plaintiffs concede that the vast majority of the March 2 disclosure had nothing whatsoever to do with KPMG's 2005 audit report or New Century's 2005 financials, focusing instead on more recent and highly negative developments.  Specifically, New Century disclosed that:

- It would be unable to file its *2006* 10-K in a timely fashion;
- Its restated net income for the *first three quarters of 2006* would be significantly lower than previously reported;
- The Company's results of operations for the *quarter and year ended December 31, 2006* would reflect declines in earnings and profitability when compared to the same periods in 2005;
- The Company expected to report a loss for the *full year ended December 31, 2006*;
- The Company expected its poor financial performance during *the third and fourth quarters of 2006* to result in a breach of 11 separate financing arrangements;
- KPMG had informed the Company that a failure to obtain written waivers from its lenders would cause KPMG to note in its *2006 audit report* that "substantial doubt exists as to the Company's ability to continue as a going concern";
- The Company's declining *2006 results* were attributable to lower gains on sales of mortgage loans, reductions in the carrying values of its residual interests and loans held for sale, and an increase in its allowance for losses on loans held for investment;
- The SEC staff had recently requested a meeting to discuss the Company's announcement that it would restate *2006 quarterly* financial statements; and
- The New York Stock Exchange and the U.S. Attorney's office had recently informed the Company that each was investigating possible insider trading in New Century stock.

(Cmplt. ¶ 464) (emphases added).)

1    Plaintiffs argued instead that a single phrase in the March 2 announcement –

2    "that the Audit Committee of the Board of Directors had 'initiated its own

3    independent investigation into the issues giving rise to the Company's need to restate

4    its 2006 interim financial statements, as well as issues pertaining to the Company's

5    valuation of residual interests in securitizations in 2006 *and prior periods*'" – caused

6    the losses they seek to recover from KPMG.  (Order at 59 (quoting Cmplt. ¶ 464)

7    (emphasis in Order).)  According to Plaintiffs, "this reference to 'prior periods' can be

8    read to refer to the 2005 financial statements reviewed by KPMG."  (Order at 59.)

9         **4.    March 8, 2007 Form SC 13D/A**

10    The fourth adverse disclosure was New Century's Form SC 13D/A, filed with

11    the SEC on March 8, 2007, which disclosed that David Einhorn had resigned as a

12    member of New Century's Board of Directors.  (Cmplt. ¶ 468.)  Plaintiffs do not

13    suggest that this disclosure had anything to do with KPMG's 2005 audit report.

14         **5.    March 8, 2007 Press Release**

15    The fifth adverse disclosure was New Century's press release on March 8,

16    2007, which focused entirely on dire developments that had occurred in recent days in

17    2007.  (*Id.* ¶ 470.)  It announced that, as a result of "its current constrained funding

18    capacity," New Century had elected to cease accepting loan applications from

19    prospective borrowers "effective immediately;" and "that New Century was in

20    discussions with lenders and other third parties regarding refinancing or other

21    alternatives to obtain additional liquidity, but that no assurance could be given that

22    any of the discussions would be successful."  (*Id.*)  Plaintiffs did not suggest at the

23    motion to dismiss stage, nor could they, that this disclosure had anything whatsoever

24    to do with KPMG's 2005 audit report or New Century's 2005 financials.

25         **6.    March 12, 2007 Form 8-K**

26    The sixth adverse disclosure was the Form 8-K that New Century filed with the

27    SEC on March 12, 2007.  (*Id.* ¶ 472.)  The announcement again focused on the recent

28    and rapidly deteriorating state of affairs at the Company, disclosing that New Century

7

1    had received notices of default from certain of its lenders; that all of its short-term

2    lenders had discontinued their lending agreements with the Company; and that the

3    Company did not have sufficient liquidity under its existing financing arrangements.

4    (*Id.*)  None of those disclosures had anything to do with KPMG's 2005 audit report or

5    New Century's 2005 financials, and Plaintiffs have never contended otherwise.

6    **7.    March 13, 2007 Form 8-K and Press Release**

7    The last adverse disclosure that Plaintiffs allege caused their losses was the

8    Form 8-K that New Century filed with the SEC on March 13, 2007, and its press

9    release of that same date (the last day of the class period).  (*Id.* ¶¶ 474, 476.)  Once

10    again, those announcements focused entirely on the Company's current, increasingly

11    dire condition, disclosing that additional lenders had advised the Company that it was

12    in default and/or had accelerated the Company's obligation to repurchase outstanding

13    mortgage loans and that the New York Stock Exchange had suspended the listing of

14    New Century stock.  (*Id.* ¶ 476.)  Plaintiffs did not suggest at the motion to dismiss

15    stage that these disclosures had anything whatsoever to do with the 2005 financials.

16    **C.    New Century's Bankruptcy and the May 24, 2007 Disclosure**

17    New Century filed a petition for bankruptcy on April 2, 2007.  (*Id.* ¶ 2.)  More

18    than a month later, and *more than two months after Plaintiffs claim to have suffered*

19    *all of their losses, the Company made its first disclosure concerning its 2005*

20    *financials*.  On May 24, 2007, New Century filed a Form 8-K with the SEC

21    announcing that "the Company's Board of Directors concluded, based upon the

22    recommendation of the Audit Committee, that the 2005 Financial Statements should

23    no longer be relied upon."  (*Id.* ¶ 482.)  The Company concluded by stating that, "[a]s

24    the Company is currently in liquidation proceedings under chapter 11 of the

25    Bankruptcy Code, the Company does not expect to complete a restatement of either

26    the 2005 Financial Statements or the Interim Financial Statements."  (*Id.*)  There were

27    never any disclosures concerning KPMG's 2005 audit work or report.

28

**D.    The SEC Complaint**

On December 7, 2009, the SEC filed a complaint against three former officers of New Century – Brad Morrice (CEO), Patti Dodge (CFO) and David Kenneally (Controller) – two of whom are defendants in this action.  (Lopez Decl., Ex. J.)  The complaint charges "three former top officers of New Century Financial Corporation with securities fraud for misleading investors as New Century's subprime mortgage business was collapsing in 2006."  (*Id.*, Ex. K at 1.)

The SEC has concluded that the defendants intentionally altered the Company's accounting practices in both the second and third quarters of 2006 to hide the effects that the weakening subprime markets were having on New Century.  The SEC charges the former officers with eight counts of securities fraud and related offenses, including one claim for making materially false statements to the KPMG auditors.  (Lopez Decl., Ex. J at 47-48.)  The SEC Complaint does not allege any material misstatements or omissions in New Century's 2005 financial statements or in KPMG's 2005 audit report.

**E.    The Ruling on KPMG's Motion to Dismiss**

KPMG moved to dismiss Plaintiffs' claims on the ground, among others, that it was apparent on the face of the Complaint that KPMG did not cause any of Plaintiffs' investment losses.  (Dkt. No. 282.)  KPMG argued that the disclosures between February 7 and March 13 said nothing about its 2005 audit report or even New Century's 2005 financials, and that the losses Plaintiffs suffered in the wake of those disclosures thus were not caused by KPMG.  (*Id.* at 8-14.)  Plaintiffs opposed KPMG's motion primarily by focusing on the March 2 announcement, ignoring most of the announcement – which disclosed dire details about New Century's 2007 financial and operational crisis – focusing instead on a single phrase:

> "[T]hat the Audit Committee of the Board of Directors had 'initiated its own independent investigation into the issues giving rise to the Company's need to restate its 2006 interim financial statements, as well

1    as issues pertaining to the Company's valuation of residual interests in
2    securitizations in 2006 *and prior periods*.'"

3    (Order at 59 (quoting Cmplt. ¶ 464) (emphasis in Order).)  Plaintiffs argued "that this

4    reference to 'prior periods' can be read to refer to the 2005 financial statements

5    reviewed by KPMG." (*Id.*)

6          In ruling on KPMG's motion, the Court made clear that losses suffered in the

7    wake of the February 7 announcement could not be recovered:  "KPMG cannot be

8    liable for losses that occurred prior to the disclosures that implicated its

9    misrepresentations." (*Id.* at 59 & n.26.)  The Court then focused on New Century's

10   March 2 announcement, holding that whether "the disclosed problems with the 2006

11   statements and the 2005 misstatements were integrally overlapping *such that they*

12   *became known to the market*," as Plaintiffs contended, was a question of fact that

13   could not be resolved on a motion to dismiss.  (*Id.* at 60-61 (emphasis added).)  The

14   Court observed that, "[a]dmittedly, the connection between the March 2, 2007

15   disclosure and KPMG's allegedly misleading statements may be found too attenuated,

16   or the existence of intervening causes may be too significant, for Plaintiffs to establish

17   loss causation." (*Id.* at 61.)  Nevertheless, the Court ruled that whether the market

18   understood the March 2 announcement to disclose misstatements in KPMG's 2005

19   audit report, and whether any portion of the ensuing stock drop was caused by that

20   disclosure, were factual questions that could not be resolved on a motion to dismiss.

21   (*Id.*)

22   **F.    The Expert Report of Dr. Allan Kleidon**

23         Following the Court's ruling, KPMG engaged Dr. Allan Kleidon to determine

24   whether there is any evidence to support a finding that KPMG caused the losses

25   Plaintiffs seek to recover.  Dr. Kleidon is a highly respected economist with

26   Cornerstone Research, which is a financial and economic consulting firm, and an

27   Honorary Professor in the School of Business at the University of Queensland in

28   Australia; he previously was a professor at Stanford University, the University of

1    California at Berkeley, and the University of Chicago.  (Kleidon Report ¶ 1.)  Dr.

2    Kleidon has focused his academic work in the fields of econometrics (the application

3    of statistical models within an economic framework), security prices and markets,

4    corporate finance, and management of financial institutions.  (*Id.*)

5         To assess whether KPMG's alleged misstatements caused Plaintiffs' investment

6    losses, Dr. Kleidon reviewed all available analyst reports and public press regarding

7    New Century during the relevant period to examine comments expressed by informed

8    market participants regarding the Company's disclosures between February 7 and

9    March 13.  (*Id.* ¶¶ 6, 22.)  Economists often study reports authored by informed

10   market participants, including stock analyst reports, to determine how the market

11   interpreted particular pieces of information.  (*Id.* ¶ 20.)  Commentary found in analyst

12   reports and public press is generally considered to reflect the value-relevant

13   information known to the market following a public disclosure.  (*Id.* ¶¶ 6, 20-21.)

14        Dr. Kleidon has concluded that there is no evidence that the market understood

15   the reference to "and prior periods," any other aspect of the March 2 announcement,

16   or any aspect of the other announcements between February 7 and March 13, to mean

17   that errors existed in KPMG's 2005 audit report or New Century's 2005 financials.

18   (*Id.* ¶¶ 6, 23.)  To the contrary, one analyst report explicitly stated, even after the

19   March 2 announcement, that the audited 2005 financials could be relied upon.  (*Id.*

20   ¶¶ 6, 24.)  Moreover, following New Century's announcement on May 24 that its

21   2005 financials should no longer be relied upon, press reports stated that this

22   disclosure was new information that had not been disclosed previously.  (*Id.* ¶¶ 6, 25.)

23   Not surprisingly, Dr. Kleidon found that the analyst reports during the class period

24   focused entirely on the then-current and dire disclosures regarding the Company's

25   *2006 financial problems* and its rapidly evolving *2007 funding crisis*.  (*Id.* ¶ 23.)  Dr.

26   Kleidon concluded that "the evidence is very clear that no declines in New Century's

27   stock price during the Class Period are attributable to perceived errors in New

28   Century's 2005 financial statements or the KPMG 2005 audit report."  (*Id.* ¶ 45.)

1

## <u>LEGAL STANDARDS</u>

2

**A.    <u>Summary Judgment Standard</u>**

3

Summary judgment is proper "if the pleadings, the discovery and disclosure

4

materials on file, and any affidavits show that there is no genuine issue as to any

5

material fact and that the movant is entitled to judgment as a matter of law." Fed. R.

6

Civ. P. 56(c).  The moving party bears the initial burden of demonstrating the absence

7

of a genuine issue of material fact.  *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323

8

(1986).  The burden then shifts to the non-moving party to "designate 'specific facts

9

showing that there is a genuine issue for trial.'"  *Id.* at 324 (quoting Fed. R. Civ. P.

10

56(e)).  To carry this burden, the non-moving party "must do more than simply show

11

that there is some metaphysical doubt as to the material facts."  *Matsushita Elec.*

12

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  "The mere existence of a

13

scintilla of evidence . . . will be insufficient; there must be evidence on which the jury

14

could reasonably find for the [non-moving party]."  *Anderson v. Liberty Lobby, Inc.*,

15

477 U.S. 242, 252 (1986).

16

**B.    <u>Loss Causation</u>**

17

Loss causation is the "causal connection between the [defendant's] material

18

misrepresentation and the [plaintiff's] loss."  *Dura Pharm., Inc. v. Broudo*, 544 U.S.

19

336, 342 (2005).  In *Dura*, the Supreme Court made clear that the securities laws are

20

intended "not to provide investors with broad insurance against market losses, but to

21

protect them against those economic losses *that misrepresentations actually cause*."

22

*Id.* at 345 (emphasis added).  The Court therefore held that loss causation requires a

23

showing that a company's "share price fell significantly *after the truth became*

24

*known*."  *Id.* at 347 (emphasis added).

25

Both of Plaintiffs' claims against KPMG fail if Plaintiffs cannot demonstrate

26

that KPMG's alleged misstatements caused their investment losses.  Loss causation is

27

an essential element of a Section 10(b) claim.  15 U.S.C. § 78u-4(b)(4).  Likewise,

28

Section 11 expressly provides a defense – the so-called "negative causation defense" –

12

1   when the specific alleged misrepresentation or omission upon which the defendant is

2   sued did not cause the plaintiff's claimed damages; in other words, when there is an

3   absence of loss causation.  15 U.S.C. § 77k(e).[2]

4                              **ARGUMENT**

5          In ruling on KPMG's motion to dismiss, the Court held that, to establish loss

6   causation, Plaintiffs must prove that "the stock price fell 'after the truth became

7   known' regarding [KPMG's] material misrepresentations."  (Order at 57 (quoting

8   *Dura*, 544 U.S. at 347).)  Put otherwise, KPMG did not cause Plaintiffs' losses unless

9   "the market became aware of [KPMG's] misrepresentations."  (*Id.* at 58.)  The

10  evidence now demonstrates (a) that the market did not understand any disclosure

11  between February 7 and March 13 to disclose errors in KPMG's 2005 audit report,

12  and (b) that no portion of the stock drops following those disclosures was caused by

13  information about the 2005 audit report.  Plaintiffs thus cannot prove loss causation

14  and KPMG is entitled to summary judgment.

15  **I.    THE MARKET DID NOT UNDERSTAND ANY OF THE
16          DISCLOSURES BETWEEN FEBRUARY 7 AND MARCH 13, 2007 TO
        HAVE REVEALED ERRORS IN KPMG'S 2005 AUDIT REPORT.**

17         As this Court already has held, to establish loss causation, Plaintiffs must prove

18  that the stock price dropped because the market became aware that *KPMG's 2005*

19  *audit report was false.*  (*Id.* at 57-59.)  Plaintiffs cannot prove loss causation by

20  demonstrating that the stock price dropped after the Company made adverse

21  disclosures about its financial condition generally.  *In re Retek, Inc. Sec. Litig.*, 621 F.

22  Supp. 2d 690, 702-03 (D. Minn. 2009).  Nor can Plaintiffs defeat KPMG's motion for

23  summary judgment by musing about what "and prior periods" – or any other aspect of

24  _____

25  [2] Except for the burden of proof, the loss causation analysis is identical under both
    Section 10(b) and Section 11.  *In re WorldCom, Inc. Sec. Litig.*, 2005 WL 375314, at
26  *6 (S.D.N.Y. Feb. 17, 2005) ("the negative causation defense in Section 11 and the
    loss causation element in Section 10(b) are mirror images").

27

28

1    New Century's announcements – might mean, or by "simply speculating that fraud

2    caused the loss." *Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton*

3    *Co.*, 2008 WL 4791492, *6 (N.D. Tex. Nov. 4, 2008). Rather, as the Ninth Circuit

4    has explained, Plaintiffs must establish "that the practices that [Plaintiffs] contend[]

5    are fraudulent were revealed to the market and caused the resulting losses." *Metzler*

6    *Investment GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1063 (9th Cir. 2008).

7    In other words, Plaintiffs must "produce[] specific evidence" that the market

8    understood New Century's announcements to disclose materials errors in KPMG's

9    2005 audit report. *Retek*, 621 F. Supp. 2d at 703 ("without producing specific

10   evidence demonstrating that the public became aware of an alleged misrepresentation .

11   . . a plaintiff cannot satisfy [his] evidentiary burden at summary judgment").

12         Courts regularly grant defendants summary judgment on loss causation grounds

13   where plaintiffs do not present evidence establishing that the market understood a

14   disclosure to have revealed errors in the defendant's prior statements. For example, in

15   *Retek,* 621 F. Supp. 2d 690, the company disclosed that it had to reverse revenue

16   previously recognized on a specific transaction. *Id.* at 692. The plaintiffs alleged that

17   this announcement "indirectly" disclosed that the company also had made accounting

18   errors regarding four other transactions and thus revealed "the truth" about all five

19   transactions. *Id.* at 699-708. The court granted defendants' motion for summary

20   judgment, holding that the plaintiffs had not produced sufficient evidence that the

21   market understood the disclosure to have referred to the other four transactions. *Id.*;

22   *see also In re Oracle Corp. Sec. Litig.*, 2009 WL 1709050, at *17 (N.D. Cal. June 19,

23   2009) (granting summary judgment because the plaintiff could not point to any

24   evidence, such as analyst reports, showing that the market understood the defendant's

25   announcement to disclose errors in the earlier statements).

26         Plaintiffs also cannot establish loss causation by showing that the market

27   reacted to disclosures concerning New Century's *2006* interim financial statements, or

28   even that the problems occurring in 2007 were somehow related to problems that

1    existed in 2005.  In *Tricontinental Industries, Ltd. v. Pricewaterhouse Coopers, LLP*,

2    475 F.3d 824, 842-44 (7th Cir. 2007) (cited favorably in *Metzler*, 540 F.3d at 1063),

3    the Seventh Circuit affirmed the dismissal of a securities fraud lawsuit against an

4    auditor, holding that an announcement that there were misstatements in the client's

5    *1998*, *1999*, and *2000* financial statements did not establish loss causation with regard

6    to the auditor's report on the *1997* financial statements.  The Seventh Circuit reached

7    this holding even though the plaintiffs had alleged that the 1997 fraud was part of an

8    ongoing scheme to overstate revenue and that the 1998 audit relied in part on the 1997

9    information.  *Id.* at 842.  Similarly, in *Amorosa v. Ernst & Young LLP*, 2009 WL

10    4434943, at *12 (S.D.N.Y. Nov. 30, 2009), the court dismissed Section 10(b) and

11    Section 11 claims brought against an outside auditor because there was no evidence

12    that the announcement revealed to the market the falsity of the specific audit opinion

13    at issue.  The announcement "[did] not mention the [audit report] by name; [did] not

14    mention any *audited* or *annual* financial statement . . . and [did] not mention Ernst &

15    Young or any other auditors."  *Id.* (emphasis in original).

16        KPMG's evidence demonstrates that the market did not understand any of the

17    class period disclosures to reveal the purported truth about KPMG's 2005 audit report.

18    Expert economist Dr. Kleidon has reviewed all of the analyst and press reports

19    concerning New Century issued after the class period announcements and found that

20    there is no evidence that the market understood any aspect of New Century's

21    announcements to mean that there were misstatements in KPMG's 2005 audit report.

22    (Kleidon Report ¶¶ 6, 43.)

23        Courts routinely employ the process Dr. Kleidon used – reviewing analyst and

24    press reports – to determine whether the market understood a particular announcement

25    to reveal misstatements or omissions in a defendant's prior public statements, and

26    whether the announcement caused any of the plaintiffs' investment losses.  For

27    example, in *Oracle,* 2009 WL 1709050, at *14-15, the court reviewed analyst reports

28    submitted by the parties and granted summary judgment because that evidence

1    demonstrated that "the market understood the announcement as disclosing that the

2    earnings shortfall was caused by the economic downturn," not by disclosure of alleged

3    misstatements by the defendants.  Similarly, in *In re Omnicom Group, Inc. Sec. Litig.*,

4    541 F. Supp. 2d 546, 553-54 (S.D.N.Y. 2008), the court reviewed analyst reports to

5    determine whether there was evidence that "the market reacted negatively to the

6    disclosures" allegedly causing the plaintiffs' losses.

7         During his review, Dr. Kleidon found extensive analyst and press coverage

8    regarding the March 2 announcement and the other announcements during the class

9    period.  That coverage focused entirely on New Century's disclosure of drastic

10   developments at the Company *during 2006 and early 2007*:  the Company's

11   restatement of its 2006 unaudited, quarterly financial statements, its expected negative

12   results for the year-ended December 31, 2006, its violation of its lending covenants,

13   and its increasingly dire financial condition and uncertain future prospects.  (Kleidon

14   Report ¶¶ 23, 44.)  Dr. Kleidon found "no analyst or press report that even mentions,

15   let alone analyzes, the 'and prior periods' comment" (*id.* ¶ 43); nor did he find any

16   commentary during the relevant period that even hinted that New Century's 2005

17   financials or KPMG's 2005 audit report contained errors (*id.* ¶ 23).  In fact, in the

18   wake of the March 2 announcement, one analyst explicitly stated that the year-end

19   2005 financials were "the last financials that *we can rely on*."  (*Id.* ¶ 24 (emphasis

20   added).)  Moreover, Dr. Kleidon found that following New Century's announcement

21   *after the end of the class period* – that the Company's 2005 financials "should no

22   longer be relied upon," no commentator suggested that this was old news.[3]  (*Id.* ¶ 25.)

23

24   [3] Because the May 24, 2007 announcement occurred after the class period closed on
     March 13, 2007, and after Plaintiffs, by their own admission (Cmplt. ¶¶ 1, 9), suffered

25   their losses, it cannot supply the causal link between Plaintiffs' damages and KPMG's
     alleged misstatements.  *See In re Leapfrog Enters., Inc. Sec. Litig.*, 527 F. Supp. 2d

26   1033, 1041 (N.D. Cal. 2007) (events and disclosures after class period cannot supply
     missing loss causation link); *In re Daou Sys., Inc., Sec. Litig.*, 411 F.3d 1006, 1026-27

27

28   (9th Cir. 2005) (decline in stock price cannot be causally related to fraudulent

                                                                          *(Footnote continued)*

                                            16

1   To the contrary, Dr. Kleidon found that the market understood the May 24, 2007

2   announcement to be new information that had not been previously disclosed. (*Id.*)

3          In short, the evidence conclusively demonstrates that the market did not

4   interpret the "and prior periods" investigation language in the March 2, 2007

5   announcement, or any other disclosures during the class period, as revealing that

6   KPMG's 2005 audit report was misstated. That evidence precludes any finding of

7   loss causation, and KPMG is entitled to summary judgment.

8

9   **II.    KPMG DID NOT CAUSE ANY PORTION OF THE STOCK PRICE
          DECLINES BETWEEN FEBRUARY 7 AND MARCH 13, 2007.**

10         Even if Plaintiffs could demonstrate that the market learned the truth about

11  KPMG's alleged misrepresentation (which, as explained in Part I, they cannot), that

12  showing would not be sufficient to survive summary judgment. Rather, Plaintiffs also

13  must proffer evidence that the price of their New Century stock *declined in reaction to*

14  *that information*. "Even if the truth has made its way into the marketplace, *Dura*

15  requires that a plaintiff show that it was this revelation that caused the loss and not one

16  of the 'tangle of factors' that affect price." *In re Williams Sec. Litig. – WCG Subclass*,

17  558 F.3d 1130, 1137 (10th Cir. 2009) (affirming summary judgment to defendant on

18  loss causation grounds).

19         Where the market learns numerous adverse facts simultaneously with the

20  alleged "truth" about the defendant's statements, plaintiff can avoid summary

21  judgment only by "disaggregating" the information, showing which portion of the

22  ensuing stock drop was caused by the market learning the truth about the defendant's

23  alleged misstatements specifically. In *Omnicom*, the Court granted summary

24  judgment, holding:

25         Because the law requires the disaggregation of confounding factors,
           disaggregating only *some* of them cannot suffice to establish that the

26

27  ───────────────────

28  accounting practices where price dropped before alleged revelation of fraud).

17

1
2
3
4

alleged misrepresentations actually caused Plaintiffs' loss.  Thus, there is
simply no way for a juror to determine whether the alleged fraud caused
any portion of Plaintiffs' loss.  Accordingly, Defendants' motion for
summary judgment on Plaintiffs' 10b-5 claims is granted.

5    541 F. Supp. 2d at 554 (citation omitted, emphasis added); *see also Williams*, 558

6    F.3d at 1143 (affirming grant of summary judgment where plaintiffs' expert made "no

7    account for the fact that these disclosures contained non-fraud related information that

8    would have also affected [the company's] value"); *Metzler*, 540 F.3d at 1065

9    (rejecting loss causation and noting that the announcement "contained a far more

10   plausible reason for the resulting drop in [the company's] stock price – the company

11   failed to hit prior earnings estimates"); *Gordon Partners v. Blumenthal*, 2007 WL

12   1438753, at *2 (S.D.N.Y. May 16, 2007) (granting summary judgment where

13   plaintiffs presented insufficient evidence to "show whether any loss (and if so how

14   much) was caused by defendants' conduct as opposed to other market factors").  To

15   survive summary judgment, Plaintiffs must disaggregate the portion of their losses

16   caused by the market learning about *KPMG*'s alleged misstatements from those losses

17   caused by the market learning about *New Century*'s alleged misstatements or other

18   negative news generally.  *See McAdams v. McCord*, 584 F.3d 1111,1114-15 (8th Cir.

19   2009) (affirming dismissal of securities fraud claims where plaintiffs did "not specify

20   how two statements by [the outside auditor], as compared to the complaint's long list

21   of alleged misrepresentations and omissions by the [defendant] executives,

22   proximately caused the investors' losses"); *Amorosa*, 2009 WL 4434943, at *11

23   (dismissing securities fraud claims: "in cases where, as here, a plaintiff seeks to hold

24   a financial advisor or auditor responsible for primary violations of the securities laws,

25   the plaintiff must plead that the market reacted negatively to some disclosure

26   correcting the falsity in the advisor or auditor's statements (and not simply the

27   underlying fraud)"); *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 158 (2d Cir.

28   2007) (affirming dismissal:  "Plaintiffs have not alleged facts to show that [auditor's]

18

1    misstatements, among others (made by [company]) that were much more

2    consequential and numerous, were the proximate cause of plaintiffs' loss").

3        Plaintiffs cannot perform any such disaggregation here. They concede that

4    virtually all of the devastating disclosures between February 7 and March 13 related to

5    events occurring in 2006 and 2007, and had nothing whatsoever to do with the audited

6    2005 financials. Plaintiffs cannot provide the trier of fact with any reliable basis for

7    disaggregating the massive losses caused by those disclosures – upon which market

8    analysts focused all of their attention – from the losses allegedly caused by investor

9    concerns about the 2005 financials or KPMG's 2005 report.

10       Dr. Kleidon found ample evidence that, even if the market had understood any

11   of the announcements in question to disclose errors in New Century's 2005 financials

12   (which it did not), the market would not have considered such information to be

13   "value-relevant." (Kleidon Report ¶¶ 29-31.) Those 15-month-old financials had

14   become stale when compared with the more current 2006 quarterly financials,

15   particularly given the dramatic downturn in the subprime mortgage industry and the

16   dire developments at New Century that had occurred since December 31, 2005. (*Id.*

17   ¶¶ 31, 36.)[4] Academic literature establishes that stale financial information is not

_____

18

19   [4] In another case arising out of investments in mortgage-related securities, the court
     recently found the elapsed time between defendant's allegedly misleading statements

20   and plaintiff's alleged losses dispositive, dismissing a securities fraud complaint for,
     among other things, failure to plead loss causation:

21

22       We are satisfied that the one-and-a-half year time period between the
         alleged misrepresentation and the injury, combined with the market

23       downturn in the mortgage industry that developed in early- to mid-2007,
         is sufficient to undermine the inference of a nexus between Defendants'

24       misrepresentations [and plaintiffs' losses].

25   *Luminent Mortgage Capital Inc. v. Merrill Lynch & Co.*, 652 F. Supp. 2d 576, 593

26   (E.D. Pa. 2009). *See also Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 174 (2d Cir.
     2005) ("when the plaintiff's loss coincides with a marketwide phenomenon causing

27   comparable losses to other investors, the prospect that the plaintiff's loss was caused
     by the fraud decreases").

28

1  relevant for stock price valuation purposes. (*Id.* ¶¶ 32-33.) Not surprisingly, Dr.

2  Kleidon found that analysts did not consider the 2005 financials to provide valuable

3  information about New Century's financial condition in early 2007. (*Id.* ¶¶ 31, 33.)

4  For example, following New Century's February 7, 2007 disclosure of its

5  intention to restate interim financials for the first three quarters of 2006, Roth Capital

6  Partners suspended coverage of New Century, explaining that it no longer had

7  relevant financial information upon which to judge New Century's financial

8  condition:

9  The upshot of the foregoing is that we have no reasonable basis on which
10  to calculate estimates of GAAP earnings, taxable income, dividends or
    fair value. Until the company can provide restated operating results and
11  statements of financial condition for 2006 interim periods and 4th quarter
    operating results and a December 31, 2006 balance sheet – as well as
12  2007 guidance – in which we feel confident, we cannot arrive at what we
13  deem to be reasonable estimates of performance or value.

14  (*Id.* ¶ 34.) Similarly, a JP Morgan analyst report dated March 5, 2007 stated:

15  As the last financials that we can rely on were filed in the company's
16  2005 10K, we are unable to make estimates at this time, and are also
    unable to provide any basis for valuation.

17

18  (*Id.* ¶ 35.)

19  Based on this evidence, Dr. Kleidon concluded: "contemporaneous analyst

20  commentary confirms that, by early 2007, the 2005 financials were stale and

21  inadequate to provide any basis for valuing the Company, consistent with academic

22  research." (*Id.* ¶ 6.) Thus, even if they could show that the market understood any

23  class period disclosures to mean that KPMG's 2005 audit report was misstated,

24  Plaintiffs could not demonstrate what portion of the decline in the value of their shares

25  was caused by that disclosure, as opposed to the voluminous, more current, and dire

26  disclosures that occurred at the same time. For that independent reason as well, the

27  Court should enter summary judgment in KPMG's favor.

28

III.   **ALTERNATIVELY, THE COURT SHOULD SUMMARILY ADJUDICATE THAT KPMG DID NOT CAUSE THE STOCK DECLINES FOLLOWING THE FEBRUARY 7, MARCH 1, MARCH 8, MARCH 12, AND MARCH 13 DISCLOSURES.**

Plaintiffs did not dispute at the motion to dismiss stage and cannot dispute now that none of the disclosures during the class period, other than the March 2 disclosure, said anything whatsoever about the 2005 financials or about KPMG. At the very least, then, the Court should separately consider each of the disclosures on February 7 and March 1, 8, 12, and 13, and summarily adjudicate that Plaintiffs cannot recover from KPMG for any of the losses caused by those disclosures.

The Federal Rules of Civil Procedure authorize a party to move for summary judgment "on all or part" of a claim. Fed. R. Civ. P. 56(b). In denying a motion for summary judgment, a court "should, to the extent practicable, determine what material facts are not genuinely at issue," and should "issue an order specifying what facts – including items of damages or other relief – are not genuinely at issue" and therefore should "be treated as established in the action." Fed. R. Civ. P. 56(d).[5]  Courts in this circuit regularly grant partial summary judgment or summary adjudication in order to narrow the issues for trial – including issues regarding the amount of damages. *See, e.g.*, *El Dorado Irrigation Dist. v. Traylor Bros., Inc.*, 2006 WL 38953, at *2, 6 (E.D. Cal. Jan. 4, 2006) (granting defendant's motion for summary adjudication as to

---

[5] *See also Kramer v. Thomas*, 2006 WL 4729242, at *15 (C.D. Cal. Sept. 28, 2006) ("The purpose of Rule 56(d) is to salvage some results from the judicial effort involved in evaluating a summary judgment motion and to frame narrow triable issues if the court finds that the order would be helpful with the progress of litigation."). When a party seeks to have the court resolve something less than an entire claim, the motion is referred to as one for "summary adjudication" or "partial summary judgment." *See, e.g.*, *Lies v. Farrell Lines, Inc.*, 641 F.2d 765, 769 n.3 (9th Cir. 1981) ("It is clear that Rule 56 authorizes a summary adjudication that will often fall short of a final determination, even of a single claim[.]") (quoting 6 James Wm. Moore *et al.*, Moore's Federal Practice § 56.20, at 56-691 (2d ed. 1976)).

whether plaintiff could recover certain damages:  "Summary adjudication, or partial summary judgment upon all or any part of a claim, is appropriate where there is no genuine issue of material fact as to that portion of the claim") (internal quotation marks omitted); *L.A. County Employees Ret. Ass'n v. Towers, Perrin, Forster & Crosby, Inc.*, 2002 WL 32919576, at *2 (C.D. Cal. June 20, 2002) (granting defendant's motion for summary adjudication in part:  "courts have found it procedurally proper for a party to move to narrow the issues on one part of a damages claim").

KPMG respectfully submits that the Court should consider separately each of the following disclosures and hold that Plaintiffs may not recover the losses they suffered as a result of the price declines after each such disclosure:  (1) the press release on February 7, 2007 (Cmplt. ¶ 457); (2) the press release on March 1, 2007 (*id.* ¶ 463); (3) the Form SC 13D/A filed with the SEC on March 8, 2007 (*id.* ¶ 468); (4) the press release on March 8, 2007 (*id.* ¶ 470); (5) the Form 8-K filed with the SEC on March 12, 2007 (*id.* ¶ 472); and (6) the Form 8-K filed with the SEC on March 13, 2007, and the press release issued that same day (*id.* ¶¶ 474, 476).  *See In re Fortune Sys. Sec. Litig.*, 680 F. Supp. 1360, 1368-71 (N.D. Cal. 1987) (granting partial summary judgment as to Section 10(b) and Section 11 claims:  price declines during certain periods were not proximately caused by defendant, but by "other forces").  Such a ruling would significantly "narrow triable issues" and "would be helpful with the progress of litigation."  *Kramer*, 2006 WL 4729242, at *15.

1

## **CONCLUSION**

2  Plaintiffs cannot prove *either* that the market understood any announcement

3  during the class period to reveal material misstatements in KPMG's 2005 audit report

4  *or* that the market price declined in reaction to such news.  For those two separate

5  reasons, KPMG's alleged misstatements did not cause Plaintiffs' losses, and KPMG is

6  entitled to summary judgment in its favor on Plaintiffs' Section 10(b) and Section 11

7  claims.

8                                             Respectfully submitted,

9

10  Dated:  January 13, 2010            /s/ Michael L. Rugen

11  Michael C. Kelley (No. 090062)      Michael L. Rugen (No. 85578)
    Bradley H. Ellis (No. 110467)       Robert B. Martin III (No. 235489)
12  Jose F. Sanchez (No. 161362)        SIDLEY AUSTIN LLP
    Jodi E. Lopez (No. 231117)          555 California Street, Suite 2000
13  SIDLEY AUSTIN LLP                   San Francisco, California 94104
    555 West Fifth Street               (415) 772-1200
14  Los Angeles, California 90013
15  (213) 896-6000                      *Attorneys For Defendant KPMG LLP*

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT KPMG LLP'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT, OR, IN THE
ALTERNATIVE, SUMMARY ADJUDICATION – CASE NO. 2:07-CV-00931-DDP (FMO)

**DECLARATION OF**

**ALLAN W. KLEIDON, Ph.D.**

**In re New Century Financial Corporation Consolidated Class Action**

**January 12, 2010**

## I.    Qualifications

1.    I am a Senior Vice President at Cornerstone Research, a financial and economic consulting firm, and an Honorary Professor in the School of Business at the University of Queensland in Australia.  Prior to joining Cornerstone Research, I was an Associate Professor of Finance at the Graduate School of Business, Stanford University, and I have taught in the Graduate School of Business and the School of Law at Stanford since joining Cornerstone Research.  I have also taught at the Haas School of Business at the University of California, Berkeley and the University of Chicago, Graduate School of Business.  I received my doctorate in 1983 from the University of Chicago and my Master of Business Administration degree from that institution in 1981.  My academic work has been in the fields of econometrics (the application of statistical methods within an economic framework), security prices and markets, corporate finance, and management of financial institutions.  I have published numerous articles on economic and financial topics.  A copy of my curriculum vitae and a list of prior testimony over the past four years are attached hereto as Exhibit 1.

## II.    Assignment

2.    I have been asked by counsel for KPMG LLP ("KPMG") to determine whether there is any evidence of loss causation with respect to KPMG in the

current matter.  I understand that, based on the Second Amended Consolidated Class Action Complaint dated April 30, 2008 ("Complaint"), plaintiffs' loss causation theory for the putative class period from May 5, 2005 to March 13, 2007 ("Class Period") depends on disclosures by New Century Financial Corporation ("New Century" or "the Company") beginning February 7, 2007 until the end of the Class Period ("alleged disclosure period"; Complaint, ¶9).  I further understand that the March 2, 2007 disclosure was cited by the Court regarding potential loss causation in its Order Denying Defendants' Motion to Dismiss and Denying Motion to Strike dated December 3, 2008.

3.    On March 2, 2007, New Century disclosed (among other things) that New Century's audit committee had "initiated its own independent investigation into the issues giving rise to the Company's need to restate its 2006 interim financial statements, as well as issues pertaining to the Company's valuation of residual interests in securitizations in 2006 and prior periods" (New Century Form 12b-25:  Notification of Late Filing for the Period Ended December 31, 2006, filed on March 2, 2007 ("March 2, 2007 announcement")).

4.    Specifically, I have been asked to determine whether there is any evidence that the market understood the reference to "and prior periods," any other aspect of the March 2, 2007 announcement, or any aspect of any other disclosure that plaintiffs allege caused their losses, to mean that errors existed in New Century's 2005 financial statements or in the audit report issued by KPMG on

those financial statements ("KPMG 2005 audit report").  Further, I have been asked to determine if there was any decrease in the Company's stock price attributable to alleged disclosures regarding New Century's 2005 financial statements or the KPMG 2005 audit report.

5.     Cornerstone Research is being compensated for my work in this matter at my standard hourly rate of $785.  A list of the materials I have relied upon is attached hereto as Exhibit 2.

## III.     Summary of Opinions

6.     Below is a summary of my preliminary findings in this matter.  The bases for each finding are detailed in the sections that follow.  My work in this matter is ongoing, and I reserve the right to supplement my current analysis if additional information becomes available.

- To determine how the market interprets particular pieces of information announced concurrently with other information, economists often study reports authored by informed market participants, including stock analysts' reports.  Commentary found in analyst reports and public press is generally considered to reflect the value-relevant information known to the market following a public disclosure.

- I reviewed all available analyst reports and public press regarding New Century during the relevant period to examine comments expressed by market participants regarding the Company's March 2, 2007 announcement, or regarding any other Company announcement during the alleged disclosure period.

- Based upon the analysis of the relevant analyst reports and press articles, there is no evidence that the market understood the reference to "and prior periods," any other aspect of the March 2, 2007 announcement, or any aspect of any other Company announcement during the alleged disclosure period, to mean that errors existed in New Century's 2005 financial statements or in the KPMG 2005 audit report.

- One analyst report explicitly stated after the March 2, 2007 announcement that the 2005 financials could be relied upon.

- Following New Century's announcement on May 24, 2007 (after the end of the Class Period) that the 2005 financial statements should no longer be relied upon, public reports stated that this disclosure was new information that had not been disclosed previously. I found no commentary suggesting that this was old news.

- The review of relevant analyst reports and public press finds that no market commentary suggested that any of the price declines during the alleged disclosure period were attributable to errors in the Company's 2005 financial statements or the KPMG 2005 audit report. This is not surprising for two reasons. First, there is no evidence that the market understood that errors *existed* in the 2005 financials or audit report. Second, as of early 2007, the 2005 financial information was stale when compared with the more current 2006 financials, particularly given the very different industry environment in early 2007 versus 2005 (e.g., increasing foreclosures, slowing or falling home prices, and slowing home sales). Academic literature establishes that stale financial information is not value relevant for stock price valuation. This academic finding is confirmed by analyst reports which specifically indicated that the 2005 financials did not provide any relevant basis for valuing the Company in early 2007.

- Prior to the March 2, 2007 disclosure, at least some analysts suspended coverage of New Century because there was no basis on which to value the Company given the announced intention to restate interim financials for 2006, which confirms that the stale 2005 financials were not value relevant as of February 2007.

- Following the March 2, 2007 disclosure, one analyst report explicitly stated that the Company's 2005 financials were reliable, but indicated that those stale financials provided no basis for valuation.

- In my opinion, the evidence is very clear that no declines in New Century's stock price during the Class Period are attributable to perceived errors in New Century's 2005 financial statements or the KPMG 2005 audit report. No contemporaneous, informed market commentary during the Class Period suggested that there were any issues with the 2005 financials; there was contemporaneous analyst commentary that the 2005 financials were reliable; information disclosed after the end of the Class Period about the 2005 financials was characterized as new information; no analyst or press commentary attributed any price decline during the Class Period to errors in the 2005 financials or audit report; and contemporaneous analyst commentary confirms that, by early 2007, the 2005 financials were stale and inadequate to provide any basis for valuing the Company, consistent with academic research.

## IV.    Background

7.    This section reviews the relevant disclosures between February 7, 2007 and May 24, 2007, including the March 2, 2007 announcement.

8.    On February 7, 2007, after the close of trading, New Century issued a press release and filed a Form 8-K disclosing, among other things, the following:

- a)    New Century would restate its unaudited financial results for the quarters ended March 31, June 30, and September 30, 2006 to correct errors the Company discovered in its application of generally accepted accounting principles regarding the Company's allowance for loan repurchase losses;

- b)    The Company's methodology for estimating the volume of repurchase claims to be included in the repurchase reserve calculation did not properly consider, in each of the first three

quarters of 2006, the growing volume of repurchase claims outstanding;

c)       In light of the pending restatements, the Company's previously filed condensed consolidated financial statements for the quarters ended March 31, June 30, and September 30, 2006 and all earnings-related press releases for those periods should no longer be relied upon;

d)       Commenting on fourth quarter 2006 developments, the Company expected to record a fair value adjustment to its residual interests to reflect revised prepayment, loss, and discount rate assumptions with respect to the loans underlying these residual interests, based on indicative market data;

e)       The Company was still determining the magnitude of adjustments to fourth quarter 2006 results, but expected to report a net loss for the quarter; and

f)       There was an increasing industry trend of early payment defaults and, consequently, loan repurchases that intensified in the fourth quarter of 2006.  The Company continued to observe this increased trend in its early payment default experience in the fourth quarter, and the volume of repurchased loans and repurchase claims remained high.

On the trading day following this announcement, February 8, 2007, the price of New Century shares declined from $30.16 to $19.24 (Complaint, ¶459).

9.       On March 1, 2007, after the close of trading, New Century announced that it expected to file a Notification of Late Filing (Form 12b-25) with respect to the Company's 2006 10-K.  On the trading day following this announcement, March 2, 2007, the price of New Century shares declined from $15.85 to $14.65 (Complaint, ¶463).

10.     On March 2, 2007, after the close of trading, New Century filed a

Notification of Late Filing (Form 12b-25) disclosing additional information,

including the following:

    a)     New Century was unable to file its 2006 10-K in a timely
fashion;

    b)     Restated net income for the first three quarters of 2006 would
be significantly lower than previously reported;

    c)     The Company's results of operations for the quarter and year
ended December 31, 2006 would reflect declines in earnings
and profitability when compared with the same periods in 2005;

    d)     The Company expected to report a pretax loss for the quarter
and full year ended December 31, 2006;

    e)     The Company expected that for the two-quarter period ended
December 31, 2006, it would violate the loan covenants in 11 of
its 16 financing arrangements, which required that it report at
least one dollar of net income for any rolling two-quarter
period;

    f)     KPMG had informed the Company that a failure to obtain
written waivers from its lenders would cause KPMG to note in
its 2006 audit report that "substantial doubt exists as to the
Company's ability to continue as a going concern";

    g)     The Company's audit committee had "initiated its own
independent investigation into the issues giving rise to the
Company's need to restate its 2006 interim financial statements,
as well as issues pertaining to the Company's valuation of
residual interests in securitizations in 2006 and prior periods";

    h)     The Company's declining 2006 results were attributable to
lower net gains on sales of mortgage loans, reductions in the

carrying values of its residual assets and loans held for sale, an increase in its allowance for losses on loans held for investment, and possible changes in the ability to realize its deferred tax assets;

i)     The SEC had requested a meeting with the Company to discuss its announcement that it would restate its 2006 quarterly financial statements; and

j)     The NYSE and the United States Attorney's Office had each informed the Company that they were investigating transactions in New Century's securities.

On the following trading day, March 5, 2007, the price of New Century shares declined from $14.65 to $4.56 (Complaint, ¶467).

11.     On March 8, 2007, at 9:14 AM, New Century filed an Amendment to its General Statement of Acquisition of Beneficial Ownership (Schedule 13D/A), stating that Mr. David Einhorn had resigned as a director of the Company (Complaint, ¶468). On that day, the price of New Century shares declined from $5.16 to $3.87 (Complaint, ¶469).

12.     On March 8, 2007, after the close of trading, New Century made an announcement and filed a Form 8-K stating that it had stopped accepting loan applications from new borrowers. On the following trading day, March 9, 2007, the Company's stock price fell from $3.87 to $3.21 (Complaint, ¶¶470–71).

13.     On March 12, 2007, New Century filed a Form 8-K announcing that:

a)     All of its lenders had ceased lending funds to the Company or had notified the Company of their intent to do so;

b)  Certain lenders had accelerated the Company's obligation to repurchase all outstanding mortgage loans financed under the applicable agreements; and

c)  The Company did not have sufficient funds to repurchase the loans as demanded by its lenders.

On that day, New Century's stock declined from $3.21 to $1.66 (Complaint, ¶473).

14.  On March 13, 2007, before the start of trading, New Century filed a Form 8-K disclosing, among other things, the following (Complaint, ¶474):

a)  The Company had entered into a material definitive agreement with certain buyers to provide limited covenant waivers on a Master Repurchase Agreement dated September 2, 2005.  The Company also disclosed that certain lenders had advised that it was in default under its financing agreements with them; and

b)  On March 12, 2007, the Company had received notice of a preliminary investigation being conducted by the Securities and Exchange Commission's Pacific Regional Office.

On that day, New Century's stock declined from $1.67 to $0.85 (Complaint, ¶475).

15.  Also on March 13, 2007, after the close of trading, New Century announced that the NYSE had delisted the Company's securities (Complaint, ¶476).  This date marks the end of plaintiffs' Class Period.

16.  New Century ultimately failed to negotiate covenant waivers from its lenders and filed for bankruptcy on April 2, 2007 (Complaint, ¶10).  As a result, New Century did not complete its restatement of its 2006 interim financials.  New Century also did not file financials for the full year 2006.

17.     On May 24, 2007 (after the end of the Class Period), the Company filed a Form 8-K announcing that "the 2005 Financial Statements should no longer be relied upon" (Form 8-K, May 24, 2007, p. 4).

## V.    Analysis

18.     I have been asked by counsel for KPMG to determine whether there is evidence that the market understood the reference to "and prior periods," any other aspect of the March 2, 2007 announcement, or any aspect of any other Company announcement during the alleged disclosure period, to mean that errors existed in New Century's 2005 financial statements or in the KPMG 2005 audit report, and whether there was any decrease in the Company's stock price attributable to alleged disclosures regarding New Century's 2005 financial statements or the KPMG 2005 audit report.

19.     This section describes the methodology for my analysis, the basis for the methodology, and my conclusions, first with respect to the market's understanding of the alleged disclosures, and second with respect to whether there were any price declines attributable to alleged disclosures concerning the 2005 financials or the 2005 audit report.

A.    *No Evidence of Market Understanding of Errors in the 2005 Financials or Audit Report*

20.    Many potentially value-relevant statements, that is, new information potentially affecting the expected future cash flows of the Company and hence its stock price, were announced on March 2, 2007 and the other disclosure period dates, as described above.  To determine how the market interprets particular pieces of information announced concurrently with other information, economists often study reports authored by informed market participants, including stock analysts' reports.  Commentary found in analyst reports and public press is generally considered to reflect the value-relevant information known to the market upon some public disclosure regarding a security.  Lang and Lundholm[1] (pp. 467, 468) state:

> Financial analysts are an integral part of the capital market, providing earnings forecasts, buy/sell recommendations and other information to brokers, money managers and institutional investors….
>
> …[A]nalysts may be viewed as either representing or influencing investor beliefs.

21.    Economics and accounting researchers commonly use analyst reports and reports by financial media as evidence of the market's views as a whole.  This

---

[1] Lang, Mark H., and Russell J. Lundholm, "Corporate Disclosure Policy and Analyst Behavior," *The Accounting Review*, Vol. 71, No. 4, October 1996, pp. 467–92.

concept is elaborated in a summary paper by Katherine Schipper[2] (p. 107, emphasis added):

> [A]ggregate (i.e., market) expectations are unobservable by definition, and all our inferences about these expectations are of necessity drawn from a priori reasoning and indirect tests. An example of the former is: analysts influence investors with their forecasts and recommendations, so *we expect their views will mirror or summarize those of investors generally.*

22.     I reviewed analyst reports and public press regarding New Century following the Company's February 7, 2007 announcement and throughout the disclosure period to determine whether there was any evidence that the market understood any Company announcement to mean that there were errors in New Century's 2005 financial statements or the KPMG 2005 audit report. My review included all available analyst reports on New Century following the February 7, 2007 announcement,[3] as well as public press from Factiva for the period February 7, 2007 through March 20, 2007 (one week following the end of the Class Period) and the week following the May 24, 2007 announcement.[4]

23.     I found no evidence that the market understood the reference to "and prior periods," any other aspect of the March 2, 2007 announcement, or any aspect

---

[2] Schipper, Katherine, "Commentary: Katherine Schipper on Analyst Forecasts," *Accounting Horizons*, December 1991, pp. 105–21.

[3] The last available analyst report is dated May 7, 2007. See Exhibit 2 for a list of analyst reports reviewed.

[4] I reviewed all public press from Factiva that included the words "New Century Financial Corp." for the periods February 7, 2007 through March 20, 2007, and May 24, 2007 through May 31, 2007.

of any other Company announcement, to mean that errors existed in New

Century's 2005 financial statements or in the KPMG 2005 audit report.  The

analyst reports and press articles I reviewed discussed the Company's March 2,

2007 announcement and other announcements at length, but the discussion focused

entirely on the other issues described in ¶¶8–15 above.  The majority of the

discussion focused on the Company's fourth quarter performance and forward-

looking topics such as dampened Company and industry expectations for 2007 and

the Company's risk of insolvency following announcements of halted loan

production, covenant violations, financing questions, and the possibility of

bankruptcy.  For example, in a March 5, 2007 report, analysts at FBR Research

characterized the Company's March 2, 2007 disclosure as follows:

> After the market close on March 2, NEW filed a form 12b-25, citing reasons for the inability to file a timely 10-K.  The filing raises questions regarding the company's viability, in our minds, given the currently adverse operating environment.  We believe NEW is under severe liquidity strains for several reasons:  it has not yet been able to convince all warehouse lenders to waive certain covenants; the restatement appears to result in a larger loss than initially suggested; and several different governing bodies have indicated that they are launching investigations.

Similarly, on March 9, 2007, analysts at Fox-Pitt, Kelton noted:

> The biggest development was that the company has halted production, as they do not currently have the ability to draw down their warehouse lines.…

> …NEW remains $70MM short of their margin requirement and now must scramble for a capital infusion as they did (successfully) in 1998.

On March 5, 2007, Jeffries & Company also expressed concern about the Company's liquidity position:

> [W]e believe the risks of a "worst-case" liquidity scenario have increased. Based upon further declines in fundamentals, additional delays in filing financial statements, and the increased potential that NEW's warehouse lenders may not waive necessary covenants, we believe risks substantially outweigh potential upside.

I found no discussion of the "and prior periods" language from March 2, 2007, or any discussion even hinting at errors in the 2005 financial statements or the KPMG 2005 audit report.

24.     By contrast, one analyst report explicitly stated after the March 2, 2007 announcement that the 2005 financials could be relied upon.  JPMorgan analysts, in their report dated March 5, 2007, stated that "the last financials that we can rely on were filed in the company's 2005 10K" (JPMorgan, March 5, 2007). The 2005 financials were, of course, those included in the 2005 10-K.  This discussion in the JPMorgan report is consistent with my conclusion that there is no evidence that the market understood the March 2, 2007 announcement, or any other announcement during the alleged disclosure period, to mean that errors

existed in the Company's 2005 financial statements or the KPMG 2005 audit report.

    25.    Moreover, following New Century's announcement on May 24, 2007 (after the end of the Class Period) that the 2005 financial statements should no longer be relied upon, I found no commentary suggesting that this was old news. In fact, public reports stated that this disclosure was new information that had not been disclosed previously. These reports further support the conclusion that the market did not understand the March 2, 2007 announcement or any other prior announcement to mean that errors existed in the 2005 financial statements or the KPMG 2005 audit report. For example:

> New Century Financial Corp. (NEWC) said Thursday that an internal investigation indicates that the subprime lender may have overstated its pretax earnings in 2005, *implying that accounting improprieties may have begun earlier than was previously disclosed.*
>
> In a filing with the Securities and Exchange Commission, New Century said its annual financial statement for 2005 "should no longer be relied upon" *because of newly discovered accounting errors* involving loan-repurchase losses. ("New Century 2005 Financial Info 'Likely' Overstated," *Dow Jones Corporate Filings Alert*, May 24, 2007, emphasis added)
>
> The *problems surfaced 3-1/2 months after* New Century said it planned to restate results for the first nine months of 2006, citing increases in loan losses. ("UPDATE 1-New Century Says Probably Overstated 2005 Earnings," *Reuters News*, May 24, 2007, emphasis added)

> The Irvine, Calif., subprime lender New Century Financial
> Corp. said that *it has found more accounting errors* but will not
> bother to correct them or the errors it discovered previously.
> ("In Brief: New Century: New Errors, No Correction,"
> *American Banker*, May 25, 2007, emphasis added)

26.     I understand that plaintiffs have identified an anonymous Internet

message board posting from March 2, 2007 that comments, "So everything was

kosher in 2005?  I bet KPMG has already filed an E&O claim."[5]  This anonymous

comment comprises one individual's statement of speculation in the form of a

question asked of the limited audience who participated in this message board, and

does not constitute evidence that the market understood that there were errors in

the Company's 2005 financial statements or the KPMG 2005 audit report, for at

least three reasons.

27.     First, on its face, the comment does not suggest that the March 2,

2007 disclosures indicated that there were errors in the 2005 financials or audit

report.  The question, "So everything was kosher in 2005?" implies quite the

opposite, that is, that the public disclosures did *not* indicate that there were errors

in the 2005 financials or audit report.  Second, the comment does not state a

conclusion that there were errors in the Company's 2005 financial statements or

the KPMG 2005 audit report, but rather comprises one person's speculation on the

topic.  Third, the comment did not even generate any responses by other members

---

[5] www.haloscan.com/comments/calculatedrisk/4232822836438007318/, March 2,
2007, 6:23 PM.

of the same message board. No subsequent replies on this message board picked up on this theme—the comment simply failed to inspire any replies or conversation concerning the Company's 2005 financials (although subsequent replies on the message board did discuss certain aspects of the March 2, 2007 announcement).

28.    This absence of any discussion concerning the 2005 financials is consistent with my review of public press and analyst reports in which I found no evidence that the market understood the reference to "and prior periods," any other aspect of the March 2, 2007 announcement, or any aspect of any other Company announcement, to mean that errors existed in New Century's 2005 financial statements or in the KPMG 2005 audit report.

B.    *No Evidence of Impact on Stock Price*

29.    My review of analyst reports and public press regarding New Century following the Company's February 7, 2007 announcement and throughout the disclosure period finds that there was no market commentary that suggested that any of the price declines during the alleged disclosure period were attributable to errors in the Company's 2005 financial statements or the KPMG 2005 audit report. It is not surprising that analysts did not attribute any price declines to errors in the 2005 financials or audit report, for two reasons.

30.    First, as discussed in the previous section, I find no evidence that the market understood the reference to "and prior periods," any other aspect of the March 2, 2007 announcement, or any aspect of any other Company announcement,

to mean that errors *existed* in New Century's 2005 financial statements or in the KPMG 2005 audit report. If there was no market understanding that there were such errors, then no price declines could possibly be attributable to such errors.

31.     Second, as of early 2007, the 2005 financial information was stale when compared with the more current 2006 financials, particularly given the very different industry environment in early 2007 versus 2005 (e.g., slowing or falling home prices, slowing home sales, and increasing foreclosures, as described further below). Academic literature establishes that stale financial information is not value relevant for stock price valuation. This academic finding is confirmed by analyst reports during the disclosure period specifically indicating that the 2005 financials did not provide any relevant basis for valuing the Company in early 2007.

32.     Academic studies of the time series behavior of accounting earnings numbers demonstrate that historical earnings can have usefulness in predicting future earnings, but this usefulness decreases over time as newer financial results and additional information about the firm are released. This is because accounting earnings numbers are best described as a random walk, that is, the best predictor of next period's earnings is this period's earnings.[6] S. P. Kothari[7] (p. 148) notes that

_____

[6] For example, Professor George Foster states (*Financial Statement Analysis*, 2nd Ed., Prentice Hall, 1986, p. 240), "The result that, on average, annual reported earnings or EPS can be well described by a random walk model is one of the most robust empirical findings in the financial statement literature."

[7] Kothari, S.P., "Capital Markets Research in Accounting," *Journal of Accounting and Economics*, Vol. 31, 2001, pp. 105–231.

"quarterly earnings are more timely, so the use of a quarterly earnings forecast as a proxy for the market's expectation is likely more accurate than using a stale annual earnings forecast."  Moreover, historical financial statements are not the only source of value-relevant information, and they will give a particularly incomplete picture when market or industry conditions change dramatically from those that existed in the time period covered by the financial statements.

33.    Consistent with this literature, at least two analysts who covered New Century decided that they were left with no reasonable basis to continue coverage after learning that the 2006 quarterly financials would be restated.[8]  This shows that analysts did not consider the 2005 financial statements to be current or value relevant in light of the passage of time since their publication.

34.    For example, following New Century's February 7, 2007 disclosure of its intention to restate interim financials for the first three quarters of 2006, Roth Capital Partners suspended coverage of New Century.  The Roth analyst report dated February 8, 2007 describes the rationale for suspending coverage as follows:

> The upshot of the foregoing is that we have no reasonable basis
> on which to calculate estimates of GAAP earnings, taxable
> income, dividends or fair value.  Until the company can provide
> restated operating results and statements of financial condition
> for 2006 interim periods and 4th quarter operating results and a
> December 31, 2006 balance sheet—as well as 2007 guidance—
> in which we feel confident, we cannot arrive at what we deem

---

[8] In addition to the two analysts discussed here, a third analyst, Jefferies & Company, suspended earnings estimates for New Century in its report dated February 8, 2007.

to be reasonable estimates of performance or value.  We are, therefore, suspending our estimates, price target and rating pending the provision of audited financial statements for 2006 and guidance for 2007 operational measures that we consider dependable.

35.     JPMorgan analysts, in their report dated March 5, 2007, stated that New Century's 2005 10-K could be relied upon, but indicated that the information contained in those financials was no longer value relevant and was inadequate to provide any basis for valuing the Company:

> At this time we believe it is more likely than not that NEW will be forced to seek bankruptcy protection due to the questions surrounding its short-term liquidity.  As the last financials that we can rely on were filed in the company's 2005 10K, we are unable to make estimates at this time, and are also unable to provide any basis for valuation.

36.     It is not surprising that reasonable investors did not find the Company's December 31, 2005 financial statements to be value relevant as of early 2007 because intervening industry-wide and Company-specific events had dramatically altered the economic prospects for the Company between 2005 and 2007.  By early 2007, the rise in housing prices had slowed or prices had fallen, home sales had slowed, and foreclosures were increasing.  The Chairman of the

Federal Reserve, Ben Bernanke, summarized some of the changes in the subprime

mortgage and housing industries in a speech on May 17, 2007:[9]

> The rise in delinquencies has begun to show through to
> foreclosures.  In the fourth quarter of 2006, about 310,000
> foreclosure proceedings were initiated, whereas for the
> preceding two years the quarterly average was roughly 230,000.
> Subprime mortgages accounted for more than half of the
> foreclosures started in the fourth quarter.
>
> …After rising at an annual rate of nearly 9 percent from 2000
> through 2005, house prices have decelerated, even falling in
> some markets.…
>
> …Sales of both new and existing homes have dropped sharply
> from their peak in the summer of 2005, the inventory of unsold
> homes has risen substantially, and single-family housing starts
> have fallen by roughly one-third since the beginning of 2006.
> Although a leveling-off of sales late [in 2006] suggested some
> stabilization of housing demand, the latest readings indicate a
> further stepdown in the first quarter [of 2007].

37.     Exhibit 3 lists the annual percentage change in four housing price

indexes—the S&P/Case-Shiller, Freddie Mac, OFHEO, and the U.S. Census

Bureau indexes.  This exhibit illustrates that housing prices rose strongly

throughout 2004 and 2005, but rose more slowly or declined in 2006 and 2007.

---

[9] Federal Reserve Chairman Ben S. Bernanke's Speech at the Federal Reserve
Bank of Chicago's 43rd Annual Conference on Bank Structure and Competition,
Chicago, IL, May 17, 2007 (internal footnote omitted).

38.    Exhibit 4 illustrates the number of subprime mortgages in foreclosure as of year end.  This exhibit shows that the number of subprime foreclosures was flat from 2004 to 2005, but rose strongly after 2005.

39.    As home prices slowed or fell, construction and sale of new homes slowed, the inventory of unsold homes increased, and mortgage originations slowed.  For example:

- Authorized building permits rose by 4.12% in 2005 (from 2004), but fell by 14.68% in 2006.[10]  Housing starts rose by 5.75% in 2005, but fell by 12.93% in 2006.[11]

- The California Association of Realtors' index of single-family homes inventory for sale more than doubled from the end of 2005 to the end of 2006.

- Prime mortgage originations rose by 4.83% in 2005, but fell by 4.61% in 2006.[12]  Similarly, industry-wide subprime originations rose by 15.74% in 2005, but fell by 4% in 2006.[13]

---

[10] U.S. Census Bureau (Manufacturing, Mining, and Construction Statistics), New Residential Construction – Building Permits, http://www.census.gov/const/www/newresconstindex.html and http://www.census.gov/const/www/C40/table1.html.

[11] U.S. Census Bureau (Manufacturing, Mining, and Construction Statistics), New Residential Construction – Housing Starts, http://www.census.gov/const/startsan.pdf).

[12] Includes loans classified as:  FHA/VA, Conv/Conf, Jumbo, Alt-A, and HEL (*The 2009 Mortgage Market Statistical Annual – Volume I:  The Primary Market*, Inside Mortgage Finance Publications, Inc., 2009, p. 4).

[13] *The 2009 Mortgage Market Statistical Annual – Volume I:  The Primary Market*, Inside Mortgage Finance Publications, Inc., 2009, p. 4.

New Century's experience was similar to that of the industry. The Company's subprime originations rose by 24.88% in 2005, but fell by 2.09% in 2006.[14]

40.     In addition to changing industry trends, a considerable amount of relevant news also was disclosed to the market in early 2007 regarding the future prospects of the Company, including disclosures regarding New Century's financing difficulties related to covenant violations and disclosures regarding the Company's worsening expectations for the outlook of the subprime mortgage industry. Indeed, as discussed above, analysts specifically indicated that, as of February or March 2007, the 2005 financials were inadequate to provide any basis for valuing the Company.

41.     Given this backdrop of dramatically changing industry trends after 2005 and the additional Company disclosures in early 2007, it is not surprising that reasonable investors did not find the Company's stale December 31, 2005 financial statements to be value relevant as of early 2007.

42.     Further, as noted above, the anonymous Internet message board posting from March 2, 2007 failed to inspire any replies or conversation concerning the Company's 2005 financials. Again, this absence of any discussion concerning the 2005 financials is consistent with my finding that reasonable investors did not find the Company's December 31, 2005 financial statements to be value relevant as of early 2007.

---

[14] *The 2009 Mortgage Market Statistical Annual – Volume I:  The Primary Market*, Inside Mortgage Finance Publications, Inc., 2009, pp. 212, 214, 216.

*C.    Conclusions*

43.    In summary, I have found no evidence in the materials I have reviewed that the market understood the reference to "and prior periods," any other aspect of the March 2, 2007 announcement, or any aspect of any other Company announcement, to mean that errors existed in the 2005 financial statements or the KPMG 2005 audit report.  I have found no analyst or press report that even mentions, let alone analyzes, the "and prior periods" comment.  Moreover, after March 2, 2007, one analyst affirmatively stated that the 2005 financial statements could be relied upon.  After the May 24, 2007 announcement that the 2005 financial statements should no longer be relied upon, market observers commented on this being new information.

44.    I have also found no market commentary in the materials I have reviewed suggesting that any of the price declines during the alleged disclosure period were attributable to errors in the Company's 2005 financial statements or the KPMG 2005 audit report.  This is to be expected for two reasons:  first, I have found no evidence that the market understood that there were any errors in the 2005 financials or audit report; and second, by early 2007, the stale 2005 financials were no longer value relevant and were inadequate to provide any basis for valuing the Company.

45.    In my opinion, the evidence is very clear that no declines in New Century's stock price during the Class Period are attributable to perceived errors in

New Century's 2005 financial statements or the KPMG 2005 audit report. No contemporaneous, informed market commentary during the Class Period suggested that there were any issues with the 2005 financials; there was contemporaneous analyst commentary that the 2005 financials were reliable; information disclosed after the end of the Class Period about the 2005 financials was characterized as new information; no analyst or press commentary attributed any price decline during the Class Period to errors in the 2005 financials or audit report; and contemporaneous analyst commentary confirms that, by early 2007, the 2005 financials were stale and inadequate to provide any basis for valuing the Company, consistent with academic research.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 12th day of January in 2010 in Menlo Park, CA.

_Allan W. Kleidon_

Allan W. Kleidon