# Exhibit J

1   DONALD W. SEARLES, Cal. Bar No. 135705
    E-mail: searlesd@sec.gov
2   JANET E. MOSER, Cal. Bar No. 199171
    E-mail: moserj@sec.gov
3
    Attorneys for Plaintiff
4   Securities and Exchange Commission
    Rosalind R. Tyson, Regional Director
5   Andrew G. Petillon, Associate Regional Director
    John M. McCoy III, Regional Trial Counsel
6   5670 Wilshire Boulevard, 11th Floor
    Los Angeles, California 90036
7   Telephone:  (323) 965-3998
    Facsimile:  (323) 965-3908

8

9

10              UNITED STATES DISTRICT COURT

11              CENTRAL DISTRICT OF CALIFORNIA

12  SECURITIES AND EXCHANGE        Case No.
    COMMISSION,
13                                 SACV09-01426 JVS (ANx)
                                   
14            Plaintiff,           COMPLAINT FOR VIOLATIONS OF
                                   THE FEDERAL SECURITIES LAWS
15        vs.

16  BRAD A. MORRICE, PATTI M.
    DODGE, and DAVID N. KENNEALLY,
17
              Defendants.
18

19

20

21

22

23

24

25

26

27

28

1    Plaintiff Securities and Exchange Commission (the "Commission") alleges

2  as follows:

3  **I.    JURISDICTION AND VENUE**

4         1.    This Court has jurisdiction over this action pursuant to Sections 20(b),

5  20(d)(1), 20(e) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15

6  U.S.C. §§ 77t(b), 77t(d)(1), 77t(e), and 77v(a), Sections 21(d)(1), 21(d)(2),

7  21(d)(3)(A), 21(e), and 27 of the Securities Exchange Act of 1934 ("Exchange

8  Act"), 15 U.S.C. §§ 78u(d)(1), 78u(d)(2), 78u(d)(3)(A), 78u(e) & 78aa, and

9  Section 3(b) of the Sarbanes-Oxley Act, 15 U.S.C. § 7202(b).  Defendants have

10  directly or indirectly made use of the means or instrumentalities of interstate

11  commerce, of the mails, or of the facilities of a national securities exchange in

12  connection with the transactions, acts, practices and courses of business alleged in

13  this Complaint.

14         2.    Venue is proper in this district pursuant to Section 22(a) of the

15  Securities Act, 15 U.S.C. § 77v(a), and Section 27 of the Exchange Act, 15 U.S.C.

16  § 78aa, because Defendants reside and transact business within this district and

17  certain of the transactions, acts, practices and courses of conduct constituting

18  violations of the federal securities laws alleged in this Complaint occurred within

19  this district.

20  **II.    SUMMARY**

21         3.    This matter involves securities fraud by three former officers of New

22  Century Financial Corporation ("New Century" or "the Company"), once the third

23  largest subprime lender in the United States.  After announcing in February 2007

24  that it would have to restate its 2006 quarterly financial statements, New Century

25  quickly collapsed, ceasing operations in March 2007 and filing for bankruptcy

26  protection in April 2007.  New Century's second and third quarter 2006 Forms 10-

27  Q and three late 2006 private stock offerings contained false and misleading

28  statements and omissions regarding its subprime mortgage business.  Those

1  disclosure documents emphasized that New Century was a subprime lender –

2  lending to individuals who could not generally qualify for home mortgage loans

3  under the underwriting standards prescribed by conventional mortgage lenders –

4  but generally sought to assure investors that its underlying business model was

5  sound, that its "commitment to responsible lending is good business" and that the

6  Company was performing better than its peers.  As the multi-year rise in residential

7  real estate prices abated in 2006, however, New Century's business was anything

8  but "good" and it soon became evident that its lending practices, far from being

9  "responsible," were the recipe for financial disaster.  During the second and third

10  quarters of 2006, as New Century's liquidity crises unfolded, the Company failed

11  to disclose certain information that would have significantly altered the total mix

12  of information available to investors regarding the Company and had, and could

13  reasonably be expected to have, an unfavorable impact on net revenues and income

14  from continuing operations, including dramatic increases in the production of high

15  risk loans, early default rates, loan repurchases, and loan repurchase requests.

16      4.      Brad A. Morrice ("Morrice"), a New Century co-founder and former

17  CEO, and Patti M. Dodge ("Dodge"), New Century's former CFO, were

18  responsible for these fraudulent disclosures and omissions.  Morrice and Dodge

19  knew this negative information from numerous reports they regularly received,

20  including weekly reports that Morrice started in September 2006, ominously

21  entitled "Storm Watch."  Morrice and Dodge also participated in New Century's

22  disclosures, including reviewing and signing the Forms 10-Q.  Yet, despite their

23  knowledge of the negative information and participation in the disclosure process,

24  Morrice and Dodge failed to ensure that the negative information regarding New

25  Century's business was properly disclosed.

26      5.      In addition, in the second and third quarters of 2006, New Century

27  materially overstated its financial results by improperly understating its expenses

28  related to repurchased loans and pending repurchase requests.  Dodge and David

1  N. Kenneally ("Kenneally"), New Century's former controller, were responsible
2  for New Century's fraudulent accounting practices. In the face of dramatically
3  *increasing* loan repurchases and repurchase requests, Kenneally, with Dodge's
4  knowledge, changed in both the second and third quarters of 2006 New Century's
5  repurchase reserve accounting to *reduce* the reserve provision (or expense). These
6  undisclosed accounting changes violated Generally Accepted Accounting
7  Principles ("GAAP") and resulted in New Century improperly avoiding substantial
8  expenses, understating its repurchase reserve, and materially overstating its
9  financial results – its second quarter 2006 pre-tax earnings were overstated by
10  165%, and its third quarter 2006 pre-tax earnings were improperly reported as a
11  $90 million profit instead of an $18 million loss.

12      6.    Morrice's, Dodge's, and Kenneally's (collectively, "Defendants") fraud
13  caused investors substantial losses. From early 2006 to early 2007, New Century's
14  stock price ranged from around $30.00 to $50.00, and in the second half of 2006,
15  the company raised $142.5 million by selling stock to new investors. These
16  investments were wiped out as New Century's fraud was revealed to the public in
17  early 2007. On February 7, 2007, New Century announced that it would have to
18  restate its consolidated financial results for the first three quarters of 2006 because
19  of errors in its application of GAAP regarding the Company's allowance for loan
20  repurchase losses and the growing volume of outstanding repurchase claims that it
21  experienced in 2006. New Century further announced that it expected to conclude
22  that the errors leading to its restatements constituted material weaknesses in its
23  internal controls over financial reporting, and that its previously issued financial
24  statements "should no longer be relied upon." That day, New Century's stock
25  price fell nearly 40%, from $30.16 to $19.24. On March 1, 2007, New Century
26  disclosed that it would be unable to timely file its 2006 annual report (Form 10-K).
27  On March 12, 2007, the Company disclosed that certain lenders discontinued
28  financing for the Company, and that it lacked the liquidity to keep pace with loan

3

1  repurchase requests. After close of trading on March 13, 2007, with the price of its
2  once-lofty stock at a paltry 84 cents, the New York Stock Exchange delisted New
3  Century's stock. Shortly thereafter, on April 2, 2007, the Company filed for
4  bankruptcy protection.

5       7.    Based on their conduct, Defendants, among other things, violated and/or
6  aided and abetted violations of the antifraud, reporting, record-keeping, internal
7  controls, lying to accountants, certification and/or reimbursement provisions of the
8  federal securities laws. The Commission seeks an order enjoining Defendants
9  from future violations of the securities laws, requiring Defendants to disgorge their
10 ill-gotten gains with prejudgment interest, requiring defendants Morrice and Dodge
11 to reimburse the Company for their bonuses and incentive or equity-based
12 compensation pursuant to Section 304 of the Sarbanes-Oxley Act, ordering
13 Defendants to pay civil monetary penalties, barring Defendants from serving as
14 officers or directors of a public company, and providing other appropriate relief.

15 **III.    THE DEFENDANTS**

16      8.    **Brad A. Morrice** is a resident of Laguna Beach, California. Morrice,
17 one of New Century's founders, served as Vice Chairman of New Century's Board
18 of Directors from 1996 until his termination on June 8, 2007; as President and a
19 director of the Company from 1995 until June 8, 2007; as Chief Executive Officer
20 of the Company from July 1, 2006 until June 8, 2007; as Chief Operating Officer
21 of the Company from January 2001 until July 2006; as General Counsel of the
22 Company from December 1995 until December 1997; and as Secretary of the
23 Company from December 1997 to May 1999. Morrice also served as the Chief
24 Executive Officer and Director of New Century Mortgage, a wholly owned direct
25 subsidiary of New Century; Chairman of the Board of Directors and Chief
26 Executive Officer of NC Capital, a wholly owned indirect subsidiary of New
27 Century Mortgage; and Chairman of the Board of Directors and Chief Executive
28 Officer of Home 123, a wholly owned subsidiary of New Century.

4

1    9.    **Patti M. Dodge** is a resident of Irvine, California. Dodge served as
2 Executive Vice President of New Century from March 2004 until her termination
3 on June 22, 2007; as Chief Financial Officer of the Company from July 20, 2004
4 until November 14, 2006; and as Executive Vice President, Investor Relations of
5 the Company from November 15, 2006, until June 2007. Dodge also served as
6 Senior Vice President and Controller of the Company from September 1999 until
7 July 2004; Senior Vice President and Chief Financial Officer of New Century
8 Mortgage between February 2002 and March 2004, and Executive Vice President
9 and Chief Financial Officer of New Century Mortgage from March 2004 to June
10 2007. In addition, Dodge served as the Chief Financial Officer of Home 123 since
11 March 2004 and one of its directors from February 2006 to June 2007. Dodge was
12 licensed as a CPA in California but her license was cancelled.

13    10.    **David N. Kenneally** is a resident of Rossmoor, California. Kenneally
14 was a Vice President of New Century from July 2003 to July 2005 and a Senior
15 Vice President from July 2005 until his termination on June 21, 2007. Kenneally
16 served as New Century's Controller from July 2005 to March 2007, and served as
17 the Company's Assistant Controller from July 2003 to July 2005. Kenneally is
18 licensed as a CPA in California.

19 **IV.    RELATED PARTY**

20    11.    **New Century Financial Corporation** was a Maryland corporation
21 with its principal executive offices in Irvine, California. New Century's common
22 stock was registered with the Commission pursuant to Section 12(b) of the
23 Exchange Act and traded on the New York Stock Exchange until it was delisted on
24 March 13, 2007. On April 2, 2007, New Century filed for Chapter 11 bankruptcy
25 protection; on July 15, 2008, the bankruptcy court entered an order confirming a
26 liquidation plan effective August 1, 2008, which provided for the transfer of all
27 remaining assets to a liquidating trust for the benefit of unsecured creditors. After
28 all distributions have been made, the liquidating trustee will file a certificate of

5

1  dissolution on behalf New Century.

2  **V.     NEW CENTURY: "A NEW SHADE OF BLUE CHIP™"**

3        **A.     Background**

4        12.    New Century was founded in 1995 and began originating, purchasing,

5  selling and servicing home mortgage loans in 1996. It ended 1996, its first full

6  year of operation, with over 300 employees and an annual mortgage loan

7  production volume of $350 million. The Company became a public company in

8  June 1997, trading on the NASDAQ. Over the ensuing decade, New Century

9  experienced phenomenal growth: by 2001, New Century had originated over $20

10  billion in mortgage loans since its inception. From 2001 to 2005, New Century's

11  loan production increased more than nine-fold, and in 2005 it originated over $50

12  billion in mortgage loans in that year alone and, at its peak, had over 7,000

13  employees. New Century's earnings per share grew commensurate with its

14  phenomenal growth. The Company's reported earnings per share grew from $0.13

15  in 1996 to $7.17 in 2005. In a May 4, 2006 news release, under New Century's

16  trademarked byline, *"A New Shade of Blue Chip™,"* Morrice publicly reported that

17  the Company's wholesale business "ranked as the #1 non-prime wholesale lender

18  and #4 wholesale lender in the overall mortgage market in 2005."

19        13.    In October 2004, New Century converted to a publicly-traded real

20  estate investment trust, or REIT, listed on the NYSE, and, through its subsidiaries,

21  became one of the nation's largest mortgage finance companies. New Century's

22  structure as a REIT allowed it to pay little or no corporate income taxes. To

23  maintain its status as a REIT, however, New Century was required to distribute at

24  least 90% of the REIT's annual, taxable income to its shareholders. As a result,

25  New Century's ability to accumulate capital for mortgage lending operations was

26  severely limited, and required the Company to raise funds through equity offerings

27  and debt financings and to maintain a number of credit facilities so that it could

28  borrow money, on a short term basis, to originate and purchase mortgage loans and

6

1  to otherwise support its operating activities.

2  14.  New Century originated and purchased loans through two divisions: a

3  Wholesale Division and a Retail Division. Its Wholesale Division, operating under

4  the name New Century Mortgage Corporation, originated and purchased loans

5  through a network of independent mortgage brokers and correspondent lenders

6  solicited by the Company's account executives. The Wholesale Division

7  originated its mortgage loans through its FastQual Web site at

8  www.newcentury.com, where, according to New Century's 2005 Form 10-K, "a

9  broker can upload a loan request and receive a response generally within 12

10  seconds." New Century's Retail Division operated under the name Home123

11  Corporation and originated loans through a consumer-direct channel and a

12  builder/realtor channel, supported by over 200 branch offices and a central

13  telemarketing unit. In 2005, New Century's Wholesale Division originated $49.2

14  billion in mortgage loans, or 87.2% of total originations, and its Retail Division

15  originated $6.9 billion in mortgage loans, or 12.3% of total originations.

16  15.  Historically, New Century pooled its loans and sold them, typically at

17  a premium (*i.e.*, at a price above the loan's then outstanding principal balance), in

18  secondary market transactions. New Century sold the pooled loans either through

19  a whole loan sale or a securitization. In whole loan sales, New Century sold the

20  loans to investors (*e.g.*, Morgan Stanley and Lehman Brothers, which in turn often

21  securitized the loans) and recorded a gain on the sale. In securitizations, New

22  Century sold interests in the pooled loans, *i.e.*, mortgaged-backed securities. In

23  2005, New Century had $35.3 billion in whole loan sales and $17.4 billion in

24  securitizations; in the first three quarters of 2006, it had $41.1 billion in whole loan

25  sales and $3.2 billion in securitizations.

26  16.  New Century sold whole loans pursuant to purchase agreements in

27  which the Company provided customary representations and warranties regarding

28  its loan characteristics and origination process. New Century could be required to

7

1  repurchase or substitute loans in the event of a breach of those representations and

2  warranties. In addition, New Century generally committed to repurchase or

3  substitute a loan if a payment default occurred within the first month or two

4  following the date the loan is sold. New Century's net revenues and income from

5  operations were negatively affected by loan repurchases. In repurchasing a loan,

6  New Century had to repay the loan purchaser the loan's full unpaid principal

7  balance, any missed interest payments, and any premium paid for the loan.

8  Moreover, once it had repurchased a loan, New Century was left with a loan whose

9  value was typically 80% of the repurchase price. As New Century acknowledged

10  in its 2005 Form 10-K, "[s]ignificant repurchase activity could harm our cash flow,

11  results of operations, financial condition and business prospects."

12      17.    According to its periodic filings, New Century focused on "lending to

13  individuals whose borrowing needs are generally not fulfilled by traditional

14  financing institutions because they do not satisfy the credit, documentation or other

15  underwriting standards prescribed by conventional mortgage lenders and loan

16  buyers." In common industry parlance, New Century was a "subprime" lender, as

17  its customer base typically could not qualify for a "prime" or conventional loans

18  with conventional lenders.

19      18.    New Century made numerous and repeated representations in its

20  periodic filings that downplayed the risks of its subprime mortgage business. For

21  example, New Century claimed in its 2005 Form 10-K, which was filed with the

22  Commission on March 16, 2006, that it: continued "to prudently manage[] [its]

23  capital and liquidity levels;" employed a variety of sophisticated hedging strategies

24  "to monitor and address interest rate risk;" had designed and implemented

25  procedures for "qualifying, approving and monitoring [its] network of approved

26  mortgage brokers"; and its "loan origination and procedures [were] designed to

27  produce high quality loans" including "proprietary underwriting systems in [its]

28  loan origination process that improve[s] the consistency of underwriting standards,

1  assess[es] collateral adequacy and help[s] to prevent fraud, while at the same time

2  increasing productivity."

3      19.    New Century further stated in its 2005 Form 10-K that under all its

4  loan programs, whether it be its "full documentation," "limited documentation" or

5  "stated income documentation" programs, it "review[ed] the applicant's source of

6  income, calculate[d] the amount of income from sources indicated on the loan

7  application or similar documentation, review[ed] the applicant's credit history, and

8  calculate[d] the debt service-to-income ratio to determine the applicant's ability to

9  repay the loan." In discussing its loan processing policies in 2005 Form 10-K,

10 New Century assured investors, among other things, that it "only approve[d]

11 subprime loan applications that evidence a borrower's ability to repay the loan"

12 and that it "consider[s] whether a subprime borrower's loan terms are in the

13 borrower's best interests and document[s] [its] belief that the loan represents a

14 tangible benefit to the borrower."

15     20.    In discussing its evaluation and compliance procedures in its 2005

16 Form 10-K, New Century further assured investors, among other things, that it

17 "subjects[s] a significant statistical sampling of [its] loans to a quality assurance

18 review of borrower qualification, validity of information and verified property

19 value determination," that it "periodically engage[s] independent firms to review

20 internal controls and operations to help ensure compliance with accepted federal

21 and state lending regulations and practices," and that it "adhere[s] to high

22 origination standards in order to sell our loan products in the secondary market."

23     21.    In the section of New Century's Forms 10-Q for the second quarter

24 ending June 30, 2006, and third quarter ending September 30, 2006, entitled

25 "Management's Discussion and Analysis of Financial Condition and Results of

26 Operation," ("MD&A"), the Company advised its investors that its quarterly

27 reports "represent[ed] an update to the more detailed and comprehensive

28 disclosures included in [its] Annual Report on Form 10-K for the year ended

9

1   December 31, 2005. As such, a reading of the Annual Report on Form 10-K is

2   necessary to an informed understanding of the [current quarter MD&A

3   discussion]." In addition, in each of the second and third quarter Forms 10-Q,

4   which were filed with the Commission on August 9, 2006 and November 11, 2006,

5   respectively, New Century repeated and/or paraphrased many of the same positive

6   statements contained in its 2005 Form 10-K, which served to downplay the risks

7   presented by its subprime mortgage business and the risks associated with it being

8   required to repurchase loans in the event it breached its customary representations

9   and warranties, or in the event of first payment or early payment default by its

10  borrowers. For example, in its second and third quarter 2006 Forms 10-Q, New

11  Century continued to claim, among other things, that it prudently managed its

12  capital and liquidity levels, engaged in sophisticated hedging strategies to

13  minimize interest rate risk, and had designed and/or modified its underwriting

14  standards and quality assurance programs to ensure that its loan quality was

15  consistent and met its guidelines.

16      22.     In its periodic filings, New Century also claimed that it had

17  adequately reserved for loan repurchase losses. As New Century stated in its 2005

18  Form 10-K,

19          *[t]he allowance for repurchase losses on loans sold relates to*

20          *expenses incurred due to the potential repurchase of loans or*

21          *indemnification of losses based on alleged violations of*

22          *representations and warranties which are customary to the business.*

23          *Provisions for losses are charged to gain on sale of loans and*

24          *credited to the allowance. The allowance represents the Company's*

25          *estimate of the **total** losses expected to occur and is considered to be*

26          *adequate by management based upon the Company's evaluation of*

27          *the potential exposure related to the loan sale agreements over the*

28          *period of repurchase risk. The allowance for repurchase losses is*

1    *included in accounts payable and accrued liabilities on the*

2    *Company's consolidated balance sheet.*

3    (emphasis added). New Century further stated that "[g]enerally, repurchases are

4    required within 90 days from the date the loans are sold. Occasionally, we may

5    repurchase loans after 90 days have elapsed." As of December 31, 2005, June 30,

6    2006 and September 30, 2006, New Century's repurchase allowance totaled $7.0,

7    $14.4 and $13.9 million, respectively. In New Century's Forms 10-Q for the

8    second and third quarters of 2006, the Company continued to claim that its

9    allowance for repurchase losses was "adequate."

10       23.    New Century also claimed in its 2005 Form 10-K and 2006 Forms 10-

11   Q that it had established and maintained effective internal controls and procedures

12   over its financial reporting obligations.

13       **B.    New Century's Subprime Loan Products And Associated Disclosures**

14       24.    In 2005 and 2006, New Century originated a variety of home

15   mortgage loans, including: traditional 15-year and 30-year fixed rate loans; 40-year

16   loans; adjustable rate mortgages ("ARMs"); interest only loans that became fully

17   amortizing after two or five years; home equity lines of credit; full documentation,

18   limited documentation and stated documentation or "stated income" loans; and

19   "80/20" loans, which were 0% down loans comprised of a first loan for 80% of the

20   home's value and a second loan for the remaining 20% of the value, resulting in a

21   loan-to-value ratio ("LTV") of 100%.

22       25.    New Century's no-down "80/20 Combo Product" was first introduced

23   in 2003 and soon became one of New Century's principal – and highest risk –

24   products. New Century's 80/20 product had a high risk of first or early payment

25   default, as the borrower had no equity in the property securing the loan. Without

26   placing any of his or her own money at risk, in the form of a traditional down

27   payment, the borrower could walk away from the loan as soon as market

28   conditions justified such a move, without suffering a loss. As soon the nationwide

11

1    rise in home prices abated in late 2005 and early 2006, and home prices began to
2    decline, these borrowers were among the first to default on their payment
3    obligations, thereby triggering, in ever increasing numbers, New Century's loan
4    repurchase obligations.

5         26.    New Century was well aware of the risks created by its 80/20 product,
6    but never disclosed those risks or its growing production volume of 80/20 loans.
7    Instead, New Century sought to mollify its investors, first by emphasizing its strict
8    underwriting guidelines with respect to its "niche" 80/20 product in its 2003 and
9    2004 Forms 10-K, and thereafter dropping references to that product altogether in
10   its 2005 Form 10-K and in its subsequent periodic filings.

11        27.    New Century discussed its 80/20 product in its 2003 and 2004 Forms
12   10-K under the innocuous heading *"'Niche' or Special Programs."* In describing
13   that product, New Century strove to downplay the risks presented by its no-down,
14   100% LTV product.  As New Century stated,

15            *[w]e have several programs that we have designated as "niche" or*
16            *special programs.  These programs are the 80/20 Combo Product, the*
17            *Stand Alone Second trust deed, or TD, Product and the 100% High*
18            *LTV Product.  In general, these programs require the borrower to*
19            *have an excellent mortgage history over the last 12 months.  In*
20            *addition to credit score minimums, these programs require a more in-*
21            *depth analysis of consumer credit and have certain requirements for*
22            *verification of liquid reserves.  The minimum credit scores for these*
23            *products are 580 on the 80/20 Combo Product, 600 on the 100%*
24            *High LTV Product, and 620 on the Stand Alone Second TD product.*
25            *Maximum loan amounts or combined loan amounts on these products*
26            *range from $600,000 to $850,000 on the 80/20 Combo Product and*
27            *the 100% High LTV Product.  The maximum loan amount on the*
28            *Stand Alone Second TD Product is $200,000.  Higher loan amounts*

1     *have higher credit score minimums and are subject to other*

2     *restrictions and limitations.*

3         28.     In its 2005 Form 10-K, New Century dropped its discussion of its

4 "niche" and "special programs" and its 80/20 Combo Product altogether. In

5 addition, New Century never disclosed its increasing origination of 80/20 or high

6 LTV loans, that those high-LTV loans represented approximately one third of its

7 total loan originations, or the increasing default rates and repurchase obligations it

8 was incurring as a result of those products.

9         29.     New Century carefully tracked its loan production in monthly Capital

10 Markets Reports, which were internally distributed to its officers, including

11 Morrice and Dodge. As shown in the chart below, the Capital Markets Reports

12 disclosed that 80/20 loans increased substantially in 2004 and 2005 and accounted

13 for approximately 30% of New Century's loan production from Q2 2005 through

14 Q3 2006.

15

| Time Period | 80/20 Loans as a Percent of Total Loan Production |
|---|---|
| 1Q 2004 | 15.02% |
| 2Q 2004 | 19.15% |
| 3Q 2004 | 22.96% |
| 4Q 2004 | 23.35% |
| 1Q 2005 | 23.66% |
| 2Q 2005 | 31.40% |
| 3Q 2005 | 33.62% |
| 4Q 2005 | 34.06% |
| 1Q 2006 | 31.61% |
| 2Q 2006 | 33.47% |
| 3Q 2006 | 30.22% |

13

| Time Period | 80/20 Loans as a Percent of Total Loan Production |
|---|---|
| 4Q 2006 | 29.17% |

30.    As a result of the higher proportion of 80/20 loans, in 2006, the Company's internal Capital Market Reports stated that New Century's combined loan-to-value ratio ("CLTV") ranged from 86.6% to 87.6%. As the Company's Capital Market Report for June, 2006 noted, "[o]verall, CLTV's rose to 87.5%, an all time high. This is the result of the very high 80/20 volume of 34.8%." New Century also understood, as early as 2004, that higher CLTV ratios increased its default risk. New Century, however, did not disclose it actual LTV ratios in its periodic filings.

31.    Any reasonable investor would expect an 80/20 loan to have a 100% LTV ratio, since New Century financed both portions of the loan and the borrower was not required to make any down payment or have any equity in his or her home. New Century, however, through mathematical chicanery, materially underreported its LTV ratios in its periodic filings. Specifically, New Century reduced the 100% LTV ratio for its 80/20 product to just 84%, by separately calculating the LTV ratio of the "80" portion of the product and the "20" portion of its 80/20 Combo Product. For example, assuming a $100,000 80/20 loan, New Century calculated the LTV ratio of the "80" portion at just 64% ($80,000 first lien times 80%), and then added the calculated LTV ratio of the "20" portion at 20% ($20,000 second lien times 100%), for a resulting LTV ratio of 84% (64% plus 20%). New Century never disclosed in its periodic filings its methodology for calculating its publicly reported LTV ratios, other than by dropping an unintelligible footnote in its periodic filings that stated that its "weighted average LTV is the LTV of its first lien mortgages and combined LTV of its second lien mortgages." The discrepancy between New Century's actual LTV ratios, as tracked in the Company's internal Capital Market Reports, and the weighted average loan-to-value ratio ("WALTV")

as disclosed in its periodic filings, was dramatic. Whereas New Century's internally-tracked LTV ratios ranged from 86.6% to 87.7% in 2006, its publicly reported ratios ranged from 80.9% to 81.4%. These publicly reported figures materially understated New Century's actual LTV ratios, and misled investors by implying that virtually all of New Century's borrowers had considerable equity in their homes, whereas, in fact, nearly one-third of New Century's borrowers had no equity in their homes whatsoever.

32.    Many of New Century's loans also had multiple layers of risk, such as 80/20 (or 100% LTV) loans made to borrowers on a "stated income" basis. New Century knew that such loans had a higher risk of default, and hence created a higher risk of triggering New Century's loan repurchase obligations, as the borrower had no equity in the property (presenting the risk that the borrower would walk away from the loan in the event of a decline in home prices), and the borrower's stated income could be false (presenting the risk that the borrower would default due to an inability to make monthly payments on the loan). According to its internal Capital Market Reports, New Century made a significant amount of these layered risk loans in 2005 and 2006, as shown in the chart below.

| Time Period | Layered 80/20-Stated Income Loans as a Percent of Total Loan Production |
|---|---|
| 1Q 2005 | 11.53% |
| 2Q 2005 | 16.73% |
| 3Q 2005 | 18.39% |
| 4Q 2005 | 18.60% |
| 1Q 2006 | 17.27% |

33.    New Century also made many of these layered risk loans to first time home buyers ("FTHBs"), which added yet another layer of risk. For example, according to the January 2006 Capital Market Report, 54.9% of FTHB loans were

15

1  stated income loans and 72.2% of the FTHB loans were 80/20 loans, which

2  indicated that some FTHBs obtained 80/20 loans based on stated income (*e.g.*,

3  layered risk loans).

4    **C.    New Century Experienced Greater Losses On Certain Loans**

5    34.    In 2003 and 2004, New Century experienced a relatively low level of

6  losses, as measured by default, delinquency, and repurchase rates.  Beginning in

7  2005, New Century began to experience an increasing default rate where the

8  borrower missed the first payment due on a loan (commonly referred to as first

9  payment default of "FPD"), or one of the first three payments on a loan (commonly

10  referred to as an early payment default of "EPD"), and increasing loan repurchase

11  losses, with a disproportionate amount of those losses coming from 80/20, stated

12  income, and layered risk loans.  As a result of the increasing rate of FPD's and

13  EPD's, New Century's loan repurchases in 2005 and 2006 sharply increased as

14  compared to the prior year.

15    35.    Throughout 2006, New Century produced several internal reports that

16  discussed these increasingly greater default rates and loan repurchase losses and

17  the loans disproportionately contributing to those losses.

18    36.    A February 14, 2006 report entitled "2005 Delinquency," which

19  Morrice and Dodge received on that date, stated in the summary that since 2003,

20  New Century had been making more stated income and 80/20 loans; that 80/20

21  loans perform worse than core (80%) loans; and that stated income-80/20 loans

22  with one borrower have "terrible performance relative to other loans in the same

23  FICO band."  The summary concluded by stating: *__Overall, our volume has__*

24  *__moved into loan cohorts that have weaker performance.  As a result of the higher__*

25  *__volume coming from those poor performing buckets, our delinquency rates are__*

26  *__being negatively impacted.__*" (bold and italics in original).   In discussing its 60+

27  day delinquency rate from its 2005 vintage loans, this report further noted that,

28  *__"60+ Delinquency performance has deteriorated in 2005 versus the 2003-2004__*

16

*vintages. Overall the 2005 60+ delinquency at month 11 is twice as high as it was in 2003. 80/20 loans show similar trends and although they have higher FICOs, the delinquency is generally higher than the core loans across all vintages.*" (bold and italics in original).

37.    The January 2006 Capital Markets Report, which Morrice, Dodge and Kenneally received on February 22, 2006, contained a special report on FTHB-80/20 loans and how they performed as measured by early payment defaults. According to the report, the two worst performing loans by category were stated income-FTHB-80/20 loans (8.85% EPD rate) and stated income-non-FTHB-80/20 loans (7.95% EPD rate).

38.    The February 2006 Capital Markets Report, which Morrice, Dodge and Kenneally received on March 17, 2006, contained a special report on loan losses and borrower age. The report confirmed that losses were greater for stated income loans than for full documentation loans and for second-lien loans than for first-lien loans. The report concluded by stating: "As New Century continues to fund a greater percentage of 80/20 stated documentation purchase [loans] for younger borrowers … you can expect losses to increase as well."

39.    After first payment defaults jumped from a low of 0.6% in March 2005 to a then historical high of 2% in April 2006, New Century conducted a study to determine the cause of the increase. The "First Payment Default Report," which Morrice, Dodge and Kenneally received on July 26, 2006, noted that the increase in FPDs occurred after New Century had changed the "credit mix" of its loans, including higher overall loan-to-value ratio loans (*i.e.*, more 80/20 loans) and an increase in stated income loans. The report further stated that this increase in FPDs had occurred even though the average FICO score of New Century's borrowers had increased. The report concluded that in making loans, the most important factor was the "credit mix" of each loan and that the borrower's FICO score was less important.

17

40.     Two internal Company reports, entitled "Repurchase Activity August 2006" and "Repurchase Activity September 2006", which Morrice and Dodge received on August 26, 2006 and September 7, 2006, respectively, stated that the primary drivers of repurchase activity included first time home buyers with 80/20 loans.  Kenneally also received the August 2006 report on August 26, 2006.

41.     Finally, an early September 2006 report entitled "Targeted EPD Problem Areas" stated that even with loans in which the borrower's FICO score was above 650, the worst performing loans involved some combination of 80/20 loans, stated income loans, and FTHBs.  Dodge received this report on September 13, 2006.

## VI.    NEW CENTURY'S DISCLOSURE FRAUD

### A.    New Century's Misleading Disclosures Regarding Its Loan Production

42.     New Century, Morrice, and Dodge made numerous representations disclosures regarding New Century's subprime business model and the characteristics of its loan production through its second quarter and third quarter Forms 10-Q, securities offerings (which incorporated by reference the periodic filings or referred to them as true and accurate), press releases, and earnings calls, but they failed to disclose known negative information that significantly altered the total mix of information available to investors regarding the Company and had, and could reasonably be expected to have, an unfavorable impact on net revenues and income from continuing operations.

43.     First, New Century disclosed its loan production in the MD&A of its second and third quarter 2006 Forms 10-Q and in its press releases associated with each of those filings (which were filed as Forms 8-K).  In these disclosures, New Century stated the amount (both in dollars and as a percentage of total loan production) of various loan types, including:  fixed rate mortgages; ARMs; interest only loans; 40-year loans; and stated income loans.  This loan production

1   disclosure was materially misleading because it omitted to disclose known

2   negative information, such as the substantial increase of 80/20 loans (33.47% of

3   its total second quarter 2006 loan production, up from 23% at year-end 2004 and

4   9% at year-end 2003) and the significant amount of loans with layered risks,

5   including stated income-80/20 loans (17.27% in Q1 2006, when New Century

6   last tracked such loans in its Capital Market Reports).

7        44.    Second, as discussed in paragraphs 31and 32 above, as part of its

8   loan production presentation, New Century disclosed materially misleading LTV

9   information on its loans.  Specifically, New Century disclosed a "weighted

10  average" LTV, which, in 2006, was between 80.9% and 81.4%.  As discussed

11  above, however, the "weighted average combined" LTV tracked in the

12  Company's internal Capital Markets Reports ranged from 86.6% to 87.6%.

13  New Century's public disclosure of the lower "weighted average" LTV, instead

14  of the higher internally reported "weighted average combined" LTV was

15  materially misleading, as it gave the false impression that its borrowers had, on

16  average, put 18.6% to 19.1% down, when, in fact, its borrowers had put, on

17  average, only 12.4% to 13.4% down and more than 30% of its loans were 80/20

18  or 100% LTV loans with no down payment whatsoever.

19       45.    Third, New Century's 2005 Form 10-K, which was referenced in its

20  second and third quarter 2006 Forms 10-K, disclosed risks relating to certain

21  types of loans.  Specifically, New Century stated that: interest only loans had a

22  higher risk of default after the loan became fully amortizing and the payments

23  increased and had greater losses upon default because no principal had been paid;

24  ARMs could have a higher default rate if interest rates increased and the

25  borrowers' monthly payments increased beyond their ability to pay; and, in the

26  only oblique reference to 80/20 loans, stated there was greater risk of loss where

27  New Century made "both a first and second lien mortgage loans on the same

28  property and [had no] benefit of private mortgage insurance."  This disclosure of

1  *potential* greater losses was misleading because it omitted in the second quarter

2  2006 known negative information regarding loan losses, such as the fact that

3  New Century was *actually* experiencing greater defaults on its 80/20, stated

4  income, and layered risk loans.

5      46.    Moreover, in the MD&A section of the second and third quarter

6  2006 Forms 10-Q, New Century also made disclosures that downplayed the risks

7  of its interest only and stated income loans.  Specifically, New Century disclosed

8  that it was decreasing the amount of interest only loans by introducing new

9  products such as 40-year loans, and that it had "designed [its] underwriting

10  standards and quality assurance programs to ensure that loan quality is consistent

11  and meet[s its] guidelines, even as the documentation mix varies."

12      47.    In its second quarter 2006 Form 10-Q, New Century mentioned that

13  during the first quarter of 2006, it had completed two securitizations, one of

14  which consisted of $313 million of second mortgage loans, most of which was

15  originated in connection with its 80/20-mortgage product.  As the Company

16  stated, "[w]e believe the securitization of second lien collateral allowed us to

17  capture the full economic value over the life of the mortgage loans of that

18  particular pool of loans, particularly when compared to the value that may have

19  been recognized in a whole loan sale.  This securitization was the first

20  transaction executed with collateral not representative of a cross-section of our

21  overall loan production."  This reference to 80/20 loans was materially

22  misleading in that it sought to assure investors that New Century was making a

23  profit on 80/20 loans but it omitted to disclose the substantial amount of these

24  loans that New Century was making or the increasing losses it was incurring from

25  these loans.

26      48.    The only other public disclosure of its 80/20 loans in New

27  Century's period filings, press releases or earnings calls during the second and

28  third quarters of 2006, was in New Century's second quarter 2006 earnings call,

1 | which took place on August 3, 2006, in which Morrice and Dodge participated.

2 | Dodge, in response to a question about an increase in discounted loan sales, stated:

3 | *Most of the reasons for the increase in the discounted sales is indeed*

4 | *second trust deeds. And the first quarter you might recall we did a*

5 | *securitization of those second trust deeds because the whole loan*

6 | *market at that time was very weak. I would tell you that most of the*

7 | *second trust deeds that we originate are the 20% portion of what we*

8 | *call an 80/20 loan. And we generally price the combined 80/20 loan*

9 | *to achieve our target profit margin. So you shouldn't be concerned*

10 | *that if we carve out the 20% second trust deeds and sell that at a*

11 | *discount that that means that we have a particular issue with those*

12 | *loans. We look at the overall profitability of the combined loans.*

13 | Dodge's answer was materially misleading in that it sought to assure investors that

14 | New Century was making a profit on 80/20 loans but omitted to disclose the

15 | substantial amount of these loans that New Century was making or the increasing

16 | defaults it was experiencing on these loans.

17 |      49.    Similarly, although New Century made substantial disclosures

18 | regarding potential greater losses on interest only and ARM loans and provided

19 | assurances on its underwriting of stated income loans, it failed to disclose through

20 | the second quarter of 2006 that it was actually experiencing greater defaults on its

21 | 80/20, stated income and layered risk loans. In the Company's third quarter 2006

22 | conference call, which took place on November 2, 2006, in which Morrice and

23 | Dodge participated, New Century finally disclosed that it was experiencing greater

24 | defaults on layered risk loans, which Morrice described as "a combination of

25 | borrower and collateral characteristics that includes a first-time home buyer with

26 | stated income, and a high loan to value ratio." Morrice and Dodge knew, or were

27 | reckless in not knowing, that this disclosure was materially incomplete as the

28 | substantial volume of such loans New Century had made was omitted.

50.    New Century's misleading disclosures regarding the characteristics and associated risks of its loan production were particularly misleading in light of other, disclosures New Century had made, including:

- In its 2003 Form 10-K, New Century disclosed a "weighted average initial" LTV of 82.1%, at which time 80/20 loans accounted for less that 10% of its total loan production.  It began disclosing its "weighted average" LTV in Q3 2004, when it disclosed a lower LTV of 81.1% (instead of the internally reported "weighted average combined" LTV of 85% to 85.3%) even though the amount of 80/20 loans had more than doubled to over 20% of loan production.

- In its 2002 and 2003 Forms 10-K, New Century stated that its "borrowers generally have considerable equity in the properties securing their loans....."  In its subsequent filings, New Century omitted this statement, but continued to represent that its borrowers had considerable equity in their homes by disclosing a "weighted average" loan-to-value ratio that materially underreported the Company's true LTV ratios.

- In its 2004 Form 10-K, New Century disclosed that it had "several programs that [were] designed as 'niche' or special programs," including 80/20 loans, but did not quantify the number of 80/20 loans (at that time, 80/20s accounted for about 20% of loan originations).  It deleted any mention of 80/20 loans in 2005 and 2006 when they had grown to 30% or more of loan production.

- In its 2005 Form 10-K, New Century first disclosed the amount of its 40-year loans, which at the time accounted for less than 7% of all loans.  But, it made no mention of 80/20 loans, or the percentage of such loans in the overall production, which, at the time, accounted for more than 30% of loan production.

22

1
2
3
4
5
6
7
8
9

- In its March and June 2006 securitizations (but not in its March and June 2006 Forms 10-Q), New Century disclosed that 32% and 23%, respectively, of the loans included in the securitization were part of an 80/20 loan, the "weighted average combined" LTV on 80/20 loans was over 99%, and the foreclosure frequency on 80/20 loans may be greater because the borrowers had less equity in the property. In other words, New Century used one LTV number for its securitizations and for internal tracking purposes, and another much lower number for its periodic filings.

**B.     New Century's False And Misleading Disclosures Regarding Loan Repurchases**

       **1.     New Century's Loan Repurchase Obligation**

51.     New Century could be required to repurchase loans sold pursuant to repurchase agreements in two situations: (1) the representations and warranties about the loan were untrue (*e.g.*, the represented value of the underlying property was overstated); or (2) the borrower defaulted on the loan by failing to make the first payment due after the loan was sold. New Century's financial results were negatively affected by loan repurchases and the amount of its allowance for loan repurchase losses. In repurchasing a loan, New Century had to repay the loan purchaser the loan's full unpaid principal balance, any missed interest payments, and any premium paid for the loan. Moreover, once it had repurchased a loan, New Century was left with a loan whose value was typically 80% of the repurchase price.

       **2.     New Century's Increasing Loan Repurchases In 2006**

         **a)     New Century's Increasing FPDs And EPDs**

52.     In 2006, as shown in the chart below, New Century experienced an increasing rate of FPDs and EPDs, which could trigger New Century's obligation to repurchase loans it previously had sold. These increasing FPDs and EPDs were chronicled in the monthly Capital Markets Reports, which Morrice and Dodge

received.

| Time Period | FPDs as a Percent of Total Loan Production | EPDs as a Percent of Total Loan Production |
|---|---|---|
| Q1 2005 | 1.01% | 6.59% |
| Q2 2005 | 1.03% | 7.45% |
| Q3 2005 | 1.27% | 8.60% |
| Q4 2005 | 1.30% | 9.70% |
| Q1 2006 | 1.46% | 8.08% |
| Q2 2006 | 1.88% | 11.31% |
| Q3 2006 | 2.03% | 13.77% |
| Q4 2006 | 2.40% | 14.83% |

### b)    New Century's Increasing Repurchases

53.    As a result of the increasing rate of FPDs and EPDs, New Century's loan repurchases in 2006 sharply increased as compared to the prior years, as shown in the chart below.

| ($ in millions) | 2004 Loan Repurchases | 2005 Loan Repurchases | 2006 Loan Repurchases |
|---|---|---|---|
| 1Q | $22.6 | $31.0 | $65.3 |
| 2Q | $32.5 | $108.0 | $250.4 |
| 3Q | $22.9 | $102.0 | $150.2 |
| 4Q | $58.7 | $91.1 | $317.8 |
| Total | $136.7 | $332.1 | $784.3 |

54.    In fact, New Century repurchased loans totaling $315.7 million during the first six months of 2006, which represented 95% of all loans repurchased in 2005. Dodge knew of these repurchases because she received a monthly "CFO Report" that included the amount of actual repurchases for the month.

24

55.    New Century's increasing repurchase activity negatively affected its net income and liquidity. On August 17, 2006, Dodge advised Morrice in an email that New Century started the "we started the quarter with $400mm in liquidity and we are down to less than $50mm today." The attachment to the email attributed the decrease in liquidity to a variety of factors, including loan repurchases, and recommended that New Century raise money from securities offerings.

c)    **New Century's Increasing Backlog Of Repurchase Requests**

56.    In addition to its actual repurchases, New Century had a substantial and rapidly growing backlog of pending repurchase claims – from at least $143 million at the end of 2005, to $400 million at the end of the third quarter of 2006, to $545 million by the time the third quarter 2006 Form 10-Q was issued.

57.    In the second quarter and early part of the third quarter of 2006, New Century studied its repurchase claims to better quantify them and to attempt to improve its internal controls for processing and reporting such claims. In the third quarter and early part of the fourth quarter of 2006, New Century produced and widely disseminated several internal reports that discussed the increase in outstanding repurchase claims.

58.    First, according to the August and September 2006 "Repurchase Activity" reports, as of July 31, 2006, New Century had $154 million in pending repurchase claims. Morrice, Dodge and Kenneally received the August report on August 26, 2007 report; Morrice and Dodge received the September report on September 7, 2006.

59.    Second, on September 7, 2006, Morrice and Dodge received an another report, entitled "Outstanding Repurchase Summary Report," showing total outstanding claims of $281.9 million as of that date. The email accompanying the report stated that New Century "clearly got [its] teeth kicked in with regard to purchase requests in Aug[ust] and thus far in September."

60.     Third, a report entitled "Inventory Management" reported that as of September 8, 2006, repurchase claims were trending up and pending repurchase claims totaled $382 million.  Dodge received drafts of this report on September 27 and 28, 2006; both Morrice and Dodge received final versions of this report on at least three different occasions, on September 28, October 5, and October 12, 2006.

61.     Finally, beginning in mid-October 2006, New Century began internally distributing a weekly report that was originally titled "Storm Watch" (later renamed "Key Indicators") that was designed to summarize its key operating metrics, including repurchase claims.  The "Storm Watch" reports, which were distributed to Morrice, Dodge, Kenneally and others, chronicled the outstanding repurchase claims, which grew from $143 million at the end of 2005, to $400 million at the end of third quarter of 2006, to $545 million as of October 26, 2006 (before the third quarter 2006 Form 10-Q was issued).

### d)     New Century's False And Misleading Disclosures Regarding Loan Repurchases

62.     New Century made substantial disclosures regarding New Century's loan repurchases, but failed to disclose known increases in its loan repurchase obligations that would have significantly altered the total mix of information available to investors regarding the Company and had, and could reasonably be expected to have, an unfavorable impact on net revenues and income from continuing operations.

63.     New Century disclosed in its 2006 Forms 10-Q that it could be required to repurchase loans sold pursuant to repurchase agreements in two situations:  (1) where its representations and warranties about the loan were untrue; or (2) where there was an FPD or EPD.  New Century also disclosed that it typically could sell or finance repurchased loans only at a significant discount to the unpaid principal balance, and significant repurchase activity could harm its cash flow, results of operations, financial condition, and business prospects.  New

26

1   Century further disclosed in its Q3 2006 Form 10-Q that it had $150.9 million in

2   repurchases for the quarter and $469.3 million in repurchases year to date, that

3   repurchases had increased as a result of higher EPDs, that it expected the trend in

4   increased repurchases to continue in the near term, but that it was refining its

5   underwriting standards to mitigate against the trend.

6       64.   These disclosures were misleading because New Century omitted

7   known material information regarding its loan repurchases, including the

8   substantially increasing early default rates (which, as reflected in the above chart

9   at paragraph 52, greatly exceeded New Century's reported FPD rates) and

10   growing backlog of repurchase claims ($281.9 million at September 7, 2006; 400

11   million at September 30, 2006; and $545 million at the time the third quarter

12   2006 Form 10-Q was filed).  Despite having repeatedly received information

13   regarding these matters and substantially participating in preparing the Forms 10-

14   Q, Morrice and Dodge failed to take any action to provide for proper disclosure

15   of this negative information in New Century's second and third quarter 2006

16   Forms 10-Q.

17       65.   New Century also disclosed that provisions for estimated repurchase

18   losses were charged to (or reduced) gain on sale of loans and credited to (or

19   increased) the repurchase reserve and that actual repurchase losses (or charge-offs)

20   reduced the repurchase reserve, *i.e.*, charge-offs reflected actual repurchase losses

21   and, by extrapolation, its actual repurchase activity.  In the Critical Accounting

22   Policies portion of its Forms 10-Q New Century presented the activity in its

23   repurchase reserve, which showed that Company had only a small amount of

24   charge-offs for loan repurchases:

25   ///

26   ///

27   ///

28   ///

27

| | Q1 2006 (3 months YTD) | Q3 2006 (6 months YTD) | Q3 2006 (9 months YTD) |
|---|---|---|---|
| Beginning balance | $6.955 | $6.955 | $6.955 |
| Provision (expense) | $3.202 | $10.062 | $9.622 |
| Charge-offs | $1.232 | $2.594 | $2.692 |
| Ending balance | $8.925 | $14.423 | $13.885 |

66.    This disclosure was misleading because it materially understated New Century's actual repurchase activity and losses.  Specifically, New Century did not reduce, or charge-off, the repurchase reserve for actual losses from repurchases. Rather, the charge-off number was merely a "plug" number that resulted in an ending repurchase reserve balance that New Century estimated was necessary. New Century's failure to charge-off actual losses resulted in the charge-offs being understated by approximately $63 million year to date for the second quarter 2006 and approximately $110 million year to date for the third quarter 2006.

67.    Dodge and Kenneally knew, or were reckless in not knowing, that the charge-offs were understated because: (1) New Century had repurchased $315.7 million loans during the six months ended June 30, 2006, almost as many as New Century had repurchased in all of 2005, yet charge-offs for the six months ended June 30, 2006 were approximately 15% of 2005's charge-offs; and (2) charge-offs for the nine months ended September 30, 2006 represented less than 0.6% of repurchases, whereas, in fact, they were over 20%.  Kenneally (either directly or through his direct reports) also accounted for repurchases and prepared the repurchase reserve activity chart and therefore knew, or was reckless in not knowing, that New Century was not accurately disclosing the activity in its repurchase reserve.  Despite his knowledge and participation, Kenneally never ensured that the repurchase reserve activity was properly and accurately disclosed.

68.    New Century also disclosed in its 2005 Form 10-K, which was referenced in its second and third quarter 2006 Forms 10-Q, that it had adequately reserved for loan repurchase losses, and that its allowance represented the Company's estimate of the *"total"* losses it expected to occur. As Morrice, Dodge and Kenneally knew, or were reckless in not knowing, by the third quarter of 2006 this statement was materially misleading, as the Company's loan loss reserve was based solely on loans the Company had already repurchased, and did not include the enormous backlog of pending repurchase requests, which stood at $281.9 million at September 7, 2006, 400 million at September 30, 2006; and $545 million at the time the third quarter 2006 Form 10-Q was filed.

C.    **Defendants' Involvement In New Century's Misleading Disclosures Regarding Its Loan Production And Loan Repurchases**

69.    During the time period at issue, Morrice was New Century's President (1995 to June 2007), CEO (July 2006 to June 2007), a member of the Executive Management Committee, and was primarily responsible for supervising the Company's mortgage operations. Morrice directly participated in New Century's disclosures. He signed the Company's second and third quarter Forms 10-Q as the Company's CEO and President, and also signed the Sarbanes-Oxley certifications associated with each of those filings. Morrice was also a member of New Century's Disclosure Committee, which met before each periodic report was filed with the Commission to ensure the Company's disclosures were adequate. Before he signed the periodic reports, he reviewed the entire filing. Morrice also participated in preparing New Century's press releases and spoke during New Century's earnings calls. Morrice also directly participated in New Century's 2006 securities offerings. He signed the shelf registration statement, approved the Series B preferred stock offering as a member of New Century's board, and signed the

29

1   Form 8-A registering the stock for sale. In connection with the September and

2   November 2006 trust preferred offerings, Morrice signed officer's certificates as

3   New Century's President and CEO. He also served as an administrative trustee of

4   the two trusts created in connection with the trust preferred offerings, signed the

5   stock purchase agreements on the trusts' behalf, and also signed administrative

6   trustee's certificates.

7        70.    During the period at issue, Dodge was New Century's CFO and a

8   member of New Century's Executive Management Committee. As CFO, Dodge

9   had direct responsibility for New Century's accounting and financial reporting.

10  Dodge directly participated in the preparation of New Century's periodic reports.

11  She was a member of one working group that drafted the periodic reports, and a

12  member of another working group that reviewed the periodic reports. Dodge was

13  also a member of New Century's Disclosure Committee. Before she signed the

14  periodic reports, she reviewed the entire filing. Dodge signed New Century's

15  second and third quarter 2006 Forms 10-Q as the Company's CFO, and also signed

16  the Sarbanes-Oxley certifications associated with each of those filings. Dodge also

17  participated in speaking on New Century's earnings calls. Dodge signed the shelf

18  registration statement pursuant to which the Series B preferred stock was registered

19  for sale and an underwriting agreement dated August 15, 2006. She also signed

20  the stock purchase agreements for the September and November trust preferred

21  offerings, an officer's certificate as New Century's CFO for the September trust

22  preferred offering, and, as an administrative trustee of the two trusts crated in

23  connection with the offerings, administrative trustee's certificates.

24       71.    During the period at issue, Kenneally was New Century's Controller

25  and reported directly to Dodge. As the Company's Controller, Kenneally

26  participated in the preparation of New Century's periodic reports. Kenneally and

27  his direct reports were principally responsible for preparing New Century's

28  periodic reports, including compiling the financial statements and drafting the

1    accompanying footnotes and disclosures. Kenneally was also a member of both

2    working groups, which drafted and reviewed the Company's periodic reports, and

3    he was also a member of New Century's Disclosure Committee. Kenneally also

4    signed sub-certifications in connection with New Century's second and third

5    quarter 2006 Forms 10-Q.

6        72.    Based on their regular receipt of information concerning the New

7    Century's loan production and loan losses, during the second and third quarters of

8    2006, as described in paragraphs 58 to 61 above, Morrice and Dodge knew of, or

9    were reckless in not knowing, the following material, negative information: (i)

10   New Century's increasing production of 80/20 loans and that such loans

11   represented approximately one-third of the Company's total loan production in

12   2006; (ii) that New Century underreported its LTV's ratios, by disclosing in its

13   periodic reports a "weighted average" LTV, as opposed to the combined LTV

14   ratios that the Company internally tracked; (iii) New Century's increasing

15   production of layered-risk loans; (iii) the higher default risk associated with high-

16   LTV and layered-risk loans; and (iv) the increasing loan repurchase losses New

17   Century suffered in the second and third quarters of 2006 as a result of increasing

18   FPDs and EPDs. Morrice and Dodge also knew, or were reckless in not knowing,

19   during the third quarter of 2006, of New Century's enormous and growing backlog

20   of pending repurchase requests, and that New Century's allowance for loan

21   repurchase losses materially understated the Company's actual repurchase activity

22   and losses, as it did not take into account the Company's backlog of pending

23   repurchase requests.

24       73.    Based on his regular receipt of information concerning New Century's

25   enormous and growing backlog of pending repurchase requests, Kenneally also

26   knew, or was reckless in not knowing, during the third quarter of 2006, that New

27   Century's allowance for loan repurchase losses materially understated the

28   Company's actual repurchase activity and losses, as it did not take into account the

1   Company's backlog of pending repurchase requests.

2       74.   Despite their participation in New Century's disclosure process, and

3   their knowledge of the material information discussed in paragraphs 65 and 66

4   above, Morrice and Dodge failed to take any action to ensure adequate disclosure

5   of that information.  Indeed, for the second and third quarter 2006 Forms 10-Q,

6   New Century's in-house counsel sent the Risk Factors section from the 2005

7   Form 10-K to Morrice and Dodge (among other New Century officers) and

8   specifically requested each of them to advise him of any material changes to the

9   risks facing New Century.  Morrice and Dodge never suggested disclosure in the

10  Forms 10-Q of the known negative information concerning New Century's loan

11  production and greater losses on certain loans.  They also received internal

12  reports of New Century's weighted average combined LTV, yet they never took

13  any action to provide for disclosure of an LTV number that would accurately

14  reflected the risk presented by New Century's loan production.

15          **1.   Press Releases And Earnings Calls**

16      75.   Morrice made false and misleading statements in a second quarter

17  2006 press release and the third quarter 2006 earnings call.  In these misleading

18  statements, Morrice disclosed the minimum amount of negative information and

19  suggested that New Century would be able to survive.  In a September 8, 2006

20  press release announcing New Century's loan production for August 2006, Morrice

21  was quoted as saying:

22      *We believe our strict underwriting guidelines, skilled risk*

23      *management and servicing teams and enhanced fraud detection tools*

24      *have resulted in lower early default and repurchase rates than many*

25      *of our peers.  While we have seen an increase in early payment*

26      *defaults from 2005 levels as a result of the macro-economic*

27      *environment, the increase has been modest.*

28      76.   Morrice's statement was materially misleading in several respects.

1    First, Morrice omitted to disclose the purported context of the statement, *i.e.*, that

2    the rise in EPDs was modest as compared to New Century's peers **and** EPD rates

3    prior to 2003.  Second, New Century's EPDs had in fact risen substantially from

4    2005 to 2006 and were at, or near, historic highs.

5      77. Morrice also made materially misleading statements in the November

6    2, 2006 earnings call for the third quarter 2006.  During the call, Morrice for the

7    first time disclosed that New Century's EPDs, repurchase claims, and repurchases

8    were increasing.  Morrice referred to a power point presentation that showed that

9    FPDs had increased in the third quarter of 2006 to 2.03%, as compared to 1.86% in

10   the second quarter of 2006, that repurchases had increased from 1.18% for the first

11   three quarters of 2006, as compared to 0.61% for the first three quarters of 2005,

12   and that loan repurchase rates were expected to continue to be higher in the near

13   term.  Morrice further stated that the increase in EPDs resulted in part from "the

14   layering of risk characteristics in the loan[, such as] a combination of borrower and

15   collateral characteristics that include[] a first-time home-buyer with stated income,

16   and a high loan to value ratio."  Morrice, however, also touted that New Century

17   had many credit-risk management practices that "helped [it] to reduce the amount

18   of first payment default[s] and repurchase activity ... versus [its] peers."

19     78. Morrice, however, again omitted to disclose material information, of

20   which he was aware, which made these statements materially misleading.  Morrice

21   failed to disclose the magnitude of EPD's (which, as of the third quarter of 2006,

22   were 13.77%), the increasing rate of EPDs (*see* chart at paragraph 52 above), that,

23   as of late October 2006, New Century had $545 million in pending repurchase

24   claims; and that layered risk loans comprised a significant amount of its loan

25   production in 2006.

26     79. Dodge also made materially misleading statements in the second

27   quarter 2006 quarterly earnings call, again apparently in an attempt to manage and

28   minimize the amount of negative information disclosed and to convey that New

1  Century would be able to survive. In response to a question about "kicked-back"

2  loans, Dodge stated: "Yes, I would tell you that while we are seeing that – a

3  modest trend upward in investor due diligence and loans that we are repurchasing

4  as a result of early payment defaults." Dodge, however, failed to disclose New

5  Century's significant increases in repurchases ($315.7 million in repurchases in

6  first half of 2006 almost equaled the $332 million in repurchases for all of 2005)

7  and FPDs (in April 2006, FPDs rose to New Century's "historical high" of 2%).

## VII.    NEW CENTURY'S ACCOUNTING FRAUD

### A.    New Century's Repurchase Reserve Accounting

10      80.    At the time New Century sold a pool of mortgage loans that qualified

11  for sales accounting under GAAP, it was required to estimate the fair value of its

12  repurchase obligation and to reduce the gain it reported on the sale by that amount.

13  *See* Statement of Financial Accounting Standards No. 140, "Accounting for

14  Transfers and Servicing of Financial Assets and Extinguishment of Liabilities

15  ("SFAS 140"), ¶¶ 9 & 11. If it could not estimate the fair value of liabilities, no

16  gain on sale would be recorded. *Id.* at ¶ 71. GAAP further required New Century

17  to record any repurchased loan at fair value at the time of repurchase. *Id.*, at ¶ 55.

18      81.    To estimate its repurchase obligation, New Century was therefore

19  required to estimate:  (1) the amount of loans that it would have to repurchase, *i.e.*,

20  the repurchase rate; and (2) the costs that it would incur in repurchasing loans. The

21  repurchase costs should have included:  (1) premium recapture—reimbursing the

22  loan purchaser for the amount the purchaser paid for the loan above its then-

23  outstanding principal balance; (2) interest recapture—reimbursing the loan

24  purchaser for missed loan interest payments; and (3) loss severity—the difference

25  between the loan's unpaid principal balance that New Century had to pay to the

26  purchaser and the loan's fair value. In accounting for repurchases, New Century

27  divided loan loss severity into two components: "inventory severity," which was

28  the loss severity on loans already repurchased; and "future loss severity," which

1  was the loss severity on loans sold during the quarter that it estimated it would

2  have to repurchase.

3      82.    When New Century repurchased a loan, it recorded the loan at the

4  loan's unpaid principal balance and not at fair value as required by SFAS 140, ¶

5  55.  At each quarter end through Q1 2006, however, New Century estimated

6  inventory severity on repurchased loans it still owned and included that amount in

7  determining the adequacy of its repurchase reserve.  For example, at the end of Q1

8  2006, New Century estimated that it needed a repurchase reserve of $17.3 million,

9  which included an $8.4 million provision for inventory severity on repurchased

10 loans.  New Century then reclassified the $8.4 million of the repurchase reserve to

11 reduce the value of repurchased loans held for sale.  Although New Century

12 reduced the value of the repurchased loans for purposes of reporting its periodic

13 financial results, it continued to carry the repurchased loans on its books at their

14 unpaid principal balance in violation of SFAS 140, ¶ 55.  Nevertheless, New

15 Century's methodology resulted in New Century's presenting repurchased loans in

16 inventory on a net fair value basis for financial reporting purposes and generally

17 complied with SFAS 140 prior to Q2 2006.

18     83.    GAAP also required New Century to continually evaluate actual

19 repurchases and repurchase claims to determine whether its repurchase reserves

20 were adequate in light of actual repurchase rates.  Statement of Financial

21 Accounting Standards No. 5, "Accounting for Contingencies" ("SFAS 5"), ¶ 8

22 (requires accrual of loss contingency if information indicates that it is probable that

23 liability had been incurred and amount of loss can be reasonably estimated).

24 Accordingly, if New Century had initially underestimated the repurchase rate or

25 losses on the repurchases, it was required under SFAS 5 to recognize the loss

26 related to the higher than estimated repurchase costs.

27     **B.    New Century Improperly Ceased Accounting For Loss Severity**

28     84.    New Century's loan repurchase rate and inventory of repurchased

35

1   loans began to substantially increase in 2006, which required a greater reserve for

2   inventory severity in accordance with SFAS 140, ¶¶ 11 & 55. Rather than increase

3   the repurchase reserve and recognize a larger expense to fund the reserve, New

4   Century changed its accounting methodology, first by eliminating inventory

5   severity on repurchased loans in the second quarter of 2006 and then by

6   eliminating future loss severity on current loan sales estimated to be repurchased in

7   the future in the third quarter of 2006. These two changes that New Century

8   implemented in the face of rising repurchases violated SFAS 140, ¶¶ 11 & 55 and

9   had the effect of overstating the value of its repurchased loans; understating its

10  repurchase reserve expense; and overstating its financial results.

11      85.    By eliminating inventory severity, New Century understated its

12  repurchase reserve expense by $81.871 million in the second quarter of 2006 and

13  $3.917 million in the third quarter of 2006. By eliminating future loss severity,

14  New Century further understated its repurchase reserve expense by $42.095

15  million in the third quarter of 2006.

16      86.    Kenneally, who was responsible for making the methodology

17  changes, knew, or was reckless in not knowing, that neither of these changes were

18  in accordance with GAAP and materially affected the Company's financial

19  statements. Under SFAS 65, ¶ 4, New Century was required to record loans held

20  for sale at lower of cost or market ("LOCOM") and to take as a current expense the

21  amount by which the cost of loans held for sale exceeded their market value.

22  Under SFAS 65, ¶ 9, New Century was to determine LOCOM by the type of loan

23  (residential or commercial), either on an aggregate or individual loan basis for each

24  type of loan. Because New Century held more performing loans that sold at a

25  premium than non-performing loans (including repurchased loans) that sold at a

26  discount, New Century's aggregate unrealized gains on the performing loans offset

27  the aggregate unrealized losses on non-performing loans. As a result, New

28  Century never recorded a LOCOM expense.

87.    Before the filing of both the second and third quarter 2006 Forms 10-Q, Dodge learned that New Century had changed its methodology for calculating the repurchase reserve.  In late July 2006, Kenneally told Dodge that he had changed New Century's methodology for calculating the repurchase reserve. Kenneally also told Dodge the methodology change was to eliminate inventory severity and resulted in a $23 million decrease in the repurchase reserve expense. Prior to New Century filing its third quarter 2006 Form 10-Q, Kenneally reminded Dodge that he had previously advised her that New Century had eliminated inventory severity from the repurchase reserve calculation in the second quarter of 2006.

88.    In order to comply with GAAP, SFAS 154, New Century's was required to disclose its changes to its measurement of its repurchase reserves and repurchased loans. including a description of both the nature of and reason for the changes, an explanation of why the newly adopted accounting principle was preferable, and the method of applying the change, including the effect of the change on net income.  In addition, Regulation S-X also required that interim financial statements shall include disclosures of "significant changes since the end of the most recently completed fiscal year in such items as: accounting principles and practices; estimates inherent in the preparation of financial statements...." 17 C.F.R. § 210.10-01(a)(5).  Both Dodge and Kenneally knew, or were reckless in not knowing of these accounting changes.  Despite their knowledge of these accounting changes, Dodge and Kenneally failed to take any action to ensure that New Century made these required disclosures.  Indeed, in a disclosure checklist provided to other New Century officers, Kenneally indicated that there had been no accounting changes in the second quarter of 2006 by writing "N/A" for not applicable next to a question about accounting changes.  Moreover, despite the Board of Directors' specific questions about the adequacy of the repurchase reserve, Dodge and Kenneally never advised them of these accounting changes.

89.    As a result of Dodge's and Kenneally's failure to disclose these significant accounting changes, or the material impact those changes had on the Company's reported financial results, New Century's second and third quarter Forms 10-Q materially overstated the Company's financial results.

C.    **New Century Improperly Failed To Account For The Backlog Of Repurchase Claims**

90.    New Century failed, as required by GAAP, to estimate the loss it would incur from the backlog of repurchase claims, as required by SFAS 5, ¶ 8. Both Dodge and Kenneally knew, or were reckless in not knowing, of New Century's backlog of repurchase claims.  Indeed, Dodge and Kenneally were repeatedly advised of the unprecedented backlog of unprocessed repurchase claims prior to New Century filing its third quarter 2006 Form 10-Q, but they failed to account for the contingent losses it represented.  By failing to account for the backlog of repurchase claims, New Century materially understated its repurchase reserve expense by $62.481 million in the third quarter of 2006.

D.    **New Century Improperly Excluded Interest Recapture**

91.    In estimating the repurchase reserve, New Century also violated SFAS 140, ¶ 11 by not providing for interest recapture prior to the third quarter of 2006. Dodge and Kenneally knew, or were reckless in not knowing, that New Century failed to provide for interest recapture prior to the third quarter of 2006.  By failing to account for interest recapture, New Century understated its repurchase reserve expense by $2.122 million in the second quarter of 2006.

E.    **Defendants' Circumvention and Failure to Implement Internal Controls**

92.    Morrice, Dodge, and Kenneally knowingly failed to implement appropriate internal controls to track repurchase requests and their disposition. Each of them knew that New Century had no standardized procedure for receiving and processing repurchase requests during the second and third quarters of 2006.



38

1  Dodge and Kenneally also failed to implement any system of internal accounting

2  controls relating to changes in accounting principles, and the disclosure thereof.

3    **F.    New Century's Material Overstatement Of Its Financial Results**

4    93.    As a result of its improper repurchase reserve accounting described

5  above, New Century materially overstated its financial results, as shown on the

6  table below.  As also shown on the table below, with correct accounting, New

7  Century would have reported financial results far below analysts' estimates.  When

8  New Century announced these overstated financial results in its earnings releases,

9  its stock trading volume (but not price) rose significantly

10

11

| | Q2 2006 | Q3 2006 |
|---|---|---|
| Pre-Tax Earnings (in millions): | | |
| Reported | $134.822 | $90.245 |
| Corrected | $50.829 | ($18.248) |
| Overstatement | 165% | Loss (instead of reported profit) |
| Earnings Per Share (diluted): | | |
| Analysts' EPS Estimates | $1.62-$2.20 | $1.15-$2.22 |
| Reported | $1.81 | $1.12 |
| Corrected | $0.92 | ($0.03) |
| Overstatement | 96% | Loss (instead of reported profit) |

23  **VIII.  DEFENDANTS' FALSE REPRESENTATIONS IN MANAGEMENT**

24      **REPRESENTATION LETTERS**

25    94.    Morrice, Dodge, and Kenneally signed false management

26  representation letters in connection with KPMG's reviews of New Century's

27  financial statements.  Knowing of the backlog of pending repurchase claims in the

28  third quarter of 2006, Morrice, Dodge, and Kenneally signed management

1   representation letters in which they falsely represented to KPMG that: (1) there

2   were no unasserted claims or assessments that were probable of assertion that were

3   required to be disclosed by SFAS 5; and (2) there were no liabilities or loss

4   contingencies that were required to be accrued or disclosed by FAS 5.

5       95.    In addition, despite knowing of the accounting changes to the

6   repurchase reserve in the second and third quarter of 2006, Dodge's and

7   Kenneally's management representation letters to KPMG also falsely represented

8   that: (1) the financial statements were prepared and presented in conformity with

9   GAAP; and (2) changes in accounting principles affecting consistency had been

10  properly recorded or disclosed.

11  **IX.    NEW CENTURY'S SECURITIES OFFERINGS**

12      96.    On August 22, 2006, New Century sold approximately 2.3 million

13  shares of Series B preferred stock, raising approximately $57.5 million. This

14  offering incorporated by reference New Century's Annual Report on Form 10-K,

15  including any filing after the date of the prospectus until the offering in completed.

16  As such, this offering included New Century second quarter Form 10-Q. Morrice

17  and Dodge directed participated in this security offering, as described in

18  paragraphs 69 and 70 above.

19      97.    New Century later conducted two private placements of trust

20  preferred securities, the first for $50 million on September 13, 2006, and the

21  second for $35 million on November 16, 2006. In connection with each private

22  placement, Morrice, as New Century's CEO, and Dodge, as New Century's CFO,

23  executed officer's certificates, in which they certified that they had reviewed the

24  purchase agreements, that the representations and warranties of the Company in

25  the purchase agreements are true and correct, and that there had been no material

26  adverse changes subsequent to the execution of the purchase agreements.

27      98.    Among the representations and warranties made by Morrice and

28  Dodge, in connection with September 13, 2006 private placement, each of them

40

1    represented that the Company's interim unaudited financial statements for the three

2    and six months ended June 30, 2006, filed with the Commission, fairly present in

3    all material respects, in accordance with GAAP, the financial position of the

4    Company, that the Company had no undisclosed material liabilities, whether

5    accrued or unaccrued,  and that the Company's periodic filings, including the

6    Company's second quarter 2006 Form 10-Q, complied in all material respects with

7    the requirements of the Exchange Act, and did not include any untrue statement of

8    material fact or omit to state a material fact required to be stated therein or

9    necessary to make the statements therein, in light of the circumstances under which

10   they were made, not misleading.  At the time Morrice and Dodge signed these

11   certificates, they each knew, or were reckless in not knowing, that New Century

12   had a substantial backlog of pending repurchase claims, which were not reflected

13   as liabilities in New Century's financial statements.

14        99.    Among the representations and warranties made by Morrice and

15   Dodge, in connection with November 16, 2006, private placement, each of them

16   represented that the Company's interim unaudited financial statements for the three

17   and nine months ended September 30, 2006, filed with the Commission, fairly

18   present in all material respects, in accordance with GAAP, the financial position of

19   the Company, that the Company had no undisclosed material liabilities, whether

20   accrued or unaccrued,  and that the Company's periodic filings, including the

21   Company's second and third quarter 2006 Form 10-Q, complied in all material

22   respects with the requirements of the Exchange Act, and did not include any untrue

23   statement of material fact or omit to state a material fact required to be stated

24   therein or necessary to make the statements therein, in light of the circumstances

25   under which they were made, not misleading.  At the time Morrice and Dodge

26   signed these certificates, they each knew, or were reckless in not knowing, that

27   New Century had a substantial backlog of pending repurchase claims, which were

28   not reflected as liabilities in New Century's financial statements.

41

## X.    DEFENDANTS BENEFITED FROM THE FRAUD

100.    During 2006 and 2007, the Defendants received the following salaries, cash bonuses, and incentive compensation based on employment contracts and pursuant to a 2004 performance incentive plan:

| | Year | Salary | Cash Bonuses | Long Term Incentive Compensation | Non-Cash and Other | Total Compensation |
|---|---|---|---|---|---|---|
| **Morrice** | 2006 | $663,647 | $1,437,096 | $4,548,578 | $101,474 | $6,750,795 |
| | 2007 | $398,131 | $0 | $1,169,924 | $2,596 | $1,570,651 |
| | | $1,061,778 | $1,437,096 | $5,718,502 | $104,070 | $8,321,445 |
| **Dodge** | 2006 | $313,692 | $632,982 | $133,593 | $94,828 | $1,175,095 |
| | 2007 | $168,896 | $0 | $175,150 | $58,052 | $402,098 |
| | | $482,588 | $632,982 | $308,742 | $152,881 | $1,577,193 |
| **Kenneally** | 2006 | $219,839 | $212,641 | $17,988 | $6,070 | $456,538 |
| | 2007 | $115,260 | $28,067 | $41,102 | $5,902 | $190,331 |
| | | $335,099 | $240,708 | $59,089 | $11,972 | $646,868 |

101.    Cash bonuses were based on several factors, including company or department performance and personal performance goals and included recognition and retention bonuses. Incentive compensation included stock options grants, restricted stock awards, stock appreciation rights, dividend equivalent rights, and cash performance awards. Morrice received semi-annual bonuses calculated as a percentage of pre-tax income based upon the ratio of net income to average stockholders' equity. Dodge's quarterly cash bonuses were based 80% on EPS goals and 20% on individual goals. Kenneally also received bonuses based, in

42

1   part, on the Company's performance.

2       102.   Morrice and Dodge have never reimbursed New Century for any

3   portion of their bonuses and other incentive-based and equity-based compensation,

4   or their stock sale profits, as required by Section 304 of the Sarbanes-Oxley Act,

5   15 U.S.C. § 7243(a).

6   **FIRST CLAIM FOR RELIEF**

7   **FRAUD IN THE OFFER OR SALE OF SECURITIES**

8   **Violations of Section 17(a) of the Securities Act**

9   **(Against Defendants Morrice and Dodge)**

10      103.   The Commission realleges and incorporates by reference ¶¶ 1 through

11  102 above.

12      104.   Defendants Morrice and Dodge, and each of them, by engaging in the

13  conduct described above, directly or indirectly, in the offer or sale of securities by

14  the use of means or instruments of transportation or communication in interstate

15  commerce or by the use of the mails:

16          a.    with scienter, employed devices, schemes, or artifices to

17                defraud;

18          b.    obtained money or property by means of untrue statements of a

19                material fact or by omitting to state a material fact necessary in

20                order to make the statements made, in light of the

21                circumstances under which they were made, not misleading; or

22          c.    engaged in transactions, practices, or courses of business which

23                operated or would operate as a fraud or deceit upon the

24                purchaser.

25      105.   By engaging in the conduct described above, defendants Morrice and

26  Dodge violated, and unless restrained and enjoined will continue to violate, Section

27  17(a) of the Securities Act, 15 U.S.C. § 77q(a).

28  ///

43

1
<u>**SECOND CLAIM FOR RELIEF**</u>                -

2
**FRAUD IN CONNECTION WITH THE PURCHASE**

3
**OR SALE OF SECURITIES**

4
**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder**

5
**(Against All Defendants)**

6
106.   The Commission realleges and incorporates by reference ¶¶ 1 through

7
102 above.

8
107.   Defendants, and each of them, by engaging in the conduct described

9
above, directly or indirectly, in connection with the purchase or sale of a security,

10
by the use of means or instrumentalities of interstate commerce, of the mails, or of

11
the facilities of a national securities exchange, with scienter:

12
    a.    employed devices, schemes, or artifices to defraud;

13
    b.    made untrue statements of a material fact or omitted to state a

14
          material fact necessary in order to make the statements made,

15
          in the light of the circumstances under which they were made,

16
          not misleading; or

17
    c.    engaged in acts, practices, or courses of business which

18
          operated or would operate as a fraud or deceit upon other

19
          persons.

20
108.   By engaging in the conduct described above, Defendants violated, and

21
unless restrained and enjoined will continue to violate, Section 10(b) of the

22
Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. §

23
240.10b-5.

24
///

25
///

26
///

27
///

28
///

44

## THIRD CLAIM FOR RELIEF

## VIOLATIONS OF COMMISSION PERIODIC

## REPORTING REQUIREMENTS

### Aiding and Abetting Violations of Section 13(a) of the Exchange Act

### and Rules 12b-20, 13a-11, and 13a-13 thereunder

### (Against All Defendants)

109. The Commission realleges and incorporates by reference ¶¶ 1 through 102 above.

110. New Century violated Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), and Rules 12b-20, 13a-11, and 13a-13 thereunder, 17 C.F.R. §§ 240.12b-20, 240.13a-11 & 240.13a-13, by filing with the Commission quarterly reports on Form 10-Q for the quarters ended March 31, 2006, June 30, 2006, and September 30, 2006, that were materially false and failed to include material information necessary to make the required statements, in light of the circumstances under which they were made, not misleading.

111. Defendants, and each of them, knowingly provided substantial assistance to New Century in its violation of Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), and Rules 12b-20 and 13a-11, and 13a-13 thereunder, 17 C.F.R. §§ 240.12b-20, 240.13a-11 & 240.13a-13, in connection with New Century's quarterly report for the second and third quarters of 2006.

112. By engaging in the conduct described above and pursuant to Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e), Defendants aided and abetted New Century's violations, and unless restrained and enjoined will continue to aid and abet violations, of Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), and Rules 12b-20, 13a-11, and 13a-13 thereunder, 17 C.F.R. §§ 240.12b-20, 240.13a-11 & 240.13a-13.

///

///

## FOURTH CLAIM FOR RELIEF

## FALSIFICATION OF BOOKS AND RECORDS VIOLATIONS

### Violations of Section 13(b)(5) of the Exchange Act

### and Rule 13b2-1 Thereunder

### (Against Defendants Dodge and Kenneally)

113. The Commission realleges and incorporates by reference ¶¶ 1 through 102 above.

114. Defendants Dodge and Kenneally, and each of them, by engaging in the conduct described above, knowingly falsified any New Century book, record, or account described in Section 13(b)(2) of the Exchange Act, 15 U.S.C. § 78m(b)(2); and, directly or indirectly, falsified or caused to be falsified, any book, record or account of New Century subject to Section 13(b)(2)(A) of the Exchange Act, 15 U.S.C. § 78m(b)(2)(A).

115. Defendants Dodge and Kenneally, and each of them, by engaging in the conduct described above, directly or indirectly, falsified or caused to be falsified New Century's books, records, or accounts subject to Section 13(b)(2) of the Exchange Act, 15 U.S.C. § 78m(b)(2), and Section 13(b)(2)(A) of the Exchange Act, 15 U.S.C. § 78m(b)(2)(A).

116. By engaging in the conduct described above, defendants Dodge and Kenneally violated Section 13(b)(5) of the Exchange Act, 15 U.S.C. § 78m(b)(5), and Rule 13b2-1 thereunder, 17 C.F.R. § 240.13b2-1, and unless restrained and enjoined will continue to violate Section 13(b)(5) of the Exchange Act, , 15 U.S.C. § 78m(b)(5), and Rule 13b2-1 thereunder, 17 C.F.R. § 240.13b2-1.

///
///
///
///
///

## FIFTH CLAIM FOR RELIEF

## CIRCUMVENTION OF INTERNAL CONTROLS

### Violations of Section 13(b)(5) of the Exchange Act

### (Against All Defendants)

117.   The Commission realleges and incorporates by reference ¶¶ 1 through 102 above.

118.   Defendants, and each of them, by engaging in the conduct described above, knowingly circumvented or failed to implement a system of internal accounting controls.

119.   By engaging in the conduct described above, Defendants, and each of them, violated Section 13(b)(5) of the Exchange Act, 15 U.S.C. §78m(b)(5), and, unless restrained and enjoined, Defendants will continue to violate Section 13(b)(5) of the Exchange Act, 15 U.S.C. §78m(b)(5).

## SIXTH CLAIM FOR RELIEF

## FALSE STATEMENT TO ACCOUNTANTS

### Violations of Exchange Act Rule 13b2-2

### (Against All Defendants)

120.   The Commission realleges and incorporates by reference ¶¶ 1 through 102 above.

121.   Defendants, and each of them, directly or indirectly, (i) made, or caused to be made, materially false or misleading statements, or (ii) omitted to state, or caused others to omit to state, material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading, to an accountant in connection with an audit, review or examination of financial statements or the preparation or filing of a document or report required to be filed with the Commission.

122.   By engaging in the conduct alleged above, Defendants violated, and unless restrained and enjoined will continue to violate, Exchange Act Rule 13b2-2,

47

1    17 C.F.R. § 240.13b2-2.

2    <u>**SEVENTH CLAIM FOR RELIEF**</u>

3    **CERTIFICATION VIOLATIONS**

4    **Violations of Rule 13a-14 of the Exchange Act**

5    **(Against Defendants Morrice and Dodge)**

6    123.   The Commission realleges and incorporates by reference ¶¶ 1 through

7    102 above.

8    124.   Defendants Morrice and Dodge, and each of them, violated Rule 13a-

9    14 of the Exchange Act, 17 C.F.R. § 240.13a-14, by signing the certifications

10    included with New Century's second and third quarterly reports on Forms 10-Q

11    certifying, among other things, that the forms fully complied with the requirements

12    of the Exchange Act and fairly presented, in all material respects, the financial

13    condition and results of operations of the company, when, in fact, the reports

14    contained untrue statements of material fact and omitted material information

15    necessary to make the reports not misleading.

16    125.   By engaging in the conduct described above, defendants Morrice and

17    Dodge violated Exchange Act Rule 13a-14 of the Exchange Act, 17 C.F.R.

18    § 240.13a-14.  Unless restrained and enjoined, defendants Morrice and Dodge will

19    continue to violate Rule 13a-14 of the Exchange Act, 17 C.F.R. § 240.13a-14.

20    <u>**EIGHTH CLAIM FOR RELIEF**</u>

21    **FAILURE TO REIMBURSE**

22    **Violations of Section 304(a) of the Sarbanes-Oxley Act**

23    **(Against Defendants Morrice and Dodge)**

24    125.   The Commission realleges and incorporates by reference ¶¶ 1 through

25    102 above.

26    126.   New Century, by engaging in the conduct described above, filed

27    Forms 10-Q for the second and third quarters of 2006 that were in material non-

28    compliance with financial reporting requirements under the securities laws.

48

1    127.  New Century's material non-compliance with its financial reporting

2  requirements under the securities laws was the result of its misconduct.

3    128.  Due to New Century's material non-compliance with its financial

4  reporting requirements under securities laws, and as a result of its misconduct,

5  New Century was required to prepare an accounting restatement for its second and

6  third quarters of 2006.

7    129.  The Commission has not exempted Morrice or Dodge, pursuant to

8  Section 304(b) of the Act, 15 U.S.C. § 7243(b), from the application of Section

9  304(a) of the Act, 15 U.S.C. § 7243(a).

10    130.  By engaging in the conduct described above, Morrice and Dodge

11  violated, and unless ordered to comply will continue to violate, Section 304(a) of

12  the Act, 15 U.S.C. § 7243(a).

13                              **PRAYER FOR RELIEF**

14    WHEREFORE, the Commission respectfully requests that the Court:

15                                        **I.**

16    Issue findings of fact and conclusions of law that Defendants committed the

17  alleged violations.

18                                        **II.**

19    Issue a judgment, in a form consistent with Fed. R. Civ. P. 65(d),

20  permanently enjoining defendant Morrice and his agents, servants, employees,

21  attorneys, and those persons in active concert or participation with any of them,

22  who receive actual notice of the order by personal service or otherwise, from

23  violating Section 17(a) of the Securities Act, Sections 10(b) and 13(b)(5) of the

24  Exchange Act, and Rules 10b-5, 13b2-2, and 13a-14 thereunder; and from aiding

25  and abetting violations of Section 13(a) of the Exchange Act, and Rules 12b-20,

26  13a-11 and 13a-13 thereunder.

27                                        **III.**

28    Issue a judgment, in a form consistent with Fed. R. Civ. P. 65(d),

1  permanently enjoining defendant Dodge and her agents, servants, employees,

2  attorneys, and those persons in active concert or participation with any of them,

3  who receive actual notice of the order by personal service or otherwise, from

4  violating Section 17(a) of the Securities Act, Sections 10(b) and 13(b)(5) of the

5  Exchange Act, and Rules 10b-5, 13b2-1, 13b2-2, and 13a-14 thereunder; and from

6  aiding and abetting violations of Section 13(a) of the Exchange Act, and Rules

7  12b-20, 13a-11 and 13a-13 thereunder.

8                                   **IV.**

9      Issue a judgment, in a form consistent with Fed. R. Civ. P. 65(d),

10  permanently enjoining defendant Kenneally and his agents, servants, employees,

11  attorneys, and those persons in active concert or participation with any of them,

12  who receive actual notice of the order by personal service or otherwise, from

13  violating Sections 10(b) and 13(b)(5) of the Exchange Act, and Rules 10b-5, 13b2-

14  1, and 13b2-2 thereunder; and from aiding and abetting violations of Section 13(a)

15  of the Exchange Act, and Rules 12b-20, 13a-11 and 13a-13 thereunder.

16                                   **V.**

17      Enter an order, pursuant to Section 20(e) of the Securities Act, 15 U.S.C. §

18  77t(e), and/or 21(d)(2) of the Exchange Act, 15 U.S.C. § 78u(d)(2), prohibiting

19  defendants from acting as officers or directors of any issuer that has a class of

20  securities registered pursuant to Section 12 of the Exchange Act, 15 U.S.C. § 78l,

21  or that is required to file reports pursuant to Section 15(d) of the Exchange Act, 15

22  U.S.C. § 78o(d).

23                                   **VI.**

24      Order Defendants to disgorge all ill-gotten gains from their illegal conduct,

25  together with prejudgment interest thereon.

26  ///

27  ///

28  ///

**VII.**

Order Defendants Morrice and Dodge to reimburse New Century for bonuses or other incentive-based or equity based compensation pursuant to Section 304 of the Sarbanes-Oxley Act of 2002, 15 U.S.C. § 7243.

**VIII.**

Order Defendants to pay civil penalties under Section 20(d)(1) of the Securities Act, 15 U.S.C. § 77t(d)(1), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3).

**IX.**

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

**X.**

Grant such other and further relief as this Court may determine to be just and necessary.

DATED:  December 7, 2009          Respectfully submitted,

JANET E. MOSER
Attorney for Plaintiff
Securities and Exchange Commission

51