# Exhibit F

8-K 1 htm_18823.htm LIVE FILING

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

# FORM 8-K

CURRENT REPORT

Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

Date of Report (Date of Earliest Event Reported): March 7, 2007

# New Century Financial Corporation

(Exact name of registrant as specified in its charter)

| Maryland | 001-32314 | 56-2451736 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

| 18400 Von Karman Avenue, Suite 1000, Irvine, California | 92612 |
|---|---|
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: (949) 440-7030

Not Applicable

Former name or former address, if changed since last report

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

[ ] Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)
[ ] Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)
[ ] Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))
[ ] Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Top of the Form

**Item 1.01 Entry into a Material Definitive Agreement.**

On March 8, 2007, New Century Mortgage Corporation, New Century Financial Corporation's (the "Company") indirect wholly owned subsidiary ("NCMC"), NC Capital Corporation, a direct wholly owned subsidiary of NCMC ("NC Capital"), NC Asset Holding, L.P. (successor by conversion to NC Residual II Corporation), an indirect wholly owned subsidiary of the Company ("NCAH"), Home123 Corporation, an indirect wholly owned subsidiary of the Company ("Home123") and New Century Credit Corporation, a direct wholly owned subsidiary of the Company ("NCCC" and, together with NCMC, NC Capital, NCAH and Home123, the "Existing Borrowers"), NC Residual III Corporation, a direct wholly owned subsidiary of NC Capital, and NC Residual IV Corporation, a direct wholly owned subsidiary of the Company (the "New Borrowers" and together with the Existing Borrowers, collectively, the "Borrowers"), and Morgan Stanley Mortgage Capital Inc. ("Morgan Stanley") entered into Amendment No. 8 (the "Morgan Stanley Amendment") to that certain Master Repurchase Agreement dated December 12, 2005 (as amended to date, including by the Morgan Stanley Amendment, the "Morgan Stanley Agreement") by and among the Existing Borrowers and Morgan Stanley. The Morgan Stanley Amendment had the effect of adding the New Borrowers to the Morgan Stanley Agreement and allowing the Borrowers to pledge additional assets for $265 million in new financing. The Morgan Stanley Amendment also provides that Morgan Stanley may, in its discretion, elect to discontinue extending financing to the Borrowers under the Morgan Stanley Agreement. The Morgan Stanley Amendment is filed as Exhibit 10.1 to this Current Report and is incorporated herein by reference.

As described in Item 2.04 of this Current Report, on March 9, 2007, the Company received a letter from Morgan Stanley notifying the Company of certain purported defaults, accelerating certain obligations under the Morgan Stanley Agreement and stating that Morgan Stanley was discontinuing financing to the Borrowers under the Morgan Stanley Agreement.

**Item 1.02 Termination of a Material Definitive Agreement.**

As described in Item 2.04 of this Current Report, on March 8, 2007, the Company and its subsidiaries repaid their outstanding obligations under the Citigroup Agreement (defined below). Although the parties to the Citigroup Agreement have not formally terminated the Citigroup Agreement, the Company does not expect to be able to obtain additional financing under the Citigroup Agreement.

In addition, as further described in Item 2.04 of this Current Report, under the respective financing arrangements between the Company and its lenders, each of the Company's lenders have the right to cease providing financing to the Company and its subsidiaries during the pendency of an event of default. As of March 9, 2007, all of the Company's lenders under its short-term repurchase agreements and aggregation credit facilities had discontinued their financing with the Company or had notified the Company of their intent to do so. Certain of these lenders had also purported to terminate the Company's servicing rights under the respective financing arrangement, as described in Item 2.04 of this Current Report.

**Item 2.04 Triggering Events That Accelerate or Increase a Direct Financial Obligation or an Obligation Under an Off-Balance Sheet Arrangement.**

The Company relies on short-term repurchase agreements and aggregation credit facilities and an asset-backed commercial paper facility to fund mortgage loan originations and purchases pending the pooling and sale of such mortgage loans.

As previously disclosed, the Company has been in discussions with its lenders in an effort to obtain waivers for certain of the obligations of the Company and its subsidiaries under these financing arrangements. As described below, the Company has received notices from certain of its lenders asserting that the Company and/or its subsidiaries have violated their respective obligations under certain of these financing arrangements and that such violations amount to events of default. Certain of these lenders have further advised the Company that they are accelerating the Company's obligation to repurchase all outstanding mortgage loans financed under the applicable agreements. Below is a summary of the Company's financial

Page 35
Exhibit F

obligations that are purported to have been accelerated by the Company's lenders as well as a description of certain additional notices received by the Company from its lenders.

Bank of America, N.A. ("Bank of America")

- The Company has received two letters from Bank of America, each dated March 8, 2007. The letters allege that certain subsidiaries of the Company failed to satisfy margin calls under that certain Third Amended and Restated Master Purchase Agreement, dated as of May 13, 2002, amended and restated to and including September 7, 2006, by and among certain subsidiaries of the Company and Bank of America, and that certain Amended and Restated Master Repurchase Agreement, dated as of September 5, 2005, amended and restated to and including September 28, 2006, by and among certain subsidiaries of the Company and Bank of America (such agreements, the "Bank of America Agreements") and that as a result Events of Default (as defined in the respective Bank of America Agreements) have occurred. The letters also purport to accelerate the obligation of the Company's subsidiaries to repurchase all outstanding mortgage loans financed under the Bank of America Agreements. Under the Bank of America Agreements, such acceleration would require the immediate repayment of the repurchase obligation. The Company estimates that the aggregate repurchase obligation of its subsidiaries under the Bank of America Agreements was approximately $0.6 billion as of March 9, 2007. The Company is a guarantor under the Bank of America Agreements. In the letters, Bank of America additionally purports to transfer to itself the Company's subsidiaries' servicing rights under the Bank of America Agreements and requests that the Company and such subsidiaries transfer the relevant servicing records to a party designated by Bank of America.

Barclays Bank PLC ("Barclays")

- The Company received a Notice of Termination of Servicing from Barclays, dated March 8, 2007, purporting to terminate the right of one of the Company's subsidiaries to service certain loans under that certain Master Repurchase Agreement, dated as of March 31, 2006, by and among the Company, certain of its subsidiaries, Barclays and Sheffield Receivables Corporation. In its notice, Barclays also requested that the Company and its subsidiaries take certain actions to facilitate the transfer of the servicing rights to a party appointed by Barclays.

Citigroup Global Markets Realty Corp. ("Citigroup")

- The Company received a Notice of Maintenance Call from Citigroup, dated March 6, 2007, stating that a margin deficit under that certain Master Repurchase Agreement, dated as of August 1, 2006, among certain subsidiaries of the Company, the Company, as guarantor, and Citigroup (the "Citigroup Agreement") exists, and demanding that such subsidiaries transfer approximately $80.3 million to Citigroup in immediately available funds on or before 5:00 p.m. on March 7, 2007. This obligation was satisfied as a result of the repayment described immediately below.

- The Company also received a Notice of Repurchase and Termination of Transactions from Citigroup, dated March 6, 2007, notifying the Company that Citigroup was exercising its option under the Citigroup Agreement to require the Company and/or its subsidiaries to satisfy their obligation to repurchase all outstanding mortgage loans financed under the Citigroup Agreement and to pay the amount of such obligation to Citigroup no later than 5:00 p.m. on March 7, 2007. The aggregate amount of this obligation at March 7, 2007 was approximately $717 million. On March 8, 2007, the Company used the proceeds of the additional financing under the Morgan Stanley Amendment to satisfy this obligation.

- Additionally, the Company and one of its subsidiaries received a Notice of Default, dated March 8, 2007, alleging that an Event of Default as defined in that certain Servicer Advanced Financing Facility Agreement between such subsidiary and Citigroup (the "Citigroup Servicer Agreement") exists as a result of the downgrade, on March 8, 2007, by Fitch Ratings and Moody's Investor Services of such subsidiary's residential primary servicer rating and the Company's alleged breach of its covenant to maintain cash and cash equivalents at all times in an amount of not less than $60 million. The Notice of Default states that all amounts and obligations of the Company (as guarantor) and such subsidiary in the aggregate principal amount of approximately $31.9 million together with interest, fees, expenses and other charges as provided in the Citigroup Servicer Agreement and the Note (as defined in the Citigroup Servicer Agreement) are immediately due and payable. This amount remains outstanding as of March 9, 2007.

Credit Suisse First Boston Mortgage Capital LLC ("CSFBMC")

- The Company received a Notice of Event of Default and Exercise of Remedies, dated March 11, 2007, from CSFBMC alleging that certain Events of Default as defined in that certain Amended and Restated Master Repurchase Agreement, dated as of January 31, 2007, by and among the Company, certain of its subsidiaries and CSFBMC (the "CSFBMC Agreement") have occurred as a result of (i) the alleged failure of such subsidiaries to make certain cash payments and (ii) alleged defaults of the Company and its subsidiaries under certain of their other financing arrangements. The March 11, 2007 letter purports to accelerate the obligation of the Company's subsidiaries to repurchase all outstanding mortgage loans financed under the

CSFBMC Agreement and demands repayment of the aggregate repurchase obligation. Under the CSFBMC Agreement, such acceleration would require the immediate repayment of the repurchase obligation. The Company estimates that the aggregate repurchase obligation of its subsidiaries under the CSFBMC Agreement was approximately $0.9 billion as of March 9, 2007. The Company is a guarantor under the CSFBMC Agreement. In its notice, CSFBMC additionally purports to terminate the Company's subsidiary's servicing rights under the CSFBMC Agreement and requests that the subsidiary take certain actions to facilitate the transfer of the servicing rights to a party appointed by CSFBMC.

DB Structured Products ("DBSP")

• The Company received two Reservation of Rights notices from DBSP, each dated March 10, 2007, alleging that certain Events of Default, as defined in that certain Master Repurchase Agreement, dated as of April 14, 2006, by and among certain of the Company's subsidiaries, DBSP, Aspen Funding Corp., Newport Funding Corp. and Gemini Securitization Corp., LLC, and the related Loan and Security Agreement (collectively, the "April 2006 Agreements"), have occurred as a result of (i) the failure of the Company and its subsidiaries to satisfy an alleged margin and collateral deficit (as defined in the April 2006 Agreements), (ii) alleged defaults of the Company's subsidiaries under certain of their other financing arrangements and (iii) an alleged failure of the Company to maintain the profitability required by the April 2006 Agreements. DBSP purports in the notices to reserve its rights with respect to the alleged Events of Default and also, among other requested actions, requests that the Company and its subsidiaries take certain actions to facilitate the establishment of a back up servicing arrangement with a party appointed by DBSP.

• The Company received a Reservation of Rights notice from DBSP, dated March 10, 2007, alleging that certain Events of Default, as defined in that certain Master Repurchase Agreement, dated as of September 2, 2005, by and among certain of the Company's subsidiaries, DBSP, Aspen Funding Corp., Newport Funding Corp., Tucson Funding LLC and Gemini Securitization Corp., LLC (the "DB Agreement"), have occurred as a result of (i) the failure of the Company and its subsidiaries to satisfy an alleged margin deficit (as defined in the DB Agreement), (ii) alleged defaults of the Company's subsidiaries under certain of their other financing arrangements and (iii) an alleged failure of the Company to maintain the profitability required by the DB Agreement. DBSP purports in the notice to reserve its rights with respect to the alleged Events of Default and also, among other requested actions, requests that the Company and its subsidiaries take certain actions to facilitate the establishment of a back up servicing arrangement with a party appointed by DBSP.

Goldman Sachs Mortgage Company ("GSMC")

• The Company received notices from GSMC, dated March 7, 2007 and March 8, 2007, respectively, alleging that an Event of Default as defined in that certain Master Purchase Agreement, dated as of February 15, 2006, between the Company, as guarantor, one of its subsidiaries and GSMC (the "GSMC Agreement") has occurred due to the failure of such subsidiary to comply with a margin call under the GSMC Agreement. The March 8, 2007 letter purports to accelerate the Company's and its subsidiary's obligation to repurchase all outstanding mortgage loans financed under the GSMC Agreement and demands repayment of the aggregate repurchase obligation. Under the GSMC Agreement, such acceleration would require the immediate repayment of the repurchase obligation. The March 8, 2007 letter also purports to terminate the right of the Company's subsidiary to service certain loans. The Company estimates that the aggregate repurchase obligation of the Company and its subsidiary under the GSMC Agreement was approximately $0.1 billion as of March 9, 2007.

• The Company's subsidiary received an additional notice from GSMC, dated March 9, 2007, in which GSMC purported to offset the mortgage loans held by GSMC (and for which the subsidiary has a repurchase obligation under the GSMC Agreement) against the subsidiary's repurchase obligation to GSMC. In this notice, GSMC states that it will inform the Company's subsidiary of the total value credited by GSMC (as a result of this offset) against the Company's and the subsidiary's obligation under the GSMC Agreement.

IXIS Real Estate Capital, Inc. ("IXIS")

• The Company received a Notice of Default and Reservation of Rights from IXIS, dated March 8, 2007, alleging that certain Events of Default as defined in that certain Fifth Amended and Restated Master Repurchase Agreement, dated as of November 10, 2006, by and among the Company, certain of its subsidiaries and IXIS (the "IXIS Agreement") have occurred as a result of such subsidiaries' alleged failure to (i) deliver certain financial statements of the Company and its consolidated subsidiaries, (ii) keep adequate books and records of account, (iii) maintain the profitability required by the IXIS Agreement and (iv) make certain cash payments. The March 8, 2007 letter purports to accelerate the obligation of the Company's subsidiaries to repurchase all outstanding mortgage loans financed under the IXIS Agreement and demands repayment of the aggregate repurchase obligation. Under the IXIS Agreement, such acceleration would require the immediate repayment of the repurchase obligation. The Company estimates that the aggregate repurchase obligation of its subsidiaries under the IXIS Agreement was approximately $0.8 billion as of March 9, 2007. The Company is a guarantor under the IXIS Agreement. In its notice, IXIS additionally purports to terminate the Company's subsidiaries' servicing rights under the IXIS Agreement

and requests that the subsidiaries take certain actions to facilitate the transfer of the servicing rights to a party appointed by IXIS.

Morgan Stanley Mortgage Capital Inc. ("Morgan Stanley")

• The Company received a Notice of Event of Default, Acceleration and Exercise of Remedies from Morgan Stanley, dated March 9, 2007, alleging that certain Events of Default (as defined in the Morgan Stanley Agreement) have occurred as a result of (i) alleged defaults of the Company's subsidiaries under certain of their other financing arrangements and (ii) a determination by Morgan Stanley that there has been a material adverse change to the Company's subsidiaries or their ability to perform their obligations under the Morgan Stanley Agreement. The March 9, 2007 letter purports to accelerate the obligation of the Company's subsidiaries to repurchase all outstanding mortgage loans and securities financed under the Morgan Stanley Agreement and demands repayment of the aggregate repurchase obligation. Under the Morgan Stanley Agreement, such acceleration would require the immediate repayment of the repurchase obligation. The Company estimates that the aggregate repurchase obligation of the Company's subsidiaries under the Morgan Stanley Agreement was approximately $2.5 billion as of March 9, 2007. In its notice, Morgan Stanley additionally purports to terminate the Company's subsidiary's servicing rights under the Morgan Stanley Agreement and requests that the subsidiary take certain actions to facilitate the transfer of the servicing rights to a party appointed by Morgan Stanley.

All of the Company's financing arrangements with its lenders contain cross default and cross acceleration provisions. Accordingly, each of the Company's lenders that have not yet delivered notices of default or acceleration to the Company will be permitted to do so under the terms of their applicable financing arrangement with the Company. If each of the Company's lenders were to accelerate the obligations of the Company and its subsidiaries to repurchase all outstanding mortgage loans financed under all of the Company's outstanding financing arrangements, the aggregate repayment obligations would be approximately $8.4 billion. Further, under the respective financing arrangements, each of the Company's lenders have the right to cease providing financing to the Company and its subsidiaries during the pendency of an event of default. As of March 9, 2007, all of the Company's lenders under its short-term repurchase agreements and aggregation credit facilities had discontinued their financing with the Company or had notified the Company of their intent to do so. One of the Company's lenders has subsequently indicated to the Company that, notwithstanding its written notification to the Company of its intention to cease providing financing to the Company, it may be willing to continue providing limited financing under its existing agreements with the Company, but that such financing may be eliminated by the lender at any time.

The Company and its subsidiaries do not have sufficient liquidity to satisfy their outstanding repurchase obligations under the Company's existing financing arrangements. The Company is continuing its discussions with its lenders and other third parties regarding refinancing and other alternatives to obtain adequate liquidity. No assurance can be given that any of these discussions will be successful. If the Company and its subsidiaries are not able to satisfy their repurchase obligations, one or more of the Company's lenders may seek to liquidate the mortgage loans or other assets financed under the applicable financing arrangement with the Company. If this were to occur and if such liquidation was for an amount less than the contractual amount at which the Company and its subsidiaries have agreed to repurchase such mortgage loans from the applicable lender, then the lender may seek to recover this deficiency from the Company and its subsidiaries. The Company and its subsidiaries may not have sufficient resources to satisfy any such deficiency.

**Item 8.01 Other Events.**

Update on Status of 2006 Form 10-K

As previously announced, on March 2, 2007, the Company filed a Form 12b-25 with the Securities and Exchange Commission in which it reported that it had not yet filed its Annual Report on Form 10-K for its fiscal year ended December 31, 2006 (the "2006 Form 10-K"). In the Form 12b-25, the Company reported that it would not be able to complete its 2006 Form 10-K until (i) the Audit Committee of its Board of Directors completes its previously announced internal investigation into the issues giving rise to the Company's need to restate its 2006 interim financial statements, as well as issues pertaining to the Company's valuation of residual interests in securitizations in 2006 and prior periods, and (ii) the Company provides its independent registered public accounting firm, KPMG LLP, with the information that it needs in order to complete its audit of the Company's financial statements and internal control over financial reporting.

The Company continues to work diligently to finalize its financial statements for the year ended December 31, 2006, but does

Page 38
Exhibit F

not expect to finalize its financial statements, or to file its 2006 Form 10-K, prior to March 16, 2007 (the fifteenth calendar day following the prescribed due date for the 2006 Form 10-K). If the Company does not file its 2006 Form 10-K with the SEC on or before March 16, 2007, the Company will be in violation of Section 203.01 (Annual Financial Statement Requirement) of the New York Stock Exchange's (the "NYSE") Listed Company Manual and will be subject to the procedures specified in Section 802.01E (SEC Annual Report Timely Filing Criteria) of the NYSE Listed Company Manual. This section provides that the NYSE will monitor the Company and the filing status of the 2006 Form 10-K. If the Company has not filed its 2006 Form 10-K within six months of the filing due date of the 2006 Form 10-K, the NYSE will determine whether the Company should be given up to an additional six months to file its 2006 Form 10-K. If the NYSE determines that such an additional time period is not appropriate, suspension and delisting procedures would be commenced pursuant to Section 804.00 of the NYSE Listed Company Manual.

**Item 9.01 Financial Statements and Exhibits.**

(d) Exhibits.

10.1 Amendment No. 8 to Master Repurchase Agreement, dated as of March 8, 2007, by and among New Century Mortgage Corporation, NC Capital Corporation, New Century Credit Corporation, Home123 Corporation, NC Asset Holding, L.P. (successor by conversion to NC Residual II Corporation), NC Residual III Corporation, NC Residual IV Corporation, and Morgan Stanley Mortgage Capital Inc.

Page 39
Exhibit F

**Top of the Form**

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

|  |  | New Century Financial Corporation |
|---|---|---|
| March 12, 2007 | By: | /s/ Brad A. Morrice |
|  |  | Name: Brad A. Morrice |
|  |  | Title: President and Chief Executive Officer |

**Top of the Form**

Exhibit Index

| Exhibit No. | Description |
|---|---|
| 10.1 | Amendment No. 8 to Master Repurchase Agreement, dated as of March 8, 2007, by and among New Century Mortgage Corporation, NC Capital Corporation, New Century Credit Corporation, Home123 Corporation, NC Asset Holding, L.P. (successor by conversion to NC Residual II Corporation), NC Residual III Corporation, NC Residual IV Corporation, and Morgan Stanley Mortgage Capital Inc. |

# AMENDMENT NO. 8
# TO MASTER REPURCHASE AGREEMENT

AMENDMENT NO. 8, dated as of March 8, 2007 (this "Amendment"), to that certain Master Repurchase Agreement, dated as of December 12, 2005 (as previously amended, restated, supplemented or otherwise modified prior to the date hereof, the "Existing Repurchase Agreement"; as amended hereby and as further amended, restated, supplemented, or otherwise modified and in effect from time to time, the "Repurchase Agreement"), by and among NC CAPITAL CORPORATION, NEW CENTURY MORTGAGE CORPORATION, NC ASSET HOLDING, L.P. (successor by conversion to NC Residual II Corporation), HOME123 CORPORATION, and NEW CENTURY CREDIT CORPORATION (collectively, the "Existing Sellers"), NC RESIDUAL III CORPORATION, NC RESIDUAL IV CORPORATION (each, a "New Seller", and together with the Existing Sellers, collectively, the "Sellers" and each, a "Seller") and MORGAN STANLEY MORTGAGE CAPITAL INC., as Buyer (in such capacity, the "Buyer") and as Agent (in such capacity, the "Agent"). Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Existing Repurchase Agreement. Unless otherwise stated, all article and section references used herein refer to the corresponding parts of the Existing Repurchase Agreement.

## RECITALS

WHEREAS, the Existing Sellers and the Buyer are parties to the Existing Repurchase Agreement;

WHEREAS, the Sellers and the Buyer have agreed, subject to the terms and conditions hereof, that the Existing Repurchase Agreement shall be modified as set forth in this Amendment.

NOW THEREFORE, the Sellers and the Buyer hereby agree, in consideration of the mutual premises and mutual obligations set forth herein, the receipt and sufficiency of which are hereby acknowledged, that the Existing Repurchase Agreement is hereby amended as follows:

**SECTION 1.** Amendments.

(a) The first paragraph of the Recitals to the Existing Repurchase Agreement is hereby amended by deleting it in its entirety and substituting the following new paragraph in lieu thereof:

"The Sellers have each requested that the Buyers from time to time enter into transactions (each, a "Transaction"), pursuant to which a Seller agrees to sell to the Buyer, and the Buyer agrees to purchase from such Seller, on the Purchase Date (defined below) for such Transaction, certain (i) Eligible Mortgage Loans (defined below) and (ii) Eligible Securities (defined below), the Buyer purchasing undivided ownership interests in such Eligible Mortgage Loans or Eligible Securities pursuant to such Transactions, against payment by the Buyer of an amount equal to the Purchase Price (defined below) for such undivided ownership interests in such Eligible Mortgage Loans or Eligible Securities, with a simultaneous agreement by the Buyer to sell to such Seller, and such Seller to repurchase from the Buyer, Purchased Loans or Purchased Securities (defined below) on the related Repurchase Date (defined below) against payment by such Seller of an amount equal to the

related Repurchase Price (defined below)."

(b) Section 1.01 of the Existing Repurchase Agreement is hereby further amended adding the following new definitions in the appropriate alphabetical order:

"8th Amendment Effective Date" shall have the meaning specified in Section 2 of Amendment No. 8, dated as of March 8, 2007, to the Existing Agreement.

"Eligible Securities" shall mean those securities and other financial assets set forth on Schedule 6 hereto.

"Eligible Securities Pricing Spread" shall mean the sum of the Eurodollar Base Rate plus 1.50%.

"Eligible Securities Purchase Rate" shall mean 75%.

"Eligible Securities Recognized Value" shall mean, with respect to each Eligible Security, the product of (i) the ERRS Market Value of such Eligible Security, and (ii) the Eligible Securities Purchase Rate for such Eligible Security; provided, that the aggregate Eligible Securities Recognized Value shall not in the aggregate exceed $265,000,000.

"ERRS Market Value" shall mean, as of any date as to with respect to any Purchased Security, the value determined by the Agent in good faith in its sole discretion.

"ERRS Transaction" shall have the meaning specified in Section 2.01A.

"ERRST Transaction Request" shall mean a request for the ERRS Transaction in the form of Exhibit M attached hereto.

"Purchased Securities" shall mean the Eligible Securities sold by the Sellers to the Buyer in the ERRS Transactions hereunder.

(c) The Existing Repurchase Agreement is hereby amended by adding the following new Article II.A immediately following the existing Article II:

"ARTICLE II.A. TRANSACTIONS, REPURCHASE AND MARGIN MAINTENANCE WITH RESPECT TO ELIGIBLE SECURITIES

Section 2.01A Transactions. (a) Subject to the fulfillment of the conditions precedent set forth in Sections 2.06A, 5.01, 5.02 hereof, and provided that no Default or Event of Default shall have occurred and be continuing hereunder, the Buyer shall, on the 8th Amendment Effective Date, on the terms and subject to the conditions of this Repurchase Agreement, enter a Transaction with each applicable Seller to purchase the Eligible Securities from such applicable Seller in an aggregate Purchase Price, for the Buyer in such Transaction (which Purchase Price shall be payable in Dollars) at any one time outstanding up to but not exceeding the lesser of (i) the Buyer's unused Commitment and (ii) the Eligible Securities Recognized Value (as to each Seller, an "ERRS Transaction").

(b) Notwithstanding anything to the contrary contained herein, for non-tax purposes, the Buyer shall be deemed to have purchased an undivided interest in all Purchased Securities from time to

time subject to Transactions hereunder.

(c) Notwithstanding anything to the contrary provided herein or in any related Repurchase Document, absent a default by the Sellers, the Buyer may not cause the Purchased Securities to be sold or otherwise divest the Sellers of ownership of the Purchased Securities for U.S. federal income tax purposes, it being understood that a pledge of the Purchased Securities by the Buyer that does not permit the transferee to transfer the Purchased Securities, or a repurchase agreement with respect to the Purchased Securities that is treated as a financing for U.S. federal income tax purposes, shall not cause the Purchased Securities to be sold or otherwise divest the Seller of ownership of the Purchased Securities for U.S. federal income tax purposes.

(d) Notwithstanding anything to the contrary provided herein or in any related Repurchase Document, the Buyer and the Sellers agree to treat each ERRS Transaction as a loan by the Buyer to the Sellers that is secured by the Purchased Securities for U.S. federal income tax purposes unless otherwise required by law.

2.02A <u>ERRST Transaction Request Procedure</u>. (a) Each Seller holding Eligible REIT Residual Securities shall request an ERRS Transaction hereunder relating to such Eligible Securities on the 8th Amendment Effective Date, by delivering to the Buyer an ERRST Transaction Request, which ERRST Transaction Request must be received by the Buyer prior to 3:00 p.m., New York City time, on the 8th Amendment Effective Date. Such ERRST Transaction Request shall (i) attach a schedule identifying the Eligible Security that the applicable Seller proposes to sell to the Buyer hereunder in connection with such Transaction, (ii) specify the requested Purchase Price and Purchase Date and (iii) attach an officer's certificate signed by a Responsible Officer of each applicable Seller stating that, except as set forth in such certificate and accepted by the Agent in its sole discretion, (A) no Default or Event of Default exists and (B) all representations and warranties made by such Seller hereunder or in any other Repurchase Document are true, complete and correct in all material respects on and as of the 8th Amendment Effective Date (or, if any such representation of warranty is expressly stated to have been made as of a specific date, as of such specific date).

(b) Upon receipt from the applicable Seller of an ERRST Transaction Request pursuant to Section 2.02A(a), the Buyer shall, subject to the limitations set forth in Section 2.01A(a) hereof and upon satisfaction of (i) all conditions precedent set forth in Sections 2.06(A) and (ii) all applicable conditions in Sections 5.01, 5.02 and 5.04 hereof, and <u>provided</u> that no Default or Event of Default shall have occurred and be continuing, countersign such ERRST Transaction Request and enter into such ERRS Transaction with such Seller.

(c) Upon satisfaction of the applicable conditions precedent, the Buyer will remit to the applicable Seller or designee of such Seller via wire transfer to the account specified by such Seller in the related Transaction Request, the aggregate amount of such Purchase Price in funds immediately available to such Seller or designee, net of any amounts then payable by the Sellers to the Buyer.

2.03A <u>Payment of Repurchase Price, Price Differential</u>. (a) With respect to each ERRS Transaction entered into hereunder, the applicable Seller hereby promises to pay in full on the related Repurchase Date the Repurchase Price outstanding in respect of such ERRS Transaction and, without limiting Section 11.18 hereof, the Sellers hereby promise, jointly and severally, to pay in full on the Termination Date the aggregate Repurchase Price of all ERRS Transactions then outstanding.

Page 44
Exhibit F

(b) Each Seller hereby promises to pay to the Buyer Price Differential on all ERRS Transactions entered into hereunder. Notwithstanding the foregoing, each Seller hereby promises to pay to the Buyer interest at the applicable Post Default Rate on any Repurchase Price and on any other amount payable by the Seller hereunder that shall not be paid in full when due (whether at stated maturity, by acceleration or by mandatory prepayment or otherwise) for the period from and including the due date thereof to but excluding the date the same is paid in full. Accrued Price Differential for each ERRS Transaction shall be payable monthly on the first (1st) Business Day of each month and for the last month of the Repurchase Agreement on the first (1st) Business Day of such last month and on the Termination Date; Interest payable at the Post Default Rate shall accrue daily and shall be payable upon such accrual.

(c) So long as no Default or Event of Default has occurred and is continuing, a Seller may repurchase one or more Purchased Securities that are subject to any ERRS Transaction outstanding hereunder on any Business Day provided that notice of repurchase is given to the Agent no later than 11:00 a.m., New York City time, on such Business Day.

(d) Each applicable Seller shall direct the trustee, paying agent or like Person responsible for making payments on or in respect of any Purchased Security to make all such payment directly to an account specified by the Buyer to such Seller, and all amounts received by the Buyer as payments on or in respect of such Purchased Security shall be applied as a prepayment of the Repurchase Price for such Purchased Security.

(e) It is understood and agreed that, unless an Event of Default shall have occurred and be continuing, all right, title and interest in a Purchased Security shall automatically pass to the applicable Seller upon payment in full of the Repurchase Price for such Purchased Security.

2.04A Margin Maintenance; Buyer Downgrade. (a) If at any time the aggregate Repurchase Price of all ERRS Transactions then outstanding hereunder exceeds the aggregate Eligible Securities Recognized Value of all Purchased Securities subject to such ERRS Transactions (an "ERSS Margin Deficiency"), as determined by the Buyer and notified to the Sellers on any Business Day, the Sellers shall no later than one (1) Business Day after receipt of such notice, either make a payment to the Buyer in respect of such aggregate Repurchase Price or transfer to the Buyer additional securities or other financial assets in all respects acceptable to the Buyer in its sole discretion (which additional securities or other financial assets shall be deemed to be Purchased Securities under the Repurchase Documents) such that after giving effect to such payment or transfer, no ERSS Margin Deficiency shall then exist.

2.05A Representations and Warranties. Each applicable Seller hereby makes the representations and warranties with respect to the Purchased Securities sold by it hereunder set forth on Schedule 7.

2.06A Covenant of NC Residual IV Corporation and NC Capital Corporation. Each of NC Residual IV Corporation ("NCR IV") and NC Capital Corporation ("NCCC") agree that, without the prior written consent of the Agent, the intercompany credit agreement and note and the pledge agreement, each dated as of the 8th Amendment Effective Date, made by NCCC to NCR IV (the intercompany credit agreement and note and the pledge agreement, collectively, the "I-C Documents") shall not be amended, waived or otherwise modified.

2.07A Conditions Precedent to ERRS Transactions. The funding of the ERRS Transactions on the 8th Amendment Effective Date is subject to the following further conditions precedent:

(i) the Agent shall have received physical possession of original certificates for all of the Purchased Securities, together with such bond powers, direction letters and other instruments or documents, each undated and executed in blank by the applicable Seller, necessary or advisable, in the sole discretion of the Agent, to effect a transfer of the Purchased Securities to a third party without any further action on the part of the applicable Seller;

(ii) without limiting the provisions contained in Articles V, VI or VII, each Seller of a Purchased Security shall have taken such actions as are necessary or advisable, in the sole discretion of the Agent, to cause the trustee, paying agent or like Person responsible for making payments on or in respect of such Purchased Security under the related agreement with respect to such Purchased Security to make payments to the Buyer at the account number designated in the Control Agreement or such other account as may be designated by the Buyer from time to time;

(iii) the Agent shall have received a payoff letter from Citigroup Global Markets Realty Corp. ("Citigroup"), in form and substance satisfactory to the Agent, releasing any interest that Citigroup may have in the Purchased Securities; and

(iv) the representations and warranties made by the Sellers in Schedule 7 with respect to the Purchased Securities shall be true and correct in all material respects.

(d) Section 4.01(c) of Existing Repurchase Agreement is hereby amended by inserting the following phrase at the end of subclause (i): "and all Purchased Securities;". Without in any way limiting or affecting the grant of security interests made prior to the 8th Amendment Effective Date under Section 4.01 of the Existing Repurchase Agreement, upon the effectiveness of this Amendment, each Seller hereby grants a security interest in the Collateral to secure the Repurchase Obligations and any MS Obligations.

(e) The Existing Repurchase Agreement is hereby amended by inserting a reference to "Purchased Securities" after each applicable reference to "Purchased Loans", *mutatis mutandis*.

(f) The Existing Repurchase Agreement is hereby amended adding the Schedule attached hereto as Schedule 6 in the appropriate numerical order.

(g) The Existing Repurchase Agreement is hereby amended by adding the Schedule attached hereto as Schedule 7 in proper numerical order.

(h) The Existing Repurchase Agreement is hereby amended by adding the Exhibit attached hereto as Exhibit M in proper alphabetical order.

**SECTION 2. Conditions Precedent.** This Amendment shall become effective on the date on which (the "8th Amendment Effective Date") the Buyer shall have received:

(a) this Amendment, executed and delivered by a duly authorized officer of the Buyer and the Sellers;

(b) a Reaffirmation of Guarantee, executed and delivered by a duly authorized officer of the Guarantor;

(c) a certificate of a Responsible Officer of the Sellers, dated as of the date hereof, and:

(1) attaching certificates dated as of a recent date from the Secretary of State or other appropriate authority, evidencing the good standing of each Seller in the jurisdiction of its respective organization;

(2) attaching a copy of the resolutions, in form and substance satisfactory to the Buyer, of the Board of Directors of the Sellers authorizing (A) the execution, delivery and performance of this Amendment and (B) the Transactions contemplated under the Repurchase Agreement;

(3) attaching certified copies of the organizational documents of each Seller; and

(4) certifying as to the incumbency and specimen signature of each officer executing this Amendment;

(d) legal opinions of internal and outside counsel to the Sellers, in form and substance satisfactory to the Buyer in its sole discretion;

(e) the Joinder Agreements, dated as of the date hereof, by and among the Sellers, the New Sellers and the Guarantor;

(f) a flow of funds memorandum in form and substance satisfactory to the Agent in its sole discretion relating to the Transactions to be effected on the 8th Amendment Effective Date;

(g) payment of an amendment fee in the amount of $2,000,000, such payment to be made in Dollars, in immediately available funds, without deduction, set-off or counterclaim, to the account of the Agent set forth in Section 3.01(a) of the Repurchase Agreement;

(h) a copy of the I-C Documents, as defined in Section 2.06A of the Repurchase Agreement, and related pledge documentation, in form and substance satisfactory to the Buyer;

(i) payment of legal fees of counsel to the Buyer incurred in connection with this Amendment and related matters, to be paid directly to such counsel; and

(j) such other documents as the Buyer or counsel to the Buyer may reasonably request.

**SECTION 3.** Limited Effect; Reservation of Rights. Except as expressly amended and modified by this Amendment, the Existing Repurchase Agreement shall continue to be, and shall remain, in full force and effect in accordance with its terms; provided, however, that from and after the 8th Amendment Effective Date, all references to the Agreement therein or in any related document shall be deemed to be a reference to the Existing Repurchase Agreement as amended hereby. The execution of this Amendment by the Buyer and the performance by the parties hereto of the transactions contemplated hereby shall not operate as a waiver of any of its rights, powers or privileges under the Existing Repurchase Agreement or any related document, except as expressly set forth herein. The Buyer expressly reserves its rights (i) fully to invoke any and all such rights, remedies, powers and privileges under the Repurchase Documents, applicable law and equity at any time the Buyer deems appropriate in respect of any current or future Default or Event of Default or any current or future Material Adverse Effect and (ii) in its sole and absolute discretion at any time to no longer enter into any Transactions under the Repurchase Agreement. Any prior or current discussions or course of conduct

Page 47
Exhibit F

between the Buyer, on the one hand, and the Sellers and/or any of its respective Affiliates, on the other hand, shall not (and has not been intended to) constitute a waiver of any rights or remedies of the Buyer under the Repurchase Documents or an amendment or other modification of the Repurchase Documents.

**SECTION 4.** <u>Counterparts</u>. This Amendment may be executed by each of the parties hereto on any number of separate counterparts, each of which shall be an original and all of which taken together shall constitute one and the same instrument. Delivery of an executed counterpart of a signature page to this Amendment in Portable Document Format (PDF) or by facsimile transmission shall be effective as delivery of a manually executed original counterpart thereof.

**SECTION 5.** <u>GOVERNING LAW</u>. THIS AMENDMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

[SIGNATURES FOLLOW]

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be duly executed and delivered as of the day and year first above written.

**SELLERS**

NC CAPITAL CORPORATION

By: /s/ Warren Licata


Name: Warren Licata
Title: SVP

NEW CENTURY MORTGAGE CORPORATION

By: /s/ Warren Licata


Name: Warren Licata
Title: SVP

NC ASSET HOLDING, L.P.


By: NC DELTEX, LLC, its general partner
By: NC Capital Corporation, its sole member

By: /s/ Warren Licata


Name: Warren Licata
Title: SVP

HOME123 CORPORATION

By: /s/ Warren Licata

Name: Warren Licata
Title: SVP

NEW CENTURY CREDIT CORPORATION

By: /s/ Warren Licata

Name: Warren Licata
Title: SVP

NC RESIDUAL IV CORPORATION

By: /s/ Warren Licata

Name: Warren Licata
Title: SVP

NC RESIDUAL III CORPORATION

By: /s/ Kevin Cloyd

Name: Kevin Cloyd
Title: President

**BUYER and AGENT**

MORGAN STANLEY MORTGAGE CAPITAL INC.

By: /s/ Deborah Goodman

Name: Deborah Goodman
Title: Vice President