# Exhibit G

8-K 1 htm_18857.htm LIVE FILING

---

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

## FORM 8-K

CURRENT REPORT

Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

Date of Report (Date of Earliest Event Reported):      March 12, 2007

# New Century Financial Corporation

(Exact name of registrant as specified in its charter)

| Maryland | 001-32314 | 56-2451736 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

| 18400 Von Karman Avenue, Suite 1000, Irvine, California | 92612 |
|---|---|
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code:      (949) 440-7030

Not Applicable

Former name or former address, if changed since last report

---

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

[ ] Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)
[ ] Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)
[ ] Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))
[ ] Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

---

Page 51
Exhibit G

**Top of the Form**

**Item 1.01 Entry into a Material Definitive Agreement.**

New Century Mortgage Corporation, New Century Financial Corporation's (the "Company") indirect wholly owned subsidiary ("NCMC"), NC Capital Corporation, a direct wholly owned subsidiary of NCMC ("NC Capital"), Home123 Corporation, an indirect wholly owned subsidiary of the Company ("Home123"), and New Century Credit Corporation, a direct wholly owned subsidiary of the Company ("NCCC" and, together with NCMC, NC Capital and Home123, the "Sellers"), and DB Structured Products, Inc. ("DBSP"), Aspen Funding Corp. ("Aspen"), Newport Funding Corp. ("Newport"), Tucson Funding LLC ("Tucson"), and Gemini Securitization Corp., LLC ("Gemini" and, together with DBSP, Aspen, Newport and Tucson, the "Buyers") have entered into Amendment No. 4 and Waiver, dated as of March 6, 2007 (the "DB Amendment"), to that certain Master Repurchase Agreement dated as of September 2, 2005 (as amended to date, including by the DB Amendment, the "DB Agreement") by and among the Sellers and the Buyers. The DB Amendment had the effect of (i) providing limited covenant waivers until March 9, 2007, (ii) limiting the types of loans that the Buyers would purchase from Sellers to prime mortgage loans (as defined therein), (iii) increasing the repurchase price to be paid by the Sellers for loans repurchased by the Sellers from the Buyers under the DB Agreement, (iv) increasing the collateral for the Sellers obligations under the DB Agreement, and (v) requiring daily sweeps to the Buyers of principal and interest payments received by the Sellers with respect to loans that had been sold by the Sellers to the Buyers under the DB Agreement. The DB Amendment also provides that the Buyers may, in their discretion, elect to discontinue extending financing to the Sellers under the DB Agreement. The DB Amendment is filed as Exhibit 10.1 to this Current Report and is incorporated herein by reference.

As previously disclosed by the Company, on March 10, 2007, the Company received a letter from DBSP notifying the Company of certain purported defaults under the DB Agreement. Notwithstanding its entry into the DB Amendment, DBSP has ceased extending financing to the Sellers under the DB Agreement.

**Item 1.02 Termination of a Material Definitive Agreement.**

On December 19, 2006, St. Andrew Funding Trust, an indirect wholly owned subsidiary of the Company ("SAFT"), entered into a Mortgage Loan Purchase and Servicing Agreement with the Company, NCMC and Home123 (the "SAFT Agreement"). On March 12, 2007, the Company received a notice from SAFT stating that a termination event (as defined in the SAFT Agreement) had occurred as a result of the alleged failure of the Company to maintain the level of profitability specified in the SAFT Agreement. The notice further provides that SAFT is terminating its funding commitment under the SAFT Agreement at the request of ABN AMRO Bank N.V., as a swap counterparty under the SAFT Agreement. As of March 12, 2007, no amounts had been advanced under the SAFT Agreement to the Company or any of its subsidiaries.

On December 15, 2006, Von Karman Funding Trust, an indirect wholly owned subsidiary of the Company ("VKFT"), entered into an Amended and Restated Mortgage Loan Purchase and Servicing Agreement with the Company and NCMC (the "VKFT Agreement"). On March 12, 2007, the Company received a notice from Citibank, N.A., BNP Paribas and Calyon New York Branch, as swap counterparties under the VKFT Agreement (the "Swap Counterparties"), stating that a termination event (as defined in the VKFT Agreement) had occurred as a result of the alleged failure of the Company to repay certain of its outstanding obligations. Under the notice, the Swap Counterparties have also requested that VKFT notify the Company's subsidiary that VKFT's funding commitment under the VKFT Agreement terminated as of March 12, 2007.

As described in Item 2.04 of this Current Report, certain of the Company's lenders have purported to terminate or transfer the servicing rights of the Company's subsidiaries under the respective financing arrangement.

**Item 2.04 Triggering Events That Accelerate or Increase a Direct Financial Obligation or an Obligation Under an Off-Balance Sheet Arrangement.**

Page 52
Exhibit G

Barclays Bank PLC ("Barclays")

• The Company received a Notice of Event of Default and Reservation of Rights from Barclays, dated March 12, 2007, alleging that certain Events of Default, as defined in that certain Master Repurchase Agreement, dated as of March 31, 2006 (as amended to date), by and among the Company, certain of the Company's subsidiaries, Barclays and Sheffield Receivables Corporation, have occurred as a result of (i) alleged defaults by the Company and its subsidiaries under certain of their other financing arrangements and (ii) the Company's prior disclosure in a Current Report on Form 8-K that the Company and its subsidiaries do not have sufficient liquidity to satisfy their outstanding repurchase obligations under the Company's existing financing arrangements. Barclays purports in the notice to reserve its rights with respect to the alleged Events of Default.

Guaranty Bank

• The Company received a notice from Guaranty Bank, dated March 12, 2007, alleging that an Event of Default, as defined in that certain Credit Agreement, dated as of October 10, 2006, between one of the Company's subsidiaries and Guaranty Bank (as amended to date, the "Guaranty Bank Agreement"), has occurred as a result of the alleged failure of the Company to repay certain of its outstanding obligations. In its notice, Guaranty Bank stated that the outstanding loan balance under the Guaranty Bank Agreement exceeded the collateral value of the borrowing base under the Guaranty Bank Agreement by $1.5 million and demanded payment of such amount on or before March 13, 2007. Guaranty Bank also stated in its notice that, while reserving its purported rights with respect to the alleged Event of Default, it may, in its sole discretion, elect to continue providing limited financing under the Guaranty Agreement, but that it may discontinue such financing at any time in its sole discretion. The Company is a guarantor under the Guaranty Bank Agreement.

Morgan Stanley Mortgage Capital Inc. ("Morgan Stanley")

• The Company previously disclosed that it had received a letter from Morgan Stanley notifying the Company of alleged events of default as defined in that certain Master Repurchase Agreement, dated December 12, 2005, by and among certain of the Company's subsidiaries and Morgan Stanley (as amended to date, the "Morgan Stanley Agreement"), accelerating the obligation of the Company's subsidiaries to repurchase all outstanding mortgage loans and securities financed under the Morgan Stanley Agreement and demanding repayment of the aggregate repurchase obligation under the Morgan Stanley Agreement. The Company received a notice from Morgan Stanley, dated March 11, 2007, stating that Morgan Stanley may, in its sole discretion, elect to continue providing limited financing under the Morgan Stanley Agreement. Morgan Stanley subsequently informed the Company that, with an exception for a limited amount of previously committed financing expected to occur on March 13, 2007, it does not intend to provide further financing under the Morgan Stanley Agreement.

State Street Global Markets, LLC ("State Street")

• The Company received a notice from State Street, dated March 12, 2007, alleging that certain Events of Default, as defined in that certain Receivables Purchase Agreement, dated as of August 1, 2001 (as amended to date), by and among certain of the Company's subsidiaries, State Street, State Street Bank and Trust Company and Galleon Capital LLC, have occurred as a result of (i) alleged defaults by the Company and its subsidiaries under certain of their other financing arrangements and (ii) a determination by State Street that there has been a material adverse change to the Company or its subsidiaries. State Street purports in the notice to reserve its rights with respect to the alleged Events of Default.

Sutton Funding LLC ("Sutton")

• The Company received a Servicing Transfer Notice from Sutton, dated March 8, 2007, purporting to transfer the right of one of the Company's subsidiaries to service certain loans under that certain Interim Servicing Agreement, dated as of January 1, 2006, between one of the Company's subsidiaries and Sutton. In its notice, Sutton also requested that the subsidiary take certain actions to facilitate the transfer of the servicing rights to a party appointed by Sutton.

UBS Real Estate Securities Inc. ("UBS")

• The Company received a Notice of an Event of Default from UBS, dated March 12, 2007, alleging that certain Events of Default as defined in that certain Master Repurchase Agreement, dated as of June 23, 2006, by and among the Company, certain of its subsidiaries and UBS (as amended to date, the "UBS Agreement") have occurred as a result of (i) such subsidiaries' failure to satisfy its alleged obligation to repurchase all outstanding mortgage loans financed under the UBS Agreement, (ii) alleged defaults by the Company and its subsidiaries of unspecified covenants under the UBS Agreement, (iii) a determination by UBS that there has been a material adverse change to the Company or its subsidiaries and (iv) alleged defaults of the Company and its subsidiaries under certain of their other financing arrangements. The March 12, 2007 letter purports to accelerate the obligation of the Company's subsidiaries to repurchase all outstanding mortgage loans financed under the UBS Agreement and demands repayment of the aggregate repurchase obligation. Under the UBS Agreement, such

acceleration would require the immediate repayment of the repurchase obligation. The Company estimates that the aggregate repurchase obligation of its subsidiaries under the UBS Agreement was approximately $1.5 billion as of March 9, 2007. The Company is a guarantor under the UBS Agreement. In its notice, UBS additionally stated that it will not be renewing its servicing arrangement, which expires under the UBS Agreement on April 2, 2007, with the Company's servicing subsidiary and requests that the Company prepare for a servicing transition. In a separate letter to the Company and its subsidiaries, also dated March 12, 2007, UBS requested immediate access to the servicing and related records applicable to the mortgage loans financed under the UBS Agreement.

**Item 8.01 Other Events.**

On February 28, 2007, the Company received a letter from the United States Attorney's Office for the Central District of California (the "U.S. Attorney's Office") indicating that it was conducting a criminal inquiry under the federal securities laws in connection with trading in the Company's securities, as well as accounting errors regarding the Company's allowance for repurchase losses. The Company has subsequently received a grand jury subpoena requesting production of certain documents. The Company intends to cooperate with the requests of the U.S. Attorney's Office.

On March 12, 2007, the Company received a letter from the staff of the Pacific Regional Office of the Securities Exchange Commission stating that the staff was conducting a preliminary investigation involving the Company and requesting production of certain documents. The staff of the SEC had also previously requested a meeting with the Company to discuss the events leading up to the Company's previous announcement of the need to restate certain of its historical financial statements. The Company intends to cooperate with the requests of the SEC.

**Item 9.01 Financial Statements and Exhibits.**

(d) Exhibits.

10.1 Amendment No. 4 and Waiver to Master Repurchase Agreement, dated as of March 6, 2007, by and among DB Structured Products, Inc., Aspen Funding Corp., Newport Funding Corp., Tucson Funding LLC, Gemini Securitization Corp., LLC, New Century Mortgage Corporation, New Century Credit Corporation, Home123 Corporation and NC Capital Corporation.

**Top of the Form**

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

|  |  |
|---|---|
|  | New Century Financial Corporation |
| *March 13, 2007* | By: /s/ Brad A. Morrice |
|  | *Name: Brad A. Morrice* |
|  | *Title: President and Chief Executive Officer* |

**Top of the Form**

Exhibit Index

| Exhibit No. | Description |
|---|---|
| 10.1 | Amendment No. 4 and Waiver to Master Repurchase Agreement, dated as of March 6, 2007, by and among DB Structured Products, Inc., Aspen Funding Corp., Newport Funding Corp., Tucson Funding LLC, Gemini Securitization Corp., LLC, New Century Mortgage Corporation, New Century Credit Corporation, Home123 Corporation and NC Capital Corporation. |

EX-10.1 2 exhibit1.htm EX-10.1

**EXHIBIT 10.1**

AMENDMENT NO. 4 AND WAIVER TO MASTER REPURCHASE AGREEMENT

AMENDMENT NO. 4 AND WAIVER TO MASTER REPURCHASE AGREEMENT (this "Amendment") is made and entered into as of March 6, 2007, among DB Structured Products, Inc. ("DBSP" or the "Committed Buyer"), Aspen Funding Corp. ("Aspen"), Newport Funding Corp. ("Newport"), Tucson Funding LLC ("Tucson"), Gemini Securitization Corp., LLC ("Gemini" and, together with Aspen, Newport and Tucson, each a "Noncommitted Buyer" and collectively, the "Noncommitted Buyers" and, together with the Committed Buyer, each a "Buyer" and collectively, the "Buyers"), and New Century Mortgage Corporation ("NCMC"), New Century Credit Corporation ("NC Credit"), Home123 Corporation ("Home123") and NC Capital Corporation ("NCCC"; together with NCMC, NC Credit and Home123, each a "Seller" and collectively, the "Sellers").

WITNESSETH:

WHEREAS, the Sellers and the Buyers are parties to a certain Master Repurchase Agreement dated as of September 2, 2005, as amended by Amendment No. 1 to the Master Repurchase Agreement dated as of July 17, 2006, by Amendment No. 2 to the Master Repurchase Agreement dated as of November 17, 2006 and by Amendment No. 3 to the Master Repurchase Agreement dated as of December 19, 2006 (as so amended, the "Existing Agreement"; and as amended by this Amendment, the "Master Repurchase Agreement");

WHEREAS, the parties hereto desire to further amend the Existing Agreement in the manner, and on the terms and conditions, herein provided, in order to, among other things, provide that no Buyer, including the Committed Buyer, shall any longer be committed to enter into Transactions.

NOW, THEREFORE, in consideration of the mutual covenants herein contained, and other good and valuable consideration, the receipt and adequacy of which are hereby expressly acknowledged, the parties hereto agree as follows:

1. Definitions. Unless otherwise defined herein, all terms used herein which are defined in the Existing Agreement shall have the meanings assigned thereto in the Existing Agreement.

2. Amendments to Existing Agreement. The Existing Agreement is hereby amended as follows:

(a) The Sellers agree that no Buyer, including the Committed Buyer, is obligated to enter into Transactions with respect to Eligible Mortgage Loans at any time and that any decision to do so will be at the sole and absolute discretion of the Buyers;

(b) the Sellers and Buyers agree that, if any Buyer elects to enter into any Transaction on or after the date hereof, only Prime Mortgage Loans shall be the subject of such Transactions;

(c) in the absence of mutual agreement of the Buyers and Sellers to the contrary, the Repurchase Price for any Eligible Mortgage Loan which is the subject of a Transaction entered into on or after the date hereof shall be, on any date, the sum of (i) 105.36% of the Purchase Price with respect to such Purchased Asset plus (ii) the Price Differential as of the date of such determination decreased, in the case of clauses (i) and (ii), by all cash and Income on Purchased Assets actually received by such Buyer

pursuant to Sections 9 and 12 plus (iii) any Breakage Costs due pursuant to Section 3(i) with respect to such Purchased Asset;

(d) Section 11(a) of the Existing Agreement is amended by adding the following to the end thereof:

On or before March _, 2007, the Sellers shall cause the Collection Account Bank on each Business Day to transfer all collections on the Mortgage Loans on deposit in the Collection Account to an account of DBSP. DBSP will identify such account to the Sellers in writing. The Sellers will cooperate with DBSP and the bank maintaining such account to enter into an account control agreement in form and substance satisfactory to DBSP and such bank with respect to such account.

3. Waiver. The Sellers have informed the Buyers that the Sellers and NCFC did not meet the requirements of Subsection (d) of Schedule C for the rolling two-quarter period ending December 31, 2006 (the "December 2006 Profitability Test"), and that as a result, Events of Default exist under Sections 7(g) and (k) of the Master Repurchase Agreement (the "Specified Events of Default"). The Buyers hereby agree to waive, until March 10, 2007, compliance by the Sellers with Subsection (d) of Schedule C to the Existing Agreement for the two-quarter period ended December 31, 2006 only. After March 9, 2007, the waiver set forth in this Section 3 shall have no force or effect.

4. Limitations. The amendments and waiver set forth in Sections 2 and 3 above are limited precisely as written and shall not be deemed to (x) be a consent to any waiver of, or modification of, any other term or condition of the Existing Agreement, or any of the documents referred to therein or (y) prejudice any right or rights which the Buyers may now have or may have in the future under or in connection with the Master Repurchase Agreement, or any of the documents referred to therein. Except as expressly amended hereby, the terms and provisions of the Existing Agreement shall remain in full force and effect.

5. Fees and Expenses. The Sellers agree to promptly pay after being billed by a Buyer any reasonable legal fees and expenses incurred by such Buyer in connection with the preparation and execution of this Amendment.

6. Representations and Warranties. Each of the parties hereto severally represents and warrants that all acts, filings and conditions required to be done and performed and to have happened (including, without limitation, the obtaining of necessary governmental approvals) prior to the entering into of this Amendment to constitute this Amendment and the Existing Agreement as amended hereby the duly authorized, legal, valid and binding obligation of such party, enforceable in accordance with its terms, have been done, performed and have happened in due and strict compliance with all applicable laws.

7. Effectiveness. This Amendment shall become effective as of March 6, 2007, when:

(a) each of the parties hereto shall have executed a counterpart hereof and delivered the same to the Buyers;

(b) NCFC shall have executed a Consent and Acknowledgment, substantially in the form of Annex A hereto, and delivered the same to the Buyers; and

(c) the Buyers shall have received executed counterparts of Amendment No. 5 to the Fee Letter and the conditions to the effectiveness of such amendment shall have been satisfied.

8. Governing Law. THIS AMENDMENT SHALL BE GOVERNED BY, AND CONSTRUED IN

ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

9. <u>Counterparts</u>. This Amendment may be executed in several counterparts, each of which shall be regarded as the original and all of which shall constitute one and the same agreement.

10. <u>No Present Claims</u>. The Sellers and, by its execution and delivery of the attached Consent and Acknowledgment, NCFC each acknowledges and agrees that, based upon the facts and circumstances existing as of the date hereof: (i) it has no claim or cause of action against any of the Buyers (or any of their directors, officers, employees, agents or Affiliates); (ii) it has no offset right, counterclaim or defense of any kind against any of its obligations, indebtedness or liabilities to any of the Buyers; and (iii) each of the Buyers has heretofore performed and satisfied in a timely manner all of its obligations. Therefore, each Seller and NCFC unconditionally releases, waives and forever discharges all claims, offsets, causes of action, suits or defenses of any kind whatsoever (if any), whether known or unknown, which it might otherwise have against any of the Buyers or any of their directors, officers, employees, agents or Affiliates for their respective actions or omissions occurring prior to the date hereof, on account of any condition, act, omission, event, contract, liability, obligation, indebtedness, claim, cause of action, defense, circumstance or matter of any kind whatsoever which existed, arose or occurred at any time prior to the date hereof.

11. <u>No Waiver</u>. No failure on the part of any Buyer to exercise, and no delay in exercising, any right, power or remedy under the Master Repurchase Agreement shall operate as a waiver thereof, nor shall any single or partial exercise by such Buyer of any right, power or remedy under the Master Repurchase Agreement preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

IN WITNESS WHEREOF, the parties have caused this Amendment to be executed by their respective officers thereunto duly authorized as of the day and year first above written.

BUYERS:

DB STRUCTURED PRODUCTS, INC.
By: /s/ Glenn Minkoff
Name: Glenn Minkoff
Title: Director

By: /s/ John McCarthy
Name: John McCarthy
Title: Authorized Signatory


ASPEN FUNDING CORP.
By: /s/ Doris J. Hearn
Name: Doris J. Hearn
Title: Vice President

NEWPORT FUNDING CORP.
By: /s/ Doris J. Hearn
Name: Doris J. Hearn
Title: Vice President

TUCSON FUNDING LLC

By: /s/ Bernard J. Angelo
Name: Bernard J. Angelo
Title: Vice President

GEMINI SECURITIZATION CORP., LLC
By: Gemini Member Corp., as sole member
By: /s/ Douglas Donaldson
Name: Douglas Donaldson
Title: Treasurer

SELLERS:

NEW CENTURY MORTGAGE CORPORATION
By: /s/ Kevin Cloyd
Name: Kevin Cloyd
Title: Executive Vice President

NEW CENTURY CREDIT CORPORATION
By: /s/ Kevin Cloyd
Name: Kevin Cloyd
Title: President

HOME123 CORPORATION
By: /s/ Kevin Cloyd
Name: Kevin Cloyd
Title: Executive Vice President

NC CAPITAL CORPORATION
By: /s/ Kevin Cloyd
Name: Kevin Cloyd
Title: President

Annex A to Amendment No. 4 and Waiver

**CONSENT AND ACKNOWLEDGMENT**

Reference is made to the Master Repurchase Agreement, dated as of September 2, 2005 (as amended, supplemented or otherwise modified prior to the date hereof, the "Existing Agreement"; and as amended by the Amendment No.4 and Waiver referred to below, the "Master Repurchase Agreement"), among DB Structured Products, Inc. ("DBSP" or the "Committed Buyer"), Aspen Funding Corp. ("Aspen"), Newport Funding Corp. ("Newport"), Tucson Funding LLC ("Tucson"), Gemini Securitization Corp., LLC ("Gemini" and, together with Aspen, Newport and Tucson, each a "Noncommitted Buyer" and collectively, the "Noncommitted Buyers" and, together with the Committed Buyer, each a "Buyer" and collectively, the "Buyers"), and New Century Mortgage Corporation ("NCMC"), New Century Credit Corporation ("NC Credit"), Home123 Corporation ("Home123") and NC Capital Corporation ("NCCC"; together with NCMC, NC Credit and Home123, each a "Seller" and collectively, the "Sellers"). Capitalized terms used but not defined herein shall have the meanings given

to them in the Existing Agreement.

The undersigned hereby consents to the execution and delivery of (1) Amendment No. 4 and Waiver to the Master Repurchase Agreement, dated as of the date hereof, among the Buyers and the Sellers and (2) Amendment No. 5 to the Fee Letter, dated as of the date hereof, among DBSP and the Sellers and agrees that it is bound by the provisions of Section 10 of such Amendment No. 4 and Waiver.

NEW CENTURY FINANCIAL CORPORATION
By: /s/ Kevin Cloyd
Name: Kevin Cloyd
Title: Executive Vice President
By: /s/ Stergios Theologides
Name: Stergios Theologides
Title: Executive Vice President

Dated as of March 6, 2007