1  BERNSTEIN LITOWITZ BERGER
      & GROSSMANN LLP
2  BLAIR A. NICHOLAS  (Bar No. 178428)
   (blairn@blbglaw.com)
3  ELIZABETH LIN  (Bar No. 174663)
   (elizabethl@blbglaw.com)
4  BENJAMIN GALDSTON  (Bar No. 211114)
   (beng@blbglaw.com)
5  MATTHEW P. JUBENVILLE  (Bar No. 228464)
   (matthewj@blbglaw.com)
6  TAKEO A. KELLAR  (Bar No. 234470)
   (takeok@blbglaw.com)
7  12481 High Bluff Drive, Suite 300
   San Diego, CA 92130
8  Tel:   (858) 793-0070
   Fax:   (858) 793-0323
9       -and-
   SALVATORE J. GRAZIANO
10  (sgraziano@blbglaw.com)
   LAUREN A. MCMILLEN
11  (laurenm@blbglaw.com)
   1285 Avenue of the Americas
12  New York, NY 10019
   Tel:   (212) 554-1400
13  Fax:   (212) 554-1444

14  Lead Counsel for Lead Plaintiff New
   York State Teachers' Retirement System

15

16

17            UNITED STATES DISTRICT COURT

18            CENTRAL DISTRICT OF CALIFORNIA

19
   IN RE NEW CENTURY            Case No. 2:07-cv-00931-DDP (FMOx)
20                              (Lead Case)

21                              DECLARATION OF CHAD
                               COFFMAN IN OPPOSITION TO
22                              KPMG LLP'S MOTION FOR
                               SUMMARY JUDGMENT, OR IN
23                              THE ALTERNATIVE, SUMMARY
                               ADJUDICATION
24

25                              Date:  April 12, 2010
26                              Time: 10:00 a.m.
                               Ctrm.: No. 3
27                              Judge: Hon. Dean D. Pregerson
28

---

1    Attached hereto is the declaration of Chad Coffman in opposition to KPMG

2  LLP's motion for summary judgment or, in the alternative, summary adjudication.

3  Dated: March 15, 2010                    Respectfully submitted,

4                                           BERNSTEIN LITOWITZ BERGER
                                            & GROSSMANN LLP
5

6
                                            /s/ Elizabeth Lin
7                                           ELIZABETH LIN

8                                           BLAIR A. NICHOLAS
                                            ELIZABETH LIN
9                                           BENJAMIN GALDSTON
                                            MATTHEW P. JUBENVILLE
10                                          TAKEO A. KELLAR
                                            12481 High Bluff Drive, Suite 300
11                                          San Diego, CA 92130
                                            Tel:   (858) 793-0070
12                                          Fax:   (858) 793-0323

13                                                 -and-

14                                          SALVATORE J. GRAZIANO
                                            LAUREN A. MCMILLEN
15                                          1285 Avenue of the Americas
                                            New York, NY  10019
16                                          Tel:   (212) 554-1400
                                            Fax:   (212) 554-1444
17
                                            *Lead Counsel for Lead Plaintiff*
18                                          *The New York State Teachers' Retirement*
                                            *System and the Class*
19
                                            MARVIN L. FRANK
20                                          Murray, Frank & Sailer LLP
                                            275 Madison Avenue
21                                          New York, NY 10016
                                            Tel:   (212) 682-1818
22                                          Fax:   (212) 682-1892

23                                          *Counsel for Plaintiff Carl Larson*

24                                          JEFFREY ZWERLING
                                            Zwerling, Schachter & Zwerling, LLP
25                                          41 Madison Avenue
                                            New York, NY 10010
26                                          Tel:   (212) 223-3900
                                            Fax:   (212) 371-5969
27
                                            *Counsel for Plaintiff Charles Hooten*
28

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| In Re New Century Securities Litigation | ) Case No. 07-cv-00931-DDP |
| | ) |
| | ) |

## DECLARATION OF CHAD COFFMAN

**March 11, 2010**

## I.   INTRODUCTION

1.      My name is Chad Coffman. I am the President of Winnemac Consulting, a Chicago-based firm that specializes in the application of economics, finance, statistics, and valuation principles to questions that arise in a variety of contexts, including, as here, in the context of litigation. My qualifications are set forth in the next section.

2.      I have been asked by counsel for Plaintiffs in the above captioned matter to review Defendant KPMG LLP's Notice of Motion and Motion for Summary Judgment or, in the Alternative, Summary Adjudication; Memorandum of Points and Authorities, ("KPMG Motion"), including the Declaration of Allen Kleidon ("Kleidon Report"), and analyze whether the KPMG Motion provides a reliable basis for concluding that KPMG did not cause investor losses even if all other elements of Plaintiffs' allegations regarding KPMG's violation of the securities laws are proven.

3.      The materials I have relied upon in forming my opinions are listed in **Appendix A**. Winnemac Consulting is being compensated at an hourly rate of $450 for my work on this matter and my compensation is not contingent in any way on the opinions I have formed or on the outcome of this matter.  The next section presents my qualifications and the remainder of the report provides the basis for my opinion.

## II.   QUALIFICATIONS

4.      I hold a Bachelors Degree in Economics with Honors from Knox College and a Masters in Public Policy from the University of Chicago. I am also a CFA charter-holder. The CFA, or Chartered Financial Analyst, designation is awarded to those who have sufficient

practical experience and complete a rigorous series of three exams over three years that cover a wide variety of financial topics including valuation and financial statement analysis.

5.       I, along with several others, founded Winnemac Consulting in March of 2008. Prior to starting Winnemac Consulting, I was employed by Chicago Partners for over twelve years.  At both firms I have been responsible for conducting and managing analysis in a wide variety of areas including securities valuation and damages, discrimination and antitrust. I have been responsible for conducting loss causation, damages, and valuation analysis in some of the most high profile securities cases on record including Parmalat, Enron, Tyco, and WorldCom among others. I have been engaged numerous times as a valuation expert both within and outside the litigation context. My experience in class action securities cases includes work for plaintiffs, defendants, D&O insurers and I have also been engaged on dozens of cases by a prominent mediator (Retired Judge Daniel Weinstein) to provide neutral economic analysis and opinions in numerous securities class actions as well as other matters.

6.       My qualifications are further detailed in my curriculum vitae, which is attached as **Appendix B**.

### III.    SUMMARY OF OPINIONS

7.       The core argument in the KPMG Motion is that the corrective disclosures in this matter do not specifically reveal a misstatement or omission by New Century Financial Corporation, ("New Century" or "Company") in their 2005 audited financial statements or KPMG's 2005 audit opinion.  KPMG argues, therefore, that Plaintiffs cannot establish loss causation even if KPMG would otherwise be liable for material misstatements and omissions in those statements.

8.      In my opinion, the question of whether KPMG's conduct and public statements proximately caused investor losses is not properly assessed by focusing solely on the specific time span of financial statements identified in the initial corrective disclosures. This would be tantamount to a finding that preliminary corrective disclosures that put investors on notice of material misstatements, but prior to the completion of a formal investigation and with limited information regarding the scope and duration of the wrongdoing, constrains the ability of investors to recover – regardless of what the underlying facts and discovery might later suggest as to the underlying proximate cause of the losses. This makes no economic or logical sense and, in my view, is inconsistent with the how to properly assess proximate causation.

9.      The KPMG Motion simply assumes that New Century's 2006 quarterly financial statements are somehow completely separable and independent of:

a.      New Century's 2005 audited financial statements;

b.      The clean audit opinion issued by KPMG on March 15, 2006;

c.      KPMG's conduct during 2005 and 2006; and

d.      KPMG's consent to reissue the clean audit opinion on August 15, 2006. This reissuance occurred as part of the prospectus for New Century's issuance of the 9.75% Series B Cumulative Redeemable Preferred Stock. This consent was provided after KPMG's Second Quarter 2006 review and New Century's issuance of those quarterly results.

10.     These assumptions make no logical or economic sense and are faulty for a number of reasons, including:

a.      A substantial portion of the 2006 material misstatements that New Century admitted to in the corrective disclosures involved the same accounts and were a

4

continuation of the exact same accounting procedures applied in preparing the 2005 audited financial statements. The Company later acknowledged that the 2005 financial statements were also materially misstated for the same reasons. Therefore, there is a direct causal nexus between the 2006 misstatements and the immediately preceding financial statements that were issued during the Class Period[1] and audited by KPMG.

b.      The 2005 audited financial statements are inherently linked as a pure matter of accounting to the 2006 quarterly statements since the ending balances for 2005 serve as the opening balances in 2006 that are reported in each of the 2006 10-Qs. If Plaintiffs' allegations are correct, New Century's quarterly financial statements in 2006 would have admittedly been materially different but-for KPMG's conduct.

c.      In reporting and evaluating the Company's 2006 quarterly earnings, New Century and securities analysts compared against its 2005 performance.  These types of "prior year" comparisons are ubiquitous in evaluations of corporate performance and thus investment decisions.  This indicates that the materially misstated 2005 audited financial statements were highly relevant in 2006 and the connection between 2005 and 2006 financial statements cannot be dismissed as KPMG suggests.

d.      Moreover, KPMG's conduct and additional public statements (or lack thereof) in 2006 belie the notion that the material misstatements in New Century's

---

[1] The Class Period is May 5, 2005 through March 13, 2007

5

2006 quarterly financial statements are independent events as the KPMG Motion implies. For example,

    i.      In preparation of the Second Quarter 2006 financial statements, New Century, at least in consultation with, if not initiated by KPMG itself, changed its accounting for repurchase reserves in a manner that did not correct the prior erroneous method, but actually introduced additional misstatements that exacerbated the understatement of the same reserve that was misstated in 2005 and Q1 2006.

    ii.     Subsequent to New Century's issuance of its Second Quarter 2006 10-Q, KPMG consented to a reissuance of the 2005 clean audit opinion in conjunction with New Century's issuance of 9.75% Series B Cumulative Redeemable Preferred Stock. This is despite KPMG's: (1) continued explicit acceptance of the prior erroneous accounting, (2) either acceptance or initiation of additional accounting errors, and (3) observance of continued deterioration in the subprime market and a substantial repurchase backlog.

    iii.    In preparing its Third Quarter 2006 financial statements, New Century again changed its accounting for the repurchase reserve, again in consultation with if not at the behest of KPMG, in a manner that further compounded the accounting errors and understatement of the repurchase reserve and did not correct the errors that extended back into 2005 despite additional evidence of deterioration in the market and a growing backlog of repurchase claims.

6

iv.     KPMG could reasonably foresee that the accounting errors present

in 2005 would continue into 2006 and ultimately cause investor losses

when revealed.  This is especially true after market conditions deteriorated

in 2006, yet KPMG consented to reissuance of its clean audit opinion after

Second Quarter 2006.

v.      KPMG's clean audit opinion, both when originally issued on March

15, 2006 and when reissued on August 15, 2006, proclaimed not only that

New Century's 2005 financial statements were free of material

misstatements, but that the Company had proper internal controls.  It was

later revealed that as of the end of 2005, New Century did not have proper

internal controls.  Instead, the Company and KPMG both admitted that

New Century had a poor internal control environment extending back into

2005.[2]  KPMG had no reason to believe that the poor internal control

environment that existed in 2005 would change in 2006 and therefore could

reasonably foresee additional accounting errors – which when revealed

would result in investor losses.

vi.     As a general matter, audit opinions and evaluations of internal

controls should not be viewed as purely backward looking, their purpose is

also to provide prospective investors comfort that companies are

consistently applying proper internal controls and accounting procedures.

11.     More broadly, I understand loss causation (or proximate causation) to be a

combination of the "but-for" test and the "foreseeability" test.  In other words, would Plaintiffs

---

[2] Second Amended Consolidated Class Action Complaint dated 4/30/2008; paragraph 193

7

have suffered the loss but-for Defendants' actions and was the loss a foreseeable consequence of their actions?  The following represent key economic questions in assessing whether KPMG proximately caused investor losses in this matter:

        a.     *Did KPMG's misstatements cause artificial inflation in New Century's stock (part of but-for causation)?* **Yes, materially understating reserves and overstating the value of residual interests would cause artificial inflation.**

        b.     *Would the 2006 misstatements have occurred but-for KPMG's conduct (part of but-for causation)?* **In my view, the accounting misstatements in 2006 would not have occurred but-for KPMG's conduct.**

        c.     *Did the artificial inflation caused by the misstatements continue until the corrective disclosures (part of but-for causation)?* **Yes. There were no disclosures that corrected the misstatements before the corrective disclosures or intervening events that would have eliminated the artificial inflation.**

        d.     *Did the disclosure of the relevant truth result in investor losses (part of but-for causation)?* **Yes, when the misstatements and their consequences were disclosed, the stock price fell significantly.**

        e.     *Could KPMG reasonably foresee that the disclosure of the accounting errors (whether from 2005 or subsequent periods) would cause investor losses?* **In my opinion, it is entirely foreseeable that such a disclosure would cause investor losses.**

     12.    Based on the economic logic above, I conclude that Plaintiffs, if they prevail on proving the other elements of their claims, will be able to demonstrate loss causation on the corrective disclosures.

13.     KPMG also argues that investor losses were driven by economic events unrelated to the accounting errors.  I note that the market was fully aware that New Century was in the business of subprime mortgages and that the mortgage market was experiencing a severe downturn.  This is why in late 2006 and early 2007, prior to the corrective disclosures that began on February 7, 2007, there were substantial declines in New Century's market value that are not recoverable by Plaintiffs.  Plaintiffs are only seeking to recover for events in which the market was surprised by Company specific announcements related to the wrongdoing.  In my view, the losses sustained on the corrective disclosures are substantially, if not entirely, caused by information related to the accounting errors.

14.     Even if the finder of fact determines KPMG cannot be held liable for the portion of the price declines related to the 2006 misstatements, in my view, a substantial, albeit smaller, portion of the corrective disclosures are directly related to the 2005 misstatements.  This is because the market reaction to errors in the backlog reserve and revaluation of residual interest are reactions to the *cumulative economic impact* of those restatements – a substantial portion of which arose in 2005 and should have been disclosed by the end of 2005 as of the time of KPMG's audit opinion.

15.     The remainder of this report is organized as follows: Section IV provides background on New Century's business and KPMG's role with New Century.  Section V summarizes the accounting misstatements at issue in this matter; Section VI describes the corrective disclosures in this matter; Section VII summarizes and evaluates KPMG's position on loss causation; Section VIII provides an affirmative analysis of loss causation in this matter.

## IV.   OVERVIEW OF NEW CENTURY'S BUSINESS AND KPMG'S ROLE

16.    Founded in 1995, New Century was one of the largest mortgage finance companies in the United States. As summarized in the 2005 10-K filed with the SEC:

> We began originating and purchasing loans in 1996, and, in the fourth quarter of 2004, we began operating our business as a REIT. We originate and purchase primarily first mortgage loans nationwide. Historically, we have focused on lending to individuals whose borrowing needs are generally not fulfilled by traditional financial institutions because they do not satisfy the credit, documentation or other underwriting standards prescribed by conventional mortgage lenders and loan buyers. In September 2005, we acquired a mortgage origination platform from RBC Mortgage Company, or RBC Mortgage, that expands our offerings to include conventional mortgage loans, including "Alt-A" mortgage loans, loans insured by the Federal Housing Administration, or FHA, and loans guaranteed by the Veterans Administration, or VA. A significant portion of the conventional loans, which are generally referred to as "conforming loans," we produce qualify for inclusion in guaranteed mortgage securities backed by the Federal National Mortgage Association, or Fannie Mae, or the Federal Home Loan Mortgage Corp., or Freddie Mac. At the same time, some of the conventional loans we produce either have an original loan amount in excess of the Fannie Mae and Freddie Mac loan limit for single-family loans or otherwise do not meet Fannie Mae or Freddie Mac guidelines.[3]

17.    By 2001, New Century had originated over $20 billion in mortgage loans.[4]  New Century grew substantially over the next several years as shown in **Exhibit 1**.  New Century originated over $27 billion in mortgage loans in 2003 alone.[5]  Also in 2003, New Century restructured its business and began retaining 20 to 25% of its mortgage loan production on its balance sheet by structuring loan securitizations as financings rather than as sales.[6]  By the end of

---

[3] SEC Form 10-K for fiscal year ended December 31, 2005, filed 3/16/2006, p.1

[4] Final Report of Michael J. Missal, Bankruptcy Court Examiner, dated 2/29/2008, p. 41

[5] Final Report of Michael J. Missal, Bankruptcy Court Examiner, dated 2/29/2008, p. 41; SEC Form 10-K for fiscal year ended December 31, 2003, filed 3/15/2004, p. 1

[6] Final Report of Michael J. Missal, Bankruptcy Court Examiner, dated 2/29/2008, p. 41; SEC Form 10-K for fiscal year ended December 31, 2005, filed 3/16/2006, p. 56

2006, the Company was the third largest subprime mortgage loan originator in the United States, with a loan production volume that year of $51.6 billion.[7]

18.     **Exhibit 2** plots New Century's closing stock price from January 2002 through July 2007.  The chart shows that the market value of New Century's stock rose substantially leading up to the Class Period and then began to fall substantially in the latter half of 2006 as the subprime mortgage market began to deteriorate.  There was then a sudden and precipitous drop in New Century's value beginning on February 7, 2007 as it disclosed accounting errors, the need to restate its financial statements, and lack of proper internal controls.  Subsequent events, which Plaintiffs claim are consequences of the accounting errors, further reduced the market value of New Century and the company ultimately declared bankruptcy on April 2, 2007.[8]

19.     KPMG provided audit, audit-related, tax and other services to the Company prior to and throughout the Class Period.[9] On March 15, 2006, KPMG issued an audit report on New Century's financial statements and management's assessment of internal controls for the year ended December 31, 2005.[10]  KPMG consented to the incorporation by reference in the prospectus for the Series B Preferred Stock offering of its unqualified opinions on the Company's financial statements and management's assessment of internal controls for the year ended December 31, 2005.[11]  This prospectus was issued on August 15, 2006.[12]  KPMG also

---

[7] Final Report of Michael J. Missal, Bankruptcy Court Examiner, dated 2/29/2008, p. 40

[8] SEC Form 8-K filed 4/6/2007

[9] SEC Form 10-K for fiscal year ended 2003 and 2005, KPMG Answer to Second Amended Consolidated Class Action Complaint dated 4/30/2008; paragraph 39

[10] SEC Form 10-K for fiscal year ended December 31, 2005, filed 3/16/2006; KPMG Answer to Second Amended Consolidated Class Action Complaint dated 4/30/2008; paragraph 39

[11] Prospectus Supplement (To Prospectus Dated May 6, 2005); 9.75% Series B Cumulative Redeemable Preferred Stock, Filed Pursuant to Rule 424(b)(5), dated August 15, 2006, p. S-47 and p. 81, KPMG Answer to Second Amended Consolidated Class Action Complaint dated 4/30/2008; paragraph 39

[12] Prospectus Supplement (To Prospectus Dated May 6, 2005); 9.75% Series B Cumulative Redeemable Preferred Stock, Filed Pursuant to Rule 424(b)(5), dated August 15, 2006

performed reviews of New Century's interim financial statements and offered accounting advice in conjunction with those reviews.

## V.   OVERVIEW OF THE ACCOUNTING MISSTATEMENTS

20.     New Century has admitted to accounting errors in two areas: calculation of the repurchase reserve and valuation of residual interests.[13]  I address each separately.

21.     The purpose of New Century's repurchase reserve calculation was to reflect the expected loss in value as a result of having to repurchase loans out of securitizations.  A loan would need to be repurchased either because of an early payment default or a breach of representation or warranty regarding the nature of the loan.[14]  The Company's calculation should have reflected the following components:[15]

> a.     Backlog claims:  Existing repurchase claims on loans over 90 days old. These would not be captured by the company's estimation procedure.
>
> b.     Interest recapture:  The interest New Century would have to pay investors on the repurchased loan.
>
> c.     Inventory severity:  The amount by which loans already repurchased during the quarter are  impaired (repurchased loans would naturally be impaired because they either were already in default or their quality was less than stated to the investor).

---

[13] One component of the repurchase reserve calculation performed by the Company (inventory severity) technically affected its "lower of cost or market" adjustment ("LOCOM"), which falls outside of the repurchase reserve.  For ease of exposition, however, throughout the remainder of this report I refer to this as part of the repurchase reserve.

[14] SEC Form 10-K for fiscal year ended December 31, 2003, filed 3/15/2004, p. 35

[15] Final Report of Michael J. Missal, Bankruptcy Court Examiner, dated 2/29/2008, p. 212-228

      d.    Future loss severity:  An estimate of the impairment on loans sold during the quarter that are expected to be repurchased, but for which the repurchase has not yet occurred.

      e.    Premium recapture:  If New Century sold the loan at a premium to the investor, this premium would have to be repaid by New Century to the investor. This account estimated the expected amount of those payments.

22.    New Century's repurchase reserve calculation never included backlog claims and was inconsistent in incorporating other components.[16]  The table below reflects the inconsistent treatment of the repurchase reserve components.

**Components of Repurchase Reserve Calculation**

| Description | Proper Accouning | 2005 | Q1- 2006 | Q2 - 2006 | Q3 - 2006 |
|---|---|---|---|---|---|
| Backlog Claims | Include | | | | |
| Interest Recapture | Include | | | | Included |
| Inventory Severity (LOCOM) | Include | Included | Included | | |
| Future Loss Severity | Include | Included | Included | Included | |
| Premium Recapture | Include | Included | Included | Included | Included |

23.    According to the Examiner, New Century also understated each of the included components of the reserve.[17]  Based upon the examiner's analysis, the following table reflects the total misstatement of income, including the valuation of New Century's residual interests, which will be discussed further below.

---

[16] Final Report of Michael J. Missal, Bankruptcy Court Examiner, dated 2/29/2008, p. 212-228.

[17] Final Report of Michael J. Missal, Bankruptcy Court Examiner, dated 2/29/2008, p. 212-218

## Quantification of Accounting Misstatements

| ($ in 000's) | | 2005 | Q1 2006 | | Q2 2006 | | Q3 2006 |
|---|---|---|---|---|---|---|---|
| **New Century's Repurchase Reserve - As Reported** | | | | | | | |
| Backlog | | | | | | | $5,039 |
| New Century's Interest Recapture | a | | | | | | |
| New Century's Inventory Severity (LOCOM) | b | $8,272 | $8,394 | | | | |
| New Century's Future Loss Severity | a | $4,392 | $5,566 | e | $9,448 | e | |
| New Century's Premium Recapture | a | $1,137 | $1,349 | e | $2,606 | e | $5,335 |
| New Century's Reserve | | $13,801 | $15,309 | | $12,054 | | $10,374 |
| | | | | | | | |
| **Examiner Recalculation of Repurchase Reserve** | | | | | | | |
| Backlog | | $8,351 | $19,846 | | $19,633 | | $62,481 |
| Interest Recapture | | $1,956 | $2,484 | | $2,122 | | $5,161 |
| Inventory Severity (LOCOM) | c | $18,080 | $26,797 | | $81,871 | | $85,788 |
| Future Loss Severity | | $5,009 | $6,993 | | $9,363 | | $42,095 |
| Premium Recapture | | $1,725 | $1,964 | | $2,355 | | $5,464 |
| Total Examiner's Calculated Repurchase Reserve | | $35,121 | $58,084 | | $115,344 | | $200,989 |
| | | | | | | | |
| Cumulative Difference in Repurchase Reserve and LOCOM | | $21,320 | $42,775 | | $103,290 | | $190,615 |
| | | | | | | | |
| Quarterly Earnings Impact of Repurchase Reserve and LOCOM Errors | | ($21,320) | ($21,455) | | ($60,515) | | ($87,325) |
| | | | | | | | |
| Overstatement of Residual Interest Valuation | | ($42,300) | $14,100 | | ($15,200) | | ($29,100) |
| | | | | | | | |
| Total Quarterly Income Statement Impact | d | ($63,620) | ($7,355) | | ($75,715) | | ($116,425) |

NOTES:
a. Excludes Home 123 repurchase reserve amounts.
b. Relates to the MTM on repurchased loans booked by the Company.
c. Includes only the Inventory Severity (LOCOM) on Repurchased Loans due to mispricing of loans in Q4 2005 and Q1 2006 and the exclusion of Inventory Severity in Q2 and Q3 2006. Does not include Industry Practice LOCOM.
d. Does not constitute the total financial statement impact of the Examiner, as this excludes Industry Practice LOCOM.
e. Includes certain immaterial reconciling items for financial statements.

Dark shading indicates the component was excluded completely, light shading indicates the component was misstated in a way that overstated income

Source: Final Report of Michael J. Missal, Bankruptcy Court Examiner, dated 2/29/2008, p. 222

24.    What is clear from the table above is that the misstatements in 2006 were a continuation of the same misstatements that occurred in 2005. The complete exclusion of backlog claims was unchanged throughout the period. In addition, the exclusion of interest recapture was a holdover from 2005. I understand the complete exclusion of inventory severity and future loss severity (rather than simply understating them) commenced with the agreement of, if not at the suggestion of KPMG.[18] As a result, the existence of material accounting errors in

---

[18] Final Report of Michael J. Missal, Bankruptcy Court Examiner, dated 2/29/2008, p. 216-217

the repurchase reserve calculation is not limited to the first three quarters of 2006 and represents, in large part, a continuation of previous errors that existed in 2005.

25.     In addition to errors in the repurchase reserve, the Company disclosed errors in its calculation of residual interests that extended back to at least 2005.[19]  The Examiner identified numerous problems with New Century's accounting for residual interests including flawed assumptions and a lack of internal controls.  For many of the issues identified by the Examiner, neither the Company nor the Examiner attempted to quantify the degree of misstatement.  The Examiner did quantify, however, the impact for two categories of errors: (1) understatement of appropriate discount rates, and (2) the assumption that all loans remaining in a securitization could be sold at par value if the securitization were terminated.

26.     With respect to discount rates, the Examiner found that as of the end of 2005, New Century was applying a discount rate to future cash flows of 12% to 14% to calculate the present value of its residual interests.[20]  Based on his analysis, and given the information available to New Century and KPMG at the time, the *lowest* defensible range of discount rates that New Century should have been applying as of 2005 was 15% to 17%.[21]  Application of these rates would have caused New Century to write down the value of its residual interests by $14.8 million[22] as of the end of 2005.

27.     In addition, the Examiner determined that New Century was erroneously assuming that at the termination of a securitization all of the remaining loans could be sold at par value – regardless of their delinquency or foreclosure status.  This practice extended back to New

---

[19] Final Report of Michael J. Missal, Bankruptcy Court Examiner, dated 2/29/2008, p. 229-231

[20] Final Report of Michael J. Missal, Bankruptcy Court Examiner, dated 2/29/2008, p. 284

[21] Final Report of Michael J. Missal, Bankruptcy Court Examiner, dated 2/29/2008, p. 303

[22] Final Report of Michael J. Missal, Bankruptcy Court Examiner, dated 2/29/2008, p. 304

Century's first securitizations and was never updated by the Company and, according to the Examiner, never questioned by KPMG. Based on the Examiner's findings, this resulted in an overstatement in the value of the residual interests of at least $27.5 million[23] as of the end of 2005.

28.     As described herein and reflected on the table above, taking the errors in the discount rate and par value assumption together suggests an overstatement of value of $42.3 million as of the end of 2005. These exact same errors continued into 2006 and led to additional misstatements in New Century's 2006 quarterly results.

29.     While the Examiner did not quantify the magnitude of any other errors, there were a number of other problems with the Company's valuation of its residual interests. For example, two of the key inputs to a valuation of residual interests are the "prepayment speed" and "loss curve". Prepayment speed refers to the rate at which loans will be prepaid because the borrower refinances, or sells their home. The "loss curve" is an estimate of how loan losses would accumulate over time. The Examiner found that until December 2006 New Century was basing its prepayment rate and loss curve assumptions on the average historical performance from 1997 to 2002. [24] The Examiner concluded that the Company should have been calibrating the prepayment and loss assumptions in its residual interest valuation models to reflect changing market conditions much earlier.[25] Other problems identified by the Examiner included the general deficiency and unreliability of the models used to perform the valuations, the control environment surrounding the models, and arbitrary changes in the clean-up call percentages.[26]

---

[23] Final Report of Michael J. Missal, Bankruptcy Court Examiner, dated 2/29/2008, p. 305

[24] Final Report of Michael J. Missal, Bankruptcy Court Examiner, dated 2/29/2008, p. 320

[25] Final Report of Michael J. Missal, Bankruptcy Court Examiner, dated 2/29/2008, p. 323

[26] Clean up call percentage generally refers to the ability of the servicer to terminate a securitization once the principal balance of the loans in the securitization falls below a certain percentage of the original principal balance.

## VI.    THE CORRECTIVE DISCLOSURES

30.    The complaint alleges that there were a number of disclosures that corrected the previous misrepresentations of Defendants.  I describe each of the corrective disclosures in detail below.


**February 7, 2007**

31.    On February 7, 2007, after the close of trading and just one day before New Century was scheduled to report its 2006 fourth quarter and year-end results, the Company issued a press release announcing that it would need to restate its reported financial results for the quarters ended March 31, June 30 and September 30, 2006.  As a result of this disclosure, New Century's stock price fell 36%.  The press release stated, among other things, that:

> . . .[New Century] will restate its consolidated financial results for the quarters ended March 31, June 30, and September 30, 2006 to correct errors the company discovered in its application of [GAAP] regarding the company's allowance for repurchase losses.

> . . . During the second and third quarters of 2006, the company's accounting policies incorrectly applied [SFAS-140].  Specifically, the company did not include the expected discount upon disposition of loans when estimating its allowance for loan repurchase losses. [i.e. Inventory Severity and Future Loss Severity]

> In addition, the company's methodology for estimating the volume of repurchase claims to be included in the repurchase reserve calculation did not properly consider, in each of the first three quarters of 2006, the growing volume of repurchase claims outstanding that resulted from the increasing pace of repurchase requests that occurred in 2006, compounded by the increasing length of time between the whole loan sales and the receipt and processing of the repurchase request. [i.e. Backlog]

> Importantly, the foregoing adjustments are generally non-cash in nature.  Moreover, the company had cash and liquidity in excess of $350 million at December 31, 2006.

Although the company's full review of the legal, accounting and tax
impact of the restatements is ongoing, at this time the company expects
that, once restated, its net earnings for each of the first three quarters of
2006 will be reduced. In light of the pending restatements, the company's
previously filed condensed consolidated financial statements for the
quarters ended March 31, June 30 and September 30, 2006 and all
earnings-related press releases for those periods should no longer be relied
upon.

. . . The company also expects that the errors leading to these restatements
constitute material weaknesses in its internal control over financial
reporting for the year ended December 31, 2006.

. . . The company's fourth quarter and full-year 2006 earnings
announcement, originally scheduled for February 8, 2007, has been
postponed to an undetermined future date . . .

The increasing industry trend of early-payment defaults and, consequently,
loan repurchases intensified in the fourth quarter of 2006.  The company
continued to observe this increased trend in its early-payment default
experience in the fourth quarter, and the volume of repurchased loans and
repurchase claims remains high.

In addition, the company currently expects to record a fair value
adjustment to its residual interests to reflect revised prepayment, loss and
discount rate assumptions with respect to the loans underlying these
residual interests, based on indicative market data.  While the company is
still determining the magnitude of these adjustments to its fourth quarter
2006 results, the company expects the combined impact of the foregoing
to result in a net loss for that period.[27]

32.     While my detailed analysis of loss causation and rebuttal of the analysis and

conclusions in the KPMG Motion follows in a later section, it is worthwhile to point out some

salient interpretations of this disclosure.

33.     First, neither the KPMG Motion nor the Kleidon Report argue, nor could they

credibly, that the announcement of the accounting errors on February 7, 2007 was not the

substantial cause of the 36% decline in market price observed in the next day's trading session.

---

[27] PR Newswire, 2/7/2007, 17:12, "New Century Financial Corporation to Restate Financial Statements for the
Quarters Ended March 31, June 30 and September 30, 2006"

18

Indeed, the only potentially confounding information contained in the announcement is the statement that early payment defaults and repurchase activity intensified and remained high in the fourth quarter.   The fourth quarter developments were consistent with the public knowledge that the subprime market was performing poorly and it is not at all clear that the market would have been surprised by such an announcement.  This would be especially true if the repurchase reserve and residual interests had been reported correctly (and thus shown a much more negative trend).  Moreover, New Century's stock price had been falling ahead of the scheduled February 8, 2007 earnings announcement – suggesting the market was expecting some decline in earnings. The real "surprise" in the February 7, 2007 announcement was the disclosure of the accounting errors and the writing down of its residual interests.  Therefore, I conclude that the disclosure of the accounting errors is the substantial cause of the 36% price decline observed in the first trading session following the February 7, 2007 announcement.[28]

34.     Second, the KPMG Motion completely omits from its description of the February 7, 2007 announcement, and the Kleidon Report does not directly address in his analysis, the announcement that New Century would suffer a loss as a result of revaluing its residual interests. While the company's statement of February 7, 2007 attributes this to a fourth quarter adjustment, we know from the previous section that the Company later announced that the residual interest valuations should have been reduced in 2005.  Regardless of when the valuation adjustment should have taken place, the market's reaction to this announcement would reflect the cumulative impact on valuation.  Therefore, at least a portion of the economic impact of this announcement reflects the adjustment that should have taken place in 2005 (i.e. the February 7,

---

[28] I understand that formally disaggregating such an effect, if any, is a damages issue and not a loss causation issue that needs to be addressed in the context of summary judgment as long as the corrective portion of the disclosure is a substantial cause of the price decline.

2007 announcement at least partially corrected the 2005 misstatement). As a result, KPMG and Mr. Kleidon cannot reliably claim that the losses on this day are not at least partially caused by a disclosure directly tied to the 2005 misstatements.

35.     Similarly, the February 7, 2007 announcement specifically discusses the failure to account for backlog claims. Again, while the announcement suggests this only relates to 2006, the previous section detailed that this misstatement extended back to 2005. Again, the market reaction to the cumulative increase in repurchase reserve (i.e. the estimate of total expected repurchase costs) would reflect the total impact on valuation regardless of what prior period those expected costs arose. Therefore, in my opinion, this portion of the announcement can also be directly tied to the 2005 misstatements.

36.     As a result, even though the February 7, 2007 announcement only explicitly discusses a 2006 restatement relating to the repurchase reserve, in my opinion, a substantial portion of the true underlying economic circumstances that caused the stock price to decline are directly related to misstatements that occurred in 2005.

**March 1, 2007 & March 2, 2007**

37.     On March 1, 2007, after the close of trading, New Century issued a press release announcing that it expected to file a Form 12b-25 Notification of Late Filing with the SEC with respect to its Form 10-K for the year-ended December 31, 2006.[29] New Century's stock price declined 7.57% during the following trading session on March 2, 2007.

---

[29] Second Amended Consolidated Class Action Complaint dated 4/30/2008; paragraph 463; PR Newswire (U.S.), 3.1.2007, 22:21 "New Century Financial Corporation to file form 12b-25 with the SEC"

On March 2, 2007, after the close of trading, New Century filed the Form 12b-25 Notification of Late Filing with the SEC. The following trading day, March 5, 2007, New Century's stock price declined 68.87%.[30]

38.     On March 2, 2007, after the closing of trading, the Company announced in a form 12b-25 that the Audit Committee of the Board of Directors:

> …has initiated its own independent investigation into the issues giving rise to the Company's need to restate its 2006 interim financial statements, as well as issues pertaining to the Company's valuation of residual interests in securitizations in 2006 ***and prior periods***. [emphasis added][31]

39.     The KPMG Motion and the Kleidon Report both devote substantial attention and analysis to whether the reference to "and prior periods" singularly caused a substantial decline in the stock price. Neither the KPMG Motion, nor the Kleidon Report, argues that the stock price declines on March 2, 2007 and March 5, 2007 were not proximately caused by the disclosure of the accounting errors. Indeed, the Company's 12b-25 filing identifies the "considerable work" associated with the need to restate its financial statements, the Board investigation, the revaluation of residual interests, and assessment of internal controls as the reasons for the delay.[32]

40.     Moreover, the delay in filing the Company's revised financial statements and 2006 10-K directly caused one of the two covenant violations. The filing highlighted that New Century might not be able to access its funding sources if it were not able to obtain waivers to past and future covenants. Indeed, the analyst quoted by Mr. Kliedon sums it up nicely,

> After the market close on March 2, NEW filed a form 12b-25, citing reasons for the inability to file a timely 10-K. The filing raises questions regarding the company's viability, in our minds, given the currently adverse operating environment. We believe NEW is under severe

---

[30] Declaration of Allan W. Kleidon, In re New Century Financial Corporation Consolidated Class Action, dated 1/12/2010, p.8-9

[31] Form 12b-15 filed with SEC on March 2, 2007

[32] Form 12b-15 filed with SEC on March 2, 2007

liquidity strains for several reasons: it has not yet been able to convince all warehouse lenders to waive certain covenants; the restatement appears to result in a larger loss than initially suggested; and several different governing bodies have indicated they are launching investigations.[33]

41.    Also, but-for the accounting errors, the other predicted covenant violation (two quarters of cumulative negative income) would have become known to the market earlier. This is because New Century would have reported negative income for the third quarter of 2006 and the market was not improving in the fourth quarter.[34]  Therefore, a substantial portion of the decline in stock price observed on March 5, 2007 would have occurred earlier but-for the accounting errors.

42.    Even if KPMG was only found liable for the misstatements in 2006 that relate to components of the restatement that were misstated back in 2005 (e.g. backlog and valuation of residual interests), those components alone were substantial contributors to the restatement in 2006, and therefore caused a substantial portion of the stock price decline on March 5, 2007.

43.    The lack of focus by securities analysts on the precise "and prior periods" language in the March 2 announcement, as documented at length in the KPMG Motion and Kleidon Report, is neither surprising nor relevant. To understand why KPMG's focus on time frame is misplaced, consider an example where the company and auditor knowingly conspire in an accounting fraud over many years and the true value of the enterprise is zero. The company, in a series of partial corrective disclosures (analogous to, but weaker than the disclosures on

---

[33] Declaration of Allan W. Kleidon, In re New Century Financial Corporation Consolidated Class Action, dated 1/12/2010, p.14

[34] One could also argue that but-for the accounting misstatements, New Century would have had additional time to negotiate with its lenders or determine some other solution to the anticipated covenant violation that would not have precipitated a liquidity crisis at that time. Instead, according to analyst reports at the time, New Century's management lost credibility as a result of the need to restate earnings. This provides another reason that the declines in the stock price related to the liquidity crisis are causally related to the fraud.

February 7, March 1, March 2, March 8, March 12, and March 13) discloses the fraud, but either

does not specify when the fraud began or only admits that it had committed fraud in the last year

since its most recent audited financial statements.  Upon the disclosure of the *relevant* truth –

that the company is a fraud with no real value – the market price falls to zero.  A later disclosure

(analogous to the May 24, 2007 announcement in this matter) that the scheme extended further

back in time to cover the auditor's last audit opinion is irrelevant to investors at that point in time

because the relevant truth has already been revealed and the damage has been done.  KPMG's

argument is analogous to claiming that the auditor could not be held liable because the first series

of announcements did not mention the time frame over which the fraud had been occurring.  In

my opinion, a proper interpretation of loss causation doctrine would not, and should not absolve

the auditor of liability in that case based on the limited time frame covered by the initial series of

disclosures.  But that is precisely the standard KPMG is proposing here.


**March 8, 2007**

44.     On March 8, 2007 New Century issued a press release announcing that its director

David Einhorn had resigned. Also, after the market closed on March 8, 2007, New Century

issued a press release announcing that as a result of "its current constrained funding capacity,"

New Century had elected to cease accepting loan applications from prospective borrowers

"effective immediately" while the Company sought to obtain additional funding capacity.[35] The

press release further reported that New Century was in discussions with lenders and other third

parties regarding refinancing or other alternatives to obtain additional liquidity, but that no

---

[35] SEC Form 8-K filed with the SEC on 3/8/2007

assurance could be given that any of the discussions would be successful.[36] As a result of this announcement, New Century's stock price declined 17.05%.

45.     As discussed above, the truth about the company's operating performance and therefore the risk of funding constraints would have been known earlier but-for the accounting misstatements and was a foreseeable consequence of the misstatements. Therefore, in my view, a substantial portion of the price decline on this day was proximately caused by the accounting misstatements.

**March 12, 2007 & March 13, 2007**

46.     On March 12, 2007, New Century disclosed that a number of its lenders[37] advised the Company that it was in default and/or accelerated the Company's obligation to repurchase outstanding mortgage loans. [38]   Specifically, the Company disclosed that all of its short-term lenders had discontinued their lending agreements with the Company; and that the Company did not have sufficient liquidity under its existing financing arrangements. [39] As a result of this announcement New Century's stock price declined 48.29%.

47.     On March 13, 2007, New Century disclosed additional lenders advised the Company that it was in default and/or accelerated the Company's obligation to repurchase outstanding mortgage loans[40]. These lenders included: Barclays Bank PLC; Guaranty Bank;

---

[36] SEC Form 8-K filed with the SEC on 3/8/2007

[37] Bank of America, N.A.; Citigroup Global Markets Realty Corp.; Credit Suisse First Boston Mortgage Capital LLC; Goldman Sachs Mortgage Company; and Morgan Stanley Mortgage Capital Inc.; see Second Amended Consolidated Class Action Complaint dated 4/30/2008; paragraph 472; and see SEC Form 8-K filed with the SEC on 3/12/2007

[38] SEC Form 8-K filed with the SEC on 3/12/2007

[39] SEC Form 8-K filed with the SEC on 3/12/2007

[40] SEC Form 8-K filed with the SEC on 3/13/2007

24

State Street Global Markets, LLC; and UBS Real Estate Securities Inc.[41] After market close,

New Century issued a press release announcing that the New York Stock Exchange ("NYSE")

had determined that its common stock, Preferred A stock, and Preferred B stock were no longer

suitable for continued listing on the NYSE and would be suspended immediately. The press

release reported that the NYSE made its decision based upon the Company's recent filings with

the SEC and the uncertainty of its current liquidity position.[42] As a result of this announcement

New Century's stock price declined 49.10%.

48.       As discussed above, the truth about the company's operating performance and

therefore the risk of covenant violations and funding constraints would have been known earlier

but-for the accounting misstatements and was a foreseeable consequence of the misstatements.

Therefore, in my view, a substantial portion of the price decline on this day was proximately

caused by the accounting misstatements.

## VII.    EVALUATION OF THE LOSS CAUSATION ARGUMENT IN THE KPMG MOTION AND KLEIDON REPORT

49.       KPMG's motion states,

> To succeed on their claims, Plaintiffs must prove "loss causation" – that is,
> that the 2007 decline in the value of their New Century stock occurred in
> reaction to the market's learning 'the truth' about alleged misstatements in
> KPMG's 2005 audit report. The evidence plainly demonstrates that
> Plaintiffs cannot do so. Between February 7 and March 13, 2007,
> Plaintiffs' stock lost 97% of its value in reaction to numerous
> announcements by New Century – announcements that disclosed the well-
> chronicled meltdown of the subprime markets *in 2006 and 2007*, and the
> effects of that meltdown on New Century's business. Those disclosures

---

[41] Second Amended Consolidated Class Action Complaint dated 4/30/2008; paragraph 474;  SEC Form 8-K filed with the SEC on 3/13/2007

[42] SEC Form 8-K/A filed with SEC on 3/13/2007

said nothing at all about New Century's 2005 financials or KPMG's 2005 audit report (emphasis in original).[43]

50.   And the KPMG Motion summarizes the conclusion of the Kleidon Report:

Dr. Allan Kleidon, a highly respected economist, has reviewed all of the relevant analyst and press reports about New Century and found that not a single one even hinted during the class period that New Century's 2005 financials might have been misstated, let alone that KPMG's 2005 audit report was erroneous.  Dr. Kleidon has concluded that *the market did not understand* any of the announcements between February 7 and March 13 to reveal the alleged "truth" about KPMG's 2005 audit report.  Rather, those announcements, and the commentary about them, focused entirely on more recent events at New Century and in the subprime market generally – all of which occurred after December 31, 2005.  Thus, the decline in price of Plaintiffs' shares was caused by those intervening events, not by anything related to KPMG's 2005 statements. (emphasis in original).[44]

51.    And Mr. Kleidon's summarizes his opinion by stating:

In my opinion the evidence is very clear that no declines in New Century's stock price during the Class Period are attributable to perceived errors in New Century's 2005 financial statements or the KPMG 2005 audit report.[45]

52.   Thus, the KPMG Motion and the Kleidon Report make clear that their core argument in opposition of loss causation is that the corrective disclosures in this matter do not specifically or explicitly reveal a misstatement or omission by New Century in its 2005 audited financial statements or KPMG's 2005 audit opinion.  KPMG acknowledges that after the Class Period, on May 24, 2007, that New Century announced that the 2005 financial statements

---

[43] Defendant KPMG LLP's Notice of Motion and Motion for Summary Judgment or, in the alternative, Summary Adjudication; Memorandum of Points and Authorities dated 1/13/2010, p. 1

[44] Defendant KPMG LLP's Notice of Motion and Motion for Summary Judgment or, in the alternative, Summary Adjudication; Memorandum of Points and Authorities dated 1/13/2010, p. 2

[45] Declaration of Allan W. Kleidon, In re New Century Financial Corporation Consolidated Class Action, dated 1/12/2010, p. 6

contained material errors related to the repurchase reserves and residual interests and should no

longer be relied upon.[46]  The press release stated,

> Based on recent communications with members of the Investigative Team,
> the Audit Committee has determined that there were errors in the
> Company's previously filed annual financial statements for its fiscal year
> ended December 31, 2005 (the "2005 Financial Statements") with respect
> to both the accounting and reporting of loan repurchase losses and the
> Company's valuation of certain residual interests in securitizations. The
> Company's ability to further investigate these matters is constrained as the
> Company is currently in liquidation proceedings under chapter 11 of the
> Bankruptcy Code. However, based upon the work performed by the
> Investigative Team, the Audit Committee and management believe that it
> is more likely than not that these errors in the aggregate resulted in a
> material overstatement of pretax earnings in the 2005 Financial
> Statements. Accordingly, on May 23, 2007, the Company's Board of
> Directors concluded, based upon the recommendation of the Audit
> Committee, that the 2005 Financial Statements should no longer be relied
> upon.[47]

53.     Neither the KPMG Motion, nor the Kleidon Report, dispute the notion that New

Century's stock price fell significantly as a result of disclosures related to accounting errors at

New Century.  While there is some mention of the influence of the subprime market

"meltdown", there is no formal analysis in the Kleidon Report or elsewhere that establishes

industry effects unrelated to the accounting errors are responsible for the price declines on the

corrective disclosures identified by Plaintiffs.  Indeed, as I described above, the market was well

aware that New Century was a subprime lender and its stock price had already fallen ahead of

the corrective disclosures – presumably in response to the difficulty in the subprime market.

54.     KPMG's and Mr. Kleidon's view of loss causation is thus dependent on limiting

the relevant question to whether or not an initial disclosure that corrects the market's beliefs

regarding the integrity of New Century's accounting specifically mentions all relevant time

---

[46] The Kleidon Report does not even list this announcement as a "document relied upon".

[47] SEC Form 8-K filed with SEC on 5/24/2007

periods that were ultimately found to be misstated. To understand why this view of loss

causation is far too narrow, consider a simple example. Assume New Century had announced on

February 7, 2007 that its third quarter 2006 financial statements overstated its cash balance by

$500 million because it had a fictitious bank account in that amount.[48] Abstracting from other

consequential impacts such an announcement would have, assume the market value of the

outstanding stock fell by the same amount - $500 million to precisely reflect the reduced market

value of the firms' assets.  In a subsequent announcement , (analogous to the May 24, 2007

announcement in this matter that ), the company further discloses, after the benefit of a more

thorough investigation, that earlier financial statements extending back to 2005 also contained

this fictitious asset and that KPMG had either knowingly or recklessly failed to bring this

information to light as part of its audit. We would not expect this additional announcement to

result in a further price decline because the market has already reacted to the *relevant* truth – the

non-existence of the $500 million. KPMG's methodology of assessing loss causation would

suggest KPMG could not be held liable even though the artificial inflation in the stock price

clearly extended back to 2005 and was dissipated by disclosure of the relevant truth – simply

because the initial announcement did not fully disclose how far into the past the misstatement

had occurred. This does not make economic or logical sense to me.

     55.     The KPMG Motion cites the Supreme Court opinion in Dura as controlling

authority:

> "Loss causation is the "causal connection between the [defendant's] material
> misrepresentation and the [plaintiff's] loss." In *Dura*, the Supreme Court made
> clear that the securities laws are intended "not to provide investors with broad
> insurance against market losses, but to protect them against those economic losses
> *that misrepresentations actually cause*." The Court therefore held that loss

---

[48] For ease of exposition in this example, I am assuming the corrective disclosures of February 7, March 1, March 2, March 8, March 12 and March 13 are all subsumed into one disclosure on February 7.

> causation requires a showing that a company's "share price fell significantly *after the truth became known*."(emphasis in original) [49]

I have read the Dura decision and the economic logic underlying the decision is clear. The decision requires that Plaintiffs' establish the stock price was inflated as a result of Defendants' misstatements and that the inflation was dissipated by a disclosure that revealed the truth.  In KPMG's view, the relevant "truth" is specifically limited by the time period covered by the initial corrective disclosure regardless of who is liable for the existence of the artificial inflation in the first place or when it began.  In my view, there is nothing in Dura to suggest such an interpretation.  I believe a finding of loss causation against KPMG in the example I provided above would fall well within the economic logic underlying the Dura decision. Moreover, while that example abstracts from some of the complicating factors in this case, in my view its core features are analogous to this matter and completely undermine KPMG's approach to loss causation.

56.     In addition, KPMG's loss causation analysis is dependent on the faulty assumption that the misstatements in 2006 (which are *explicitly* disclosed in the corrective disclosures) are somehow completely separable and independent of:

a.     New Century's 2005 audited financial statements;

b.     The clean audit opinion issued by KPMG on  March 15, 2006;

c.     KPMG's conduct during 2005 and 2006; and

d.     KPMG's consent to reissue the clean audit opinion as part of the August 15, 2006 prospectus for the issuance of 9.75% Series B Cumulative Redeemable

---

[49] Defendant KPMG LLP's Notice of Motion and Motion for Summary Judgment or, in the alternative, Summary Adjudication; Memorandum of Points and Authorities dated 1/13/2010, p. 12

> Preferred Stock (after KPMG's Q2 2006 quarterly review and New Century's
>
> issuance of quarterly results).

In other words, KPMG simply assumes that there is no causal link between their conduct
and the *2006* misstatements. These assumptions make no logical or economic sense and are
faulty for a number of reasons.

57.     First, as shown in detail in Section V, the 2006 material misstatements that New
Century admitted to in the corrective disclosures involved the exact same accounts and a
substantial portion were a continuation of the exact same accounting procedures applied in
preparing the 2005 audited financial statements. The Company later acknowledged that the 2005
financial statements were also materially misstated for the same reasons the 2006 financial
statements were misstated. Therefore, there is a direct causal nexus between the 2006
misstatements and the immediately preceding financial statements that were issued during the
Class Period and audited by KPMG.

58.     Second, the 2005 audited financial statements are inherently linked as a pure
matter of accounting to the 2006 quarterly statements since the ending balances for 2005 serve as
the opening balances in 2006 that are reported in each of the 2006 10-Qs. For example, as part
of its presentation of its financial statements in each 10-Q, New Century displays a
"Consolidated Statement of Changes in Shareholders Equity". I have provided an example of
such a table in **Appendix C**. The statement shows that shareholders equity at the end of third
quarter 2006 is equal to:

(a) **Shareholder's Equity as of December 31, 2005**; plus

(b) Proceeds from issuance of stock; less

(c) Repurchases and cancellation of stock; plus

30

(d) Net earnings; plus

(e) Other comprehensive income; less

(f) Dividends; plus

(g) Other miscellaneous items affecting shareholders equity

59.    Since the material misstatements in 2005 affected net earnings, the opening balance for shareholders equity was materially misstated.  This material misstatement would simply carry over to all of the financial statements contained in New Century's 2006 10-Qs.  Thus, if Plaintiffs' allegations regarding KPMG's conduct are correct, New Century's quarterly financial statements in 2006 would have been materially different but-for KPMG's conduct.

60.    Moreover, each 2006 10-Q issued by New Century contains a "Management Discussion and Analysis of Financial Condition and Results of Operations".  Within that discussion, New Century places its current results in context by comparing against the same period in 2005.  For example, the third quarter 2006 10-Q states:

> "Consolidated net earnings decreased 44.5% to $66.6 million for the three months ended September 30, 2006 from $120.1 million in the three months ended September 30, 2005."

Similar comparisons are made for diluted earnings per share and covering the 9 months ended September 2006 versus the 9 months ended September 30, 2005.  Given the admitted material misstatements in the 2005 financial statements, these statements and comparisons in the 2006 10-Qs would have either been materially different or not made at all but-for KPMG's clean audit opinion.

61.    Even more simply, the basic financial statements in each of the 2006 10-Qs (balance sheet, income statement, and statement of cash flows) each re-report the 2005 figures

31

with the heading "audited". Thus, the notion that the 2005 financial statements and the clean audit opinion issued by KPMG are somehow independent of and easily separable from the 2006 quarterly reports is simply false.

62.    Third, in reporting and evaluating the Company's 2006 quarterly earnings, New Century and securities analysts compared against its 2005 performance. These types of "prior year" comparisons are ubiquitous in evaluations of corporate performance and thus investment decisions. For example, after New Century announced third quarter earnings, but prior to the corrective disclosures, Morgan Stanley filed an analyst report that included a table comparing the Q3 2006 results against both Q3 *2005* results (same quarter from prior year) and Q2 2006 (See **Appendix D**). In addition, Roth Capital Partners issued a report in November 2006 that compared Q3 2006 results against Q3 2005 results for some performance measures and included a detailed table that broke out 2005 performance by quarter to allow for easy comparison to prior year results (See **Appendix E**). This suggests that the materially misstated 2005 audited financial statements continued to be relevant to investors in 2006 and the connection between 2005 and 2006 financial statements cannot be dismissed as KPMG suggests. It is only *after* the disclosure of the accounting errors and the void created by the lack of interim financial statements that causes analysts to suggest they have insufficient information to value the company.

63.    Fourth, KPMG's conduct and additional public statements (or lack thereof) in 2006 belie the notion that the material misstatements in New Century's 2006 quarterly financial statements are independent of KPMG conduct as the KPMG Motion implies. In the second quarter of 2006, New Century, at least in consultation with, if not initiated by KPMG, changed its accounting for repurchase reserves in a manner that did not correct the prior erroneous

method, but actually introduced additional misstatements (elimination of inventory severity) that

exacerbated the understatement of the same reserve that was misstated in 2005 and Q1 2006.

The Examiner's Report states:

> The Examiner investigated to determine how Inventory Severity came to be
> eliminated from the repurchase reserve calculation in the second quarter of 2006,
> with no notice thereof to the Audit Committee or most members of Senior
> Management, aside from Dodge who likely knew of the change.  The precise
> sequence of events is not clear.  However, from all the data the Examiner
> concludes that this accounting change reflects a combination of a suggestion from
> Kim of KPMG that such a change was consistent with GAAP and a subsequent
> decision by the Accounting Department, after a review of accounting literature, to
> effectuate the change.  There was no notification made by the Accounting
> Department or KPMG to the Audit Committee, which was at this very time
> seeking assurance that New Century's reserves were adequate.[50]

      64.    Subsequent to New Century's issuance of its second quarter 2006 10-Q, KPMG

consented to a reissuance of the 2005 clean audit opinion in conjunction with New Century's

issuance of 9.75% Series B Cumulative Redeemable Preferred Stock.  This is despite KPMG's:

(1) continued explicit acceptance of the prior erroneous accounting, (2) either acceptance or

initiation of additional accounting errors, and (3) observance of continued deterioration in the

subprime market and a substantial repurchase backlog.  Thus, if KPMG effectively made a public

statement on August 15, 2006 (after 2Q 2006) that either knowingly or recklessly omitted

material facts about both 2005 *and 2006* that rendered the statement misleading, then KPMG's

argument about segmenting the time periods is moot.

      65.    In the third quarter of 2006, New Century again changed its accounting for the

repurchase reserve, again in consultation with KPMG, in a manner that further compounded the

accounting errors and understatement of the repurchase reserve (by removing Future Loss

Severity) and did not correct the errors (other than adding interest recapture) that extended back

---

[50] Final Report of Michael J. Missal, Bankruptcy Court Examiner, dated 2/29/2008, p. 197-198

into 2005 despite additional evidence of deterioration in the market and a growing backlog of

repurchase claims.  The Examiner's report states,

> There is also contemporaneous documentary evidence of KPMG's and Kim's knowledge of the removal of Future Loss Severity in KPMG's quarterly review of documents produced by the Company each quarter entitled, "New Century Mortgage Corporation Analysis of Adequacy of Repurchase Reserves," dated March 31, June 30 and September 30, 2006.  In these quarterly documents, there are itemized dollar amounts for Future Loss Severity for the first two quarters of 2006, referred to as Estimated Potential Repurchases with Losses.  That entry was removed in the third quarter, however, and the entry for Estimated Losses on Future Repurchases was comprised solely of the estimated Interest and Premium Recapture.  KPMG is linked to contemporaneous knowledge of this change not only by virtue of the fact that Kim reviewed and initialed these documents, but also because Kim advised New Century that the change documented in these workpapers, i.e., the substitution of interest and premium costs for Future Loss Severity, was appropriate.

> Specifically, Kim admitted to the Examiner that he had advised Sanchez only that Premium and Interest Recapture should be reserved and not Future Loss Severity. He told the Examiner this conclusion was justified by equating the sum of estimated Premium Recapture and estimated Interest Recapture to Future Loss Severity – as set forth in the third quarter analysis document Kim initialed.  Kim also conceded that even if he once held this belief, he did not do so any longer. He explained that he abandoned this belief when he learned of paragraph 55 of FAS 140 in the early part of 2007. [51]

66.     The examiner's findings make clear that KPMG was involved in not only

reviewing the accounting change in Q3 2006 that compounded the understatement of the

repurchase reserve, but the evidence suggests KPMG personnel actually suggested it.

67.     Fifth, if Plaintiffs prove KPMG either knew or should have known that the 2005

accounting for the repurchase reserve and residual interests was erroneous, then it is foreseeable

that the same accounting procedures, and thus errors, would occur in the 2006 quarterly financial

statements and ultimately cause investor losses when revealed.  In the same vein, KPMG's clean

audit opinion, both when originally issued on March 15, 2006 and when reissued on August 15,

---

[51] Final Report of Michael J. Missal, Bankruptcy Court Examiner, dated 2/29/2008, p. 202-203

2006, proclaimed not only that New Century's 2005 financial statements were free of material misstatements, but that the Company had proper internal controls.  It was later revealed that as of the end of 2005, New Century did not have proper internal controls.  Instead, the Company and KPMG both admitted that New Century had a poor internal control environment extending back into 2005[52].  KPMG had no reason to believe that the poor internal control environment that existed in 2005 would change in 2006 and therefore could reasonably foresee additional accounting errors – which when revealed would result in investor losses.  In my view, audit opinions and evaluations of internal controls should not be viewed as purely backward looking, their purpose is to provide current and prospective investors comfort that companies are consistently applying proper internal controls and accounting procedures. That comfort was given on March 15, 2006 and reiterated on August 15, 2006.   Thus, to suggest KPMG's statements were only relevant up to December 31, 2005 (months before the statements were actually issued) is illogical.

68.     For all the reasons outlined above, it makes no economic or logical sense to assume that New Century's 2005 financial statements, KPMG's 2005 audit opinion and the 2006 quarterly financial statements are totally separable in the way implied by the KPMG Motion.  Indeed, it is my opinion that the accounting errors in 2006 were proximately caused by the accounting errors in 2005 and KPMG's either explicit acceptance or failure to detect them.  The accounting misstatements in 2006 occurred in the same accounts and caused by misapplication of the same accounting principles – and the market clearly reacted negatively to the disclosure of those misstatements.

---

[52] Second Amended Consolidated Class Action Complaint dated 4/30/2008; paragraph 193

69.     One of the arguments advanced in the KPMG Motion and the Kleidon Report is

that even if Plaintiffs were to show that the market "learned the truth about KPMG's

misstatements" between February 7 and March 13, that would still be insufficient for loss

causation because Plaintiffs' "must disaggregate the portion of their losses caused by the market

learning about KPMG's misstatements from those losses caused by the market learning about

New Century's misstatements or other negative news generally."[53]

70.     This argument suffers from the same infirmities described above, namely, it

assumes there is a relevant economic distinction between the disclosure of KPMG's relevant

truth and New Century's relevant truth.  Going back to the example of the fictitious $500 million

bank account, it is neither relevant nor sensible to ask what portion of the *market reaction* is

related to the auditor's wrongdoing or the company's.  Investors learned that the firm was

overvalued by $500 million dollars and the stock price declined – thus establishing loss causation

related to revelation of the relevant truth.  While the auditor and the company might disagree

about relative fault and proportionate liability, that is not a relevant consideration as to whether

loss causation is satisfied if each party contributed to the artificial inflation that is dissipated as

part of the corrective disclosure.  For all the reasons stated above, the same holds true here.  The

misstatements that occurred in 2006 were substantially a continuation of the misstatements in

2005 and are not separable by time in the way KPMG suggests.

71.     KPMG, through the Kleidon Report, attempts to bolster their argument by

suggesting that New Century's 2005 financial statements and KPMG's audit opinion were

"stale" information that provided "no basis" for valuation.  Mr. Kleidon's opinion relies on

overstating and mischaracterizing the evidence he relies upon and is not valid.  While certain

---

[53] Defendant KPMG LLP's Notice of Motion and Motion for Summary Judgment or, in the alternative, Summary
Adjudication; Memorandum of Points and Authorities, dated 1/13/2010, p. 18

analysts did not feel comfortable attempting to forecast a value for New Century *in the absence of 2006 quarterly financial statements*, their indication that that 2005 financial statements *by themselves* were not sufficient to estimate value after announcement of a restatement is a far cry from stating that 2005 financial statements were irrelevant to investors prior to the corrective disclosures. The quote offered by Mr. Kleidon to support his position was from a JP Morgan analyst report that reads:

> "At this time we believe it is more likely than not that NEW will be forced to seek bankruptcy protection due to the questions surrounding its short-term liquidity. As the last financials that we can rely on were filed in the company's 2005 10K, we are unable to provide any basis for valuation."[54]

This is not a statement by JP Morgan that the 2005 results were irrelevant to valuation in the absence of accounting misstatements. Indeed, I have provided evidence that New Century's SEC filings and securities analysts both focused on comparisons against 2005 performance in placing the firm's 2006 performance in context even after New Century's 10-Q of November 9, 2006. Instead, it is a statement that 2005 financials *by themselves* in the face of what has already occurred – material accounting errors and its consequences – are not sufficient to predict future cash flows, not that they were somehow inherently "stale".

72.     Finally, KPMG and Mr. Kleidon state that there was no commentary suggesting the May 24, 2007 announcement that New Century's 2005 financial statements "should no longer be relied upon" was old news. Mr. Kleidon points out, however, that analysts discontinued coverage and the last analyst report was issued on May 7, 2007.[55] Therefore, there is no evidence as to how securities analysts would have characterized such an announcement.

---

[54] Declaration of Allan W. Kleidon, In re New Century Financial Corporation Consolidated Class Action, dated 1/12/2010, p. 21.

[55] Declaration of Allan W. Kleidon, In re New Century Financial Corporation Consolidated Class Action, dated 1/12/2010, p. 13

## VIII.   AFFIRMATIVE ANALYSIS OF LOSS CAUSATION

73.     The previous section focused on the arguments in the KPMG Motion and why, in my view, the analysis and facts do not support a finding that there is no loss causation as to KPMG.  In this section I provide the basis for my opinion that if KPMG is found liable in all other respects for the material misstatements in New Century's 2005 financial statements, they indeed proximately caused investor losses.

74.     I understand loss causation to be a combination of the "but-for" test and the "foreseeability" test. In other words, would Plaintiffs have suffered the loss but-for Defendants' actions and was the loss a foreseeable consequence of their actions? The roles for economists in this  type of inquiry include evaluating the economic impact of the fraud (in terms of how it would affect stock prices) and determining whether there is economic evidence to link later price declines (if any) to the revelation of the prior misstatements or omissions.

75.     Based on that framework, the following represent key economic questions in assessing whether KPMG proximately caused investor losses in this matter:

a.     *Did KPMG's misstatements cause artificial inflation in New Century's stock (part of but-for causation)?  Yes, materially understating reserves and overstating the value of residual interest would cause artificial inflation.*

b.     *Would the 2006 misstatements have occurred but-for KPMG's conduct (part of but-for causation)?  In my view the same accounting misstatements in 2006 would not have occurred but-for KPMG's conduct.*

c.     *Did the artificial inflation caused by the misstatements continue until the corrective disclosures (part of but-for causation)?  Yes. There were no disclosures that corrected*

38

*the misstatements before the corrective disclosures or intervening events that would have eliminated the artificial inflation.*

        d.     *Did disclosure of the relevant truth result in investor losses (part of but-for causation)?* ***Yes, when the misstatements and their consequences were disclosed, the stock price fell significantly.***

        e.     *Could KPMG reasonably foresee that the disclosure of the accounting errors (whether from 2005 or subsequent periods) would cause investor losses?* ***In my opinion, it is entirely foreseeable that such a disclosure would cause investor losses.***

    76.    In my view, these questions provide the appropriate economic framework to evaluate loss causation in this matter and, as described below, these questions mirror the economic logic underlying the Dura decision. Based on this analysis, I conclude that Plaintiffs, if they prevail on proving the other elements of their claims, will be able to demonstrate loss causation with respect to KPMG misstatements on at least some, if not all, of the corrective disclosure dates. The remainder of this section provides the basis for this opinion.

*Would KPMG's misstatements have caused artificial inflation in New Century's stock?*

    77.    Existence of artificial inflation (or deflation) is an economic prerequisite to loss causation.[56] This is because the appropriate measure of economic loss stemming from a misrepresentation is typically measured as the inflation at time of purchase minus the inflation at the time of sale. Moreover, the Supreme Court in Dura decision talked about artificial inflation being a necessary, but not sufficient condition for loss causation.

---

[56] For ease of exposition I hereafter only discuss artificial inflation rather than the possibility of artificial deflation.

78.     The confirmed material misstatements in this case caused artificial inflation in the market price of New Century stock.  First, basic finance and valuation theory tells us that the value of a company is the present value of future cash flows.  Current and historical earnings are often used as a guide by investors and securities analysts to predict likely future earnings, and thus cash flows.[57]  Therefore, when a firm materially overstates its current and historical earnings by materially understating reserves, and/or overstating asset values, there is a clear economic link between the misstatements and artificial inflation in the market value of the company.  Second, the severe price declines that occurred upon disclosure of the accounting errors serves as further evidence that the stock had been artificially inflated as a result of the material misstatements.  Therefore, it is clear to me artificial inflation existed in New Century's stock price back to at least 2005.

*But-for causation: Would the 2006 misstatements have occurred but-for KPMG's conduct?*

79.     This is a question that would not be relevant if we were evaluating loss causation for New Century, but is a key question with respect to KPMG since a significant component of their defense is that they only audited the 2005 misstatements.  If the causal link between the accounting errors in 2005 and 2006 were weak or non-existent, and the corrective disclosures only concerned 2006 errors that were unrelated to the 2005 errors, then I believe Plaintiffs would have a difficult road to proving loss causation.  For example, if the errors in 2006 involved fraudulent reporting of cash balances – something that had not existed in 2005 and was not a foreseeable misstatement based on the 2005 audit – then this would break the causal link.

---

[57] This concept is prominent in the Kleidon Report.

40

80.     That is not the case in this matter.  In Section VI described at length why the
misstatements in 2005 and 2006 are inherently linked.  To summarize again, the misstatements in
2005 and 2006 both involved the same two broad issues: the repurchase reserve calculation and
valuation of residual interests.  Second, the 2005 and 2006 financial statements are inherently
linked since the former serves as the opening balance for the latter.  Third, 2005 results
repeatedly appeared and served as the benchmark for comparison in the 2006 10-Qs and were a
focus of comparison by securities analysts.  Fourth, KPMG was heavily involved in and the
Examiner concludes contributed to the growing misstatements in 2006.  Moreover, KPMG, at the
request of New Century, reissued its clean 2005audit opinion in the second half of 2006 –
suggesting it was still relevant to investors at the time.

81.     Moreover, in the "but-for" world where KPMG either forces New Century to
correct the errors in the repurchase reserve and valuation of residual interests to obtain a clean
audit opinion, or offers a qualified opinion that identified the errors, it is difficult to imagine that
the same errors would have continued into 2006.  Or, even if they did, New Century's market
price would already reflect the public knowledge of New Century's faulty accounting practices.
For those reasons, I conclude that the same accounting errors would not have occurred in 2006
but-for KPMG's conduct.

*But-for causation: Did the artificial inflation caused by the misstatements continue until the
corrective disclosures?*

82.     As stated above, the appropriate measure of economic loss for a class member is
inflation at the time of purchase less the inflation at time of sale.  A relevant economic question
is therefore whether the artificial inflation was dissipated by an intervening event.  This was

41

precisely the logic used by the Supreme Court in Dura to reject the notion loss causation could be shown by an inflated purchase price alone. If the intervening event that dissipates the artificial inflation is unrelated to the fraud then there might be an economic loss, but it would not be as a result of a relevant disclosure. For example, if New Century announced that it had been seized by regulators because of widespread money laundering, and the stock price declined to zero, this would clearly prove the artificial inflation had been eliminated, but not because the relevant truth came to light.

83. A key corollary question to ask is whether or not the stock price would have fallen regardless of when the truth became known. This is an especially revealing question in this matter and lays bare in an alternative argument why KPMG's approach is insufficient. Suppose, for example, New Century disclosed its material misrepresentations on May 9, 2006, the day before the company issued its Q1 2006 earnings. In my view, there is no doubt the stock price would have reacted negatively to such an announcement, as it did on February 7, 2007.[58] In that case, however, KPMG could not claim that the price decline was related only to 2006 errors. Thus, KPMG's argument regarding loss causation is really only a function of how long the truth of the misstatements remained hidden (in other words, a function of their own and New Century's non-disclosure), not an argument of whether they contributed to the artificial inflation that was ultimately dissipated on the corrective disclosures.

84. My review of the events in 2006 and early 2007 suggest there is no intervening event or announcement that would have eliminated the artificial inflation that began in 2005. Indeed, the table in Section V shows that the misstatements foreseeably continued and grew.

---

[58] KPMG may attempt to argue (and already implicitly argues in the Motion) that the price decline resulting from a corrective disclosure earlier in the Class Period would have been less than what occurred on February 7, 2007 because the degree of understated losses was worse as of February 7, 2007 than on May 9, 2006. While this might be true, that would be appropriately considered as part of the damages calculation, but is irrelevant to the question of whether there is loss causation as a result of the corrective disclosures.

Therefore, I find no reason to believe that the artificial inflation had been eliminated by any intervening event prior to the corrective disclosures. Finally, the significant price declines observed on the corrective disclosures provide additional confirmatory evidence that the inflation that existed early in the class period had not been dissipated by intervening events.

85.     As mentioned before, KPMG and Mr. Kleidon note that the subprime market faced difficulties in 2006 and this caused New Century's stock price to decline prior to the corrective disclosures. I agree. This is fully taken into account by the fact that Plaintiffs are only asserting they are entitled to losses on days where there are price declines where there was new firm specific news related to the allegations. Thus, any diminution of inflation as a result of industry effects before the corrective disclosures is explicitly excluded from what Plaintiffs are claiming.


*Did disclosure of the relevant truth result in investor losses (part of but-for causation)?*

86.     In Section VI I described the corrective disclosure dates in detail and why the price declines on those days are causally related to disclosure of the accounting errors. Neither the KPMG Motion nor the Kleidon Report suggests the price declines on these days were not material (e.g. statistically significant). Indeed, I understand Plaintiffs have retained an expert that will opine the stock price decline on each of the disclosures was statistically significant. Based on the size of the negative returns, this is not surprising.

87.     I have also described at length throughout this report why these declines are related to the KPMG's misconduct. Therefore, I conclude that the corrective disclosures dissipated inflation related to KPMG's conduct and caused investor losses.

43

*Could KPMG reasonably foresee that its misstatements (whether from 2005 or in subsequent periods) would lead to investor losses?*

88.　As noted above, the link between earnings and value is ubiquitous in the finance and valuation literature.  Therefore, a material overstatement of earnings by materially understating the repurchase reserve or overstating the value of residual interests would almost certainly lead to loss in investor value when disclosed.  Moreover, accounting firms often face shareholders litigation in response to the need to restate financial results.  Therefore, in my view, investor losses would be an entirely foreseeable consequence of the wrongdoing.

89.　In sum, I conclude that Plaintiffs, if they prevail on proving the other elements of their claims, will be able to demonstrate loss causation against KPMG.

Respectfully Submitted on March 11, 2010

Chad Coffman

# EXHIBIT 1



Exhibit 1
New Century Financial
Total Loan Originations and Purchases (1996 - 2005)

Source: Final Report of Michael J. Missal,
Bankruptcy Court Examiner, dated 2/29/2008

Prepared by Winnemac Consulting, LLC

# EXHIBIT 2



Exhibit 2
New Century Financial Corp
Daily Closing Stock Price and Volume
1/2/2002 - 7/31/2007

Source: Bloomberg

Prepared by Winnemac Consulting, LLC

# APPENDIX A

**Appendix A**

**List of Documents Considered**

**Court Documents**

- Second Amended Consolidated Class Action Complaint, dated 4/30/2008
- Defendant KPMG LLP's Notice of Motion and Motion for Summary Judgment or, in the Alternative, Summary Adjudication; Memorandum of Points and Authorities; dated 1/13/2010
- Declaration of Allan W. Kleidon, dated 1/12/2010
- Final Report of Michael J. Missal, Bankruptcy Court Examiner, dated 2/29/2008
- [Proposed] Statement of Uncontroverted Facts and Conclusions of Law in Support of Defendant KPMG LLP's Motion for Summary Judgment, dated 1/13/2010
- Defendant KPMG LLP's Answer to Second Amended Consolidated Class Action Complaint dated 4/30/2008

**SEC Filings/Forms**

- Prospectus Supplement (to Prospectus dated May 6, 2005); 9.75% Series B Cumulative Redeemable Preferred Stock Filed Pursuant to Rule 424(b)(5), dated August 15, 2006
- New Century Financial Corporation 10-Q for the quarterly period ended 3/31/2006, 6/30/2006, 9/30/2006
- New Century Financial Corporation 10-K for fiscal years ended 12/31/2003 and 12/31/2005
- New Century Financial Corporation 8-K filed 3/8/2007, 3/12/2007, 3/13/2007, 4/6/2007, 5/24/2007 and New Century Financial Corporation 8-K/A filed 3/13/2007
- New Century Financial Corporation Form 12b-15 filed on March 2, 2007

**New Century Financial Corporation News**

- News articles downloaded from Factiva for New Century Financial Corporation

**New Century Analyst Reports**

In addition to the Analyst Reports reviewed by Allan W. Kleidon I have reviewed the following Analyst Reports:

- Bear Stearns & Co. Inc. – 2/2/2006, 5/5/2006, 6/15/2006
- Deutsche Bank – 2/2/2006, 3/2/2006, 3/7/2006
- Friedman Billings Ramsey – 2/1/2006, 2/17/2006, 3/23/2006, 4/7/2006, 5/3/2006, 5/4/2006, 5/5/2006, 9/8/2006, 11/3/2006
- Fox-Pitt, Kelton – 6/5/2006, 6/8/2006, 6/11/2006, 8/3/2006, 8/4/2006, 9/8/2006, 10/4/2006, 10/10/2006, 11/3/2006
- Jefferies & Company, Inc. – 1/9/2006, 2/2/2006, 2/3/2006, 5/5/2006, 6/8/2006, 6/16/2006, 8/4/2006, 10/3/2006, 11/3/2006
- J.P. Morgan Securities Inc.- 2/2/2006, 2/17/2006, 3/17/2006, 5/18/2006, 10/4/2006, 10/23/2006, 11/2/2006, 11/28/2006
- Morgan Stanley – 1/6/2006, 2/2/2006, 5/3/2006, 5/4/2006, 6/16/2006, 8/3/2006, 10/17/2006, 11/2/2006
- Roth Capital Partners – 2/6/2006, 5/17/2006, 9/19/2006, 11/7/2006

**Stock Data**

- Bloomberg historical data for New Century Stock

**Court Decisions and Securities Law**

- Dura Pharmaceuticals Inc., et al., Petitioners, v. Michael Broudo, et al., 544 U.S. (2005)

# APPENDIX B

APPENDIX B

**CHAD W. COFFMAN, CFA**

Winnemac Consulting, L.L.C.
One South Wacker Drive, Suite 3800
Chicago, IL 60606
Office:          (312) 752-3329
Mobile:        (815) 382-0092
Email:          coffman@winnemac.com

**EMPLOYMENT:**

### Winnemac Consulting, LLC
President (2008 - Current)

Winnemac Consulting is a Chicago-based firm that specializes in the application of economics, finance, statistics, and valuation principles to questions that arise in a variety of contexts, including litigation. Principals of Winnemac Consulting have extensive experience in high-profile securities, antitrust, labor, and intellectual property matters.

### Chicago Partners, LLC
Principal (2007 – 2008)
Vice President (2003 – 2007)
Director (2000 – 2003)
Senior Associate (1999 – 2000)
Associate (1997 – 1999)
Research Analyst (1995 – 1997)

**EDUCATION:**

**CFA**     Chartered Financial Analyst, 2003

**M.P.P.**  University of Chicago, 1997
Masters of Public Policy, with a focus in economics including coursework in Finance, Labor Economics, Econometrics, and Regulation

**B.A.**    Knox College, 1995
Economics, Magna Cum Laude
Graduated with College Honors for Paper entitled "Increasing Efficiency in Water Supply Pricing:  Using Galesburg, Illinois as a Case Study"
Dean's List Every Term
Phi Beta Kappa

**SELECTED EXPERIENCE:**

Experience in Securities and Valuation Cases:

- Expert consultant for Citigroup/Salomon Smith Barney in various matters related to Jack Grubman's analyst coverage of various companies. This included supporting multiple experts at high-profile arbitration where plaintiffs claimed $900 million in damages. Arbitration panel returned a verdict in favor of client (reported in Wall Street Journal).

- Expert damages consultant in dozens of 10b-5 and Section 11 securities litigation, including, but not limited to:
    o WorldCom
    o Enron
    o Tyco
    o Parmalat
    o Sears
    o Atlas Air
    o UnumProvident
    o XL Capital
    o Household Finance/HSBC
    o Dynegy
    o Anicom

- Expert consultant in multiple cases involving market timing and/or late-trading. Developed models to estimate market timing profits.

- Served as neutral expert for mediator (Judge Daniel Weinstein) in multiple 10(b)-5 securities cases as well as futures manipulation case.

- Expert consultant for the American Stock Exchange (AMEX) where I evaluated issues related to multiple listing of options. Performed econometric analysis of various measures of option spread using tens of millions of trades.

- Expert consultant to large hedge fund that owned bonds in WorldCom. Responsible for directing analysis that led to favorable settlement of their claim in the bankruptcy.

- Performed detailed audit of CDO valuation models employed by a banking institution to satisfy regulators – non-litigation matter.

- Played significant role in highly-publicized internal accounting investigations of two Fortune 500 companies. One led to restatement of previously issued financial statements and both involved SEC investigations.

- Testifying expert in the matter of <u>Kuo, Steven Wu v. Xceedium Inc, Supreme Court of New York, County of New York, Index No. 06-100836</u>. Filed report re: the fair value of Mr. Kuo's shares. Case settled at trial.

- Testifying expert in the matter of <u>Pallas, Dennis H. v. BPRS/Chestnut Venture Limited Partnership and Gerald Nudo, Circuit Court of Cook County, Illinois, County Department, Chancery Division.</u> Filed report re: fair value of Pallas shares.  Report: July 9, 2008. Deposition August 6, 2008. Court Testimony February 11th, 2009.

- Loss Causation expert <u>in Re: Washington Mutual Securities Litigation, United States District Court, Western District of Washington, at Seattle, No. 2:08-md-1919 MJP, Lead Case No. C08-387 MJP.</u> Filed declaration August 5th, 2008 re: plaintiffs' loss causation theory.

- Testifying expert <u>in Re: DVI Securities Litigation, United States District Court, Eastern District of Pennsylvania, 2:03-CV-05336-LDD.</u>  Filed expert report October 1, 2008 re: damages. Filed rebuttal expert report December 17th, 2008. Deposition January 27th, 2009.

- Testifying expert in <u>Syratech Corporation v. Lifetime Brands, Inc. and Syratech Acquisition Corporation,</u> Supreme Court of the State of New York, Index No. 603568/2007. Filed expert report October 31st, 2008.

- Expert declaration in <u>Jacksonville Police and Fire Pension Fund, et al. v. AIG, Inc., et al., No. 08-CV-4772-LTS; James Connolly, et al. v. AIG, Inc., et al., No. 08-CV-5072-LTS; Maine Public Employees Retirement System, et al. v. AIG, Inc., et al., No. 08-CV-5464-LTS; and Ontario Teachers' Pension Plan Board, et al. v. AIG, Inc., et al., No. 08-CV-5560-LTS, United States District Court, Southern District of New York.</u> Filed declaration February 18th, 2009.

- Expert declaration <u>in Re: Connetics Securities Litigation, Case No. C 07-02940 SI, United States District Court for the Northern District of California, San Francisco Division.</u> Filed declaration March 16th, 2009.

- Testifying expert <u>in Re: Boston Scientific Securities Litigation, Master File No. 1:05-cv-11934 (DPW), United States District Court District of Massachusetts.</u>  Filed expert report August 6th, 2009. Deposition October 6th, 2009.

- Expert declaration in <u>Louisiana Sheriffs' Pension and Relief Fund, et al. v. Merrill Lynch & Co, Inc., et al., Case Number 08-cv-09063, United States District Court, Southern District of New York.</u> Filed declaration October, 2009.

- Testifying expert in <u>Henry J. Wojtunik v. Joseph P. Kealy, John F. Kealy, Jerry A. Kleven, Richard J. Seminoff, John P. Stephen, C. James Jensen, John P. Morbeck, Terry W. Beiriger, and Anthony T. Baumann.</u> Filed expert report on January 25, 2010.

- Expert report <u>in Re: REFCO Inc. Securities Litigation, Case No. 05 Civ. 8626 (GEL), United States District Court for the Southern District of New York.</u> Filed expert report February 2, 2010.

<u>Experience in Labor Economics and Discrimination-Related Cases:</u>

- Expert consultant for Cargill in class action race discrimination matter in which class certification was defeated.

- Expert consultant for 3M in class action age discrimination matter.

- Expert consultant for Wal-Mart in class action race discrimination matter.

- Expert consultant for Novartis regarding various labor related issues.

- Expert consultant on various other significant confidential labor economics matters in which there were class action allegations related to race and gender.

- Expert consultant for large insurance company related to litigation and potential regulation resulting from the use of credit scores in the insurance underwriting process.

- Testifying expert in <u>Shirley Cohens v. William Henderson, Postmaster General, United States Postal Service. United States District Court for the District of Columbia. C.A 1:00CV-1834 (TFH)</u> – Filed report re: lost wages and benefits.

- Testifying expert in <u>Richard Akins v. NCR Corporation.</u>  Before the American Arbitration Association – Filed report re: lost wages.

<u>Selected Experience in Antitrust, General Damages, and Other Matters:</u>

- Expert consultant in high-profile antitrust matters in the computer and credit card industries.

- Expert consultant for plaintiffs in re: Brand Name Drugs Litigation.  Responsible for managing, maintaining and analyzing data totaling over one billion records in one of the largest antitrust cases ever filed in the Federal Courts.

- Served as neutral expert for mediator (Judge Daniel Weinstein) in allocating a settlement in an antitrust matter.

- Expert consultant in Seminole County and Martin County absentee ballot litigation during disputed presidential election of 2000.

- Expert consultant for sub-prime lending institution to determine effect of alternative loan amortization and late fee policies on over 20,000 customers of a sub-prime lending institution. Case settled favorably at trial immediately after the testifying expert presented an analysis I developed showing fundamental flaws in opposing experts calculations.

**TEACHING EXPERIENCE:**

> KNOX COLLEGE, Teaching Assistant - Statistics, (1995)
> KNOX COLLEGE, Tutor in Mathematics, (1992 - 1993)

**PUBLICATIONS:**

> Coffman, Chad and Mary Gregson, "Railroad Construction and Land Value." *Journal of Real Estate and Finance*, 16:2, 191-204 (1998).

> Coffman, Chad, Tara O'Neil, and Brian Starr "An Empirical Analysis of the Impact of Legacy Preferences on Alumni Giving at Top Universities." (Forthcoming).

**PROFESSIONAL AFFILIATIONS:**

Associate Member CFA Society of Chicago
Associate Member CFA Institute
Phi Beta Kappa

**AWARDS:**

1994  Ford Fellowship Recipient for Summer Research.
1993  Arnold Prize for Best Research Proposal.
1995  Knox College Economics Department Award.

**PERSONAL ACTIVITIES:**

Pro bono consulting for Cook County State's Attorney's Office

# APPENDIX C

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

## FORM 10-Q

(Mark One)

þ   QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the quarterly period ended September 30, 2006.

o   TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from _____ to _____

COMMISSION FILE NUMBER: 001-32314

# NEW CENTURY FINANCIAL CORPORATION
*(EXACT NAME OF REGISTRANT AS SPECIFIED IN ITS CHARTER)*

| MARYLAND | 56-2451736 |
|---|---|
| *(State of Incorporation)* | *(I.R.S. Employer Identification No.)* |

18400 VON KARMAN, SUITE 1000,
IRVINE, CALIFORNIA 92612
*(Address of principal executive offices)(Zip Code)*

(949) 440-7030
*(Registrant's telephone number, including area code)*

Not Applicable
*(Former name, former address and former fiscal year, if changed since last report)*

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to the filing requirements for the past 90 days. þ Yes o No

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer þ                         Accelerated filer o                         Non accelerated filer o

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). o Yes þ No

As of October 31, 2006, the registrant had 55,470,607 shares of common stock outstanding.

NEW CENTURY FINANCIAL CORPORATION AND SUBSIDIARIES

Consolidated Statements Of Changes In Stockholders' Equity
Year Ended December 31, 2005 and Nine Months Ended September 30, 2006
(In thousands, except per share amounts)
(Nine Months Ended September 30, 2006 Unaudited)

| | Preferred Shares Outstanding | Preferred Stock Amount | Common Shares Outstanding | Common Stock Amount | Additional Paid-in Capital | Accumulated Other Comprehensive Income (Loss) | Retained Earnings | Deferred Compensation | Total |
|---|---|---|---|---|---|---|---|---|---|
| Balance at December 31, 2004 | — | — | 54,703 | 547 | 1,108,590 | (4,700) | 781,627 | (7,499) | 1,878,565 |
| Proceeds from issuance of common stock | — | — | 1,880 | 19 | 26,440 | — | — | — | 26,459 |
| Proceeds from issuance of preferred stock | 4,500 | 45 | — | — | 108,619 | — | — | — | 108,664 |
| Repurchases and cancellation of treasury stock | — | — | (879) | (9) | (29,465) | — | — | — | (29,474) |
| Cancelled shares related to stock options | — | — | (214) | (2) | (12,414) | — | — | — | (12,416) |
| Conversion of convertible senior notes | — | — | 15 | — | 500 | — | — | — | 500 |
| Issuance of restricted stock, net | — | — | 248 | 2 | 14,493 | — | — | (14,495) | — |
| Amortization of deferred compensation | — | — | — | — | — | — | — | 7,415 | 7,415 |
| Net earnings | — | — | — | — | — | — | 416,543 | — | 416,543 |
| Tax benefit related to non-qualified stock options | — | — | — | — | 17,599 | — | — | — | 17,599 |
| Other comprehensive income, net of tax | — | — | — | — | — | 65,745 | — | — | 65,745 |
| Dividends declared on common stock, $6.50 per share | — | — | — | — | — | — | (364,482) | — | (364,482) |
| Dividends declared on preferred stock, $1.20 per share | — | — | — | — | — | — | (5,418) | — | (5,418) |
| Balance at December 31, 2005 | 4,500 | 45 | 55,723 | 557 | 1,234,362 | 61,045 | 828,270 | (14,579) | 2,109,700 |
| Proceeds from issuance of common stock | — | — | 827 | 8 | 14,706 | — | — | — | 14,714 |
| Proceeds from issuance of preferred stock | 2,300 | 23 | — | — | 55,580 | — | — | — | 55,603 |
| Repurchases and cancellation of treasury stock | — | — | (1,544) | (15) | (66,476) | — | — | — | (66,491) |
| Cancelled shares related to stock options | — | — | (93) | (1) | (1,355) | — | — | — | (1,356) |
| Compensation expense related to common stock options | — | — | — | — | 8,318 | — | — | — | 8,318 |
| Excess tax benefits related to non-qualified stock options | — | — | — | — | 5,037 | — | — | — | 5,037 |
| Conversion of convertible senior notes | — | — | 166 | 2 | 4,998 | — | — | — | 5,000 |
| Restricted stock, net | — | — | 250 | 2 | (2,480) | — | — | — | (2,478) |
| Compensation expense related to restricted stock | — | — | — | — | 8,340 | — | — | — | 8,340 |
| Reclassification of deferred compensation related to adoption of SFAS 123R | — | — | — | — | (14,579) | — | — | 14,579 | — |
| Net earnings | — | — | — | — | — | — | 275,920 | — | 275,920 |
| Other comprehensive income, net of tax | — | — | — | — | — | (37,595) | — | — | (37,595) |
| Dividends declared on common stock, $5.40 per share | — | — | — | — | — | — | (302,056) | — | (302,056) |
| Dividends declared on Series A preferred stock, $1.71 per share | — | — | — | — | — | — | (7,700) | — | (7,700) |
| Dividends declared on Series B preferred stock, $0.26 per share | — | — | — | — | — | — | (607) | — | (607) |
| Balance at September 30, 2006 | 6,800 | 68 | 55,329 | 553 | 1,246,451 | 23,450 | 793,827 | — | 2,064,349 |

See accompanying notes to unaudited condensed consolidated financial statements.

4

# APPENDIX D

# Morgan Stanley

MORGAN STANLEY RESEARCH
NORTH AMERICA

Morgan Stanley & Co. Incorporated   **Suzanne B Schiavelli**
Suzanne.Schiavelli@morganstanley.com
+1 (1)212 761 7347

**David N Brown**
David.Brown@morganstanley.com
+1 (1)212 761 0531

November 2, 2006

Stock Rating
**Equal-weight**

Industry View
**In-Line**

# New Century Financial Corp.

## 3Q06 EPS Miss on Lower Gain-on-Sale Margins

### Key Ratios and Statistics

**Reuters: NEW.N  Bloomberg: NEW US**

Emerging Specialty Finance / United States of America

| | |
|---|---|
| Price target | **$42.00** |
| Shr price, close (Nov 2, 2006) | $38.00 |
| Mkt cap, curr (mm) | $2,161 |
| 52-Week Range | $51.97-30.55 |

**Quick Comment:** NEW reported 3Q06 EPS of $1.12, well short of our $1.89 estimate and consensus. The shortfall was due to weaker gain-on-sale margins due to losses on loans sold at a discount and repurchase costs ($1.08) and marking-to-market derivatives not qualifying for hedge accounting ($0.75), somewhat offset by lower expenses ($0.45) and tax benefits ($0.30). The company expects negative gain on sale trends to persist in 4Q06. NEW plans to return $400 mm of capital to shareholders in a combination of dividends and share buybacks in 2007. We believe it unlikely that the company will be able to meet this obligation through securitization over-collateralization releases and company earnings and will have to resort to raising additional trust or perpetual preferred.

**What's New:** The **net gain on sale margin** contracted to 1.13% from 1.74% in 2Q. We had forecast 1.80%. NEW said it expects gain on sale margins to fall 10-20 bps in 4Q. Production economics, as measured by the **net operating margin** at the TRS, declined by 49 bps q/q to 52 bps. **Net interest income** of $118 million came in below our projection by $14.7 million. **Non-interest expenses** of $198 million were better than modeled by $25.8 million. Loan acquisition costs of 1.49% were down 2 bps from 2Q. Annualized **charge-offs** fell to 55 bps, slightly ahead of our estimate of 53 bps, but there are further signs of normalization in credit quality. Delinquencies in the 2005 and 2006 vintages are running higher than the 2003 and 2004 vintages; delinquencies increased to 5.95% for the REIT portfolio from 4.61% in the second quarter. First payment defaults rose to 2.03% from 1.86% in 2Q.

**Implications:** We remain Equal-weight. Shares will likely be weak on the open. In 2007 we look for lower production volumes and higher credit losses to dampen returns and EPS.

Morgan Stanley does and seeks to do business with companies covered in its research reports. As a result, investors should be aware that the firm may have a conflict of interest that could affect the objectivity of this report. Investors should consider this report as only a single factor in making their investment decision. Customers of Morgan Stanley in the U.S. can receive independent, third-party research on the company covered in this report, at no cost to them, where such research is available. Customers can access this independent research at www.morganstanley.com/equityresearch or can call 1-800-624-2063 to request a copy of this research.

**For analyst certification and other important disclosures, refer to the Disclosure Section.**

# Morgan Stanley

**M O R G A N   S T A N L E Y   R E S E A R C H**

November 2, 2006
New Century Financial Corp.

Exhibit 1
## New Century: 3Q06 at a Glance

*($ mm, Except Ratios and Per Share Data)*

| | 3Q05A | 2Q06A | Estimate 3Q06E | Actual 3Q06A | A vs E Variance | Y/Y % Change | Q/Q % Change | |
|---|---|---|---|---|---|---|---|---|
| **Income Statement** | | | | | | | | |
| Net Interest Income | 201.6 | 140.0 | 159.4 | 138.9 | (20.5) | -31.1% | -0.8% | Lower than expected net interest income, and lower provision than we forecast. |
| Provision | 38.5 | 32.3 | 26.5 | 20.8 | (5.8) | -46.1% | -35.8% | |
| Net Interest Income after provision | 163.0 | 107.7 | 132.9 | 118.2 | (14.7) | -27.5% | 9.8% | |
| **Non-Interest Income** | | | | | | | | |
| Gain on Sale of Loans | 176.2 | 195.2 | 224.3 | 173.0 | (51.2) | -1.8% | -11.3% | Gain on sale weaker than expected and servicing loss relative to our expectation for a $17 mm gain. |
| Servicing & Other Income | 17.3 | 39.0 | 17.2 | (3.0) | (20.2) | -117.2% | -107.6% | |
| Total Non-Interest Income | 193.6 | 234.1 | 241.5 | 170.1 | (71.4) | -12.1% | -27.4% | |
| Total Net Revenue, before provision | 395.2 | 374.1 | 400.9 | 309.0 | (91.9) | -21.8% | -17.4% | |
| Total Net Revenue, after provision | 356.6 | 341.8 | 374.4 | 288.3 | (86.1) | -19.2% | -15.7% | |
| **Non-Interest Expense** | | | | | | | | |
| Personnel | 146.6 | 126.9 | 144.5 | 112.6 | (31.9) | -23.2% | -11.3% | Continued discipline on expenses as loan acquisition costs fell 2 bps to 1.49%. |
| General & Administrative Expenses | 49.8 | 55.1 | 54.3 | 57.5 | 3.2 | 15.4% | 4.3% | |
| Other | 37.2 | 25.0 | 25.0 | 27.9 | 2.9 | -25.0% | 12.0% | |
| Total Non-Interest Expenses | 233.6 | 207.0 | 223.8 | 198.0 | (25.8) | -15.2% | -4.3% | |
| Pre-tax Income | 123.0 | 134.8 | 150.5 | 90.2 | (60.3) | -26.6% | -33.1% | EPS $0.77 short of consensus our estimate, primarily on negative mark-to-market of derivatives ($0.75), lower gains due to loan repurchases & discounted mortgage sales somewhat offset by lower expenses. |
| Income Tax | 2.9 | 29.3 | 39.4 | 23.6 | (15.8) | 723.3% | -19.4% | |
| Preferred Dividend | 2.6 | 2.6 | 2.6 | 3.2 | 0.6 | NA | 23.6% | |
| Net Income Available to Common | 117.5 | 103.0 | 108.5 | 63.5 | (45.1) | -46.0% | -38.4% | |
| **Diluted EPS** | $2.04 | $1.81 | $1.89 | $1.12 | ($0.77) | -45.0% | -37.9% | |
| Average Diluted Shares Outstanding | 57.6 | 56.9 | 57.4 | 56.5 | (0.9) | -1.9% | -0.7% | |
| **Selected Balance Sheet Data** | | | | | | | | |
| Loans HFI | 18,330 | 15,906 | 15,017 | 14,031 | (986) | -23.5% | -11.8% | Repurchased 992,500 shares in 3Q. |
| Loans HFS | 8,571 | 9,303 | 9,370 | 8,945 | (425) | 4.4% | -3.8% | |
| Total | 26,901 | 25,209 | 24,387 | 22,976 | (1,411) | -14.6% | -8.9% | |
| Total Assets | 29,087 | 27,325 | 26,605 | 25,060 | (1,546) | -13.8% | -8.3% | |
| Total Shareholders' Equity | 2,104.0 | 2,138.3 | 2,197.5 | 2,064.3 | (133) | -1.9% | -3.5% | |
| **Production and Sales** | | | | | | | | |
| Production Volume (excluding RBC) | 15,857.0 | 14,069.3 | 13,601.7 | 15,857.0 | 2,255.3 | 0.0% | 12.7% | Production volume up 3.2% q/q. |
| Production Volume (including RBC) | 16,711.6 | 16,191.7 | 15,980.5 | 16,711.6 | 731.1 | 0.0% | 3.2% | |
| Sales (total) | 11,952.1 | 11,491.5 | 13,583.4 | 16,002.9 | 2,419.5 | 33.9% | 39.3% | |
| Sales / Production | 72% | 71% | 85% | 96% | 0.1 | 33.9% | 34.9% | |
| **Gain on Sale Margin** | | | | | | | | Net execution came in 68 bps below our forecast mainly because of higher loan repurchases and discounted mortgage loan sales. |
| Net Execution, non-prime | 2.05% | 2.10% | 2.30% | 1.58% | -0.72% | -23.0% | -24.9% | |
| Net Gain on Sale, non-prime | 1.48% | 1.74% | 1.80% | 1.13% | -0.67% | -23.7% | -35.4% | |
| **Leverage** | | | | | | | | |
| Book Value Per Common Share | $34.64 | $35.65 | $35.51 | $33.71 | ($1.79) | -2.7% | -5.4% | |
| **Credit Statistics** | | | | | | | | |
| Provision / Avg. Mortgages HFI | 0.84% | 0.81% | 0.69% | 0.67% | (0.0) | -19.7% | -16.7% | Reserves continue to build ahead of losses that will materialize as the portfolio seasons. |
| Net Charge-offs / Avg. Mortgages HFI | 0.14% | 0.81% | 0.53% | 0.52% | (0.0) | 277.4% | -35.4% | |
| Reserves / Mortgages HFI (EOP) | 0.97% | 1.34% | 1.46% | 1.56% | 0.0 | 60.9% | 16.4% | |
| **Profitability Metrics** | | | | | | | | |
| Efficiency Ratio | 59.1% | 55.3% | 55.8% | 64.1% | 8.2% | 8.4% | 15.8% | Efficiency ratio up on lower income; ROE of 13% well below our forecast of 21%. |
| Return on Avg. Assets | 1.73% | 1.62% | 1.65% | 1.02% | -0.6% | -41.2% | -37.1% | |
| Return on Avg. Common Equity | 24.2% | 20.1% | 21.3% | 12.9% | -8.4% | -46.7% | -35.7% | |
| Tax Rate | 2.3% | 21.7% | 26.2% | 26.2% | 0.0% | 1021.8% | 20.4% | |

*E = Morgan Stanley Research estimates.*

Source: Company data, Morgan Stanley Research

# APPENDIX E



**ROTH** Capital Partners

Richard A. Eckert, CFA, (949) 720-5764
reckert@rothcp.com

Isabel Sterk, (949) 720-5771
isterk@rothcp.com

Sales and Trading, (800) 933-6820

COMPANY NOTE | EQUITY RESEARCH | November 7, 2006

## Financial Services: REITs

# New Century Financial Corporation | NEW - $37.00 - NYSE | *Buy*

**Analysis of Sales/Earnings**
Estimates Changed, Rating Changed, Target Price Changed

| REITs | |
| --- | --- |
| Shares Out. (mil) | 56.12 |
| Mkt. Cap.(mil) | $2,076.3 |
| 3-Mo. Avg. Vol. | 1,663,377 |
| 12-Mo.Price Target | $47.00 |
| Tot. Debt (mil) | $22,398.34 |
| Debt/Equity (x) | 13.90 |
| Current Dividend (Annl. $) | $7.60 |
| Dividend Yield (Calculated) | 20.54 |

*Tot. Debt (mil): Includes debt at TRS*

| EPS ($) | | | | | |
| --- | --- | --- | --- | --- | --- |
| **Yr Dec** | **2005** | **—2006E—** | | **—2007E—** | |
| | Actual | Curr | Prev | Curr | Prev |
| 1Q | 1.48A | 1.79A | 1.79A | — | — |
| 2Q | 1.65A | 1.81A | 1.81A | — | — |
| 3Q | 2.04A | 1.12A | 1.97E | — | — |
| 4Q | 2.00A | 1.10E | 1.48E | — | — |
| YEAR | 7.17A | 5.83E | 7.04E | 4.25E | 6.25E |
| P/E | 5.2x | 6.3x | 5.3x | 8.7x | 5.9x |

*2005 Q4 includes estimated losses related to Gulf hurricanes amounting to approx $0.14 per share.*

| Dividend ($) | | | | | |
| --- | --- | --- | --- | --- | --- |
| **Yr Dec** | **2005** | **—2006E—** | | **—2007E—** | |
| | Actual | Curr | | Curr | Prev |
| 1Q | 1.55A | 1.75A | | — | — |
| 2Q | 1.60A | 1.80A | | — | — |
| 3Q | 1.65A | 1.85A | | — | — |
| 4Q | 1.70A | 1.90A | | — | — |
| YEAR | 6.50A | 7.30A | | 3.85E | 6.50E |



1 Year Price History/Ave. Daily Vol for NEW

*Created by BlueMatrix*

## Looking for Valu(ation) in all the Wrong Places; Upgrading to Buy

- Last Thursday, NEW reported Q306 operating results of $1.12, well below Street consensus of $1.89 and our own estimate of $1.97
- Fair value adjustments on the company's derivatives that did not qualify for hedge accounting treatment under SFAS 133 negatively impacted GAAP EPS by approximately $0.75
- Ignoring the mark-to-market adjustments on NEW's hedges, we believe many of the macroeconomic and business trends adversely impacting company performance in Q306 will persist; we have, therefore, lowered our 2006 and 2007 GAAP EPS estimates to $5.83 and $4.25 from $7.04 and $6.25, respectively
- Company did not provide dividend guidance but did communicate intention to distribute $400 million in capital to shareholders in the form of both dividends and share repurchases
- We believe management will utilize the entirety of a new share repurchase authorization, leaving ~$200 million of planned distributions, or $3.85 per share, available for dividends
- We have thus reduced our dividend estimate to $3.85 from $6.50
- Just as GAAP accounting measures fail to capture the true economic value of NEW's hedges, we believe any valuation of the company, or its shares, based on GAAP earnings will miss the mark as well
- We feel the real value of New Century resides in its assets: the company's mortgage banking platform and its residual interests
- Using reported transaction values and the value at which NEW carries certain assets, we arrive at an estimate of fair value for these assets of $47, which we have established as our new 12-mo. price target (up from $44.50 previously)
- If realized, that value would provide investors with capital appreciation of 27%; if our dividend projections are reasonably accurate, the company would pay them nearly $4.00 a share, to wait
- Given a total return potential of 37%, we are raising our rating on New Century shares to Buy from Hold

*Please note that we have changed our Rating System Definitions as of 04/03/06. Refer to Important disclosure information and rating System Definition on pages 20 - 21 of this report. Regulation Analyst Certification ("Reg AC"): The research analyst primarily responsible for the content of this report certifies the following under Reg AC: I hereby certify that all views expressed in this report accurately reflect my personal views about the subject company or companies and its or their securities. I also certify that no part of my compensation was, is or will be, directly or indirectly, related to the specific recommendations or views expressed in this report.*

Roth Capital Partners, LLC |24 Corporate Plaza |Newport Beach CA 92660 |949 720 5700 |Member NASD/SIPC

## SUMMARY

### Q306 Operating and Financial Results

On Thursday, November 2, 2006, New Century reported Q306 operating results of $1.12, well below Street consensus of $1.89 and our own estimate of $1.97. A large part of the shortfall can be attributed to fair value adjustments on the company's derivatives that do not qualify for hedge accounting treatment under SFAS 133. These adjustments negatively impacted GAAP EPS by approximately $0.75. Although most of these represent timing issues--changes in the fair value of hedge instruments and changes in the fair value of the underlying asset or liability are recognized at different times under GAAP--about $0.18 of the $0.75 reflected the cumulative impact of achieving hedge accounting treatment of a portion of New Century's swap agreements. While representing a permanent "cost", this item was one-time in nature.

Most of these derivatives in question fall under the rubric of "cash flow hedges"--that is, they are designed to contain the variability in future cash flows associated with, for instance, adjustable-rate borrowings or loan sales. If these instruments, which are carried at fair value on the company's balance sheet, do not qualify for hedge accounting treatment, changes in fair value are recorded through current period income. The corresponding increase/decrease in the value or cash flows associated with the asset or liability hedged is not recognized until the expected transaction occurs. For example, if it is anticipated that interest rates will fall, the fair value of swaps and Eurodollar contracts hedging the company's variable-rate borrowings used to fund its loans held-for-investment (HFI) are adjusted downward long before lower rates result in smaller interest payments and wider net interest margins. The same is true of the forward commitments hedging the company's loans held-for-sale (HFS). If rates are expected to fall, the forward commitments are marked to market via the P&L long before New Century realizes a bigger-than-anticipated gain from the sale of loans with an above-market coupon.

The reason for the sharp swing in fair value adjustments, which were positive in the previous four quarters was a reversal in both actual and expected rates all along the swap curve. LIBOR remained flat at just over 5.30% over the course of the 3rd qtr after marching steadily upward over the previous two years. The rates along the middle of the swap curve decreased meaningfully, with the fixed rate on 2-yr and 3-yr swaps falling by as much as 60 bp. The forward curves suggest that short-term and intermediate rates will fall even further. The expectation of lower rates means that the net payments on its short swaps will increase (the company receives the variable and pays the fixed), obviously diminishing their net present and fair value. Similarly, falling rates clearly reduce the value of Eurodollar contracts and forward commitments, which impart the right to sell an instrument carrying a certain interest rate at a specified price over specified period of time. As rates fall, the value of those instruments increases naturally and the right to sell them at a lower price becomes increasingly worthless.

Once again, we would like to emphasize here that these fair value adjustments represent, by and large, timing issues. They do not alter cash flows. Nor, for that matter, reported earnings over time. And they most certainly do not affect the company's aggregate book value, merely its geography. If these derivatives qualifed for hedge accounting treatment, the fair value adjustments would have been recorded in accumulated other comprehensive income, a separate component of equity. Not qualifying for hedge accounting treatment moves them into retained earnings.

Even if we ignore these timing issues and one-time adjustments used to bring at least a portion of the derivatives portfolio into accordance with the requirements of SFAS 133--at least those pertaining to hedge accounting treatment--New Century's operating results would have fallen short of our expectations by ~$0.10. The entirety of this shortfall resided in the taxable mortgage bank subsidiary, or TRS. If we exclude the impact of hedge-related activities in the REIT portfolio (approximately $25 million, or $0.45 a share), the income from that portfolio would have exceeded our projections by roughly $2 million, or $0.04 a share. A lower-than-projected loan loss provision accounts for the entirety of the positive variance. Notwithstanding a spike in 60+ delinquencies in this portfolio during the third quarter--from 4.62% at the end of June to 6.14% at the end of September--cumulative losses to date amount to only 0.24% of the original principal amount in the aggregate. Projected losses total just 2.52% of the original principal amount, well below the 4.5%-5.0% assumptions observed historically (and typical of the assumptions used when capitalizing the estimated cash flows in a securitization treated as a sale). While recently added pools are performing much more in line with historical averages, they still represent a relatively small part of the total REIT portfolio. Earlier vintages of loans continue to perform much better than historical

experience indicates they would at this point in their seasoning.

Partially offsetting this positive variance was lower-than-expected other income, net of operating expenses, which fell below our estimate by nearly $7 million.

At the TRS, net income declined to $43.6 million from $53.6 million the preceding quarter and well short of our expectation of $70.3 million. The $26.7 million difference amounted to $0.47 a share after tax. The fair value adjustments on the company's forward commitments accounted for approximately $25 million, or $0.29 a share after tax, of the shortfall. The remainder of the negative variance can be traced to a much greater-than-anticpated loss severity on loans sold at a discount and smaller-than-projected gross premium on loans sold at a premium (expressed as a percentage of total loans sold at a premium). The severity of losses on loans sold at a discount ballooned to 12.86% in the quarter just ended from 5.00% in the June 2006 quarter. Our estimate was in line with the previous quarter. Thus, even though total loans sold at discount, $410 million was $90 lower than our estimate, losses from those sales were more than twice the $25 million we had calculated. The company cites a higher percentage of non-performing assets in the discounted sales mix as well as a lower average price for loans with minor defects. Neither the company nor we expect conditions in the market for "scratch-and-dent" loans to improve any time soon. The company has once again begun to break out loan repurchases and the costs associated from loan repurchases--both of which have escalated sharply over the past several quarters--from whole loan sales in the non-prime segment and the gross premium on those sales. Because the costs appear to have been rising faster than the volume of repurchases themselves--which seem to have held steady at ~$150 million per quarter--our estimate of the gross premium on loan sales may have been aggressive. To make our model more consistent with reported results, we will begin breaking out repurchase activity as well. We devoted much space to discounted loan sales and repurchases in our last report. Please refer to the New Century note dated 9/19/06 for a discussion. Also impacting the gross premium on whole loan sales was a greater proportion of prime and Alt-A loans, which carry a lower margin than non-prime loans (1.01% before hedging activities vs. 2.25% in the non-prime segment), in the sales mix. Prime and Alt-A loans represented 10.8% of total premium loan sales in the recently ended quarter, up from 9.3% the quarter before and 0.1% in Q305.

Partially offsetting these negative variances were lower-than-projected broker premiums and operating expenses as well as a smaller-than-anticipated effective tax rate. Premiums paid amounted to only 0.39% of total loan sales, vs. our expectation of 0.45%, as the company--and its peers--appear to be holding the line on broker compensation. Operating costs fell faster than loan production in the most recently ended quarter, dropping 5% to $190.5 million, by our calculations, from $199.6 million the previous quarter--despite just a 2.5% decline in loan production. We had actually modeled a small increase. The company appears to be reaping the benefits of its cost-cutting initiatives, driving its loan acquisition costs in the non-prime segment to a record low of 1.49% of loan production in the third quarter--down from 1.51% in the second quarter and 1.82% in Q305. Similarly, loan acquisition costs fell to 0.83% of loan production in the prime and Alt-A segment. The effective tax rate, which will vary with the composition of total revenue and the states/municipalities in which the TRS does business declined to 35% from 40% in the preceding quarter. We had assumed the effective tax rate would be similar to that reported in the 2nd quarter.

**New Underwriting and Disclosure Best Practices**

On October 12, 2006, New Century announced a series of changes to its underwriting and disclosure policies aimed at providing fair and informed access to credit as well as to enhance the overall credit quality of the company's loan production and loan portfolio. The specific changes, which are to be implemented over the next 90 days, are reproduced below:

- Tightening underwriting guidelines for its adjustable-rate mortgage programs for at-risk borrowers. This includes using the fully-indexed rate minus 1 percent as the qualifying rate for these borrowers.
- Offering existing adjustable-rate mortgage (ARM) and interest-only customers who qualify the option of refinancing into a low fee 30-year or 40-year fixed-rate mortgage. Any borrower having problems meeting their loan obligations should feel free to contact the company.
- Implementing plain language disclosures that go beyond legal requirements in explaining terms such as prepayment charges, interest-only features, adjustable-payment features, escrows for insurance and taxes and other key features of a loan.

Enhancing its processes for confirming the income information provided on stated income loans. In addition to the closing certification currently employed, the company will introduce a new front-end confirmation early in the loan process to assist applicants in better understanding the terms of their loan.

Prompted by new guidelines on non-traditional mortgages issued by federal banking regulators in late September and a changing interest rate and housing environment--indeed, some have characterized them as "volatile"--the company felt the need to be proactive in addressing the needs of all of the constituencies it serves: 1) its borrowers; 2) its whole loan buyers and asset-backed investors; 3) its shareholders; and 4) the communities in which it lends. Although not subject to regulation by federal banking regulators, the rules guidelines promulgated by those agencies (the FRB, the OCC, the OTS, the FDIC and the NCUA) have tended to become the criteria used by ratings agencies and the fixed-income markets. In fact, it has been our experience that the latter move toward the standards developed by the former than vice versa. Additionally, federal regulators are urging state officials, which govern the business activities of even non-bank lenders, to develop their own guidelines and to place the force of law behind them.

We feel that, against this backdrop of evolving regulatory oversight, higher short-term interest rates, an inverted yield curve, and flat to declining home values in many parts of the country, it was only prudent to develop these best practices. The measures adopted are designed to make sure that specific loan products are appropriate for the borrower committing to them and to help improve the overall credit quality of the company's loan production. The company plans to continue to monitor and evaluate these and other business practices with the objective of introducing further enhancements over time.

The new underwriting guidelines, targeted to the "at risk" ARM borrower, apply to applicants with FICO scores below 580 and a LTV at origination of greater than 80% who plan to occupy the residences serving as collateral for the loan. These borrowers will have to qualify at the fully-indexed rate minus 100 bp and will not qualify if their debt-to-income (DTI) ratio exceeds 50%. Nonetheless, the initial coupon on their loans would represent the company's current start rate for adjustable-rate mortgages of type for which they qualified. All other ARM borrowers would qualify at the start rate. The company estimates that less than 4% of its loan production would not have qualified under the new guidelines. Management does anticipate a modest decline in loan production as a result of implementing these guidelines, but they are not expected to have a meaningful impact on overall firm profitability.

**Capital Management and Dividend Policy - An Update**

In the conference call hosted by New Century to discuss 3rd quarter 2006 operating and financial results, company officials did not commit to a specific dividend policy for 2007. However, management did announce its intention to make distributions of capital to shareholders, in the aggregate, of $400 million--a sum roughly similar to the total dividends declared in 2006 (or $7.30 a share with the $1.90 dividend declared for the 4th quarter of 2006; we note that a portion of this distribution, $0.50 - $0.75 will represent a return of capital). The 2007 distributions, though, could take the form of either dividends or share repurchases. Supporting this capital distribution policy was the announcement of a new share repurchase program, approved by the board of directors on October 31, authorizing the company to buy back up to 5 million shares of its common stock, or 9% of the total currently outstanding, over the next twelve months.

To support these distributions, management has identified the following three potential sources of funding:

- 2007 taxable income from the existing REIT portfolio, currently estimated at $50 million;
- Releases of cash from the overcollateralization (O/C) accounts providing some of the credit enhancement on the company's securitizations; these are expected to start becoming significant in 2007, with $137 million projected in that year alone; and
- Earnings from the TRS.

Given our outlook on the housing and housing finance sectors (once again, we encourage our readers to review our 9/19/06 note on New Century), we believe that NEW shares many languish over much of the next twelve months. However, as the company emerges from the current interest rate and consumer

**New Century Financial Corporation**                                    Company Note - November 7, 2006

credit cycles--as well as the mild recession we foresee in the first half of 2007--we expect that both its fortunes and the market value of its shares will rise sharply (see *Looking for Value--or, more precisely, Valuation in all the Wrong Places* below). We believe that management shares this view. Therefore, representing as they do the investment with the highest potential return on equity, we are convinced the company will utilize the entirety of its share repurchase authority over the next twelve months. In fact, if the market prices of NEW shares continue to hover around book value, the company may become very aggressive and seek approval of additional buybacks from its board of directors. Assuming a weighted average repurchase price of just over $39 (1.3 million shares at current market prices and 3.7 million at $40 a share), stock buybacks would account for just under 1/2 of the $400 million in capital distributions planned for next year. We believe these would be funded by some combination of TRS earnings and O/C releases.

As a result of the foregoing, we are calculating dividend payments of $3.85 for all of 2007. This would amount to just over $200 million. To support these projected payments, the company would probably have to fall back on all three sources of funding, including the entirety of the $50 million in taxable income expected of the REIT portfolio. Coincidentally enough, this would represent a yield of 10.5% at present levels, in line with the yields at which mortgage REITs have historically traded. There seems to be no need to augment this yield, especially when the equity markets do not seem to be giving the company any credit for it.

Although we can understand the frustration of many investors--including those income-oriented investors buying into NEW for its high yield--with the company's new capital distributions policy, we feel it was a necessary first step in reclaiming the capital flexibility usurped of it when converting to a REIT. We now believe the economic value of the enterprise resides in its origination and servicing platform, the mortgage banking subsidiary. That is where the company adds value--providing solutions as it does to both its borrowers and investors. Jeopardizing the value of that enterprise--by committing to a specific dividend policy and parting with capital and liquidity when it is needed most--is ill-advised in our opinion. And certainly not in the best interests of any of the company's constituencies. Especially when, once again, equity investors do not appear to be willing to assign any value to those dividends (current yield = 20.8%).

**New Estimates**

We have cut our 2006 and 2007 GAAP EPS estimates to $5.83 and $4.25 from $7.04 and $6.25, respectively. Similarly we have lowered our estimate of 2007 dividends to $3.85 from $6.50 (see section above for an explanation of the assumptions behind the new dividend calculation). The previous 2006 dividend estimate of $7.30 is now an actual (Q406 dividend of $1.90 has already been declared; it is payable January 31, 2007 to shareholders of record on December 29, 2006).

Our 2006 GAAP EPS estimate reflects both the earnings miss in Q306 and the belief that many of the same trends observed in the third quarter will persist in the fourth. We believe that elevated levels of repurchases and discounted loan sales will continue to weigh heavily on net execution and net gain-on-sale (GOS) margins at the TRS. Also, we have boosted our expectation of the severity of the losses on loans sold at a discount to 13% from 5%. Additionally, we do not feel that we had fully reflected in our previous estimates the anticipated impact of the new S&P LEVELS 5.7 model (once again we refer our readers to the 9/19/06 note on New Century for a more detailed discussion of the S&P LEVELS 5.7 model). And, while we do not expect any material changes in total loan volume, we now believe--with home values leveling off, interest rates at elevated levels and the implementation of tighter underwriting guidelines--the composition of New Century's loan production and loan sales will tilt a little more toward the lower-margin prime and Alt-A business. Finally, our last set of projections did not fully take into account the volatility in the secondary market normally observed during the fourth quarter when traders/dealers lock in YTD bonuses/profits by ceasing their purchases and releasing their inventories, temporarily creating an imbalance of supply and demand. Thus, our modeled net execution and net GOS margins go from 1.99% and 1.54% to 1.49% and 1.00%, respectively. We observe here that we do not anticipate any material impact from fair value adjustments on the company's forward commitments.

Also exerting a negative influence on our Q406 projections is the fact that the company did not add to the HFI portfolio at the REIT in the 3rd quarter. The assumption that all dispositions will take the form of whole loan sales in Q406 actually creates a partial offset to the decrease in expected net execution as the revenue from cash sales is realized up front rather than deferred and recognized over time. As does

the belief that, in the aggregate, HFI loan performance will continue to exceed initial expecations and that loan loss provisions will remain at Q306 levels--which were well below our prior estimates. Another partial offset to a much lower-than-previously-projected GOS margin in our modeled results is a decline in share count. At current market values, we feel the company will be very active in the market for its own shares. We have trimmed our estimate of average diluted shares outstanding to 56 million from 57.4 million.

The major changes in expectations and assumptions behind the reduction in our 2007 GAAP EPS estimate are summarized below:

- We are now forecasting loan production of $54 billion, down $6 billion from our previous set of estimates. Although we had previously incorporated data from the National Association of Realtors (NAR), Census Bureau and Office of Federal Housing Enterprise Oversight (OFHEO)--all evidencing declining home sales and home sale prices--into our forecast, we do not feel we had fully reflected increases in household debt and absence of real wage increases (Exhibit I). Borrowers are simply running out of capacity to take on new debt by our calcuations, especially non-prime borrowers. When considered with the company's new underwriting and disclosure guidelines, we believe non-prime originations may fall by up to 20% in 2007. However, the precipitous drop in long-term Treasury rates and the accompanying decline in loan coupons on conforming fixed-rate mortgages should rekindle interest in conforming rate-and-term refi shoppers. When combined with the rollout of the company's Alt-A product in the wholesale channel, we are projecting that increases in prime/Alt-A loan production will offset at least half of the expected decrease in non-prime loan volume.
- A decline in of 35 bp in both net execution and net GOS margins from our previous set of modeled results (1.65% and 1.20% vs. 2.00% and 1.55%, respectively). This decrease reflects the same factors weighing on the net execution and net GOS margin we have modeled for Q406. The largest of these--in terms of its impact on our projections--is the increase in the expected severity of losses on discounted loan sales. We have boosted this to 10% from 5%. Once again, we do not expect any significant impact from fair value adjustments on the company's forward commitments.
- The belief that the company will add no new assets to the REIT portfolio in Q406 or 2007. When combined with the absence of any additions in Q306, the expectation of a narrower net interest margin--as the natural compression on securitized pools of loans (as lower-cost fundings pay down first) eclipses the positive influence of resetting loans (we believe most of these will refinance into new loans shortly)--we are now projecting total REIT portfolio income of just under $50 million, in line with company forecasts, down from more than 3x that level previously. As with New Century Mortgage's pipeline hedges, do not expect that the fair value adjustments to the company's swaps and Eurodollar contracts will significantly alter the REIT net interest margin one way or the other.
- Also impacting projected REIT portfolio income is a small change in our assumed loan loss provision. Even though we do not anticipate any material increase in loan losses--certainly not from levels the projected today--in the REIT portfolio, we have, in the interest of conservatism, boosted our modeled loan loss provision to 1.5% of average loans from 1.25% in our prior set of calculations. We feel the ability of the American consumer to meet his/her financial obligations as they come due will be put to the test over the next twelve months given the data displayed in Exhibit I and II and our belief that the U.S. economy will enter a mild recession in the first half of 2007. Therefore, despite the outstanding performance of the loans HFI at the REIT to date, we believe it was only prudent to increase the assumed loan loss provision in 2007.
- Providing a small partial offset to these unfavorable influences on expected 2007 results are lower-than-previously-calculated operating expenses at the TRS (1.42% of anticipated loan production vs. 1.47% earlier) and a lower average diluted share count, the result of our beliefs about the company's buyback strategy. As a result of these beliefs, we are projecting average fully diluted shares of 53.8 million in 2007, down from 57.8 million in our last set of estimates.

Our outlook on interest rates, housing and the U.S. economy are unchanged from that articulated in the 9/19/06 note on New Century.

**Looking for Value--or, more precisely, Valuation--in all the Wrong Places**

Just as GAAP accounting measures fail to capture the true economic value of the derivatives hedging the company's assets, liabilities and cash flows, we believe that any valuation of the company, or its shares, based on GAAP earnings will miss the mark as well. Indeed, any measure of earnings or taxable income will fall short of the true underlying value of the company, which we now feel resides in its assets--counted among these, in our estimation, are the skills, knowledge, experience and relationships

**New Century Financial Corporation**                     **Company Note - November 7, 2006**

of its human capital. Although early champions of the REIT and the "steady stream" of cash returns it would provide the company's shareholders, we now view it as merely as tax-advantaged channel of disposition should the company decide to securitize its loans instead of selling them in the cash market. It is our belief that the company needs to continue to avail itself of the securitization market in the event that the economic value--that supported by the expected cash flows of the loans awaiting disposition--exceeds the market value of those loans by a wide margin. In other words, the company needs to keep its whole loan buyers honest. And the REIT is as efficient a vehicle for housing the assets retained in a securitization as any.

Thus, we have concluded the real value of New Century lies in its origination engine, its servicing platform and its residual assets. These are the assets that create value--transforming renters into borrowers, home equity into home improvement, and index-hugging fixed-income investors into alpha-producing managers. Delivering affordable mortgage products to homeowners and loans that are likely to perform to whole loan and asset-backed investors is no mean feat. To which the rapid entry into and departure from the business of many of the firms contained on Table 1 will attest. The key here, in our opinion, is in the marketing skill and underwriting/pricing discipline residing in the company's origination platform. The operating results and cash flows associated with this business over time, however, will be cyclical and volatile, subject as they are to conditions in the housing arena, general economy, and fixed-income markets. Any estimates of the cash flows generated by the business have to evaluated stochastically. Typically, powerful option-adjusted spread and predictive modeling applications--which can not only project cash flows, but also assign them probabilities--are used.

Unable to justify the cost of such sophisticated applications, our only recourse is to observe the valuations accorded origination platforms by those organizations possessed of them. Table 1 summarizes the consideration given in transactions involving mortgage banking targets with more than $1 billion in total originations annually. We believe the most pertinent deal metrics are those reported in the most recent five transactions. The median deal value, in terms of annual origination volume (which we feel is the most pertinent statistic, given that what the buyer was acquiring, in most cases, was loan production capacity), was 4.76%. Using our 2007 forecast of origination volume at New Century Mortgage, the company's mortgage banking operation would be valued at 4.76% X $54 billion/56.5 million fully diluted shares or ~$45.50 a share. We recognize that many of the strategic buyers on Table 1 were acquiring more than loan origination platforms and that fixed-income and housing market conditions over the next 5 - 6 quarters will differ materially from those when the deals on Table 1 were negotiated. So, we have decided to discount the median consideration offered in the last five deals--perhaps arbitrarily--by 1/3, or 33.33%. Applying this discount to the previously calculated $45.50 previously arrived at yields a value of just over $30.00. We note here that any organization buying the mortgage banking operation at the $30.00 we have calculated would get the loan adminstration platform, currently servicing over $43 billion in loans, for free (we did not consider that operation in this computation of value).

| Table 1. Nonconforming Mortgage Banking Acquisitions - Target > $1 Billion in Total Originations | | | | | | | | |
| 01/01/1999 - Present | | | | | | | | |
| Buyer/ Target | Announcement Date | Completion/ Termination Date | Credit Quality | Deal Value Announcement ($M) | Price/Book Announcement (%) | Price/ LTM Earnings Announcement (x) | Deal Value/ Managed Receivables Announcement (%) | Deal Value/ Originations Announcement (%) |
|---|---|---|---|---|---|---|---|---|
| Citigroup Inc./ Source One Mrtg Svcs Corp. & Sub. | 03/23/1999 | 05/01/1999 | Both | 117.8 | 28.56 | 2.57 | 0.47 | 1.08 |
| Washington Mutual Inc./ Long Beach Financial Corp. | 05/18/1999 | 10/01/1999 | Subprime | 374.8 | 329.79 | 11.92 | 17.19 | 13.21 |
| National City Corp./ First Franklin Financial Cos. Inc. | 07/27/1999 | 08/31/1999 | Subprime | 266.1 | 436.23 | NM | NA | 12.09 |
| Citigroup Inc./ Associates First Capital Corp. | 09/06/2000 | 11/30/2000 | Both | 31,131.9 | 300.71 | 20.63 | 33.99 | 49.37 |
| NetBank Inc./ Resource Bancshares Mortgage Grp Inc | 11/19/2001 | 03/31/2002 | Both | 148.3 | 98.19 | 12.41 | 1.30 | 1.39 |
| American International Group/ Wilmington Finance Inc. | 11/07/2002 | 01/01/2003 | Subprime | 117.1 | 671.71 | 12.20 | NA | 7.80 |
| HSBC Holdings plc/ Household International Inc. | 11/14/2002 | 03/28/2003 | Both | 14,861.2 | 161.65 | 8.13 | 13.36 | NA |
| Freemont Billings Rumsey Group/ First NLC Financial Services, Inc. | 01/10/2005 | 02/16/2005 | Subprime | 88.0 | 343.09 | 4.62 | 41.26 | 5.10 |
| Accredited Home Lenders/ Aames Investment Corporation | 05/24/2006 | 10/01/2006 | Subprime | 331.4 | 129.23 | NM | 5.50 | 4.76 |
| Morgan Stanley/ Saxon Capital, Inc. | 08/09/2006 | Pending | Subprime | 706.1 | 118.59 | 8.69 | 2.64 | 11.46 |
| Merrill Lynch & Co./ First Franklin and affiliates | 09/05/2006 | Pending | Subprime | 1,300.0 | NA | 3.77 | NA | 4.40 |
| Bear Stearns & Co./ECC Capital wholesale mortg bank | 10/10/2006 | 10/10/2006 | Subprime | 26.0 | NA | NA | NA | 0.43 (1) |
| | | | Maximum: | | 671.71 | 20.63 | 41.26 | 49.37 |
| | | | Minimum: | | 28.56 | 2.57 | 0.47 | 0.43 |
| | | | Average: | | 272.18 | 9.37 | 14.51 | 11.01 |
| | | | Median: | | 300.71 | 10.26 | 13.36 | 7.80 |
| (1) Calculated as Purchase Price/Q206 Loan Production Annualized. | | | | | | | | |
| Source: SNL Financial, company press releases. | | | | | | | | |

To the value of the mortgage bank we have calculated above, we feel we must add the market value of the company's residual assets. If we deduct the company's equity in loans held for investment (assigning it, as we do, to the origination platform), or $458 million, and assume that all other assets and liabilities

offset one another, New Century's reported book value of $33.61 less the warehouse commitment, or ~$25.50, should represent, by and large, the carrying value of its residuals. Assuming these assets are properly marked-to-market, as required by GAAP, the $25.50 we arrived at should fairly approximate the market value of New Century's residuals. Once again, we have decided to haircut this calculation of fair value--in this instance, to explicitly consider any unforeseen increases in projected cumulative losses, prepayment speeds or required discount rates--by 1/3 or 33.33%, which results in an estimated fair value of about $17.00.

Adding the $30.00 value at which we arrived for the origination platform to the $17.00 calculated for the company's residual assets results in a total estimated fair value of $47.00. Our computations are summarized below:

Origination platform:

(a) Estimated 2007 loan production - $54 billion
(b) Median deal value in recent transactions involving subprime mortgage banks > $1 billion in originations - $4.76%
(c) Discount to reflect more challenging market conditions in 2007 - 33.33%

a X b (1 - c) = $1.7 billion, or ~$30.00 a share

Residuals:

(d) Reported book value per share - $33.61
(e) Equity in warehoused loans - $458 million, or $8.10 a share
(f) Discount to account for unexpected increases in cum losses, CPRs, discount rates - 33.33%

(d - e) X (1 - f) = $17.00 a share

**Conclusion and Recommendation**

We have elected to establish the $47 arrived at above our new 12-month price target. Without speculating on takeouts or other strategic transactions, we believe that the estimate of fair value yielded by our asset- and market-based approach places a floor under the valuations ultimately accorded the stock by equity investors. Here we pause to point out the following:

- the calculations in the preceding section are not based on assumptions and estimates of earnings, book value or cash; instead, they are based on observable market values, announced transaction values and reported carrying values; in our opinion, only the arbitrarily chosen discount rates may be debated;
- none of those calculations take into consideration the value of the company's servicing platform, which now includes the operating assets (but not the MSRs) of Irwin Mortgage Corporation--the acquisition of which were announced contemporaneously with 3rd quarter operating results; at the end of the September 2006, New Century serviced $43.3 billion in loans; and
- presumably, the reported balances of the company's residual assets--which are carried at fair value--take into account the $400+ million in overcollateralization (O/C) account releases over the next two years; these releases have generally occurred ahead of schedule--the result, in our estimation, of more rapid-than-anticipated prepayment speeds and better-than-expected loan performance (which are not unrelated); to the extent these trends continue, the company's estimates of the cash flows from those accounts and the fair value of its residual assets may be understated;

And it is our conviction that, eventually, the valuations accorded the net assets of New Century in the "cash" and equity markets should converge. If the efficient markets hypothesis, premised as it is on the notion of rational expectations, holds, the arbitrage so created should disappear. That is, if all of the participants at an auction know what an asset is worth, none of them is going to allow another to walk

**New Century Financial Corporation**                                      **Company Note - November 7, 2006**

away with that asset at a bid substantially below that value. We believe that over time, even equity investors will realize that the aggregate value of New Century's net assets in the cash markets significantly exceeds the current aggregate value of the company's shares, or market cap, in the equity markets. Assuming NEW shares trade up toward our estimate of the former from the latter over the next twelve months, investors would enjoy capital appreciation of 27%. And if our dividend projections are reasonably accurate, the company would pay them nearly $4.00 a share, to wait for that gain, bringing the total return potential at current prices to 37%. Given that return potential and a management that, in our assessment, is committed to doing all the right things--beefing up its underwriting and disclosure policies, reclaiming its capital flexibility, delivering value to all of the constituencies it serves--we are raising our rating on New Century's shares to Buy from Hold.

## VALUATION

We have elected to use a market- and asset-based approach to arriving at an estimate of the fair value of New Century and its shares. Table 1 summarizes the consideration given in transactions involving mortgage banking targets with more than $1 billion in total originations annually. We believe the most pertinent deal metrics are those reported in the most recent five transactions. The median deal value, in terms of annual origination volume (which we feel is the most pertinent statistic, given that what the buyer was acquiring, in most cases, was loan production capacity), was 4.76%. Using our 2007 forecast of origination volume at New Century Mortgage, the company's mortgage banking operation would be valued at 4.76% X $54 billion/56.5 million fully diluted shares or ~$45.50 a share. To account for the likely fluctuations in the values calculated for origination platforms, we have decided to discount the median consideration offered in the last five deals--perhaps arbitrarily--by 33.33%. Applying this discount to the approximately $45.50 previously arrived at yields a value of just over $30.00.

| Table 1. Nonconforming Mortgage Banking Acquisitions - Target > $1 Billion in Total Originations 01/01/1999 - Present | | | | | | | | |
|---|---|---|---|---|---|---|---|
| Buyer/ Target | Announcement Date | Completion/ Termination Date | Credit Quality | Deal Value Announcement ($M) | Price/ Book Announcement (%) | Price/ LTM Earnings Announcement (x) | Deal Value/ Managed Receivables Announcement (%) | Deal Value/ Originations Announcement (%) |
| Citigroup Inc./ Source One Mrtg Svcs Corp. & Sub. | 03/23/1999 | 05/01/1999 | Both | 117.8 | 28.56 | 2.57 | 0.47 | 1.08 |
| Washington Mutual Inc./ Long Beach Financial Corp. | 05/18/1999 | 10/01/1999 | Subprime | 374.8 | 329.79 | 11.92 | 17.19 | 13.21 |
| National City Corp./ First Franklin Financial Cos. Inc. | 07/27/1999 | 08/31/1999 | Subprime | 266.1 | 436.23 | NM | NA | 12.09 |
| Citigroup Inc./ Associates First Capital Corp. | 09/06/2000 | 11/30/2000 | Both | 31,131.9 | 300.71 | 20.63 | 33.59 | 49.37 |
| NetBank Inc./ Resource Bancshares Mortgage Grp Inc | 11/19/2001 | 03/01/2002 | Both | 148.3 | 98.19 | 12.41 | 1.30 | 1.39 |
| American International Group/ Wilmington Finance Inc. | 11/07/2002 | 01/01/2003 | Subprime | 117.1 | 671.71 | 12.30 | NA | 7.80 |
| HSBC Holdings plc/ Household International Inc. | 11/14/2002 | 03/28/2003 | Both | 14,861.2 | 161.66 | 8.13 | 13.36 | NA |
| Brascan Holdings Group/ Encore NFC Financial Services, Inc. | 01/10/2005 | 02/16/2005 | Subprime | 88.0 | 441.09 | 4.62 | 41.26 | 5.10 |
| Accredited Home Lenders/ Aames Investment Corporation | 05/24/2006 | 10/01/2006 | Subprime | 311.4 | 129.23 | NM | 2.64 | 4.70 |
| Morgan Stanley/ Saxon Capital, Inc. | 08/08/2006 | Pending | Subprime | 706.1 | 118.91 | 9.90 | 1.64 | 21.46 |
| Merrill Lynch & Co./ First Franklin and affiliates | 09/05/2006 | Pending | Subprime | 1,300.0 | NA | 3.27 | NA | 4.40 |
| Bear Stearns & Co./ECC Capital wholesale mrtg bank | 10/10/2006 | 10/10/2006 | Subprime | 76.0 | NA | NA | NA | 0.43 (1) |
| | | | Maximum: | | 671.71 | 20.63 | 41.26 | 49.37 |
| | | | Minimum: | | 28.56 | 2.57 | 0.47 | 0.43 |
| | | | Average: | | 272.18 | 9.37 | 14.51 | 11.01 |
| | | | Median: | | 300.71 | 10.26 | 13.36 | 7.80 |
| (1) Calculated as Purchase Price/Q206 Loan Production Annualized. | | | | | | | | |
| Source: SNL Financial, company press releases. | | | | | | | | |

To the value of the mortgage bank we have calculated above, we feel we must add the market value of the company's residual assets. If we deduct the company's equity in loans held for investment (assigning it, as we do, to the origination platform), or $458 million, and assume that all other assets and liabilities offset one another, New Century's reported book value of $33.61 less the warehouse commitment, or ~$25.50, should represent, by and large, the carrying value of its residuals. Assuming these assets are properly marked-to-market, as required by GAAP, the $25.50 we arrived at should fairly approximate the market value of New Century's residuals. Once again, we have decided to haircut this calculation of fair value--in this instance, to explicitly consider any unforeseen increases in projected cumulative losses, prepayment speeds or required discount rates--or 33.33%, which results in an estimated fair value of about $17.00.

Our computations are summarized below:

Origination platform:

(a) Estimated 2007 loan production - $54 billion

(b) Median deal value in recent transactions involving subprime mortgage banks > $1 billion in originations - $4.76%

(c) Discount to reflect more challenging market conditions in 2007 - 33.33%

a X b (1 - c) = $1.7 billion, or ~$30.00 a share

Residuals:

ROTH Ⓡ      **Page 9 of 21**

**New Century Financial Corporation**                    **Company Note - November 7, 2006**

(d) Reported book value per share - $33.61

(e) Equity in warehoused loans - $458 million, or $8.10 a share

(f) Discount to account for unexpected increases in cum losses, CPRs, discount rates - 33.33%

(d - e) X (1 - f) = $17.00 a share

Adding the $30.00 value at which we arrived for the origination platform to the $17.00 calculated for the company's residual assets results in a total estimated fair value of $47.00.

## RISKS

Our estimates of earnings, taxable income, dividends and fair value rely heavily on the ability of New Century Mortgage, the TRS, to maintain its subprime lending franchise, keeping up the strong volumes of loans reported in recent years as well as the quality of those loans.

The major risks to the company's mortgage banking franchise, in our opinion, are:

Dependence on the capital markets for profitable exit strategies. Whether the company is securitizing loans itself or selling the loans to a third party which will subsequently securitize those loans, New Century is highly dependent on conditions in the broader fixed-income markets, the ABS markets in particular. The ABS markets can be a demanding and, sometimes, capricious taskmaster. During periods of uncertainty and volatility these could become severely disrupted. Even under less direful circumstances, widening spreads between Treasuries and securities backed by nonprime assets may place pressure on the bid for whole loans and the yields at which the company's asset-backed securities can be issued-effectively raising New Century's cost of funding and diminishing the profitability of the transaction. If the expected returns on loan sales or from issuing securities become unsatisfactory, the company would probably be forced to consider curtailing production, making it difficult to meet our estimates.

Competitive pressures-The prospect of outsized returns, when combined with mortgage banking's relatively low barriers to entry, has given rise to a host of new competitors over the last three years, many of them novice operators. Additionally, the 19% and 14% declines volume expected by the Mortgage Bankers Association (MBA) in 2006 and 2007, respectively, and razor-thin margins in the conforming markets have already forced traditional lenders to evaluate alternative loan markets. Both Fannie Mae and Freddie Mac, for instance, under a mandate to increase the American homeownership rate, have already started buying non-prime loans. Having a large, liquid outlet for non-prime loans may encourage banks, thrifts, and conventional mortgage banks to originate more of those products. Intensely competitive or even irrational pricing or other efforts to maintain volumes by New Century's rivals may make it difficult for the company to garner additional market share or even to defend current market share. Pricing pressures have contributed in no small part to the widespread deterioration in GOS and net interest margins reported throughout the industry as lenders have generally not been able to fully adjust loan coupons for the sharp increases in short- and intermediate-term interest rates witnessed over the last two yeears.

Proliferation of local and state anti-predatory lending laws. Many such ordinances restrict the rates and fees that can be charged - as well as other terms of the loan, such as the period over which prepayment penalties apply. The additional costs and restrictions may hamper lenders' ability to price appropriately for risk, rendering the risk-adjusted returns inadequate or the altogether unprofitable. They also increase the amount of disclosure that must be made and the manner in which the disclosure is delivered to the consumer. Most ominous are recent measures making assignees - including ABS issuers, investors, and servicers - liable for violations that may have been committed by the original lender or broker. Because of the potentially uncapped liability extended to those buying non-compliant loans from the jurisdictions enacting such legislation, the company might not be able to include in its securitizations loans covered by the statutes in question. Although amendments and superseding legislation have removed some of the most onerous provisions of anti-predatory lending acts in states like Georgia and New Jersey, we feel that an unfortunate precedent has been set.

Credit risk. Generally all loans are sold non-recourse to the company. There are the standard representations and warranties wherein the company is obligated to repurchase loans on which the borrower defaults on the first payment or the documentation is deficient. Early payment defaults and subsequent repurchases required of the original lender have become epidemic in the nonconforming mortgage industry over the last two quarters. The loans so reacquired are typically sold at a discount in the "scratch and dent" market. It is our understanding that the largest whole loan buyers—by and large, bulge-bracket broker/dealers—are becoming very sensitive to loan performance and documentation issues which reflects their own fears about the adverse effects of rising interest rates, costs of living and debt levels on a homeowner population that has not, in the aggregate, seen a real wage increase in nearly four years [1]. Recent trends in home sales and home prices can only have ratified those

**New Century Financial Corporation**                    **Company Note - November 7, 2006**

concerns. Consequently, they are forcing lenders to repurchase a growing number of loans. We believe the trend toward higher levels of putbacks by whole loan buyers will continue and that New Century and its peers will have to provision accordingly.

On whole loan sales, there is no additional exposure - other than reputation risk. If the subsequent performance of the loans fails to meet investors' expectations, those investors may be loath to make a bid on future production or only induced to do so at a sharply lower price.

New underwriting and disclosure policies. A larger-than-anticipated number of borrowers may not qualify for new loans under the new standards--or the revised disclosures may discourage borrowers, particularly refinance customers, from applying for a mortgage--causing a greater-than-expected decline in loan volume after the policies are implemented later this quarter and early next year.

Implementation of S&P LEVELS 5.7 model. The use of the new model will generally result in higher levels of credit enhancement for many non-agency securitization transactions. Specifically, the new model takes aim at transactions backed by pools of loans containing "piggy-backs" (mortgage transaction in which a second lien loan is assumed by the borrower simultaneously with the first lien loan) and/or other layered risk characteristics. The Housing Volatility Index used by the new model also contains adjustments that address the risk of sharper declines in home prices at the MSA level. This has the effect of boosting the expected loss severity for pools of loans backing non-agency transactions. Finally, the LEVELS 5.7 model uses a loan-level approach rather than looking at "piggy-backs" and other types of transactions at a pool level. The net result of these changes will be higher subordination requirements (larger equity commitments and a larger part of the securitization transaction represented by lower-rated tranches) which can, in some instances, neutralize the transaction economics. Diminished economics on securitization transactions will, in all likelihood, diminish the bid whole loan buyers are willing to extend in the cash market and reduce the GOS and/or net interest income reported by those lenders securitizing their loans in-house.

Unfavorable changes in the macroeconomic environment. These would include:

- Sharp changes in interest rates;
- Slowing home sales, flat-to-declining home values; and
- Similarly, renewed weakness or recession in the U.S. economy and/or persistently high unemployment.

Our estimates also rely on the company's ability to protect the value of its residual assets and keep them cash flowing. Any developments impinging on that ability may compromise the value of those assets and restrict their cash flows, rendering our estimates overly optimistic and invalidating the assumptions upon which a large part of our valuation rests. The value of and expected cash flows from the residual assets may also be adversely affected by the macroeconomic variables outlined above, influencing as they do prepayment speeds and loan performance. If certain loan performance criteria are not met, then the release of cash from the O/C accounts to the company may be delayed. To keep the O/C accounts fully funded and cash flowing, New Century may have to add more collateral to the accounts. Or purchase the worst performing loans from the securitization trust to be subsequently sold at a discount.

[1] U.S. Dept of Labor, Bureau of Labor Statistics.

## COMPANY DESCRIPTION

Founded in 1995 and headquartered in Irvine, California, New Century Financial Corporation is a real estate investment trust and one of the nation's premier mortgage finance companies, providing mortgage products to borrowers nationwide through its operating subsidiaries, New Century Mortgage Corporation and Home123 Corporation. The company offers a broad range of mortgage products designed to meet the needs of all borrowers. New Century is committed to serving the communities in which it operates with fair and responsible lending practices.

At September 30, 2006, New Century originated loans through 235 sales offices operating in 36 states and 33 regional processing centers operating in 19 states and employed approximately 7,100 associates.

## MENTIONED COMPANIES

Accredited Home Lenders (LEND--Hold--$29.90)
American International Group (AIG--NR--$67.50)
Bear Stearns & Co. (BSC--NR--$149.27)
Citigroup Inc (C--NR--$50.22)
ECC Capital Corp (ECR--NR--$1.26)
Fannie Mae (FNM--NR--$59.56)

**New Century Financial Corporation**                                          **Company Note - November 7, 2006**

Freddie Mac (FRE--NR--$69.16)
Friedman Billings Ramsey Group (FBR--NR--7.64)
HSBC Holdings Plc ADS (HBC--NR--$98.41)
Merrill Lynch (MER--NR--$88.04)
Morgan Stanley (MS--NR--$76.04)
National City Corp (NCC--NR--$36.83)
Netbank Inc (NTBK--NR--$5.36)
Saxon Capital (SAX--NR--$13.82)
Washington Mutual (WM--NR--$42.71)

# New Century Financial Corporation

Company Note - November 7, 2006

Richard A. Eckert, CFA, (949) 720-5764, reckert@rothcp.com
Isabel Sterk, (949) 720-5771, isterk@rothcp.com

## New Century Financial Corporation
### Consolidated Earnings
Irvine, CA
($ in 000s, except per share data)

| | 2003 | 2004 | Mar-05 | Jun-05 | Sep-05 | Dec-05 | 2005 | Mar-06 | Jun-06 | Sep-06 | Dec-06E | 2006E | 2007E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Ending Balance Sheet** | | | | | | | | | | | | | |
| **Assets** | | | | | | | | | | | | | |
| Cash and cash equivalents | 386,423 | 1,296,889 | 1,360,930 | 1,305,412 | 1,301,406 | 1,230,420 | 1,230,420 | 1,416,985 | 1,098,048 | 981,707 | 1,165,262 | 1,165,262 | 1,245,172 |
| Loans held for sale/securitization | 3,422,211 | 3,922,865 | 3,874,414 | 5,989,211 | 8,570,862 | 7,825,175 | 7,825,175 | 6,352,645 | 9,303,086 | 8,945,134 | 9,120,134 | 9,120,134 | 11,120,134 |
| Securitized loans held for investment | 4,745,937 | 13,195,324 | 15,836,203 | 18,482,990 | 18,330,313 | 16,143,865 | 16,143,865 | 16,102,880 | 15,905,636 | 14,030,999 | 12,545,255 | 12,545,255 | 7,073,016 |
| Residual interests | 179,498 | 148,021 | 143,928 | 145,563 | 172,111 | 234,930 | 234,930 | 208,791 | 209,335 | 223,680 | 203,235 | 203,235 | 224,835 |
| Mortgage servicing rights | 1,900 | 8,249 | 14,448 | 40,395 | 54,310 | 69,315 | 69,315 | 66,538 | 69,837 | 88,995 | 108,921 | 108,921 | 177,136 |
| Other assets | 157,360 | 480,596 | 497,485 | 468,409 | 658,247 | 643,385 | 643,385 | 673,343 | 739,457 | 789,253 | 794,253 | 794,253 | 814,253 |
| Total assets | 8,893,329 | 19,051,944 | 21,727,408 | 26,431,980 | 29,087,243 | 26,147,090 | 26,147,090 | 24,821,182 | 27,325,399 | 25,059,768 | 23,937,159 | 23,937,159 | 20,654,546 |
| **Liabilities** | | | | | | | | | | | | | |
| Warehouse and aggregation lines of credit | 3,311,837 | 3,704,268 | 3,651,181 | 5,627,207 | 8,218,122 | 7,439,685 | 7,439,685 | 6,169,277 | 8,786,000 | 8,487,850 | 8,653,904 | 8,653,904 | 10,551,662 |
| Securitization financing | 4,686,323 | 13,105,973 | 15,692,270 | 18,343,545 | 18,226,819 | 16,045,459 | 16,045,459 | 15,948,790 | 15,794,335 | 13,858,940 | 12,457,438 | 12,457,438 | 7,023,505 |
| Notes payable | 18,977 | 37,638 | 33,438 | 43,904 | 45,318 | 45,318 | 45,318 | 33,438 | - | - | - | - | - |
| Junior subordinated notes | - | - | - | - | - | - | - | - | - | 51,545 | 51,545 | 51,545 | 51,545 |
| Other liabilities | 138,381 | 320,108 | 381,349 | 455,255 | 488,092 | 501,885 | 501,885 | 533,832 | 606,459 | 597,084 | 388,735 | 388,735 | 514,076 |
| Total liabilities | 8,360,376 | 17,173,379 | 19,763,645 | 24,474,830 | 26,983,282 | 24,037,290 | 24,037,290 | 22,685,337 | 25,187,094 | 22,995,419 | 21,551,622 | 21,551,622 | 18,140,788 |
| Total shareholders equity | 542,012 | 1,878,565 | 1,963,763 | 2,001,054 | 2,103,961 | 2,109,700 | 2,109,700 | 2,135,845 | 2,138,305 | 1,606,349 | 1,567,197 | 1,567,197 | 2,058,418 |
| EOP shares | 33,760 | 54,703 | 55,612 | 56,180 | 56,502 | 55,723 | 55,723 | 56,360 | 56,077 | 55,513 | 54,283 | 54,283 | 56,685 |
| Book value per share | 16.05 | 34.34 | 35.31 | 35.62 | 37.24 | 37.86 | 37.86 | 37.90 | 38.13 | 28.94 | 36.25 | 36.25 | 40.62 |
| --excl pref stk, incl conv notes, using avg dil shrs | 19.04 | 40.77 | 34.39 | 33.06 | 34.73 | 35.17 | 35.17 | 35.76 | 35.65 | 25.51 | 32.20 | 32.20 | 35.24 |
| **Average Balances** | | | | | | | | | | | | | |
| Total interest earning assets | 4,797,330 | 13,268,406 | 19,758,603 | 24,263,615 | 28,574,927 | 29,062,683 | 25,449,105 | 25,880,947 | 26,761,625 | 25,520,223 | 23,358,358 | 25,380,291 | 21,056,931 |
| Total interest bearing liabilities | 4,396,205 | 12,962,106 | 18,616,211 | 22,514,883 | 26,634,501 | 27,083,254 | 23,743,416 | 24,064,226 | 24,368,101 | 23,880,687 | 21,761,583 | 23,518,649 | 19,227,589 |
| Total assets | 5,648,129 | 13,600,094 | 20,389,676 | 24,079,694 | 27,759,612 | 27,617,167 | 24,961,337 | 25,484,136 | 26,073,291 | 26,192,584 | 24,498,464 | 25,562,118 | 22,295,853 |
| Total equity | 464,281 | 847,270 | 1,921,164 | 1,982,409 | 2,052,508 | 2,106,831 | 2,015,728 | 2,122,773 | 2,137,075 | 1,872,327 | 1,787,028 | 1,979,801 | 2,013,163 |
| **Income Statement** | | | | | | | | | | | | | |
| Total interest income | 353,691 | 898,647 | 331,071 | 420,861 | 494,621 | 513,014 | 1,759,567 | 463,002 | 501,114 | 514,172 | 484,004 | 1,962,292 | 1,891,917 |
| Total interest expense | 117,555 | 367,094 | 162,081 | 218,555 | 290,899 | 316,588 | 988,123 | 283,213 | 361,111 | 375,228 | 363,483 | 1,383,035 | 1,392,071 |
| Net interest expense | 236,116 | 531,553 | 168,990 | 202,306 | 203,722 | 196,426 | 771,444 | 179,789 | 140,003 | 138,944 | 120,522 | 579,257 | 499,846 |
| Loan loss provisions, loans held for investment | (26,304) | (70,250) | (30,238) | (36,875) | (38,342) | (34,538) | (140,233) | (27,825) | (32,255) | (20,756) | (23,560) | (104,466) | (140,299) |
| Net interest income after loan loss provision | 209,812 | 461,303 | 138,752 | 165,431 | 165,180 | 161,848 | 631,211 | 151,964 | 107,078 | 118,188 | 96,961 | 474,791 | 359,347 |
| Gain on sale of loans | 611,136 | 800,609 | 139,752 | 138,704 | 176,241 | 167,920 | 622,617 | 129,527 | 195,160 | 173,045 | 145,540 | 643,272 | 622,970 |
| Servicing and other income | 11,139 | 33,311 | 10,595 | 10,029 | 15,704 | 24,586 | 60,914 | 30,273 | 38,973 | (2,977) | 40,000 | 106,269 | 195,000 |
| Total other income | 622,275 | 833,920 | 150,347 | 148,733 | 191,945 | 192,506 | 683,531 | 159,800 | 234,133 | 170,068 | 185,540 | 749,541 | 817,970 |
| Personnel expense | 248,796 | 419,736 | 128,522 | 148,061 | 146,575 | 128,622 | 551,780 | 116,721 | 126,922 | 112,575 | 108,000 | 464,218 | 485,000 |
| Other expense | 160,039 | 239,589 | 69,413 | 72,712 | 87,064 | 90,396 | 319,585 | 79,368 | 80,067 | 85,436 | 90,500 | 335,371 | 350,000 |
| Indenture expense-convertible notes | - | 24,757 | - | - | - | - | - | - | - | - | - | - | - |
| Total expenses | 408,835 | 684,082 | 197,935 | 220,773 | 233,639 | 219,018 | 871,365 | 196,089 | 206,989 | 198,011 | 198,500 | 799,589 | 835,000 |
| Net income before taxes | 423,252 | 611,141 | 91,164 | 93,391 | 123,486 | 135,356 | 443,377 | 115,675 | 134,822 | 90,245 | 84,002 | 424,743 | 342,518 |
| Provision for income tax | (177,769) | (235,570) | (6,404) | 1,688 | (2,867) | (19,251) | (26,834) | (11,940) | (29,279) | (23,610) | (18,256) | (83,076) | (98,296) |
| Net income | 245,483 | 375,571 | 84,760 | 95,079 | 120,619 | 116,085 | 416,543 | 103,735 | 105,543 | 66,642 | 65,745 | 341,665 | 244,222 |
| Preferred stock dividends | - | - | - | (285) | (2,567) | (2,566) | (5,418) | (2,566) | (2,566) | (3,174) | (3,968) | (12,275) | (15,872) |
| Net available to common | 245,483 | 375,571 | 84,760 | 94,794 | 118,052 | 113,519 | 411,125 | 101,169 | 102,977 | 63,468 | 61,777 | 329,390 | 228,350 |
| Wghtd avg shares, diluted | 39,235 | 46,215 | 57,267 | 57,396 | 57,598 | 57,035 | 57,324 | 56,695 | 56,916 | 56,530 | 56,000 | 56,540 | 53,750 |
| Diluted EPS | 6.32 | 8.29 | 1.48 | 1.55 | 2.05 | 1.70 | 7.17 | 1.78 | 1.81 | 1.12 | 1.10 | 5.83 | 4.25 |
| Dividends declared | 0.43 | 2.13 | 1.55 | 1.60 | 1.65 | 1.65 | 6.50 | 1.75 | 1.80 | 1.85 | 1.90 | 7.30 | 3.85 |

*Sources: Company reports, RCP estimates.*



# New Century Financial Corporation

**Company Note - November 7, 2006**

Richard A. Eckert, CFA, (949) 720-5764, reckert@rothcp.com
Isabel Sterk, (949) 720-5771, isterk@rothcp.com

**New Century Financial Corporation**
Consolidated Earnings
Irvine, CA
($ in 000s, except per share data)

| | 2003 | 2004 | Mar-05 | Jun-05 | Sep-05 | Dec-05 | 2005 | Mar-06 | Jun-06 | Sep-06 | Dec-06E | 2006E | 2007E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Adjust net earnings to arrive at taxable earnings:** | | | | | | | | | | | | | |
| REIT loan loss provision | na | 7,500 | 29,151 | 36,550 | 38,500 | 34,961 | 139,162 | 29,025 | 30,675 | 22,500 | 22,012 | 104,212 | 133,460 |
| Actual loan losses (NCOs) | na | (5,355) | (720) | (3,450) | (3,150) | (5,913) | (13,233) | (9,653) | (17,643) | (15,504) | (16,610) | (59,410) | (98,091) |
| Differences in net deferred cost amortization | na | (2,311) | 0 | 0 | 0 | 0 | 0 | 0 | (5,385) | (5,777) | (4,983) | (16,745) | (20,109) |
| Dividends from New Century TRS | na | - | - | - | - | - | - | - | - | - | - | - | 100,000 |
| Equity in earnings of New Century TRS | na | (36,524) | (26,578) | (14,157) | (18,559) | (46,088) | (105,382) | (29,570) | (82,869) | (67,208) | (51,673) | (231,320) | (278,209) |
| Other | - | - | (4,786) | 8,663 | 3,884 | 3,087 | 10,848 | 383 | 22,021 | 25,644 | 20,000 | 68,048 | 27,500 |
| **Taxable earnings** | na | 41,979 | 88,231 | 120,997 | 144,161 | 121,383 | 474,772 | 105,860 | 81,021 | 49,900 | 52,747 | 289,528 | 207,069 |
| Taxable earnings per diluted share | na | 0.91 | 1.54 | 2.11 | 2.50 | 2.13 | 8.28 | 1.82 | 1.42 | 0.88 | 0.94 | 5.12 | 3.85 |
| **Yields and costs** | | | | | | | | | | | | | |
| Yield on interest earning assets | 7.37% | 6.77% | 6.70% | 8.52% | 8.15% | 7.18% | 6.91% | 7.28% | 7.49% | 8.06% | 8.29% | 7.73% | 8.98% |
| Cost of interest bearing liabilities | 2.67% | 2.83% | 3.48% | 3.88% | 4.37% | 4.68% | 4.16% | 4.71% | 5.93% | 6.29% | 6.68% | 5.88% | 7.24% |
| Net interest spread | 4.70% | 3.94% | 3.22% | 4.64% | 3.79% | 2.51% | 2.75% | 2.57% | 1.56% | 1.77% | 1.61% | 1.85% | 1.74% |
| Net interest margin | 4.92% | 4.01% | 3.42% | 3.34% | 2.83% | 2.70% | 3.03% | 2.78% | 2.09% | 2.18% | 2.06% | 2.28% | 2.37% |
| Note: One-month LIBOR | 1.21% | 1.50% | 2.64% | 3.11% | 3.60% | 4.17% | 3.38% | 4.61% | 5.09% | 5.35% | 5.35% | 5.10% | 5.17% |
| Three-month LIBOR | 1.21% | 1.62% | 2.84% | 3.28% | 3.78% | 4.33% | 3.56% | 4.77% | 5.22% | 5.43% | 5.40% | 5.21% | 5.18% |
| Six-month LIBOR | 1.23% | 1.80% | 3.08% | 3.49% | 3.97% | 4.52% | 3.76% | 4.91% | 5.34% | 5.49% | 5.42% | 5.29% | 5.18% |
| Ten-year Treasury | 3.98% | 4.25% | 4.29% | 4.15% | 4.20% | 4.48% | 4.28% | 4.56% | 5.07% | 4.89% | 4.80% | 4.83% | 5.00% |
| **Performance and profitability** | | | | | | | | | | | | | |
| ROAA | 4.35% | 2.53% | 1.66% | 1.67% | 1.90% | 1.77% | 1.53% | 1.63% | 1.58% | 1.07% | 1.03% | 1.34% | 4.38% |
| ROAE | 52.88% | 37.03% | 17.65% | 19.61% | 23.72% | 22.59% | 20.11% | 19.55% | 19.88% | 14.25% | 12.81% | 17.96% | 48.53% |
| ROACE | 52.88% | 37.03% | 17.65% | 19.55% | 23.22% | 22.09% | 19.85% | 19.06% | 19.39% | 13.57% | 12.04% | 17.30% | 45.37% |
| Pretax Operating Margin | 43.37% | 27.50% | 26.54% | 27.09% | 30.48% | 29.85% | 28.63% | 30.55% | 28.21% | 21.57% | 21.48% | 25.71% | 18.53% |
| **Balance sheet ratios** | | | | | | | | | | | | | |
| EOP Assets/Equity | 16.4x | 10.1x | 11.1x | 13.2x | 13.8x | 12.4x | 12.4x | 11.6x | 12.8x | 15.6x | 12.2x | 12.2x | 10.0x |
| EOP Debt to Equity | 15.2x | 9.0x | 9.9x | 12.00x | 12.6x | 11.2x | 11.2x | 10.4x | 11.5x | 13.9x | 10.7x | 10.7x | 8.5x |
| Average assets/average equity | 12.2x | 10.1x | 10.6x | 12.1x | 13.5x | 13.1x | 12.4x | 12.0x | 12.2x | 14.0x | 13.7x | 12.2x | 11.1x |
| EOP Securitization financing/loans HFI | 98.74% | 99.32% | 99.09% | 99.25% | 99.44% | 99.39% | 99.39% | 99.04% | 99.30% | 98.77% | 99.30% | 99.30% | 99.30% |
| Average securitization financing/average loans HFI | 99.45% | 101.24% | 99.21% | 97.20% | 97.95% | 97.57% | 97.92% | 97.32% | 96.04% | 98.55% | 99.27% | 97.82% | 98.12% |
| Avg securitization financing/avg int bearing liabs | 32.09% | 60.43% | 75.27% | 75.97% | 70.72% | 63.25% | 70.69% | 66.50% | 62.90% | 63.83% | 60.61% | 63.53% | 50.06% |

*Source: Company reports, RCP estimates.*

Roth Capital Partners, LLC
11/7/2006 7:24 AM

 ROTH

# New Century Financial Corporation

Company Note – November 7, 2006

Richard A. Eckert, CFA, (949) 720-5764, reckert@rothep.com
Isabel Sterk, (949) 720-5771, isterk@rothep.com

**New Century Financial Corporation**
**Consolidated Earnings**
($ in 000s, except per share data)
Irvine, CA

| | 2003 | 2004 | Mar-05 | Jun-05 | Sep-05 | Dec-05 | 2005 | Mar-06 | Jun-06 | Sep-06 | Dec-06E | 2006E | 2007E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Statement of Cash Flows** | | | | | | | | | | | | | |
| **CF from operating activities:** | | | | | | | | | | | | | |
| Net earnings (loss) | 245,483 | 375,571 | 84,760 | 95,079 | 120,619 | 110,667 | 411,125 | 101,169 | 102,977 | 66,641 | 65,745 | 336,531 | 244,222 |
| Depreciation and amortization | 23,905 | 74,122 | 23,771 | 33,540 | 38,106 | 36,542 | 131,959 | 34,890 | 34,168 | 65,286 | 65,000 | 199,344 | 300,000 |
| Stock-based compensation | - | - | - | - | - | - | - | 6,791 | 3,818 | - | - | - | - |
| Deferred income taxes | - | 42,959 | - | - | - | 4,877 | 4,877 | - | - | - | - | - | - |
| Increase in income taxes receivable | - | (129,871) | - | - | - | 93,871 | 93,871 | - | - | - | - | - | - |
| NIR gains | - | - | - | - | - | 73,459 | 109,565 | - | - | - | - | - | - |
| Initial deposits to over-collateralization accounts | 72,331 | 41,453 | 6,787 | (7,914) | (62,999) | (136,118) | (207,031) | 1,368 | (798) | 100,000 | 35,000 | 135,570 | 156,000 |
| Net cash deposited (released) from residual assets | (7,777) | (7,923) | - | - | - | - | - | - | (6,796) | - | - | (55,027) | (100,000) |
| Servicing gains | (24,228) | - | (8,120) | (27,773) | (25,034) | (34,193) | (95,120) | (7,307) | (6,430) | (6,000) | (6,000) | (25,737) | (30,000) |
| Accretion of NIRs | 19,363 | 7,697 | (4,024) | (3,903) | (4,022) | (5,020) | (16,969) | - | - | - | - | - | - |
| Fair value adjustment of residual securities | 32,172 | 70,250 | 1,330 | 3,089 | 3,226 | 2,338 | 9,983 | 32,028 | 6,684 | (9,110) | (14,674) | 14,928 | 6,838 |
| Retained bond on residual interests, net | - | 2,736 | 30,238 | 36,875 | 38,542 | 34,578 | 140,233 | 27,825 | 32,325 | 22,500 | 22,012 | 104,662 | 179,398 |
| Provision for losses, loans HFI | - | - | 548 | 5,524 | 2,026 | 9,426 | 17,524 | 3,202 | 2,499 | 1,549 | 1,549 | 8,799 | - |
| Provision for repurchases, loans HFS | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Loans originated or acquired for sale | (22,458,565) | (31,292,846) | (6,480,899) | (9,106,700) | (14,627,741) | (15,702,594) | (45,917,934) | (11,767,855) | (14,477,109) | (15,832,515) | (14,500,000) | (56,577,479) | (54,000,000) |
| Loans sales, net | 20,835,105 | 30,329,278 | 6,516,864 | 7,003,939 | 11,932,734 | 16,303,445 | 41,756,982 | 13,331,896 | 11,491,479 | 15,851,070 | 14,325,000 | 54,999,445 | 52,000,000 |
| Principal payments on loans receivable | 115,777 | 461,208 | 41,014 | 74,003 | 94,067 | 66,467 | 275,551 | 11,906 | 53,242 | 75,000 | 85,000 | 225,148 | 1,897,758 |
| Increase (*decrease) in warehouse and aggregation lines | 1,426,339 | 392,431 | (53,087) | 1,976,026 | 2,590,915 | (778,437) | 3,735,417 | (1,270,491) | 2,617,106 | (357,952) | 175,000 | 1,163,663 | - |
| Net change in other assets and liabilities | (85,959) | (53,973) | 124,057 | (94,698) | 27,676 | 19,440 | 76,475 | (118,634) | (31,834) | (25,624) | (25,001) | (174,252) | - |
| Net cash provided by (used in) operating activities | 193,946 | 285,419 | 283,239 | (5,820) | 165,356 | 101,277 | 544,052 | 386,838 | (178,669) | (49,155) | 228,631 | 377,035 | 654,217 |
| **CF from investing activities:** | | | | | | | | | | | | | |
| Sale/(purchase) of mortgage servicing rights | 15,568 | 15,184 | - | - | 8,477 | 16,400 | 24,877 | 24,516 | - | - | - | 24,516 | (35,000) |
| Purchase of office property and equipment | (22,574) | (28,977) | (17,086) | (18,532) | (11,143) | (13,769) | (60,530) | (15,607) | (2,580) | (15,000) | (15,000) | (48,187) | - |
| Loans originated or acquired for investment | (4,996,669) | (11,020,277) | (3,803,344) | (4,370,972) | (2,099,326) | - | (10,273,642) | (1,655,294) | (1,721,333) | - | - | (3,376,627) | - |
| Sale of loans to parent REIT | - | - | - | - | - | - | - | 1,654,644 | 1,873,032 | 1,900,000 | 1,500,000 | 6,927,676 | - |
| Principal payments on loans held for investment | 219,170 | 2,448,198 | 1,102,785 | 1,657,115 | 2,224,810 | 2,137,348 | 7,122,058 | (9,795) | - | 114,621 | 210,830 | 315,656 | 2,474,339 |
| Other investments in new companies/products | - | 9,058 | - | - | (80,573) | - | (80,573) | - | - | - | - | - | (100,000) |
| Net cash provided by (used in) investing activities | (4,784,445) | (8,576,814) | (2,717,645) | (2,732,389) | 42,245 | 2,139,979 | (3,267,810) | (1,536) | 149,119 | 1,999,621 | 1,695,830 | 3,843,034 | 2,339,339 |
| **Cash flows from financing activities:** | | | | | | | | | | | | | |
| Net proceeds from CMO financing | 4,918,204 | 10,569,666 | 2,888,602 | 5,685,854 | 1,217,774 | (1,399) | 9,790,831 | 1,612,464 | 1,668,887 | - | - | 3,281,351 | - |
| Repayment of securitization financing | (235,487) | (2,171,588) | (1,075,163) | (1,513,244) | (2,096,626) | (2,187,780) | (6,875,813) | (1,715,581) | (1,830,170) | (2,079,196) | (1,590,250) | (7,215,197) | (2,411,847) |
| Proceeds from (net repayments of) debt financing | 184,163 | 18,661 | 767,166 | (1,517,735) | 758,249 | 6,178 | 1,502 | (5,702) | (5,454) | - | - | (11,156) | - |
| Payment of dividends on common stock | (11,515) | (26,633) | (82,569) | (86,369) | (90,129) | (93,397) | (352,464) | (94,756) | (102,408) | (102,369) | (103,141) | (402,673) | (203,798) |
| Net proceeds from the issuance of preferred stock | - | - | - | 108,956 | (292) | - | 108,664 | 975 | (975) | - | - | - | - |
| Net proceeds from issuance of stock/purchase of treasury | (61,367) | 811,755 | 411 | 5,229 | 5,778 | (26,849) | (15,431) | 3,863 | (19,266) | 114,757 | (47,515) | 51,839 | (148,000) |
| Net cash provided by (used in) financing activities | 4,793,998 | 9,201,861 | 2,498,447 | 2,682,691 | (208,246) | (2,315,603) | 2,657,289 | (198,737) | (289,386) | (2,066,808) | (1,740,906) | (4,295,836) | (2,763,645) |
| Net increase (decrease) in cash and cash equivalents | 203,499 | 910,466 | 64,041 | (55,518) | (645) | (74,347) | (66,469) | 186,565 | (318,937) | (116,341) | 183,555 | (65,158) | 229,910 |
| Cash and cash equivalents, beginning of period | 182,924 | 386,423 | 1,296,889 | 1,360,930 | 1,305,412 | 1,304,767 | 1,296,889 | 1,230,420 | 1,416,985 | 1,098,048 | 981,707 | 1,230,420 | 1,165,262 |
| Cash and cash equivalents, end of period | 386,423 | 1,296,889 | 1,360,930 | 1,305,412 | 1,304,767 | 1,230,420 | 1,230,420 | 1,416,985 | 1,098,048 | 981,707 | 1,165,262 | 1,165,262 | 1,395,172 |

*Source: Company reports, RCP estimates.*



ROTH   Page 15 of 21

New Century Financial Corporation

Company Note – November 7, 2006

Richard A. Eckert, CFA, (949) 720-5764, reckert@rothcp.com
Isabel Sterk, (949) 720-5771, isterk@rothcp.com

**New Century Financial Corporation**
REIT
Irvine, CA
($ in 000s, except per share data)

| | 2004 | Mar-05 | Jun-05 | Sep-05 | Dec-05 | 2005 | Mar-06 | Jun-06 | Sep-06 | Dec-06E | 2006E | 2007E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Ending Balance Sheet** | | | | | | | | | | | | |
| *Assets* | | | | | | | | | | | | |
| Cash and cash equivalents | 1,026,647 | 943,110 | 961,288 | 916,914 | 891,824 | 891,824 | 921,439 | 352,979 | 178,100 | 215,111 | 215,111 | 262,591 |
| Loans, held for sale/securitization | - | - | - | - | - | - | - | - | - | - | - | - |
| Securitized loans held for investment | 9,388,489 | 12,374,674 | 15,411,421 | 15,718,745 | 13,869,641 | 13,869,641 | 14,107,497 | 14,083,300 | 12,357,438 | 11,121,694 | 11,121,694 | 6,673,016 |
| Residual interests | - | - | - | - | - | - | - | - | - | - | - | - |
| Mortgage servicing rights | - | - | - | - | - | - | - | - | - | - | - | - |
| Other assets | 157,644 | 176,321 | 107,179 | 316,853 | 475,746 | 475,746 | 404,798 | (1,142,967) | - | - | - | - |
| Total assets | 10,572,780 | 13,494,105 | 16,479,888 | 16,952,512 | 15,237,211 | 15,237,211 | 15,433,734 | 13,293,312 | 12,535,538 | 11,336,805 | 11,336,805 | 6,935,607 |
| *Liabilities* | | | | | | | | | | | | |
| Warehouse and aggregation lines of credit | 9,244,326 | 12,247,649 | 15,294,444 | 15,619,451 | 13,841,375 | 13,841,375 | 13,566,422 | 13,984,717 | 12,205,901 | 11,043,842 | 11,043,842 | 6,626,305 |
| Securitization financing | - | - | - | - | - | - | - | - | - | - | - | - |
| Notes payable | - | - | - | - | 6,178 | 6,178 | - | - | - | - | - | - |
| Junior subordinated notes | - | - | - | - | - | - | - | - | 51,545 | 51,545 | 51,545 | 51,545 |
| Other liabilities | 150,764 | 171,522 | 110,580 | 137,643 | 140,941 | 140,941 | 145,941 | (1,802,461) | (711,649) | (616,263) | (616,263) | (510,924) |
| Total liabilities | 9,395,090 | 12,419,171 | 15,405,024 | 15,757,094 | 13,988,494 | 13,988,494 | 14,112,363 | 12,182,256 | 11,545,797 | 10,479,122 | 10,479,122 | 6,165,926 |
| Total equity | 1,177,690 | 1,074,934 | 1,074,864 | 1,195,418 | 1,248,617 | 1,248,617 | 1,321,371 | 1,111,056 | 989,740 | 857,683 | 857,683 | 768,681 |
| **Average Balances** | | | | | | | | | | | | |
| Total interest earning assets | 7,042,750 | 11,066,492 | 14,280,206 | 15,841,831 | 15,129,417 | 14,129,487 | 14,246,700 | 13,955,507 | 13,607,536 | 11,739,566 | 13,387,327 | 8,897,355 |
| Total interest bearing liabilities | 6,453,517 | 10,370,301 | 14,187,247 | 15,739,157 | 15,026,969 | 13,830,919 | 14,107,322 | 13,857,818 | 13,512,283 | 11,657,389 | 13,283,703 | 8,719,408 |
| Total assets | 1,321,598 | 12,033,443 | 14,986,997 | 16,716,200 | 16,994,862 | 14,957,875 | 14,365,523 | 14,363,523 | 12,914,425 | 11,936,171 | 13,637,598 | 9,136,206 |
| Total equity | 147,211 | 1,126,312 | 1,074,899 | 1,135,141 | 1,222,018 | 1,139,592 | 1,284,994 | 1,216,213 | 1,050,398 | 923,712 | 1,118,829 | 813,182 |
| **Income Statement** | | | | | | | | | | | | |
| Interest income, loans held for sale/securitization | - | - | - | - | - | - | - | - | - | - | - | - |
| Total interest income | 119,750 | 189,897 | 250,766 | 293,594 | 283,439 | 1,017,696 | 253,956 | 265,738 | 272,151 | 241,982 | 1,033,827 | 801,207 |
| Total interest expense | 47,871 | 73,912 | 114,081 | 159,029 | 151,831 | 508,426 | 139,052 | 189,888 | 227,247 | 189,141 | 745,328 | 623,438 |
| Net interest income | 71,879 | 115,985 | 136,685 | 134,565 | 131,608 | 509,270 | 114,904 | 75,850 | 44,904 | 52,841 | 288,498 | 177,769 |
| Loan loss provision, loans held for investment | 17,808 | 29,151 | 36,550 | 38,500 | 34,961 | 139,162 | 29,025 | 30,675 | 22,500 | 22,012 | 104,212 | 133,460 |
| Net interest income after loan loss provision | 54,071 | 86,834 | 100,135 | 96,065 | 96,647 | 370,108 | 85,879 | 45,175 | 22,404 | 30,829 | 184,286 | 44,309 |
| Gain on sale of loans | - | - | - | - | - | - | - | - | - | - | - | - |
| Servicing and other income | (7,161) | (9,343) | (12,942) | 11,579 | 2,527 | (8,179) | 8,861 | 14,139 | 8,133 | 10,000 | 41,133 | 60,000 |
| Total other income | (7,161) | (9,343) | (12,942) | 11,579 | 2,527 | (8,179) | 8,861 | 14,139 | 8,133 | 10,000 | 41,133 | 60,000 |
| Personnel expense | 64 | 1,644 | 4,565 | 1,946 | 2,010 | 10,165 | 2,500 | 2,500 | 2,500 | 3,000 | 10,500 | 10,000 |
| Other expense | 2,700 | 3,323 | 3,392 | 890 | 6,160 | 13,765 | 6,135 | 4,861 | 5,000 | 5,500 | 21,496 | 30,000 |
| Inducement expense-convertible notes | - | - | - | - | - | - | - | - | - | - | - | - |
| Total expenses | 2,764 | 4,967 | 7,957 | 2,836 | 8,170 | 23,930 | 8,635 | 7,361 | 7,500 | 8,500 | 31,996 | 40,000 |
| Net income before taxes | 44,146 | 72,524 | 79,236 | 104,808 | 91,004 | 337,999 | 86,105 | 51,953 | 23,037 | 32,329 | 193,423 | 64,309 |
| Provision for income tax | (2,000) | (747) | 0 | 0 | 97 | (650) | 0 | 0 | 0 | 0 | 0 | 0 |
| Net income | 42,146 | 71,777 | 79,236 | 104,808 | 91,101 | 337,349 | 86,105 | 51,953 | 23,037 | 32,329 | 193,423 | 64,309 |
| Preferred stock dividends | - | - | (285) | (2,567) | (2,566) | (5,418) | (2,566) | (2,566) | (3,174) | (3,968) | (12,275) | (15,872) |
| Net income available to common stockholders | 42,146 | 71,777 | 78,951 | 102,241 | 88,535 | 331,931 | 83,539 | 49,387 | 19,863 | 28,361 | 181,149 | 48,437 |
| Wghtd avg shares, diluted | 46,215 | 57,267 | 57,396 | 57,598 | 57,035 | 57,324 | 56,095 | 56,936 | 56,530 | 56,000 | 56,540 | 53,750 |
| Diluted EPS | 0.91 | 1.25 | 1.38 | 1.78 | 1.55 | 5.79 | 1.47 | 0.87 | 0.35 | 0.51 | 3.20 | 0.90 |
| Dividends declared | 1.50 | 1.55 | 1.60 | 1.65 | 1.70 | 6.50 | 1.75 | 1.80 | 1.85 | 1.90 | 7.30 | 3.85 |

*Source: Company reports, RCP estimates.*

# New Century Financial Corporation

**Company Note - November 7, 2006**

Richard A. Eckert, CFA, (949) 720-5764, reckert@rothcp.com
Isabel Sterk, (949) 720-5771, isterk@rothcp.com

**New Century Financial Corporation**
REIT
Irvine, CA
($ in 000s, except per share data)

| | 2004 | Mar-05 | Jun-05 | Sep-05 | Dec-05 | 2005 | Mar-06 | Jun-06 | Sep-06 | Dec-06E | 2006E | 2007E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Yields and costs** | | | | | | | | | | | | |
| Yield on interest earning assets | 6.80% | 6.80% | 7.02% | 7.41% | 7.49% | 7.20% | 7.13% | 7.62% | 8.00% | 8.25% | 7.72% | 9.01% |
| Cost of interest bearing liabilities | 2.97% | 2.85% | 3.22% | 4.04% | 4.04% | 3.68% | 3.94% | 5.48% | 6.73% | 6.49% | 5.61% | 7.15% |
| Net interest spread | 3.83% | 4.01% | 3.81% | 3.37% | 3.45% | 3.53% | 3.19% | 2.14% | 1.27% | 1.76% | 2.11% | 1.86% |
| Net interest margin | 4.08% | 4.19% | 3.83% | 3.40% | 3.48% | 3.60% | 3.23% | 2.17% | 1.32% | 1.80% | 2.16% | 2.00% |
| Memo: One-month LIBOR | 1.50% | 2.64% | 3.11% | 3.60% | 4.17% | 3.38% | 4.61% | 5.09% | 5.35% | 5.35% | 5.10% | 5.17% |
| Three-month LIBOR | 1.62% | 2.84% | 3.28% | 3.78% | 4.33% | 3.56% | 4.77% | 5.22% | 5.43% | 5.40% | 5.21% | 5.18% |
| Six-month LIBOR | 1.80% | 3.08% | 3.49% | 3.97% | 4.52% | 3.76% | 4.91% | 5.34% | 5.49% | 5.42% | 5.29% | 5.18% |
| Ten-year Treasury | 4.25% | 4.29% | 4.15% | 4.20% | 4.48% | 4.28% | 4.56% | 5.07% | 4.89% | 4.80% | 4.83% | 5.00% |
| **Performance and profitability** | | | | | | | | | | | | |
| ROAA | 3.19% | 2.39% | 2.11% | 2.51% | 2.26% | 2.17% | 2.25% | 1.45% | 0.71% | 1.08% | 1.47% | 0.70% |
| ROAE | 28.63% | 25.49% | 29.49% | 36.93% | 29.82% | 29.43% | 26.87% | 17.09% | 8.77% | 14.00% | 18.08% | 7.91% |
| ROACE | 28.63% | 25.49% | 29.49% | 36.93% | 29.82% | 29.43% | 26.80% | 17.09% | 8.77% | 14.00% | 18.08% | 7.50% |
| Pretax Operating Margin | 65.12% | 82.66% | 79.13% | 109.10% | 94.26% | 91.15% | 100.26% | 115.00% | 102.83% | 104.87% | 104.96% | 145.14% |
| **Balance sheet ratios** | | | | | | | | | | | | |
| EOP Assets/Equity | 9.0x | 12.6x | 15.3x | 14.2x | 12.2x | 12.2x | 11.7x | 12.0x | 12.7x | 13.2x | 13.2x | 9.0x |
| EOP Debt to Equity | 7.8x | 11.4x | 14.2x | 13.1x | 11.1x | 11.1x | 10.6x | 12.0x | 12.3x | 12.5x | 12.5x | 8.6x |
| Average assets/average equity | 9.0x | 10.7x | 13.9x | 14.7x | 13.2x | 13.1x | 11.9x | 11.8x | 12.3x | 12.9x | 12.2x | 11.2x |
| EOP Securitization financing/loans HFI | 98.46% | 99.87% | 99.35% | 99.06% | 99.32% | 99.32% | 99.00% | 99.30% | 99.30% | 99.30% | 99.30% | 99.30% |
| Average securitization financing/average loans HFI | 98.00% | 99.08% | 99.35% | 99.06% | 99.32% | 99.29% | 99.00% | 99.30% | 99.30% | 99.30% | 99.22% | 98.00% |
| Avg securitization financing/avg int bearing liabs | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% | 99.98% | 100.00% | 100.00% | 100.00% | 99.99% | 100.00% |

*Source: Company reports, RCP estimates.*

Roth Capital Partners, LLC
11/7/2006 7:28 AM

# New Century Financial Corporation

Company Note – November 7, 2006

Richard A. Eckert, CFA, (949) 720-5764, reckert@rothcp.com
Isabel Sterk, (949) 720-5771, isterk@rothcp.com

**New Century Financial Corporation**
TRS Holdings (Taxable REIT Subsidiary)
Irvine, CA
($ in 000s, except per share data)

| | 2003 | 2004 | Mar-05 | Jun-05 | Sep-05 | Dec-05 | 2005 | Mar-06 | Jun-06 | Sep-06 | Dec-06E | 2006E | 2007E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Ending Balance Sheet** | | | | | | | | | | | | | |
| **Assets** | | | | | | | | | | | | | |
| Cash and cash equivalents | 386,423 | 270,242 | 417,820 | 344,124 | 384,486 | 338,596 | 338,596 | 495,546 | 745,060 | 803,607 | 844,572 | 844,572 | 982,981 |
| Loans held for sale/securitization | 3,422,211 | 3,922,865 | 3,874,414 | 5,989,211 | 8,570,862 | 7,825,175 | 7,825,175 | 6,354,645 | 9,303,086 | 8,545,154 | 9,120,134 | 9,120,134 | 11,120,134 |
| Securitized loans held for investment | 4,745,937 | 3,806,835 | 3,461,529 | 3,071,569 | 2,611,568 | 2,274,224 | 2,274,224 | 2,086,914 | 1,921,903 | 1,673,561 | 1,423,561 | 1,423,561 | 400,000 |
| Residual interests | 179,498 | 148,021 | 143,928 | 145,563 | 172,111 | 234,590 | 234,590 | 208,791 | 209,335 | 223,680 | 203,335 | 203,335 | 224,835 |
| Mortgage servicing rights | 1,900 | 8,249 | 14,448 | 40,395 | 54,310 | 69,315 | 69,315 | 66,538 | 69,837 | 88,995 | 108,921 | 108,921 | 177,136 |
| Other assets | 157,360 | 322,952 | 321,164 | 328,335 | 341,394 | 167,639 | 167,639 | 172,639 | 1,782,858 | 789,253 | 794,253 | 794,253 | 814,253 |
| Total assets | 8,893,329 | 8,479,164 | 8,233,303 | 9,919,197 | 12,134,731 | 10,909,879 | 10,909,879 | 9,385,073 | 14,032,087 | 12,524,230 | 12,494,775 | 12,494,775 | 13,718,939 |
| **Liabilities** | | | | | | | | | | | | | |
| Warehouse and aggregation lines of credit | 3,311,837 | 3,704,268 | 3,651,181 | 5,627,207 | 8,218,122 | 7,439,685 | 7,439,685 | 6,160,277 | 8,786,300 | 8,487,850 | 8,653,904 | 8,653,904 | 10,551,662 |
| Securitization financing | 4,686,323 | 3,861,647 | 3,444,621 | 3,049,101 | 2,607,368 | 2,204,084 | 2,204,084 | 2,066,045 | 1,809,618 | 1,653,039 | 1,413,596 | 1,413,596 | 397,200 |
| Convertible notes | 204,858 | 5,392 | 5,407 | 4,919 | 4,931 | 4,943 | 4,943 | - | - | - | - | - | - |
| Notes payable | 18,977 | 37,638 | 33,438 | 43,904 | 45,318 | 39,140 | 39,140 | - | - | - | - | - | - |
| Other liabilities | 138,381 | 169,344 | 209,827 | 43,904 | 355,449 | 360,944 | 360,944 | 365,944 | 2,000,000 | 1,000,000 | 1,005,000 | 1,005,000 | 1,025,000 |
| Total liabilities | 8,360,376 | 7,778,289 | 7,344,474 | 8,769,035 | 11,226,182 | 10,048,796 | 10,048,796 | 8,601,266 | 12,395,918 | 11,140,889 | 11,072,500 | 11,072,500 | 11,973,862 |
| Total equity | 542,012 | 728,654 | 888,829 | 1,150,162 | 908,543 | 861,083 | 861,083 | 783,807 | 1,436,169 | 1,383,342 | 1,422,275 | 1,422,275 | 1,745,078 |
| **Average Balances** | | | | | | | | | | | | | |
| Total interest earning assets | 4,797,330 | 10,887,823 | 8,692,111 | 9,983,409 | 12,733,096 | 13,220,319 | 11,177,682 | 11,634,257 | 12,330,190 | 11,912,687 | 11,618,792 | 11,876,232 | 12,159,576 |
| Total interest bearing liabilities | 4,396,205 | 10,265,823 | 8,245,910 | 8,327,036 | 10,895,344 | 10,281,796 | 9,437,671 | 9,959,993 | 10,510,283 | 10,368,403 | 10,104,194 | 10,235,718 | 10,508,181 |
| **Income Statement** | | | | | | | | | | | | | |
| Total interest income | 353,691 | 778,897 | 141,174 | 170,095 | 206,508 | 229,694 | 741,871 | 209,046 | 235,376 | 242,021 | 242,022 | 928,465 | 1,090,711 |
| Total interest expense | 117,575 | 319,223 | 88,169 | 104,474 | 131,870 | 179,998 | 504,421 | 144,161 | 171,223 | 147,981 | 174,342 | 637,707 | 768,634 |
| Net interest income | 236,116 | 459,674 | 53,005 | 65,621 | 69,038 | 49,786 | 237,450 | 64,885 | 64,153 | 94,040 | 67,681 | 290,759 | 322,077 |
| Loan loss provision, loans held for investment | (26,304) | (52,442) | (1,087) | (325) | (42) | 383 | (1,071) | 1,200 | (1,650) | 1,744 | (1,549) | (255) | (6,338) |
| Net interest income after loan loss provision | 209,812 | 407,232 | 51,918 | 65,296 | 68,996 | 50,169 | 236,379 | 66,085 | 62,503 | 95,784 | 66,132 | 290,504 | 315,239 |
| Gain on sale of loans | 611,136 | 800,609 | 139,752 | 138,704 | 176,241 | 167,920 | 622,617 | 129,527 | 195,160 | 173,045 | 145,540 | 643,272 | 622,970 |
| Servicing and other income | 11,139 | 40,472 | 19,938 | 22,971 | 4,125 | 22,087 | 69,121 | 21,412 | 24,834 | (11,110) | 30,000 | 65,136 | 135,000 |
| Total other income | 622,275 | 841,081 | 159,690 | 161,675 | 180,366 | 190,007 | 691,738 | 150,939 | 219,994 | 161,935 | 175,540 | 708,408 | 757,970 |
| Personnel expense | 248,796 | 419,672 | 126,878 | 143,496 | 144,629 | 126,612 | 541,615 | 114,221 | 124,422 | 110,075 | 105,000 | 453,718 | 475,000 |
| Other expense | 160,039 | 236,889 | 66,090 | 69,320 | 86,174 | 84,236 | 305,820 | 73,233 | 75,206 | 80,436 | 85,000 | 313,875 | 320,000 |
| Inducement expense-convertible notes | - | 24,757 | | | | | | | | | | | |
| Total expenses | 408,835 | 681,318 | 192,968 | 212,816 | 230,803 | 210,848 | 847,435 | 187,454 | 199,628 | 190,511 | 190,000 | 767,593 | 795,000 |
| Net income before taxes | 423,252 | 566,995 | 18,640 | 14,155 | 18,559 | 29,328 | 80,682 | 29,570 | 82,869 | 67,208 | 51,673 | 231,319 | 278,209 |
| Provision for income tax | (177,769) | (233,570) | (5,657) | 1,688 | (2,867) | (19,349) | (26,260) | (11,940) | (29,279) | (23,603) | (18,257) | (83,079) | (98,296) |
| Net income | 245,483 | 333,425 | 12,983 | 15,843 | 15,692 | 9,980 | 54,498 | 17,630 | 53,590 | 43,605 | 33,416 | 148,241 | 179,913 |
| Wgted avg shares, diluted | 39,235 | 46,215 | 57,267 | 57,396 | 57,598 | 57,035 | 57,324 | 56,695 | 56,936 | 56,530 | 56,000 | 56,540 | 53,750 |
| Diluted EPS | 6.32 | 7.37 | 0.23 | 0.28 | 0.27 | 0.17 | 0.95 | 0.31 | 0.94 | 0.77 | 0.60 | 2.62 | 3.35 |
| **Yields and cost** | | | | | | | | | | | | | |
| Yield on interest earning assets | 7.37% | 7.15% | 5.19% | 7.83% | 8.05% | 7.22% | 6.64% | 7.48% | 8.09% | 8.13% | 8.33% | 7.82% | 8.97% |
| Cost of interest bearing liabilities | 2.67% | 3.11% | 4.28% | 5.02% | 4.84% | 7.00% | 5.34% | 5.79% | 6.52% | 6.90% | 6.90% | 6.23% | 7.31% |
| Net interest spread | 4.70% | 4.04% | 0.91% | 2.81% | 3.21% | 0.22% | 1.29% | 1.69% | 1.56% | 1.43% | 1.43% | 1.60% | 1.66% |
| Net interest margin | 4.92% | 4.22% | 2.44% | 2.63% | 2.17% | 1.51% | 2.12% | 2.23% | 2.08% | 3.10% | 3.16% | 2.33% | 2.65% |

*Source: Company reports; MBA Mortgage Finance Forecast; RCP estimates.*

Roth Capital Partners, LLC
11/7/20067:30 AM



Company Note - November 7, 2006

Richard A. Eckert, CFA, (949) 720-5764, reckert@rothcp.com
Isabel Sterk, (949) 720-5771, isterk@rothcp.com

# New Century Financial Corporation

**New Century Financial Corporation**
**TRS Holdings (Taxable REIT Subsidiary)**
Irvine, CA
($ in 000s, except per share data)

| | 2003 | 2004 | Mar-05 | Jun-05 | Sep-05 | Dec-05 | 2005 | Mar-06 | Jun-06 | Sep-06 | Dec-06E | 2006E | 2007E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Performance and balance sheet ratios** | | | | | | | | | | | | | |
| ROAA | 4.35% | 2.73% | 0.62% | 0.69% | 0.57% | 0.35% | 0.53% | 0.69% | 1.83% | 1.31% | 1.07% | 1.22% | 5.49% |
| ROAE | 52.88% | 45.87% | 6.42% | 6.75% | 6.10% | 4.51% | 5.72% | 8.57% | 19.31% | 12.37% | 9.53% | 11.80% | 45.44% |
| ROACE | 52.88% | 45.87% | 6.42% | 6.75% | 6.10% | 4.51% | 5.72% | 8.57% | 19.31% | 12.37% | 9.53% | 11.80% | 12.71% |
| Pretax Operating Margin | 43.37% | 25.63% | 6.10% | 6.97% | 6.29% | 4.16% | 5.87% | 8.17% | 18.86% | 17.03% | 13.74% | 14.86% | 16.66% |
| EOP Asset/Equity | 16.4x | 11.6x | 9.3x | 8.6x | 13.4x | 12.7x | 12.7x | 12.0x | 9.8x | 9.1x | 8.8x | 8.8x | 7.0x |
| EOP Debt to Equity | 15.2x | 10.4x | 8.0x | 7.6x | 12.0x | 11.3x | 11.2x | 10.5x | 7.4x | 7.3x | 7.1x | 7.1x | 6.3x |
| **Analysis of gain on sale** | | | | | | | | | | | | | |
| **Originations** | | | | | | | | | | | | | |
| Industry originations | 3,810,000 | 2,589,000 | 640,000 | 800,000 | 869,000 | 718,000 | 3,027,000 | 590,000 | 721,000 | 620,000 | 532,000 | 2,463,000 | 2,120,000 |
| % of industry | 0.72% | 1.63% | 1.60% | 1.68% | 1.92% | 1.85% | | 2.27% | 2.25% | 2.55% | 2.73% | 2.43% | 2.54% |
| **Sales** | | | | | | | | | | | | | |
| Whole loan | 20,557,888 | 29,546,349 | 6,451,298 | 5,933,941 | 9,900,693 | 12,782,415 | 35,068,247 | 13,240,528 | 11,076,403 | 15,593,948 | 14,000,000 | 53,990,979 | 49,500,000 |
| Premium | 247,217 | 148,128 | 65,566 | 80,878 | 32,081 | 68,010 | 246,535 | 91,367 | 415,077 | 409,896 | 500,000 | 1,416,340 | 2,500,000 |
| Discount | 20,835,105 | 29,694,477 | 6,516,864 | 6,014,719 | 9,932,774 | 12,850,425 | 35,314,782 | 13,331,895 | 11,491,480 | 16,002,944 | 14,500,000 | 55,326,319 | 52,000,000 |
| $/I whole loan sales | | 634,801 | | 989,221 | 1,999,959 | 3,453,020 | 6,442,200 | | | (150,974) | (175,000) | (325,974) | (600,000) |
| Securitizations structured as sales | | | | | | | | | | 150,974 | 175,000 | 325,974 | 600,000 |
| Repurchases | | | | | | | | | | | | | |
| Total loan sales | 20,835,105 | 30,329,278 | 6,516,864 | 7,003,940 | 11,932,733 | 16,303,445 | 41,756,982 | 13,331,895 | 11,491,480 | 15,851,920 | 14,325,000 | 55,326,319 | 52,000,000 |
| % of production sold | 76.1% | 71.6% | 71.5% | 52.1% | 71.6% | 103.8% | 74.6% | 99.4% | 71.0% | 100.1% | 98.8% | 92.7% | 96.3% |
| Memo: Securitizations structured as financings, net | 4,745,937 | (939,102) | 2,991,324 | 5,890,404 | 2,080,230 | - | 10,961,958 | 1,678,678 | 1,714,853 | - | - | 3,393,531 | - |
| **Gain-on-sale** | | | | | | | | | | | | | |
| **Premium loan sales** | | | | | | | | | | | | | |
| Gain, whole loan transactions | 808,319 | 1,066,553 | 188,685 | 123,721 | 190,071 | 187,413 | 689,890 | 212,474 | 245,920 | 275,822 | 266,000 | 1,000,216 | 1,041,975 |
| Gain on MSRs | 83,932 | 8,137 | 7,164 | 28,255 | 24,843 | 34,857 | 95,119 | 706 | 6,796 | 23,231 | 25,000 | 55,733 | 100,000 |
| Net gain on whole loan sales | 892,251 | 1,074,690 | 195,849 | 151,976 | 214,914 | 222,270 | 785,009 | 213,180 | 252,716 | 299,053 | 291,000 | 1,055,949 | 1,141,975 |
| Net gain on securitization | | 19,405 | | 12,534 | 30,991 | 46,873 | 172,227 | | | | | | |
| Net gain, premium loans | 892,251 | 1,094,095 | 195,849 | 164,510 | 245,905 | 269,143 | 957,236 | 213,180 | 252,716 | 299,033 | 291,000 | 1,055,949 | 1,141,975 |
| Loss on loans sold at discount | (20,878) | (8,528) | (1,200) | (4,475) | (1,117) | | (16,018) | (5,593) | (20,745) | (52,722) | (65,000) | (144,460) | (250,000) |
| (Provision)/rec. for losses | (5,868) | 986 | | | | | | | | (8,808) | (10,210) | (19,018) | (35,000) |
| Net gain on sale | 865,505 | 1,086,553 | 194,549 | 160,035 | 244,788 | 260,017 | 859,389 | 207,187 | 231,971 | 237,523 | 215,790 | 892,471 | 856,970 |
| Premiums paid | (182,765) | (272,754) | (73,221) | (53,614) | (90,047) | (108,185) | (325,667) | (53,404) | (52,852) | (61,657) | (65,250) | (233,163) | (234,000) |
| Hedge gain/(loss) | (110,600) | (1,669) | 495 | | 2,769 | (4,024) | (760) | 8,232 | 6,754 | (9,112) | (5,000) | 874 | |
| Market value adj., residuals | (19,363) | (7,697) | (1,310) | (3,069) | (3,226) | 3,906 | (7,337) | (32,078) | (6,084) | 10,639 | | (28,323) | |
| Other adjustments | (41,641) | (3,824) | 10,259 | 35,372 | 21,957 | 19,804 | 96,392 | (410) | 15,971 | (4,348) | | 11,213 | (16,376) |
| Net gain/(loss) on sale after premiums, m-t-m | 611,136 | 800,609 | 139,752 | 138,704 | 176,241 | 167,920 | 622,017 | 129,527 | 195,160 | 173,045 | 145,540 | 643,272 | 622,970 |
| **As a %age of whole loan sales** | | | | | | | | | | | | | |
| Net gain, premium whole loan | na | 3.64% | 3.04% | 2.56% | 2.06% | 1.74% | 2.24% | 1.61% | 2.28% | 1.92% | 1.90% | 1.86% | 2.11% |
| Net gain, securitizations | na | na | na | na | na | na | na | na | na | na | na | na | na |
| Loss on loans sold at a disc. | -8.45% | -5.76% | -1.98% | -5.53% | -3.48% | -13.42% | -6.50% | -6.50% | -5.00% | -12.86% | -13.00% | -10.20% | -10.00% |
| Gross gain, premium loans | 3.95% | 3.66% | 2.92% | 1.97% | 1.96% | 1.95% | 2.08% | 1.16% | 1.22% | 1.39% | 1.90% | 1.86% | 2.11% |
| Net gain on whole loan sales | 3.78% | 3.63% | 2.99% | 1.98% | 1.90% | 1.59% | 1.91% | 1.55% | 1.55% | 1.39% | 1.39% | 1.86% | 1.92% |
| Net gain on sale | 4.15% | 3.58% | 2.99% | 2.28% | 2.05% | 1.59% | 2.06% | 1.55% | 1.55% | 1.50% | 1.51% | 1.61% | 1.63% |
| Broker premiums as a % of whole loan sales | -0.88% | -0.90% | -1.12% | -0.77% | -0.75% | -0.66% | -0.78% | -0.40% | -0.45% | -0.39% | -0.45% | -0.42% | -0.45% |
| Hedge gain/(loss) | -0.20% | -0.01% | 0.30% | 0.51% | 0.18% | 0.12% | 0.23% | 0.06% | 0.06% | -0.06% | -0.45% | 0.02% | 0.00% |
| Mark-to-market and other | -0.34% | -0.04% | 0.30% | 0.51% | 0.18% | 0.13% | 0.21% | -0.24% | 0.08% | 0.04% | 0.00% | -0.03% | 0.00% |
| Net Gain/(loss) on sale | 2.93% | 2.64% | 2.14% | 1.98% | 1.48% | 1.03% | 1.69% | 0.97% | 1.70% | 1.09% | 1.02% | 1.16% | 1.20% |

*Source: Company reports, MBA Mortgage Finance Forecast, RCP estimates.*



**New Century Financial Corporation**                    Company Note - November 7, 2006

## Disclosures:

Roth makes a market in shares of Accredited Home Lenders Holding Co. and as such, buys and sells from customers on a principal basis.

**Please note that we have changed our Rating System Definitions as of 04/03/06.**
We have collapsed our Strong Buy and Buy ratings into one category, Buy, which indicates the expectation of a total return of at least 10% over the next twelve months.
We have also changed the definition for Neutral rated stocks to Hold.





Each box on the Rating and Price Target History chart above represents a date on which an analyst made a change to a rating or price target, except for the first box, which may only represent the first note written during the past three years. **Distribution Ratings/IB Services** shows the number of companies in each rating category from which Roth or an affiliate received compensation for investment banking services in the past 12 month.

**New Century Financial Corporation**                    Company Note - November 7, 2006

**Distribution of Ratings/IB Services Firmwide**

| | | | IB Serv./Past 12 Mos. | |
|---|---|---|---|---|
| Rating | Count | Percent | Count | Percent |
| BUY [B/B] | 110 | 65.87 | 25 | 22.73 |
| HOLD [H] | 52 | 31.14 | 5 | 9.62 |
| SELL [S] | 5 | 2.99 | 0 | 0.00 |

Our rating system attempts to incorporate industry, company and/or overall market risk and volatility. Consequently, at any given point in time, our investment rating on a stock and its implied price movement may not correspond to the stated 12-month price target.

Ratings System Definitions - Roth employs a rating system based on the following:

**Buy:** A security, which at the time the rating is instituted and or reiterated, indicates an expectation of a total return of at least 10% over the next 12 months. (Effective 04/03/06 Equity Research eliminated the SB rating)

**Hold:** A security, which at the time the rating is instituted and or reiterated, indicates an expectation of a total return between negative 10% and 10% over the next 12 months. (Prior to 04/03/06 Hold stocks were rated "Neutral")

**Sell:** A security, which at the time the rating is instituted and or reiterated, indicates an expectation that the price will depreciate by more than 10% over the next 12 months.

Roth Capital Partners, LLC expects to receive or intends to seek compensation for investment banking or other business relationships with the covered companies mentioned in this report in the next three months.The material, information and facts discussed in this report other than the information regarding Roth Capital Partners, LLC and its affiliates, are from sources believed to be reliable, but are in no way guaranteed to be complete or accurate. This report should not be used as a complete analysis of the company, industry or security discussed in the report. Additional information is available upon request. This is not, however, an offer or solicitation of the securities discussed. Any opinions or estimates in this report are subject to change without notice. An investment in the stock may involve risks and uncertainties that could cause actual results to differ materially from the forward-looking statements. Additionally, an investment in the stock may involve a high degree of risk and may not be suitable for all investors. No part of this report may be reproduced in any form without the express written permission of Roth. Copyright 2006. Member: NASD/SIPC.