1  BERNSTEIN LITOWITZ BERGER
      & GROSSMANN LLP
2  BLAIR A. NICHOLAS   (Bar No. 178428)
   (blairn@blbglaw.com)
3  ELIZABETH LIN   (Bar No. 174663)
   (elizabethl@blbglaw.com)
4  NIKI L. MENDOZA (Bar No. 214646)
   (nikim@blbglaw.com)
5  BENJAMIN GALDSTON   (Bar No. 211114)
   (beng@blbglaw.com)
6  12481 High Bluff Drive, Suite 300
   San Diego, CA 92130
7  Tel:   (858) 793-0070
   Fax:   (858) 793-0323
8         -and-
   SALVATORE J. GRAZIANO
9  (sgraziano@blbglaw.com)
   LAUREN A. MCMILLEN
10 (laurenm@blbglaw.com)
   1285 Avenue of the Americas
11 New York, NY 10019
   Tel:   (212) 554-1400
12 Fax:   (212) 554-1444

13 Lead Counsel for Lead Plaintiff New
   York State Teachers' Retirement System

14

15              UNITED STATES DISTRICT COURT

16             CENTRAL DISTRICT OF CALIFORNIA

17

18 | IN RE NEW CENTURY | Case No. 2:07-cv-00931-DDP (FMOx) (Lead Case) |

19 **DECLARATION OF SALVATORE J. GRAZIANO IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENTS AND THE PROPOSED PLAN OF ALLOCATION, AND IN SUPPORT OF LEAD COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES**

Date:   November 8, 2010
Time:   10:00 a.m.
Ctrm:   3, Hon. Dean D. Pregerson

I, SALVATORE J. GRAZIANO, under the penalties of perjury, declare as follows:

1.      I am a member of the law firm of Bernstein Litowitz Berger & Grossmann LLP ("Bernstein Litowitz" or "Lead Counsel"), counsel to Lead Plaintiff New York State Teachers' Retirement System ("NYSTRS" or "Lead Plaintiff"). Bernstein Litowitz is the Court-appointed Lead Counsel for Lead Plaintiff and the Class in the above-captioned class action (the "Action").[1] I have personal knowledge of the matters set forth herein based on my active participation in all aspects of the prosecution and Settlements of this Action involving New Century Financial Corporation ("New Century" or the "Company"). I submit this declaration in support of Plaintiffs' motion for final approval of the Settlements and the Plan of Allocation for distribution of the settlement proceeds, and Lead Counsel's motion for an award of attorneys' fees and reimbursement of expenses.

2.      The Settlements were made on behalf of the Class of all persons and entities who purchased or otherwise acquired New Century Common Stock, New Century Series A Preferred Stock, New Century Series B Preferred Stock, and/or New Century Call Options and/or who sold New Century Put Options, during the time period from May 5, 2005, through and including March 13, 2007, either in the Offerings, pursuant to a registration statement, or in the market, and who, upon disclosure of certain facts alleged in the Complaint, were injured thereby. Approval of the proposed Settlements will resolve all of the claims in this Action as against all Defendants, including:  (i) New Century officer and director Defendants Robert K. Cole ("Cole"), Brad A. Morrice ("Morrice"), Estate of

---

[1] Unless otherwise indicated, all initial capitalized terms are used as defined in the Stipulations of Settlement (the "Stipulations"), filed with the Court on July 30, 2010, as Exhibits ("Exs.") 2-4 to Plaintiffs' Memorandum of Points and Authorities in Support of Unopposed Motion for Preliminary Approval of Settlements, ECF No. 484).

Edward Gotschall ("Gotschall"), and Patti M. Dodge ("Dodge") (collectively, "Officer Defendants"), and New Century director defendants Frederic J. Forster ("Forster"), Michael M. Sachs ("Sachs"), Harold A. Black ("Black"), Donald E. Lange ("Lange"), Terrence P. Sandvik ("Sandvik"), Richard A. Zona ("Zona"), Marilyn A. Alexander ("Alexander"), David Einhorn ("Einhorn"), and William J. Popejoy ("Popejoy") (collectively, "Director Defendants"; with Officer Defendants, "Individual Defendants"); (ii) New Century underwriter defendants Bear, Stearns & Co. Inc., Deutsche Bank Securities Inc., Piper Jaffray & Co., Stifel, Nicolaus & Co., Inc., JMP Securities LLC, Roth Capital Partners, Morgan Stanley & Co., Inc., and Jeffries & Co., Inc. (collectively, "Underwriter Defendants"); and (iii) New Century auditor defendant KPMG LLP ("KPMG"). New Century was not named as a defendant due to its filing of bankruptcy.

## I.     **INTRODUCTION AND OVERVIEW**

3.     After more than three years of litigation, Plaintiffs' efforts have resulted in an outstanding recovery for the Class. The Settlements provide for the payment of approximately $125,000,000 in cash (the "Settlement Amount"), plus interest earned thereon. The Settlement Amount is a recovery of between 8% and 16% of Plaintiffs' maximum damages estimates for the Class as calculated by Plaintiffs' damages expert. Given the significant risks Plaintiffs faced in establishing liability and damages discussed herein and the size of the proposed Settlements, it is clear that the Settlements at this time are in the best interests of the Class. Rather than proceed with this litigation and risk obtaining little or nothing from Defendants (while causing substantial available insurance to be expended in defense costs), the Settlements provide the Class with the very substantial recovery of $124,827,088.00 in cash – an amount which was deposited into escrow accounts beginning on August 12, 2010, and has been earning interest for the benefit of the Class.

4.     The Settlements are documented in three separate Settlement Stipulations.  First, Plaintiffs entered into a Settlement Stipulation with Defendant KPMG providing for payment to the Class of $44,750,000.  Second, Plaintiffs entered into a Settlement Stipulation with the Underwriter Defendants for payment to the Class of $15,000,000.  Third, Plaintiffs entered into a global Settlement Stipulation with the New Century Officer and Director Defendants providing for payment to the Class of $65,077,088 in cash.  The global Settlement Stipulation provides other payments to resolve other claims brought against New Century officers and directors by the U.S. Securities and Exchange Commission ("SEC"),[2] separate Kodiak plaintiffs,[3] and the New Century Liquidating Trustee.[4]

5.     As demonstrated herein and in the accompanying Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Final Approval of Settlements and Plan of Allocation (the "Settlement Brief"), the proposed Settlements are fair, reasonable, and adequate, and should be approved by this Court.  Additionally, the proposed Plan of Allocation is a fair and reasonable method for distributing the proceeds of the Settlements to the members of the Class, and, therefore, also should be approved.

6.     The Settlements totaling approximately $125 million represent an excellent recovery for members of the Class.  The Settlements were negotiated with the direct participation of the institutional investor Lead Plaintiff, NYSTRS, and by experienced counsel on all sides with a firm understanding of the strengths

---

[2] The case brought by the SEC is before this Court as *SEC v. Morrice, et al.,* Case No. 09-1426-DDP (the "SEC Action").

[3] The case brought by Kodiak is before this Court as *Kodiak Warehouse LLC v. Morrice*, Case No. 8:08-cv-01265-DDP-FMO.

[4] The case brought by the New Century Liquidating Trustee is pending in the United States Bankruptcy Court for the District of Delaware as *The New Century Liquidating Trust and Reorganized New Century Warehouse Corporation v. Cole*, Case No. 07-10416(KJC).

and weaknesses of their respective cases. The Settlements confer an immediate and substantial benefit to the Class and eliminate the risk of continued litigation whose favorable outcome cannot be assured. Even if Plaintiffs were successful at trial, it is possible that a jury could award less to the Class than that which was obtained in the Settlements or that Plaintiffs would be unable to collect a greater amount after trial from the Defendants found to be liable.

7.    As explained in greater detail below, Plaintiffs' understanding of the strengths and weaknesses of their case is based on Plaintiffs' Counsel's prosecution of the Action, which included, *inter alia,* (i) drafting three detailed complaints – the Consolidated Complaint, the Amended Consolidated Complaint and the Second Amended Complaint – after extensive review and analysis of the Company's SEC filings and press releases, media and news reports about the Company, publicly available trading data relating to the price and volume of New Century's Common Stock and Preferred Shares, the 551-page Final Report of Michael J. Missal, Bankruptcy Court Examiner, and other available information, and meeting with the Examiner; (ii) locating and interviewing approximately 200 former employees of New Century and other witnesses; (iii) thoroughly researching the law pertinent to the claims against Defendants and potential defenses thereto; (iv) opposing Defendants' five separate motions to dismiss the Consolidated Complaint; (v) opposing Defendants' six separate motions to dismiss the Second Amended Complaint; (vi) opposing KPMG's motion for summary judgment; (vii) reviewing and analyzing over 38 million pages of documents produced by Defendants and third-parties in discovery; (viii) consulting with loan underwriting, due diligence, accounting and damages experts; (ix) preparing for depositions of KPMG audit members; (x) exchanging confidential mediation statements with Defendants; and (xi) participating in eleven mediation sessions before an experienced mediator and extensive related negotiations.

8.    The Settlements were reached only after arduous and protracted settlement negotiations, including mediation sessions under the auspices of an experienced mediator (which yielded an agreement only after eleven mediation sessions) and extensive discussions with Defendants and other parties, which were conducted with the mediator's assistance. *See* Declaration of the Honorable Daniel H. Weinstein, attached hereto as Ex. A ("Weinstein Decl."). Lead Plaintiff believes that the approximately $125,000,000 cash recovery for the Class is an outstanding result, particularly when viewed in connection with the total potential damages as well as the risks Plaintiffs faced going forward in this Action, including those relating to establishing liability and damages, and ability to collect difficulties as to the Individual Defendants whose insurance was being expended on defense costs. *See* Declaration of Wayne Schneider in Support of Final Approval of Settlements and Plan of Allocation, and Request for Attorneys' Fees and Reimbursement of Litigation Expenses ("Schneider Decl."), attached hereto as Ex. B.   Further, I understand this is the second highest sub-prime securities class action settlement to date – next to the settlements reached in the sub-prime securities class action settlements in *In re Merrill Lynch & Co., Inc. Sec., Deriv. and ERISA Litig.*, 07-cv-9633 (S.D.N.Y. Aug. 4, 2009 and Dec. 2, 2009), totaling $625 million – and the highest such settlement where the primary entity is bankrupt.   I am aware of no other higher sub-prime related securities class action settlement that has been granted final approval as of the filing of this declaration.

9.    From the start of this Action, Defendants vigorously denied all of the claims and arguments made by Plaintiffs.   As discussed in more detail below, Plaintiffs faced significant risks going forward, including, among others, that Defendants would ultimately be successful in showing that (i) no misrepresentation had been made because the Company's statements during the Class Period were true or the Company had warned investors of the risks concerning New Century's sub-prime underwriting and loan quality; (ii) the alleged misrepresentations were

not material; (iii) the alleged accounting errors did not violate Generally Accepted Accounting Principles ("GAAP"); (iv) KPMG's audit did not violate Generally Accepted Auditing Standards ("GAAS"); (v) Defendants did not act with scienter because, among other things, the Individual Defendants' trading negates scienter, and they did not have a motive for committing the fraud, and relied on KPMG's audit opinion with respect to the financial statements; (vi) the alleged fraudulent misstatements did not cause the loss to investors; and (vii) the Underwriter Defendants would be able to establish an affirmative due diligence defense at trial. Even if Plaintiffs prevailed on the merits, there was risk that the damages determined to be attributable to the alleged misrepresentations and omissions would be less than the Settlement Amount. In addition, New Century was bankrupt and was not available as a source of recovery, and the available insurance funds were deteriorating with numerous Individual Defendants represented by many different attorneys in multiple actions. Accordingly, while Plaintiffs believe that all of their claims have merit, one or more of these arguments or issues may have ultimately proved insurmountable, and the Class may have ended up with little or no recovery. In light of these risks, the Settlements provide the Class with an excellent result.

10. Furthermore, this case could have been dismissed at various stages of the litigation. Among other things, Plaintiffs carried the burden of pleading claims for violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), and Rule 10b-5 promulgated thereunder, against certain of the Defendants, in conformity with the heightened pleading requirements set forth in the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b). Plaintiffs faced the risk that the Complaint could be dismissed on the ground that scienter was not adequately pled, as Defendants argued that there was no unusual or suspicious insider trading or other strong motives to defraud. Moreover, Plaintiffs faced the risk that the Complaint could be dismissed on

grounds of loss causation, as Defendants vigorously argued that their alleged misrepresentations did not cause the loss to investors. Even though Plaintiffs eventually defeated Defendants' motions to dismiss, the risks of surviving a summary judgment motion was significant. Notably, KPMG submitted an expert declaration in support of its motion for summary judgment stating that Plaintiffs could not establish loss causation. In addition to the risk of not surviving beyond the pleading and summary judgment stages, there was also risk inherent in establishing liability and proving damages against Defendants at trial. There was no guarantee that Plaintiffs would obtain a verdict or be able to recover significant damages against Defendants. Further, continued prosecution of the Action would be complex, expensive and lengthy. There were substantial risks that, even if the matter were to proceed to trial and a judgment was obtained against Defendants, the recovery might be no greater than the proposed Settlements.

11. In addition, Plaintiffs could not have been successful in resolving their claims against the Individual Defendants (whose insurance was being wasted) without resolving its claims against KPMG who had preserved its claims against those same Defendants. At the same time, KPMG had filed a fully briefed motion for summary judgment on the issue of loss causation which threatened to extinguish all claims against KPMG and greatly reduce the size of Plaintiffs' claims against the Individual Defendants and Underwriter Defendants. In addition, the Individual Defendants argued that they did not have scienter because they relied upon KPMG's audit, which could have been particularly problematic if KPMG was dismissed from the Action.

12. In the end, the parties were able to reach global settlements on all claims, including not only those claims alleged in the instant class action, but also the claims brought by the Trustee, Kodiak, and the SEC which was necessary to achieve the Settlements here.

13.     The favorable reaction of the members of the Class supports the reasonableness of the Settlements, Plan of Allocation, and the fee and expense request.  Beginning on August 17, 2010, the Notice of Pendency Of Class Action And Proposed Settlements, Settlement Fairness Hearing, And Motion For Attorneys' Fees And Reimbursement Of Litigation Expenses (the "Notice") was mailed to over 50,000 potential Class Members or their nominees.  *See* Declaration of Richard W. Simmons:  Notice Dissemination and Publication (the "Simmons Decl."), attached hereto as Ex. C, ¶¶3-8.  The Notice (attached as Ex. A to Simmons Decl.) advised Class Members of the proposed Settlements, the proposed Plan of Allocation and the request for an award of attorneys' fees and reimbursement of expenses.  The Notice further advised Class Members of their right to object or seek exclusion from the Class, and explained that this right needed to be exercised by October 18, 2010.  Additionally, a Summary Notice was published in the national edition of *The Wall Street Journal* and over the *PR Newswire* on August 24, 2010.  *See* Simmons Decl. ¶10.  Finally, the Notice and Proof of Claim form were posted on the website specifically created for the Settlements, www.NewCenturySettlement.com, and on Lead Counsel's website, www.blbglaw.com.

14.     To date, no Class Member has objected to any aspect of the Settlements, the Plan of Allocation, or the request for attorneys' fees and expenses; and only one Class Member representing 300 shares has sought exclusion from the Class.

## II.     THE ALLEGATIONS OF THE ACTION

15.     During the Class Period, New Century was one of the nation's largest sub-prime mortgage finance companies.  Since its formation in 1996, the Company grew rapidly, reporting $56.1 billion of total mortgage originations and purchases for the year-ended December 31, 2005, nearly ten times as much as the Company had originated and purchased in 2001, and an increase of over $10 billion of

originations and purchases from the prior year-ended December 31, 2004. Second Amended Consolidated Class Action Complaint ("SAC" or "Complaint") ¶2.

16.     The SAC alleges that between May 5, 2005, to March 13, 2007, (the "Class Period"), New Century kept pushing ever-increasing sub-prime mortgage loans through its system by loosening the Company's underwriting practices and introducing a growing percentage of higher risk mortgage products, including adjustable-rate, interest-only loans and "stated income" loans, where even W-2 wage earners did not have to verify their stated income. SAC ¶3. As these circumstances led to increased first payment defaults on loans and New Century's loan deficiencies and defaults grew, New Century failed to account for these adverse facts and substantially increased risks in its financial statements. SAC ¶4. Instead, Defendants falsely promoted the quality and underwriting of the loans originated by New Century and New Century overstated its financial results by, among other things, failing to account for the expected discount upon disposition of its repurchased loans and failing to consider its backlog of repurchase claims outstanding when setting its repurchase reserves. SAC ¶89.

17.     While these misstatements were being made, in June 2005, New Century sold approximately 4,500,000 shares of 9.125% Series A Cumulative Redeemable Preferred Stock for net proceeds of approximately $109 million in an offering (the "Series A Offering"). SAC ¶236. Defendants Bear Stearns, Deutsche Bank, Piper Jaffray, Stifel Nicolaus, JMP Securities and Roth Capital were underwriters for the Series A Offering. SAC ¶236. Defendants Morrice, Dodge, Cole, Gotschall, Black, Forster, Lange, Popejoy, Sachs, Sandvik and Zona signed the registration statement for the Series A Offering. SAC ¶237.

18.     In August 2006, New Century also sold approximately 2,300,000 shares of 9.75% Series B Cumulative Preferred Stock for net proceeds of approximately $55.6 million in an offering (the "Series B Offering"). SAC ¶256. Defendants Bear Stearns, Morgan Stanley, Stifel Nicolaus and Jefferies & Co. were

the underwriters for the Series B Offering.  SAC ¶256.  Defendants Morrice, Dodge, Cole, Gotschall, Black, Forster, Lange, Sachs and Zona signed the registration statement for the Series B Offering.  SAC ¶256.  Defendant KPMG consented to the incorporation by reference in the registration statement for the Series B Offering of its unqualified opinions on the Company's financial statements and internal controls for the year ended December 31, 2005.  SAC ¶39.

19.    The SAC alleges that the Underwriter Defendants and Officer and Director Defendants who signed the registration statements for the Series A and Series B Offering materials violated § 11 of the Securities Act of 1933 ("Securities Act") because the Series A and B registration statements included false and misleading statements.  The SAC alleges that Defendant KPMG violated § 11 of the Securities Act and § 10(b) of the Exchange Act by issuing unqualified opinions in connection with the Company's financial statements and internal controls for the year-ended December 31, 2005.  The SAC alleges that Officer Defendants Cole, Morrice, Gotschall, and Dodge violated § 10(b) of the Exchange Act by issuing false and misleading statements with scienter, and are liable as control persons under § 20(a) of the Exchange Act and § 15 of the Securities Act.

20.    The statutory violations alleged as to each Defendant are summarized as follows:

| Statutory Violation | Defendants |
| --- | --- |
| § 11 of the Securities Act, Series A Offering | Cole, Morrice, Gotschall, Dodge, Forster, Sachs, Black, Lange, Sandvik, Zona, Alexander, Popejoy, Bear Stearns, Deutsche Bank, Piper Jaffray, Stifel Nicolaus, JMP Securities, Roth Capital |
| § 15 of the Securities Act, Series A Offering | Cole, Morrice, Gotschall and Dodge |
| § 11 of the Securities Act, Series B Offering | Cole, Morrice, Gotschall, Dodge, Forster, Sachs, Black, Lange, Zona, Alexander, Einhorn, KPMG, Bear Stearns, Morgan Stanley, Stifel Nicolaus, Jefferies & Co. |

| § 15 of the Securities Act, Series B Offering | Cole, Morrice, Gotschall and Dodge |
|---|---|
| § 10(b) of the Exchange Act | Cole, Morrice, Gotschall, Dodge and KPMG |
| § 20(a) of the Exchange Act | Cole, Morrice, Gotschall and Dodge |

21.    The SAC alleges that, as a result of Defendants' misrepresentations, the market prices of New Century securities – including its Common Stock, Series A Preferred Stock, Series B Preferred Stock, and Call and Put Options – were artificially inflated (or deflated, in the case of Put Options) during the Class Period.[5]   The SAC alleges that the artificial inflation began to dissipate with corrective disclosures beginning on February 7, 2007.

22.    On February 7, 2007, after the close of trading and just one day before the Company was scheduled to report its 2006 fourth quarter and year-end results, New Century issued a press release announcing that it would restate its reported financial results for the first three quarters of 2006.  According to the press release, during the first three quarters of 2006, the Company incorrectly applied accounting policy SFAS 140 because "the Company did not include the expected discount upon disposition of loans when estimating its allowance for loan repurchase losses [and] the Company's methodology for estimating the volume of repurchase claims to be included in the repurchase reserve calculation did not properly consider, in each of the first three quarters of 2006, the growing volume of repurchase claims outstanding that resulted from the increased pace of repurchase requests that occurred in 2006, compounded by the increasing length of time between the whole

---

[5] As of March 1, 2006, New Century had 55,984,229 shares of Common Stock issued and outstanding; 4,500,000 shares of Series A Preferred Stock issued and outstanding; and 2,300,000 shares of Series B Preferred Stock issued and outstanding.  SAC ¶49.

1   loan sales and the receipt and processing of the repurchase request." The

2   February 7, 2007 press release further disclosed that, "[i]n addition, the Company

3   currently expects to record a fair value adjustment to its residual interests to reflect

4   revised prepayment, loss and discount rate assumptions with respect to the loans

5   underlying these residual interests, based on indicative market data." SAC ¶457.

6       23.   The SAC alleges that, in response to the Company's February 7, 2007

7   disclosures, the price of New Century Common Stock closed at $19.24 per share

8   the next day, a decline of approximately 36% from the closing price of $30.16 on

9   February 7, 2007. SAC ¶459. Similarly, the price of New Century Series A and B

10  Preferred Stock declined by approximately 10%. SAC ¶459.

11      24.   On March 1, 2007, after the close of trading, New Century issued a

12  press release announcing that it expected to file a Form 12b-25 Notification of Late

13  Filing with the SEC with respect to its Form 10-K for the year-ended December

14  31, 2006. SAC ¶463.

15      25.   On March 2, 2007, New Century filed its Form 12b-25 Notification of

16  Late Filing with the SEC, which included various disclosures. Among other

17  things, New Century provided information concerning its estimated fourth quarter

18  and full-year results. New Century also disclosed that it received inquiries from

19  the SEC, the New York Stock Exchange ("NYSE") and the U.S. Attorneys' office.

20  New Century further disclosed that, "[i]n connection with the restatement process,

21  the Audit Committee of the Company's Board of Directors (the "Audit

22  Committee"), advised by its independent counsel who is assisted by forensic

23  accountants, has initiated its own independent investigation into the issues giving

24  rise to the Company's need to restate its 2006 interim financial statements, as well

25  as issues pertaining to the Company's valuation of residual interests in

26  securitizations in 2006 and prior periods." SAC ¶464.

27      26.   The next trading day, on Monday, March 5, 2007, New Century's

28  Common Stock declined approximately 69%, from $10.65 per share on

March 2, 2007, to \$4.56 per share on March 5, 2007.  SAC ¶467.  Similarly, the price of New Century Series A and B Preferred Stock declined by approximately 55% and 58%, respectively.  SAC ¶467.

27.     On March 13, 2007, before the market opened, New Century filed a Form 8-K with the SEC disclosing that certain lenders had advised the Company that it was in default and/or had accelerated the Company's obligation to repurchase outstanding mortgage loans.  The Form 8-K further stated that the Company had received a grand jury subpoena requesting production of certain documents.  SAC ¶474.  In response to these disclosures, the price of New Century Common Stock declined 49%, from \$1.67 on March 12, 2007, to \$0.85 on March 13, 2007.  SAC ¶475.

28.     On March 13, 2007, after the close of trading, New Century announced that the New York Stock Exchange had determined that its Common Stock and its Preferred A and Preferred B stock were no longer suitable for continued listing on the NYSE and would be suspended immediately.  SAC ¶477.

29.     On April 2, 2007, New Century announced that the Company had filed a voluntary petition for relief under Chapter 11 of the U.S. Bankruptcy Code. SAC ¶479.

## III.    HISTORY OF THE ACTION

30.     Beginning on February 8, 2007, numerous class action complaints were filed in the United States District Court for the Central District of California alleging that Defendants violated the federal securities laws by misrepresenting and failing to disclose adverse facts concerning New Century's business condition and financial results.  As required by the PSLRA, notice to shareholders of the pendency of those actions began the 60-day period for interested shareholders to move the Court to be appointed Lead Plaintiff on behalf of New Century's investors.  In consultation with Lead Counsel, NYSTRS determined to move for Lead Plaintiff, and did so on April 10, 2007.  Under the PSLRA, NYSTRS was

presumptively the "most adequate" Lead Plaintiff movant because it had the greatest loss among the movants from its investments in New Century securities during the proposed class period. In its motion for Lead Plaintiff, NYSTRS submitted its choice of Bernstein Litowitz as Lead Counsel to the Court. *See* Notice of Motion for Appointment as Lead Plaintiff, Approval of Its Selection of Counsel as Lead Counsel, and Consolidation of All Related Cases, filed by NYSTRS (ECF No. 17). NYSTRS choice of Bernstein Litowitz as Lead Counsel followed its review of a series of submissions by numerous interested firms and an interview process designed to select the most favorable counsel for this role.

31. On February 8, 2007, concurrent with its motion for appointment as Lead Plaintiff and approval of its selection of Bernstein Litowitz as Lead Counsel, NYSTRS took steps to protect the interests of the Class. On that day, NYSTRS filed a motion for preliminary injunction seeking to require Officer Defendants Morrice, Dodge, Gotschall and Cole to, among other things, place in a constructive trust all of the proceeds from their sales of New Century securities; an accounting of their stock sales and information concerning the current location and/or disposition of the proceeds of their sales; and limited and particularized expedited discovery concerning their trades in New Century securities and the location and proceeds of their sales of New Century stock. *See* Notice of Motion for Preliminary Injunction, filed by NYSTRS (ECF No. 11). NYSTRS subsequently stipulated to withdraw its motion for preliminary injunction after receiving agreement from those Defendants that they would preserve documents relevant to this litigation, preserve financial records sufficient to enable NYSTRS to ascertain Defendants' assets and liabilities and to trace material changes in their net worth, and would not hide or otherwise waste personal assets.

32. On June 26, 2007, the Court appointed NYSTRS as Lead Plaintiff and approved its selection of Bernstein Litowitz as Lead Counsel for the Class. *See*

Order Granting in Part and Denying in Part Various Plaintiffs' Motions Regarding
Consolidation, Lead Plaintiffs Status, and Lead Counsel Status (ECF No. 145).

33.    Upon its appointment as Lead Counsel, Bernstein Litowitz undertook
a hard-fought prosecution that lasted for over three years through the Settlements.
As described more fully below, Lead Counsel vigorously litigated this Action by,
among other things: (i) conducting an extensive investigation into Defendants'
alleged wrongful conduct; (ii) drafting three detailed, particularized complaints;
(iii) successfully contesting Defendants' motions to dismiss the SAC; (iv) engaging
in extensive discovery which entailed obtaining and analyzing more than 38
million pages of documents; (v) moving to compel KPMG's compliance with
certain discovery requests; (vi) opposing KPMG's motion for summary judgment;
(vii) preparing to embark on an intensive program of depositions; and (viii)
participating in hard fought arm's-length settlement negotiations, including eleven
mediation sessions before an experienced mediator and related extended
negotiations.

### A.    Plaintiff's Investigation And the Consolidated Complaint

34.    In preparation for the filing of the Consolidated Class Action
Complaint ("Consolidated Complaint"), Lead Counsel conducted a thorough
investigation which included, among other things, locating and interviewing
approximately 200 witnesses including former employees of the Company,
reviewing statements made by Defendants (including those made in regulatory
filings, press releases, conference calls, news articles and analysts' reports),
researching the Company's business practices, researching the law related to
Defendants' anticipated motions to dismiss, and obtaining the assistance of experts
in loss causation, damages, market efficiency, accounting, loan underwriting, and
underwriting due diligence.   Lead Counsel's investigation uncovered substantial

information about the facts and events involving New Century, which formed the basis of Plaintiffs' detailed and particularized complaint.

35.     On September 14, 2007, after extensive research and investigation, Plaintiffs filed the Consolidated Complaint, asserting claims against Defendants under §§ 11, 12(a)(2) and 15 of the Securities Act, and §§ 10(b) and 20(a) of the Exchange Act.  The Consolidated Complaint was brought on behalf of all persons and entities who purchased or acquired New Century Common Stock, New Century Series 9.125% Series A Cumulative Redeemable Preferred Stock, New Century 9.75% Series B Cumulative Redeemable Preferred Stock, and/or New Century Call Options and/or who sold New Century Call Options during the Class Period. *See* Consolidated Complaint (ECF No. 191).

36.     Beginning on November 2, 2007, Defendants filed five separate motions to dismiss the Consolidated Complaint:   (i) the Director Defendants moved to dismiss the § 11 claims asserted against them (ECF No. 196); (ii) Officer Defendants Morrice, Gotschall and Dodge moved to dismiss the claims brought under §§ 11 and 15 of the Securities Act and §§ 10(b) and 20(a) of the Exchange Act against them (ECF No. 202); (iii) Underwriter Defendants moved to dismiss the §§ 11 and 12(a)(2) claims under the Securities Act against them (ECF No. 203); (iv) Director Defendant Popejoy moved to dismiss the claims against him by joining the Director Defendants' motion (ECF No. 207); and (v) Officer Defendant Cole joined in the Director Defendants' motion and the Officer Defendants' motion (ECF No. 199).  On November 20, 2007, Defendant KPMG also filed a motion to dismiss the § 11 claim asserted against it (ECF No. 208).

37.     In their motions to dismiss, Officer Defendants Morrice, Gotschall and Dodge argued that the case did not involve fraud and that New Century merely got caught in an industry-wide meltdown.  The Officer Defendants also argued that the Consolidated Complaint did not adequately plead scienter because, among other reasons, the Consolidated Complaint failed to plead specific facts that

Defendants knew that the Company's allowance for repurchase losses was materially understated at the time they signed certifications; they relied on KPMG's unqualified opinion on the Company's financial statements for the year-ended December 31, 2005; the Consolidated Complaint failed to plead facts demonstrating that Defendants were aware that the Company's residual interests were materially overstated; Defendants did not have motives to commit the fraud; Officer Defendant Morrice acquired additional shares during the Class Period; Officer Defendant Gotschall's stock sales were tied to his retirement; and that the insider sales by the Officer Defendants were not unusual or suspicious.

38.   Officer Defendant Cole also argued that the Consolidated Complaint failed to plead scienter because he sold only a small portion of his New Century stock and held on to roughly 90% of his shares despite the Company's issuance of warnings about deteriorating market conditions.  Cole also argued that he, like other New Century investors, suffered massive financial losses.   Defendant Cole also argued that, in 2005, he acquired more shares than he had sold, and that he only began to diversify his New Century holdings in early 2006, after the announcement of his retirement.

39.   Underwriter Defendants and Director Defendants argued that the Consolidated Complaint failed to allege misstatements concerning the Series A and Series B Preferred Stock; that the alleged misstatements related to the Series B Offering were non-actionable forward-looking statements accompanied by sufficient cautionary language; and that the misstatement of financial for the Series B Offering did not violate GAAP.  In addition, the Underwriter Defendants argued that the § 12(a)(2) claims against them should fail because the Consolidated Complaint did not allege facts that established privity of contract between any underwriter and Plaintiffs.

40.   Defendant KPMG argued that the Consolidated Complaint should be dismissed because KPMG did not cause the loss to New Century investors, as no

corrective disclosures were made concerning KPMG's 2005 audit opinions or its audit work, and no corrective disclosures were made concerning any errors in New Century's financial statements until nearly two months after it had already filed for bankruptcy – long after investors had already suffered their losses in February and March 2007. KPMG also argued that the claims against it should be dismissed because the Consolidated Complaint did not adequately allege that KPMG's audit and internal control opinion contained in the Series B registration statement were false, failed to allege the nature and amount of the overstatement, failed to explain how KPMG's audit work was deficient, and failed to identify any specific audit procedure that would have alerted KPMG to New Century's backlog of outstanding repurchase claims or that New Century's allowance for loan losses was decreasing through the Class Period.

41. On December 14, 2007, Plaintiffs filed an omnibus opposition to Defendants' motions to dismiss (ECF No. 218). Plaintiffs argued that the Consolidated Complaint adequately pleaded claims under the Exchange Act because the Officer Defendants made actionable misrepresentations and omissions regarding New Century's financial results, including by failing to properly account for the allowance for repurchase loss reserve, the valuation of residual interests, and the allowance for loan loss reserve. Plaintiffs also argued that falsity was sufficiently alleged despite the lack of a completed restatement. Plaintiffs further argued that the allegations gave rise to a strong inference of scienter because New Century admitted to material accounting errors, the Officer Defendants signed sworn certifications that were contrary to the true facts concerning the Company's internal controls, the allegations based on facts from confidential sources were reliable and further gave rise to an inference of scienter, and the Officer Defendants' financial gains from the fraud further support the inference. Plaintiffs also argued that the Consolidated Complaint states claims under §§ 11 and 12(a)(2) of the Securities Act because the registration statements in connection with the

Series A and Series B Preferred Stock Offerings contained material misstatements and omissions regarding New Century's financial results, internal controls, underwriting standards and loan quality. Plaintiffs further argued that KPMG's audited financial opinions were materially misstated at the time of the Series B Offering, that the bespeaks caution doctrine and the PSLRA's safe harbor did not apply to these statements, and that Defendants' reliance on KPMG's audit opinion was not appropriate grounds for dismissal on a motion to dismiss.

42. On January 8, 2008, Plaintiffs filed a notice of supplemental authority in further support of their opposition to the Defendants' motions to dismiss.

43. On January 14, 2008, Defendants filed five separate reply briefs in support of their respective motions to dismiss.

44. The reply brief filed by Officer Defendants Morrice, Gotschall and Dodge further argued that Plaintiffs could not establish scienter. Among other things, Morrice, Gotschall and Dodge argued that KPMG's unqualified audit opinion strongly negated scienter. They also argued that New Century's announced restatement of the financial results, their certifications, their compensation and stock sales, the allegations regarding the repurchase reserves, the allegations regarding the allowance for loan losses, and their public statements did not rise to a strong inference of scienter.

45. Officer Defendant Cole separately filed a reply brief in which he argued that the Consolidated Complaint failed to plead a strong inference of scienter against him because it failed to include particularized allegations against him and because his stock sales were only a small fraction of his holdings over a two-year period in which he began his retirement.

46. The Underwriter Defendants and the New Century Director Defendants' reply briefs also repeated their previous arguments that Plaintiffs failed to allege material misstatements in the Series A and Series B registration statements, that statements of opinion were not actionable misstatements, that the

alleged misstatements were forward-looking statements protected by the bespeaks caution doctrine and the PSLRA's safe harbor, that disagreements with management decisions was not a basis for securities liability, and that Plaintiffs failed to allege "red flags" regarding KPMG's accounting work that would have put the Underwriter Defendants on notice of accounting issues.

47.   Defendant KPMG's reply brief further reiterated its argument that KPMG did not cause investors to suffer any loss, that it had established negative causation, and that Plaintiffs failed to sufficiently allege that KPMG's 2005 opinions on New Century's financial results and internal controls were false when made.  Defendants also addressed Plaintiffs' supplemental authority in their reply briefs.

48.   On January 22, 2008, Plaintiffs filed a second notice of supplemental authority in further opposition to Defendants' motions to dismiss.   On January 25, 2008, the Officer Defendants responded to the supplemental authority submitted by Plaintiffs.

49.   On January 31, 2008, the Court issued an order granting Defendants' motions to dismiss with leave to amend.  The Court dismissed the Consolidated Complaint on the basis that the Consolidated Complaint did not clearly articulate the grounds for its claims and did not clearly identify the alleged false statements or the factual allegations supporting an inference that particular statements were false or misleading.

## B.   The Second Amended Complaint

50.   On March 24, 2008, after extensive additional investigation, including reviewing publicly available information concerning New Century, evaluating New Century's loan data with the assistance of an expert, and interviews with additional confidential witnesses, Plaintiffs filed the Amended Consolidated Class Action Complaint.

51.     On March 26, 2008, Michael J. Missal, the Examiner appointed by the United States Bankruptcy Court for the District of Delaware to investigate the accounting and financial statement irregularities of New Century, filed a 551-page report of his investigations dated February 29, 2008 (the "Examiner's Report"). Prior to the filing of the Examiner's Report, the Examiner and his staff met with Lead Counsel regarding the Examiner's investigation.   Lead Counsel shared information that Lead Counsel had obtained through its investigation with the Examiner, including certain information pertaining to witnesses.  I am informed that Lead Counsel's participation in this process was a primary factor leading to the Examiner's investigation of New Century statements concerning loan quality.

52.     On March 31, 2008, in light of the Examiner's Report, and in the interests of judicial economy, the parties stipulated to a filing of a Second Amended Consolidated Class Action Complaint ("SAC" or the "Complaint") and a briefing schedule.

53.     On April 30, 2008, Plaintiffs filed the SAC.  The SAC asserted claims under §§ 10(b) and 20(a) of the Exchange Act and §§ 11 and 15 of the Securities Act.   For the first time, the SAC added a § 10(b) claim against KPMG for fraudulent misrepresentations and dropped the § 12(a)(2) claim against the Underwriter Defendants.

54.     The SAC alleged that Defendants made false and misleading statements during the Class Period concerning New Century's loan underwriting, loan quality, and its financial condition.  Specifically, the SAC alleged that New Century's financial results were overstated during the Class Period, in violation of GAAP, because the Company failed to account for the expected discount upon disposition of its repurchased loans and its backlog of repurchase claims outstanding when setting its repurchase reserves.  The SAC alleged that (1) the Officer Defendants, the Director Defendants and the Underwriter Defendants violated § 11 of the Securities Act in connection with false and misleading

statements in the registration statements for the Series A and Series B Preferred Stock Offerings; (2) the Officer Defendants violated § 10(b) of the Exchange Act for fraud and were liable under other statutes as controlling persons; and (3) KPMG violated § 11 of the Securities Act for making misrepresentations relating to the Series B Preferred Stock Offering, as well as § 10(b) of the Exchange Act for fraud.

55.     On June 2, 2008, Defendants filed six separate motions to dismiss the SAC.

56.     In their motion to dismiss, Officer Defendants Morrice, Gotschall and Dodge argued that the SAC failed to comply with the applicable pleading requirement; the SAC failed to specify each statement alleged to have been misleading and the reasons why the statement was misleading when made; and the SAC failed to plead specific facts giving rise to an inference of scienter that was at least as compelling as any opposing inference of nonfraudulent conduct because, among other things, Morrice, Gotschall and Dodge's incentive compensation and trading patterns were not unusual or suspicious.

57.     Officer Defendant Cole argued that the claims against him in the SAC should be dismissed for failing to adequately plead scienter, as he held on to the vast majority of his New Century stock and suffered massive financial losses, and the Examiner found no persuasive evidence of earnings manipulation.

58.     Director Defendants argued that the SAC should be dismissed because, among other things, investors' losses were not caused by the misstatements.  Specifically, Director Defendants argued that none of the alleged misstatements in the registration statement for the Series A Offering caused the loss to investors, investors had no recoverable damages because the decline in the price of New Century securities occurred prior to any corrective disclosure, and investors had no recoverable damages because the price declines were caused by

1   disclosures unrelated to any of the alleged misstatements in the 2005 Series A
2   registration statement.

3       59.    Similarly, the Underwriter Defendants argued that the § 11 claims
4   against them should be dismissed because Plaintiffs failed to allege material
5   misrepresentations or omissions in the Offering materials, as the alleged
6   misstatements amounted to no more than corporate mismanagement, were
7   forward-looking statements accompanied by cautionary language, and were non-
8   actionable puffery. Additionally, the Underwriter Defendants argued that Plaintiffs
9   alleged facts that established a negative causation defense with respect to the
10  Series A Offering because New Century's corrective disclosures had nothing to do
11  with the misstatements in the registration statements for the 2005 Offering.

12      60.    Director Defendant Popejoy joined in the motion to dismiss filed by
13  the Director Defendants and the Underwriter Defendants.

14      61.    Defendant KPMG argued that Plaintiffs' claims against it should be
15  dismissed because KPMG did not cause the loss, as the corrective disclosures did
16  not reveal any misrepresentations regarding New Century's 2005 financial
17  statements, which were audited by KPMG. KPMG also argued that the § 10(b)
18  fraud claim against it should be dismissed because Plaintiffs did not plead with
19  particularity facts giving rise to a strong inference that KPMG acted with
20  conscious or deliberate recklessness and did not present a cogent theory that
21  KPMG committed fraud. KPMG also filed a separate motion to strike the SAC's
22  allegations based on the Examiner's Report, arguing that such allegations were
23  based on uncorroborated third-party assertions and inadmissible hearsay.

24      62.    On July 7, 2008, Plaintiffs filed their opposition to Defendants'
25  motions to dismiss. Among other things, Plaintiffs' opposition brief argued that the
26  SAC should be upheld because it complied with the applicable pleading standard,
27  it adequately alleged that each of the Officer Defendants made actionable false and
28  misleading statements, the factual allegations gave rise to a strong inference of

scienter as to each Officer Defendant and KPMG, the SAC adequately stated claims under § 11 with respect to the Series A and Series B Preferred Stock registration statements, and the SAC adequately pled loss causation. Plaintiffs also argued that KPMG's motion to strike was without basis.

63.    On July 28, 2008, Defendants filed their five separate reply briefs in support of their motions to dismiss and a separate reply in support of KPMG's motion to strike.

64.    On August 12, and 15, 2008, respectively, Plaintiffs filed a first and second notice of supplemental authority in further opposition to the Defendants' motions to dismiss. On August 21, 2008, Defendants filed responses to Plaintiffs' first and second notices of supplemental authorities.

65.    On September 9, 2008, Plaintiffs filed a third notice of supplemental authority in further opposition to the Defendants' motions to dismiss.

66.    On September 11, 2008, Defendants filed responses to Plaintiffs' third notice of supplemental authorities.

67.    On September 22, 2008, the Court held a hearing on Defendants' motions to dismiss and KPMG's motion to strike.

68.    Following the hearing, the parties continued to argue their positions. On October 31, 2008, Officer Defendants Morrice, Dodge and Gotschall filed a supplement to their motion to dismiss the SAC.

69.    On December 2, 2008, Plaintiffs filed a fourth notice of supplemental authorities in further opposition to the Defendants' motions to dismiss.

70.    On December 3, 2008, the Court issued an order largely denying Defendants' motions to dismiss and denying KPMG's motion to strike. The Court found that the SAC provided sufficiently clear allegations under the applicable pleading standard and that it adequately alleged material misstatements with respect to loan quality and underwriting, financial reporting and internal controls in connection with the Exchange Act claims under § 10(b) against the Officer

Defendants.   The Court also found that the SAC adequately alleged scienter with respect to the Officer Defendants as to statements regarding loan quality and underwriting, internal controls, repurchase reserves and residual interests.   The Court, however, held that the SAC did not adequately allege scienter as to the Officer Defendants with respect to allegations relating to New Century's Allowance for Loan Losses ("ALL").   With respect to KPMG, the Court found that the SAC adequately alleged a strong inference of scienter as to statements regarding the repurchase reserve, residual interests, hedge accounting, mortgage servicing rights and goodwill.   However, it found that the SAC did not adequately allege scienter as to KPMG with respect to the ALL.   The Court also found that the SAC sufficiently pled loss causation at the pleading stage, but warned that at a later stage the alleged misstatements made "may be found too attenuated, or the existence of intervening causes may be too significant, for Plaintiffs to establish loss causation."   With respect to the Securities Act claims, the Court upheld the § 11 claims against the Director Defendants, the Underwriter Defendants and KPMG; and it upheld the § 15 controlling person claims derived from the § 11 claims against the Officer Defendants.   The Court, however, dismissed the allegations of false and misleading statements that relied on the group pleading doctrine.

71.   In its December 3, 2008 order, the Court also denied KPMG's request to strike all references in the SAC to the Examiner's Report, because it found that the Examiner's Report qualified as a reliable source for pleading purposes.

72.   On January 26, 2009, Defendants filed their Answers to the SAC.   In their Answers, Defendants raised numerous affirmative defenses.   Among other things, Defendants asserted that the statements that were made during the Class Period were true, that any increase or decrease in New Century's securities prices was not caused by Defendants' statements, that Plaintiffs were not entitled to a recovery because the facts Plaintiffs claim were not disclosed were already known

by the market, that Defendants' conduct was not the cause of investors' losses, and that Defendants lacked scienter.

## C. Discovery

73.     Pursuant to the PSLRA, until the Court decided the motions to dismiss, Plaintiffs were unable to pursue any formal discovery in this Action. However, following the Court's decision, the parties promptly met and conferred pursuant to Fed. R. Civ. P. 26(f) and exchanged initial disclosures.  In its initial disclosures, Lead Plaintiff disclosed information related to its investment advisors and the individuals Lead Plaintiff believed to have relevant information (including individuals who Lead Plaintiff had uncovered in its pre-discovery investigation). Likewise, Defendants disclosed information concerning individuals who were likely to possess discoverable information.

74.     Beginning in February 2009, Plaintiffs served document requests on each of the Defendants.  The requests sought, among other things, documents concerning New Century's announced restatement of financial results, audit workpapers, documents concerning New Century's loan underwriting, documents concerning New Century's internal controls, and documents concerning New Century's accounting for residual interests and repurchase reserves.

75.     Plaintiffs also issued dozens of document subpoenas to relevant nonparties, including to the Liquidating Trustee of the New Century Liquidating Trust, who had maintained New Century's business records following the Company's filing of bankruptcy.

76.     Among the numerous nonparties Plaintiffs subpoenaed were as follows:

| Subpoenaed Entity | Relevance |
| --- | --- |
| Access Lending Corporation | Entity acquired by New Century that provided warehouse lending services |
| AlixPartners LLP | Retained by New Century to assist in management of the |

|  | Company |
|---|---|
| Bank of America, N.A. | Warehouse lender; had credit facility and/or loan repurchase agreement with New Century |
| Barclays Bank PLC | Warehouse lender; had credit facility and/or loan repurchase agreement with New Century |
| BDO Seidman LLP | Retained by the Examiner to assist in the examination of New Century |
| Bear Stearns Mortgage Capital Corp. | Warehouse lender; had credit facility and/or loan repurchase agreement with New Century |
| Carrington Capital Management LLC | New Century invested $2.0 million in Carrington and $25 million in Carrington Mortgage Credit Fund I, LP ("CMCF"). During 2Q '04 and 3Q '04, New Century was the majority investor in CMCF, and consolidated its results into the Company's financial statements. |
| Citigroup Global Markets Realty Corp. | Warehouse lender; had credit facility and/or loan repurchase agreement with New Century |
| Concord Minutemen Capital Inc. | Warehouse lender; had credit facility and/or loan repurchase agreement with New Century |
| Credit Suisse USA Inc. | Warehouse lender; had credit facility and/or loan repurchase agreement with New Century |
| Deutsche Bank Structured Products | Warehouse lender; had credit facility and/or loan repurchase agreement with New Century |
| Ernst & Young LLP | Consultant to New Century re Sarbanes-Oxley compliance |
| Fitch Ratings | Ratings agency |
| Flagstone Securities LLC | Analyst |
| Fox-Pitt Kelton, Inc. | Analyst |
| Friedman Billings Ramsey Group | Analyst |
| Gemini Securitization Corp. | Warehouse lender; had credit |

| | |
|---|---|
| | facility and/or loan repurchase agreement with New Century |
| Gilford Securities Inc. | Analyst |
| GMP Securities, LP | Analyst |
| Goldman Sachs Group, Inc. | Analyst |
| Goldman Sachs Mortgage Company | Warehouse lender; had credit facility and/or loan repurchase agreement with New Century |
| Gradient Analytics Inc. | Analyst |
| Grant Thornton LLP | Auditor; assisted with New Century management's Sarbanes-Oxley review |
| Greenlight Capital LLC | Hedge fund that invested in New Century and ran by Defendant Einhorn |
| Guaranty Bank | Warehouse lender; had credit facility and/or loan repurchase agreement with New Century |
| Heller Ehrman LLP | Involved in New Century's internal investigation |
| Howe Barnes Hoefer & Arnett, Inc. | Analyst |
| Imperial Capital LLC | Analyst |
| Integrity Research Associates | Analyst |
| Keefe, Bruyette, Woods, Inc. | Analyst |
| JMP Securities | Analyst |
| JP Morgan Securities, Inc. | Analyst |
| Liberty Hampshire Company | Warehouse lender; had credit facility and/or loan repurchase agreement with New Century |
| Merrill Lynch & Co., Inc. | Analyst |
| Moody's Investors Service | Ratings agency |
| Morgan Stanley Mortgage Capital Inc. | Warehouse lender; had credit facility and/or loan repurchase agreement with New Century |
| Natixis Real Estate Capital, Inc. | Warehouse lender; had credit facility and/or loan repurchase agreement with New Century |
| Newport Funding Corp. | Warehouse lender; had credit facility and/or loan repurchase agreement with New Century |
| Pricewaterhouse Coopers LLP | Financial consultant to Heller |

| | Ehrman, which conducted the internal investigation with respect to the restatement |
|---|---|
| RBC Mortgage Company | Prime mortgage lender |
| SNL Financial LC | Analyst |
| Standard & Poor's | Ratings Agency |
| State Street Bank and Trust Company | Warehouse lender; had credit facility and/or loan repurchase agreement with New Century |
| The Center for Financial Research and Analysis | Analyst |
| The Clayton Group | Retained to review New Century's loans |
| The Vance Caesar Group | Consultant to New Century |
| UBS Real Estate Securities Inc. | Warehouse lender; had credit facility and/or loan repurchase agreement with New Century |
| UBS Securities Research, LLC | Analyst |

77.     Lead Counsel expended much time and effort to obtain documents from each of the Defendants, the New Century Liquidating Trustee and the various nonparties who were subpoenaed.  All of the parties and most of the nonparties objected to the document requests and subpoenas, requiring Lead Counsel to engage in numerous telephone conferences and correspondence in an attempt to resolve their objections and discovery disputes.  In addition, before certain parties and nonparties would agree to produce documents, they required that a confidentiality and protective order be put in place.  Although Plaintiffs disputed the necessity of such a confidentiality order especially in light of New Century's bankruptcy, an agreed-to, more narrowly defined, confidentiality order was eventually entered in this case.

78.     Even after document requests were agreed to and the confidentiality order had been entered, certain parties and nonparties delayed their document productions or refused to produce them.  For example, after numerous meet and

confers and protracted correspondence, Plaintiffs was forced to file motions to compel Defendant KPMG to produce certain categories of documents.   As discussed below, Plaintiffs' motions to compel were largely successful.

79.   Specifically, on May 8, 2009, Plaintiffs filed a motion to compel production of certain documents from KPMG, seeking documents KPMG produced to the Bankruptcy Examiner, the SEC, and to the Department of Justice. KPMG opposed the motion, arguing that certain documents were outside of the relevant time period or otherwise had no relevance to the Action.

80.   On May 20, 2009, Plaintiffs filed a supplemental memorandum in support of their motion to compel, informing the Court that their motion to compel was further supported by the fact that the documents also had since been produced to the Liquidating Trustee.   KPMG responded the same day, again arguing that the documents were not relevant to this Action.

81.   By Order dated July 8, 2009, Magistrate Judge Olguin largely granted Plaintiffs' motion to compel, and ordered that KPMG shall respond, under oath, to Plaintiffs' document request no later than July 29, 2009.

82.   On July 21, 2009, Plaintiffs filed their second motion to compel production of documents from KPMG, seeking to enforce compliance with the Court's prior discovery order.   KPMG filed a cross-motion for protective order, seeking entry of a protective order to protect KPMG's alleged trade secrets and confidential commercial information and certain private personal information.

83.   On July 29, 2009, KPMG filed a supplement to its motion for protective order, to which Plaintiffs responded the same day.

84.   By Order dated August 10, 2009, Magistrate Judge Olguin largely granted Plaintiffs' second motion to compel, and granted KPMG's motion for a protective order, and ordered that KPMG shall produce the documents no later than August 17, 2009.

85. On September 23, 2009, KPMG filed a motion to compel documents from Lead Plaintiff NYSTRS. KPMG sought, among other documents, Minutes of meetings and other documents by NYSTRS and certain committees. Lead Plaintiff opposed the motion, arguing that the discovery was an effort to burden and harass NYSTRS.

86. On September 30, 2009, KPMG filed a supplement to its motion to compel, to which Lead Plaintiff responded on the same day.

87. By Order dated December 7, 2009, Magistrate Judge Olguin largely denied KPMG's motion to compel, finding that Lead Plaintiff had satisfied its burden of establishing that the documents sought were not relevant or otherwise discoverable.

88. Eventually, after extensive efforts, Plaintiffs ultimately obtained over 38 million pages of documents from the parties and non-parties in this Action. The 38 million pages of documents include over 35 million pages of documents from the New Century Liquidating Trust, over 2.8 million pages of documents from Defendant KPMG, over 600,000 pages of documents from the Underwriter Defendants, and approximately 500,000 pages of documents from various third parties.

89. Plaintiffs also produced numerous documents to Defendants, including trade confirmations, brokerage statements, investment manuals, emails, news articles, and other materials in their possession concerning New Century.

90. Plaintiffs also noticed five KPMG depositions and were preparing for those and several other depositions with the assistance of Plaintiffs' accounting expert, when the Settlements were reached.

91. Based on the extensive document production by the parties and non-parties, Plaintiffs and Defendants were fully aware of the strengths and weaknesses in this case.

### D.   **KPMG's Motion for Summary Judgment**

92.   On January 13, 2010, Defendant KPMG filed an early motion for summary judgment, arguing that Plaintiffs could not establish loss causation in this case for any misstatements concerning the Company's 2005 financial results, which it had audited.  Among other things, KPMG argued that it did not cause the loss to New Century investors because the market and securities analysts did not understand that New Century's 2005 financial results were misstated before the end of the Class Period, let alone that KPMG's 2005 audit report was erroneous. KPMG also argued that Plaintiffs had to disaggregate the losses caused by KPMG in order to withstand summary judgment.   KPMG further sought summary adjudication relating to losses from various Class Period disclosures on the grounds that the disclosures did not reveal KPMG's misconduct or misconduct related to the 2005 financial results.  In support of its motion, KPMG submitted a report from a proffered expert on loss causation.

93.   On the same day, KPMG also filed a request for case management conference regarding scheduling and case management issues, including, among other things, the ordering of discovery, the scope of discovery regarding KPMG's motion for summary judgment, dates related to class certification briefing, and a trial date.

94.   On February 26, 2010, KPMG filed a Supplemental Declaration of its proffered expert, including additional analyses regarding certain allegedly corrective disclosures.

95.   On March 15, 2010, Plaintiffs filed their opposition to KPMG's motion and a related motion to exclude KPMG's proffered expert on loss causation. Plaintiffs argued that fact-for-fact disclosures were not required for loss causation, that written analyst confirmation was not required for loss causation, that investor losses were caused by disclosure of the facts related to KPMG's misconduct, and that disaggregation of the losses caused by KPMG was not

required.  Plaintiffs also argued that summary adjudication with respect to certain disclosures was inappropriate because the disclosures reflected the materialization of the foreseeable risks that emanated from the misconduct relating to KPMG's 2005 audit.  In support of their opposition, Plaintiffs also filed three expert reports, including:  (i) the expert declaration of Stuart Harden, opining, among other things, that investors had sufficient reason to conclude, based solely on information publicly available up to and including February 7, 2007, and March 2, 2007, that New Century's financial statements as of December 31, 2005, and KPMG's audit opinion thereon, and related documents, might be materially misstated and cannot be relied upon; (ii) the expert declaration of Chad Coffman, opining, among other things, that KPMG's alleged misstatements caused artificial inflation in New Century's stock price and when the misstatements and their consequences were disclosed, the stock price fell significantly; and (iii) the expert declaration of H. Nejat Seyhun, responding to the declaration of KPMG's proffered expert, and opining, among other things, that reasonable investors would have and did question the integrity of New Century's 2005 audited financial statements upon the Company's corrective disclosures on February 7, 2007, and on subsequent disclosure dates.  Plaintiffs also filed a motion to exclude the declaration of KPMG's proffered expert.

96.   On April 14, 2010, KPMG filed its reply in support of its motion for summary judgment, and its opposition to Plaintiffs' motion to strike the declaration of KPMG's proffered expert.  KPMG also filed three motions to exclude Plaintiffs' experts on loss causation.  KPMG argued that:  (i) the declaration of Stuart Harden should be excluded because it opines on subjects about which, according to KPMG, he has no expertise, specifically, how reasonable investors would have interpreted New Century's disclosures in February and March 2007; (ii) the declaration of Chad Coffman should be excluded because, among other arguments, it makes no attempt to disaggregate confounding factors that caused the claimed loss; and (iii)

the declaration of H. Nejat Seyhun should be excluded because, among other arguments, it purportedly did not segregate the stock price impact of the alleged corrective disclosures from the effects of other information.

97.    On April 20, 2010, KPMG filed a notice of supplemental authorities in support of its summary judgment motion.

98.    Pursuant to a stipulation and Order filed March 26, 2010, the Court scheduled the hearing on KPMG's motion for summary judgment for May 24, 2010.

99.    KPMG's motion for summary judgment was pending before the Court when the Settlements were reached.

100.    Also at the time the parties agreed to settle, as noted above, Plaintiffs had noticed and scheduled the depositions of five KPMG witnesses to be taken between April 27 and May 20, 2010, and was in the process of identifying and preparing for additional potential deponents. The witnesses included key KPMG employees involved in the audit of New Century's financial statements.

### 2.   Experts

101.    To assist it in the prosecution of the Action, Lead Counsel retained several experts, including H. Nejat Seyhun, Ph.D.; Andrew Mintzer, CPA; Stu Harding, CPA; Chad Coffman; Richard D. Puntillo; and M. Cary Collins, Ph.D. Lead Counsel negotiated competitive fee rates for these experts, each of whom played a significant part in the prosecution of this Action.

102.    Professor H. Nejat Seyhun, a professor of finance and business administration at the University of Michigan, is an expert on market efficiency – *i.e.*, determining whether the price of New Century securities reacted to various news and statements concerning the Company – as well as an expert on loss causation, insider trading and damages. Lead Counsel asked Professor Seyhun to, among other things, analyze whether New Century securities traded on an efficient market, evaluate whether Defendants' misrepresentations caused the loss to New

Century investors, estimate the size of damages and losses in this Action, and formulate a fair and reasonable Plan of Allocation for distribution of the settlement proceeds. Professor Seyhun also drafted a detailed expert report in connection with Plaintiffs' opposition to KPMG's motion for summary judgment.

103. Andrew Mintzer, CPA, is an accounting expert. Mr. Mintzer has had more than 25 years of experience as a CPA providing accounting, auditing and litigation services, and is one of fifteen members of the Accounting Standards Executive Committee of the American Institute of Certified Public Accountants ("AICPA"), the senior technical committee of the AICPA authorized to set accounting standards and speak for the AICPA on accounting matters. Lead Counsel asked Mr. Mintzer to assist in evaluating accounting workpapers and other documents to help determine whether New Century's reported financial results violated GAAP, whether KPMG conducted its audit in violation of GAAS, and issues involving New Century's restatement.

104. Stu Harding, CPA, is also an accounting expert. Mr. Harding has had more than 40 years of experience in public accounting, including audit work. He has served as a member of the Audit Standards Board and on various committees of the AICPA. He is also a current member of the Emerging Issues Task Force of the Financial Accounting Standards Board. Lead Counsel asked Mr. Harding to assist in evaluating the workpapers and arguments raised by KPMG. Mr. Harding drafted an expert report in connection with Plaintiffs' opposition to KPMG's motion for summary judgment.

105. Chad Coffman is the principal of Winnemac Consulting, a firm that specializes in the application of economics, finance, statistics, and valuation principles. Mr. Coffman has over a decade of experience involving securities valuation, damages, and loss causation. Lead Counsel asked Mr. Coffman to assist in evaluating Defendants' loss causation arguments in connection with mediations and KPMG's motion for summary judgment. Mr. Coffman also drafted an expert

report, excluding exhibits, in connection with Plaintiffs' opposition to KPMG's motion for summary judgment.

106.   Professor Richard Puntillo is an expert on underwriters' due diligence. Professor Puntillo is a professor of finance at the University of San Francisco with two decades of high-level executive experience in investment and commercial banking, as well as 30 years of board of director experience in public companies, including as Chairman of the Board and Audit Committee Chair. Lead Counsel asked Professor Puntillo to assist in evaluating whether Underwriter Defendants performed adequate due diligence in connection with the Series A and Series B Preferred Stock Offerings.

107.   M. Cary Collins is an expert on loan underwriting. Professor Collins is a professor of finance at Bryant University with expertise in fair lending, underwriting and pricing models for mortgage lending activities. Lead Counsel asked Professor Collins to assist in analyzing loan underwriting and loan data, and to determine whether New Century followed its own underwriting practices in connection with the quality of the loans New Century underwrote.

### E.   The Risks Faced by Plaintiffs

108.   At the time the agreements in principle to settle the Action were reached, Plaintiffs and their counsel had a thorough understanding of the strengths and weaknesses of the case. While Plaintiffs and their counsel believe that all of the claims asserted against Defendants have merit, they also recognize that there were serious risks as to whether Plaintiffs would ultimately prevail on the merits, including as a result of Defendants' argument that Plaintiffs could not establish scienter, the materiality of the misstatements, or loss causation. In addition to the risk that Plaintiffs might not succeed on the merits before a jury, there was a very substantial risk that, even if Plaintiffs were to prevail, the Class might not recover as much as the Settlement Amount on a judgment, much less more. Indeed, Defendants throughout this litigation repeatedly argued that Plaintiffs could not

prove loss causation and that Defendants could show negative causation. For example, there was a risk that Defendants could successfully argue at summary judgment or at trial that the stock price drops on the alleged corrective disclosure dates were only partially recoverable on one of those days, or not at all.

109.   In addition, Defendants would have continued to argue that they could not be held liable under § 10(b) of the Exchange Act because they did not have the requisite scienter.   The Individual Defendants would have argued that their transactions in New Century stock and their retention of shares negate scienter. They also would have argued that they relied on the audit opinion of KPMG in connection with New Century's financial results, and that any alleged financial misstatements were committed by lower level employees without their knowledge.

110.   Defendants also would have contended that there were no material misstatements; that the Company's statements during the Class Period were true when made; that the Company repeatedly warned investors of the risk that loans may default; and that Defendants adequately disclosed the risks that eventually materialized, rendering the alleged omissions non-material.

111.   Although Plaintiffs believe that they have sufficient evidence to overcome scienter, materiality, falsity, and loss causation, there were very real risks that the Court or jury would be persuaded by the arguments of Defendants and their experts.   In addition, as detailed *infra* ¶¶130-31, the New Century Officer and Director Defendants' insurance coverage was being expended on defense costs. Moreover, there could be no settlement that preserves the substantial available insurance for the Class absent a global settlement of the other clams against those Defendants by the SEC, the Trustee and Kodiak, as well as a release of KPMG's preserved claims against those Defendants, which would not have been possible absent a Class settlement with KPMG.

112.   Plaintiffs' expert estimates that maximum recoverable damages in this Action are between $778 million and $1.6 billion.[6]  Thus, even under Plaintiff's maximum damage estimates, it has achieved a recovery of between 8% and 16% in this case.

113.   Importantly, Defendants would have argued that the declines in the share price of New Century's Common Stock on February 8, 2007, and on March 5, 2007 – as well as various other dates – were only partially caused by the alleged fraud, if at all.

114.   With regard to the February 7, 2007 disclosure, Defendants would have continued to argue that the disclosure of the restatement only pertained to the first three quarters of 2006 and did not pertain at all to the Company's financial results in 2005.  Defendants thus would have argued that the financial results issued prior to the first quarter of 2006 were not actionable.  If successful, this

_____

[6] As explained in the Seyhun Declaration (¶¶51-52), Lead Plaintiff's expert calculated an estimated number of damaged securities for each type of security. The number of individuals and institutions that have suffered damages, however, is more difficult to estimate without detailed brokerage trading reports. First, this is because ownership of common stock is not recorded at the individual level but at the brokerage level. Second, even with detailed brokerage data, without certain additional information, it would be difficult to discern multiple accounts by the same individual from multiple accounts by different individuals. Professor Seyhun was able, however, to determine the number of registered common shareholders in New Century as of December 31, 2005, from public sources, as 165,000. Based on the number of common stockholders, Professor Seyhun expects the number of damaged individuals who purchased options and Preferred Shares to be in the tens of thousands.  The Court also inquired during the preliminary approval hearing as to how many New Century employees had their retirement funds invested in New Century securities.  My firm has inquired with the Trustee and been informed that since most employees held their stock through brokerages, the Trustee is unable to determine the number of New Century employees who held New Century stock at any particular time. The Trustee did inform us that since 1997 (when New Century went public), approximately 3,000 New Century employees participated in the Employee Stock Purchase Plan.

argument would have ended Plaintiffs' case against KPMG and greatly reduced Plaintiff's case against the Underwriter Defendants, leaving only the Individual Defendants whose insurance coverage would likely have been greatly expended by that point in the litigation. In addition, with regard to the restatement for the first three quarters of 2006, Defendants would have argued that the accounting errors were not made with scienter. Defendants also would have argued that there was no loss causation as to the February 7, 2007 disclosure because the drop in the stock price was attributable to other news and information that were unrelated to the fraud or financial restatement. Thus, Plaintiffs faced the risk of no recovery for the stock price drop following the February 7, 2007 disclosure.

115. With regard to the March 2, 2007 corrective disclosure, Defendants also would have argued that the fall in the price of New Century securities was not caused by the fraud. Indeed, in its motion for summary judgment, KPMG argued that it could not be held liable for losses from this disclosure because the disclosure revealed nothing about KPMG's misconduct or New Century's 2005 financial results. Moreover, all of the Defendants would have argued that the loss from the March 2, 2007 disclosure did not cause New Century investors' losses because the drop was caused by other news and information announced by New Century and had nothing to do with the fraud or restatement. Thus, Plaintiffs also faced the risk of no recovery for the March 5, 2007 stock price drop.

116. Additionally, with regards to the March 13, 2007 corrective disclosure, Defendants would have argued that the delisting of New Century's securities from the NYSE was not caused by Defendants' fraud but, instead, by the decline in the mortgage industry or other news. Thus, Plaintiffs also faced the risk of no recovery for the March 13, 2007 stock price drop.

117. Of course, if Defendants successfully argued at summary judgment or trial that there was no corrective disclosure on any of these dates, the Class would receive no recovery. Furthermore, each of the maximum damages estimates by

Professor Seyhun discussed above and in his Declaration assumes a 100% claims rate by members of the Class; in other words, that following a fully successful trial, each and every member of the Class would file a proof of claim. The percentage of claims actually submitted in securities actions is typically significantly lower. A less than 100% claims rate would have the effect of reducing the maximum damages available. *See* Seyhun Decl. ¶53.

118. The Settlements are well within the range of reasonableness in light of the best possible recovery and all the attendant risks of litigation, especially when compared to other class action settlements. *See, e.g., City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 455 (2d Cir. 1974) (affirming approval of settlement that was between 3.2% and 12% of recoverable damages; "[i]n fact there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery") (affirming in part *City of Detroit v. Grinnell Corp.*, 356 F. Supp. 1380, 1386 (S.D.N.Y. 1972) (approving settlement valued at 3.2% to 3.7% as "'well within the ball park'")); *In re Crazy Eddie Sec. Litig.*, 824 F. Supp. 320 (E.D.N.Y. 1993) (settlement of between 6% and 10% of damages); *see also* Laura E. Simmons & Ellen M. Ryan, "Post-Reform Act Securities Settlements, 2005 Review and Analysis," at 5 (Cornerstone Research 2006) (www.cornerstone.com) (finding that, in 2005, settlement were approximately 3% of plaintiffs' estimated damages); *cf. In re Heritage Bond Litig. v. U.S. Trust Co. of Tex., N.A.,* 2005 U.S. Dist. LEXIS 13627, at *27-28 (C.D. Cal. June 10, 2005) (citing "Recent Trends in Securities Class Action Litigation: 2003 Early Update" 1430 PLI/Corp. 429, 440, 437 (May 20-21, 2004) ("In 2003, the median percentage of investor losses paid in settlement remained its all-time low at 2.8%, up from 2.7% in 2002") and Elaine Buckberg, *et al.*, "Recent Trends in Shareholder Class Action Litigation: Bear Market Cases Bring Big Settlements," at 8 (NERA Feb. 2005) (www.nera.com) ("In 2004, the median percentage of investors losses paid in settlement reached a new low of

2.3% . . . .")); Todd Foster, Ronald I. Miller and Stephanie Plancich, "Recent Trends in Shareholder Class Action Litigation: Filings Plummet, Settlements Soar," at 9 (NERA Jan. 2007) (www.nera.com) (finding that, in 2006, median recoveries were just 2.2% of losses); Stephanie Plancich and Svetlana Starykh, "Recent Trends in Securities Class Action Litigation: 2009 Year-End Update," at 20 (NERA Dec. 2009) ("2009 NERA Report"), available at www.nera.com (finding that the ratio of settlements to investor losses has been between 2% and 3% of investor losses from 2002 onward, and that over the past few years, this ratio has stayed at approximately 2.5%).

119. Had the case proceeded to trial, Plaintiffs would have had to present the testimony of damage experts in order to establish that Class Members' losses were legally recoverable damages. In recent years, defendants have become increasingly active in attempting to prevent experts from delivering testimony and attempting to strike the testimony of plaintiff's expert on damage issues. Even if Plaintiffs' damages experts were allowed to testify, Defendants would have undoubtedly secured their own well-credentialed experts. Plaintiffs' experts and Defendants' experts would inevitably have different assessments as to the existence and amount of damages the Class suffered. No doubt, Defendants' experts would contend, among other things, that the damages claimed by Plaintiffs were grossly inflated and that much, if not all, of the losses suffered by the Class were due to market conditions or other events and not to the alleged wrongdoing. The reaction of a jury to such expert testimony is highly unpredictable, and it is uncertain whose expert a jury would find more persuasive.

120. Moreover, in light of the bankruptcy of New Century, the complexity of the case, the number of parties involved and the need for a global resolution of numerous claims, the Settlements totaling approximately $125 million for the Class represent an extraordinary result. *See Atlas v. Accredited Home Lenders Holding Co.,* 2009 U.S. Dist. LEXIS 103035 (S.D. Cal. Nov. 2, 2009) (granting

final approval of settlement and noting that the company's bankruptcy filing increased the risks of recovery). This result compares favorably to the median settlement of $9 million for securities class actions in 2007, 2008, and 2009. *See* 2009 NERA Report, at 1 (finding that the median settlement value in 2009 is $9 million, similar to the 2007 and 2008 medians).

121. Further, Plaintiffs and their counsel obtained contributions to the global Settlements from numerous Defendants, including insurers of New Century's officers and directors, contribution from certain individual New Century officers, auditor defendant KPMG, and the Underwriter Defendants.

122. Despite the most vigorous and competent efforts, success in litigation such as this is never assured. The riskiness of litigation is shown by the many securities cases lost on or after trial, including *Robbins v. Koger Props. Inc.,* 129 F.3d 617 (11th Cir. 1997) (overturning an $81 million jury verdict for the plaintiff on loss causation grounds and dismissing the entire litigation); *Anixter v. Home-Stake Prod. Co.,* 77 F.3d 1215 (10th Cir. 1996) (overturning securities fraud class action verdict for plaintiffs filed in 1973 and tried in 1988 on basis of 1994 Supreme Court opinion); *In re JDS Uniphase Corp. Sec. Litig.,* 2007 WL 4788556 (N.D. Cal. Nov. 27, 2007) (2002) (verdict for defendants); *In re Health Mgmt., Inc. Sec. Litig.,* 184 F.R.D. 40 (E.D.N.Y. 1999) (jury verdict for auditor in securities case); *In re Apple Computer Sec. Litig.,* 1991 U.S. Dist. LEXIS 15608 (N.D. Cal. Sept. 6, 1991) (although plaintiff class obtained a substantial jury verdict against two individual defendants, the district court vacated judgment on motion for judgment n.o.v.). Even before trial, Plaintiffs faced substantial risk on Defendants' arguments for summary judgment. For example, in *In re Omnicom Group, Inc. Sec. Litig.,* following 5½ years of litigation and millions of dollars in time and expense incurred by plaintiff's counsel, the district court granted defendant's motion for summary judgment based on loss causation grounds, dismissing all claims in their entirety. The Second Circuit affirmed. 597 F.3d 501 (2d Cir. 2010).

123.   If the Settlements here had not been achieved, the Action would likely have continued for years and the substantial insurance funds available to fund the Settlements likely would have been fully expended in defense costs of this action, the Trustee action, the Kodiak action, and the SEC action.   Given the stakes involved in this litigation, an appeal is virtually assured regardless of the result of trial.   Instead of the lengthy, costly, and uncertain course of further litigation with Defendants, the Settlements provide an immediate and certain recovery for the Class.   The Settlements clearly outweigh the substantial risks associated with lengthy continued litigation.

124.   In sum, Plaintiffs and their counsel vigorously negotiated with Defendants and carefully weighed the risks and benefits in a fully informed manner before finally agreeing to the Settlements on behalf of the Class.

## F.   The Negotiation of the Settlements

125.   The Settlements result from intensive, arm's-length negotiations between informed parties, involving formal mediation sessions with all parties present, as well as extensive additional negotiations.   The Settlements occurred only after Plaintiffs had withstood Defendants' motions to dismiss, obtained and analyzed over 38 million pages of documents, filed expert reports and briefs in opposition to KPMG's motion for summary judgment, and were preparing for depositions.   Moreover, it took eleven in-person mediation sessions and numerous negotiations over the course of more than a year before the case settled.

126.   In advance of the mediations, Lead Counsel consulted with a damages expert (Professor Seyhun) to quantify the damages allegedly suffered by the Class and to ensure that any negotiated settlement would confer a substantial benefit to the Class.   Lead Counsel also had the benefit of its work with another expert, Mr. Coffman, who gave it an objective evaluation of the strengths and weaknesses of the claims.   Consultation with these experts helped provide Plaintiffs with

sufficient information to make an informed decision about whether to settle this Action and on what terms.

127.   Beginning on March 11, 2009, the negotiations commenced with the assistance of the Honorable Daniel Weinstein (Ret.) (the "Mediator").   The Court-appointed Lead Plaintiff, NYSTRS, actively participated in the negotiations, and its General Counsel or Associate General Counsel personally attended the mediation sessions.

128.   Before the March 11, 2009 mediation, the parties exchanged lengthy mediation briefs that set forth the respective parties' positions and analysis of the strengths and weaknesses of the case.   Over three separate days on March 11, 12 and 24, 2009, Lead Plaintiff and certain of the Defendants participated in in-person mediation sessions with the Mediator, but were not able to resolve the case. Thereafter, additional negotiations facilitated by the Mediator occurred on March 31 and May 8, 2009.   A second in-person mediation session took place over two days on June 25 and 26, 2009, followed by telephone calls with the Mediator on July 29 and August 18, 2009.   On September 14, 2009, a third in-person mediation session took place, followed by a conference call on October 1, 2009. On October 14 and October 20, 2009, Lead Plaintiff provided three letter briefs to the Mediator to address the defenses raised by KPMG and the Underwriter Defendants, the evidence against them, and their liability.   Thereafter, a fourth in-person mediation session took place on October 26, 2009, followed by conference calls and meetings with the Mediator on December 29, 2009, and January 13, 2010.   Over the course of two days on January 18 and 19, 2010, a fifth in-person mediation session took place, followed by conference calls on January 19, January 20, and February 11, 2010.   Thereafter, the parties continued to participate in conference calls with the Mediator and participated in final in-person mediation sessions on April 28 and 29, 2010.   By April 29, 2010, although the parties did not fully resolve the matters, all of the parties were close to reaching

agreements in principle to settle all of the claims.  At that time, Lead Counsel drafted comprehensive settlement agreements.  Over May, June and July 2010, the parties extensively negotiated the specific terms of the settlement documents, including three separate Settlement Stipulations, the proposed preliminary approval Order, the Class Notice, the Summary Notice, and the three proposed Judgments.

129.  The negotiations that ultimately culminated in the parties' agreement to settle were especially complex and difficult due to the parties' disputes over the claims and defenses in this Action, New Century's bankruptcy, the number of defendants in this Action, and the existence of claims that were made against certain of the Defendants by (1) the New Century Liquidating Trustee, (2) the Kodiak plaintiffs, (3) the SEC, and (4) potential claims by KPMG against certain Individual Defendants.  During the course of negotiation, numerous issues had to be researched and analyzed, and the claims of these other claimants had to be considered.  In addition, because Defendants continued to insist that they did not cause New Century investors' losses, a damages and loss causation expert for Plaintiffs was required to attend some of the mediations.

130.  Further, New Century was bankrupt and could not contribute to the Settlements.  Although there was substantial directors and officers insurance ("D&O insurance"), by the time the mandatory discovery stay of the PSLRA was lifted after the Defendants' motions to dismiss were denied, the primary layer of the insurance – $10 million – had already been used for defense costs.  Moreover, the D&O insurance was complex.  Not only did the D&O policy consist of 14 excess policies underwritten by 10 different insurance companies, but the 14 excess polices were divided into 3 different towers consisting of ABC coverage, Side A coverage and Independent Directors Liability ("IDL") coverage, which meant that cooperation and agreement to payment from numerous insurance carriers were required to achieve the Settlements.  In addition, the IDL tower applied only to New Century's independent directors, and then only with respect to

one-seventh of the IDL tower for each of the independent directors who was found liable.

131. As the litigation wore on, the D&O insurance continued to be rapidly wasted. Moreover, the claims of competing claimants – the Trustee, the Kodiak plaintiff, the SEC (and possibly KPMG) – had to be factored into the availability of the D&O insurance in connection with the Settlements. Plaintiffs had to obtain the cooperation of the Trustee, the Kodiak plaintiff, and the SEC – not to mention each of the 11 different insurance carriers and each of the 28 defendants – and reach a settlement with KPMG before the Settlements could be reached.

132. Lead Counsel also obtained cash contributions to the global Officer and Director Settlement from certain of the Officer Defendants after hard fought negotiations and after having conducted an assessment of their financial statements and ability to pay. The Officer Defendants' contributions to the Settlements were limited by their assets and the fact that Plaintiffs would have had to give up significantly more in insurance proceeds before they could get to their assets through the enforcement of any successful post-trial judgment.

133. In addition, Defendant KPMG threatened to sue certain Officer and Director Defendants for claims that the parties could not bar with a settlement that excluded KPMG. Further, a release of the Officer and Director Defendants and the insurance carriers by the other Defendants was required before the Settlements could be effectuated. Notwithstanding these complicated dynamics and New Century's bankruptcy, Plaintiffs achieved an excellent settlement of approximately $125 million in cash for the members of the Class.

134. As publicly noted by an experienced commentator on an entirely unsolicited basis the day after Plaintiffs filed their motion for preliminary approval of the Settlements: "I suspect that this was an enormously difficult settlement to pull off. Given the number of parties, the number of proceedings, the number of insurers, and the amount of money at stake, trying to settle this case undoubtedly

was challenging, particularly since continuing defense expenses eroded the amount of insurance remaining as the settlement negotiations went forward. I tip my hat to the lawyers involved in bringing this settlement together." *See* Ex. J attached hereto.

135. The complexity of the Settlements is reflected in the three separate Settlement Stipulations agreed to by the parties: (1) a Settlement Stipulation with Defendant KPMG providing for payment to the Class of $44,750,000; (2) a Settlement Stipulation with the Underwriter Defendants for payment to the Class of $15,000,000; (3) a global Settlement Stipulation with the Officer and Director Defendants providing for payment to the Class of $65,077,008 in cash.

136. The last of the Settlement Stipulations, the global Settlement Stipulation, provides for a total of $91,102,331.51 in cash and $944,029.49 in other consideration to be paid to resolve all of the claims against the New Century officers and directors by the Class, as well as plaintiffs in other pending actions – namely, the SEC, the Trustee and Kodiak. The global Settlement Stipulation further provides an agreed-to allocation of these payments to the Class and the plaintiffs in the other pending actions. The Class is receiving over 70% of the amount paid by and on behalf of the New Century officers and directors in the global Settlement Stipulation, or $65,077,088 all in cash.

137. Pursuant to the Settlement Stipulations, the three settlement agreements are closely related and, if one of the three Settlements should not become final for any reason, it could affect the finality and enforceability of the other settlements.

IV.    **CLASS NOTICE**

138. Pursuant to the Order Preliminarily Approving Settlements and Providing for Notice, dated August 10, 2010 (the "Preliminary Approval Order"), this Court granted preliminary approval of the Settlements, preliminarily certified the Class, ordered that notice be disseminated to the Class, and set a schedule for

settlement events, including the filing of the settlement papers and fee application, for submitting exclusion requests or objections, and for the final approval hearing date.

139. Lead Plaintiff, with the Court's approval, retained Analytics, Inc. ("Analytics") as the Claims Administrator for the Settlements. Analytics was selected through a competitive bidding process with three claims administrators, and approved by Lead Plaintiff NYSTRS.

140. Pursuant to the Preliminary Approval Order, Lead Plaintiff, through Analytics, disseminated copies of the Notice and the Proof of Claim and Release (the "Notice Packet") to potential Class Members. A copy of the Notice Packet is attached as Ex. A to the Simmons Decl. The Notice contains a thorough description of the Settlements, the Plan of Allocation and Class Members' rights to participate in and object to the Settlements, or to exclude themselves from the Class. *Id.* As detailed in the Simmons Declaration, Analytics obtained the names and addresses of potential Class Members from the New Century bankruptcy Trustee and the Underwriter Defendants, and used Analytics' database of names of brokerage firms, institutions and other nominees that it maintains, as well as names provided by banks, brokers and nominees pursuant to the Preliminary Approval Order for purposes of its initial mailing. *Id.* ¶¶3-8.

141. Analytics began disseminating the Notice Packet to potential Class Members on August 17, 2010. *Id.* ¶6. In total, over 50,000 copies of the Notice Packet have been disseminated to potential Class Members. *Id.* ¶8.

142. In addition to direct mail, the Summary Notice ("Publication Notice") was published once each in the national edition of *The Wall Street Journal* and over the *PR Newswire* on August 24, 2010. *Id.* ¶10. Information regarding the Settlements, including downloadable copies of the Notice and Claim Form, was posted on the website established by the Claims Administrator for this Action

(www.NewCenturySettlement.com), *id.* ¶12, as well as on Lead Counsel's website (www.blbglaw.com).

143.  As ordered by the Court and stated in the Notice, all objections to the Settlements, Plan of Allocation, or request for attorneys' fees and reimbursement of expenses and/or requests for exclusion from the Settlements were to be received by no later than October 18, 2010.  There are presently no objections to the Settlements, the Plan of Allocation, or the fee and expense request.

144.  In addition, Analytics has received only one request for exclusion from a Class Member representing only 300 shares.  A list of those seeking exclusion will be included as Exhibit 1 to the proposed Judgments that will be submitted to the Court following expiration of the deadline for seeking exclusion.

## V.    PLAN OF ALLOCATION

145.  Pursuant to the Preliminary Approval Order, and as set forth in the Notice, all Class Members who wish to participate in the distribution of the Settlement Fund must submit a Claim Form no later than December 15, 2010.  As provided in the Notice, after deducting all appropriate taxes, administrative costs, attorneys' fees, and reimbursement of litigation expenses, the balance of the Settlement Fund (the "Net Settlement Fund") will be distributed according to the Plan of Allocation.

146.  If approved, the Plan of Allocation will govern how the proceeds of the Net Settlement Fund will be distributed among Class Members who submit valid Claim Forms.  The Plan of Allocation is designed to achieve an equitable distribution of the Net Settlement Fund.  Lead Plaintiff, in consultation with the other Named Plaintiffs, worked with Lead Plaintiff's damages expert, Professor H. Nejat Seyhun, in drafting the Plan of Allocation.  Professor Seyhun's Declaration (attached hereto as Ex. D) explains the methods used to determine the artificial inflation in the New Century securities for purposes of the Plan of Allocation, and opines that the Plan of Allocation is fair and reasonable.

147.   The Plan of Allocation is based on the following premises:  (1) the market price of New Century securities were artificially inflated during the Class Period due to Defendants' allegedly material misrepresentations and omissions; (2) the degree of inflation varied throughout the Class Period and decreased with each partial disclosure of adverse information; and (3) the value of the Recognized Loss Claim varies depending on when the claimant bought and/or sold the New Century securities.

148.   As discussed in the Declaration of Professor Seyhun, the Plan of Allocation was based on an initial identification of "corrective disclosure" dates. Using an "event study" methodology, Lead Plaintiff's expert performed a statistical test to assess the statistical significance of the alleged corrective disclosure dates to estimate the actual impact of the corrective disclosures on New Century's securities prices.   Plaintiffs' expert calculated the inflation per share for New Century securities during the Class Period based upon the effect of the corrective disclosures on the price of New Century's securities. *See* Seyhun Decl. ¶¶17-43. Having identified the inflation per share during the Class Period, Plaintiffs' expert was able to isolate those losses which are due to the alleged fraud from those which were caused by market and industry factors or Company-specific factors not related to the fraud.

149.   The Plan of Allocation uses a formula for Recognized Loss Claims which will fairly and reasonably distribute the Settlement proceeds to those Class Members who suffered economic losses as a result of the alleged fraud.  The Plan of Allocation covers the following New Century securities:  (i) Common Stock; (ii) Series A Preferred Stock; (iii) Series B Preferred Stock; and (iv) Call and Put Options on Common Stock.  A New Century security must be held through a Corrective Disclosure in order to be eligible for a recovery in the Settlements.  In other words, a New Century security purchased or otherwise acquired during the first part of the Class Period from May 5, 2005 through February 7, 2007, must be

held until or beyond February 8, 2007, the first trading day after the first corrective disclosure of February 7, 2007. Similarly, a New Century security purchased or otherwise acquired on or after February 8, 2007, and before or on March 2, 2007, must be held until March 5, 2007, the next day after the corrective disclosure on March 2, 2007. Finally, a New Century security purchased or otherwise acquired on or after March 5, 2007, must be held until March 13, 2007, the last day of the Class Period. For shares that are held after the Corrective Disclosures, the Plan of Allocation provides for calculation of recognized loss for New Century shares based on inflation per share at the time of purchase minus the inflation of shares at the time of sale. Plaintiffs' expert determined that the inflation per share was $25.21 for Common Stock purchased between May 5, 2005 and February 7, 2007, $11.09 for Common Stock purchased between February 8, 2007, and March 4, 2007, and $0.69 for Common Stock purchased between May 5, 2007, and March 12, 2007.

150. Analytics, as the Claims Administrator for the Settlements, will determine each Authorized Claimant's *pro rata* share of the Net Settlement Fund based upon each Authorized Claimant's Recognized Loss Claim, calculated in accordance with the Plan of Allocation. Calculation of the Recognized Loss Claim will depend upon several factors, including when the shares were purchased or acquired, and whether they were held until the conclusion of the Class Period or sold during the Class Period, and if so, when they were sold.

151. The Plan of Allocation was designed to fairly and rationally allocate the proceeds of the Settlements among Class Members based on the Corrective Disclosures. Lead Counsel respectfully submits that the Plan of Allocation is fair and reasonable and should be approved. Approval of the Plan of Allocation is also supported by Lead Plaintiff and the other Named Plaintiffs.

## VI.   THE FEE APPLICATION

152.   Lead Counsel achieved a beneficial result for the Class at great risk and expense.   Throughout this litigation, Lead Counsel was committed to the interests of the Class and to investing the full amount of time and resources necessary to bring this litigation to a successful conclusion.

153.   Lead Counsel undertook this litigation on a wholly contingent fee basis for over three years.   From the outset, Lead Counsel understood that it was embarking on a complex, expensive, and probably lengthy litigation with no guarantee of ever being compensated for the investment of time and money the case would require.   In undertaking that responsibility, Lead Counsel was obligated to ensure that sufficient resources were dedicated to the prosecution of the litigation and that funds were available to compensate staff and the considerable out-of-pocket costs that cases like this one entail.

154.   The Notice informed Class Members of Lead Counsel's intent to apply for an award of attorneys' fees in an amount not to exceed 12% of the Settlement Amount, and for reimbursement of litigation expenses in an amount not to exceed $4.5 million, plus interest on such fees and expenses at the same rate as earned by the Settlement Amount.

155.   The requested fee of approximately 11.5% of the Settlement Amount is pursuant to a retainer agreement that was negotiated by Lead Plaintiff NYSTRS, a sophisticated institutional investor at the beginning of the litigation.[7]   Lead Plaintiff agrees that the fee requested is fair, adequate and reasonable.   *See* Schneider Decl. ¶13.

---

[7] The exact fee request is $14,410,933.80, which is approximately 11.5% of the Settlement Amount.  No attorneys' fees in Lead Counsel's request are based upon, or sought with respect to, any disgorgement or penalties obtained by the SEC Action.

156. As explained in the accompanying motion for attorneys' fees and reimbursement of litigation expenses, the requested fee award of approximately 11.5% of the Settlement Amount is a very modest request when compared to other similar securities class actions, and significantly below the Ninth Circuit's 25% benchmark. *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1029 (9th Cir. 1998) ("This Circuit has established 25% of the common fund as a benchmark award for attorney fees"); *Paul, Johnson, Alston & Hunt v. Graulty,* 886 F.2d 268, 272 (9th Cir. 1989) (25% benchmark for fees in the Ninth Circuit).

157. Further, the fee requested is fair, adequate and reasonable because of the significant risks faced by Lead Counsel in pursuing this Action. As discussed above, liability here was far from assured and there were significant risks concerning the damages recoverable even if it were established and diminishing insurance coverage.

158. The fee requested is also fair, adequate and reasonable because the outstanding Settlements were in large part the result of Plaintiffs' Counsel's hard work, persistence and skill. The challenges posed by the size and complexity of the case and the underlying subject matter were enormous. Counsel for Defendants consisted of top-tier national firms and mounted a formidable defense. The risks of litigation, in particular the requirement for Plaintiffs to establish that Defendants caused their loss, combined with the Defendants' rigorous defense, created tremendous pressure on counsel. Only because of the skill, experience and dedication of Plaintiffs' Counsel were Plaintiffs able to mount a strong and vigorous prosecution, which ultimately led to an outstanding recovery of approximately $125 million in cash for the Class. Indeed, Plaintiffs' Counsel expended over 29,251.45 hours in the prosecution and investigation of this litigation. *See.* Exs. F-H. The hours invested by counsel are a testament not only to the large scale of the case, but to Plaintiffs' Counsel's commitment and professional sacrifice to obtain the best possible result for the Class. Having

demonstrated exceptional commitment, perseverance and skill, coupled with an outstanding recovery, Lead Counsel respectfully submits that Plaintiffs' Counsel performed a great service to the Class.  Thus, the fee requested fairly and reasonably rewards Plaintiffs' Counsel's performance.

159.  The fee is also fair, adequate and reasonable when measured based on a lodestar multiplier.  The lodestar multiplier is calculated by (i) dividing the fee requested by (ii) the number of hours counsel billed to the case multiplied by the counsel's standard hourly rate.  The lodestar for the services performed by all Plaintiffs' Counsel here was $12,671,645.25.  *See* Exs. F-H.  This represents a multiplier of only 1.1.  As explained in the accompanying fee and expense application, this multiplier is very reasonable, and courts have recognized that multipliers that are much higher are common.  This case was prosecuted on a fully contingent basis, with no assurance of success, and litigated for over three years without any compensation at all.

160.  In addition, in response to over 50,000 Notices being sent, no Class Member has objected to the fee request.  Finally, there are no pre-existing percentage fee or other fee agreements between Lead Counsel and Plaintiffs' other counsel.  Lead Counsel has already advanced the fees and expenses of bankruptcy counsel (Lowenstein Sandler PC) and Estate Counsel (Loeb & Loeb LLP) in connection with the work they performed in assisting Lead Counsel with respect to the bankruptcy proceedings and the claims against the Estate of deceased defendant, Edward Gotschall.

## VII.  REIMBURSEMENT OF THE REQUESTED EXPENSES AND COSTS IS FAIR AND REASONABLE

161.  Lead Counsel seeks reimbursement of $3,064,348.82 in litigation expenses reasonably and actually incurred by Plaintiffs' Counsel in connection with commencing and prosecuting the claims against the Defendants with interest thereon at the same rate as earned by the Settlement Amount.

162.   From the beginning of the case, Plaintiffs' Counsel were aware that they might not recover any of its expenses, and, at the very least, would not recover anything until the Action was successfully resolved.  Plaintiffs' Counsel also understood that, even assuming that the case was ultimately successful, reimbursement for expenses would not compensate it for the lost use of the funds advanced by it to prosecute this Action.   Therefore, Plaintiffs' Counsel were motivated to, and did, take significant steps to minimize expenses whenever practicable without jeopardizing the vigorous and efficient prosecution of the case.

163.   As set forth in the Summary Schedule attached hereto as Exhibit E, Lead Counsel requests a total of $3,064,348.82 in unreimbursed litigation expenses incurred by Plaintiffs' Counsel in connection with the prosecution of this Action. The declarations of Plaintiffs' Counsel detailing the expenses for which reimbursement is sought are attached hereto as Exhibits F through H.  As set forth in the declarations, these expenses are reflected on the books and records maintained by Plaintiffs' Counsel which are prepared from expense vouchers, check records and other source materials, and are an accurate record of the expenses incurred.  The expenses of Plaintiffs' Counsel for which reimbursement is sought are set forth in detail in the respective firms' declarations, which identify the specific category of expense, *e.g.*, experts' fees, travel costs, photocopying, telephone, fax and postage expenses, and other costs actually incurred.

164.   The litigation expenses for which reimbursement is sought were largely incurred for professional expert fees.  Of the total amount of expenses, $2,116,142.55, or over 69%, was expended on experts in the areas of market efficiency, loss causation, damages, accounting, loan underwriting, underwriters' due diligence, and to assist with the Plan of Allocation.  As discussed more fully below, the expertise and assistance provided by these experts was critical to the prosecution and successful resolution of this Action.

165.   As noted above, Lead Counsel retained accounting experts to analyze New Century's financial statements, audit workpapers, and determine whether New Century's financial statements violated GAAP and whether KPMG's audit was performed in conformity with GAAS.

166.   Similarly, damages experts provided substantial assistance to Lead Counsel in the prosecution and resolution of this Action.   Plaintiffs' damages expert worked closely with Lead Counsel in connection with analyzing the damages suffered by the Class in advance of mediation and in developing a fair and reasonable Plan of Allocation. *See* Seyhun Decl., attached hereto as Ex. D.

167.   These experts were used to oppose KPMG's motion for summary judgment on the loss causation issue and also assisted in the prosecution and settlement of this Action.

168.   Other experts were also required to assess Plaintiffs' claims and Defendants' defenses, including the loan underwriting expert and the underwriting due diligence expert.

169.   The expenses also include the costs of on-line legal and factual research in the total amount of $195,799.56. *See* Ex. E hereto.   These are the charges for computerized factual and legal research services such as *Lexis-Nexis* and *Westlaw*.

170.   Further, Plaintiffs' Counsel were required to travel in connection with prosecuting and mediating this matter and, thus, incurred the related costs of travel tickets, meals, parking and lodging.  Included in the expense request is $34,338.60 for out-of-town travel expenses necessarily incurred for the prosecution of this litigation.

171.   The other expenses for which reimbursement is sought are the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour.  These expenses include, among others, long distance

1   telephone and facsimile charges, postage and delivery expenses, filing fees,

2   photocopying, and document management.[8]

3       172. All of Plaintiffs' Counsel's litigation expenses incurred for which

4   reimbursement is being sought were necessary to the successful prosecution and

5   resolution of the claims against Defendants.   In addition, the Notice apprised

6   potential Class Members that Lead Counsel would seek reimbursement of

7   expenses in an amount not to exceed $4.5 million.   The amount now sought –

8   $3,064,348.82 – is far less than the amount stated in the Notice.   There are no

9   objections to the request for reimbursement of expenses.   Lead Plaintiff NYSTRS

10  has approved of Lead Counsel's request for reimbursement of expenses.

11      173. In addition, under the PSLRA, the Court may also award "reasonable

12  costs and expenses (including lost wages) directly relating to the representation of

13  the class to any representative party serving on behalf of a class."   15 U.S.C. §

14  78u-4(a)(4).  Here, the Notice informed the Class that Lead Counsel would request

15  an award of costs and expenses (including lost wages) incurred by Plaintiffs

16  directly related to their representation of the Class.   Such costs and expenses

17  incurred by Lead Plaintiff NYSTRS are $6,611.27, and such costs and expenses

18  incurred by Plaintiff Hooten are $3,650, for a total of $10,261.27.   The amounts

19  are supported by sworn declarations detailing the incurred expenses.   *See*

20  Schneider Decl. ¶¶15-16; Declaration of Named Plaintiff Charles Hooten in

21  Support of Request for Reimbursement of Litigation Expenses, Ex. I attached

22  hereto, ¶¶3-4.   These costs and expenses are directly related to Plaintiffs'

23

24

25

26  [8] The amount for Outside Copying includes $136,933.50 invoiced from KPMG as
    costs for conversion and copying in connection with its production of documents in

27  this case.  Magistrate Judge Olguin's July 8, 2009 Order allowed KPMG to seek
    costs for this production to Plaintiffs, and pursuant to that Order, KPMG seeks a

28  total of $136,933.50 from Plaintiffs.

representation of the Class and are properly reimbursable from the Settlement Fund. Thus far, no Class Member has objected to the request.

174.   In view of the complex nature of the Action, the litigation expenses incurred were reasonable and necessary to pursue the interests of the Class. Accordingly, Lead Counsel respectfully submits that the expenses are reasonable in amount and should be reimbursed in full.

## VIII.  CONCLUSION

175.   In view of the substantial recovery to the Class, the risks of this Action, the enormous efforts of Plaintiffs and Plaintiffs' Counsel, the quality of work performed, the contingent nature of the fee, the complexity of the case and the standing and experience of Plaintiffs' Counsel, Lead Counsel respectfully submits that the Settlements totaling approximately $125,000,000 should be approved as fair, reasonable and adequate; that the Plan of Allocation should be approved as fair and reasonable; and that a fee in the amount of approximately 11.5% of the Settlement Amount, and expenses in the amount of $3,064,348.82, with interest thereon at the same rate as earned by the Settlement Amount, should be awarded to Lead Counsel and a total of $10,261.27 in expenses should be awarded to Plaintiffs.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 4, 2010          _/s/ Salvatore J. Graziano_____
                                                            Salvatore J. Graziano

**Exhibits to Declaration of Salvatore J. Graziano**

| EXHIBIT | DOCUMENT |
|---------|----------|
| A | Declaration of the Honorable Daniel H. Weinstein |
| B | Declaration of Wayne Schneider in Support of Final Approval of Settlements and Plan of Allocation, and Request for Attorneys' Fees and Reimbursement of Litigation Expenses |
| C | Declaration of Richard W. Simmons:  Notice Dissemination and Publication |
| D | Declaration of H. Nejat Seyhun, Ph.D. |
| E | Summary of All Plaintiffs' Counsel's Expenses |
| F | Declaration of Edward Grossmann in Support of Petition for Attorneys' Fees and Reimbursement of Expenses Filed on Behalf of Bernstein Litowitz Berger & Grossmann LLP |
| G | Declaration of Marvin L. Frank in Support of Lead Counsel's Request for Attorneys' Fees and Reimbursement of Litigation Expenses |
| H | Declaration of Jeffrey C. Zwerling in Support of Lead Counsel's Request for Attorneys' Fees and Reimbursement of Litigation Expenses |
| I | Declaration of Named Plaintiff Charles Hooten in Support of Request for Reimbursement of Litigation Expenses |
| J | LaCroix, Kevin, "First-Filed Subprime Securities Suit Settles for $125 Million" (Aug. 3, 2010) |